**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KATARZYNA FOULGER and | ) | |
| JOHN DOE | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. |
| AVERTEST, LLC, dba Averhealth | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| | ) | |

**<u>COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................................................... 1

THE PARTIES................................................................................................................................. 2

    Plaintiffs........................................................................................................................................ 2

    Defendant..................................................................................................................................... 2

JURISDICTION AND VENUE ................................................................................................... 2

FACTUAL ALLEGATIONS REGARDING DEFENDANT'S LIABILITY .............................. 3

    Overview of Averhealth's drug testing services....................................................................... 3

    Averhealth's Representations About the Accuracy and Speed of Its Testing Services............. 3

    Averhealth's Recognition of the Importance of Accurate Test Results in Family Courts ........ 8

    Averhealth's improper and inaccurate testing services ........................................................... 10

        Averhealth's improper collection services................................................................... 10

        Averhealth's improper testing procedures ................................................................... 15

    Plaintiff Foulger's Experience .................................................................................................. 19

    Plaintiff Doe's Experience ........................................................................................................ 24

COUNT I: NEGLIGENCE under Arizona law ........................................................................... 27

COUNT II: VIOLATION OF ARIZONA CONSUMER FRAUD ACT By MEANS OF UNFAIR PRACTICES ................................................................................................................. 28

COUNT III: VIOLATION OF THE ACFA BY MEANS OF DECEPTION ............................. 30

COUNT IV: VIOLATION OF THE ACFA BY MEANS OF OMISSION OF A MATERIAL FACT ............................................................................................................................................. 33

COUNT V: breach of contract..................................................................................................... 35

COUNT VI: NEGLIGENCE under MASSACHUSETTS law .................................................. 36

JURY DEMAND ......................................................................................................................... 37

PLAINTIFFS KATARZYNA FOULGER and JOHN DOE ("Plaintiffs"), file this Complaint against Defendant Avertest, LLC, d/b/a Averhealth as follows based on personal knowledge of each Plaintiff as to their own actions and on information and belief, based on the investigation of counsel, as to Defendant's conduct and practices.

## INTRODUCTION

1.      Plaintiffs bring this action for damages with respect to drug tests conducted by Averhealth on samples that they submitted in connection with child custody proceedings conducted in connection with their divorce cases. As set forth herein, the tests performed by Averhealth were not conducted according to acceptable and appropriate standards of toxicology, due to Averhealth's failure to follow accepted and proper procedures in collecting the samples and its failure to employ proper quality control methods and standards in its testing. Accordingly, the results obtained from the tests of Plaintiffs' samples were not based on proper data and science, and thus were not scientifically meaningful; to the contrary, they reported positive results, indicative of illegal drug use, even though neither Plaintiff has ever used illegal drugs.

2.      As Averhealth knows, individuals who submit to its drug tests depend on the tests as being fair and accurate, and severe consequences often arise when individuals test positive for a substance. Thus, adhering to proper quality control standards is of the utmost importance. But as set forth herein, Averhealth prioritized the speed in which it returned test results to its customers over ensuring that proper testing methods were followed.

3.      In addition, Defendant did not utilize proper collection methods for the samples that purportedly tested positive.

4.      Defendant's actions as alleged herein breached its duty of care to perform its tests pursuant to accepted protocols, such that the tests are accurate and reliable.

1

## THE PARTIES

### Plaintiffs

5.     Plaintiff Katarzyna Foulger is a resident and citizen of the State of Arizona. She tested positive for illegal substances that she had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate collection and testing protocols and methods.

6.     Plaintiff John Doe is a resident and citizen of the Commonwealth of Massachusetts. He tested positive for an illegal substance that he had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate collection and testing protocols and methods. "John Doe" is not his real name. He is using it in public filings in this case because of the possibility of serious consequences if knowledge of his false positive drug results became public. He will disclose his real name to the Defendant pursuant to an appropriate protective order in this case.

### Defendant

7.     Defendant Avertest, LLC, dba Averhealth ("Averhealth"), is a Virginia limited liability corporation, with its principal place of business at 2916 W. Marshall St., Suite A, Richmond, VA 23230. Its registered agent in Missouri is CSC-Lawyers Incorporating Company, 221 Bolivar Street, Jefferson City, MO 65101.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because (a) there is complete diversity of citizenship in that Plaintiffs are citizens of Arizona and Massachusetts, respectively, and Defendant is a citizen of Virginia; and (b) the matter in controversy exceeds the sum or value of $75,000.

9.     This Court has personal jurisdiction over Defendant because Defendant purposefully conducts activities in the State of Missouri and the litigation "arises[] out of or

relate[s] to Defendant's contacts with" Missouri. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) (internal quotation marks omitted).

10.     Specifically, as Averhealth states on its website, "[a]ll samples ship to [Averhealth's] laboratory in St. Louis," which is where it performs its analysis of samples.[1] Its laboratory is located at 4709 LaGuardia Drive, Ste. 100, St. Louis, MO 63134. Averhealth tested all of Plaintiffs' samples in that laboratory and issued its false positive reports there.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, specifically the drug testing at Defendant's laboratory in this district.

## FACTUAL ALLEGATIONS REGARDING DEFENDANT'S LIABILITY

### Overview of Averhealth's drug testing services

12.     Averhealth performs drug testing services to over 550,000 individuals in the United States whom it refers to as clients,[2] including individuals such as Plaintiffs who are involved in child custody proceedings in connection with divorce cases. It conducts tests based on the following specimen types: urine, hair, oral fluid, and sweat. *Id.*

### Averhealth's Representations About the Accuracy and Speed of Its Testing Services

13.     On its website, Averhealth repeatedly boasts about its laboratory. For example, it states that its laboratory "is one of only 30 labs with accreditation by College of American Pathologists-Forensic Drug Testing (CAP-FDT) and accredited by the U.S. Department of Health and Human Services Clinical Laboratory Improvements Amendment (CLIA) and the

---

[1] https://averhealth.com/court-programs/ (accessed 7/15/2022) ("serving more than 550,000 active clients and 2,700 programs nationwide").
[2] https://averhealth.com/our-laboratory/ (accessed 5/11/2022).

