**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KATARZYNA FOULGER, DAVID SHNITZER, TIFFANI PADILLA, STEPHEN PADILLA, RANDI HEKKEMA, JOSEPH HEKKEMA, ALEXANDRA HODOR, and NICOLE WHITE, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:22-CV-00878 |
| AVERTEST, LLC, dba Averhealth | ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

## AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................... 1

II.  THE PARTIES ............................................................................................................... 4

   A.  Plaintiffs ................................................................................................................ 4

   B.  Defendant ............................................................................................................... 5

III.  JURISDICTION AND VENUE ..................................................................................... 5

IV.  FACTUAL ALLEGATIONS REGARDING DEFENDANT'S LIABILITY .................. 6

   A.  Overview of Averhealth's Drug Testing Services ................................................. 6

      1.  Averhealth's Representations About the Accuracy and Speed of Its Testing Services .. 7

      2.  Averhealth's Recognition of the Importance of Accurate Test Results ...................... 12

   B.  Averhealth's Improper and Inaccurate Testing Services ................................... 14

      1.  Averhealth's Improper Collection Services ................................................. 14

      2.  Averhealth's Improper Testing Procedures ................................................. 20

      3.  The College of American Pathologists' Support of Dr. Riley's Allegations ............... 24

      4.  The State of Michigan's Suspension of Averhealth for Improper Testing Practices ... 33

         a.  MDHHS's 2021 investigation that erroneously upheld Averhealth's practices ..... 37

            i.  Concerns are raised over the accuracy of Averhealth's testing, including by Michigan's judges .................................................................................. 37

            ii.  MDHHS responds to the courts' concerns ............................................ 41

            iii.  MDHHS begins to investigate Averhealth ........................................... 46

            iv.  Averhealth attempts to defend itself .................................................... 47

            v.  MDHHS hires Wagner Toxicology to audit Averhealth's practices ................... 48

            vi.  Wagner issues a flawed report ........................................................... 50

            vii.  Averhealth attempts to influence MDHHS, the judges and Wagner ................... 55

            viii.  MDHHS accepts the Wagner conclusions; judges disagree ................................. 63

  b.  CSA's suspension of Averhealth for improper testing practices ............................ 66

  i.  MDHHS learns of federal and state investigations of Averhealth for medical fraud ........................................................................................................................................... 68

  ii.  MDHHS suddenly suspends Averhealth ............................................................ 77

  iii.  MDHHS stops using past Averhealth test results for any purpose ...................... 81

  iv.  MDHHS investigates the concerns that led to the suspension and reviews thousands of positive Averhealth test results ........................................................ 83

  v.  CSA scrambles to find substitute testing services ............................................... 88

  vi.  MDHHS extends the Averhealth suspension and then makes it permanent ......... 90

V.  PLAINTIFFS' EXPERIENCES ...................................................................................... 91

 A. Katarzyna Foulger ........................................................................................................ 91

 B. David Shnitzer ............................................................................................................... 97

 C. Tiffani and Stephen Padilla .......................................................................................... 99

 D. Randi and Joseph Hekkema ........................................................................................ 115

 E. Plaintiff Alexandra Hodor ........................................................................................... 123

 F. Plaintiff Nicole White .................................................................................................. 127

VI.  COUNT I: NEGLIGENCE UNDER ARIZONA LAW (PLAINTIFF FOULGER) ...... 130

VII.  COUNT II: VIOLATION OF ARIZONA CONSUMER FRAUD ACT BY MEANS OF UNFAIR PRACTICES (PLAINTIFF FOULGER) ...................................................... 131

VIII.  COUNT III: VIOLATION OF THE ACFA BY MEANS OF DECEPTION (PLAINTIFF FOULGER) ...................................................................................................................... 133

IX.  COUNT IV: VIOLATION OF THE ACFA BY MEANS OF OMISSION OF A MATERIAL FACT (PLAINTIFF FOULGER) ............................................................... 136

X.  COUNT V: BREACH OF CONTRACT (PLAINTIFF FOULGER) ............................ 138

XI.  COUNT VI: NEGLIGENCE UNDER MASSACHUSETTS LAW (PLAINTIFF SHNITZER) ................................................................................................................... 139

XII.  COUNT VII: VIOLATION OF MASSACHUSETTS' CHAPTER 93A BY MEANS OF UNFAIR PRACTICES (PLAINTIFF SHNITZER) ...................................................... 140

XIII.    COUNT VIII: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF TIFFANI PADILLA) ................................................................................................................. 143

XIV.    COUNT IX: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF STEPHEN PADILLA) ................................................................................................................. 144

XV.    COUNT X: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF RANDI HEKKEMA) ............................................................................................................... 144

XVI.    COUNT XI: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF JOSEPH HEKKEMA) ............................................................................................................... 145

XVII.    COUNT XII: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF ALEXANDRA HODOR) ................................................................................................................... 146

XVIII. COUNT XIII: NEGLIGENCE UNDER MASSACHUSETTS LAW (PLAINTIFF NICOLE WHITE) ........................................................................................................... 147

XIX.    JURY DEMAND ...................................................................................................... 148

XX.    PRAYER FOR RELIEF ........................................................................................... 148

PLAINTIFFS KATARZYNA FOULGER, DAVID SHNITZER, TIFFANI PADILLA, STEPHEN PADILLA, RANDI HEKKEMA, JOSEPH HEKKEMA ALEXANDRA HODOR, and NICOLE WHITE (collectively "Plaintiffs"), file this Complaint against Defendant Avertest, LLC, d/b/a Averhealth ("Averhealth"), based on personal knowledge of each Plaintiff as to his or her own actions and on information and belief, based on counsel's investigation, as to Defendant's conduct and practices.

I. **<u>INTRODUCTION</u>**

1. Plaintiffs bring this action for damages with respect to drug tests performed by Averhealth that they underwent in connection with child custody proceedings. Averhealth did not conduct these tests according to acceptable and appropriate standards, due to its failure to follow accepted and proper procedures in collecting samples and its failure to employ proper quality control methods and other procedures in its testing. Consequently, the results it obtained from the tests on Plaintiffs were not based on proper data and science, and thus were not scientifically meaningful or accurate; to the contrary, Averhealth reported positive results on Plaintiffs, indicative of illegal drug use, even though Plaintiffs were not using illegal drugs.

2. As Averhealth knows, individuals who submit to its drug tests depend on the tests' fairness and accuracy, and severe consequences arise when they test positive for an illegal substance. Thus, adhering to proper collection and testing standards is of the utmost importance. But as set forth herein, Averhealth failed to follow proper collection and testing methods.

3. Plaintiffs' allegations are supported by many sources.

4. One such source is Sarah Riley, Ph. D., Associate Professor of Pathology and Medical Director of Clinical Toxicology at Saint Louis University School of Medicine. From September to November 2020, Dr. Riley was Laboratory Director of Averhealth, with day-to-day oversight of the laboratory and responsibility for specimen testing and reporting. She saw first-

hand the inadequate testing procedures at Averhealth and resigned when management would not make corrections.

5.     Following her resignation from Averhealth, Dr. Riley submitted a complaint about its practices to the College of American Pathologists ("CAP"), Averhealth's accrediting body, in November 2020. After giving Averhealth two opportunities to respond, CAP's scientists did a thorough evaluation of Dr. Riley's four allegations and found that they were all substantiated.

6.     CAP put Averhealth on probation on January 27, 2021, because of the laboratory's unacceptable quality assurance of mass spectrometry confirmatory testing, its failure to follow procedures as written, its manipulation of instrument calibrations, and its inadequate quality control. The probation was not lifted until July 28, 2021 when Averhealth corrected its many problems. Even then, the move was made subject to continual special rigorous requirements of submitting corrective actions and evidence of Quality Control review.

7.     Those findings were not made public at the time. They were not disclosed for nearly two years until they were produced by the Michigan Department of Health and Human Services in response to Plaintiffs' counsel's Freedom of Information Act Request. However, while it was on probation, Averhealth continued to claim falsely that CAP had approved its practices and had rejected Dr. Riley's allegations. To this day, it has never disclosed that it was put on probation by CAP, much less mention the serious violations CAP found.

8.     The inadequacy of Averhealth's laboratory procedures is also recognized by the Michigan Department of Health and Human Services ("MDHHS") and its Children's Services Agency ("CSA"). Until March 7, 2022, under a $27 million five-year contract that began in May 2019, Averhealth was the laboratory they used for drug testing in child custody proceedings. The

State's Children's Protective Services ("CPS"), a part of MDHHS, would take the serious step of removing children from their parents' homes when Averhealth reported parents' positive results for illegal drugs. That happened in more than 11,000 cases, including those of Plaintiffs Tiffani and Stephen Padilla, Randi and Joseph Hekkema, and Alexandra Hodor.

9.    In March 2022, MDHHS learned that U.S. and Michigan authorities were investigating Averhealth for medical fraud based on Averhealth's years-long violation of national accreditation standards. So serious were those violations that MDHHS discontinued using Averhealth.

10.    Moreover, MDHHS's action was not only prospective. It also decided it could not – and therefore would not – use any *past* Averhealth results in any proceeding for any purpose.

11.    Because, on information and belief, Averhealth was not performing tests for MDHHS differently than in any other states, the same deficiencies affect its tests throughout the United States.

12.    Moreover, so utterly shoddy were Averhealth's testing methods that in early 2021 it unknowingly tested a sample *consisting of pure water* and erroneously reported that it contained fentanyl, an illegal opiate. As described below, video evidence proves that this was a sample of pure water and Averhealth's test report proves that it purported to find fentanyl in it.

13.    In addition, where Defendant's employees collected samples, they did not follow proper collection methods. Averhealth knew that. In or about October 2019, it fired most of its collectors in at least some parts of Massachusetts and instituted new collection methods. But that was too late for one of the Plaintiffs, David Shnitzer, who lost unsupervised contact with his children after Averhealth reported a false positive on his improperly collected sample.

14.     Defendant's actions as alleged herein breached its duty of care to follow proper collection and testing protocols, such that the tests are accurate and reliable.

15.     Plaintiffs bring this action to recover damages for the serious and sustained injuries they suffered because of Averhealth's shockingly faulty drug testing.

## II.     **THE PARTIES**

### A.     **Plaintiffs**

16.     Plaintiff Katarzyna Foulger is a resident and citizen of the State of Arizona. She tested positive for illegal substances that she had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate collection and testing protocols and methods.

17.     Plaintiff David Shnitzer is a resident and citizen of the Commonwealth of Massachusetts. He tested positive for an illegal substance that he had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate collection and testing protocols and methods. In the original complaint in this case, Mr. Shnitzer was identified under the pseudonym "John Doe." David Shnitzer is his real name.

18.     Plaintiff Tiffani Padilla is a resident and citizen of the State of Michigan. She tested positive for illegal substances that she had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

19.     Plaintiff Stephen Padilla is a resident and citizen of the State of Michigan. He tested positive for illegal substances that he had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

20.     Plaintiff Randi Hekkema is a resident and citizen of the State of Michigan. She tested positive for illegal substances that she had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

21.     Plaintiff Joseph Hekkema is a resident and citizen of the State of Michigan. He tested positive for illegal substances that he had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

22.     Plaintiff Alexandra Hodor is a resident and citizen of the State of Michigan. She tested positive for illegal substances that she had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

23.     Plaintiff Nicole White is a resident and citizen of the Commonwealth of Massachusetts. She tested positive for an illegal substance that she had not consumed in a test conducted by Defendant Averhealth that did not follow appropriate collection and testing protocols and methods.

**B.      Defendant**

24.     Defendant Avertest, LLC, dba Averhealth ("Averhealth"), is a Virginia limited liability corporation, with its principal place of business at 2916 W. Marshall St., Suite A, Richmond, VA 23230. Its registered agent in Missouri is CSC-Lawyers Incorporating Company, 221 Bolivar Street, Jefferson City, MO 65101. It conducted the drug tests at issue in this case at its laboratory in Missouri.

## III.    JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because (a) there is complete diversity of citizenship in that Plaintiff Foulger is a citizen of Arizona; Plaintiffs Shnitzer and White are citizens of Massachusetts; Plaintiffs Tiffani and Stephen Padilla, Randi and Joseph Hekkema, and Alexandra Hodor are citizens of Michigan; and Defendant is a citizen of Virginia; and (b) the matter in controversy exceeds the sum or value of $75,000.

26. This Court has personal jurisdiction over Defendant because Defendant purposefully conducts activities in the State of Missouri and the litigation "arises[] out of or relate[s] to Defendant's contacts with" Missouri. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) (internal quotation marks omitted).

27. Specifically, as Averhealth states on its website, "[a]ll samples ship to [Averhealth's] laboratory in St. Louis," which is where it performs its tests.[1] Its laboratory is located at 4709 LaGuardia Drive, Ste. 100, St. Louis, MO 63134. Averhealth tested all of Plaintiffs' samples in that laboratory and issued its false positive reports there.

28. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, specifically the drug testing at Defendant's laboratory in this district.

## IV. FACTUAL ALLEGATIONS REGARDING DEFENDANT'S LIABILITY

### A. Overview of Averhealth's Drug Testing Services

29. Averhealth performs drug testing services to over 520,000 individuals in the United States whom, as quoted below, it calls "our clients" or simply "clients":

> "Since 1995, we have been seamlessly integrating every element of our clients' monitoring needs including collections, laboratory services, results reporting, and every step in between."[2]

> "Now, more than ever, we believe our clients should continue to be tested and that their program is evidence-based."[3]

> "We provide care that clients view as safe, trustworthy, supportive, collaborative, empowering, and empathetic. It is part of our values to treat clients with respect and dignity."

---

[1] https://averhealth.com/court-programs/ (accessed 7/15/2022) ("serving more than 550,000 active clients and 2,700 programs nationwide").
[2] https://averhealth.com/job-openings/ (accessed 1/6/2023).
[3] https://blog.averhealth.com/the-twin-pandemic (accessed 1/6/2023).

"Averhealth partners with probation, parole, pretrial supervision programs, treatment courts and social service agencies serving more than 550,000 active clients and 2,700 programs nationwide. "[45]

"2021: Averhealth has 600 employees serving more than 520,000 active clients in 34 states."[6]

These clients include individuals such as Plaintiffs who are involved in child custody proceedings. It conducts tests based on the following specimen types: urine, hair, oral fluid, and sweat. *Id*.

### 1. Averhealth's Representations About the Accuracy and Speed of Its Testing Services

30.     On its website, Averhealth repeatedly boasts about its laboratory. For example, it states that its laboratory "is **one of only 30 labs** with accreditation by College of American Pathologists-Forensic Drug Testing (CAP-FDT) and accredited by the U.S. Department of Health and Human Services Clinical Laboratory Improvements Amendment (CLIA) and the Drug Enforcement Agency (DEA)."[7] It adds that its laboratory "is operated by PhD-and Masters-level toxicologists." *Id*. See this screenshot:

---

[4] https://averhealth.com/clients/ (accessed 1/6/2023).
[5] https://averhealth.com/court-programs/ (accessed 12/27/2022).
[6] https://averhealth.com/about/ (accessed 1/6/2023).
[7] https://averhealth.ccaom/our-laboratory/ (accessed 5/11/2022).



The Averhealth laboratory is one of only 30 labs within the United States with accreditation by College of American Pathologists-Forensic Drug Testing (CAP-FDT) and accredited by the U.S. Department of Health and Human Services Clinical Laboratory Improvements Amendment (CLIA) and the Drug Enforcement Agency (DEA). Located in St. Louis, Missouri, our laboratory is operated by PhD- and Masters-level toxicologists.

31.     It also boasts that it conducts scientifically valid and forensically defensible methodologies (*id.*):



Averhealth tests for over 1,500 substances across urine, breath, oral fluid, and hair using laboratory instruments and applying scientifically valid and forensically defensible methodologies that satisfy Daubert and Frye legal standards and fulfill CAP-FDT specifications.

"scientifically valid and forensically defensible methodologies."

32.     Averhealth even goes beyond touting its supposed valid methodologies to claim that it "delivers the industry's most accurate and timely testing." *Id.* (emphasis added).



33.    Averhealth also brags about its data and intelligence and what it calls its "most accurate and timely testing":[8]



---

[8] Averhealth.com (accessed 6/9/2022)



34.     Averhealth publicly describes the methods it claims to follow. It states that "[s]amples that initially screen positive are reflexed for a second screen using a new aliquot. The specimen is reported as positive if the reactions of the first and second tests are statistically similar." *Id.*



35.     Averhealth states that these methods provide "better precision and sensitivity." *Id.*



Confirmation testing is conducted via LC-MS/MS, a methodology that exceeds GC/MS standards. This method allows for greater compound coverage, including designer and synthetic substances, better precision and sensitivity, and faster panel expansion to adapt to changing substance use trends.

"better precision and sensitivity"

36.     Averhealth also touts its "Next Business Day Results," which it claims is a "full day faster than most lab-based testing companies."[9]



[9] https://averhealth.com/court-programs/ (accessed 12/27/2022).

### 2. Averhealth's Recognition of the Importance of Accurate Test Results

37. Averhealth knows how important it is that its tests be accurate. In Averhealth's blog post entitled "Why Accurate Results Are So Important," it states that "[a]ccurate and reliable testing results are crucial" and that "there are real life implications for inaccurate tests."[10]



38. Avertest adds that "drug test results can be a driver for incentives and sanctions" and "[w]hen those consequences … are not in line with reality due to a false positive or negative, the impact on participants can be profound. . . . [T]ests need to be accurate" *Id.*

---

[10] https://averhealth.com/why-accurate-results-are-so-important/ (accessed 5/11/2022).



In treatment court, drug test results can be a driver for incentives and sanctions. When those consequences, good or bad, are not in line with reality due to a false positive or negative, the impact on participants can be profound. A false positive can engender learned helplessness, whereas a false negative can endanger public health and delay interventions. Holding someone accountable to a test only reinforces the idea that tests need to be accurate. This is something often lacking from instant tests.

> "[T]he impact on participants [from false positives or negatives] can be profound."

> "[T]ests need to be accurate."

39.     Furthermore, Averhealth states that "one of the most potentially harmful things that can happen as a result of a false positive is the separation of parents from children. Not only does this hurt the parent, both emotionally and psychologically, but it can hurt the child even more." *Id*. (blue highlighting added).



**Losing children to foster care.** One of the most potentially harmful things that can happen as a result of a false positive is the separation of parents from children. Not only does this hurt the parent, both emotionally and psychologically, but it can hurt the child even more. Parents in treatment courts

**B.     Averhealth's Improper and Inaccurate Testing Services**

40.     Contrary to its claim that delivers the industry's "most accurate" testing, Averhealth's test results are in fact riddled with inaccuracies based on comprehensive and widespread failures to follow accepted standards.

41.     Averhealth provided inaccurate test results regarding Plaintiffs for two separate reasons.

42.     First, where it collected the samples itself, it used improper collection methods.

43.     Second, its laboratory used improper testing methods.

**1.   Averhealth's Improper Collection Services**

44.     According to the Society of Hair Testing, a worldwide network of scientists involved in drug testing in hair that has published guidance documents relating to the examination of drugs and doping agents in hair, proper collection procedures call for collection to be undertaken within a secure contamination-free facility with access restrictions in place, for the collector to wear gloves when handling hair, and for the collection kit to include foil and a collection envelope for securing the hair.[11]

45.     In addition, according to a Hair Collection Manual on the website of the National Drug & Alcohol Screening Association, a membership organization in the drug and alcohol testing industry, the shears used to cut the subject's hair "should be thoroughly sterilized" with alcohol wipes.[12]

---

[11] Gail A.A. Cooper, Robert Kronstrand and Pascal Kintz, *Society of Hair Testing guidelines for drug testing in Hair*, 218 Forensic Science International 20 (2012),

[12] https://ndasa.com/wp-content/uploads/2020/12/Hair-CollectionManual_Psychemedics.pdf (accessed 8/3/2022); *see also* David M. Ledgerwood *et al.*, *Comparison between self-report and hair analysis of illicit drug use in a community sample of middle-age men*, 33 Addict. Behav. 1131 (2008), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2495080/pdf/nihms-59586.pdf (accessed 8/3/2022), describing a hair test study for illicit drug use by scientists from Washington University in St. Louis and other universities in which "[p]recautions to avoid contamination of hair samples were taken including the interviewer wearing a head cap and the use of surgical gloves and sterilized scissors." *Id.* at 4.

46.     As Plaintiff Shnitzer observed, Averhealth did not follow these procedures. When he visited Averhealth's Lawrence and Boston facilities to provide samples, the facilities were dirty and were not secure with access restrictions in place, as required by the Society of Hair Testing.

47.     Mr. Shnitzer appeared for his first Averhealth test, on August 23, 2019, at Avertest's Lawrence, Massachusetts, facility, which was filthy. On that occasion, the collector violated a number of proper collection procedures. She cut Plaintiff Shnitzer's hair in the presence of other individuals who were laughing with her during the procedure. The collector never sterilized or sanitized her scissors. After she cut Mr. Shnitzer's hair, rather than secure the hair with foil and a sealed collection envelope, as required by the Society of Hair Testing, she stuck his hair to a piece of tape.

48.     On later occasions, Mr. Shnitzer reported to Averhealth's Boston facility to provide his samples. Until October 2019, the Boston facility was not only dirty, but it was disorganized with samples strewn around on a desk, and paperwork, gloves and other equipment scattered everywhere.

49.     On or about October 2, 2019, Mr. Shnitzer reported to Averhealth's Boston office for a urine test. There was a woman present auditing the procedures to make sure everything was done properly. She was making changes in how Averhealth collected urine and hair to assure that poor collection methods did not impair the results.

50.     Subsequently, when Mr. Shnitzer came to the Boston facility for testing, he observed that they were cleaned up and its operations were better organized.

51.     When Mr. Shnitzer reported to Averhealth's Boston location for a urine test on October 16, 2019, there was a new collector, named Gerald Carino. Mr. Carino told Mr. Shnitzer

that collections would now be done with additional steps to ensure accuracy. He also said that Averhealth had just fired almost everyone working in its collection centers for engaging in bad collection practices.

52.     From then on, Mr. Shnitzer did not observe problems with Averhealth's collection practices. The Boston facility, where he reported for all his subsequent tests, was then cleaner and better organized, with test samples stacked neatly in a corner and gloves and test cups arranged neatly in another.

53.     However, improper collection practices continued elsewhere in Massachusetts, as Plaintiff White observed in the Dartmouth facility in January 2020. The facility was dirty and was not secure with access restrictions in place, as required by the Society of Hair Testing. To the contrary, Ms. White was required to provide her sample in the facility's waiting room in the presence of many other people, who were laughing, talking and walking around. The Averhealth collector simply appeared with a pair of pair of scissors, which was not in a sealed container or bag, and did not sanitize or sterilize the scissors before using it; after she cut Plaintiff's hair, she secured it to tape rather than wrapping it in aluminum foil. Discovery may reveal other improper aspects of the collection procedure.

54.     Plaintiff Shnitzer reported what he observed both to the Massachusetts Probation Service ("MPS"), which was overseeing his drug testing program on behalf of the Massachusetts Probate and Family Court, and to Averhealth.

55.     On October 16, 2019, after leaving the Averhealth Boston facility, Mr. Shnitzer emailed Scott Goldberg of the MPS, the probation officer assigned to him:

> I just left Averhealth in Boston to submit my urine. A new guy was working doing the test. His name was Gerald. He informed me that the test would be done with additional steps to ensure it's done accurate. He also said Averhealth just

fired almost everyone working in their testing centers for inappropriate testing procedures when collecting samples.

56.     That same day, Mr. Shnitzer began writing to Averhealth to report what he had

seen. Among others, he emailed Jason Herzog, co-founder and CEO; Michele Glinn, Laboratory

Director; Ken Freedman, chief medical officer; Dominique Delagnes, Chief Operating Officer;

Jeff Herr, co-founder and Chief Information Officer; Nick Runge, Director of Operations; Justin

Manne, Director of Business Development; and Sean Shea, Business Development Director.

