**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KATARZYNA FOULGER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:22-CV-00878 |
| AVERTEST, LLC, dba Averhealth | ) | |
| | ) | |
| Averhealth. | ) | |
| | ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS FOR**
**AVERHEALTH'S SPOLIATION OF EVIDENCE**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................... 1

   A.   Averhealth's Spoliation of Documents and Materials ........................................ 1

      1.   Spoliation of chain-of-custody documents ................................................... 1

      2.   Spoliation of Plaintiff Foulger's hair sample ................................................ 6

      3.   Spoliation of Test Records ............................................................................ 8

   B.   Averhealth's Bad Faith Spoliation of Evidence Is Consistent with How It Has Defended this Lawsuit .................................................................................... 9

      1.   Averhealth falsely told the Court that CAP had rejected Dr. Riley's allegations of Averhealth's testing deficiencies ................................................................. 9

      2.   Averhealth falsely told the Court that it had produced all underlying data for Plaintiffs' positive tests .......................................................................... 13

      3.   Averhealth's Pattern of Intentionally Misleading Courts ........................... 15

III.    ARGUMENT ........................................................................................................ 16

   A.   Averhealth's Spoliation of Evidence Is Sanctionable Conduct ....................... 16

   B.   The Court Should Strike Averhealth's Pleadings, Order It to Pay Plaintiffs' Attorneys' Fees, and Fine It. .......................................................................... 18

IV.    CONCLUSION ..................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Am. Builders & Contractors Supply Co. v. Roofers Mart, Inc.*,
    2012 U.S. Dist. LEXIS 101842 (E.D. Mo. July 20, 2012) .......................................... 18, 19, 20

*Ameriwood Indus. v. Liberman*,
    2007 U.S. Dist. LEXIS 74886 (E.D. Mo. July 3, 2007) .............................................. 18, 19, 20

*Anderson v. BNSF Ry. Co.*,
    681 F. Supp. 3d 899 (S.D. Iowa 2023) .......................................................................... 1, 16, 18

*Chrysler Corp. v. Carey*,
    186 F.3d 1016 (8th Cir. 1999) ............................................................................................... 18

*Dapron v. Spire, Inc.*,
    329 F.R.D. 223 (E.D. Mo. 2019) ............................................................................................ 7

*Fid. Nat'l Title Ins. Co. v. Captiva Lake Invs., LLC*,
    2015 U.S. Dist. LEXIS 1350 (E.D. Mo. Jan. 7, 2015).............................................................. 17

*Glenn Golden v. Stein*,
    2020 U.S. Dist. LEXIS 57214 (S.D. Iowa Mar. 4, 2020) ........................................................ 7

*Morris v. Union Pac. R.R.*,
    373 F.3d 896 (8th Cir. 2004) ................................................................................................. 16

*Paisley Park Enters. v. Boxill*,
    330 F.R.D. 226 (D. Minn. 2019)........................................................................................... 20

*Pope v. Fed. Express Corp.*,
    974 F.2d 982 (8th Cir. 1992) ................................................................................................. 19

*Process Controls Int'l, Inc. v. Emerson Process Mgmt.*,
    2011 U.S. Dist. LEXIS 121369 (E.D. Mo. Oct. 20, 2011) ..................................................... 20

*Stevenson v. Union Pac. R.R.*,
    354 F.3d 739 (8th Cir. 2004) ................................................................................... 16, 18, 19

*Taylor v. Null*,
    2019 U.S. Dist. LEXIS 164133 (E.D. Mo. Sep. 25, 2019)................................................ 16, 18

**<u>Rules</u>**

Fed. R. Civ. P. 34 ........................................................................................................... 1, 5, 6, 19

**Statutes**

Mich. Comp. Laws Serv. § 600.5805 ............................................................................. 6

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ......................................................................... 1

## I.  <u>INTRODUCTION</u>

This case focuses on Averhealth's poor drug testing practices, which led to false positives for Plaintiffs. Many Plaintiffs lost custody of their children as a result. This Motion details Averhealth's intentional destruction of critical evidence and false statements to Courts, warranting the issuance of sanctions against it.

"'Spoliation' is the 'intentional destruction, mutilation, alteration, or concealment of evidence.'" *Anderson v. BNSF Ry. Co.*, 681 F. Supp. 3d 899, 910 (S.D. Iowa 2023) (quoting Spoliation, Black's Law Dictionary (11th ed. 2019)). Averhealth has committed three types of spoliation in this case. First, it destroyed records of the chain of custody of many of Plaintiffs' test specimens, some *after Plaintiffs formally requested them under Rule 34*, even though Averhealth acknowledges that those records are necessary to establish legal defensibility of its drug tests. It also destroyed the hair sample of Plaintiff Katarzyna Foulger's sole positive test, contrary to a statement on its test report, under penalty of perjury, that it would preserve the specimen for a year, as well as its contractual obligation to do so; that prevented her from having the specimen tested by another lab to prove she wasn't using drugs. In addition, it inexplicably destroyed the records of seven drug tests. Those egregious actions are consistent with the bad faith with which it has defended this case, making false statements to this and another Court regarding its testing and its document production. As a result, the Court should strike Averhealth's pleadings or, in the alternative, give an adverse-inference instruction at trial, as well as attorneys' fees in connection with this motion and exact a fine from Averhealth.