Drug Enforcement Agency (DEA)."[3] It adds that its laboratory "is operated by PhD-and Masters-level toxicologists." *Id*. See this screenshot:



14.     It also boasts that it conducts scientifically valid and forensically defensible methodologies:



15.     Averhealth even goes beyond touting its supposed valid methodologies to claim that it "delivers the industry's most accurate and timely testing." *Id*. (emphasis added).

---

[3] https://averhealth.com/our-laboratory/ (accessed 5/11/2022).



16.     Averhealth also boasts about its data and intelligence and what it calls its "most accurate and timely testing":[4]





17.     Averhealth publicly describes the methods it claims to follow. It states that "[s]amples that initially screen positive are reflexed for a second screen using a new aliquot. The specimen is reported as positive if the reactions of the first and second tests are statistically similar." *Id.*



18.     Averhealth states that these methods provide "better precision and sensitivity." *Id.*



19.    Averhealth also touts its "Next Business Day Results," which it claims is a "full day faster that most lab-based testing companies."[5]



---

[5] https://averhealth.com/providers/?msclkid=fb033e8dd15911ec865bdadda54370f3 (accessed 5/11/2022).

7

**Averhealth's Recognition of the Importance of Accurate Test Results in Family Courts**

20.     Averhealth knows how important it is that its tests be accurate. In Averhealth's

blog post entitled "Why Accurate Results Are So Important," it states that "[a]ccurate and

reliable testing results are crucial" and that "there are real life implications for inaccurate tests."[6]



21.     Avertest adds that "drug test results can be a driver for incentives and sanctions"

and "[w]hen those consequences … are not in line with reality due to a false positive or negative,

the impact on participants can be profound. . . . [T]ests need to be accurate" *Id.*

---

[6] https://averhealth.com/why-accurate-results-are-so-important/ (accessed 5/11/2022).



22.     Furthermore, Averhealth states that "one of the most potentially harmful things that can happen as a result of a false positive is the separation of parents from children. Not only does this hurt the parent, both emotionally and psychologically, but it can hurt the child even more." *Id*.



**Averhealth's improper and inaccurate testing services**

23.     Contrary to its claim that it delivers the industry's "most accurate" testing, Averhealth's test results are in fact riddled with inaccuracies based on comprehensive and widespread failures to follow accepted protocols.

24.     Averhealth provided inaccurate test results regarding Plaintiffs for two separate reasons.

25.     First, it used improper collection methods.

26.     Second, its laboratory used improper testing methods.

**Averhealth's improper collection services**

27.     According to the Society of Hair Testing, a worldwide network of scientists involved in drug testing in hair that has published guidance documents relating to the examination of drugs and doping agents in hair, proper collection procedures call for collection to be undertaken within a secure contamination-free facility with access restrictions in place, for the collector to wear gloves when handling hair, and for the collection kit to include foil and a collection envelope for securing the hair.[7]

28.     In addition, according to a Hair Collection Manual on the website of the National Drug & Alcohol Screening Association, a membership organization in the drug and alcohol testing industry, the shears used to cut the subject's hair "should be thoroughly sterilized" with alcohol wipes.[8]

---

[7] Gail A.A. Cooper, Robert Kronstrand and Pascal Kintz, *Society of Hair Testing guidelines for drug testing in Hair*, 218 Forensic Science International 20 (2012),

[8] https://ndasa.com/wp-content/uploads/2020/12/Hair-CollectionManual_Psychemedics.pdf (accessed 8/3/2022); *see also* David M. Ledgerwood *et al.*, *Comparison between self-report and hair analysis of illicit drug use in a community sample of middle-age men*, 33 Addict. Behav. 1131 (2008), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2495080/pdf/nihms-59586.pdf (accessed 8/3/2022), describing a hair test study for illicit drug use by scientists from Washington University in St. Louis and other universities in which "[p]recautions to avoid contamination of hair samples were taken including the interviewer wearing a head cap and the use of surgical gloves and sterilized scissors." *Id.* at 4.

29.     As Plaintiff Doe observed, Averhealth did not follow these procedures. When he visited Averhealth's Lawrence and Boston facilities to provide samples, the facilities were dirty and were not secure with access restrictions in place, as required by the Society of Hair Testing.

30.     Plaintiff Doe appeared for his first Averhealth test, on August 23, 2019, at Avertest's Lawrence, Massachusetts, facility, which was filthy. On that occasion, the collector violated a number of proper collection procedures. She cut Plaintiff Doe's hair in the presence of other individuals who were laughing with her during the procedure. The collector never sterilized or sanitized her scissors. After she cut Plaintiff Doe's hair, rather than secure the hair with foil and a sealed collection envelope, as required by the Society of Hair Testing, she stuck his hair to a piece of tape.

31.     On later occasions, Plaintiff Doe reported to Averhealth's Boston facility to provide his samples. Until October 2019, the Boston facility was not only dirty, but it was disorganized with samples strewn around on a desk, and paperwork, gloves and other equipment scattered everywhere.

32.     On or about October 2, 2019, Plaintiff Doe reported to Averhealth's Boston office for a urine test. There was a woman present auditing the procedures to make sure everything was done properly. She was making changes in how Averhealth collected urine and hair to assure that poor collection methods did not impair the results.

33.     Subsequently, when Plaintiff Doe came to the Boston facility for testing, he observed that they were cleaned up and its operations were better organized.

34.     When Plaintiff Doe reported to Averhealth's Boston location for a urine test on October 16, 2019, there was a new collector, named Gerald Carino. Mr. Carino told Plaintiff Doe that collections would now be done with additional steps to ensure accuracy. He also said that

Averhealth had just fired almost everyone working in its collection centers for engaging in bad collection practices.

35.     From then on, Plaintiff Doe did not observe problems with Averhealth's collection practices. The Boston facility, where he reported for all his subsequent tests, was then cleaner and better organized, with test samples stacked neatly in a corner and gloves and test cups arranged neatly in another.