57.     For example, on October 16, 2019, he sent an email to Messrs. Freedman, Herr,

Herzog, Runge, and Manni, Ms. Delagnes, and Dr. Glinn. That email reads:

> Averhealth leadership team,
>
> I hope you are all doing well. My name is David Shnitzer. My PIN is [deleted]. I am currently enrolled in testing through the Norfolk Probate Court. I am going through a divorce and this is part of the current custody order.
>
> I wanted to inform you of some bad practices I have witnessed at the Lawrence location. Along with issues from the Boston location. I was also informed today that there were a bunch of people let go from Averhealth due to how they were conducting the sample collection.
>
> On August 23 I submitted a hair follicle test at the Lawrence location. The woman that took my sample grabbed scissors from her desk. She never sanitized them. She then cut three massive bald spots on the front of my head as she laughed with other people around us. She then stuck my sample to masking tape. Never secured the sample. Never put it in an envelope. Never had me initial it. The results came back on 8/30 positive for cocaine.
>
> On 8/30 I went to ARCpoint labs and submitted another hair follicle and a toe nail test. Both came back negative.
>
> The judge would not accept my tests from ARCpoint and ordered me back to Averhealth. On 9/17 I went back to Averhealth in Boston. I submitted the sample. On 9/23 we received results back. They said the sample was infected with lice. Impossible. It came from my leg.
>
> On 9/23 I submitted a third test in Boston with Averhealth. The results came back on 9/24. Positive again for cocaine.

I have never used cocaine. These results are not accurate. I also lost my overnights with my children and now my visitation is supervised. I also was disgusted with how the samples were collected at Averhealth vs ARCpoint.

The news today about employees being let go and seeing the test center changed its procedures made me want to reach out to you. Could you elaborate on what is going on?

58.     On October 17, 2019, Mr. Shnitzer wrote back to the Averhealth Leadership team asking if they had received his email from the day before.

59.     Mr. Shnitzer received only two responses to these emails, neither of them substantive.

60.     One individual stated that she had no responsibility for the division in which the Lawrence and Boston locations are located.

61.     In addition, on October 17, Averhealth's director of operations, Nick Runge, wrote Mr. Shnitzer that Averhealth had looked into his concerns and had "provided information to our customer, Massachusetts Probation Services. Any further concerns should be addressed to your Probation Officer."

62.     Inexplicably, Mr. Runge provided no substantive information to Mr. Shnitzer. Considering that Mr. Shnitzer's concerns were with Averhealth and not the MPS, there was no apparent reason why Averhealth was unwilling to communicate with him directly.

63.     Moreover, contrary to what Mr. Runge had said, Mr. Shnitzer's probation officer, Scott Goldberg, told Mr. Shnitzer that he had received no information from Averhealth regarding these concerns.

64.     On October 23, 2019, Mr. Shnitzer again wrote Averhealth's leadership team, stating:

Averhealth leadership team,

Here are the results from my nail test done with ARCPOINT. I paid them to retest the samples at cutoff levels lower than Averhealth's 100. This is also a toe nail test with a 12 month look back vs 6 months for hair. As you can see in this test there is no cocaine present.

65.    Once again, no one responded. In all, Averhealth has never, either directly or indirectly, provided a substantive response to Mr. Shnitzer's concerns or questions. That silence continued after this lawsuit was filed.

66.    Averhealth states that its core values include treating all clients with respect, taking accountability of its actions and work, exercising honesty in all its communications, and incorporating quality and accuracy into its work:[13]



67.    The above facts show that those "core values" are a sham. As noted above, Averhealth counts Mr. Shnitzer among its clients.[14] Had it treated all clients with respect and taken accountability for its actions and work, it would have provided substantive responses to Mr. Shnitzer's concerns when he inquired. Had it exercised honesty in all of its communications, Mr. Goldberg would not have stated that he had received no response from Averhealth regarding

---

[13] https://averhealth.com/compliance/ (accessed 8/15/2022).
[14] *See* Paragraph 29, *supra.*

Mr. Shnitzer's concerns. Had Averhealth been reliable and incorporated quality and accuracy into its work, it would not have given false positives to Mr. Shnitzer and would not have provided the ludicrous rejection of his hair sample on the ground that it was infected with lice.

68.     Averhealth's improper collection procedures continued even after it improved them in its Lawrence and Boston locations, as Plaintiff Nicole White's experience attests. *See* Paragraph 53, *supra.*

69.     Similarly, as described below, Plaintiff Foulger experienced improper collection procedures in Averhealth's Arizona facilities in 2022.

### 2.  Averhealth's Improper Testing Procedures

70.     As set forth herein, significant problems with Averhealth's laboratory practices, which did not meet guidelines established by the College of American Pathologists for forensic drug testing ("CAP"), render the results of its tests essentially meaningless.

71.     Contrary to its claim that it delivers the industry's "most accurate" testing, Averhealth's test results are in fact riddled with inaccuracies based on comprehensive and widespread failures to follow accepted testing protocols.

72.     The facts set forth in this section are largely based on information provided by Sarah Riley, Ph. D., DABCC, FACB, a clinical chemist and toxicologist. She is Associate Professor of Pathology and Medical Director of Clinical Toxicology at Saint Louis University School of Medicine and former Assistant Professor of Pathology and Immunology at Washington University School of Medicine. In addition to toxicology, Dr. Riley has extensive training in laboratory management and quality control processes. She is a Diplomate of the American Board of Clinical Chemistry, a Fellow of the National Academy of Clinical Biochemistry, and past Chief Fellow in Clinical Chemistry, Department of Pathology and Immunology at Washington University School of Medicine. Among other awards, she has

received the American Association of Clinical Chemistry Outstanding Speaker Award. She is also actively involved in many professional organizations including Organization of Scientific Area Committees (OSAC), which develops quality procedure standards for the field of toxicology. She is an award-winning mass spectrometrist with international recognition.

73.     Dr. Riley has first-hand knowledge of the facts set forth in this Section of the Amended Complaint, not just because of her expertise, but because she was Laboratory Director at Averhealth from September to November 2020, where she had day-to-day oversight of the laboratory's specimen testing and reporting. Her responsibilities included daily production and quality control.

74.     Dr. Riley resigned that position because Averhealth would not change its faulty practices. Dr. Riley provided a summary of these facts in testimony in a Michigan child custody case, *In the matter of B.K and M.B.*, File No. 76442—1/2—NA (Thirtieth Judicial Circuit Mich., Family Division), (full names of minor children redacted). As described below, she also reported Averhealth's improper practices to the College of American Pathologists, Averhealth's accrediting body, which investigated and found her allegations substantiated.

75.     As set forth herein, significant problems with Averhealth's quality control practices, which did not meet guidelines established by the College of American Pathologists for forensic drug testing ("CAP"), render the results of its tests essentially meaningless.

76.     For an acceptable quality control scheme, samples with known concentrations, or "quality controls," should be tested alongside the patients' samples. The results of these quality controls should match the expected value within at least 20% for the entire run of patient samples to be scientifically acceptable.

77.     Averhealth's quality controls consistently failed, yet the test results were still reported. Moreover, technical staff would manipulate data to force quality controls to be within the acceptable range. Some manipulations included changing the internal standards used and changing the regression of the calibration curve (addressed further below).

78.     Furthermore, to ensure that the preparation of a sample is correct, an internal standard should be used. An internal standard is a compound that is similar to the compound of interest; thus, in toxicology, it is usually a drug with isotopes (elemental differences) distinct from the drug of interest. Notably, it is a substance not likely to occur in hair or urine being tested.

79.     Internal standards are added to the sample at the beginning of the sample preparation process, and at the end of the analytical process the result of the internal standard is compared to an expected value. If the comparison is good, then the sample data can be analyzed. But if it is not a good comparison or if the internal standard is not detected, the results of the specimen analysis should not be used and the sample should be prepared again.

80.     Thus, the internal standard ensures that the output numbers from the test are accurate, because the results should show the exact quantity of the internal standard placed into the test. As an example, if 5ng/ml (nanograms per milliliter) of an internal standard are put into a test, the results should show 5ng/ml of that internal standard.

81.     However, Averhealth did not follow the proper process for internal standards. Instead, Averhealth used test results even where the results supposedly showed that an internal standard that was used *did not exist*.

82.     There were also serious problems with the calibration curves that Averhealth used for its tests.

83.     As Averhealth states, "[a] quantitative test, also known as a confirmation, compares an unknown sample against a defined numerical range. The defined range is based on a calibration curve with five to seven data points. The calibration curve can give a definitive amount of a drug that is present in the sample. The interpretation of the result is not just positive or negative, but also 'how much.'"[15]

84.     More specifically, a calibration curve is a series of samples with known concentrations that span a range of concentrations of a particular drug. Each calibrator would have an increasing amount of a particular drug. It should be prepared and analyzed with every batch of patient specimens. Prior to analyzing the patient specimens, the calibration curve should be analyzed for accuracy, including the coefficient of determination, which measures variance around the regression line of the curve. This is important to the accuracy of the patients' results because the regression of the curve is used to determine the concentrations of drugs in the patients' samples. Without a proper calibration curve, concentration numbers are nothing more than an educated guess.

85.     Averhealth frequently and consistently used calibration curves that failed to meet acceptance criteria and/or manipulated data, yet Averhealth reported the patients' results anyway. One frequent method used to manipulate data was to pull calibration curve data from runs going back days to weeks in order to find a curve that was within the acceptance criteria. It would then use this "historical" curve, which is not an acceptable practice by the CAP guidelines.

86.     Furthermore, quality controls should be used to verify that the calibration curve worked. For example, one quality control should be low for a particular drug and one high. If the

---

[15] https://averhealth.com/drug-test-cutoff-levels-not-what-you-think/ (accessed 2/12/2021).

calibration curve works, the result would show the low result and high result. However, Averhealth did not properly follow this use of quality controls to verify the calibration curves that they used in their tests.

87.     In her testimony in Michigan in *B.K and M.B.*, Dr. Riley summarized her reasons for concluding that Averhealth did not follow proper laboratory methods and stated that, based on her experience, as many as 30 percent of the laboratory results that Averhealth did for the State of Michigan were false.

88.     Instead of conducting its tests with proper internal standards, quality controls, and calibration curves, Averhealth prioritized the speed of its results, consistent with its above claim that it gets results faster than other companies, as well as the rapid expansion of its services, which increased from only 1,000 clients in 2013 to 100,000 in 2015, 250,000 in 2017, and more than 520,000 active clients in 2021.[16] But as Averhealth's above statements about why accurate results are so important show, speed and corporate growth should not come at the expense of proper quality control practices.

### 3. The College of American Pathologists' Support of Dr. Riley's Allegations

89.     The allegations of this section are based on documents produced by the College of American Pathologists ("CAP") to the United States Department of Justice and the Michigan Department of Health and Human Services ("MDHHS") and in turn produced by MDHHS to Plaintiffs' counsel in response to a Michigan Freedom of Information Act request.

90.     CAP is the body that provides Averhealth with accreditation as a forensic laboratory.

---

[16] https://averhealth.com/about/ (accessed 1/9/22).

91.     Following her resignation from Averhealth, Dr. Riley submitted a complaint about its practices to CAP. As summarized by CAP in a letter to Averhealth, she made four allegations:

> (1) Concern with regard to mass spectrometry confirmatory testing.
>
> (2) Failure to follow procedures as written.
>
> (3) Concerns regarding instrument calibrations.
>
> (4) Concerns regarding the review of quality control results.

Letter from Earle S. Collins, M.D., to Michele Glinn, Ph. D., 11/11/21, Ex. 91.[17]

92.     The concerns regarding mass spectrometry "pertain[ed] specifically to how quality controls, internal standards, defined cut-off and calibration data are interpreted, prior to the release of patient results. There [were] also concerns that practice does not follow laboratory procedures." *Id.*

93.     As shown herein, CAP agreed with these allegations and, as a result, placed Averhealth on probation for six months.

94.     After receiving Dr. Riley's complaint, Earle S. Collins, M.D., Complaints and Investigations Committee Chair, CAP Accreditations Programs, wrote to Averhealth's Michelle Glinn, Ph. D., on CAP letterhead on November 11, 2020. He outlined Dr. Riley's allegations and asked for specific detailed information on its practices by November 24, 2020. *Id.*

95.     Averhealth responded to CAP's letter, but CAP found its response inadequate. Accordingly, on December 22, 2020, Lena Portillo, Investigations Analyst, CAP Accreditation

---

[17] All exhibits to this Amended Complaint are designated by the paragraph number where they are first cited and are included in the Appendix hereto.

Programs, wrote Dr. Glinn and asked for additional information by January 4, 2021. Ex. 95 at 15-16. [18]

96.     One striking example of the problems with Averhealth's response related to its practice of using historical Quality Controls ("QCs"). In her letter to Dr. Glinn, Ms. Portillo stated that this was an example of "unacceptable practices" and called it "data manipulation to accommodate poor responses and accept runs or a patient sample without understanding why there are discrepancies." She asked for additional information regarding this practice. *Id.* at 15.

97.     Ms. Portillo also stated that there were instances where Averhealth's practice did not follow its written policy:

> For example, the policy states that the lower limit of reporting may be at or above the lowest calibrator. There are instances where the laboratory did not obtain results for calibrator 1 or 2 and reported values less than the recovered calibrator value. Additionally, the policy states that no more than 25% of the total number of data points per curve may be excluded without the director/designee review. There are instances of 3 out of 8 calibrators not being included in the curve, indicating unstable calibration.

*Id.*

98.     Dr. Glinn responded to CAP on January 4, 2021. *Id.* at 17-22. She not only attempted to defend Averhealth's practices, but she also bad-mouthed Dr. Riley, accusing her of "disregard[ing] the principles of ethical conduct for the toxicology profession by violating confidentiality, honesty, and personal integrity. . . ." *Id.* at 17. She stated that "[i]t is perplexing that Sarah Riley never once raised any concerns while working for Averhealth. . . ." *Id.*

---

[18] This exhibit is a collection of documents produced to Plaintiff's counsel by the Michigan Department of Health and Human Services in response to a Freedom of Information Act Request. Other documents produced by the Department indicate that CAP had produced these documents to Amanda Doane of the Michigan Department of Health and Human Services on March 25, 2022 and that it had previously produced them to the United States Department of Justice. Ex. 95-B.

99. Dr. Glinn also stated that "[w]e believe that upon your review of the information enclosed herein you will arrive at a finding of Not Substantiated." *Id.*at 18. That expectation turned out to be far off the mark.

100. As Ms. Portillo noted in the final CAP memorandum reviewing Averhealth's response, Dr. Glinn was not even accurate regarding whether Dr. Riley had raised any concerns before her resignation. Ms. Portillo noted drily, "This is an interesting statement, as the complainant provided the email she sent two days prior to resigning and it outlines in detail numerous quality concerns." *Id.* at 1.

101. More substantively, CAP rejected Averhealth's defenses to every one of Dr. Riley's allegations and obviously disagreed with Averhealth's attempted smear that Dr. Riley had acted unethically, dishonestly, with a lack of integrity and in violation of principles of confidentiality..

102. In a memorandum dated January 11, 2021, Ms. Portillo reviewed and evaluated Averhealth's responses to each of the allegations. Regarding Allegation #1, unacceptable quality assurance of mass spectrometry confirmatory testing, she stated "As previously discussed, I believe that this allegation is **substantiated**." *Id.* at 2 (emphasis in original).

103. After discussing Allegation #2, failure to follow procedures as written, Ms. Portillo stated:

> [T]he laboratory's procedures are largely *acceptable but they are not being followed as written*. … [T]he laboratory does not appear to be following their QC and calibration policies. … [T]he laboratory is also not evaluating their survey results with a root cause analysis, as required by policy, nor do the policies address the 'magic' that is referenced in the chat transcripts provided by the complainant referencing the QC and calibrator manipulations used to report results.

*Id.* at 2-3 (emphasis added). She concluded, "For these reasons, and as previously discussed, I believe that this allegation is **substantiated**." *Id.* at 3 (emphasis in original).

27

104. Regarding Allegation #3, manipulation of instrument calibrations, including the use of historical QC data, she stated, "I believe this allegation is likely **substantiated** . . . ." *Id.* at 3 (emphasis in original). The reason she found it "likely substantiated" rather than "substantiated" was that she did not believe she was sufficiently knowledgeable regarding the validity of Averhealth's specific use of historical data and asked Dr. Arthur Zebelman, Ph. D., CAP's Forensic Drug Testing Commissioner, to review it.

105. Dr. Zebelman did not find the practice acceptable; in fact, he had never heard of it. He stated: "I do not understand what they mean when they say they may use historical quality control data. As I understand the phrase, which I have never seen used before, they somehow use QC data from a run different from that which they are assessing. I hope I am misunderstanding what they are suggesting." *Id.* at 12. But that is exactly what Averhealth was not only suggesting, but doing.

106. Overall, Dr. Zebelman stated, "This laboratory has many quality assurance issues in the areas of quality control and proficiency testing. I believe they need to be put on probation and required to institute more thorough follow up and resolution of their QA issues." *Id.* at 9.

107. Finally, regarding Allegation #4, review of quality control results, Ms. Portillo stated: "I believe this allegation is **substantiated**." *Id.* at 4 (emphasis in original).

108. In summary, Ms. Portillo stated, "I suggest presentation to the Accreditation Committee for consideration of a Non Routine Inspection and/or probation." *Id.* at 4. The reason for the inspection was not to determine whether the laboratory was in compliance but rather to correct its faults. She stated: "I believe the laboratory needs an experienced inspector who can educate them, as they do not seem to understand the issues." *Id.*

109. Others at CAP also noted serious deficiencies in Averhealth's practices. Barry Sample, Ph. D., agreed with Dr. Zebelman and specifically called out "[t]he imprecision and lack of quantitative accuracy," "concerns regarding the chromatic separation" and "a higher than expected variability on the immunoassay screening … for certain analytes (e.g., THC) as well as the confirmatory (LC-MS/MS) assays." *Id.* at 137.

110. Joan Kosiek of CAP noted many problems, including that "[t]here [were] numerous issues with PT [Proficiency Testing], both qualitative and quantitative involving three different matrices (urine, oral fluid and hair)." *Id.* at 134. She also noted that the laboratory stated that review of past PT results indicate no bias even though "[a] review of the bar graphs from the past three cycles of survey challenges <u>clearly</u> shows bias in one direction for numerous analytes." *Id.* (emphasis in original). In fact, she said that "the laboratory does not understand Bias." *Id.* at 135.

111. None of the CAP scientists expressed any disagreement with Dr. Riley's four allegations.

112. On January 27, 2021, CAP placed Averhealth's accreditation on probation. In its letter informing Averhealth of that move, CAP stated, "This decision is based on the laboratory's lack of continuous compliance with Standard III – Quality Management, as documented during the review of documentation submitted in response to a complaint investigation." Letter of Michael B. Datto, MD, PhD, CAP Accreditation Committee chair to Michelle Glinn (with a copy to Jason Herzog, Averhealth CEO), January 29, 2021 ("Probation Letter"), Ex. 112, at 1.

113. CAP found all four allegations substantiated. These were unacceptable quality assurance of mass spectrometry confirmatory testing, failure to follow procedures as written, manipulation of instrument calibrations, and review of quality control results. *Id.* The letter

indicated that CAP's Accreditation Committee was "particularly concerned about the evaluation of bias and root cause analysis in regard to proficiency testing results, as well as the use of historical QC and QC acceptance practices." *Id.*

114. The letter directed Averhealth to submit detailed documentation on the steps it was taking to correct these deficiencies. The probation was to remain in effect "until the Accreditation Committee determines that the conditions of probation have been successfully rectified." *Id.*

115. On May 13, 2021, CAP conducted a non-routine inspection of Averhealth. The inspector found that Averhealth had corrected the practices that led to its being put on probation, presumably because the inspector performed the education process that Ms. Portillo had recommended in her January 11 memo. Ex. 115, Letter from Earle S. Collum, M.D., to Michelle Glinn, Ph. D., 5/25/21.

116. Nevertheless, Averhealth remained on probation for two more months. The probation was finally lifted July 28, 2021. However, in its letter dated July 29, 2021, CAP also required that Averhealth comply with the following detailed and onerous requirements:

- Submit evaluations and corrective actions for all external proficiency testing for urine, oral fluid, and hair testing to include investigation of bias.

  - Submission expected within 14 days of receipt of PT results, to continue until the laboratory's next routine inspection in 2022.

- Submit 2 quarters of evidence of QC review with documentation of follow-up for any QC issues.

  - First submission expected by October 12, 2021.
  - Second submission expected by January 11, 2022

Ex. 116, Letter of July 29, 2021, from Michael B. Datto, Accreditation Committee Chair to Dr. Glinn.

117.  CAP's letter also reiterated Averhealth's past serious violations with its

accreditation standards that had led to this investigation:

> Our investigation determined that the laboratory was out of compliance with the
> CAP Standards for Laboratory Accreditation with respect to the following
> allegations:
>
> • Concern regarding unacceptable quality assurance of mass spectrometry
>   confirmatory testing.
>
> • Failure to follow procedures as written.
>
> • Concerns regarding the manipulation of instrument calibrations.
>
> • Concerns regarding the review of quality control results.

*Id.*

118.  Averhealth never publicly disclosed that CAP had placed it on probation for these

violations. To the contrary, it dishonestly hyped its accreditation during the very period it was on

probation. For example, on February 19, 2021, less than a month after it had been placed on

probation, it referred to its accreditation on its website without mentioning that it had been

placed on probation for flouting the very standards it claimed to follow:[19]

---

[19] https://averhealth.com/the-importance-of-lab-based-testing-for-accuracy-and-reliability/ (accessed 1/16/2022).



"2/9/21"

averhealth     COURT SOLUTIONS    BLOG    NEWS ROOM    AVERHEA

Reliability

02.19.21

Evidence-based drug testing practices serve a critical role in helping people to navigate the intersection of criminal justice programs and healthcare. Many courts and probation departments understand the crucial importance of random testing but choosing a substance use monitoring partner that has a reliable process and the best testing technology is just as important. Averhealth's laboratory testing gives you the confidence and intelligence you need to ensure clients are staying on the path to recovery.



When drug testing in a criminal justice program, mistakes simply cannot be made. It is important that a drug test is not subjective and follows a process certified by toxicologists. Averhealth understands the importance of accurate and reliable drug testing. All samples are tested at the Averhealth laboratory, which is led by Ph.D. and [...providing] you with the highest standards of accuracy and

"accreditation by College of American Pathologists"

The Averhealth laboratory is one of only 30 domestic labs with accreditation by College of American Pathologists-Forensic Drug Testing (CAP-FDT). This accreditation requires a very comprehensive inspection, with a long list of criteria including, a robust chain of custody, collections, accessioning, screening, confirmation, safety, personnel, and facilities. The Averhealth laboratory is also accredited by the U.S. Department of Health and Human Services Clinical Laboratory Improvements Amendment (CLIA) and the Drug Enforcement Agency (DEA). The laboratory and testing procedures are routinely reviewed by the agencies that Averhealth holds accreditation with and undergoes additional inspections throughout the year.

119.    According to the Internet Wayback Machine, the Averhealth web page shown above that boasted about its CAP accreditation (*see* Paragraph 30) contained that same message throughout the period of Averhealth's probation. Here it is from February 25, 2021:[20]



120.    Averhealth did not contest CAP's findings or CAP's placement of it on probation. Nevertheless, it has not taken the slightest step to make amends to those whose tests it conducted while it was violating CAP's standards. It did not even inform the thousands of clients whose samples it tested during that period that it had been found to have performed their tests improperly.

### 4.  The State of Michigan's Suspension of Averhealth for Improper Testing Practices

121.    This section of the Amended Complaint is primarily based on information and belief from documents produced by the Michigan Department of Health and Human Services

---

[20] https://web.archive.org/web/20210225134301/https://averhealth.com/our-laboratory/ (accessed 1/17/2023); *see also* the identical pages from April 10, May 5 and June 16, linked at https://web.archive.org/web/20210415000000*/https://averhealth.com/our-laboratory/ (accessed 1/17/2023).

("MDHHS") in response to requests under the state's Freedom of Information Act ("FOIA").

Here is a summary of what those documents show, with more detail in the subsections below:

122.     After entering into a five-year contract with Averhealth beginning in May 2019 for drug testing services in child-custody proceedings, MDHHS suddenly stopped utilizing Averhealth's testing services in March 2022 because of Averhealth's improper testing practices. Among other reasons for the Department's actions, Averhealth had been violating national accreditation standards, leading the Michigan Attorney General and the United States Department of Justice to investigate Averhealth for medical fraud. That fraud was allegedly directed against federal funds used to finance Averhealth's tests. MDHHS also decided that it could no longer – and therefore would no longer – rely on any Averhealth result that it had ever received.