## II.  <u>FACTUAL BACKGROUND</u>

### A.  **Averhealth's Spoliation of Documents and Materials**

#### 1.  **Spoliation of chain-of-custody documents**

Averhealth intentionally destroyed chain of custody documents, critical in drug testing, even

after Plaintiffs requested them in discovery. As Averhealth states, the chain of custody consists of "[p]rocedures and associated documents designed to trace the custody of a specimen from the point of origin to final analysis with the intent of *legally demonstrating that custody remained intact and that no tampering occurred*." Ex. A (Averhealth document titled "Definitions"), p. 2 (emphasis added). Averhealth largely uses an electronic process that creates a "chain-of-custody document ... to keep track of a specimen throughout the drug-testing process. It tracks the specimen from when the donor provides it until the result is reported back to the client." Ex. B (Rule 30(b)(6) Dep. Tr., 146:4-12; *see generally id.*, 145:21-146:12.) On its website Averhealth states that this process ensures the test's "legal defensibility";[1] *see* this screenshot:

> • Chain of custody is preserved from sample collection and shipping through laboratory analysis and results reporting, ensuring legal defensibility that a valid sample is collected, appropriately tested, and accurately reported. In other words, you always know the status of a specimen.

Testifying as Averhealth's Rule 30(b)(6) witness, its Chief Executive Officer Dominique Delagnes couldn't think of a single instance where Averhealth could defend a result in court without a contemporaneous chain of custody:

> Q. So my question now is: In what instances could you be able to defend the test result in court without a contemporaneous chain-of-custody document as we've described?
>
> A. And what do you mean by ·contemporaneous?
>
> Q. With the results -- you know, putting down at the time things happen. That's how a chain of custody works, right?
>
> A. Yes.
>
> ***
>
> Q. So what -- what kind of circumstances could there be where you could

---

[1] https://averhealth.com/single-source-a-better-choice-for-drug-testing/#:~:text=Chain%20of%20 custody%20is%20preserved,the%20status%20of%20a%20specimen (highlighting added).

defend the result in ·court without a contemporaneous chain-of-custody document from collections to test report?

A. I don't know how to answer that.

*Q. Can you think of anything?*

*A. No.*

Q. Have you ever defended a test result without a contemporaneous chain of custody from collection to test reporting?

A. Not that I'm aware.

Ex. B, 148:18-149:2, 149:5-15 (emphasis added).[2]

Averhealth produced "the data and documentation" regarding Plaintiffs' tests, including the chain-of-custody documents, in reports it calls "Data Packs." Ex. C (email from Colleen Kinsey to Jamie Boyer and others, 1/26/2024). Using the Data Pack for Tiffani Padilla's January 13, 2021, test as an example, a *proper* chain-of-custody document is found just after the "Full Page Lab Report." Ex. B, 156:19-157:5, referring to Dep. Ex. 18 (attached hereto as Ex. D). That document begins when Mrs. Padilla was "selected to have a collection event"; it continues through the collection of her oral-fluid specimen and to its being shipped, both of which occurred on 1/13/2021 at a site in Michigan, where an employee named "Floyd W." entered the items into Averhealth's computerized database. Ex. B, 157:6-161:2. Here are screen shots of those entries:





The remaining events occurred at Averhealth's lab in St. Louis; they began on 01/15/2021 at 08:38 a.m., when the specimen was delivered and continued through its being placed in a box

---

[2] At the outset of her deposition as a 30(b)(6) witness, Ms. Delagnes agreed that the word "you" in a question referred to Averhealth, not to herself individually. *Id.* 10:19-25.

and added to a "batch" ("a collection of specimens that are tested together"), to the testing, the

report of the result as positive, and the specimen's being placed in storage. *See* Ex. D, pp.

AH0010157-10162; Ex. B, 161:3-22; 164:20-166:25; 167:20-168:22.

As Ms. Delagnes testified as Averhealth's Rule 30(b)(6) witness:

> Q. We've looked and seen that there are contemporaneous records for when
> the person – in this case, Mrs. Padilla -- entered the collection site and when the
> collection occurred, when the shipment occurred, when it was received in St.
> Louis. We haven't looked at everything, but also when the test was done, when it
> was reported back as positive, and so forth.
>
> A. Yes.
>
> Q. And -- and so that's how it's supposed to work; is that right?
>
> A. That's a very broad question. I still don't quite understand what you're
> trying to ask me. I mean, I'm not trying to be difficult, I don't understand the
> question.
>
> Q. I mean the chain of custody is supposed to show all of these things --
>
> A. Yes.
>
> Q. -- on a contemporaneous basis?
>
> A. Yes.
>
> Q. And that's what you -- what you create in order to have defensible test
> results in a court of law --
>
> A. Yes.

*Id.*, 172:4-173:2.

But in the case of 19 tests on Plaintiffs, that is *not* what they show. In each one, the chain-of-

custody document shows *nothing* in Michigan where the sample was collected; it begins in St.