36.     Plaintiff Doe reported what he observed both to the Massachusetts Probation Service ("MPS"), which was overseeing his drug testing program on behalf of the Massachusetts Probate and Family Court, and to Averhealth.

37.     On October 16, 2019, after leaving the Averhealth Boston facility, Plaintiff Doe emailed Scott Goldberg of the MPS, the probation officer assigned to him:

> I just left Averhealth in Boston to submit my urine. A new guy was working doing the test. His name was Gerald. He informed me that the test would be done with additional steps to ensure it's done accurate. He also said Averhealth just fired almost everyone working in their testing centers for inappropriate testing procedures when collecting samples.

38.     That same day, Plaintiff Doe began writing to Averhealth to report what he had seen. Among others, he emailed Jason Herzog, co-founder and CEO; Michele Glinn, Laboratory Director; Ken Freedman, chief medical officer; Dominique Delagnes, Chief Operating Officer; Jeff Herr, co-founder and Chief Information Officer; Nick Runge, Director of Operations; Justin Manne, Director of Business Development; and Sean Shea, Business Development Director.

39.     For example, on October 16, 2019, he sent an email to Messrs. Freedman, Herr, Herzog, Runge, and Manni, Ms. Delagnes, and Dr. Glinn. That email reads:

> Averhealth leadership team,
>
> I hope you are all doing well. My name is [deleted]. My PIN is [deleted]. I am currently enrolled in testing through the Norfolk Probate Court. I am going through a divorce and this is part of the current custody order.

I wanted to inform you of some bad practices I have witnessed at the Lawrence location. Along with issues from the Boston location. I was also informed today that there were a bunch of people let go from Averhealth due to how they were conducting the sample collection.

On August 23 I submitted a hair follicle test at the Lawrence location. The woman that took my sample grabbed scissors from her desk. She never sanitized them. She then cut three massive bald spots on the front of my head as she laughed with other people around us. She then stuck my sample to masking tape. Never secured the sample. Never put it in an envelope. Never had me initial it. The results came back on 8/30 positive for cocaine.

On 8/30 I went to ARCpoint labs and submitted another hair follicle and a toe nail test. Both came back negative.

The judge would not accept my tests from ARCpoint and ordered me back to Averhealth. On 9/17 I went back to Averhealth in Boston. I submitted the sample. On 9/23 we received results back. They said the sample was infected with lice. Impossible. It came from my leg.

On 9/23 I submitted a third test in Boston with Averhealth. The results came back on 9/24. Positive again for cocaine.

I have never used cocaine. These results are not accurate. I also lost my overnights with my children and now my visitation is supervised. I also was disgusted with how the samples were collected at Averhealth vs ARCpoint.

The news today about employees being let go and seeing the test center changed its procedures made me want to reach out to you. Could you elaborate on what is going on?

40.     On October 17, 2019, Plaintiff Doe wrote back to the Averhealth Leadership team asking if they had received his email from the day before.

41.     Plaintiff Doe received only two responses to these emails, neither of them substantive.

42.     One individual stated that she had no responsibility for the division in which the Lawrence and Boston locations are located.

43.     In addition, on October 17, Averhealth's director of operations, Nick Runge, wrote Mr. Doe that Averhealth had looked into his concerns and had "provided information to

13

our customer, Massachusetts Probation Services. Any further concerns should be addressed to

your Probation Officer."

44.     Inexplicably, Mr. Runge provided no information to Plaintiff Doe. Considering

that Mr. Doe's concerns were with Averhealth and not the MPS, there was no apparent reason

why Averhealth was unwilling to communicate with him directly.

45.     Moreover, despite what Mr. Runge had said, Relator's probation officer, Scott

Goldberg, told Mr. Doe that he had received no information from Averhealth regarding these

concerns.

46.     On October 23, 2019, Plaintiff Doe again wrote Averhealth's leadership team,

stating:

> Averhealth leadership team,
>
> Here are the results from my nail test done with ARCPOINT. I paid them to retest
> the samples at cutoff levels lower than Averhealth's 100. This is also a toe nail
> test with a 12 month look back vs 6 months for hair. As you can see in this test
> there is no cocaine present.

47.     Once again, no one responded. In all, Averhealth has never, either directly,

provided a substantive response to Plaintiff Doe's concerns or questions.

48.     Averhealth states that its core values include treating all clients with respect,

taking accountability of its actions and work, exercising honesty in all its communications, and

incorporating quality and accuracy into its work:[9]

---

[9] https://averhealth.com/compliance/ (accessed 8/15/2022).

14



49.     The above facts show that those "core values" are a sham. As noted above,

Averhealth counts Plaintiff Doe among its clients.[10] Had it treated all clients with respect and

taken accountability for its actions and work, it would have provided substantive responses to

Plaintiff Doe's concerns when he inquired. Had it exercised honesty in all of its communications,

Mr. Goldberg would not have stated that he had received no response from Averhealth regarding

Plaintiff Doe's concerns. Had Averhealth been reliable and incorporated quality and accuracy

into its work, it would not have given false positives to Plaintiff Doe and would not have

provided the ludicrous rejection of his hair sample on the ground that it was infected with lice.

**Averhealth's improper testing procedures**

50.     As set forth herein, significant problems with Averhealth's quality control

practices, which did not meet guidelines established by the College of American Pathologists for

forensic drug testing ("CAP"), render the results of its tests essentially meaningless.

---

[10] *See* Paragraph 12, *supra.*

51.     Contrary to its claim that it delivers the industry's "most accurate" testing, Averhealth's test results are in fact riddled with inaccuracies based on comprehensive and widespread failures to follow accepted collection and testing protocols.

52.     The facts set forth in this section are largely generally based on information provided by Sarah Riley, Ph. D., DABCC, FACB, a clinical chemist and toxicologist. She is Associate Professor of Pathology and Medical Director of Clinical Toxicology at St. Louis University Hospital. In addition to toxicology, Dr. Riley has extensive training in laboratory management and quality control processes. She is a Diplomate of the American Board of Clinical Chemistry, a Fellow of the National Academy of Clinical Biochemistry, and past Chief Fellow in Clinical Chemistry, Department of Pathology and Immunology at Washington University School of Medicine. She is also involved in many professional organizations including Organization of Scientific Area Committees (OSAC), which develops quality procedure standards for the field of toxicology. She is an award-winning mass spectrometrist with international recognition.