123.     MDHHS's contract had made Averhealth the sole provider of drug testing services for MDHHS from May 15, 2019, through August 31, 2024. These tests were conducted on parents for use in child welfare proceedings by the MDHHS's Children's Services Agency ("CSA") to enable the state to decide whether to remove children from their parents' homes.[21]

124.     The value of Averhealth's contract with the MDHHS was more than $27.3 million. Ex. 124-A at 2-3.

125.     While Averhealth realized millions in annual revenues from its contract with MDHHS, the Department itself realized substantial savings with Averhealth compared to its previous drug testing company, Forensic Fluids Laboratories ("FFL"). On an apples-to-apples basis, MDHHS estimated that it was saving $768,318 *per year* compared with what it would

---

[21] According to MDHHS documentation, the samples tested on Michigan residents were collected by MDHHS staff, private agency foster care staff, collectors in third-party "brick and mortar" locations, and third-party mobile collectors, but not Averhealth employees. Thus, Averhealth's improper collection practices do not appear to have affected the Michigan results (discovery may show otherwise). But its improper testing practices did. Ex. 124-B

have spent if it had continued with FFL. Email from Amanda Doane, 2/9/20. Ex. 125 at 1. Thus, MDHHS had a significant financial incentive to support Averhealth against accusations of improper testing practices.

126. After Averhealth's service for MDHHS began, concerns arose – especially among the state's judiciary – that Averhealth's tests were unreliable and that it was reporting false positives. In the Fall of 2020, many judges refused to accept Averhealth's results. Those concerns increased after one judge reported on a phone call he had had with Dr. Riley about Averhealth's improper testing practices.

127. At least in their internal communications and after hearing Averhealth smear Dr. Riley as a disgruntled former employee spreading lies, MDHHS's officials said they disbelieved her. However, MDHHS never communicated with Dr. Riley directly to learn from her the basis of her allegations. Moreover, although Averhealth and MDHHS officials repeatedly called Dr. Riley a "disgruntled former Averhealth employee" or the like, they never said what she was disgruntled about; in fact, assuming she was "disgruntled," the cause was Averhealth's refusal to change its improper testing practices when she brought them to its attention.

128. Nevertheless, in response to complaints about Averhealth from the judiciary, MDHHS told the judges that MDHHS would pay for tests by alternative services (as it did for Averhealth tests) and that MDHHS would investigate the claims against Averhealth.

129. MDHHS contracted with toxicology consulting firm Wagner Toxicology Associates ("Wagner") to audit Averhealth's lab practices. Internally, however MDHHS made clear that, even before receiving Wagner's report, it intended to return to Averhealth as its sole drug testing service, raising the implication that Wagner's conclusions were pre-ordained.

130.    After MDHHS suspended Averhealth in 2022, at least one MDHHS official questioned whether Wagner had been biased or worse.

131.    In fact, Wagner conducted an abbreviated assessment compared with what it told MDHHS it would conduct and, on February 28, 2021, essentially whitewashed Averhealth in a report that, as described more fully below, was so deeply flawed that it cannot be used as a basis to conclude that Averhealth's tests were reliable. To the contrary, the *facts* reported by Wagner, as opposed to its supposed conclusions, demonstrate that Averhealth's practices were unsound.

132.    Nevertheless, after receipt of the final Wagner report, MDHHS restored Averhealth as its sole drug testing service and continued to save money compared to its previous provider.

133.    However, some Michigan judges were still dissatisfied and persisted in refusing to accept Averhealth's test results in their courts.

134.    Then, in June of that year, the state's Attorney General's office informed MDHHS that, along with the U.S. Attorney's Office for the Eastern District of Michigan, it was investigating Averhealth for medical fraud based on Dr. Riley's allegations. MDHHS cooperated with that investigation and provided information to the investigators.

135.    MDHHS communicated with representatives of the Michigan Attorney General's office and the U.S. Attorney's office in emails beginning in January 2022, that were produced in redacted form in response to a Michigan FOIA request. Thus, Plaintiffs do not know exactly what was said in those emails.

136.    However, on March 7, 2022, a few days after MDHHS's and CSA's top officials met regarding Averhealth with attorneys from the Attorney General's fraud division and an Assistant U.S. Attorney, MDHHS suddenly and with no public warning suspended Averhealth's

services for 90 days because of its failure to follow national accreditation standards and the investigation of it for medical fraud by the Michigan Attorney General and the United States Department of Justice. It also refused to rely any longer on any past test results provided by Averhealth from the beginning of its contract.

137. At the end of those 90 days, MDHHS extended the suspension for another 90 days. When that period expired, MDHHS made Averhealth's suspension permanent. Averhealth no longer provides drug testing services for MDHHS.

138. These events are laid out in more detail below.

### a. MDHHS's 2021 investigation that erroneously upheld Averhealth's practices

139. To understand MDHHS's suspension of Averhealth, it is necessary to start with the earlier investigation that MDHHS conducted in response to allegations regarding Averhealth's testing practices, an investigation that erroneously concluded that those practices were sound and reliable.

### i. *Concerns are raised over the accuracy of Averhealth's testing, including by Michigan's judges*

140. After Averhealth began drug testing under its contract with the MDHHS, concerns were raised about the accuracy of its results (along with other issues such as turnaround time for test reports, missing reports, lack of local administrators to collect samples, and unavailability of witnesses to testify in support of test results).

141. In the Fall of 2020, MDHHS conducted a survey of its staff and the courts regarding their experiences with Averhealth. A report on the results noted that, in response to an open-ended question asking about concerns based on personal experience, "[c]ourts and attorneys have identified concerns regarding accuracy of the screening results." Averhealth

Caseworker Survey, Ex. 141-A, at 2. Specifically, according to a graph summarizing the results, nearly 30% of all respondents said they were concerned about Averhealth's accuracy. Averhealth Responses, Ex. 141-B 10-5-2003.

142.    So serious were those concerns that many Michigan judges stopped accepting Averhealth's test results. For example, a court administrator in Kalkaska County asked an MDHHS employee in September 2020: "Have you heard much about … accuracy issues? Judge Buday is hearing from other judges in other Court[s] that they are finding the results unreliable." Email from Jeffrey Wilson, September 25, 2020, Ex. 142, at 1-2.

> Hi Kris,
>
> Regarding the email below, the Kalkaska court administrator is now inquiring about false positives from Averhealth testing, as our judge has heard other counties are having a problem. Specifically, she is questioning:
>
> "Have you heard much about there be accuracy issues? Judge Buday is hearing from other Judges in other Court that they are finding the results unreliable?"

143.    Similarly, that same month according to an MDHHS Program Manager in Monroe County, judges there felt "that the Averhealth drug screens are inaccurate and give false positives. It is at the point where they are telling parents to go get a second drug test to prove they are drug free. On more than one occasion this has caused the Court to 'throw out' the Averhealth screens as being inaccurate and using the results of the parents private screens to make their decision." Email from Teresa Marshall, September 17, 2020, Ex. 143, at 2.

From: Marshall, Teresa (DHHS) <MarshallT@michigan.gov>
Sent: Thursday, September 17, 2020 2:36 PM
To: Westergard, Brooke (DHHS) <WestergardB@michigan.gov>; Strong, Janien (DHHS) <StrongJ1@michigan.gov>
Cc: Needham, Linda Sue (DHHS) <NeedhamL@michigan.gov>
Subject: Concerns with Averhealth Drug Screens

I wanted to bring your attention to an issue shared with us by the Monroe County Juvenile Court jurists. They voiced that they feel that the Averhealth drug screens are inaccurate and give false positives. It is at the point where they are telling parents to go get a second drug test to prove they are drug free. On more than one occasion this has caused the Court to "throw out" the Averhealth screens as being inaccurate and using the results of the parents private screens to make their decision.

144.    Also in September 2020, a Tribal Court refused to consider positive results on Averhealth tests because of false positives reported downstate. Email from Lisa Garcia, 9/24/2020, Ex. 144 at 2.

145.    In November 2020, Judge Terence Ackert emailed other judges and MDHHS officials with the ominous subject, "Urgent: Significant Development with Averhealth Drug Testing." He reported that Dr. Riley had called him and stated, in part:

> Dr. Riley informed me that last night she terminated her position as Lab Director with Averhealth because of her serious concerns that Averhealth has failed to follow standard testing procedures and is not compliant with the standards developed by the College of American Pathologists. …

> The basis of her complaint, and the concern she raised with me, is that Averhealth does not follow the standard quality control procedures when conducting a test and reporting the results to the client. …

> Dr. Riley states that in certain circumstances the failed procedures can create a false positive, especially with cocaine, in approximately 30% of the tests. The frequency of a false positive could, in some instances, increase to 50%.

> I considered Dr. Riley's statements and her tone during our conversation to be credible. I was not left with the impression that she was a disgruntled employee or had some "axe to grind."

Email from Judge Terence Ackert, November 4, 2020, Ex. 145 at 1.

146. Judge Ackert also reported that Dr. Riley had "filed a formal complaint against Averhealth with the College of American Pathologists" ("CAP"), Averhealth's accrediting body, *Id.*

147. As Amanda Doane, the MDHHS employee who oversaw the Averhealth contract, later described it, "this caused a huge crisis within MDHHS." Email from Amanda Doane, 10/25/21, Ex. 147, at 1.

148. Two days after Judge Ackert's report, on November 6, 2020, Judge Thomas P. Boyd, State Court Administrator, wrote on behalf of the State Court Administrative Office ("SCAO") to the state's Family Court Judges about "Concerns Raised Regarding Averhealth Drug Test Reports." He stated, "MDHHS is currently investigating these allegations." Memorandum by Thomas P. Boyd, dated 11/6/2020, Ex. 148 at 1. The SCAO is the body that provides guidance and support to Michigan's trial courts statewide.[22]

149. Judicial rejection of Averhealth's results continued. On November 10, 2020, the Midland County Probate Court issued an order that, because of "significant questions regarding the reliability of Aver Health [*sic*]," an alternative lab would henceforth be used in child protection cases. Blanket Order Regarding Substance Use Testing for Midland County Child Protection Cases, issued 11/10/20, Ex. 149.

150. Similarly, on November 16, 2020, because of "significant questions regarding the reliability of Aver Health [*sic*]," Judge Elwood L. Brown of the Probate/Family Division in St. Clair County "order[ed] that substance abuse testing in child protective cases be conducted by a laboratory other than "Aver Health [*sic*]." Blanket Order Regarding Substance Use Testing for St. Clair County Child Protective Cases, dated 11/16/2020, Ex. 150.

---

[22] https://www.courts.michigan.gov/administration/offices/scao-main/ (accessed 12/9/2002).

151.    MDHHS, which continued to support Averhealth, feared that many other courts would enter similar orders. On November 16, 2020, Colin Parks, the State Manager of MDHHS' Children's Protective Services ("CPS") responsible for ensuring the integrity of CPS programs[23], wrote Demetrius Starling, then State Bureau Administrator, Bureau of In-House Services (and later CSA Executive Director), "Unfortunately, this may be happening with many of our courts in the coming days. Hopefully, this is for the short term, but time will tell." Email from  Colin Parks, 11/16/2020, Ex. 151 at 1. (CPS is the state agency responsible for investigating allegations of child abuse and neglect.)

152.    Shortly thereafter, the Oscoda County Court announced it would not accept Averhealth's test results, Ex. 152 at 1.

153.    Shayne Machen, MDHHS's Special Advisor to the CSA Director, described the state's judges' dissatisfaction with Averhealth in a report on a meeting December 9, 2021, of the Child Welfare Leadership Workgroup. This group consisted of state court judges, a tribal court judge and SCAO staff. She said, "[T]here was a lot of discussion about Averhealth and judges expressed frustration over past false positives and newer concerns about (allegedly) inconsistent responses." Email from Shayne Machen, 12/13/21, Ex. 153 at 1-2.

### ii.    MDHHS responds to the courts' concerns

154.    MDHHS told the courts that it took those concerns seriously and accordingly that it would pay for tests by other testing services, similar to its payments for Averhealth tests. In a memo to State Court Administrator Boyd, Family Court Judges, Tribal Court Judges, and involved stakeholders, JooYeun Change, then the Executive Director of CSA, wrote:

> We share with you a commitment to have accurate and reliable testing results and information upon which to make critical decisions. We recognize the importance of valid and reliable testing results on the court's ability to issue fair and

---

[23] https://www.linkedin.com/in/colin-parks-9675b916/ (accessed 11/1/2022).

defensible decisions and orders, and how critical those decisions are to the children and families we serve. We will thoroughly assess and resolve the concerns raised to the satisfaction of our court partners, appointed attorneys, field staff, and parents.

***

In the time it takes us to resolve these concerns, if a court is not confident in the Averhealth tests, the court may utilize sample collection and testing through another local vendor and MDHHS will arrange to pay for the alternative testing.

Memorandum dated 11/13/2020, Ex. 154-A at 1-2. On November 20, 2020, MDHHS issued a formal "Communications Issuance" allowing its staff to use alternative laboratories while it resolved the concerns. Communications Issuance 20-145, Ex. 154-B.

155.    Privately, however, MDHHS staffers in charge of administering the testing program were in contact with Averhealth and, presumably as a result of misinformation Averhealth gave it, stated, with no equivocation, that they believed that Dr. Riley's allegations were false and unfounded.

156.    To be sure, the day that Judge Ackert reported on his conversation with Dr. Riley, Stacie Bladen, CSA Deputy Director, wrote: "We may be headed toward ending this contract. Not sure. Will doing [*sic*] further investigation." Email from Stacie Bladen, 11/4/20, Ex. 156 at 4. However, the next day, Colin Parks, one of the MDHHS officials most closely involved with Averhealth, responded in reference to "the process that Dr. Riley and Judge Ackert have brought to our attention" and stated, "Following our consultation with Averhealth, our office is confident that the process for testing and retesting meets, or exceeds contract requirements and industry standards." Email from Colin Parks, 11/5/20, *id.* at 2-3.

157.    Mr. Parks sent his email to Jason Herzog, Averhealth CEO, for his approval. Mr. Herzog made no substantive comment (other than to approve a minor edit made by Dominique Delagnes, Averhealth's Chief Operations Officer), but he proceeded to smear Dr. Riley's

qualifications by asking that Mr. Parks "change Dr. Riley to Sarah Riley." Email from Jason Herzog, 11/5/20, *id.* at 1-2.

158.    Asked by Mr. Parks whether she was in fact a doctor, he said (with a copy to Amanda Doane, the MDHHS employee who oversaw the Averhealth contract), "She is, and maybe I'm being petty, but I don't think she merits the title." Email from Jason Herzog, 11/5/20, *id.* at 1. Showing that he had bought into Mr. Herzog's insult of Dr. Riley, Mr. Parks responded, "Too funny. Sarah Riley it is." Email from Colin Parks, 11/5/20, *id*. Here is a screenshot:

| From: | Parks, Colin (DHHS) |
| To: | Jason Herzog |
| Cc: | Dominique Delagnes; Doane, Amanda (DHHS) |
| Subject: | RE: Urgent: Significant Development with AverHealth Drug Testing Errors |
| Date: | Thursday, November 5, 2020 3:28:48 PM |

Too funny. Sarah Riley it is.

From: Jason Herzog <jherzog@averhealth.com>
Sent: Thursday, November 5, 2020 4:28 PM
To: Parks, Colin (DHHS) <ParksC@michigan.gov>
Cc: Dominique Delagnes <ddelagnes@averhealth.com>; Doane, Amanda (DHHS)
<DoaneA@michigan.gov>
Subject: Re: Urgent: Significant Development with AverHealth Drug Testing Errors

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

She is, and maybe I'm being petty, but I don't think she merits the title.

**Jason Herzog**
ceo
o 804.767.8693
m 804.955.5246
jherzog@averhealth.com | averhealth.com

On Nov 5, 2020, at 2:14 PM, Parks, Colin (DHHS) <ParksC@michigan.gov> wrote:

She is not a doctor?

From: Jason Herzog <jherzog@averhealth.com>
Sent: Thursday, November 5, 2020 4:04 PM
To: Dominique Delagnes <ddelagnes@averhealth.com>
Cc: Parks, Colin (DHHS) <ParksC@michigan.gov>; Doane, Amanda (DHHS)
<DoaneA@michigan.gov>
Subject: Re: Urgent: Significant Development with AverHealth Drug Testing Errors

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Can you also change Dr. Riley to Sarah Riley?

159.    Thereafter, MDHHS employees privately expressed the view that Dr. Riley's allegations were false and, in their emails, never called her "Dr. Riley" and often not even "Sarah Riley," but merely "disgruntled employee" or the like and accused her of spreading lies.

160.    For example, on November 13, 2020, Amanda Doane, the individual within MDHHS who oversaw the Averhealth contract, referred in an email sent to other MDHHS employees to "a disgruntled employee calling a judge and giving false information." Email from Amanda Doane, 11/13/2020, Ex. 160 at 1.

161.    That same day, Demetrius Starling – at the time acting Bureau Director over CPS-In Home and later CSA Executive Director – wrote to colleagues, "We have determined that the complaint filed by the worker who resigned from Averhealth is not accurate." Email by Demetrius Starling, 11/13/20, Ex. 161, at 1. Mr. Starling did not explain how he, a non-scientist, had made that determination. At the time, MDHHS had no information on Averhealth's practices other than what Averhealth had told it.

162.    On November 17, 2020, Mr. Parks wrote that CSA wanted to continue with Averhealth: "The concerns of the court surround confidence in the testing process and, I believe to some extent, confidence in the company itself. Our goal is to maintain the contract, but to listen to the concerns of the court and consider amendments to the contract that may address/resolve those issues." Email from Colin Parks, 11/17/20, Ex. 162 at 1. Documents produced by MDHHS, however, contain no reference to *any* specific contract amendment that could possibly alleviate judges' concerns about Averhealth's testing process – certainly Averhealth never proposed one – and it is hard to imagine an amendment that would do that.

163.    On December 2, 2020, Ms. Doane referred to "the misconceptions surrounding Averhealth." Email from Amanda Doane, 12/2/2020, Ex. 163 at 1.

164.    The following day, December 3, 2020, Ms. Doane wrote to Mr. Parks: "I had a group video call today with the judge from Calhoun County along with prosecutors, family

attorneys, DHHS staff and Averhealth. All questions were asked and answered and I believe the judge will stay with Averhealth." Email from Amanda Doane, 12/3/20, Ex. 164 at 1.

165.    This was welcome news to Mr. Park. He wrote back: "Nice work, superstar!" Email from Colin Park, 12/3/20, *id*. See this screenshot:



| | |
|---|---|
| **From:** | Parks, Colin (DHHS) |
| **To:** | Doane, Amanda (DHHS) |
| **Subject:** | RE: BSC 3: Forensic Fluids *Immediate response |
| **Date:** | Thursday, December 3, 2020 1:10:32 PM |

Nice work, superstar!

**From:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Sent:** Thursday, December 3, 2020 1:43 PM
**To:** Parks, Colin (DHHS) <ParksC@michigan.gov>
**Subject:** RE: BSC 3: Forensic Fluids *Immediate response

I had a group video call today with the judge from Calhoun County along with prosecutors, family attorneys, DHHS staff and Averhealth.  All questions were asked and answered and I believe the judge will stay with Averhealth.

Amanda

166.    Again, on December 15, 2020, in an email to various MDHHS employees, outside attorneys, and others, Ms. Doane referred to "the false allegations made by a past employee." Email from Amanda Doane, 12/15/2020, Ex. 166 at 1.

### iii.    *MDHHS begins to investigate Averhealth*

167.    At the same time, MDHHS began to investigate these complaints. Among other steps, on November 24, 2020, it asked Jason Herzog, Averhealth's CEO, to provide it with Dr. Riley's contact information and the complaint she had filed with CAP. Email from Colin Parks, 11/24/2020, Ex. 167 at 3.

168.     Mr. Herzog refused to provide Dr. Riley's contact information. Email from Jason

Herzog, 11/30/20, *id.* at 1-2. In lieu of forwarding Dr. Riley's complaint, he sent

"correspondence we received from CAP regarding Ms. Riley's false allegations." *Id.* at 2.

169.     There is no indication in the FOIA documents that MDHHS made any effort to

locate Dr. Riley on its own, for example by conducting a Google search. Currently, a simple

search for "Sarah Riley toxicologist" will turn up her web page at Saint Louis University.[24]

Instead, without ever speaking with Dr. Riley, MDHHS's employees continued to accuse her of

lying about Averheath's practices.

### iv.     *Averhealth attempts to defend itself*

170.     On December 1, 2020, Mr. Herzog sent two MDHHS employees a memo

purporting to defend Averhealth's practices and asking that MDHHS end its investigation and

exonerate Averhealth. Memo of Jason Herzog to Colin Parks and Amanda Doane, December 1,

2020, Ex. 170 ("Request for Exoneration").

171.     In his Request for Exoneration, he stated that Averhealth had conducted an

internal investigation of the allegations in the CAP complaint. He stated that "mass spectrometry

testing has since been conclusively refuted" (*sic*; presumably he meant that the *allegations*

regarding mass spectrometry testing had been refuted), that there were "no issues with following

procedures or instrument calibration," and that "Dr. Glinn has since completed the reviews of

quality control results and fortunately there were no issues." *Id.* at 2.

172.     However, he provided no facts to support any of these conclusory statements and

did not mention that CAP's investigation was ongoing. The only fact he offered was that CAP

---

[24] *See* https://www.google.com/search?q=sarah+riley+toxicologist&rlz=1C1CHBF_enUS977US977&oq=sarah+riley+toxicologist&aqs=chrome..69i57j33i160l2.6189j0j15&sourceid=chrome&ie=UTF-8, which returns the following page as the first link: https://www.slu.edu/medicine/pathology/faculty/riley-sarah.php. (both accessed 1/25/2023).

had inspected Averhealth years in the past, "on April 12, 2016, March 15, 2018 and February 7, 2020" and "concluded with glowing remarks" (which he did not quote). *Id.* at 2. This was hardly an exonerating fact because, if it were, CAP would not have sent its November 11, 2020, letter asking that Averhealth submit detailed information supporting the validity of its practices against Dr. Riley's allegations.

173.    MDHHS did not accept Mr. Herzog's invitation to end its investigation.

### *v.    MDHHS hires Wagner Toxicology to audit Averhealth's practices*

174.    Instead of immediately exonerating Averhealth, MDHHS hired Wagner Toxicology Associates, a consulting firm in Oklahoma headed by Dr. Jarrad Wagner, to provide an assessment of Averhealth's lab. The Wagner firm reviewed Averhealth's lab practices and submitted an audit report prepared by Dr. Wagner and a colleague, Dr. Larry Broussard. (Hereinafter, Wagner Toxicology Associates is referred to as "Wagner" and Dr. Jarrad Wagner as "Dr. Wagner").

175.    However, despite hiring Wagner to conduct a supposedly independent assessment, MDHHS always intended to return to Averhealth as its sole drug testing service. Colin Parks admitted as much in a memo entitled "Transition Planning," which he sent to MDHHS colleagues as he was about to move to new job responsibilities in March 2021. Referring to the judges' concerns about Averhealth's reliability, Mr. Parks wrote: "Those concerns resulted in guidance to the field/court, allowing for testing to be completed by alternative labs, until the report by Wagner/Broussard was complete. . . . The intent was always to return to Averhealth as the sole tester for the state . . . ." Memo entitled "Transition Planning," Ex. 175-A at 1, transmitted by email from Colin Parks, 3/5/21, Ex. 175-B. Mr. Parks did not

explain how, in light of that intention, the Wagner assessment was anything other than pre-ordained.

176.     Before Wagner conducted its examination, Dr. Wagner emailed Mr. Parks to describe his protocol to "audit [Averhealth's] testing process to make sure that they are performing appropriate testing."

177.     Dr. Wagner said his audit would consist of three aspects, a review of records of test results over the past year, a site visit to Averhealth's St. Louis laboratory to observe its testing, and a review of the laboratory's manuals.