Louis with the delivery of the specimen to the lab. That is because, in those tests, the events in

Michigan were recorded on paper, not electronically. The paper was shipped with the specimens

*and then destroyed* according to Averhealth's procedures after two years. For example, in

Stephen Padilla's Data Pack with a collection date of 10/28/2021, the earliest event in the chain-

of-custody document was a week later, 11/5/2021, entered by a St. Louis employee. Ex. B, 173:5-175:3. No event from the collection site was included, not collection, not shipment, nothing. Then, when the Michigan chain-of-custody papers were destroyed two years after the test (*id.*, 175:4-19), this lawsuit was pending and by that point *Plaintiffs had requested all records related to this test under Rule 34. Id.*, 176:9-11). But that request was futile:

> Q. And rather than produce them to us so that we could review it and check to see if the chain of custody creates a legal defensible record, you threw it away?
>
> A. Yes.

*Id.*, 176:12-16. Here, in chronological order, are all test reports produced to Plaintiffs where the chain-of-custody begins, not with collection in Michigan but in the lab in St. Louis:[3]

| Exhibit | Plaintiff | Collection Date | First Date in Chain of Custody |
|---------|-----------|-----------------|-------------------------------|
| E | Hodor | 11/22/2019 | 12/3/2019 |
| F | Hodor | 11/24/2019 | 12/3/2019 |
| G | Hodor | 12/18/2019 | 12/21/2019 |
| H | S. Padilla[4] | 12/19/2019 | 12/24/2019 |
| I | Hodor | 1/24/2020 | 1/30/2020 |
| J | Hodor | 2/13/2020 | 2/17/2020 |
| K | Hodor | 2/26/2020 | 2/27/2020 |
| L | Helmcke (R. Hekkema) | 7/21/2020 | 7/28/2020 |
| M | J. Hekkema | 7/21/2020 | 7/28/2020 |
| N | J. Hekkema | 8/10/2020 | 8/12/2020 |
| O | Helmcke (R. Hekkema) | 8/10/2020 | 8/12/2020 |
| P | Helmcke (R. Hekkema) | 8/14/2020 | 8/19/2020 |
| Q | T. Padilla[5] | 7/27/2021 | 7/29/2021 |
| R | S. Padilla | 8/31/2021 | 9/8/2021 |
| S | T. Padilla | 10/20/2021 | 10/27/2021 |
| T | S. Padilla | 10/28/2021 | 11/5/2021 |
| U | S. Padilla | 11/8/2021 | 11/10/2021 |
| V | T. Padilla | 11/8/2021 | 11/10/2021 |
| W | T. Padilla | 11/26/2021 | 11/30/2021 |

---

[3] The exhibits on these tests (Ex. E though Ex W) contain relevant portions of the Data Packs for these tests (i.e., from the cover page through the Chain-of-Custody document).

[4] This test is not at issue. The specimen was taken the day after the last date on which Mr. Padilla took illegal drugs with drugs still in his system. *See* Sec. Am. Compl. ("SAC"), ECF 23, ¶ 326.

[5] Averhealth produced this data pack after the Delagnes depositions.

Ms. Delagnes testified that "all of those would have been paper chains of custody from Michigan that Averhealth destroyed." *Id.*, 193:20-24; *see generally id.*, 193:2-24. As noted, it did so two years after the test. But the seven most recent tests (including one produced after the deposition) all occurred less than two years before Plaintiffs requested all test documents under Rule 34 in February 2023, so Averhealth destroyed those records *despite a pending request*. Also, Michigan has a three-year statute of limitations. *See* Mich. Comp. Laws Serv. § 600.5805. Seven tests occurred between two and three years before these plaintiffs joined the case with the Amended Complaint on January 25, 2023 (*see* ECF 16), so Averhealth destroyed the chain-of-custody records a year before the statute of limitations expired, meaning the claim was still alive.

Once she learned about these destroyed documents in her deposition, Ms. Delagnes attempted to defend their destruction despite her earlier testimony that she couldn't think of a circumstance where she could defend a result in court *without* a contemporaneous chain of custody. She claimed that "we would have documented anything that was unusual with the specimen and not tested it had we seen that the chain of custody was broken." *Id.*, 179:1-4. That's simply saying, "Take our word for it," but that's no defense. The records are the proof, but they were intentionally destroyed. Furthermore, if this were a legitimate justification, Averhealth wouldn't need to retain *any* test records. It could throw everything away but the final result and simply say that if anything had been amiss, it wouldn't have reported the result. Of course, that would be absurd. In short, this is egregious spoliation.

## 2.  Spoliation of Plaintiff Foulger's hair sample

Plaintiff Katerzyna Foulger has only one allegedly positive Averhealth test, a hair sample reported as positive for cocaine. Ex. X (Dep. Ex. 14; Foulger Data Pack), p. AH0007837; Ex. B, 95:9-13. Averhealth's Certifying Scientist Krista Ferando signed the lab report for that test under penalty of perjury: "I acknowledge that submission of false information may subject me to

prosecution for the criminal offence of perjury." Ex. X, p. AH0007837. One item of information

on the report is that the specimen would be retained for a full year, as shown in this screen shot:



*Id.* (highlighting added). That requirement is consistent with Averhealth's contract with

Maricopa County, Arizona, governing Ms. Foulger's hair test; that contract similarly requires

that Averhealth "[m]aintain all positive test specimens for a minimum of one year." Ex. B,

101:11-21; 105:13-21.