53.     Dr. Riley has first-hand knowledge of these facts, not just because of her expertise, but because of her experience as Laboratory Director at Averhealth, a position she resigned because Averhealth would not change its faulty practices. Dr. Riley provided a summary of these facts in a Michigan child custody case, *In the matter of B.K and M.B.*, File No. 76442—1/2—NA (Thirtieth Judicial Circuit Mich., Family Division), (full names of minor children redacted).

54.     As set forth herein, significant problems with Averhealth's quality control practices, which did not meet guidelines established by the College of American Pathologists for forensic drug testing ("CAP"), render the results of its tests essentially meaningless.

55.     For an acceptable quality control scheme, samples with known concentrations, or "quality controls," should be tested alongside the patients' samples. The results of these quality controls should match the expected value within at least 20% for the entire run of patient samples to be scientifically acceptable.

56.     Averhealth's quality controls consistently failed, yet the test results were still reported. Moreover, technical staff would manipulate data to force quality controls to be within the acceptable range. Some manipulations included changing the internal standards used and changing the regression of the calibration curve (addressed further below).

57.     Furthermore, to ensure that the preparation of a sample is correct, an internal standard should be used. An internal standard is a compound that is similar to the compound of interest; thus, in toxicology, it is usually a drug with isotopes (elemental differences) distinct from the drug of interest. Notably, it is a substance not likely to occur in hair or urine being tested.

58.     Internal standards are added to the sample at the beginning of the sample preparation process and at the end of the analytical process the result of the internal standard is compared to an expected value. If the comparison is good, then the sample can be analyzed. But if it is not a good comparison or if the internal standard is not detected, the results of the specimen analysis should not be used and the sample should be prepared again.

59.     Thus, the internal standard ensures that the output numbers from the test are accurate, because the results should show the exact quantity of the internal standard placed into the test. As an example, if 5ng/ml (nanograms per milliliter) of an internal standard are put into a test, the results should show 5ng/ml of that internal standard.

60.     However, Averhealth did not follow the proper process as to internal standards. Instead, Averhealth used test results even where the results supposedly showed that an internal standard that was used *did not exist*.

61.     There were also serious problems with the calibration curves that Averhealth used for its tests.

62.     As Averhealth states, "[a] quantitative test, also known as a confirmation, compares an unknown sample against a defined numerical range. The defined range is based on a calibration curve with five to seven data points. The calibration curve can give a definitive amount of a drug that is present in the sample. The interpretation of the result is not just positive or negative, but also 'how much.'"[11]

63.     More specifically, a calibration curve is a series of samples with known concentrations that span a range of concentrations of a particular drug. Each calibrator would have an increasing amount of a particular drug. It should be prepared and analyzed with every batch of patient specimens. Prior to analyzing the patient specimens, the calibration curve should be analyzed for accuracy, including the coefficient of determination, which measures variance around the regression line of the curve. This is important to the accuracy of the patients' results because the regression of the curve is used to determine the concentrations of drugs in the patients' samples. Without a proper calibration curve, concentration numbers are nothing more than an educated guess.

64.     Averhealth frequently and consistently used calibration curves that failed to meet acceptance criteria and/or manipulated data, yet Averhealth reported the patients' results anyway. One frequent method used to manipulate data was to pull calibration curve data from

---

[11] https://averhealth.com/drug-test-cutoff-levels-not-what-you-think/ (accessed 2/12/2021).

runs going back days to weeks in order to find a curve that was within the acceptance criteria. It would then use this "historical" curve, which is not an acceptable practice by the CAP guidelines.

65.     Furthermore, quality controls should be used to verify that the calibration curve worked. For example, one quality control should be low for a particular drug and one high. If the calibration curve works, the result would show the low result and high result. However, Averhealth did not properly follow this use of quality controls to verify the calibration curves that they used in their tests.

66.     In her testimony in Michigan in *B.K and M.B.*, Dr. Riley summarized her reasons for concluding that Averhealth did not follow proper laboratory methods and stated that, based on her experience, as many as 30 percent of the laboratory results that Averhealth did for the State of Michigan were false.

67.     Instead of conducting its tests with proper internal standards, quality controls, and calibration curves, Averhealth prioritized the speed of its results, consistent with its above claim that it gets results faster than other companies. But as Averhealth's above statements about why accurate results are so important show, speed should not come at the expense of proper quality control practices.

**Plaintiff Foulger's Experience**

68.     Beginning in December 2021, Plaintiff Foulger was ordered by the Superior Court of Maricopa County, Family Department, in connection with her divorce proceeding, to undergo drug testing by Averhealth.

69.     The first such order occurred on December 13, 2021, when Ms. Foulger was ordered by to submit to a drug test by Averhealth at her expense.

70.     Accordingly, on that same date, she reported to Averhealth's Phoenix AZ – Central location and signed a "Donor Testing Agreement," in which Averhealth promised "to competently perform" its testing services. (Exhibit A [handwritten markings were on the document when Ms. Foulger received it]). Pursuant to that agreement, Ms. Foulger submitted to a drug test, for which she paid $145, by providing a hair sample to Averhealth as ordered by the court and submitted to other drug tests on later dates for which she paid.

71.     The Averhealth facility was filthy on that date and every other occasion when she has been there, with a dirty floor and dusty surfaces. The collector did not know how to open the Ziploc bag for her hair sample and tore it in doing so. Ms. Foulger had to show him how to open the bag.

72.     On December 17, 2021, Ms. Foulger obtained a drug test of her hair on her own from an independent laboratory, Fastest Labs of Scottsdale. That test was negative for all tested substances, including cocaine and opiates.

73.     Subsequently, Ms. Foulger received two tardy, incorrect and bafflingly inconsistent results of the test that Avehealth had run on her hair sample.