178.     Regarding the review of records, Dr. Wagner stated:

> We will ask for a list of test results in the past year or so, then select about 10 samples per month (80% positive) to review. We will identify the files we want to view so that the lab can assemble any and all supporting data with the reports, and we will verify that the data support the report. All specimens audited should have screening results and since some are positive we should see confirmation data. We will need to see some positives for each class being reported.

Email from Jarrad Wagner to Colin Parks, dated 12/8/2020, Ex. 178 at 1.

179.     In addition, Dr. Wagner said that he and Dr. Broussard would conduct a two-day laboratory site visit to observe the personnel's practices and review Averhealth's lab manual to make sure the laboratory was "doing exactly what their lab manual says they are doing." *Id.*

180.     MDHHS issued a State of Michigan Procurement Statement of Work Contract Activities that included these aspects of the protocol. Dr. Wagner's description of his projected audit of past test results based on written records was included nearly verbatim:

> Ask for a list of test results in the past year or so, then select about 10 samples per month (80% positive) to review.  Will identify the files to view so that the lab can assemble any and all supporting data with the reports, and will verify that the data support the report.  All specimens audited should have screening results.

Schedule A – Statement of Work Activities, Ex. 180 at 1.

### vi.    *Wagner issues a flawed report*

181.    Drs. Wagner and Broussard conducted their site visit of the Averhealth laboratory on January 19-20, 2021.

182.    In their final report, dated February 28, 2021 ("Wagner Report"), the authors upheld the validity of Averhealth's testing and expressed disagreement with the opinions of Dr. Riley. Although they identified some concerns, the report's conclusion stated: "The team feels that the items of concern expressed in this report do not indicate that the laboratory has reported any false negative or false positive results. The team is confident that the observed data was forensically and scientifically defensible in a court of law."[25]

183.    However, that report was severely flawed for several reasons and, far from supporting a clean bill of health for Averhealth, it indicates that the laboratory had been following improper procedures and that it was impossible to conclude that the results Averhealth had reported were accurate.

184.    First, the Wagner Report's conclusions were based only on the authors' review of the laboratory's manuals, their observations in the laboratory – in which the laboratory personnel obviously knew they were being observed and could therefore adjust their practices accordingly – and only "[a] relatively small number of reports" of past tests. Wagner Report at 3 (Executive Summary).

185.    Contrary to Dr. Wagner's protocol, the Wagner Report did not indicate that they had obtained a list of test results in the past year, requested or obtained 10 samples per month, or

---

[25] This report is available on the internet at https://www.courts.michigan.gov/SysGlobalAssets/migrated/administration/scao/documents-(lisa-and-deb-review)/family-probate/averhealthreport.pdf (accessed 12/23/2022). Note that table of contents in inaccurate and does not refer to section of the report entitled, "Concerns Raised by the Judiciary."

reviewed the supporting data with the reports so that they could attempt to "verify that the data supported the report."

186.     Instead, the authors stated that, before the visit, they were provided *10 random reports* (not 10 per month). Wagner Report at 6.

187.     Still, the authors found significant problems in those few records.

188.     One was that "some analytes were reported that were being flagged as outside identification criteria by the analytical software in use, MultiQuant." *Id.* They stated that this "wasn't *necessarily* an issue, since it was not known how MultiQuant was setup to flag outliers prior to the site visit." *Id.* (emphasis added).

189.     However, during the site visit, they did learn how MultiQuant had been set up, and based on what they learned, Averhealth should not have been reporting some or all of the analytes it reported.

190.     Specifically, the authors noted that, during the site visit, they recommended that MultiQuant be "setup with identical acceptance criteria to the SOP [Standard Operating Procedures]." Wagner Report at 6. Apparently, that had not been done before the visit. They then stated, "Analytes that do not meet these criteria should not be reported." *Id.*

191.     The authors did indicate that "[i]t is the understanding of the site visitors that Averhealth has *now* clearly defined the acceptance criteria for identification of analytes and is using them while reporting results." *Id.* (emphasis added). However, assuming that this change was in fact made (the authors don't say what their understanding was based on), nevertheless their statement that "[a]nalytes that do not meet these criteria should not be reported" means that Averhealth should not have been reporting any analytes before the change; the reason for that is that those criteria did not exist before the change.

192.     Another one of Wagner's concerns was that if Quality Control ("QC") values were outside the normal range, "the laboratory might change the linearity model or internal standard used for a specific analyte." *Id.* This is similar to the QC concern raised by Dr. Riley. The authors said that "this practice would need to be supported by method validation to be acceptable . . . ." *Id.* However, they did not indicate that any such method validation had *ever been conducted*. Without it, the authors had no basis to conclude that this was an acceptable practice, and Averhealth had no basis to report results based on this method.

193.     Yet another concern, in Wagner's words, was "a prior incident in which there were 13 'false positives' reported.  Basically, in a prior batch the vials were put in the autosampler *in the wrong location*, causing 13 results to be associated with the wrong donors." *Id.* at 7 (emphasis added).

194.     The authors indicated that this was the result of human error and that, after discovering it, the lab had "added independent sequence and vial checks that are currently in place, and in the opinion of the inspectors are sufficient to prevent a similar occurrence in the future." *Id.* They did not describe those checks, so there is no basis to conclude that they were correct that these "independent checks" would prevent similar occurrences in the future.

195.     Be that as it may, this incident indicates that the lab had not *previously* used such checks to prevent these occurrences. Nevertheless, Wagner did not conduct any investigation to determine whether any such errors had previously occurred and did not report that Averhealth had ever conducted such an investigation itself. Nor did the authors investigate how this error had occurred on this one occasion.

196. If this type of human error occurred once, there is no assurance that it didn't occur on other occasions, especially without knowing how it happened that one time. Yet the authors did not investigate that question and, instead, improperly gave short shrift to this issue.

197. In sum, although the authors indicated that their review of records would be designed to "verify that the data support the report," they did not conduct any such verification. They did not verify that the laboratory hadn't been reporting inaccurate results.

198. Moreover, although in their Conclusion, the authors stated that the laboratory's methods were appropriate despite these concerns, they did not purport to provide any basis for that conclusion.

199. For example, they did not explain how the test results could be regarded as valid if the laboratory had not validated its method of changing its linearity model or internal standard where a QC result was outside the normal range.

200. Nor did they explain how they could conclude that the flagging of analytes as outside identification criteria by MultiQuant wasn't a defect before their site visit given their statements that "[a]nalytes that do not meet these criteria should not be reported" and that they did not know the acceptance criteria in the pre-visit Multiquant setup. *Id.*

201. Similar problems infected the author's refutation of Dr. Riley's opinions. Before explaining why that is, it is important to note that the initial Wagner report, labeled "Draft," did not mention Dr. Riley's allegations. *See* Ex. 201. Dr. Wagner actually did not learn of those allegations until after he had submitted a draft of the report, dated February 8, 2021. Apparently, Averhealth kept Dr. Riley's allegations from him, even though those allegations were the instigating reason for hiring him in the first place.

202.     Moreover, when Dr. Wagner learned about Dr. Riley's allegations in general terms second-hand, he expressed his disagreement with her *before he even saw her statements*.

203.     On February 24, 2021, two weeks after the draft report but before he submitted the final report, Colin Parks of MDHHS emailed Dr. Wagner about Dr. Riley's testimony in a Michigan child custody case about what she had witnessed at Averhealth. Mr. Parks wrote that, in a call with judges, Dr. Wagner *had already said* that "Dr. Riley's concerns were (my words) irrelevant and would not impact testing results." Email from Colin Parks, 2/24/21, Ex. 203 at 6.

204.     In response to that email, however, Dr. Wagner indicated that he had not actually seen Dr. Riley's statements. In fact, he admitted that he could not say at that point whether Dr. Riley's criticisms were founded or unfounded. He wrote: "Are you able to provide me with Dr. Riley's statements? That would allow me to review them and determine if they were founded or unfounded." Email from Jarrad Wagner, 2/24/2021, *id* 5-6. Therefore, the opinion Dr. Wagner gave the judges that Dr. Riley's concerns would not impact testing results was akin to saying, "Don't bother me with the facts, here's my opinion."

205.     After finally reviewing Dr. Riley's testimony, Dr. Wagner emailed MDHHS on February 25, 2021, that he "did not observe the issues she references." Email from Jarrad Wagner, 2/25/2021, *id.* at 3. But he relied only on what he "observed onsite in January and as described in the current SOP for Michigan Oral Fluid confirmations." *Id.* In describing the bases of his disagreement with Dr. Riley, he did not rely on, or even mention, the laboratory's actual practices in the past, as shown in the records he was provided. *Id.* The same is true in the section he added to his report entitled, "Concerns Raised by the Judiciary," where they said they disagreed with Dr. Riley only on what they "observed onsite in January and as described in the current SOP for Michigan Oral Fluid confirmations."

206.     Moreover, in the Executive Summary of their final report, the authors stated regarding concerns raised by the judiciary: "None of the items of concern were observed *during the audit or are valid in the current laboratory practices*." Wagner Report at 3 (emphasis added). Again, they did not opine on whether the concerns were valid based on records of past tests. And of course, they could not opine that those concerns would not arise again in the future when Drs. Wagner and Broussard were not present and the laboratory staff was not being observed.

207.     There is another flaw in the Wagner analysis, or at least an incompleteness. The report mentioned Averhealth's accreditation by CAP (Wagner Report at 3), but apparently nobody informed the authors about the CAP investigation based on Dr. Riley's complaint, an investigation that was ongoing at the time of their visit to the laboratory and therefore known by laboratory personnel such as Dr. Glinn. Perhaps ever worse, no one informed them of CAP's decision to place Averhealth's accreditation on probation for violating its accreditation standards. Would the authors conclusions be different if they knew that? There is no way to know.

### vii.     *Averhealth attempts to influence MDHHS, the judges and Wagner*

208.     Averhealth did not sit idly while courts were expressing their skepticism about Averhealth's tests and while Wagner was conducting its assessment. It waged a campaign to influence the courts, Wagner, and MDHHS.

209.     One week after Judge Ackert reported on his conversation with Dr. Riley, Mr. Herzog emailed Judge Ackert directly and sent him "a memo regarding the allegations by Sarah Riley." He also asked for "a few moments of your time to discuss these events." Email from Jason Herzog, 11/12/20, Ex. 209 at 2-3.

210.     In response, Judge Ackert said he would share the memo with the judges in his home county but added, "I believe I should not be involved in communications with AverHealth,

and the investigation of this issue must be conducted by DHHS and the State Court Administrator's Office. I will communicate with them on this issue." Email from Judge Terence Ackert, 11/12/20, *id.* at 1-2.

211.     Subsequently, Averhealth attended a number of Microsoft Teams meetings with court and MDHHS personnel to defend its processes. Averhealth controlled what the judges were told. On November 13, 2020, before one of those meetings, Mr. Herzog sent Colin Parks and Amanda Doane of MDHHS his talking points "to help avoid potential confusion and ensure clarity of the message." Those talking points defended Averhealth's practices but did not address any specific allegations of Dr. Riley, much less refute them. Email from Jason Herzog, 11/13/20, Ex. 211 at 1-2.

212.     On December 1, 2020, as described above, Averhealth sent MDHHS Mr. Herzog's Request for Exoneration, asking MDHHS to end its investigation and clear Averhealth, Ex. 170. As noted above, MDHHS declined the request.

213.     Averhealth also attempted to influence Dr. Wagner. On February 26, 2021, two days after Dr. Wagner told MDHHS that he needed to see Dr. Riley's statements, Jason Herzog, Averhealth's CEO, forwarded Dr. Riley's testimony to him, and he then attempted to influence Dr. Wagner's conclusions about it. After summarizing three allegations she made, including that "positive results were reported despite failed quality controls," he stated, "No positive results were allowed to be reported if quality control failed. The Averhealth staff followed these standard operating procedures at all times." Email from Jason Herzog, 2/26/21, Ex. 213 at 23-24. (As noted above, CAP found that the lab did not follow its standard operating procedures. Mr. Herzog did not tell Dr. Wagner that.)

214. Mr. Herzog was therefore asking Dr. Wagner to accept his self-serving statement over Dr. Riley's sworn testimony based on her first-hand knowledge (and CAP's findings, which Dr. Wagner did not know about). Mr. Herzog did not work in the lab. He was based in Richmond, Virginia, more than 800 miles away. Thus, unlike Dr. Riley, he was reporting on these practices second-hand. Note that this was a month after Drs. Wagner and Broussard had conducted their site visit, where they could have investigated this issue first-hand if they'd known about it.

215. Averhealth also hired *lobbyists* to try to influence the judiciary. On February 24, 2021, Mr. Herzog emailed MDHHS personnel that "Melissa and Carrie, copied on this email, had a positive conversation with Judge Boyd earlier today." Email from Jason Herzog, 2/24/21, Ex. 215 at 3. Here is a screenshot:



As mentioned above, Judge Boyd was State Court Administrator and head of SCAO, the body that provides guidance and support to Michigan's trial courts statewide.

216.     As can be seen from the "To" line of the above email, Melissa and Carrie are Melissa McKinley and Carrie Linderoth. They were with the lobbying firm Kelley Cawthorne. That firm promotes itself with this inviting description (at least inviting to businesses seeking to influence government decisions): "Lobbying is more than just politics. It's a professional calling to advance your business and institutional interests. We tailor innovative strategies with proven messaging . . . ."[26] The use of professional lobbyists to influence the judiciary is certainly an "innovative strategy" and is an indication of the steps Averhealth was willing to take to attack Dr. Riley and defend its lucrative business in Michigan.

217.     Averhealth also attempted to influence MDHHS. For example, on February 26, 2021, *while Averhealth was on CAP probation based on Dr. Riley's allegations*, Mr. Herzog wrote several MDHHS employees severely criticizing her. He stated: "The sworn testimony provided by Ms. [*sic*] Riley relies on innuendo and lacks factual data." He then purported to rebut her testimony, for example repeating his assertion that Averhealth's staff always followed its standard operating procedures. He did not mention that CAP had put Averhealth on probation because it had *not* been following those procedures. He also (falsely) denied Dr. Riley's testimony that "she and others submitted concerns to management that were either rebuffed or ignored." Email from Jason Herzog, 2/26/21, Ex. 217 at 1-2. Again as noted above, CAP found that this was also untrue.

218.     Most significantly, Mr. Herzog deliberately concealed Averhealth's probationary status with CAP and did not tell MDHHS that CAP agreed with Dr. Riley.

219.     Averhealth also falsely told MDHHS that CAP had investigated Dr. Riley's allegations in December 2020 and found them unfounded. In March 2021, *again while*

---

[26] https://kelleycawthorne.com/ (accessed 12/21/2022).

*Averhealth was on CAP probation*, it sent MDHHS promotional slides entitled "MDHHS Update" for a meeting with Mr. Starling and other MDHHS officials. It included a "Timeline of Events" that states that in December 2020 "Averhealth ha[d] a perfect CAP-FDT proficiency test, a rare industry feat."[27] See this screenshot:



Averhealth presentation, MDHHS Update, March 2021, Ex. 219 at 9.[28] Again he did not mention that, to the contrary, CAP had agreed with Dr. Riley and, as noted above, had placed Averhealth on probation because it had found Dr. Riley's allegations correct and specifically called out Averhealth's proficiency testing as an area with which it was "particularly concerned." Ex. 112 at 1.

---

[27] CAP-FDT is CAP's forensic drug testing accreditation program.
[28] The reference to the conclusions of two organizations in November 2020 apparently refers to whether it was appropriate to forego immunoassay tests, but not to Dr. Riley's allegations regarding issues such as Quality Control and calibration of instruments.

220.    In an email on January 20, 2021, to an MDHHS colleague questioning

Averhealth's accuracy, Ms. Doane wrote that she *had a report of a CAP inspection* "based on the

disgruntled ex-employee allegations" and that "all allegations were deemed to be unfounded."

**From:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Sent:** Wednesday, January 20, 2021 7:20 AM
**To:** Smith, Amy (DHHS) <SmithA41@michigan.gov>
**Subject:** RE: Drug Screens

Our independent assessor team is in St. Louis at the Averhealth lab this week conducting the review. We expect to have the report no later than mid-February.

"got report[] from CAP-FDT"

We also got reports from CAP-FDT and CLIA who did inspections based on the disgruntled ex-employee allegations to the accrediting bodies and to the judge and ... all accusations were deemed to be unfounded.  Both accrediting bodies gave Averhealth excellent marks.

As soon as we get the report from our independent assessor we will put everything together in a communication to courts and MDHHS staff with findings.

Amanda

Email from Amanda Doane, 1/20/21, Ex. 220-A at 1.[29] Ms. Doane must have been told about

this supposed CAP report from Averhealth because, as noted above, no such report existed so

she could not have had one in her possession.

221.    In fact, a month after saying she *had* a CAP report, Ms. Doane asked Averhealth's

COO whether such a report even existed. She said, "Did you ever get the CAP report and submit

---

[29] CLIA stands for "Clinical Laboratory Improvement Amendments," federal standards applicable to laboratories testing human specimens. The CLIA inspection, conducted by the Department of Health and Human Services, was a standard inspection that did not look at Dr. Riley's allegations, as Colin Parks admitted in an email transmitting the inspection report to Stacie Bladen, Deputy CSA Director. Email from Colin Parks, 1/4/21, Ex. 220-B. After reviewing the report, which noted a number of deficiencies, Ms. Bladen commented that "the federal findings are concerning." Email from Stacie Bladen, 1/8/21, *Id.* at 1.

your response to any issues? If so, can you please send me those?" Email from 2/10/21

(emphasis added), Ex. 221 at 2.

---

**From:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Sent:** Wednesday, February 10, 2021 12:22 PM
**To:** Dominique Delagnes <ddelagnes@averhealth.com>
**Subject:** CAP Report?

> **EXTERNAL: This email originated from outside averhealth. Do not click any links or open any attachments unless you trust the sender and know the content is safe.**

Did you ever get the CAP report and submit your response to any issues? If so, can you please send me those?

---

222.    In response, Dominique Delagnes, the COO, like her boss Mr. Herzog, concealed

the fact that Averhealth was on CAP probation. Instead, she stated CAP had not yet concluded its

investigation and was not expected to do so for several months. Emails from Dominique

Delagnes, 2/10/21, *id.* at 1.

**From:** Dominique Delagnes <ddelagnes@averhealth.com>
**Sent:** Wednesday, February 10, 2021 1:13 PM
**To:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Subject:** RE: CAP Report?

**CAUTION: This is an External email. Please send suspicious emails to** abuse@michigan.gov

Good afternoon Amanda,

They have the information they initially requested and since our last inspection was a year ago they have opted to come on-site to conduct an inspection to conclusively resolve the matter.

Best,

Dominique

---

**From:** Dominique Delagnes <ddelagnes@averhealth.com>
**Sent:** Wednesday, February 10, 2021 2:39 PM
**To:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Cc:** Parks, Colin (DHHS) <ParksC@michigan.gov>
**Subject:** RE: CAP Report?

**CAUTION: This is an External email. Please send suspicious emails to** abuse@michigan.gov

They have not set a date yet and we expect it to be in the next few months.

**From:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Sent:** Wednesday, February 10, 2021 1:27 PM
**To:** Dominique Delagnes <ddelagnes@averhealth.com>
**Cc:** Parks, Colin (DHHS) <ParksC@michigan.gov>
**Subject:** RE: CAP Report?

When will they be on-site?

223.    Ms. Delagnes ignored Ms. Doane's query about whether Averhealth had submitted a response to the issues raised by CAP and Ms. Doane's request that, if it had, to send it to her. So far as the Michigan FOIA documents show, Averhealth never sent MDHHS its response to CAP. Nor did it ever deviate from its falsehoods that it had never received less than glowing reviews from CAP, much less admit that CAP believed Dr. Riley's criticisms were so well-founded that they warranted putting Averhealth on probation.

224.    MDHHS never learned about CAP's real conclusions until it received documents directly from CAP on March 25, 2022.

225.    Averhealth's deception regarding its improper testing practices extends into this lawsuit. In support of its motion to dismiss, Averhealth attacked Dr. Riley's opinions as untenable as a matter of law but never mentioned that the scientists of CAP unanimously agreed with her and had placed Averhealth on probation as a result. Memorandum in Support of Motion to Dismiss Complaint, Doc. # 12 at 12-15,

*viii.    MDHHS accepts the Wagner conclusions; judges disagree*

226.    As a result of the Wagner Report, MDHHS stated that "**MDHHS staff and private providers should return to full utilization of Averhealth as a testing provider**." MDHHS Children's Services Agency Communication Issuance 21-047, dated 5/24/2021.[30]

227.    On June 4, 2021, Judge Lisa McCormick of the Ingham County Circuit Court Family Division, relying in large part on the Wagner Report and the testimony of Dr. Wagner and Dominique Delagnes, Averhealth's Chief Operations Officer, issued an opinion that the Averhealth results before her were reliable. Dr. Riley also testified in the case, but Judge McCormick rejected her testimony as "speculative." Ex. 227 at 8.

---

[30] https://micounties.org/wp-content/uploads/OBSOLETE-PI-2021-001-Substance-Use-Testing-CCF-Eligibility-for-Alternate-Provider.pdf (accessed 11/3/2022; emphasis in original).

228.     However, it is clear that the record in that case was woefully incomplete and that her opinion therefore is not an indication that Averhealth engaged in sound practices. First, it does not appear from the opinion that the court heard any testimony regarding the fatal flaws in the Wagner Report. Dr. Riley testified in that case before the final Wagner report was submitted and therefore could not testify about it.

229.     Perhaps even more significant, there was no testimony informing the court that CAP had put Averhealth's accreditation on probation based on its determination that Dr. Riley's allegations were well-founded and that Averhealth's laboratory practices were unsound. The only witness who knew about that was Ms. Delagnes, who testified on February 5, 2021, only a week after that decision. However, Ms. Delagnes, who had been sworn to tell the whole truth, testified that Averhealth was "a CAP-FDT certified laboratory," but did not mention that its certification had been placed on probation. Ex. 229, testimony of Dominique Delagnes in *In the matter of [redacted]*, File No. 76442-1/2-NA (Thirtieth Judicial Circuit Court, Family Div., Mich.) at 10.

230.     Moreover, both before and after the Ingram County decision, a number of Michigan judges stated that they were *not* satisfied with the Wagner report and continued to reject Averhealth's testing.

231.     For example, on May 27, 2021, after learning that MDHHS had restored Averhealth as sole provider for drug tests, Midland County Judge Doreen Allen wrote, referring to herself and her MDHHS County Director: "We have had ongoing meetings on the Aver Health [*sic*] quality issues for some time. Maybe I have missed something, but I don't remember being asked whether the judiciary was satisfied with the 'investigation'.  I certainly am not. " She

reiterated her Blanket Order rejecting the use of Averhealth's tests. Email from Judge Doreen S. Allen, May 27, 2021, Ex. 231 at 2.

232.    As of September 2021, Judge Allen was still refusing to accept Averhealth's testing. Email from Shelly J. Marner, 9/15/21, Ex. 232 at 1.

233.    In November 2021, the court in St. Clair County likewise issued an order not to use Averhealth testing. Email from Shelly J. Marner, 11/5/21, Ex. 232 at 1-2.

234.    Also that month, SCAO informed MDHHS about additional recent complaints regarding Averhealth. For example, Averhealth had incorrectly told the St. Clair County Court that the medication Adderall could not "show up on a drug screening as amphetamine," a statement that Averhealth later retracted after seeing what another lab had said on the subject. Email from Shayne Machen, 11/17/21, Ex. 234 at 1.

| | |
|---|---|
| **From:** | Machen, Shayne (DHHS) |
| **To:** | Bushinski, Vera (DHHS) |
| **Subject:** | Averhealth Meeting |
| **Date:** | Wednesday, November 17, 2021 12:53:00 PM |

Hi Vera,

Can you please add this information to the Averhealth calendar invite:

- Agenda – To discuss recent complaints about Averhealth that have come from SCAO. Specifically, we received documentation that Averhealth incorrectly informed St. Clair County Court that Adderall would not show up on a drug screening as an amphetamine. After seeking testing at another lab, who indicated Adderall *could* show up as amphetamines, Averhealth retracted their statement and agreed with the second lab. Second, in Cheboygan County during testimony at a child welfare hearing, Averhealth staff was not able to answer general questions about the lab results. There are other concerns that Jen Warner is attempting to get more information about. In light of these concerns, the Director would like to meet before our Tuesday meeting with the Justices.