The reason for that requirement is to be able to satisfy a request to return the sample so that

another lab may retest it. *Id.*, 105:22-106:5. Speaking as Averhealth's Rule 30(b)(6) designated

witness – and therefore binding the company[6] – Ms. Delagnes agreed that Averhealth was

obligated to maintain Ms. Foulger's hair specimen for 365 days under both requirements:

> Q. So you had that obligation not just in the contract, but in the report you sent
> to Ms. Foulger, correct?
>
> A. Yes.

*Id.*, 107:7-10; *see generally id.*, 106:22-107:10.

However, Averhealth violated that requirement. When Ms. Foulger requested her sample so

that she could have it retested at a different lab, she was told that *Averhealth had destroyed it*.

*See* Ex. Y. On January 12, 2022, one week after the date of the test report, Averhealth customer

service representative Michael Giraldo emailed Lee Bostic, Averhealth's area manager for

Arizona (Ex. B, 109:25-110:4): "This lady is calling asking if she can have the hair follicle back

because she wants it tested in another lab. Can we help her with that?" Mr. Bostic answered:

---

[6] *Glenn Golden v. Stein*, 2020 U.S. Dist. LEXIS 57214, p. *34 (S.D. Iowa Mar. 4, 2020) (Rule 30(b)(6) deposition is "binding on the corporation*"); Dapron v. Spire, Inc.*, 329 F.R.D. 223, 226 (E.D. Mo. 2019) ("The Rule 30(b)(6) deposition thus serves a unique function: it is a sworn corporate admission that is binding on the corporation.")

"Our hair follicle screens are one and done, the hair is destroyed during the testing process." Mr.
Giraldo replied: "The test came positive and she was told that the lab kept it if the test comes
positive. She needs to re testing [sic] and is very upset about it." Mr. Bostic's answer: "The lab
keeps urine if its [*sic*] positive, not hair." Ex. Y.

Again, after she learned what happened, Ms. Delagnes tried to justify this destruction of
evidence, this time arguing that hair would be retained only if there were enough left over after
the test. Ex. B, 110:18-23. She offered the ludicrous defense that "[t]he packaging itself, even for
Mr. -- Ms. Foulger's hair, that original packaging with the specimen identifier, the actual
package that the hair would come in, that is actually retained." *Id.*, 123:2-5. So what? Ms.
Foulger could hardly re-test the *packaging*. Ms. Delagnes then blamed Averhealth's procedures,
which don't require taking sufficient hair to leave any left over. *Id.*, 128:3-25. This was
obviously a "johnny-come-lately" excuse because she didn't mention those procedures when she
agreed that Averhealth was obligated by contract and by its statement under penalty of perjury to
retain hair specimens for a year. Moreover, given that obligation, why didn't Averhealth take
enough hair? But whatever the reason, Averhealth despoiled that evidence, and Ms. Foulger was
stuck with the test result without the ability to do a retest.

### 3. Spoliation of Test Records

On July 30, 2024, as Plaintiffs were preparing this motion, Averhealth's counsel wrote
Plaintiffs' counsel that the data packs it had produced for seven tests were – well, there is no
better word for it than "fictitious" because they were not based on the actual test records, which
were apparently long gone. He said those data packs "did not reflect the analysis performed by
the certifier. The certifiers for these samples worked remotely and reviewed them on their local
computers. Unfortunately, the reviewers did not save their work on Averhealth's database." Ex.
Z. He did not explain how, in the absence of the actual testing analysis, Averhealth came up with

8

the data packs that it produced. That could not have been an act of good faith. Where on earth did the reported data come from? Nor did he explain what happened to the "local computers" on which the records were located. Apparently, they somehow vanished or disappeared. Or maybe they were wiped. But he did say Averhealth had attempted to *remake* the records: "Accordingly, the Averhealth team has recreated the chromatographs to reflect what they believe the remote certifier may have done during the review process." *Id.* Note the wording: "what they believe," "may have done." These new records also appear to be fictitious. But what is not fictitious is that the underlying data no longer exist, or else Averhealth would have produced data packs containing them. *When* they ceased existing – whether before or after Plaintiffs requested them in February 2023 – he didn't say. Tests of Plaintiffs Alexandra Hodor, Randi and Joe Hekkema and Tiffani and Stephen Padilla are affected.

### B. Averhealth's Bad Faith Spoliation of Evidence Is Consistent with How It Has Defended this Lawsuit

Averhealth's spoliation of these records and Ms. Foulger's hair sample is in keeping with its bad faith in defending its practices with various false statements to courts. Below is further evidence that supports finding that Averhealth has acted in bad faith.

#### 1. Averhealth falsely told the Court that CAP had rejected Dr. Riley's allegations of Averhealth's testing deficiencies

At the outset of the case, Averhealth moved to dismiss in part on its contention that the facts proved that it had used proper laboratory practices. It asserted that, even though its accrediting body, the College of American Pathologists ("CAP"), had placed it on probation after receiving allegations of faulty testing practices from Averhealth's former lab director, Dr. Sarah Riley, it lifted the probation six months later after rejecting Dr. Riley's claims – or so Averhealth contended. *See* Mem in Supp. of Motion to Dism. Sec. Amended Compl. ("Memorandum"), ECF 27, Section VI, pp. 24-32. On the other hand, Plaintiffs asserted that the probation was

lifted because Averhealth had corrected its faulty practices. Sec. Am. Compl., ECF 23, ¶ 6.