74.     On January 2, 2022, at 05:24, Averhealth reported that it had received her December 13 sample on December 15, 2021, and that Ms. Foulger had tested positive for cocaine and 6-MAM, a unique metabolite of heroin. Those results were false. Plaintiff Foulger has never used cocaine or heroin.

75.     As noted above, Averhealth represents that it provides "next day results," a day faster than other laboratories. However, this report was provided 20 days after Ms. Foulger provided her hair sample.

76.     On January 3, 2022, the day after receiving the above false positives from Averhealth, she again arranged for an independent test on a hair sample, this time from Omega Laboratories. Like the other independent test, this one was negative, including for cocaine and opiates.

77.     Then, three days after receiving the first positive test report from Averhealth, on January 5, 2022, at 16:58, Averhealth issued a *second report* on Ms. Foulger's December 13 hair sample, with no explanation for why there were two reports on the same test. This time, it reported that Ms. Foulger had tested positive for cocaine and *negative* for 6-MAM.

78.     Although Ms. Foulger raised this inconsistency with Averhealth in a phone call, she never received an explanation for it. However, both reports are inaccurate. As noted above, she has never used cocaine or heroin (or any other illegal drug).

79.     After providing her hair sample for an independent test on January 3, 2022, as noted above, she left for a brief vacation in Sedona. There she went to the closest Averhealth facility, which was in Cottonwood, to be retested. However, the woman at that location told her that she would have to go back to Averhealth's Phoenix Central location for a retest. That employee also told her that she could request that her hair sample be returned for independent testing; however, the woman said she would have to call the laboratory for that.

80.     Plaintiff Foulger could not find a phone number for Averhealth's laboratory, so she called customer service and spoke to an individual named Michael Giraldo, who told her that yes, she could obtain a return of her hair sample and advised her to ask her local center to have the lab return it.

81.     Accordingly, Plaintiff Foulger went to Averhealth's Phoenix Central location, where she was told she should contact the laboratory for a return of her hair sample.

21

82.     Again, she called customer service and got through to Mr. Giraldo. However, this time the story was different. This time he said that, although Averhealth retained other samples, such as urine, it *destroyed* all hair samples after testing. He provided no explanation for why that was or why he had purportedly given her incorrect information in the first call.

83.     Mr. Giraldo said he would ask a manager to call her to explain. No one did.

84.     On January 13, 2022, Ms. Foulger wrote Averhealth's customer service:

My name is Katarzyna Foulger. I had a drug hair follicle test done on the 13th of December 2021 and I got positive result on the 01/02/2022 first one. Then from the same hair I'm receiving second test result on the 01/05/2022 also positive but only for one drug. I've been told by your colleague that the time to test the hair in the lab is 7 to 10 days I received my one after 2.5 weeks and the second one after 3 weeks. I have to state that I don't do drugs at all and there is error in your system and error with the person who did test my hair. I called twice and talk to Michael Giraldo to request my hair sample and he gave me two different information. Also he took a notes for the manager of the facility and said he will contact me as soon as possible. And that was 01/12/2022. Today is 01/13/2022 and I still haven't heard from anyone. Tried to called numerous time and no answer. Still waiting to hear from the manager!

85.     No one from Averhealth responded to the email.

86.     On January 31, 2022, because of the positive test reported by Averhealth, the Court issued a further order for drug testing of Ms. Foulger. She was ordered to undergo random urine testing beginning on February 4, 2022, on at least a weekly basis at $10.50 per test.

87.     Every morning, Ms. Foulger was required to phone Averhealth to determine whether she must appear for testing on that day. If so, it would take an average of a half an hour to drive to and from the location each way and she spent an average of 45 minutes at Averhealth, for a total of an hour and 45 minutes per testing session on average. Contrary to the court order, Averhealth charged her $11.00 for the test.

88.     Between February 4, 2022, and April 3, 2022, Plaintiff Foulger had nine negative drug tests administered by Averhealth.

89.     According to the Court's guidelines, a no-show is considered a positive test. Averhealth also falsely reported that she was a no-show on two occasions during this period. This was false. She was never a no-show. Here is why:

90.     She was under an order to report for testing once a week. On Thursday, February 10, 2022, the day after she had reported for testing (and obtained a negative result), Averhealth somehow reported that she was a no-show. That was false because she had already received her test that week.

91.     Again, on Tuesday, February 15, 2022, she appeared for testing (and obtained a negative result). Nevertheless, Averhealth falsely reported her as a no-show for that week on Saturday, February 19, 2022.

92.     On her next visit, the Averhealth employee asked her if anyone from Averhealth had ever explained that she was supposed to call every day with a "PIN" number to find out if she was supposed to come in that day. She said no, and he then printed out a PIN number for her. From then on, she was never a "no-show."

93.     Because of those two supposed no-shows, Plaintiff Foulger was ordered to submit to additional weekly random urine tests for two months beginning by May 20, 2022.

94.     During that period, Plaintiff Foulger had seven negative tests, and Averhealth reported that two tests, those based on samples provided on May 30 and July 1, showed abnormal levels of creatinine.

95.     Those supposedly abnormal tests were either false positives based on Averhealth's unreliable procedures or were mistakenly not based on her samples. Plaintiff Foulger was taking no illegal drugs during that period (or any other period).

96.     The report on the sample collected on May 30 states that it was Plaintiff Foulger's sample, but that is incorrect because the time of collection shown on the report, 12:06:00 was not when she submitted her sample. She submitted her sample at 12:30 p.m., the same time as her husband, who accompanied her.

97.     Likewise, the report of the sample collected on July 1, 2022, that states that it was Plaintiff Foulger's sample is incorrect. The report states that the sample was collected at 12:01 p.m., but Plaintiff Foulger produced her sample at 12:10 p.m.

98.     After receiving the false positive creatinine test on the May 30 sample, Plaintiff Foulger voluntarily submitted to a urine test on June 2, 2022, at Fastest Labs of Scottsdale. That test was reported as negative on June 6.