235. Similarly, Judge Laura A. Frawley, Presiding Probate and Family Court Judge in Alcona County, issued an order on December 13, 2021, that Forensic Fluids Laboratories, not Averhealth, would conduct substance use testing in that court. Judge Frawley wrote:

> In 2019, this Court was appraised of a false positive result in a pending child protection action. Court heard sworn testimony from an Averhealth official and it was represented that quality controls were put into place to ensure that this would never occur again. Despite that, currently there are significant questions regarding the reliability of Averhealth. Many courts throughout the state are continuing to question the reliability of Averhealth tests.

Blanket Order Regarding Substance Use Testing for Alcona County Child Protection Cases, Ex. 234 at 3-4.

236. That same day, Shayne Machen, Special Advisor to the CSA Director, wrote that at a work group meeting attended by state court judges, the judges expressed frustration over Averhealth's "past false positives and newer concerns about (allegedly) inconsistent responses." Email from Shayne Machen, 12/13/2021, Ex. 153 at 1-2.

### b. CSA's suspension of Averhealth for improper testing practices

237. Although MDHHS and CSA continued to support Averhealth into early 2022, all that changed on March 7, 2022. On that date, CSA suspended Averhealth's testing services for 90 days while it investigated Averhealth's practices. It published a "Communications Issuance" stating that "the Children's Services Agency (CSA) has determined that effective immediately, CSA will discontinue the use of Averhealth for substance use testing. Staff must access other local providers for testing for the next 90 days." MDHHS Communications Issuance 22-025, Ex. 237 (highlighting in original).[31]

---

[31] That document is available at https://www.courts.michigan.gov/4970ef/siteassets/court-administration/scao-communications/memo-re-drug-testing-in-abuse-and-neglect-cases-following-mdhhs-communication-issuance-22-025.pdf (accessed 11/4/2022).

| Subject/Title | Substance Use Testing |
|---|---|
| Type | ☐ Informational Memorandum<br>☒ Program Instruction<br>☐ Policy Guide |
| Issuance Date | 3/7/2022 |
| Obsolete Date | 6/6/2022 |
| Contact Name | Sarah Goad |
| Email | GoadS@Michigan.gov |
| Phone | N/A |
| Due Date | N/A |
| Due to | N/A |
| Distribution | ☒ CSA Central Office Managers/Staff<br>☒ MDHHS BSC and County Directors<br>☒ MDHHS Juvenile Justice Managers/Staff<br>☒ MDHHS Child Welfare Managers/Staff<br>☒ Native American Tribes<br>☐ Office of Workforce Development and Training<br>☒ Private Agency Child Welfare Managers/Staff<br>☐ Private Residential Abuse/Neglect Managers/Staff<br>☐ Private Residential Juvenile Justice Managers/Staff<br>☐ Other: |

**MDHHS**
Michigan Department of Health & Human Services

**Children's Services Agency**

**Communication Issuance**

**22- 025**
*Revised

The Children's Services Agency (CSA) has determined that effective immediately, CSA will discontinue the use of Averhealth for substance use testing. Staff must access other local providers for testing for the next 90 days.

**Substance Use Testing Liaison**
Each county/district office and private agency provider has established a substance use testing liaison to assist with the substance use contract service. The liaison is responsible for identifying local substance use providers.

Substance use testing liaisons will receive a meeting notice from Amanda Doane by Monday, March 14, 2022, to discuss tracking requirements in greater detail and allow an opportunity for questions to be addressed.

**Court Ordered Drug Testing**
While the local substance use testing liaisons work to set up substance use testing with local substance use testing companies, please work with clients who are court ordered to test to ensure they have the information and resources they need to comply with the court's order.

**Payment and Tracking Process for Substance Use Testing Providers**
The cost of drug testing will be covered by the CSA during this 90-day period.

> "next 90 days"

> "discontinue the use of Averhealth for substance use testing."

238. On information and belief, this decision was triggered by information provided by attorneys with the Michigan Attorney General's Office and the United States Department of Justice that they were investigating Averhealth for health care fraud and that Averhealth was violating national accreditation standards. That belief is based on emails within MDHHS, as well as between MDHHS and the Department of Justice and the Michigan Attorney General's Office.

*i.* ***MDHHS learns of federal and state investigations of Averhealth for medical fraud***

239.    On June 29, 2021, only three months after the Wagner Report purported to exonerate Averhealth, Jason Evans, First Assistant in the Health Care Fraud Division of the Michigan Department of Attorney General, emailed Demetrius Starling, CSA Executive Director, with the Subject "Averhealth drug testing." Email from Jason Evans, 6/29/21, Ex. 239 at 4. He stated: "Our office, along with the U.S. Attorney's Office for the Eastern District of Michigan, is investigating fraud allegations related to drug testing performed by Averhealth through a contract with MDHHS.  It appears MDHHS already hired outside experts to investigate the allegations that are the basis of our fraud investigation." Email from Jason Evans, 6/29/2021, Ex. 239 at 4. See screenshot below:

**From:** Evans, Jason (AG) <EvansJ@michigan.gov>
**Sent:** Tuesday, June 29, 2021 7:12 PM
**To:** Starling, Demetrius (DHHS) <StarlingD@michigan.gov>
**Subject:** Averhealth drug testing

Demetrius,

Our office, along with the U.S. Attorney's Office for the Eastern District of Michigan, is investigating fraud allegations related to drug testing performed by Averhealth through a contract with MDHHS. It appears MDHHS already hired outside experts to investigate the allegations that are the basis of our fraud investigation.

Would you be willing to meet with the assigned Assistant U.S. Attorney and I to discuss? If so, do you have any availability next week?

Thanks,
Jason

Jason Evans
First Assistant
Health Care Fraud Division
Michigan Department of Attorney General
P.O. Box 30218
Lansing, MI 48909
(517) 241-6500

240.    In response, Mr. Starling held a Microsoft Teams meeting on July 9, 2021, with Mr. Evans and Anthony Gentner, Assistant U.S. Attorney for the Eastern District of Michigan, as well as members of his staff. *Id.* at 3.

241.    On the day of the meeting, Jennifer Warner, CSA Legal Division Director, wrote Mr. Starling that "this does not appear to be an investigation against you, but more looking for information on Averhealth." Email from Jennifer Warner, 7/9/21, Ex. 241 at 3.

242.    No record of what occurred at the meeting is contained in the FOIA documents produced by MDHHS. However, on the day of the meeting, Shayne Machen, Special Advisor to CSA Director Starling, wrote two of her colleagues: "Do we know what case the Averhealth

issue came up in? The US Attorney is requesting a copy of the transcript from that hearing. . . . They are also asking for the dollar amount of SSBG funds we spend annually, for FY 20." Email from Shayne Machen, 7/9/21, Ex. 242 at 1.

243.    "SSBG" is the Social Security Block Grant Program, the federal program that provides funds to states for service programming, such as those administered by the CSA.[32] The implication is clear. The US Attorney was investigating Averhealth for fraud directed at federal spending.

244.    The request for a transcript of a hearing apparently refers to Dr. Riley's testimony. On August 12, Mr. Gentner wrote Ms. Warner, "I was curious if you were able to locate more information on the testimony Dr. Riley appears to have given on February 19, 2021 regarding Averhealth's testing practices, which is cited in the public report. Ideally, we want to see a transcript of the testimony, but any information you have on this would be appreciated." Email from Anthony Gentner, 8/12/2021, Ex. 239, at 2.

---

[32] https://www.acf.hhs.gov/ocs/programs/ssbg (accessed 12/15/2022);

**From:** Gentner, Anthony (USAMIE) <Anthony.Gentner2@usdoj.gov>
**Sent:** Thursday, August 12, 2021 12:38 PM
**To:** Evans, Jason (AG) <EvansJ@michigan.gov>; Warner, Jennifer (DHHS)
<WarnerJ19@michigan.gov>
**Subject:** RE: Averhealth Drug Testing

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Thanks for reaching out, Jennifer. Nothing additional to report from me at this time. However, I was curious if you were able to locate more information on the testimony Dr. Riley appears to have given on February 19, 2021 regarding Averhealth's testing practices, which is cited in the public report. Ideally, we want to see a transcript of the testimony, but any information you have on this would be appreciated. Let me know.

Thanks,
Anthony

By "public report" he apparently meant the Wagner Report. Thus, it is clear that the U.S. Attorney was not accepting Wagner's conclusion at face value.

245.    The request for the transcript – which included testimony by Dr. Riley – made its way to Ms. Doane, who wrote a colleague that "now our AG's office is making noises like they want the transcripts – not just the judge's opinion . . . ." Email from Amanda Doane, 8/23/21, Ex. 245 at 1.

246.    On August 12, 2021, Ms. Warner transmitted Dr. Riley's testimony, along with that of Ms. Delagnes of Averhealth. Email from Jennifer Warner, 8/12/21, Ex. 239, at 1-2.

247.    In response, Mr. Gentner wrote Ms. Warner:

One follow-up question along the same lines: can you confirm how MDHHS first became aware of the issues raised by Dr. Riley? I see from the testimony that in February 2021, MDHHS was in the process of investigating and/or hiring consultants to examine the lab in St. Louis, but the attached memo suggests SCAO was aware of these issues as early as November 2020. I'm just trying to understand how Dr. Riley's complaints made it on your radar, and what happened, if anything, during that intervening period.

Email from Anthony Gentner, 8/19/21, Ex. 239, at 1.

> **From:** Gentner, Anthony (USAMIE) <Anthony.Gentner2@usdoj.gov>
> **Sent:** Thursday, August 19, 2021 11:46 AM
> **To:** Warner, Jennifer (DHHS) <WarnerJ19@michigan.gov>; Evans, Jason (AG) <EvansJ@michigan.gov>
> **Subject:** RE: Averhealth Drug Testing
>
> **CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**
>
> Thank you, Jennifer. This is super helpful. One follow-up question along the same lines: can you confirm how MDHHS first became aware of the issues raised by Dr. Riley? I see from the testimony that in February 2021, MDHHS was in the process of investigating and/or hiring consultants to examine the lab in St. Louis, but the attached memo suggests SCAO was aware of these issues as early as November 2020. I'm just trying to understand how Dr. Riley's complaints made it on your radar, and what happened, if anything, during that intervening period.
>
> Separately, we have the Averhealth contract, but is there a way that we can see the RFP that this contact was based on? It's RFP # 190000000633. Forgive me if this information is already available online somewhere; I just couldn't find it.
>
> Thanks,
> Anthony

248.    Ms. Warner passed on that request to two colleagues. Email from Jennifer Warner, 8/19/21, Ex. 239, at 1. How MDHHS answered Mr. Gentner's request is not contained in the FOIA documents.

249.    A few months later, on January 26, 2022, Carl Hammaker, Assistant Attorney General in the Health Care Fraud Division of the Michigan Department of Attorney General, wrote Ms. Doane, with a copy to Sarah Goad, Manager, Foster Care, Guardianship, and Adoption Program Office of MDHHS. The Subject was "Avertest d/b/a Averhealth." Email from Carl Hammaker, 1/26/22, Ex. 249 at 6. The substance of that email produced under FOIA was redacted on grounds of attorney-client privilege. *See* this screenshot:



**From:** Hammaker, Carl (AG) <HammakerC@michigan.gov>
**Sent:** Wednesday, January 26, 2022 4:34 PM
**To:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Cc:** Goad, Sarah (DHHS) <GoadS@michigan.gov>
**Subject:** Avertest d/b/a Averhealth

Ms. Doane,

MCL 15.243(1)(g)

I cc'd your supervisor as reflected on the most recent org chart I was able to find.

If you have questions please feel free to contact me on Teams, my office phone below, or my cell 248-835-6853.

Thanks,
Carl

Carl Hammaker
Assistant Attorney General
Health Care Fraud Division
Michigan Department of Attorney General
P.O. Box 30218
Lansing, MI 48909
(517) 241-6502

250.     The next day Ms. Doane responded: "I am the person who oversees the Averhealth contract for drug screens within DHHS. Sarah and I will be happy to meet with you and your team to discuss Averhealth. Can you give me a brief synopsis on what you would like to discuss so I can be prepared with any documentation I may need?" Email from Amanda Doane, 1/27/2022, *id.* at 5-6.

**From:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Sent:** Thursday, January 27, 2022 7:04 AM
**To:** Hammaker, Carl (AG) <HammakerC@michigan.gov>
**Cc:** Goad, Sarah (DHHS) <GoadS@michigan.gov>
**Subject:** RE: Avertest d/b/a Averhealth

Carl,

I am the person who oversees the Averhealth contract for drug screens within DHHS. Sarah and I will be happy to meet with you and your team to discuss Averhealth. Can you give me a brief synopsis on what you would like to discuss so I can be prepared with any documentation I may need?

Amanda


Amanda Doane

251.    On January 31, 2022, Mr. Hammaker wrote back with a "Synopsis of what is to be discussed on the call." (The actual synopsis is redacted in the document produced under FOIA.) He asked for a meeting in early February. Email from Carl Hammaker, 1/31/22, *id.* at 4.

**From:** Hammaker, Carl (AG) <HammakerC@michigan.gov>
**Sent:** Monday, January 31, 2022 3:44 PM
**To:** Goad, Sarah (DHHS) <GoadS@michigan.gov>; Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Cc:** Warner, Jennifer (DHHS) <WarnerJ19@michigan.gov>; Smitt, Zachary (AG) <SmittZ@michigan.gov>
**Subject:** RE: Avertest d/b/a Averhealth

All:

Sorry for the delay in getting back to you. We had to deal with some internal issues here within the AG's office before moving forward to setting up a call. I have cc'd Zachary Smitt from our HEFS division, who has been advising MDHHS related to certain ongoing Averhealth issues.

Synopsis of what is to be discussed on call:



MCL 15.243(1)(g)

I am not certain who should be included on this call and will leave that to your judgment. Looking back on previous correspondence, Shayne Machen was involved during our previous discussions with MDHHS regarding Averhealth.

If possible, could you send me your availability for Wed. 2/2 through Monday 2/7. I will try to find a time that everyone is available.

Thanks,
Carl

Carl Hammaker
Assistant Attorney General
Health Care Fraud Division

252. The purpose of the meeting with the representatives of Attorney General's and U.S. Attorney's offices was "to get more specific information regarding this complaint." Email from Rachel Willis, 2/2/22, *id.* at 1.

From:        Willis, Rachel (DHHS)
Sent:        Wed, 2 Feb 2022 16:48:21 +0000
To:          Click, Tim (DHHS); Goad, Sarah (DHHS); LaHaine, Ann (DHHS)
Subject:     RE: Avertest d/b/a Averhealth

Hi Tim,

Sarah and I were able to do our background research. I just want to confirm that we are still proceeding with scheduling a meeting with the MI AG's and federal AG's to get more specific information regarding this complaint.

253.    That same day, Tim Click of MDHHS wrote to his colleagues Rachel Willis, Demetrius Starling and Wendy Campau, with the Re line "Avertest d/b/a Averhealth," stating: "I want to say that the last time we spoke about issues with the contract, we were not at the point where we could say that there were performance issues." Email from Tim Click, 1/31/2022, Ex. 253 at 1-2. Apparently, they were now at that point.

254.    Because of scheduling difficulties, the meeting was pushed out until March 1.

255.    Attending the meeting on behalf of MDHHS were Demetrius Starling, CSA executive director; Rachel Willis, Director of the Bureau of Out of Home Services; Amanda Doane, who oversaw the Averhealth contract; Sarah Goad, Manager, Foster Care, Guardianship, and Adoption Program; and three MDHHS attorneys, Shayne Machen, special advisor to the CSA Director; Jennifer Warner, Director of Children's Services Legal Division; and Mary Brennan, Interim Director and Regulatory Affairs Officer of the Children's Services Legal Division of the DHHS Bureau of Legal Affairs. From the law enforcement side, Carl Hammaker and Zachary Smitt of the Michigan Attorney General's office and Assistant U.S. Attorney Anthony Gentner attended. Ex. 255 at 1. No unredacted version of what occurred at the meeting was produced with the FOIA documents,

256.     Over the succeeding several days (March 2 and March 4), Ms. Warner and

Messrs. Hammaker and Gentner, exchanged no fewer than seven messages with the subject

"Averhealth testing." Ex. 256. All of these messages were substantively redacted as privileged in

the FOIA production, except for a message from Ms. Warner to Mr. Gentner on Friday, March 4:

"Anthony, [Redacted]. Thank you for pulling this together." *Id.* at 4.

**From:** Warner, Jennifer (DHHS) <WarnerJ19@michigan.gov>
**Sent:** Friday, March 4, 2022 4:02 PM
**To:** Gentner, Anthony (USAMIE) <AGentner@usa.doj.gov>; Hammaker, Carl (AG)
<HammakerC@michigan.gov>
**Subject:** [EXTERNAL] RE: Averhealth testing

Anthony,

MCL 15.243(1)(g)

Thank you for pulling this together.
-Jennifer

Jennifer Warner
*She/Her/Hers*
Children's Services Legal Division Director
Michigan Department of Health and Human Services
517-243-7645

### ii.     *MDHHS suddenly suspends Averhealth*

257.     The next business day, Monday, March 7, MDHHS officially suspended

Averhealth.

258.     The following day, Ms. Warner, as well as others from MDHHS, held a

conference call with Messrs. Hammaker and Gentner. Emails of 3/8/22, Ex. 258 at 2-3.

259.     That same day CSA executive Director Starling wrote: "We have received

guidance from Legal and the AG's office over the last couple of days to insure that we are

making well informed decisions regarding Averhealth." Email from Demetrius Starling, 3/8/22,

Exhibit 259 at 1.

260.    In an "Executive Briefing" sent on March 10 to MDHHS' top officials, Ms. Machen explained that the reason for the discontinuation of Averhealth's testing services was that Averhealth had been violating national accreditation standards for calibration of testing devices and, as a result, was under federal investigation for medical fraud; in addition, the suspension of Averhealth was based on the recommendation of the agency's lawyers and the state's Attorney General:

> CSA has discontinued the use of Averhealth drug testing company after receiving information from the US Attorney that Averhealth was under investigation for medical fraud. Specifically, they were not complying with national accreditation standards as it related to calibration of testing devices despite agreeing to do so in their contract with DTMB. We are working closely with Children's Services Legal Division and the Attorney General's office and following all of their recommendations. Bob Wheaton in Comms has been notified of this as well.

Email from Shayne Machen, 3/10/22, Ex. 260 at1-5. (DTMB is the Department of Technology, Management and Budget, which supports the business operations of Michigan's state agencies.[33] It is the department that entered into the state's contract with Averhealth.). Here is the relevant screenshot, from p. 5 of the above exhibit:

---

[33] https://www.michigan.gov/dtmb (accessed 11/3/22).

Cases Receiving Noteworthy Media Attention

- CSA has discontinued the use of Averhealth drug testing company after receiving information from the US Attorney that Averhealth was under investigation for medical fraud. Specifically, they were not complying with national accreditation standards as it related to calibration of testing devices despite agreeing to do so in their contract with DTMB. We are working closely with Children's Services Legal Division and the Attorney General's office and following all of their recommendations. Bob Wheaton in Comms has been notified of this as well.

Shayne Machen, Esq.
Special Advisor to the Children's Services Agency Director
Michigan Department of Health and Human Services

261.    Another apparent factor in the decision was that, according to the Michigan Attorney General, Averhealth had manipulated its instrument settings. In an email dated March 4, 2022, three days after the meeting with attorneys from the Attorney General's office, Ms. Doane referred to "the instrument software settings that the AG talked about and said were manipulated." Email from Amanda Doane, 3/4/2012, Ex. 261 at 1.

From:       Doane, Amanda (DHHS)
To:         Goad, Sarah (DHHS)
Subject:    FW: follow-up
Date:       Friday, March 4, 2022 7:37:00 AM
Attachments:   Debunking Drug Testing Myths.pptx
                  MDHHC-Proven Quality vs 2.pptx
                  MI Prosecutors Association 4.21.21.pptx

FYI.

I think these could be shared with Rachel and Shayne and up through the AG's office.  These are slides they have presented at meetings with judges in the past.

In the MDHHC-Proven Quality vs 2 slide deck – on slide 6 they discuss the timeline of events from November 2020 and one thing they mention is the "perfect CAP-FDT proficiency test…"  I would like to ask Averhealth for that along with their annual CAP-FDT reports.  Please let me know if I cannot do this.

Also in the MI Prosecutors Association slide deck – Slide 8 reviews the CAP-FDT review from December 2020 and discusses the instrument software settings that the AG talked about and said were manipulated.  The instrument settings were actually set more stringent than their SOP and Averhealth changed the software parameters to align with the SOP.  In addition slides 9-11 are interesting.

Amanda

"instrument software settings that the AG talked about and said were manipulated"

This is similar to the "manipulation of instrument calibrations" that was one of the grounds on which CAP had placed Averhealth on probation. *See* Paragraph 113 above.

262.     Furthermore, the improper practices that led MDHHS and CSA to suspend Averhealth dated back to the period when the Wagner firm did its audit and before. In an email to Ms. Machen the day of the Communications Issuance announcing the suspension, Bob Wheaton, MDHHS's Public Information Officer and the individual tasked with answering media inquiries to the department,[34] said, in reference to the Wagner firm:

> How could your contractor have determined there were no issues with the AverHealth testing *when it now appears that there were issues*? Do we have

---

[34] https://www.linkedin.com/in/bob-wheaton-b569b16/ (accessed 11/3/22) (emphasis added).

concerns that the contractor didn't do an adequate job or *has some type of conflict of interest*?

Email from Bob Wheaton, 3/7/22, Ex. 262 at 1 (emphasis added) ("Wheaton email"). See the

screenshot below (yellow highlighting added):



**From:** Wheaton, Bob (DHHS) <WheatonB@michigan.gov>
**Sent:** Monday, March 7, 2022 10:26 AM
**To:** Machen, Shayne (DHHS) <MachenS@michigan.gov>
**Cc:** Warner, Jennifer (DHHS) <WarnerJ19@michigan.gov>
**Subject:** RE: Touch Base on Aver Health Response to Reporter

Hi Shayne,

I discussed this matter with my supervisor, Darice Darling, and there are a couple of important
questions we believe we should be prepared to answer from media :

- How could your contractor have determined there were no issues with the AverHealth testing
  when it now appears that there were issues? Do we have concerns that the contractor didn't
  do an adequate job or has some type of conflict of interest?

263.    Ms. Machen's answer was not recorded. Instead, she discussed it with him in a

phone call. Email from Shayne Machen, 3/7/2022, *id.* at 1. However, it is clear from Mr.

Wheaton's question that the basis for the agency's decision went back to the period when the

Wagner firm did its investigation. So serious was the revelation of the defects in Averhealth's

testing practices that Mr. Wheaton suspected that the Wagner firm might have had "some type of

conflict of interest" in upholding Averhealth against Dr. Riley's allegations. *Id.*

### iii.    *MDHHS stops using past Averhealth test results for any purpose*

264.    Following its decision, MDHHS instructed its personnel not to use past

Averhealth test results in any fashion. According to the minutes of an Urban Directors Meeting

on March 9, 2022, MDHHS Directors were told, "We are to stop using Averhealth immediately.

… Due to happenings over the last 72 hours we must take immediate adverse action against

Averhealth. We are working to get this resolved as quickly as possible. We hope to have a new statewide provider identified asap well before the 90-day period identified." Ex. 264 at 5-6.

> Due to happenings over the last 72 hours we must take immediate adverse action against Averhealth. We are working to get this resolved as quickly as possible. We
>
> hope to have a new statewide provider identified asap well before the 90-day period identified. Each county will need to identify their own provider. If you have a provider currently it might be advantageous to enter into a 90-day agreement. Questions you may have can be sent to Demetrius.