Averhealth titled Subsection A of Section VI of its brief: "Dr. Riley's Complaint to CAP Was Resolved in Averhealth's Favor." Memorandum, p. 25. In support, Averhealth relied entirely on this statement by CAP in a letter of May 25, 2021: "The College of American Pathologists' (CAP) Accreditation Programs has reviewed the inspector findings concerning the complaint that we received. The allegations were reviewed and determined to be not applicable to the testing performed under the CAP FDT program." Ex. AA (Dep. Ex. 67). Averhealth argued that "[i]t necessarily follows that any allegations based on Dr. Riley's complaint to CAP were conclusively resolved in Averhealth's favor." Memorandum, p. 27. *See also* Defendant's Reply in Supp. of Motion to Dism. Sec. Amended Compl., ECF 53-1, p. 14 (relying on the same letter).

In its decision, the Court was unable to resolve the parties' differing positions on the reasons for the lifting of the CAP suspension and the interpretation of the May 25 letter. *See* Order Denying Defendant's Motion to Dismiss, ECF 60, pp. 13, 14.

However, Averhealth's statements to the Court about the letter were false, and *Averhealth knew they were false*. They were refuted most directly by none other than Averhealth's CEO (and Chief Operating Officer at the time), Ms. Delagnes, who testified that the May 25 letter related to *a different complaint altogether*, one regarding whether certain procedures fell under CAP's SOP. Ex. BB (Delagnes Transcript as individual witness), 226:18-227:22. The letter had no connection to Dr. Riley's claims, and what Averhealth told this Court was absolutely false:

> Q. Okay. Okay. So Exhibit 67, the letter from -- the letter dated May 25th, 2021, from CAP to Averhealth has nothing to do with Dr. Riley's complaints, correct?
>
> A. Correct.
>
> ***

10

Q. If anyone were to suggest that Exhibit 67 means that CAP exonerated Averhealth of Dr. Riley's allegations, that would not be correct?

MR. CEJAS:· Same --

Q. (BY MR. CORNFELD)· Isn't that -- isn't that right?

A. This reference number is different -- than her allegations, correct.

*Id.*, 228:20-24, 229:8-15. In the face of this knowledge, Averhealth's argument that the letter absolved Averhealth of Dr. Riley's allegations was not simply *based on* a lie, it *was* a lie. If Averhealth had succeeded in persuading the Court of its prevarication, it would have obtained dismissal based on a fraud on the Court.

But that's not all. At the time it disputed Plaintiffs' position that CAP had lifted the probation because of Averhealth's corrections of its deficiencies, Averhealth had in its possession documents *proving Plaintiffs were correct*.

Just one week after CAP's May 13, 2021 inspection of Averhealth – the inspection that Averhealth claimed had refuted Dr. Riley's allegations (Memorandum, p. 27) and that Plaintiff asserted found that Averhealth had corrected its faulty practices – Ms. Delagnes, then Averhealth's Chief Operating Officer, exchanged emails with Lena Portillo of CAP. Ex. CC (Dep. Ex. 65). Initiating this exchange, Ms. Delagnes asserted that the inspectors told Averhealth they had cleared it of Dr. Riley's allegations. *Id.* Ms. Portillo's response makes clear that, at best, Ms. Delagnes misinterpreted what the inspectors said. Ms. Portillo told her that the allegations had all been substantiated and that the purpose of the inspection was to verify implementation of corrective actions. Here's her message in full:

> Good Morning Dominique.
>
> Thank you for your email. The next steps are for the laboratory responses to be received and reviewed for compliance, followed by commissioner review. The laboratory then will be presented to the Accreditation Committee with a recommendation on the removal of probation and accreditation status . To be clear, the allegations initially investigated in complaint reference #10219 were all substantiated. The purpose of the probation and documentation submissions were to monitor progress with compliance. The purpose of the inspection was to verify implementation of corrective actions and continued compliance. The laboratory will be notified of the Accreditation Committee's decision regarding the removal of probation.
>
> Thank you,
>
> Lena Portillo, MT(ASCP)

*Id.* (highlighting added); *see also* Ex. BB, 224:8-23 (confirming the exchange).

Averhealth internalized what Ms. Portillo said and passed the message on to customers in a slide deck titled, "CAP-FDT Accreditation: Complaint, Temporary Probation *and Corrective Actions*." Delagnes Tr. 234:19-235:5. Ex. DD (Dep. Ex. 69) (emphasis added). On its second page, it states:

## Summary



In November 2020, Averhealth's former Lab Director submitted several complaints to CAP

Cap is obligated to investigate complaints and, as such, requested procedural and testing information related to 2019 and 2020.  Averhealth complied with this request and submitted information in November 2020 and January 2021

In January 2021, CAP placed Averhealth's accreditation on probation over laboratory compliance/Quality Standard concerns.  CAP requested Averhealth 1) submit additional information and 2) pass an unannounced non-routine inspection by May 27, 2021

CAP conducted the routine inspection on May 13, 2021

In June 2021, CAP requested additional information.  Averhealth complied with this request

On July 28, 2021, the CAP Accreditation Committee removed the probation and indicated that the CAP inspector confirmed significant Averhealth progress in correcting deficiencies

*Id.* (highlighting added).