99.     On July 7, 2022, the same day she received the false positive creatinine test on the July 1 sample, Plaintiff voluntarily submitted to a hair follicle test with D.R.S. Medical Review Service. That test was reported as negative on July 8, 2022.

100.    Because of the inaccurate positive test results and the accusation that it meant she was an illegal drug user, Plaintiff suffered substantial emotional distress, including anxiety, stress and sleeplessness, ever since she received her first false positive result. That is especially the case because, as a result of her false positive drug test, she has had to continue to undergo drug testing and had no confidence that the results would be accurate. In addition, the false positive test result caused her to have to incur substantial legal fees in her child custody case.

**Plaintiff Doe's Experience**

101.    In August and September 2019, Mr. Doe paid for and submitted to drug tests of his hair by Averhealth as ordered by the Norfolk, Massachusetts, Probate and Family Court in his child custody case with his wife.

102. His first test was based on a sample of hair that he provided at Averhealth's Lawrence, Massachusetts, location on or about August 23, 2019.

103. The report of that test, dated August 29, 2019, showed that it was positive for cocaine with a level of 325.67 pg/mg compared to a cut-off of 100 pg/mg. This result was not accurate. Mr. Doe has never consumed cocaine.

104. The next day, August 30, 2019, Mr. Doe voluntarily submitted to a drug test of his hair and toenail samples, including testing for cocaine, at an independent laboratory, Arcpoint Labs in Southboro, Mass. That test came back negative on September 5, 2019.

105. The median half-life of cocaine in hair is 1.5 months in males.[12] In toenails, cocaine remains for 8-14 months.[13] That means that, if the Avertest result had been accurate, cocaine would have been found in the Arcpoint hair and nail samples taken one week later. Because it wasn't, the Averhealth test was inaccurate.

106. Plaintiff next provided a hair sample taken in Averheath's Boston location on September 17, 2019. On September 19, 2019, Averhealth reported that the sample was "REJECTED" because "sample infected with lice." That report was absurd and impossible. Not only did Mr. Doe not have head lice at the time, but his sample was taken from his *leg* because the Averhealth representative said he did not have enough hair on his head to take a sample.

107. Mr. Doe also submitted to testing at Averhealth's Boston location on September 23, 2019, where a hair sample was taken from his other leg. That test came back positive for cocaine.

---

[12] F Garcia-Bournissen F, Moller M, Nesterenko M, Karaskov T, Koren G., *Pharmacokinetics of disappearance of cocaine from hair after discontinuation of drug use*, 189 Forensic Sci. Int. 24 (2009).
[13] Markus R. Baumgartner, *Nails: an adequate alternative matrix in forensic toxicology for drug analysis?*, 6 Bioanalysis 2189 (2014).

108.    That test was not accurate. As stated above, Mr. Doe has never consumed cocaine.

109.    As described above, Averhealth used improper procedures to collect Mr. Doe's hair samples on the above occasions.

110.    As described above, beginning on October 16, 2019, the date that Averhealth's new collector, Gerald Carino, told him that Averhealth was changing its collection procedures and had fired most of its collection personnel, Mr. Doe began writing to the Massachusetts Probation Service ("MPS"), which was overseeing his drug testing program on behalf of the Massachusetts Probate and Family Court, and Averhealth to report what he had observed. As also described above, Averhealth never gave him a substantive response, either directly or indirectly through his MPS officer, Scott Goldberg.

111.    Averhealth's false positive results have had a devastating impact on Mr. Doe, including substantial emotional distress over being regarded as a drug user. They also caused the court to order that Mr. Doe could see his two young daughters only with supervision. They caused the court to order him to undergo frequent unscheduled urine and hair drug tests until August 2020. He was called without notice at any hour of the day to report to Averhealth to provide a sample. In all, between his second "positive" result in September 2019 and August 2020, he was tested nearly 50 times. To provide those samples, he had to leave his office without notice for 1-2 hours at a time, and his work suffered as a consequence. As a result, he was demoted and sustained a large loss of income. Other than his two "positive" hair tests in August and September 2019, all of his tests were negative, including a hair test in April 2020, except for one urine test positive for marijuana (Mr. Doe had a medical marijuana card at the time).

## COUNT I: NEGLIGENCE  (PLAINTIFF FOULGER)

112.    Plaintiffs incorporate by reference paragraphs 1-111 of this Complaint as if fully set forth herein, and further allege as follows.

113.    Averhealth owed Plaintiff Foulger a duty of care to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

114.    By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached its duty of care to Plaintiff Foulger.

115.    That breach caused Plaintiff to test positive for substances that she had not taken and thereby caused Plaintiff Foulger injury.

116.    As a result, Plaintiff Foulger suffered damages in an amount to be determined at trial.

117.    As set forth above, Averhealth knew of the consequences from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate collection protocols and quality control methods in its testing would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Foulger.

118.    WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT II: VIOLATION OF ARIZONA CONSUMER FRAUD ACT BY MEANS OF UNFAIR PRACTICES (PLAINTIFF FOULGER)

119.    Plaintiff Foulger incorporates by reference paragraphs 1-111 of this Complaint as if fully set forth herein, and further alleges as follows.

120.    The actions of Defendant alleged herein violated, and continue to violate, the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 ("ACFA"), because they constitute unfair practices.

121.    The ACFA, § 44-1522, states in relevant part:

A. The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

***

C. It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1).

Ariz. Rev. Stat. § 44-1522

122.    The ACFA defines "merchandise" to include services. Ariz. Rev. Stat.§ 44-1521.5. Averhealth's testing services thus constitute merchandise under that definition.

123.    The ACFA defines "person" to include any foreign corporation or company. Ariz. Rev. Stat.§ 44-1521.6. Averhealth is therefore a person under the statute.

124.    Plaintiff is entitled to bring this action under the ACFA because Arizona courts imply a private right of action to enforce the statute. Sellinger v. Freeway Mobile Home Sales, Inc., 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

125.    Plaintiff entered into an agreement with Defendant for its drug testing services and paid for such services in Arizona.