265. Moreover, MDHHS employees were not to use past Averhealth test results as the basis of any decision, even in part; they were not to introduce them in court; and CSA was not even to report that a client had failed to show up for a test if it was an Averhealth test. Previously, failure to show up for a test had been used as an indication of the individual's lack of cooperation. Moreover, absent contrary court order, if an Averhealth test result was the only evidence of substance abuse or an abuse/neglect allegation, the CSA petition against the parents was to be dropped. Pending Case Guidance, Ex. 265-A; email from Vera Bushinski, 3/25/22, Ex. 265-B (transmitting the guidance). Here are sample instructions:

**Preliminary Hearings and Original Termination**

- MDHHS testimony should be focused on substance abuse screen results provided by facilities other than Averhealth.
- Parents' admissions of substance abuse will be used.
- Averhealth screens already provided will be disregarded and parents will be directed to an independent screening facility instead.
- The petition should be withdrawn for any case where Averhealth screen results and/or Averhealth witnesses would be the only evidence used during trial to substantiate substance use or an abuse/neglect allegation unless the Court has ordered the agency to file the petition. If there are independent child abuse and neglect allegations the petition may be filed addressing only those allegations.

**Reports for Dispositional Review/Permanency Planning Hearings and Testimony at those Hearings**

- Averhealth screen results will not be included in court reports. Missed screens will only be included in reports if the missed screens are being reported by an independent screening agency.

        *iv.*    ***MDHHS investigates the concerns that led to the suspension and reviews thousands of positive Averhealth test results***

266.    Following its announcement, MDHHS set out to further investigate the concerns that led to the suspension. In an email to CSA personnel, CSA Executive Director Demetrius Starling wrote that "additional concerns regarding testing provided by Averheath have come to our attention," and "we are not using Averhealth while we investigate the concerns that have been raised." Email from Shayne Machen, 3/11/2022, Ex. 266 at 1.

From: Machen, Shayne (DHHS)
To: Bushinski, Vera (DHHS)
Cc: Starling, Demetrius (DHHS)
Subject: Memo for Today
Date: Friday, March 11, 2022 3:56:00 PM

Hi Vera,

Please send this out to all the County Directors and BSC Directors on behalf of Demetrius. Please label the email: Substance Use Testing Update. Thank you!

Good afternoon,

I want to thank you all for your efforts to adjust to the change in our drug testing procedures. It never ceases to amaze me what our workforce is capable of. I know the transition to new drug testing companies came as a surprise to many of you. I want to assure you this was not pre-planned. Many of you have questions regarding the discontinued use of Averhealth drug testing. I'm writing to share with you that additional concerns regarding testing provided by Averhealth have come to our attention. Out of an abundance of caution, we are not using Averhealth while we investigate the concerns that have been raised. We ask for your patience as we work through the details. We will provide you with information as it becomes available.

Very Sincerely,

Demetrius Starling

"additional concerns regarding testing provided by Averheath have come to our attention."

267.    As described above, MDHHS requested and, on March 25, 2022, received documents from CAP showing that CAP had found that Dr. Riley's allegations were substantiated.

268.    In April, "to ensure fair outcomes for children and families," CSA undertook an enormous project to review every one of the thousands of open cases with a positive Averhealth test result. To carry out this review, CSA created a Sharepoint website to store and record information on every open case with a positive Averhealth result. Relevant portions of his message to private agencies are shown below:

> In an effort to ensure each case is reviewed, the Department created a SharePoint Database to track each case review. The SharePoint site includes a record of every open case where a positive Averhealth test result was uploaded into the Averhealth Portal. These cases are organized by county and will soon also be organized by private agency. To get access to this site, each agency must send

> Thank you for you efforts to ensure careful review of each case. We believe this level of review is necessary to ensure fair outcomes for children and families. If you have questions about this

> request, please send those requests to my Special Advisor, Shayne Machen.
>
> Very Sincerely,
>
> Director Starling

Email from Amanda Doane (with message signed by CSA Executive Director Demetrius Starling), Ex. 268 at 1-2.[35]

269.     The information to be recorded in the database included whether, after the suspension, children were reunified with the parents they were taken from. This indicates that CSA planned to reunify children and parents if that had not already happened. Children Services

---

[35] In a previous lawsuit making similar claims of Averhealth's improper testing procedures, Averhealth identified CSA Director Starling and Ms. Doane as witnesses it might use to support its defenses. It made that designation before CSA suspended Averhealth because of improper testing procedures. *See* Defendant's Initial Disclosure in *Gonzalez v. Avertest, LLC*, No. 4:21-cv-00403 (E.D. Mo.).

Administration Case Review SharePoint User Guide, Ex. 269 at 3-6. Here is a screenshot of the information to be recorded for each case:

**MDHHS**
Michigan Department of Health & Human Services

> "Have all children in the case been reunified with the parent(s) they were removed from?"

### CASE INFORMATION

| Field Name | Alpha/Numeric | Type | Values | Editable? |
|---|---|---|---|---|
| First Name | Alpha | Free Form | 1-255 | Yes |
| Last Name | Alpha | Free Form | 1-255 | Yes |
| Date of Birth | Numeric | Date | Date | Yes |
| Ongoing Case ID | Alpha | Fixed | 1-255 | No |
| Person ID | Numeric | Free Form | 1-255 | Yes |
| Case Status | Alpha | Drop Down | Open / Closed | Yes |
| Case Type | Alpha | Fixed | Investigation/Ongoing/Permanent Ward | No |
| Children Reunified<br><br>Have all children in the case been reunified with the parent(s) they were removed from? | Alpha | Drop down | Yes / Now | Yes |
| Legal Status | Alpha | Free Form | 1-255 | Yes |
| Direct or PAFC | Alpha | Drop Down | Direct / PAFC | Yes |
| Responsible County | Alpha | Drop Down | 83 County Listing | Yes |
| Averhealth District | Alpha | Fixed | 1-255 | No |
| Averhealth County | Alpha | Drop Down | 83 County Listing | Yes |
| Petition Authorization Reason<br><br>Please list all the reasons the court noted the petition was authorized. | Alpha | Free Form | 1-64,000 | Yes |
| Date of Next Hearing | Numeric | Date | Date | Yes |
| Type of Next Hearing Scheduled | Alpha | Free Form | 1-255 | Yes |
| Averhealth Entry Date | Numeric | Fixed | Date | No |
| Last Positive Test | Numeric | Date | Date | Yes |
| Ongoing Case First Name | Alpha | Fixed | 1-255 | No |
| Ongoing Case Last Name | Alpha | Fixed | 1-255 | No |
| Ongoing CSE In Care | Numeric | Fixed | 1-7 | No |
| Notes<br><br>Please include any other information that if relevant to your review or decision making. | Alpha/Numeric | Free Form | 1-64,000 | Yes |

270.     According to an analysis done to prepare for this project,[36] there were more than 11,000 records of cases with positive results in the database. Email from Michael Rosenberg, 3/29/2022, Ex. 270 at 2-3. This analysis shows that the review was to include all positive results going back to Averhealth's first Michigan tests in May 2019. As another indication that MDHHS considered *all* Averhealth positive results unreliable, even those before the Wagner audit, Mr. Rosenberg noted the number of children removed from their homes after May 1, 2019. All of those were to be reviewed. Email from Michael Rosenberg, 3/29/2022, *id.* at 1-2. See this table (highlighting in original):



"Records with positive tests: 11,112"

"after 5/1/2019"

| SUMMARY OF AVERHEALTH DATA LOAD | COUNT | PERCENT | NOTE |
|---|---|---|---|
| TOTAL RECORDS | 16,391 | | |
| RECORDS WITH POSITIVE TESTS | 11,112 | 67.8% | OF TOTAL RECORDS |
| RECORDS WITH POSITIVE TESTS WITH MATCHING PERSON (NAME, DOB) | 9,333 | 84.0% | OF RECORDS WITH POSITIVE TESTS |
| MATCHING RECORDS WITH MATCHING CASE PARTICIPANT ON CASE | 9,103 | 81.9% | OF RECORDS WITH POSITIVE TESTS |
| PERSON ID MATCHES CASE REFERENCE PERSON ON CASE | 6,646 | 59.8% | OF RECORDS WITH POSITIVE TESTS |

| CASE SUMMARY | COUNT | PERCENT | NOTE |
|---|---|---|---|
| TYPES OF CASES | | | |
| CPS ONGOING | 7,687 | 84.4% | OF CASES |
| INVESTIGATIONS* (Investigations were linked to Ongoing Case where Possible) | 1,407 | 15.5% | OF CASES |
| PERMANENT WARD | 9 | 0.1% | OF CASES |
| | 9,103 | | |

| SUMMARY OF COUNTY INFORMATION | COUNT | PERCENT | NOTE |
|---|---|---|---|
| RECORDS WHERE COUNTY WAS IDENTIFIED ON AVERHEALTH SHEET | 10,640 | 95.8% | OF RECORDS WITH POSITIVE TESTS |
| RECORDS WHERE CASE COUNTY MATCHED AVERHEALTH SHEET | 7,818 | 73.5% | OF RECORDS WHERE AVERHEALTH COUNTY WAS LISTED |
| RECORDS WHERE CASE COUNTY WAS NOT FOUND OR MATCHED AVERHEALTH | 3,294 | 29.6% | OF RECORDS WITH POSITIVE TESTS |
| PROJECTED NUMBER OF UNIQUE CASES FROM UNMATCHED CASES | 2835 | 86.1% | PERCENT OF TOTAL CASES BEING UNIQUE |
| UNIQUE CASES FOUND | 7834 | | |
| UNIQUE CASES WHERE AT LEAST ONE CHILD IS IN OUT OF HOME CARE | 1536 | 19.6% | OF TOTAL UNIQUE CASES |
| CHILDREN CURRENTLY IN OUT OF HOME CARE RELATED TO CASE FOUND | 2885 | 1.9% | Average Child Per case |
| CHILDREN CONNECTED TO A CASE WHOSE REMOVAL DATE WAS AFTER 5/1/2019 | 2608 | 90.4% | OF CHILDREN ON CASES WHO ARE CURRENTLY IN OUT OF HOME CARE |
| | | 0.532409 | |
| PROJECTED ADDITIONAL NUMBER OF CASES INVOLVING OUT OF HOME CARE | 556 | | NUMBERS BASED ON THE NUMBER OF UNIQUE CASES FOUND WITH |
| PROJECTED ADDITIONAL NUMBER OF UNIQUE CHILDREN IN OUT OF HOME CARE | 1044 | | CHILDREN IN OUT OF HOME CARE PER CASE |
| PROJECTED TOTAL CASES | 2092 | | |
| PROJECTED TOTAL CHILDREN CONNECTED TO CASE | 3653 | | |

---

[36] https://www.linkedin.com/in/michael-rosenberg-a184b05b/?trk=public_profile_browsemap_profile_result-card_result-card_full-click (accessed 11/4/2022).

271.     In other words, the concerns that led to Averhealth's suspension had not arisen only after Wagner endorsed Averhealth's procedures.

### v.     *CSA scrambles to find substitute testing services*

272.     The sudden discontinuation of Averhealth's services on March 7, 2022, left CSA staff and others scrambling to find substitute testing services. In 81 of the 83 Michigan counties, Forensic Fluids Laboratory ("FFL") was selected. FFL conducted training webinars for more than 1,500 MDHHS Caseworkers on "How to Collect." Email from Amanda Doane, 4/18/22, Ex. 272 at 1.

Good Morning Drug Screen Coordinators,

I hope you are all doing well and I wanted to thank each of you for the unexpected workload during the shift away from Averhealth during this 90-day pause.  As most of you know, 81 of 83 counties are now utilizing Forensic Fluids for some or all of their oral fluid drug testing needs.  Forensic Fluids has given me the following statistics that are as of last Thursday:

- 81 Counties are onboard with FFL Services
- 1,507 Caseworkers have Attended our How to Collect Webinar
  - Webinars are live hosted and scheduled Tuesdays & Thursdays at 2pm. If you are interested in attending a webinar please contact the FFL Customer Service line at 866-492-2517 x230

273.     During the week of May 16, 2022, FFL surveyed MDHHS users to compare their experiences with the two companies. On a scale of 1-10, the overall satisfaction with Forensic Fluids was 9.3 compared to only 5.2 for Averhealth. FF Survey, Ex. 273 at 1. The score for "How much do you value the laboratory test results?" was 9.5 for Forensic Fluids compared to only 5.2 for Averhealth, again on a 1-10 scale. *Id.* at 8, 9. Here are screenshots of those results:

Results of survey given to Michigan DHHS users Week of 5/16/22. Below are the scores (average) on a 1 out of 10 scale (10 being Very Satisfied, 1 being Very Unsatisfied). We have also included the comments for each question. Forensic Fluids is proudest of our NET PROMOTER SCORE of **82** compared to that of our competitor with a NET PROMOTER SCORE of **-57**.

**What is your overall satisfaction with company services?**
Forensic Fluids Laboratories          Averhealth
9.3 / 10                                              5.3 / 10

**How responsive is the company to your questions and needs?**
Forensic Fluids Laboratories          Averhealth
9.5 / 10                                              5.7 / 10

**How satisfied are you with the company customer service team?**
Forensic Fluids Laboratories          Averhealth
9.6 / 10                                              5.8 / 10

**How much do you value the laboratory test results?**
Forensic Fluids Laboratories          Averhealth
9.5 / 10                                              5.2 / 10

274.     The Net Promotor Score mentioned in the above screenshot was the score in response to the question, "Based on your recent experience, how likely are you to recommend laboratory to other agencies or medical providers?" FFL's score indicates respondents were likely to recommend it; Averhealth's indicates the opposite for that lab. *Id.* at 1. See this screenshot:

**Based on your recent experience, how likely are you to recommend laboratory to other agencies or medical providers?**
Forensic Fluids Laboratories          Averhealth
**Net Promoter Score 82**              **Net Promoter Score -57**

275.    On June 7, 2022, the date that the 90-day suspension of Averhealth's services expired, the suspension was extended another 90 days, until September 7, 2022. Communications Issuance 22-025 updated 6/7/2022. Ex. 275 (highlighting in original).



276.    On information and belief, CSA's investigation ultimately found that the concerns that led to the suspension were well-founded. That belief is based on the fact that on the date that the June 7 suspension was to end, September 7, 2022, CSA announced that the discontinuation of Averhealth's drug testing services would essentially be made permanent. Specifically, the suspension was continued essentially to the end of the Averhealth contract in 2024. In Communications Issuance 22-098, issued on September 7, 2022, with an "Obsolete Date" of July 1, 2024, it announced that "the updated Communications Issuance issued on June 7, 2022, which

discontinued the use of Averhealth for substance use testing, will remain in effect." The temporary suspension of Averhealth's services that began on March 7, 2022, was now permanent. MDHHS Communications Issuance 22-098, Ex. 276 (issued 9/7/2022).

| | Subject/Title | Substance Use Testing Update |
|---|---|---|
| **MDHHS** Michigan Department of Health & Human Services **Children's Services Agency** **Communication Issuance** **22-098** | Type | ☐ Informational Memorandum ☒ Program Instruction ☐ Policy Guide |
| | Issuance Date 9/7/2022 Obsolete Date 7/1/2024 | |
| | Contact Name Sarah Goad Email GoadS@Michigan.gov Phone N/A | |
| | Due Date N/A Due to N/A | |
| | *Distribution* | ☒ CSA Central Office Managers/Staff ☒ MDHHS BSC and County Directors ☒ MDHHS Juvenile Justice Managers/Staff ☒ MDHHS Child Welfare Managers/Staff ☒ Native American Tribes ☐ Office of Workforce Development and Training ☒ Private Agency Child Welfare Managers/Staff ☐ Private Residential Abuse/Neglect Managers/Staff ☐ Private Residential Juvenile Justice Managers/Staff ☐ Other: |

The Children's Services Agency (CSA) has determined that the updated Communications Issuance issued on June 7, 2022, which discontinued the use of Averhealth for substance use testing, will remain in effect. Staff must continue to access other local providers for testing going forward.

**Court Ordered Drug Testing**

Please work with clients who are court ordered to test to ensure they have the information and resources they need to comply with the court's order.

277. In short, after conducting a thorough investigation, MDHHS fired Averhealth for the same faulty testing practices that give rise to this lawsuit.

## V.  PLAINTIFFS' EXPERIENCES

### A.  Katarzyna Foulger

278. Beginning in December 2021, Plaintiff Foulger was ordered by the Superior Court of Maricopa County, Family Department, in connection with her divorce proceeding, to undergo

drug testing by Averhealth. The court order had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided Ms. Foulger treatment for any health-related condition. She is not, and never has been, Averhealth's patient.

279.    The first such court order occurred on December 13, 2021, when Ms. Foulger was ordered by to submit to a drug test by Averhealth at her expense.

280.    Accordingly, on that same date, she reported to Averhealth's Phoenix AZ – Central location and signed a "Donor Testing Agreement," in which Averhealth promised "to competently perform" its testing services. (Exhibit 280, Doc # 1-1 [handwritten markings were on the document when Ms. Foulger received it]). Pursuant to that agreement, Ms. Foulger submitted to a drug test, for which she paid $145, by providing a hair sample to Averhealth as ordered by the court and submitted to other drug tests on later dates for which she paid.

281.    The services that Averhealth provided to Ms. Foulger occurred in Arizona, where Averhealth collected Mrs. Foulger's samples, and Missouri, where it conducted drug tests.

282.    The Averhealth facility was filthy on that date and every other occasion when she has been there, with a dirty floor and dusty surfaces. The collector did not know how to open the Ziploc bag for her hair sample and tore it in doing so. Ms. Foulger had to show him how to open the bag.

283.    On December 17, 2021, Ms. Foulger obtained a drug test of her hair on her own from an independent laboratory, Fastest Labs of Scottsdale. That test was negative for all tested substances, including cocaine and opiates.

284.    Subsequently, Ms. Foulger received two tardy, incorrect and bafflingly inconsistent results of the test that Avehealth had run on her hair sample.

285.    On January 2, 2022, at 05:24, Averhealth reported that it had received her December 13 sample on December 15, 2021, and that Ms. Foulger had tested positive for cocaine and 6-MAM, a unique metabolite of heroin. Those results were false. Ms. Foulger has never used cocaine or heroin.

286.    As noted above, Averhealth represents that it provides "next day results," a day faster than other laboratories. However, this report was provided 20 days after Ms. Foulger provided her hair sample.

287.    On January 3, 2022, the day after receiving the above false positives from Averhealth, she again arranged for an independent test on a hair sample, this time from Omega Laboratories. Like the other independent test, this one was negative, including for cocaine and opiates.

288.    Then, three days after receiving the first positive test report from Averhealth, on January 5, 2022, at 16:58, Averhealth issued a *second report* on Ms. Foulger's December 13 hair sample, with no explanation for why there were two reports on the same test. This time, it reported that Ms. Foulger had tested positive for cocaine and *negative* for 6-MAM.

289.    Although Ms. Foulger raised this inconsistency with Averhealth in a phone call, she never received an explanation for it. However, both reports are inaccurate. As noted above, she has never used cocaine or heroin (or any other illegal drug).

290.    After providing her hair sample for an independent test on January 3, 2022, as noted above, she left for a brief vacation in Sedona. There she went to the closest Averhealth facility, which was in Cottonwood, to be retested. However, the woman at that location told her that she would have to go back to Averhealth's Phoenix Central location for a retest. That

employee also told her that she could request that her hair sample be returned for independent testing; however, the woman said she would have to call the laboratory for that.

291.    Ms. Foulger could not find a phone number for Averhealth's laboratory, so she called customer service and spoke to an individual named Michael Giraldo, who told her that yes, she could obtain a return of her hair sample and advised her to ask her local center to have the lab return it.

292.    Accordingly, Ms. Foulger went to Averhealth's Phoenix Central location, where she was told she should contact the laboratory for a return of her hair sample.

293.    Again, she called customer service and got through to Mr. Giraldo. However, this time the story was different. This time he said that, although Averhealth retained other samples, such as urine, it *destroyed* all hair samples after testing. He provided no explanation for why that was or why he had purportedly given her incorrect information in the first call.

294.    Mr. Giraldo said he would ask a manager to call her to explain. No one did.

295.    On January 13, 2022, Ms. Foulger wrote Averhealth's customer service:

My name is Katarzyna Foulger. I had a drug hair follicle test done on the 13th of December 2021 and I got positive result on the 01/02/2022 first one. Then from the same hair I'm receiving second test result on the 01/05/2022 also positive but only for one drug. I've been told by your colleague that the time to test the hair in the lab is 7 to 10 days I received my one after 2.5 weeks and the second one after 3 weeks. I have to state that I don't do drugs at all and there is error in your system and error with the person who did test my hair. I called twice and talk to Michael Giraldo to request my hair sample and he gave me two different information. Also he took a notes for the manager of the facility and said he will contact me as soon as possible. And that was 01/12/2022. Today is 01/13/2022 and I still haven't heard from anyone. Tried to called numerous time and no answer. Still waiting to hear from the manager!

296.    No one from Averhealth responded to the email.

297.     On January 31, 2022, because of the positive test reported by Averhealth, the Court issued a further order for drug testing of Ms. Foulger. She was ordered to undergo random urine testing beginning on February 4, 2022, on at least a weekly basis at $10.50 per test.

298.     Every morning, Ms. Foulger was required to phone Averhealth to determine whether she must appear for testing on that day. If so, it would take an average of a half hour to drive to and from the location each way, and she spent an average of 45 minutes at Averhealth, for a total of an hour and 45 minutes per testing session on average. Contrary to the court order, Averhealth charged her $11.00 for each test.

299.     Between February 4, 2022, and April 3, 2022, Ms. Foulger had nine negative drug tests administered by Averhealth.

300.     According to the Court's guidelines, a no-show is considered a positive test. Averhealth also falsely reported that she was a no-show on two occasions during this period. This was false. She was never a no-show. Here is why:

301.     She was under an order to report for testing once a week. On Thursday, February 10, 2022, the day after she had reported for testing (and obtained a negative result), Averhealth somehow reported that she was a no-show. That was false because she had already received her test that week.

302.     Again, on Tuesday, February 15, 2022, she appeared for testing (and obtained a negative result). Nevertheless, Averhealth falsely reported her as a no-show for that week on Saturday, February 19, 2022.

303.     On her next visit, the Averhealth employee asked her if anyone from Averhealth had ever explained that she was supposed to call every day with a "PIN" number to find out if

she was supposed to come in that day. She said no, and he then printed out a PIN number for her. From then on, she was never a "no-show."

304.    Because of those two supposed no-shows, Ms. Foulger was ordered to submit to additional weekly random urine tests for two months beginning May 20, 2022.

305.    During that period, Ms. Foulger had seven negative tests, and Averhealth reported that two tests, those based on samples provided on May 30 and July 1, showed abnormal levels of creatinine.

306.    Those supposedly abnormal tests were either false positives based on Averhealth's unreliable procedures or were mistakenly not based on her samples. Ms. Foulger was taking no illegal drugs during that period (or any other period).

307.    The report on the sample collected on May 30 states that it was Ms. Foulger's sample, but that is incorrect because the time of collection shown on the report, 12:06:00 was not when she submitted her sample. She submitted her sample at 12:30 p.m., the same time as her husband, who accompanied her.

308.    Likewise, the report of the sample collected on July 1, 2022, that states that it was Ms. Foulger's sample is incorrect. The report states that the sample was collected at 12:01 p.m., but Ms. Foulger produced her sample at 12:10 p.m.

309.    After receiving the false positive creatinine test on the May 30 sample, Ms. Foulger voluntarily submitted to a urine test on June 2, 2022, at Fastest Labs of Scottsdale. That test was reported as negative on June 6.

310.    On July 7, 2022, the same day she received the false positive creatinine test on the July 1 sample, Plaintiff voluntarily submitted to a hair follicle test with D.R.S. Medical Review Service. That test was reported as negative on July 8, 2022.

311.    Because of the first inaccurate positive test results and the accusation that it meant she was an illegal drug user, Plaintiff suffered substantial emotional distress, including anxiety, stress and sleeplessness, ever since she received her first false positive result. That is especially the case because, as a result of her false positive drug test, she has had to continue to undergo drug testing and had no confidence that the results would be accurate. In addition, the false positive test result caused her to have to incur substantial legal fees in her child custody case.

312.    Ms. Foulger suffered her injuries in Arizona, where she experienced the consequences of Averhealth's false results.