In her deposition, Ms. Delagnes also agreed with Plaintiffs' position regarding why CAP lifted the probation. Referring to the CAP letter ending the probation (Ex. 68 in the deposition and Ex. EE hereto), she testified:

12

Q. This is the letter where CAP told you that they were lifting the probation, correct?

A. Yes.

Q. And they said the reason was that Averhealth had made what they called significant progress in correcting deficiencies identified during their investigation of the complaint, correct?

A. Yes.

Q. And that was -- and this relates to the complaint based on Dr. Riley's allegations, correct?

A. Yes.

Q. And they -- they also state that the investigation found that the laboratory was out of compliance with the CAP standards for laboratory accreditation with respect to four allegations, correct?

A. Yes.

Q. And they list those allegations, and that they're -- they're the same ones we've been looking at that Dr. Riley made to CAP going back to October, correct?

A.·November, but yes, correct.

Delagnes Dep. Tr. 230:12-231:10.

In short, the only refutation of Plaintiffs' position that CAP lifted the probation because

Averhealth had corrected its deficiencies is in Averhealth's statements to this Court.

Averhealth's own documents and the knowledge of its CEO put the lie to those statements.

### 2. Averhealth falsely told the Court that it had produced all underlying data for Plaintiffs' positive tests

In February 2024, Plaintiff moved to extend deadlines because, after a year, Averhealth had

not completed its document production. Motion to Extend Deadlines, ECF 94. In response,

Averhealth told the Court: "Averhealth has produced all the underlying data for, and evidencing,

Plaintiffs' positive tests for the presence of illicit substances." Averhealth's Resp. in Opp. to

Plffs' Motion to Extend Deadlines (filed 2/26/2024), ECF 97, p. 3.

13

That was not true, and Averhealth knew or should have known it wasn't true, even apart from the discarded chain-of-custody and "local computer" data that it never produced, as discussed above. On July 22, 2024, nearly 18 months after Plaintiffs requested the records of their drug tests, Averhealth's counsel phoned Plaintiffs' counsel that he had learned about the existence of "DI logs" with data about Plaintiffs' tests and planned to produce them. This was *after* Plaintiffs had completed two important depositions. Subsequently, Plaintiffs learned from an Averhealth document that, as it told a consultant, a DI log provides "audit tracking for *critical areas of results certification and reporting*." Ex. FF (Dep. Ex. 24), p. AH0035322 (emphasis added).

On July 30, 2024, Averhealth produced a spreadsheet containing DI logs for 127 drug tests (more than the number of tests at issue for some reason). Why didn't it produce these documents related to "critical areas of results certification and reporting" earlier? After all, it readily knew of them when it told its consultant about them. There can be only two possible explanations. Either Averhealth didn't take its discovery responsibilities seriously or it had *purposely* withheld those documents. Either possibility demonstrates bad faith.

But even worse, also on July 30, without prior notice, Averhealth produced for the first time a wealth of testing data, including three Data Packs on tests of Tiffani Padilla going back to 2021, as well as 28 supplemental data packs either containing newly produced data or replacing previously produced incorrect data. This represents 25% of the previously produced data packs. *See* Ex. Z (Averhealth counsel's letter explaining what was being produced.) Seven of those previously produced data packs are the ones with incorrect data discussed above. As noted, Averhealth supplemented them to provide supposedly reconstructed data. Counsel said that another 11 previously produced data packs "were missing the final certifying scientist's reviewed data." With counsel's letter, Averhealth supplemented the data packs to provide those data. *Id.*

14

There were also nine data packs that, according to counsel, were tested in more than one batch but for which it had originally produced data from *only one* of those batches; with the letter, Averhealth provided the missing data. Finally, counsel said that one previously produced data pack somehow contained the results of an entirely different sample. Averhealth produced a new data pack for this test as well. *Id.*

Plaintiffs had been preparing their case, as well as their anticipated expert testimony (at great expense), in reliance on Averhealth's statement that it had produced all the underlying data on Plaintiffs' positive tests. It's now clear that that statement was utterly false. Now, if Plaintiffs don't actually have to start over, they have to redo vast amounts of that work.

### 3. Averhealth's Pattern of Intentionally Misleading Courts

This is not the first time Averhealth has intentionally misled a court. On February 5, 2021, Ms. Delagnes told a Michigan court that "[t]here has been nothing that has said that we are not following our standards." Ex. GG (Dep. Ex. 50) at 12:7-16.  In its motion to dismiss, Averhealth relied on the court's decision in that case. Memorandum, pp. 21-23. But, as Ms. Delagnes admitted in this case, that testimony was utterly false:

> Q. You were asked whether anybody had found that you were not following your standards. You know that -- you knew that CAP had found that you were not following your standards and you said there's been nothing that has said we are not following our standards. That's what you told the Court, correct?
>
> A. Yes.
>
> Q. Okay. And that wasn't true, was it? It wasn't true that nothing has said that we are not following our standards because CAP said you weren't following your standards, correct?
>
> A. There is documentation from CAP that says that we did not follow our SOPs as written, yes.
>
> Q. So -- so -- so what -- so you're -- and so what you told the Court was not true?