28

126.    As alleged herein, Defendant committed unfair practices in violation of the ACFA by not using proper and accepted methods of collection and testing, and Defendant's conduct proximately caused Plaintiff Foulger to suffer damages.

127.    As noted above, in interpreting the ACFA, courts are to be guided by the interpretation of 15 U.S.C. § 45 (Section 5 of the F.T.C. Act) by the Federal Trade Commission and courts. The F.T.C. and courts interpret that statute to outlaw unethical practices. *See* F.T.C. Policy Statement on Unfairness. Thus, pursuant to the ACFA, Defendant has a duty not to engage in any unethical practice in connection with its testing services.

128.    Averhealth's collection and testing practices are unethical under ethical standards promulgated by the American Marketing Association ("AMA"), the nation's leading marketing organization with over 38,000 members[14] and 65 professional chapters in North America, including St. Louis and Richmond, VA, where Averhealth is headquartered.[15]

129.    The AMA "commits itself to promoting the highest standard of professional ethical norms and values . . . ." Exhibit B. As such, it has published its "Statement of Ethics." *Id.* AMA states that "marketers are expected to embrace the highest professional ethical norms and the ethical values implied by our responsibility toward multiple stakeholders (e.g., customers . . . )." *Id.* Thus, the Statement of Ethics contains "Ethical Norms," which "are established standards of conduct that are expected and maintained by society and/or professional organizations." *Id.*

130.    The AMA's Ethical Norms state that marketers must "[e]mbrace ethical values." Accordingly, AMA has also published "Ethical Values," which represent what is "morally

---

[14] https://www.jstor.org/publisher/ama#:~:text=The%20American%20Marketing%20Association%20(AMA,in%20every%20area%20of%20marketing (accessed 8/10/2022).
[15]  https://www.ama.org/ama-member-benefits/ (accessed 8/10/2022).

proper." *Id.* AMA states that marketers' Ethical Values include honesty, meaning "[h]onoring our explicit and implicit commitments and promises."

131. By not honoring its explicit and implicit commitments to perform its testing competently, to utilize accepted and appropriate protocols in collecting and analyzing her samples, including by failing to employ proper collection and quality control methods and standards as set forth herein, as well as its implicit commitment, as shown on its website, to avoid false positives, Averhealth violated this ethical value.

132. Plaintiff Foulger thereby suffered ascertainable loss by paying for tests that were not fair and accurate and by suffering serious emotional consequences from positive tests results that were improperly obtained from her samples.

133. Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff Foulger in an amount to be determined at trial.

134. Defendant's unfair and unethical acts and practices in violation of the ACFA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff Foulger.

135. WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## <u>COUNT III: VIOLATION OF THE ACFA BY MEANS OF DECEPTION (PLAINTIFF FOULGER)</u>

136. Plaintiff Foulger incorporates by reference paragraphs 1-111 of this Complaint as if fully set forth herein, and further allege as follows.

137. The actions of Defendant alleged herein violated, and continue to violate, the ACFA because they constitute deception.

30

138.     The ACFA, § 44-1522,  states in relevant part:

A. The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

                                        ***

C. It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1).

Ariz. Rev. Stat. § 44-1522

139.     The ACFA defines "merchandise" to include services. Ariz. Rev. Stat.§ 44-1521.5. Averhealth's testing services thus constitute merchandise under the statute.

140.     The ACFA defines "person" to include any foreign corporation or company. Ariz. Rev. Stat.§ 44-1521.6. Averhealth is therefore a person under the statute.

141.     Plaintiff is entitled to bring this action under the Arizona Consumer Fraud Act because Arizona courts imply a private right of action to enforce the statute. *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

142.     Plaintiff entered into an agreement with Defendant for its drug testing services and paid for such services in Arizona.

143.     As alleged herein, Defendant committed deception in violation of the ACFA  by not using proper and accepted methods of collection and testing, and Defendant's conduct proximately caused Plaintiff Foulger to suffer damages.

144.     Pursuant to the ACFA, Defendant has a duty not to engage in any deception in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

145.    Advertising the high quality and accuracy of its drug tests as set forth above and then failing to utilize accepted and appropriate collection methods and protocols in analyzing her samples, including by failing to employ proper quality control methods and standards as set forth herein constitutes deception under the ACFA.

146.    Defendant's statements advertising the high quality and accuracy of its drug tests, as set forth above, have the tendency to convey mislead.

147.    The reason the Superior Court of Maricopa County, Family Department, required that Averhealth be the laboratory to perform drug tests on Plaintiff Foulger is that Averhealth engaged in deception in representing that it would follow accepted and appropriate collection methods and protocols in analyzing her samples, including by failing to employ proper quality control methods and standards.

148.    Plaintiff Foulger thereby suffered ascertainable loss by paying for tests that were not accurate and by suffering serious emotional consequences from positive tests results that were improperly obtained from her samples.

149.    Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff Foulger in an amount to be determined at trial.

150.    Defendant's deceptive acts and practices in violation of the ACFA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff Foulger.

151.    WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT IV: VIOLATION OF THE ACFA BY MEANS OF OMISSION OF A MATERIAL FACT (PLAINTIFF FOULGER)

152.     Plaintiff Foulger incorporates by reference paragraphs 1-111 of this Complaint as if fully set forth herein, and further allege as follows.

153.     The actions of Defendant alleged herein violated, and continue to violate, the ACFA because they constitute omission of a material fact.

154.     The ACFA, § 44-1522, states in relevant part:

A. The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

***

C. It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1).

Ariz. Rev. Stat. § 44-1522

155.     The ACFA defines "merchandise" to include services. Ariz. Rev. Stat.§ 44-1521.5. Averhealth's testing services thus constitute merchandise under the statute.

156.     The ACFA defines "person" to include any foreign corporation or company. Ariz. Rev. Stat.§ 44-1521.6. Averhealth is therefore a person under the statute.

157.     Plaintiff is entitled to bring this action under the Arizona Consumer Fraud Act because Arizona courts imply a private right of action to enforce the statute. Sellinger v. Freeway Mobile Home Sales, Inc., 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

158.     Plaintiff entered into an agreement with Defendant for its drug testing services and paid for such services in Arizona.