**B.    David Shnitzer**

313.    Beginning in August 2019, Plaintiff Shnitzer submitted to drug tests of his hair by Averhealth as ordered by the Norfolk, Massachusetts, Probate and Family Court in his child custody case with his wife. The court order had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided Mr. Shnitzer treatment for any health-related condition. He is not, and never has been, Averhealth's patient.

314.    Mr. Shnitzer's first Averhealth test was based on a sample of hair that he provided at Averhealth's Lawrence, Massachusetts, location on or about August 23, 2019.

315.    The report of that test, dated August 29, 2019, showed that it was positive for cocaine with a level of 325.67 pg/mg compared to a cut-off of 100 pg/mg. This result was not accurate. Mr. Shnitzer has never consumed cocaine.

316.    The next day, August 30, 2019, Mr. Shnitzer voluntarily submitted to a drug test of his hair and toenail samples, including testing for cocaine, at an independent laboratory, Arcpoint Labs in Southboro, Mass. That test came back negative on September 5, 2019.

317. The median half-life of cocaine in hair is 1.5 months in males.[37] In toenails, cocaine remains for 8-14 months.[38] That means that, if the Avertest result had been accurate, cocaine would have been found in the Arcpoint hair and nail samples taken one week later. Because it wasn't, the Averhealth test was inaccurate.

318. Plaintiff next provided a hair sample taken in Averheath's Boston location on September 17, 2019. On September 19, 2019, Averhealth reported that the sample was "REJECTED" because "sample infected with lice." That report was absurd and impossible. Not only did Mr. Shnitzer not have head lice at the time, but his sample was taken from his *leg* because the Averhealth representative said he did not have enough hair on his head to take a sample.

319. Mr. Shnitzer also submitted to testing at Averhealth's Boston location on September 23, 2019, where a hair sample was taken from his other leg. That test came back positive for cocaine.

320. That test was not accurate. As stated above, Mr. Shnitzer has never consumed cocaine.

321. As described above, Averhealth used improper procedures to collect Mr. Shnitzer's hair samples on the above occasions.

322. As described above, beginning on October 16, 2019, the date that Averhealth's new collector, Gerald Carino, told him that Averhealth was changing its collection procedures and had fired most of its collection personnel, Mr. Shnitzer began writing to the Massachusetts Probation Service ("MPS"), which was overseeing his drug testing program on behalf of the

[37] F Garcia-Bournissen F, Moller M, Nesterenko M, Karaskov T, Koren G., *Pharmacokinetics of disappearance of cocaine from hair after discontinuation of drug use*, 189 Forensic Sci. Int. 24 (2009) ("Garcia-Bournissen")..
[38] Markus R. Baumgartner, *Nails: an adequate alternative matrix in forensic toxicology for drug analysis?*, 6 Bioanalysis 2189 (2014).

Massachusetts Probate and Family Court, and Averhealth to report what he had observed. As also described above, Averhealth never gave him a substantive response, either directly or indirectly through his MPS officer, Scott Goldberg.

323. Averhealth's false positive results have had a devastating impact on Mr. Shnitzer, including substantial emotional distress over being regarded as a drug user. They also caused the court to order that Mr. Shnitzer could see his two young daughters only with supervision. They caused the court to order him to undergo frequent unscheduled urine and hair drug tests until August 2020. He was called without notice at any hour of the day to report to Averhealth to provide a sample. In all, between his second "positive" result in September 2019 and August 2020, he was tested nearly 50 times. To provide those samples, he had to leave his office without notice for 1-2 hours at a time, and his work suffered as a consequence. As a result, he was demoted and sustained a large loss of income. Other than his two "positive" hair tests in August and September 2019, all of his tests were negative, including a hair test in April 2020, except for one urine test positive for marijuana (Mr. Shnitzer had a medical marijuana card at the time).

324. Mr. Shnitzer suffered his injuries in Massachusetts, where he lost custody of his children because of Averhealth's false positive results.

### C. Tiffani and Stephen Padilla

325. Beginning in 2020, Plaintiffs Tiffani and Stephen Padilla underwent drug tests by Averhealth, as ordered by MDHHS. The order had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding the custody of their child, who will be designated in this lawsuit by the initials "M.P." (All children in this Amended Complaint are designated by initials). Averhealth has never provided the Paddillas treatment for any health-related condition. They are not, and never have been, Averhealth's patients.

326.     Tiffani and Stephen Padilla have never taken any illegal drugs after December 19, 2019, and December 18, 2019, respectively.

327.     On December 19, 2019, Tiffani got in an argument with Stephen and ran from her home with her baby M.P. in her arms. M.P. was 20 months old at the time.

328.     Stephen's father John, with whom they were living, called the police. Tiffani was charged with misdemeanor fourth degree child abuse for running from the house with her child, a charge to which she pleaded guilty. She was sentenced to six months' probation.

329.     The day of her arrest CPS took M.P. from the Padillas and placed him in foster care.

330.     Tiffani and Stephen were so appalled by those events that they immediately stopped taking illegal drugs and have not taken them since.

331.     This was not easy. They began seeing Stephen Thiele, a Certified Recovery Coach at the Grand Rapids Red Project on a weekly and later monthly basis. They were also prescribed suboxone, a medication used to treat opioid addiction.

332.     Because CPS was swamped with work at the time, Catholic Charities oversaw their child custody case with the goal of reunification with M.P. The Padillas were initially given two two-hour visits with M.P. a week.

333.     The Padillas were also required to undergo frequent drug tests by Averhealth in early 2020. For example, from February 24, 2020, to January 13, 2022, Tiffani underwent 163 tests, or one every 4.2 days on average. Of those, Averhealth reported 121, or 74%, as positive for illegal drugs, including amphetamines, methamphetamines, fentanyl (an opiate), cocaine and heroin. She in fact took none of those drugs during that time.

334. Similarly, from March 2, 2020 through January 18, 2022, Stephen Padilla undertook 164 Averhealth tests, or one every 4.2 days on average. Averhealth reported 134 tests, or 82%, were positive for illegal drugs such as amphetamines, methamphetamines, and fentanyl.

335. Because of those false positive results, MDHHS did not allow the Padillas to reunify with M.P. and, in fact, they lost their visitation rights. Tiffani has not been allowed to see M.P. for over two years, and Stephen has not been allowed to see M.P. for a year.

336. Since the State of Michigan discontinued the use of Averhealth's drug testing services on March 7, 2022, and went to alternative testing services, the Padillas' tests have been uniformly negative for illegal drugs.

337. The Padillas knew that Averhealth was not conducting its tests properly. To prove that that was so, in early 2021 they began taking independent drug tests on the same days that they were given Averhealth tests. The independent tests all came back negative. They have not had a positive independent test result for an illegal drug.

338. However, as described above, MDHHS would only accept Averhealth results at the time, on the false belief that Averhealth's tests were accurate.

339. Then, on January 20, 2021, Tiffani devised another method to prove that Averhealth's positive results were inaccurate. On this date, she arranged to send Averhealth pure water rather than the oral sample she generally provided. As of that date, she had been tested by Averhealth on seven occasions in the preceding month. Averhealth reported six of those tests as positive for fentanyl, an opiate, and only one as negative, even though she was not taking opiates (or any other illegal drug). This, of course, was during the period CAP was investigating Averhealth's improper testing practices, but the Padillas did not know that.

340.     Here is how Tifffani's tests were administered: On a randomly selected day, she would be instructed to report to Services of Hope in Muskegon. There she would be handed the test materials, a swabstick, a vial containing a solution, a tape to seal the vial, a slip of paper on which to write her identifying information, and, a plastic bag. Tiffani would go to a table to take her sample. She would rub the end of the swabstick on the inside of her cheek, dip it into the solution, seal the solution with the provided tape, identify herself on the paper, and seal it all in the plastic bag.

341.     The test collecting agent was supposed to observe the entire process. However, she noticed that he often did not. He was located in another room behind an open window and to observe her, he would either have to stick his head through the open window or leave his room and enter the room with Tiffani. He rarely did that.

342.     So on this occasion Tiffani dipped the swabstick in a newly opened bottle of water, specifically Great Value Purified Drinking Water. She videotaped the entire process on her phone without stopping the video, from the beginning when she described what she was about to do while sitting in her vehicle until she left the building at the end of the process.

343.     At the start of the video, she said, "Hello, my name is Tiffany Padilla. Today is January 20th, and I'm going to show you that our tests through Averhealth are being messed with. I will test, I will put my test in this new water bottle and send it. And I can't speak while I'm in there, so here we go."

344.     Set forth below are pertinent screenshots from the video. They show Ms. Padilla:

         A.     Beginning the narration while in her vehicle.



B.   Showing the date on her phone (the photo of a child on the phone is redacted):



Redacted

C. Showing the water bottle:



D.     Now in the building, being given the test materials through the open

window (unlike the other screenshots, this one is rotated to make clear what is shown):



E.   Sitting at the table and taking out the swabstick:



F.    Opening the new water bottle (on the audio a click can be heard as she twists the cap):



G.    Dipping the swabstick into the water bottle:



H.    Dipping the swabstick into the vial containing solution (the vial is at the

bottom of the screenshot):



This close-up shows the stick and vial more clearly:



    I.      Sealing the vial with the provided tape:



J.    After sealing the vial, putting it into the plastic bag:



K.    Taking the test materials in the plastic bag to the window:



**L.**   Handing in the plastic bag:



345.     At no time during the video does Ms. Padilla place the swabstick into her mouth. Thus, what she returned for testing contained nothing more than pure water and the prefilled liquid in the vial.

346.     According to Averhealth's test report, it received this sample two days later, on January 22, 2021, at 12:06 p.m. That same day it reported the results of the test as positive for fentanyl based on immunoassay, and on January 24, 2021, it reported a result of 20 nanograms per milliliter of fentanyl based on LC-MS/MS, with a cut-off of 1 ng per ml. Of course, because the sample was nothing more than pure water, this result was false and impossible. Ex. 346.

347.     The day after Tiffani submitted her water test, she underwent a hair sample test through her physician at Harbour Towne Health in Muskegon. Ex. 347-A. That test was negative for all substances including all opiates. Ex. 347-B.

348. That negative hair test confirms that Averhealth's test on the sample collected on January 20, 2022, was fallacious. In fact, because the detection window for drugs of abuse in hair is several months,[39] the negative hair test also contradicts the positive tests by Averhealth in the month before January 20, 2021.

349. Because of the inaccurate positive test results, the accusation that they meant they were illegal drug users, and the consequent loss of custody and even contact with their son M.P., the Padillas suffered extreme emotional distress, including anxiety, stress and sleeplessness, ever since they received their first false positive result. They have had many sleepless nights and crying episodes since then. The emotional effect of the false positives made their recovery from drug addiction much more difficult. Tiffani thanks God that the stress from the false positive results didn't cause her and Stephen to go back to drugs.

350. The Padillas suffered their injuries in Michigan, where they lost custody of their son because of Averhealth's false results.

### D. Randi and Joseph Hekkema

351. In 2020, Plaintiffs Randi and Joseph Hekkema underwent drug testing by Averhealth, as ordered by MDHHS. That testing had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided the Hekkemas treatment for any health-related condition. They are not, and never have been, Averhealth's patients.

352. Plaintiffs Randi and Joseph Hekkema had a history of illegal drug use – opiates, marijuana and cocaine – due to the stresses in their lives. However, through great effort, they succeeded in ending their addictions in early July 2020.

---

[39] ANALYTICAL AND PRACTICAL ASPECTS OF DRUG TESTING IN HAIR (PACAL Kintz, ed.2007) at 275 (Table 13.2).

353. Other than one relapse each, as described below, neither Randi nor Joseph Hekkema has used any illegal drug since early July 2020.

354. Joseph Hekkema is now a substance abuse recovery coach, for which he received 40 hours of training at Fresh Coast Alliance, a recovery center in Muskegon.

355. Since June 2022, Joseph Hekkema has been the On-Site Recovery Coach with Life Align Inc ("Life Align") on a volunteer basis. Life Align is a nonprofit substance abuse prevention organization in Muskegon Heights, Michigan.

356. Life Align Inc. was formed in March 2022 and was granted 501(c)(3) status by the Internal Revenue Service. It opened its Community Drop-In Center in Muskegon Heights on June 24, 2022.

357. As On-Site Recovery Coach, Mr. Hekkema has a case load of approximately 100 individuals. He organizes and conducts various activities, such as sober social events and recovery coaching. He "walks alongside" clients in their journey of sobriety. He connects them and transports them to resources such as treatment facilities and even assists them in their activities of daily living such as grocery shopping and banking.

358. The sign shown below shows the sober activities that Mr. Hekkema runs or helps run at Life Align:



359.    In an article on Life Align accompanying a television news feature broadcast by a

Grand Rapids television station on November 21, 2022, Mr. Hekkema was quoted as saying:

> "We definitely want everybody to know that there is a way out of that darkness,"
> Joe Hekkema, Life Align's on-site recovery coach noted. "Just come on down.
> Talk to us anytime. We'll always walk beside you on your journey. We're caring
> people. We don't care what you've got going on. We're there to help you."

Charlie Tinker, "New innovative treatment program arrives in Muskegon: The peer-led

substance-use recovery group meets daily" (November 21, 2022; Updated November 22,

2022.)[40]

360.    In November 2022, Joseph Hekkema began work in a second recovery coach

position. He started a job as a paid Recovery Coach at Health West, one of the leading mental

health facilities in Western Michigan. He is the only Recovery Coach on a Substance Use

---

[40] Available at https://www.wzzm13.com/article/news/local/muskegon/innovative-treatment-program-rebuilding-in-muskegon/69-b2a4f52a-8d28-482c-bbee-ccdc7a2ef9e2 (accessed 11/22/2022).

Disorder Team with a case load of about 35 individuals. Most of his clients have mental health issues for which they have self-medicated with drugs or alcohol. He has a wide variety of responsibilities such as assisting in connecting them to programs to help them stay sober.

361.    Randi Hekkema recently underwent the same training at Fresh Coast Alliance that Joseph undertook. She is now a volunteer Recovery Coach at Life Align. She is also employed full-time Sanford Behavioral Health in Marne, Michigan, as a paid recovery coach for women with eating disorders.

362.    The first Averhealth tests that the Hekkemas took occurred in July 2020, nearly a month after they had stopped using drugs. An individual representing the Children's Protective Services ("CPS") of MDHHS appeared at their home to take an oral saliva sample. CPS is the state agency responsible for investigating child abuse and neglect.

363.    Those tests came back from Averhealth with false positive results and, consequently, CPS removed their seven-year old son K.H. from them and allowed them to see him only for two-hour visits once a week on Sundays with supervision.

364.    They also removed Joseph's son C.R. from his care. Up to then, Joseph would see C.R. on weekends, as well as "week-on-week-offs" during the summer. C.R. also spent time with his half-brother K.H., and the two boys were very close. However, CPS terminated all of Joseph's rights to see C.R., and he has not seen C.R. since the summer of 2020. In addition, C.R. and K.H. have not been allowed to see each other, causing mental trauma and distress to K.H. and likely to C.R. as well.

365.    Randi and Joseph Hekkema were both so upset by the false positives from Averhealth and the removal of K.H. and C.R. from their care that they relapsed and took heroin. Joseph took it on August 5, 2020; Randi took it from August 5 until August 15, 2020.

366. Joseph Hekkema had a positive Averhealth drug test on August 5, 2020, and Randi had one positive test between August 5 and August 15, 2020. Those were not inaccurate, but they are the only true positive drug tests they ever had, whether from Averhealth or another lab, since July 2020.

367. Randi and Joseph Hekkema overcame that relapse with the intense assistance of Stephen Thiele at Fresh Coast Alliance, whom they called for help. Mr. Thiele later was one of the founders of Life Align.

368. Randi was prescribed methadone and Joseph was prescribed suboxone to assist with their recovery.

369. Beginning with their initial false positive tests, CPS required the Hekkemas to take randomized Averhealth drug tests on a weekly basis. Several of those tests came back with false positives for illegal drugs. They also came back positive for drugs they had been prescribed for their drug addictions and for marijuana, which was legal in Michigan. However, as another indication of the inaccuracy of Avherhealth's testing, some of Randi's tests were negative for methadone even though she was taking it.

370. On the same days they were tested by Averhealth, Joseph Hekkema voluntarily underwent drug tests by Muskegon Family Clinic, and Randi Hekkema voluntarily underwent drug tests by East Side Clinic. Those tests were all negative for illegal drugs, regardless of whether the Averhealth tests were reported as positive or negative.

371. The Averhealth tests continued for approximately three months until, fed up by the false positives, they refused to undergo any more tests and voluntarily closed their cases with CPS. Randi's mother was given guardianship of K.H. Since then, the Hekkema's have continued

voluntary drug tests, all of which have been negative, leading Randi's mother to allow K.H. to come back into their care.

372.    Since becoming sober, the Hekkemas devote much of their Facebook pages to encouraging recovery, posting inspirational messages and tracking their own abstinence.

373.    Here are examples from Joseph Hekkema's Facebook page:

**November 15, 2020:**



**October 30, 2020:**



**February 15, 2021:**



**April 15, 2021:**



**June 21, 2021:**



**August 1, 2021:**



Thursday I will have one full year clean from all illegal drugs and alcohol I'm actually doing it and it's a way of life now thank you Jesus my lord and savior!

**June 5, 2022:**

 **Joe Hekkema**
June 5 at 6:24 AM

Today is not only my b day but marks 22 months clean for this guy! Almost 2 years since I have used opiods or stimulates or alcohol! The best 2 years I've ever have .it's crazy to think that 3 years ago I would have woken up hung over looking for pills or heroin after a long night of cocaine and whiskey. Now by the grace of God I'm up early and getting ready for breakfast clear headed! When I tell ya sober b days are the best I mean it I just thank God everyday for redeeming me eventho I am not worthy I am to him! I have my kids a beautiful home nice car and a great job all thanks to god and my program so when I tell ya we do recover and is possible with hard work dedication and faith just know i.lived it learned it and grew from it be smooth out here yall

The kids he refers to are K.H., to whom, as noted, his guardian allows Joseph access, and a baby girl born on February 17, 2022, of whom the Hekkemas have custody.

374.     On October 21, 2020, after nearly three months of false positives from Averhealth, Joseph Hekkema posted a query about that company (though he misspelled its name):



375.     Because of the inaccurate positive test results, the accusation that meant they were illegal drug users, and the consequent loss of custody and even contact with their children, Randi and Joseph Hekkema suffered extreme emotional distress, including anxiety, stress and sleeplessness, ever since they received their first false positive result. The emotional effect of the false positives made their recovery from drug addiction much more difficult.

376.     The Hekkemas suffered their injuries in Michigan, where they lost custody of their children because of the false positive Averhealth results.

### E.     Plaintiff Alexandra Hodor

377.     Beginning in late 2019, Plaintiff Alexandra Hodor underwent drug tests by Averhealth, as ordered by MDHHS. That testing had nothing to do with treatment for any health-

related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided Ms. Hodor treatment for any health-related condition. She is not, and never has been, Averhealth's patient.

378. Ms. Hodor has three sons, O.H. (whose father Joseph Ceci has abandoned him), M.H. (whose father is Michael Comilla) and A.H. (whose father is Stephen Hodor). Her experience with Avhealth was reported in an extensive article by Vice News. *See* Alice Hines, *Averhealth's Drug Tests Were Wrong Up to 30% of the Time, Former Employee Testifies* (vice.com 6/10/22).[41]

379. Ms. Hodor has not used an illegal drug since November 19, 2019.

380. Beginning on November 22, 2019, Ms. Hodor underwent a number of drug tests, based on oral samples, which were reported with false positive results of illegal drugs (as well as positive results due to prescription medications she was taking). The false positive tests caused the removal of her children to foster care. The positive results of illegal drugs that occurred before that happened included (dates refer to the dates when the samples were collected):

> 11/22/19. Positive for fentanyl, an illegal opiate, and norfentanyl, a metabolite of fentanyl.
>
> 11/24/2019. Positive for cocaine and benzoylecogonine, a metabolite of cocaine.
>
> 12/18/2019. Positive for cocaine and benzoylecogonine.
>
> 1/24/2019. Positive for cocaine and benzoyleogonine.

381. Those results were inaccurate. Ms. Hodor was not taking those drugs at the time.

382. The test on November 22, 2019, occurred three days after Ms. Hodor overdosed on illegal opiates, almost died, and was hospitalized. (The reason for the overdose was the stress of caring for her youngest son, M.H., who was born prematurely with many serious medical

---

[41] https://www.vice.com/en/article/n7zj3m/averhealth-drug-tests-false-results (accessed 12/27/22).

conditions. She had called a babysitter to care for her children and left home to obtain street drugs.) That overdose and near-death experience was a wake-up call that led Ms. Hodor to resolve never to take illegal drugs again, a resolve she has fulfilled.

383.    Moreover, even if she had wanted to take illegal opiates in the period following her overdose, she was too sick to do so.

384.    The positive result on the November 22, 2019 test could not have been from her overdose on November 19, 2022. The detection window for oral drug tests is 5-48 hours after consumption of the drug, as Averhealth acknowledges.[42] The November 22, 2019, oral sample was collected more than 48 hours after her overdose.

385.    Beginning on January 7, 2020, Ms. Hodor met every weekday for four weeks with Therapist Marissa Blood of Judson Center through Families First of Michigan. During these face-to-face meetings, they discussed various issues, including maintaining her sobriety through interactive worksheets and informational materials. According to a "To whom it may concern letter" by Ms. Blood, "During this time Ms. Hodor assured me she was sober and not utilizing any substances and appeared focused and determined while completing the Families First program … Ms. Hodor has shown great progress and is doing everything possible to ensure her children are well cared for."

386.    Furthermore, after the closure of the initial period of her Families First case, Ms. Blood conducted three- and six-month follow-ups in which Ms. Hodor "informed me she was still maintaining her sobriety."

---

[42] *See* https://averhealth.com/optimal-specimen-types-for-drug-testing-2/#:~:text=Disadvantages%3A%20Short%20detection%20window%20(8,of%20drug%20levels%2C%20and%20cost (accessed 12/27/222).

387.    Ms. Blood concluded: "Ms. Hodor has shown great dedication to maintaining her sobriety and properly caring for her children, she has learned substance abuse education as well as appropriate supervision techniques."

388.    Nevertheless, in February 2019, CPS filed a petition to remove Ms. Hodor's children from her. Although the petition is undated, it was filed sometime after February 13, 2019, because it refers to a Family Team Meeting on February 13, 2019.

389.    The court granted the Petition on February 20, 2020, and Ms. Hodor lost her children that day.

390.    This was during the COVID pandemic, and she was not allowed to see her children for six months, following which she had either supervised or unsupervised visitations, depending on whether there had been a (false) positive drug test.

391.    In its petition against her, CPS cited Plaintiff Hodor's positive Averhealth test results, the November 2019 overdose and an incident on January 23, 2020, in which a teacher reported that Ms. Hodor's son A.H. had said that she and a boyfriend were passed out and could not help him get to school, following which a police officer came to Ms. Hodor's home and claimed that she showed signs of intoxication. That report was false. A.H. later told Plaintiff he did not make this report to the teacher. The police officer mistook Ms. Hodor's fast talking (due to the anxiety of having a police officer arrive to inspect her home) for intoxication withdrawal. Furthermore, the incident occurred during the period covered by Ms. Blood's letter attesting to her sobriety.

392.    The principal reason behind CPS's petition for removal was the false positive Averhealth blood tests. CPS did not seek to remove Plaintiff Hodor's children following the

overdose (or the January incident), but rather three months later when her overdose was followed by four supposedly positive drug tests.

393. Following the removal of her children, Ms. Hodor continued to undergo Averhealth drug tests, many of which, until MDHHS suspended Averhealth on March 7, 2022, were falsely reported as positive for illegal drugs.

394. Because of those positive results, on a number of occasions CPS converted her unsupervised visits with her children to supervised visits.

395. Ultimately, Ms. Hodor's son O.H. was returned to her. By informal agreement, she currently shares custody of her son A.H. with his father; she has M.H. Thursdays through Sundays. Her son A.H.'s father has full-time custody of him; by court order, she has A.H. every other weekend, but his father refuses to let her see him.