A.· · Correct.

Ex. BB, 85:22-86:14.

## III. ARGUMENT

### A.  Averhealth's Spoliation of Evidence Is Sanctionable Conduct

Sanctions for spoliation of evidence require "a finding of 'intentional destruction indicating a desire to suppress the truth,'" as well as "a finding of prejudice to the opposing party ...." *Anderson*, 681 F. Supp. 3d at 910 (quoting *Stevenson v. Union Pac. R.R.*, 354 F.3d 739, 746 (8th Cir. 2004)). Here, both elements are met with respect to the chain of custody, Ms. Foulger's hair specimen, and the "local computer" data.

"The Eighth Circuit has noted that '[i]ntent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors.'" *Taylor v. Null*, 2019 U.S. Dist. LEXIS 164133, at *13-14 (E.D. Mo. Sep. 25, 2019) (quoting *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004)). Here those factors point to the conclusion that Averhealth engaged in intentional destruction with a desire to suppress the truth. Averhealth admits the chain-of-custody records are necessary to "ensur[e] legal defensibility" of the tests. *See* web page quoted on p. 2, supra. Yet it destroyed those records, many after they had been requested in this lawsuit. It destroyed Ms. Foulger's hair specimen even though it was obligated to preserve it both under its contract and its test report, and even though it knew that the reason to preserve the specimen was to enable it to be retested. And it's offered no explanation for what happened to the "local computer" data. Those actions were consistent with the bad faith in which Averhealth has defended this case, repeatedly misleading the Court.

It does not matter that the chain-of-custody records were destroyed pursuant to Averhealth's routine policy. In *Stevenson*, the Eighth Circuit found bad faith because of "Union Pacific's act

of destroying the voice tape pursuant to its routine policy in circumstances where Union Pacific had general knowledge that such tapes would be important to any litigation over an accident that resulted in serious injury or death, and its knowledge that litigation is frequent when there has been an accident involving death or serious injury." 354 F.3d at 748. The court ruled that, after the defendant had received a request for the records, it could not "rely on its routine document retention policy as a shield." Here, Averhealth knew that the chain-of-custody would be important to any litigation over the tests because those records "ensur[e] legal defensibility" of the test. The same is true for Ms. Foulger's hair specimen, which she wanted to retest. It goes without saying that such a retest would be important to any litigation over the tests. And, of course, the destruction of the "local computer" records affected evidence relevant to litigation. Averhealth not only knew that litigation was frequent over its tests, litigation had already begun at the time it destroyed many of the chain-of-custody records. Moreover, if litigation were not frequent, there would be no reason to maintain chain-of-custody records to ensure the tests' legal defensibility. And it had to anticipate litigation from someone, like the "very upset" Ms. Foulger, who requested a sample so that it could be retested.

Averhealth's business depends on preserving evidence so that it can be reviewed by a judge or jury in criminal and domestic cases. This is precisely why Averhealth says it makes its tests "forensically defensible."[7] Averhealth knows precisely how to and does preserve evidence when it is advantageous to it. But it did not do so here.

Furthermore, "[a]n explicit finding of bad faith is not required to impose sanctions on a party that destroys specifically-requested evidence after litigation has commenced." *Fid. Nat'l Title Ins. Co. v. Captiva Lake Invs., LLC*, 2015 U.S. Dist. LEXIS 1350, at *6 (E.D. Mo. Jan. 7, 2015).

---

[7] *See* Ex. HH (Dep. Ex. 45; letter to CAP, 11/18/2020) (Averhealth "produc[es] high quality, scientifically valid, and forensically defensible results.").

That is what happened in the case of many of the chain-of-custody records. But the facts justify a finding of bad faith regarding all of Averhealth's spoliations, a finding further supported by its false statements to courts.

The facts likewise demonstrate the second requirement for sanctions, prejudice from Averhealth's spoliation. To show prejudice, the spoliated evidence need not be "a smoking-gun." *Taylor*, 2019 U.S. Dist. LEXIS 164133 at *14-15 (quoting *Stevenson*, 354 F.3d at 746). Instead, "[t]he despoiled evidence must have been both relevant and must not be available to the moving party through other sources." *Am. Builders & Contractors Supply Co. v. Roofers Mart, Inc.*, 2012 U.S. Dist. LEXIS 101842, at *7 (E.D. Mo. July 20, 2012). In *Stevenson*, as the Eighth Circuit held regarding the destroyed evidence there, "the very fact that it is the only recording of conversations between the engineer and dispatch contemporaneous with the accident renders its loss prejudicial to the plaintiffs." 354 F.3d at 748. The same is true here. The missing chain-of-custody records, Ms. Foulger's hair sample, and the "local-computer" data are the only sources of the evidence they contained. Averhealth's spoliations therefore caused Plaintiffs prejudice.

## B. The Court Should Strike Averhealth's Pleadings, Order It to Pay Plaintiffs' Attorneys' Fees, and Fine It.

"Potential sanctions against an offending party for spoliation include entry of default judgment, an adverse inference jury instruction, exclusion of evidence, and the imposition of the prejudiced party's attorneys' fees or other monetary sanction." *Anderson*, 681 F. Supp. at 910. The court need not "impose the least onerous sanction available, but may exercise its discretion to choose the most appropriate sanction under the circumstances." *Ameriwood Indus. v. Liberman*, 2007 U.S. Dist. LEXIS 74886, at *13 (E.D. Mo. July 3, 2007) (quoting *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999). In addition, a sanction "should also serve 'to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Am.*

18

*Builders*, 2012 U.S. Dist. LEXIS 101842, at *13 (quoting *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999)).