159.    As alleged herein, Defendant made omissions in violation of the ACFA, and Defendant's conduct proximately caused Plaintiff Foulger to suffer damages.

160.    Pursuant to the ACFA, Defendant has a duty not to omit material facts in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

161.    As set forth above, Defendant was aware of its failure to use accepted and appropriate protocols in its drug tests, including its failure to use proper collection and quality control methods and standards. Even if Defendant had been unaware of such failures, which it was not, the lack of proper quality control methods in its drug tests would have been known to it upon reasonable inquiry.

162.    The failure of the use of accepted and appropriate protocols in its sample collections and drug tests is a material fact, because a reasonable consumer would likely consider it important to know, when submitting to a drug test, that the test is not conducted according to accepted and appropriate protocols.

163.    Furthermore, the failure of the use of accepted and appropriate protocols in Defendant's sample collections and drug tests is also a material fact because the Superior Court of Maricopa County, Family Department would undoubtedly be induced to change its decision to require the use of Averhealth testing based on knowing that it is not conducted according to such accepted and appropriate protocols.

164.    Despite Defendant's knowledge that its drug tests were not conducted according to accepted and appropriate protocols, Defendant omitted any reference of such failures to Plaintiff Foulger and, on information and belief, the Superior Court of Maricopa County, Family Department. Plaintiff Foulger's information and belief is based on the logical principle that

nobody would agree to drug tests by a laboratory that revealed that it did not use accepted and appropriate protocols.

165.    Accordingly, Defendant's provision of drug tests that were not conducted according to accepted and appropriate protocols to Plaintiff Foulger, without first disclosing the failure of its tests to employ accepted and appropriate protocols, constitutes omission of a material fact under the ACFA.

166.    Plaintiff Foulger thereby suffered ascertainable loss by paying for tests that were not fair and accurate and by suffering serious consequences from positive tests results that were improperly obtained from her samples as set forth above.

167.    Defendant's omissions have directly, foreseeably, and proximately caused loss, damages and injury to Plaintiff Foulger.

168.    Defendant's omissions in violation of the ACFA were performed willfully and wantonly, were outrageous and were done in reckless indifference to the rights of Plaintiff Foulger

169.    WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT V: BREACH OF CONTRACT (PLAINTIFF FOULGER)

170.    Plaintiff Foulger incorporates by reference paragraphs 1-111 of this Complaint as if fully set forth herein, and further alleges as follows.

171.    Plaintiff Foulger and Averhealth entered into a written contract dated December 13, 2021, entitled, "Donor Testing Agreement."

172.    Pursuant to that preprinted contract, Plaintiff Foulger agreed, among other things, to participate in Avertest's testing and collection process, to appear at an approved location for

testing on dates to be determined and to pay a pre-determined test fee for each test, and Averhealth agreed "to competently perform" sample collection and testing.

173.   Plaintiff fully performed under the contract by appearing for sample collection when required and paying the pre-determined fee for each test.

174.   Averhealth breached the contract by failing to perform sample collection and testing competently, as set forth above.

175.   Averhealth's breach resulted in damages to Plaintiff Foulger, both actual damages in the amount she paid for testing and consequential damages in amounts to be determined.

176.   WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT VI: NEGLIGENCE (PLAINTIFF DOE)

177.   Plaintiffs incorporate by reference paragraphs 1-111 of this Complaint as if fully set forth herein, and further allege as follows.

178.   Averhealth owed Plaintiff Doe a duty of reasonable care to collect and analyze his samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

179.   By failing to collect and analyze his samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

180.   That breach caused Plaintiff Doe to test positive for substances that he had not taken and thereby caused him injury.

181.    As a result, Plaintiff Doe suffered damages, in an amount to be determined at trial.

182.    As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate collection protocols and quality control methods in its testing would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Doe.

183.    WHEREFORE, Plaintiff Doe prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment against Defendant as follows:

1.    Awarding actual damages against Defendant in amounts to be determined;

2.    Awarding injunctive relief as permitted by law or equity, including a preliminary and permanent injunction enjoining Defendant from continuing the unlawful practices as set forth herein;

3.    Awarding punitive damages against Defendant as the Court deems necessary or proper;

4.    Awarding pre-judgment and post-judgment interest;

5.    Awarding reasonable attorneys' fees and costs herein, as allowed by law;

6.    Awarding such other and further relief as the Court deems fit and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Dated: August 22, 2022                    Respectfully submitted,

**LAW OFFICE OF RICHARD S. CORNFELD, LLC**

By: _ /s/Richard S. Cornfeld_____
Richard S. Cornfeld, #31046
Daniel S. Levy, #66039
Law Office of Richard S. Cornfeld, LLC
1010 Market Street, Suite 1645
St. Louis, Missouri 63101
P. 314-241-5799
F. 314-241-5788
rcornfeld@cornfeldlegal.com
dlevy@cornfeldlegal.com

And

Anthony S. Bruning, #30906MO
Anthony S. Bruning, Jr., #60200MO
Ryan L. Bruning, #62773MO
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
P. 314-735-8100 / F. 314-898-3078
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

And


J.C. Pleban, MO Bar No. 63166
jc@plebanlaw.com
C. John Pleban, Mo. Bar No. 24190
cpleban@plebanlaw.com
Pleban & Associates Law, LLC
2010 South Big Bend Blvd.
St. Louis, MO  63117
(314) 645-6666 - Telephone
(314) 645-7376 – Facsimile

And

Mike Arias, #115385(CA)
Arnold Wang, #204431(CA)
Craig S. Momita #163347(CA)
Arias Sanguinetti Wang & Torrijos, LLP

6701 Center Drive West, 14th Floor
Los Angeles, California 90045
Tel: (310) 844-9696 / Fax: (310) 861-0168
mike@aswtlawyers.com
arnold@aswtlawyers.com
craig@aswtlawyers.com
(*pro hac vice* admission to be sought)

**Attorneys for Plaintiffs**