396. The loss of her children has caused Ms. Hodor intense and sustained mental distress and emotional anguish. Her children are the most important parts of her life and their loss took away her reason for living. The turmoil caused by separating her closely bonded family has also caused mental health problems for her sons A.H and O.H. Ms. Hodor and O.H. are in therapy. A.H. suffers from depression and anxiety and has had many consequences as a result. Picking up the wreckage caused by the breakup of her family due to the false positive drug tests is the hardest thing Ms. Hodor has ever had to do. Ms. Hodor has also lost employment opportunities in the field of social work because of the test results.

397. Ms. Hodor suffered her injuries in Michigan when she lost custody of her children because of the false positive Averhealth test results.

**F.     Plaintiff Nicole White**

398. On January 10, 2021, in connection with proceedings for the custody of her daughters K.C. and B.C., Plaintiff Nicole White appeared at Averhealth's facility in Dartmouth

to undergo drug testing by providing a hair sample. That testing had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided Plaintiff White treatment for any health-related condition. She is not, and never has been, Averhealth's patient.

399. As described above, the Averhealth facility was not clean and the collector did not follow proper collection procedures.

400. On January 16, 2020, Averhealth issued a report stating that Ms. White's sample was positive with the presence of 566.343 pg/mg of cocaine.

401. That result was inaccurate. Ms. White has never consumed cocaine.

402. Ms. White did not learn of this result until on or about January 24, 2020, when one of the court personnel telephoned her with it. Ms. White had previously attempted to learn the result from Averhealth, but Averhealth refused to provide it to her.

403. When Ms. White learned of the result, she was distraught and outraged. She immediately telephoned her physician's office to tell them of this false test. The physician ordered a hair test from Franey Medical Laboratories ("Franey").

404. Ms. White went to Franey that day for a hair test. Franey's collection procedure was much different from Averhealth's. In contrast with Averhealth, she was taken into a small, clean inner clinic room to provide the sample. No one was present but her and the collector. The collector wore gloves, brought out the scissors in a plastic bag and sanitized them before using them to take three hair samples. After cutting her hair samples, she wrapped them in foil before putting them in a plastic bag for shipping.

405. On January 28, 2020, Omega Laboratories, to which Franey had sent her sample, reported that the test was negative for all substances, including cocaine. The screening and

confirmation cut-offs for cocaine were each 500 pg/mg, meaning that if Averhealth had been correct that her hair had 566.343 pg/mg of cocaine, the Omega test would have been positive.

406.     In addition to Averhealth's negligence, Averhealth committed deceptive and unfair practices in violation of Mass. Gen. Laws ch. 93A. Contemporaneous with filing this Amended Complaint, Ms. White is sending Avertest, LLC, a demand pursuant to that statute. If that demand does not result in a resolution of this claim, Ms. White will amend this Complaint to add a claim under ch. 93A.

407.     Prior to the Averhealth test, Ms. White had joint custody of her daughters K.C. and B.C. As a result of the false positive result, she lost joint custody and has only been allowed to see her daughters on a sporadic and infrequent basis.

408.     Because of the inaccurate positive test results, the loss of joint custody of her daughters K.C and B.C., and the inherent false accusation that she was a user of illegal drugs, Plaintiff suffered substantial emotional distress, including anxiety, depression, stress and sleeplessness.

409.     In addition, Plaintiff's daughters K.C. and B.C. have suffered substantial emotional distress and psychological damage at the loss of regular contact with their mother.

410.     Plaintiff has a younger daughter, A.T. That daughter had been devoted to her older half-sisters when they lived together and has suffered substantial emotional distress and psychological damage from their absence from her life.

411.     Ms. White suffered her injuries in Massachusetts, where she lost custody of her children because of the Averhealth false positive test result.

## VI.  COUNT I: NEGLIGENCE UNDER ARIZONA LAW (PLAINTIFF FOULGER)

412.    Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further alleges as follows.

413.    Averhealth owed Plaintiff Foulger a duty of care to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper testing and quality control methods and standards, such that the results obtained would be accurate and reliable.

414.    By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached its duty of care to Plaintiff Foulger.

415.    That breach caused Plaintiff to test positive for substances that she had not taken and thereby caused Plaintiff Foulger injury.

416.    As a result, Plaintiff Foulger suffered damages in an amount to be determined at trial.

417.    As set forth above, Averhealth knew of the consequences from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate collection protocols and testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Foulger.

418.    WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## VII. COUNT II: VIOLATION OF ARIZONA CONSUMER FRAUD ACT BY MEANS OF UNFAIR PRACTICES (PLAINTIFF FOULGER)

419.     Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further alleges as follows.

420.     The actions of Defendant alleged herein violated, and continue to violate, the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 ("ACFA"), because they constitute unfair practices.

421.     The ACFA, § 44-1522, states in relevant part:

A. The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

*** 

C. It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1).

Ariz. Rev. Stat. § 44-1522

422.     The ACFA defines "merchandise" to include services. Ariz. Rev. Stat.§ 44-1521.5. Averhealth's testing services thus constitute merchandise under that definition.

423.     The ACFA defines "person" to include any foreign corporation or company. Ariz. Rev. Stat.§ 44-1521.6. Averhealth is therefore a person under the statute.

424.     Plaintiff Foulger is entitled to bring this action under the ACFA because Arizona courts imply a private right of action to enforce the statute. *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

425.     Plaintiff Foulger entered into an agreement with Defendant for its drug testing services and paid for such services in Arizona.

426.     As alleged herein, Defendant Foulger committed unfair practices in violation of the ACFA by not using proper and accepted methods of collection and testing, and Defendant's conduct proximately caused Plaintiff Foulger to suffer damages.

427.     As noted above, in interpreting the ACFA, courts are to be guided by the interpretation of 15 U.S.C. § 45 (Section 5 of the F.T.C. Act) by the Federal Trade Commission and courts. The F.T.C. and courts interpret that statute to outlaw unethical practices. *See* F.T.C. Policy Statement on Unfairness. Thus, pursuant to the ACFA, Defendant has a duty not to engage in any unethical practice in connection with its testing services.

428.     Averhealth's collection and testing practices are unethical under ethical standards promulgated by the American Marketing Association ("AMA"), the nation's leading marketing organization with over 38,000 members[43] and 65 professional chapters in North America, including St. Louis and Richmond, VA, where Averhealth is headquartered.[44]

429.     The AMA "commits itself to promoting the highest standard of professional ethical norms and values . . . ." As such, it has published its "Statement of Ethics." *Id*. AMA states that "marketers are expected to embrace the highest professional ethical norms and the ethical values implied by our responsibility toward multiple stakeholders (e.g., customers . . . )." Thus, the Statement of Ethics contains "Ethical Norms," which "are established standards of conduct that are expected and maintained by society and/or professional organizations."

430.     The AMA's Ethical Norms state that marketers must "[e]mbrace ethical values." Accordingly, AMA has also published "Ethical Values," which represent what is "morally

---

[43]https://www.jstor.org/publisher/ama#:~:text=The%20American%20Marketing%20Association%20(AMA,in%20every%20area%20of%20marketing (accessed 8/10/2022).
[44] https://www.ama.org/ama-member-benefits/ (accessed 8/10/2022).

proper." *Id.* AMA states that marketers' Ethical Values include honesty, meaning "[h]onoring our explicit and implicit commitments and promises."

431. By not honoring its explicit and implicit commitments to perform its testing competently, to utilize accepted and appropriate protocols in collecting and analyzing her samples, including by failing to employ proper collection and quality control methods and standards as set forth herein, as well as its implicit commitment, as shown on its website, to avoid false positives, Averhealth violated this ethical value and consequently violated the unfairness prohibition of the ACFA.

432. Plaintiff Foulger thereby suffered ascertainable loss by paying for tests that were not fair and accurate and by suffering serious emotional consequences from positive tests results that were improperly obtained from her samples.

433. Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff Foulger in an amount to be determined at trial.

434. Defendant's unfair and unethical acts and practices in violation of the ACFA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff Foulger.

435. WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## VIII. COUNT III: VIOLATION OF THE ACFA BY MEANS OF DECEPTION (PLAINTIFF FOULGER)

436. Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

437.     The actions of Defendant alleged herein violated, and continue to violate, the

ACFA because they constitute deception.

438.     The ACFA, § 44-1522, states in relevant part:

A. The act, use or employment by any person of any deception, deceptive or
unfair act or practice, fraud, false pretense, false promise, misrepresentation, or
concealment, suppression or omission of any material fact with intent that others
rely on such concealment, suppression or omission, in connection with the sale or
advertisement of any merchandise whether or not any person has in fact been
misled, deceived or damaged thereby, is declared to be an unlawful practice.

***

C. It is the intent of the legislature, in construing subsection A, that the courts may
use as a guide interpretations given by the federal trade commission and the
federal courts to 15 United States Code §§ 45, 52 and 55(a)(1).

Ariz. Rev. Stat. § 44-1522

439.     The ACFA defines "merchandise" to include services. Ariz. Rev. Stat.§ 44-

1521.5. Averhealth's testing services thus constitute merchandise under the statute.

440.     The ACFA defines "person" to include any foreign corporation or company. Ariz.

Rev. Stat.§ 44-1521.6. Averhealth is therefore a person under the statute.

441.     Plaintiff is entitled to bring this action under the ACFA because Arizona courts

imply a private right of action to enforce the statute. *Sellinger v. Freeway Mobile Home Sales,*

*Inc.*, 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

442.     Plaintiff entered into an agreement with Defendant for its drug testing services

and paid for such services in Arizona.

443.     As alleged herein, Defendant committed deception in violation of the ACFA by

not using proper and accepted methods of collection and testing, and Defendant's conduct

proximately caused Plaintiff Foulger to suffer damages.

444. Pursuant to the ACFA, Defendant has a duty not to engage in any deception in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

445. Advertising the high quality and accuracy of its drug tests as set forth above and then failing to utilize accepted and appropriate collection methods and protocols in analyzing her samples, including by failing to employ proper quality control methods and standards as set forth herein constitutes deception under the ACFA.

446. Defendant's statements advertising the high quality and accuracy of its drug tests, as set forth above, have the tendency to mislead.

447. The reason the Superior Court of Maricopa County, Family Department, required that Averhealth be the laboratory to perform drug tests on Plaintiff Foulger is that Averhealth engaged in deception in representing that it would follow accepted and appropriate collection methods and protocols in analyzing her samples, including by failing to employ proper quality control methods and standards.

448. Plaintiff Foulger thereby suffered ascertainable loss by paying for tests that were not accurate and by suffering serious emotional consequences from positive tests results that were improperly obtained from her samples.

449. Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff Foulger in an amount to be determined at trial.

450. Defendant's deceptive acts and practices in violation of the ACFA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff Foulger.

451.     WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for

Relief set forth below in this Complaint.

## IX.     COUNT IV: VIOLATION OF THE ACFA BY MEANS OF OMISSION OF A MATERIAL FACT (PLAINTIFF FOULGER)

452.     Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended

Complaint as if fully set forth herein, and further allege as follows.

453.     The actions of Defendant alleged herein violated, and continue to violate, the

ACFA because they constitute omission of a material fact.

454.     The ACFA, § 44-1522, states in relevant part:

A. The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

***

C. It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1).

Ariz. Rev. Stat. § 44-1522

455.     The ACFA defines "merchandise" to include services. Ariz. Rev. Stat.§ 44-

1521.5. Averhealth's testing services thus constitute merchandise under the statute.

456.     The ACFA defines "person" to include any foreign corporation or company. Ariz.

Rev. Stat.§ 44-1521.6. Averhealth is therefore a person under the statute.

457.     Plaintiff is entitled to bring this action under the Arizona Consumer Fraud Act

because Arizona courts imply a private right of action to enforce the statute. *Sellinger v. Freeway*

*Mobile Home Sales, Inc.,* 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

458.     Plaintiff entered into an agreement with Defendant for its drug testing services and paid for such services in Arizona.

459.     As alleged herein, Defendant made omissions in violation of the ACFA, and Defendant's conduct proximately caused Plaintiff Foulger to suffer damages.

460.     Pursuant to the ACFA, Defendant has a duty not to omit material facts in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

461.     As set forth above, Defendant was aware of its failure to use accepted and appropriate protocols in its drug tests, including its failure to use proper collection and quality control methods and standards. Even if Defendant had been unaware of such failures, which it was not, the lack of proper quality control methods in its drug tests would have been known to it upon reasonable inquiry.

462.     The failure of the use of accepted and appropriate protocols in its sample collections and drug tests is a material fact, because a reasonable consumer would likely consider it important to know, when submitting to a drug test, that the test is not conducted according to accepted and appropriate protocols.

463.     Furthermore, the failure of the use of accepted and appropriate protocols in Defendant's sample collections and drug tests is also a material fact because the Superior Court of Maricopa County, Family Department would undoubtedly be induced to change its decision to require the use of Averhealth testing based on knowing that it is not conducted according to such accepted and appropriate protocols.

464.     Despite Defendant's knowledge that its drug tests were not conducted according to accepted and appropriate protocols, Defendant omitted any reference of such failures to

Plaintiff Foulger and, on information and belief, the Superior Court of Maricopa County, Family Department. Plaintiff Foulger's information and belief is based on the logical principle that nobody would agree to drug tests by a laboratory that revealed that it did not use accepted and appropriate protocols.

465.    Accordingly, Defendant's provision of drug tests that were not conducted according to accepted and appropriate protocols to Plaintiff Foulger, without first disclosing the failure of its tests to employ accepted and appropriate protocols, constitutes omission of a material fact under the ACFA.

466.    Plaintiff Foulger thereby suffered ascertainable loss by paying for tests that were not fair and accurate and by suffering serious consequences from positive tests results that were improperly obtained from her samples as set forth above.

467.    Defendant's omissions have directly, foreseeably, and proximately caused loss, damages and injury to Plaintiff Foulger.

468.    Defendant's omissions in violation of the ACFA were performed willfully and wantonly, were outrageous and were done in reckless indifference to the rights of Plaintiff Foulger.

469.    WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## X.    COUNT V: BREACH OF CONTRACT (PLAINTIFF FOULGER)

470.    Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further alleges as follows.

471.    Plaintiff Foulger and Averhealth entered into a written contract dated December 13, 2021, entitled, "Donor Testing Agreement."

472.     Pursuant to that preprinted contract, Plaintiff Foulger agreed, among other things, to participate in Avertest's testing and collection process, to appear at an approved location for testing on dates to be determined and to pay a pre-determined test fee for each test, and Averhealth agreed "to competently perform" sample collection and testing.

473.     Plaintiff fully performed under the contract by appearing for sample collection when required and paying the pre-determined fee for each test.

474.     Averhealth breached the contract by failing to perform sample collection and testing competently, as set forth above.

475.     Averhealth's breach resulted in damages to Plaintiff Foulger, both actual damages in the amount she paid for testing and consequential damages in amounts to be determined.

476.     WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XI.    COUNT VI: NEGLIGENCE UNDER MASSACHUSETTS LAW (PLAINTIFF SHNITZER)

477.     Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

478.     Averhealth owed Plaintiff Shnitzer a duty of reasonable care to collect and analyze his samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

479.     By failing to collect and analyze his samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

480. That breach caused Plaintiff Shnitzer to test positive for substances that he had not taken and thereby caused him injury.

481. As a result, Plaintiff Shnitzer suffered damages, in an amount to be determined at trial.

482. As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate collection protocols and testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Shnitzer.

483. WHEREFORE, Plaintiff Shnitzer prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XII. COUNT VII: VIOLATION OF MASSACHUSETTS' CHAPTER 93A BY MEANS OF UNFAIR PRACTICES (PLAINTIFF SHNITZER)

484. Plaintiff Shnitzer incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further alleges as follows.

485. The actions of Defendant alleged herein violated, and continue to violate, M.G.L. ch. 93A because they constitute unfair practices.

486. Section 2 of ch. 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. ch. 93A § 2.

487. This section further provides:

(b) It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

Mass. Gen. Laws ch. 93A, § 2.

488.     As alleged herein, Defendant committed unfair practices in violation of ch. 93A by not using proper and accepted methods of collection and testing, and Defendant's conduct proximately caused Plaintiff Shnitzer to suffer damages.

489.     As noted above, in interpreting ch. 93A, courts are to be guided by the interpretation of 15 U.S.C. § 45 (Section 5 of the F.T.C. Act) by the Federal Trade Commission and courts. The F.T.C. and courts interpret that statute to outlaw unethical practices. *See* F.T.C. Policy Statement on Unfairness. Thus, pursuant to the ACFA, Defendant has a duty not to engage in any unethical practice in connection with its testing services.

490.     Averhealth's collection and testing practices are unethical under ethical standards promulgated by the American Marketing Association ("AMA"), the nation's leading marketing organization with over 38,000 members[45] and 65 professional chapters in North America, including St. Louis and Richmond, VA, where Averhealth is headquartered.[46]

491.     The AMA "commits itself to promoting the highest standard of professional ethical norms and values . . . .". As such, it has published its "Statement of Ethics." AMA states that "marketers are expected to embrace the highest professional ethical norms and the ethical values implied by our responsibility toward multiple stakeholders (e.g., customers . . . )." Thus, the Statement of Ethics contains "Ethical Norms," which "are established standards of conduct that are expected and maintained by society and/or professional organizations."

492.     The AMA's Ethical Norms state that marketers must "[e]mbrace ethical values." Accordingly, AMA has also published "Ethical Values," which represent what is "morally

---

[45]https://www.jstor.org/publisher/ama#:~:text=The%20American%20Marketing%20Association%20(AMA,in%20e very%20area%20of%20marketing (accessed 8/10/2022).
[46] https://www.ama.org/ama-member-benefits/ (accessed 8/10/2022).

proper." AMA states that marketers' Ethical Values include honesty, meaning "[h]onoring our explicit and implicit commitments and promises."

493.    By not honoring its explicit and implicit commitments to perform its testing competently, to utilize accepted and appropriate protocols in collecting and analyzing her samples, including by failing to employ proper collection and testing methods and procedures as set forth herein, as well as its implicit commitment, as shown on its website, to avoid false positives, Averhealth violated this ethical value.

494.    Plaintiff Shnitzer thereby suffered ascertainable loss by paying for tests that were not fair and accurate and by suffering serious emotional consequences from positive tests results that were improperly obtained from her samples.

495.    Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff Shnitzer in an amount to be determined at trial.

496.    Defendant's unfair and unethical acts and practices in violation of the ACFA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff Shnitzer.

497.    M.G.L. ch. 93A allows "[a]ny person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … [to] bring an action … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper." M.G.L. ch. 93A, § 9.

498.    Plaintiff has provided a pre-suit notice and demand as required by M.G.L. ch. 93A.

499. WHEREFORE, Plaintiff Shnitzer prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XIII. COUNT VIII: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF TIFFANI PADILLA)

500. Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

501. Averhealth owed Plaintiff Tiffani Padilla a duty of reasonable care to collect and analyze her samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

502. By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

503. That breach caused Plaintiff Tiffani Padilla to test positive for substances that she had not taken and thereby caused her injury.

504. As a result, Plaintiff Tiffani Padilla suffered damages, in an amount to be determined at trial.

505. As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Tiffani Padilla.

506. WHEREFORE, Plaintiff Tiffani Padilla prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XIV.  COUNT IX: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF STEPHEN PADILLA)

507.    Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

508.    Averhealth owed Plaintiff Stephen Padilla a duty of reasonable care to collect and analyze his samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

509.    By failing to collect and analyze his samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

510.    That breach caused Plaintiff Stephen Padilla to test positive for substances that he had not taken and thereby caused him injury.

511.    As a result, Plaintiff Stephen Padilla suffered damages, in an amount to be determined at trial.

512.    As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Stephen Padilla.

513.    WHEREFORE, Plaintiff Stephen Padilla prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XV.  COUNT X: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF RANDI HEKKEMA)

514.    Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

515. Averhealth owed Plaintiff Randi Hekkema a duty of reasonable care to collect and analyze her samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

516. By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

517. That breach caused Plaintiff Randi Hekkema to test positive for substances that she had not taken and thereby caused her injury.

518. As a result, Plaintiff Randi Hekkema suffered damages, in an amount to be determined at trial.

519. As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Randi Hekkema.

520. WHEREFORE, Plaintiff Randi Hekkema prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XVI.    COUNT XI: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF JOSEPH HEKKEMA)

521. Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

522. Averhealth owed Plaintiff Joseph Hekkema a duty of reasonable care to collect and analyze his samples in accordance with accepted and appropriate protocols in toxicology,

including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

523.    By failing to collect and analyze his samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

524.    That breach caused Plaintiff Joseph Hekkema to test positive for substances that he had not taken and thereby caused him injury.

525.    As a result, Plaintiff Joseph Hekkema suffered damages, in an amount to be determined at trial.

526.    As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Joseph Hekkema.

527.    WHEREFORE, Plaintiff Joseph Hekkema prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

**XVII.  COUNT XII: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF ALEXANDRA HODOR)**

528.    Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

529.    Averhealth owed Plaintiff Alexandra Hodor a duty of reasonable care to collect and analyze her samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

530. By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

531. That breach caused Plaintiff Alexandra Hodor to test positive for substances that she had not taken and thereby caused her injury.

532. As a result, Plaintiff Alexandra Hodor suffered damages, in an amount to be determined at trial.

533. As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Alexandra Hodor.

534. WHEREFORE, Plaintiff Alexandra Hodor prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XVIII. COUNT XIII: NEGLIGENCE UNDER MASSACHUSETTS LAW (PLAINTIFF NICOLE WHITE)

535. Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

536. Averhealth owed Plaintiff Nicole White a duty of reasonable care to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

537. By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control

methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

538. That breach caused Plaintiff Nicole White to test positive for substances that she had not taken and thereby caused her injury.

539. As a result, Plaintiff Nicole White suffered damages, in an amount to be determined at trial.

540. As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate collection protocols and testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Nicole White.

541. WHEREFORE, Plaintiff Nicole White prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XIX. <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

## XX. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray judgment against Defendant as follows:

1. Awarding actual damages against Defendant in amounts to be determined;

2. Awarding injunctive relief as permitted by law or equity, including a preliminary and permanent injunction enjoining Defendant from continuing the unlawful practices as set forth herein;

3.     Awarding punitive damages against Defendant as the Court deems necessary or

proper;

4.     Awarding pre-judgment and post-judgment interest;

5.     Awarding reasonable attorneys' fees and costs herein, as allowed by law;

6.     Awarding such other and further relief as the Court deems fit and proper.


Dated: January 25, 2023                    Respectfully submitted,

**GOLDENBERG HELLER & ANTOGNOLI, P.C.**

By:   _/s/Richard S. Cornfeld_
        Richard S. Cornfeld, #31046MO
        Daniel S. Levy, #66039MO
        GOLDENBERG HELLER & ANTOGNOLI, P.C.
        500 North Broadway, Suite 1610
        St. Louis, MO 63102
        rick@ghalaw.com
        danny@ghalaw.com

        And

        Anthony S. Bruning, #30906MO
        Anthony S. Bruning, Jr., #60200MO
        Ryan L. Bruning, #62773MO
        THE BRUNING LAW FIRM, LLC
        555 Washington Avenue, Suite 600
        St. Louis, Missouri 63101
        P. 314-735-8100 / F. 314-898-3078
        tony@bruninglegal.com
        aj@bruninglegal.com
        ryan@bruninglegal.com

        And

        J.C. Pleban, MO Bar No. 63166
        jc@plebanlaw.com
        C. John Pleban, Mo. Bar No. 24190
        cpleban@plebanlaw.com
        Pleban & Associates Law, LLC
        2010 South Big Bend Blvd.
        St. Louis, MO  63117
        (314) 645-6666 – Telephone

(314) 645-7376 – Facsimile
And

Mike Arias, #115385(CA)
Arnold Wang, #204431(CA)
Craig S. Momita #163347(CA)
Arias Sanguinetti Wang & Torrijos, LLP
6701 Center Drive West, 14th Floor
Los Angeles, California 90045
Tel: (310) 844-9696 / Fax: (310) 861-0168
mike@aswtlawyers.com
arnold@aswtlawyers.com
craig@aswtlawyers.com
(*pro hac vice* admission to be sought)

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of January, 2023, the foregoing was served by operation of the Court's electronic filing system on all counsel of record in this matter.


/s/ Richard S. Cornfeld