"When a litigant's conduct abuses the judicial process, … dismissal of a lawsuit [is] a remedy within the inherent power of the court." *Ameriwood*, 2007 U.S. Dist. LEXIS 74886, at *13 (quoting *Pope v. Fed. Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992)). In this case, the court should enter a default judgment in favor of Plaintiffs. For instance, the destruction of Ms. Foulger's hair specimen prevented her from offering the most direct evidence possible to support her claim, that of a negative test by an independent lab. *See Moyers by & Through Moyers v. Ford Motor Co.*, 941 F. Supp. 883, 885 (E.D. Mo. 1996) (entering summary judgment because Plaintiff's destruction of a car's seat belts "render[ed] a full defense impossible. Ford cannot introduce expert testimony that the seat belt was not defective.").

In Ameriwood, at *20, the court entered a default judgment where the defendant "was on notice that the files on the device were discoverable and the subject of a motion to compel." But here Averhealth didn't object to producing the chain-of-custody documents, necessitating a motion to compel. It simply destroyed them despite the pendency of a Rule 34 request. The Court is therefore further justified in entering a default. And it should do so as well because of the spoliation of the "local computer" records in light of Averhealth's bad faith in producing Data Packs for those tests with false data.

Alternatively, the Court should bar Averhealth from introducing evidence of the supposedly recreated "local computer" documents and give the jury an adverse-inference instruction "permit[ting] the jury to assume that the destroyed evidence would have been unfavorable to the position of" Averhealth. *Ameriwood*, 2007 U.S. Dist. LEXIS 74886, at *13. Likewise, the Court should issue an adverse-inference instruction regarding the missing chain-of-custody documents.

19

Finally, the court should order Averhealth to pay Plaintiffs' attorneys' fees for bringing this motion. The court's inherent power to award fees "reaches conduct both before and during litigation as long as that conduct abuses the judicial process in some manner. A bad faith finding is specifically required in order to assess attorneys' fees." *Stevenson*, 354 F.3d at 751. *See Am. Builders*, 2012 U.S. Dist. LEXIS 101842, at *16-17 (awarding fees); *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 2011 U.S. Dist. LEXIS 121369, at *24 (E.D. Mo. Oct. 20, 2011) (same). The authority to award fees is independent of other sanctions. Thus, in *Paisley Park Enters. v. Boxill*, 330 F.R.D. 226, 237-38 (D. Minn. 2019), the court ordered monetary relief while deferring the issue of other sanctions to a time closer to trial. The court also ordered the guilty party to pay a fine of $10,000 into the court. This Court should do the same because, like the other sanctions the Court should impose, a fine would help deter similar conduct by others.

Averhealth's conduct is egregious, and it is unclear where it will end. This case is about Averhealth cheating the system by returning false positive tests with no scientific backing, for profit, to the detriment of these Plaintiffs. The facts set forth herein make clear that Averhealth does the same thing with the judicial system. It simply plays by its own rules, destroying evidence and misleading courts. Averhealth cannot be allowed to do that without significant consequences.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court should find that Averhealth is guilty of spoliation of evidence and acted in bad faith. It should strike Averhealth's pleadings and enter a default judgment against it, or in the alternative give the jury an adverse inference instruction. In addition, the Court should order Averhealth to pay Plaintiffs their reasonable attorneys' fees in bringing this motion and order Averhealth to pay the Court a fine of $10,000.

Dated: August 8, 2024                    Respectfully submitted,

**GOLDENBERG HELLER &
ANTOGNOLI, P.C.**

By:/s/*Richard S. Cornfeld*
Richard S. Cornfeld, #31046MO
Daniel S. Levy, #66039MO
2227 S. State Route 157
Edwardsville, Illinois 62025
618.656.5150
rick@ghalaw.com
daniel@ghalaw.com

And

Anthony S. Bruning, #30906MO
Anthony S. Bruning, Jr., #60200MO
Ryan L. Bruning, #62773MO
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
P. 314-735-8100 / F. 314-898-3078
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

And

J.C. Pleban, MO Bar No. 63166
jc@plebanlaw.com
C. John Pleban, Mo. Bar No. 24190
cpleban@plebanlaw.com
Pleban & Associates Law LLC
2010 South Big Bend Blvd.
St. Louis, MO  63117
(314) 645-6666 – Telephone
(314) 645-7376 – Facsimile

And

Mike Arias, #115385(CA)
Arnold Wang, #204431(CA)
Craig S. Momita #163347(CA)
Arias Sanguinetti Wang & Team, LLP
6701 Center Drive West, 14th Floor
Los Angeles, California 90045
Tel: (310) 844-9696 / Fax: (310) 861-0168

mike@aswtlawyers.com
arnold@aswtlawyers.com
craig@aswtlawyers.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of August, 2024, the foregoing was served by operation of the Court's electronic filing system on all counsel of record in this matter.

*/s/ Richard S. Cornfeld*

22