# Exhibit B

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF MISSOURI
 3                      EASTERN DIVISION
 4   KATARZYNA FOULGER, et al.,
 5        Plaintiffs,
 6   vs.                        Case No. 4:22-CV-00878
 7   AVERTEST, LLC d/b/a AVERHEALTH,
 8        Defendant.
 9
10
11
12
13
14
15          VIDEO-RECORDED DEPOSITION OF
                 DOMINIQUE DELAGNES
16                 JULY 8, 2024
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1                    I N D E X
 2                    WITNESSES
     All Witnesses:                           Page
 3
     Dominique Delagnes
 4     Examination by Mr. Cornfeld               8
 5
                      EXHIBITS
 6
     Exhibit 1     Deposition Notice             9
 7
     Exhibit 2     Commonwealth of              20
 8                 Massachusetts
                   Standard Contract Form
 9
     Exhibit 3     Attachment A, Scope of       20
10                 Services
11   Exhibit 4     Forensic Drug Testing        33
                   Program for Kings
12                 County
13   Exhibit 5     Forensic Drug Testing        33
                   Program for Luzerne
14                 County
15   Exhibit 6     Samaritan Recovery           36
                   Center MOU
16
     Exhibit 7     Jerry Ambrose Veteran's      36
17                 Council MOU
18   Exhibit 8     Forensic Science             40
                   International Article
19
     Exhibit 9     Averhealth's Paper titled    41
20                 Scientific References
21   Exhibit 10    Michigan Proven Quality      51
                   Averhealth, Smarter Solutions,
22                 Better Outcomes Presentation
23   Exhibit 11    8/23/19 Shnitzer Data Pack   57
24   Exhibit 12    9/23/19 Shnitzer Data Pack   57
25
```

**Page 3**

```
 1                 I N D E X (continued)
 2                 EXHIBITS (continued)
 3   Exhibit 13    E-mail                        66
 4   Exhibit 14    12/13/21 Foulger Data Pack    94
 5   Exhibit 15    Maricopa County Contract     101
 6   Exhibit 16    E-mail                       109
 7   Exhibit 17    12/13/21 Foulger Test Report 129
 8   Exhibit 18    1/13/21 T. Padilla Data Pack 150
 9   Exhibit 19    10/28/21 S. Padilla Data Pack173
10   Exhibit 20    8/31/21 S. Padilla Data Pack 188
11   Exhibit 21    12/3/21 T. Padilla Data Pack 203
12   Exhibit 22    12/3/21 S. Padilla Data Pack 203
13   Exhibit 23    Plaintiffs' Second Set of    217
                   Request for Admissions
14
     Exhibit 24    E-mail                       220
15
     Exhibit 25    Sample Litigation Package    222
16
     Exhibit 26    8/28/20 SLU Letter           242
17
     Exhibit 27    CAP PT Exception             245
18                 Investigation Checklist
19   Exhibit 28    Memorandum                   255
20   Exhibit 29    1/4/21 Letter authored by    259
                   Michele Glinn
21
     Exhibit 30    E-mail                       262
22
     Exhibit 31    E-mail                       268
23
     Exhibit 32    E-mail                       290
24
     Exhibit 33    Reoccurring Meeting Event    293
25
```

**Page 4**

```
 1                 I N D E X (continued)
 2                 EXHIBITS (continued)
 3   Exhibit 34    11/6/20 Letter               297
 4   Exhibit 35    Resignation Letter           299
 5   Exhibit 36    E-mail                       308
 6   Exhibit 37    Teams Chat                   313
 7   Exhibit 38    E-mail                       317
 8   Exhibit 39    11/11/20 Letter              321
 9   Exhibit 40    Memo to Supreme Court        330
10   Exhibit 41    E-mail                       330
11   Exhibit 42    Memo to CPS                  330
12   Exhibit 43    Memo to Judge Ackert         330
13   Exhibit 44    E-mail                       330
14
     (The original exhibits were retained by the reporter
15   and copies will be provided as requested.)
16
17
18
19
20
21
22
23
24
25
```

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                          California Firm Registration #179



Page 5

```
1            IN THE UNITED STATES DISTRICT COURT

             FOR THE EASTERN DISTRICT OF MISSOURI

2                    EASTERN DIVISION

3

4   KATARZYNA FOULGER, et al.,

5            Plaintiffs,

6   vs.                          Case No. 4:22-CV-00878

7   AVERTEST, LLC d/b/a AVERHEALTH,

8            Defendant.

9

10                    VIDEO-RECORDED DEPOSITION

11  OF DOMINIQUE DELAGNES, produced, sworn, and examined

12  on JULY 8, 2024, between the hours of eight o'clock

13  in the forenoon and six o'clock in the afternoon of

14  that day, at the office of Armstrong Teasdale, 7700

15  Forsyth Boulevard, St. Louis, Missouri, before

16  Tammie A. Heet, a Registered Professional Reporter,

17  Certified Shorthand Reporter and Notary Public

18  within and for the states of Illinois and Missouri,

19  in a certain cause now pending before the United

20  States District Court for the Eastern District of

21  Missouri, Eastern Division in re: Katarzyna Foulger,

22  et al. vs. Avertest, LLC d/b/a Averhealth; on behalf

23  of the Plaintiffs.

24

25
```

Page 6

```
1                    APPEARANCES

2
    For the Plaintiffs:

3
        Mr. Richard S. Cornfeld, Esq.

4       GOLDENBERG HELLER ANTOGNOLI, PC
        2227 South State Route 157

5       Edwardsville, Illinois 62025
        618/656-5150

6       rick@ghalaw.com

7       Mr. J.C. Pleban, Esq.
        PLEBAN & ASSOCIATES LAW

8       2010 South Big Bend Boulevard
        St. Louis, Missouri 63117

9       314/645-6666
        jc@plebanlaw.com

10

        Mr. Anthony Jenkins, Esq.

11      ARIAS SANGUINETTI WANG & TEAM, LLP
        6701 Center Drive West, 14th Floor

12      Los Angeles, California  90045
        310/844-9696

13      anthony@aswtlawyers.com

14
    For the Defendant:

15
        Mr. Nicholas P. Cejas, Esq.

16      Ms. Colleen Kinsey, Esq.
        ARMSTRONG TEASDALE, LLP

17      7700 Forsyth Boulevard, Suite 1800
        St. Louis, Missouri 63105

18      314/342-8040
        ncejas@atllp.com

19      ckinsey@atllp.com

20
    Reported/Video-Recorded By:

21
        Ms. Tammie A. Heet, RPR, CSR(IL), CCR(MO)

22      Mr. David Doell, Legal Videographer
        LEXITAS LEGAL

23      711 North 11th Street
        St. Louis, Missouri 63101

24      314/644-2191

25
```

Page 7

```
1            IT IS HEREBY STIPULATED AND AGREED by
2   and between counsel for the Plaintiffs and counsel
3   for the Defendant that this deposition may be taken
4   in shorthand by Tammie A. Heet, RPR, CSR, CCR and
5   notary public, and afterwards transcribed into
6   printing, and signature by the witness expressly
7   reserved.
8            THE VIDEOGRAPHER:  We are now on the
9   record.  Today's date is July the 8th, 2024.  The
10  time's approximately 9:15 a.m., Central Standard
11  Time.  This begins the video-recorded deposition of
12  Dominique Delagnes in the matter of Foulger v.
13  Avertest, Case Number 4:22-CV-00878 in the United
14  States District Court for the Eastern District of
15  Missouri.
16           This deposition is being held at the
17  law offices of Armstrong Teasdale.  The reporter's
18  name is Tammie Heet.  My name's David Doell and I
19  am the legal videographer.  We are here with
20  Lexitas.  Would the attorneys attending please
21  introduce yourselves and the parties you represent?
22           MR. CORNFELD:  I'm Rick Cornfeld.  I
23  represent the plaintiffs.
24           MR. PLEBAN:  J.C. Pleban for the
25  plaintiffs.
```

Page 8

```
1            MR. CEJAS:  Nick Cejas and Colleen
2   Kinsey on behalf of the defendants.
3            THE VIDEOGRAPHER:  Would the court
4   reporter please swear in the witness and we may
5   proceed.
6                    * * * * *
7            DOMINIQUE DELAGNES,
8   of lawful age, produced, sworn, and examined on
9   behalf of Plaintiffs, deposes and says:
10                   EXAMINATION
11  QUESTIONS BY MR. CORNFELD:
12       Q.   Good morning, Ms. Delagnes.
13       A.   Good morning.
14       Q.   We just met.  I just introduced
15  myself to you.  I am Rick Cornfeld.  I represent
16  the plaintiffs in this lawsuit.  I assume you've
17  had your deposition taken before.
18       A.   I have not had my deposition taken
19  before.  I've been -- I've testified in one
20  course -- in one court hearing.
21       Q.   Okay.  I assume you've had the ground
22  rules explained to you.
23       A.   Yes.
24       Q.   Okay.  And you know that I'll be
25  asking you questions?
```

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                    California Firm Registration #179



Page 9

1    A.   Yes.
2    Q.   And you'll be answering the questions
3  under oath?
4    A.   Yes.
5    Q.   Okay.  And if any time you don't
6  hear, you think you didn't hear my question right
7  or you didn't understand it, will you let me know
8  immediately so that I can either restate it or
9  rephrase it to make it understandable?
10    A.   Yes.
11    Q.   All right.  And if at any time you'd
12  like to take a break, just let me know.  My only
13  stipulation is that you wait until if there's a
14  question pending, you answer the question first.
15    A.   Understood.
16    Q.   I've never done this before.
17       That was -- just for the record, for
18  the printed record, that was a joke because my
19  microphone keeps falling off.
20       Ms. Delagnes, let me hand you what's
21  been marked as Exhibit 1 to this deposition.  This
22  is a document entitled Plaintiffs' Second-Amended
23  Notice of Rule 30(b)6 Deposition directed to
24  Defendant Avertest, LLC, d/b/a Averhealth.
25       Do you see that?

Page 10

1    A.   Yes.
2    Q.   Are you familiar with this document?
3    A.   Yes.
4    Q.   And you know that this is the
5  deposition notice that will govern the proceedings
6  today?
7    A.   Yes.
8    Q.   All right.  And you understand that
9  you are here testifying in the capacity of a
10  representative of Averhealth to answer questions
11  pertaining to the topics in the deposition notice?
12    A.   Yes.
13    Q.   All right.  And you will be answering
14  questions not on behalf of yourself, Ms. Delagnes,
15  but on behalf of Averhealth to tell us what
16  Averhealth knows in response to the -- to my
17  questions?
18    A.   Yes.
19    Q.   All right.  And if -- if I, in a
20  question refer to "you," if I use the word "you,"
21  unless I specify that, I am talking about you as an
22  individual, Ms. Delagnes, I am referring to you as
23  Averhealth.
24       Will you understand that?
25    A.   Yes.

Page 11

1    Q.   Before I start -- before I start
2  asking any other questions, on -- on last
3  Wednesday, before the holiday, I had three boxes of
4  documents delivered for use during the deposition
5  and I have them here.  When I arrived this morning,
6  the seals of those boxes had been broken,
7  indicating that the boxes were opened, and I just
8  want to confirm, you have not gone through any of
9  those documents, have you?
10    A.   I have not.
11    Q.   Okay.  And nobody else who may have
12  gone through those documents, did anybody tell you
13  what any of those documents were?
14    A.   No.
15    Q.   Did anybody ask you about any
16  specific documents?
17    A.   No.
18    Q.   Okay.  And nobody told you they
19  expected that I would be asking about any specific
20  documents?
21    A.   No.
22    Q.   Okay.  In preparation for the
23  deposition, what did you do?
24    A.   Obviously, I've looked at the
25  Complaint, our responses to the Complaint, I've

Page 12

1  reviewed SOPs, I've reviewed documentation around
2  our inspection notices, the Klette report, the
3  Wagner report.  I think I'd said our standard
4  operating procedures, information about employees
5  and -- that worked in the various collection areas,
6  as well as documents and communication that
7  occurred at the laboratory.
8       I'm sure that there's many other
9  things that I've looked at, but quite a few
10  documentations that -- all of the data packs and
11  assisted with putting together the data packs of
12  the test results.
13    Q.   You said you reviewed the SOPs, and
14  then you said something about notices.  What
15  notices were you referring to?  I don't think I
16  heard you.
17    A.   I'm not exactly sure what I said
18  about notices.  I had indicated the Complaint.
19    Q.   Inspection notices?
20    A.   Oh, sorry, inspection documentation.
21  So CAP/CLIA inspection documents.
22    Q.   And you mentioned the data packs.
23    A.   Uh-huh.
24    Q.   And you said you put them together?
25    A.   I assisted with the teams to pull the



Page 13

1  documentation.
2      Q.   Okay.  That wasn't specifically for
3  in preparation for this deposition, I assume, since
4  we received those data packs some time ago.
5      A.   Correct.
6      Q.   Okay.  Did you review the data packs
7  in preparation for the deposition?
8      A.   I did not.
9      Q.   Okay.  Have you reviewed the data
10 packs since you assisted in putting them together?
11     A.   I have not.
12     Q.   Okay.  Did you review any of the
13 plaintiffs' test results in preparation for the
14 deposition?
15     A.   I did not.
16     Q.   Did you review any of the plaintiffs'
17 test results since putting the data -- or assisting
18 in putting the data packs together?
19     A.   I don't believe so.
20     Q.   How much time did you spend reviewing
21 documents in preparation for the deposition?
22     A.   Probably 20 hours or more.
23     Q.   You said that you reviewed
24 information about employees.  Can you explain that?
25     A.   Sure.  So what was going to be

Page 14

1  covered today was -- and part of what we pulled
2  for, to provide to you as part of discovery was
3  information about our employees in Massachusetts,
4  in Arizona, as well as the laboratory.  So one of
5  the items that I reviewed was to see any
6  documentation in HR files that applied to employees
7  that work at the laboratory in Massachusetts and in
8  Arizona.
9      Q.   Were those -- were those documents in
10 the HR files, have they been produced to the
11 plaintiffs in this case?
12     A.   Yes.
13     Q.   And what -- what did you review about
14 employees in the laboratory?
15     A.   Similarly, I would have seen -- you
16 know, so back to their HR files, for employees
17 around the -- the time of -- of -- that were
18 working in the time frame that spans for this
19 issue.
20     Q.   And what were you looking for?
21     A.   Just wanted to see if there was any
22 kind of written -- write-ups or correspondence
23 about the performance of those individuals.
24     Q.   Performance evaluations, you're
25 talking about?

Page 15

1      A.   Not specific performance evaluations,
2  but if there was any -- I don't even know what we
3  call that -- you know, documentation as far as if
4  they were retrained or if they had some sort of
5  performance eval -- or performance review done on
6  those.
7      Q.   Were those documents documents that
8  have been produced to the plaintiffs?
9      A.   Yes.
10     Q.   Did you find anything of interest in
11 any of those documents, the ones about the
12 laboratory employees?
13     A.   Can you clarify what you mean "of
14 interest"?
15     Q.   Anybody receive a bad performance
16 review?
17     A.   There were -- individuals are
18 continuously retrained, so there was some
19 documentation around retraining.
20     Q.   Did you meet with counsel -- and
21 don't tell me what counsel said -- but did you meet
22 with counsel in preparation for the deposition?
23     A.   Yes.
24     Q.   And when was that?
25     A.   There's been several meetings.  There

Page 16

1  was one that was in person in St. Louis two weeks
2  ago.  We've had -- in addition to a conference call
3  that I had had with them last week.
4      Q.   Okay.  Two meetings?
5      A.   The -- the in-person were over two
6  days.  So more than two meetings.
7      Q.   Okay.  How -- how long altogether did
8  you meet with them?
9      A.   Specific to the deposition?
10     Q.   Yes.
11     A.   Around 10 hours.
12     Q.   Okay.  I'm going to start with
13 questions that I usually begin with when it's not a
14 corporate designee deposition.
15         You're employed by Averhealth,
16 correct?
17     A.   Yes.
18     Q.   What is your position?
19     A.   I'm the chief executive officer.
20     Q.   How long have you been the chief
21 executive officer?
22     A.   Since May.
23     Q.   Since May of this year?
24     A.   Correct.
25     Q.   You succeeded Mark Johnson?



Page 17

1    A.   Correct.
2    Q.   All right.  And why did Mr. Johnson
3  leave the position of CEO?
4    A.   I'm not sure.
5    Q.   Do you know where he is now?
6    A.   No, I do not.
7    Q.   Do you have any idea or have you been
8  told?
9    A.   I have not been told.
10   Q.   Or whether he is employed by somebody
11 else?
12   A.   I don't know.
13   Q.   Before you were CEO, you were the
14 chief operating officer?
15   A.   Correct, yes.
16   Q.   How long were you the chief operating
17 officer?
18   A.   I started with Averhealth in January
19 of 2014.
20   Q.   As COO?
21   A.   Yes.
22   Q.   And you understand COO means chief
23 operating officer?
24   A.   Yes.
25   Q.   I'm sorry, that was January of what

Page 18

1  year?
2    A.   2014.
3    Q.   All right.  So you -- for the events
4  that are relevant to this lawsuit, you were the
5  chief operating officer the entire time, correct?
6    A.   Yes.
7    Q.   What were your responsibilities as
8  COO?
9    A.   I had oversight over the patient care
10 centers, the field operations, the customer service
11 department, the laboratory, and at certain times,
12 human resources fell under me.  There's -- when I
13 started, it did not, then it did for a while, so
14 there's been times that human resources reported
15 directly into me.
16   Q.   When was that?
17   A.   I don't know all the dates,
18 unfortunately.  I'd have to go back and look.  I
19 don't know.
20   Q.   What -- what's your best estimate?
21   A.   Over 10 years, it's really hard for
22 me to specify the -- the various dates of when it
23 did and did not.  I honestly don't -- I can't tell
24 you that.
25   Q.   The first laboratory test of a

Page 19

1  plaintiff in this case was in August of 2019.
2    A.   Uh-huh.
3    Q.   From August 2019 until the last test
4  of a plaintiff in this case, which was in March of
5  2022, did you have any oversight over HR?
6    A.   I did.
7    Q.   For how long?
8    A.   I believe the entire time besides
9  when Mark Johnson had joined.  When Mark Johnson
10 had joined, human resources fell under him.  And
11 then when he departed, it fell back under me.
12 There was dotted lines, so there's always been some
13 dotted-line responsibility for human resources
14 since 2019, either directly or dotted line.
15   Q.   What do you mean by "dotted line"?
16   A.   I mean, it's a common term used in
17 companies, meaning that I had very close
18 interaction with -- often, our HR representatives
19 were, you know, asking me for information, advice
20 on handling situations, so the individual almost
21 had dual responsibility.
22   Q.   When did Mr. Johnson join the
23 company?
24   A.   In October of -- it was a
25 year-and-a-half ago, so in 2014, so October of

Page 20

1  2022.
2    Q.   All right.  So that was after the
3  last of the -- of the lab tests on any of the
4  plaintiffs in this case?
5    A.   Correct.
6    Q.   Ms. Delagnes, handing you two
7  exhibits that have been marked as Exhibits 2 and 3
8  to this deposition.  The first one is titled
9  Commonwealth of Massachusetts Standard Contract
10 Form and the second is entitled Attachment A, Scope
11 of Services.  And they have the Bates number on the
12 lower right-hand corner of the first page of each,
13 AH0081607 and AH01 -- excuse me, AH0081618.
14       Do you recognize these as
15 Averhealth's contracts with the Commonwealth of
16 Massachusetts?
17   A.   Yes.
18   Q.   And were these -- was this contract
19 in effect during the entire relevant period,
20 meaning the period from the first plaintiffs' test
21 in August 2019 through the last plaintiffs' test in
22 March of 2022?
23   A.   Yes.
24   Q.   So according to Exhibit 2,
25 Averhealth's responsibilities were -- to the



Page 21

1  Commonwealth of Massachusetts, actually began on
2  September 1st, 2016; is that right?
3      **A.  Yes.**
4      Q.    And if you look at attachment A,
5  Scope of Services, that's Exhibit 3, do you see
6  that this exhibit provides the scope of the
7  services that Averhealth was going to provide and
8  did provide to -- agreed to provide to the
9  Commonwealth of Massachusetts?
10     **A.  Yes.**
11     Q.    If you could go down to paragraph 8,
12  which is on the third page of Exhibit 3, it says
13  it's titled Results Reporting, and says the
14  provider, and if I can stop there.
15           Averhealth was the provider under its
16  contract with Massachusetts, correct?
17     **A.  Yes.**
18     Q.    It says:  The provider shall report
19  all test results and related information via the
20  IMS.
21           Do you see that?
22     **A.  Yes.**
23     Q.    What is the IMS?
24     **A.  The Information Management System**
25  **that's referenced in number 1.**

Page 22

1      Q.    All right.  And that was an
2  information management system or a computer system
3  that Averhealth provided to Massachusetts under
4  this contract?
5      **A.  Correct.  It's a web-based results**
6  **reporting -- reportal.**
7      Q.    And then if we go to subparagraph D,
8  under paragraph 8, one of the items that Averhealth
9  was to provide assistance to Massachusetts
10  regarding was to assist with results
11  interpretation?
12     **A.  Correct.**
13     Q.    So that means if you -- if you
14  provided a result in a laboratory test, you were to
15  assist Massachusetts in interpreting that result,
16  correct?
17     **A.  Yes.**
18     Q.    Now if we go back up to paragraph 6,
19  this provides that part of the scope of services
20  that Averhealth was to provide in its contract with
21  Massachusetts was laboratory testing, correct?
22     **A.  Yes.**
23     Q.    And it says:  The provider shall --
24  and if we skip down to paragraph H -- test assays
25  at the cutoff levels listed in table 1 below,

Page 23

1  correct?
2      **A.  Yes.**
3      Q.    And then table 1 lists various
4  assays.  An assay is simply a test for a certain
5  contaminant or item or drug that is contained in a
6  sample that's being tested, correct?
7      **A.  I'm not sure I understand your**
8  **question.  What do you mean?**
9      Q.    What do you mean, what is meant by
10  assay?
11     **A.  Assay would be, yes, an individual**
12  **either drug class or specific metabolite within**
13  **that.**
14     Q.    That's -- that is being tested in a
15  sample that's provided to Averhealth?
16     **A.  Correct.**
17     Q.    A sample of a person who provided
18  that sample such as my clients?
19     **A.  Correct.**
20     Q.    Who prepared table 1?
21     **A.  I assume that it would have been our**
22  **proposal writer.**
23     Q.    That would -- this would have been
24  part of your proposal?
25     **A.  Correct.**

Page 24

1      Q.    Okay.  And -- and Massachusetts
2  accepted that?
3      **A.  Yes.**
4      Q.    And table 1 has four columns, doesn't
5  it?  It has columns headed Assay, Specimen, Screen
6  Cutoff, and Confirmation Cutoff, correct?
7      **A.  Yes.**
8      Q.    If we could look at the first line,
9  the first item in table 1, that's for an assay for
10  amphetamines?
11     **A.  For an amphetamine urine test, yes.**
12     Q.    The assay is amphetamines, the
13  specimen is urine, correct?
14     **A.  Yes.**
15     Q.    The table actually has also specimens
16  of hair and oral fluid and breath, correct?
17     **A.  Yes.**
18     Q.    All right.  And then the third
19  column, if we look at amphetamines, it says:  The
20  screen cutoff is 1,000 ng/ml, correct?
21     **A.  Uh-huh, yes.**
22     Q.    What is meant by screen cutoff?
23     **A.  That's an amino assay screen.**
24     Q.    And that's the first stage in the
25  test that you performed for Massachusetts?

Page 25

1     A.    For the urine, yes.

2     Q.    All right.  And then the -- the last

3  column is Confirmation Cutoff.  What is meant by

4  confirmation?

5     A.    That's the confirmation cutoff by

6  LC-MS/MS.

7     Q.    LC-MS/MS stands --

8     A.    Liquid Chromatography tandem mass

9  spectrometry.

10    Q.    And let's go down to cocaine.

11    A.    Okay.

12    Q.    And do you see -- to cocaine tested

13  in hair, about midway or -- or a little more than

14  midway down the table.

15    A.    Uh-huh.

16    Q.    And this is on the page Bates H --

17  AH0081620.

18        Do you see that?

19    A.    I do.

20    Q.    All right.  And it -- and it says

21  that the cutoff for the screen is 500 pg/mg, and

22  for confirmation, it's also 500 pg/mg; is that

23  right?

24    A.    Yes.  That is what it was when we

25  entered into this contract in 2016.

Page 26

1     Q.    All right.  And -- and throughout

2  the -- we have not seen an update of the contract.

3     A.    We -- so at the time where we entered

4  into this contract, we were outsourcing our hair

5  testing to Omega Laboratories.  We brought the

6  testing in-house and we actually changed both how

7  it was being done as well as the cutoffs.

8     Q.    Is there an update to the contract

9  where that was changed?

10    A.    I don't believe we actually got a

11  contract amendment on that when we brought it

12  in-house.

13    Q.    When was that?

14    A.    I would have to check.  I don't know

15  off the top of my head, but I look into it and

16  follow up.

17    Q.    Was it before or after my clients'

18  first test?

19    A.    Before.  I believe it was sometime in

20  2018.  We could --

21        THE WITNESS:  Colleen, if we looked

22  at the -- when we first introduced the hair SOP.

23  And I don't know if it --

24        MR. CEJAS:  Is that just the binder

25  of SOPs, Colleen?

Page 27

1        MS. KINSEY:  It's the oral fluid one.

2     Q.    (BY MR. CORNFELD)  Well, while

3  Colleen looks for that --

4     A.    Yes.

5     Q.    -- what -- what was the cutoff

6  changed to?

7     A.    If we can pull up the hair result, I

8  can tell you.  I believe -- and I don't want to

9  guess, but I believe it's a hundred picograms per

10  milligram.

11    Q.    What is a picogram?

12    A.    It's a unit of measure.

13    Q.    It's a trillionth of a gram, correct?

14    A.    I believe so.

15    Q.    All right.  It could be converted to

16  other units, such as a nanogram, or a billionth of

17  a gram, correct?

18    A.    Yes.

19    Q.    So 500 picograms per milligram would

20  be the equivalent of .5 nanograms per milligram,

21  correct?

22    A.    Yes.

23    Q.    Okay.  Why was the cutoff changed to

24  100 picograms per milligram?

25    A.    Because for testing, our customers

Page 28

1  typically will ask us to see what analytically

2  is -- that we're capable of doing, but also have

3  the lowest amount possible, that is analytically

4  possible, so they have an accurate picture of if

5  there might be drugs in there.

6     Q.    Is it Averhealth's position that a

7  level of cocaine in hair above 100 picograms per

8  milligram, but below 500 picograms per milligram,

9  indicates use of cocaine?

10    A.    What we know is that that drug was in

11  there.

12    Q.    In the sample?

13    A.    In the specimen that we received,

14  correct.

15    Q.    Or in the specimen that you tested?

16    A.    In the specimen that we received and

17  tested, yes.

18    Q.    Well, it could have somehow got into

19  the specimen after you received it before it was

20  tested.  What you know is it was in there when you

21  tested it.

22        MR. CEJAS:  Object to form.

23        THE WITNESS:  I don't agree with

24  that.

25        MR. CEJAS:  Assumes facts not in



Page 29

1    evidence.
2         Go ahead.
3         Q.    (BY MR. CORNFELD)  You didn't test it
4    immediately upon receipt, did you, the specimen?
5         A.    We did not test it immediately upon
6    receipt, no.
7         Q.    What you know about when -- when the
8    specimen contained a given level is that it was
9    there when you tested it, correct?
10        A.    When we received it --
11        Q.    You know it was --
12        A.    -- put it through our appropriate
13   handling processes, analyzed it, and reported it.
14        Q.    Assuming the specimen stayed intact
15   until it was tested, then the specimen would have
16   had that amount when it was received.  Is that what
17   you're saying?
18        A.    I don't understand your question.
19        Q.    You -- the only time you tested
20   this -- the specimen was sometime after you
21   received it, correct?
22        A.    That is correct.
23        Q.    All right.  Since you changed the
24   cutoff for cocaine in hair sometime before my
25   client was tested in August 2019, have you changed

Page 30

1    it again?
2         A.    We have not.
3         Q.    So it would have been that level in
4    March of 2021, 100 picograms her milligram?
5         A.    I believe so.
6         THE WITNESS:  Colleen, did you find
7    the our LC-MS?
8         MS. KINSEY:  It's the LC-MS.
9         THE WITNESS:  It's the hair testing
10   SOP, which would have been an LC-MS method.
11        MS. KINSEY:  I have Bates number
12   AH0086829, the hair testing SOP from April 1st,
13   2018.
14        MR. CEJAS:  86829.
15        MR. PLEBAN:  Was that just from the
16   Friday?
17        MS. KINSEY:  I don't believe so.
18        (A discussion was held off the
19   record.)
20        MR. CEJAS:  All right.  So I will --
21   I'll go ahead and put that in front of her.
22        MR. PLEBAN:  Yeah, 86829 was the
23   first one.
24        MR. CEJAS:  Yeah.  Do you have a copy
25   of that, J.C.?  Can you pull that up?

Page 31

1         MR. PLEBAN:  I can pull up a digital.
2         MR. CEJAS:  That's what I'm going to
3    do.  I'm going to put digital in front of her.
4    I'll show you what I'm -- it's the hair test.
5         MR. PLEBAN:  Yep.
6         THE WITNESS:  I don't want to get
7    water on anybody.  Now I'm afraid to spill the
8    water.  I guess that's safe there.
9         MR. PLEBAN:  I don't have it because
10   I don't know what my name and password would be.
11   Let's -- let's go off for just a second.
12        MR. CEJAS:  Sure.
13        THE VIDEOGRAPHER:  Time is 9:47 a.m.
14   We are off the record.
15        (A discussion was held off the
16   record.)
17        THE VIDEOGRAPHER:  The time is
18   9:50 a.m.  We are back on the record.
19        Q.    (BY MR. CORNFELD)  Is there a record
20   that reflects the change in the cutoff for cocaine
21   in hair from 500 to 100?
22        A.    A record where?
23        Q.    In -- in Averhealth's documents.
24   Because I can tell you I searched Averhealth
25   documents for 100 pg/mg and didn't find anything

Page 32

1    other than what was in test results.
2         A.    I don't believe that there was.
3         Q.    Is -- was there any communication
4    made to Massachusetts on the fact that that cutoff
5    was changed from what was in the contract and why?
6         A.    I don't recall.  I'd have to look
7    into that.
8         Q.    All right.  I would ask you to do
9    that.
10        A.    Okay.
11        Q.    Because as I said, if it -- if that
12   communication had included the phrase 100 pg/mg, I
13   would have found it --
14        A.    Uh-huh.
15        Q.    -- and I didn't --
16        A.    Okay.
17        Q.    -- so I would request that.
18        A.    Okay.
19        Q.    Do -- do you recall making a -- a
20   proposal to Luzerne County for a forensic drug
21   testing program in March of 2021?
22        A.    I don't recall.  You can provide the
23   document to me, but I don't recall.
24        Q.    Sure.
25        MS. KINSEY:  Can I just clarify

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Dominique Delagnes                                                   July 08, 2024

Page 33

1   something really quickly?  It -- that document did
2   come Friday.  It was something Rick had identified
3   with having some corrupt pages, so we reproduced
4   it.
5        MR. PLEBAN:  I see.
6        MS. KINSEY:  So we did produce it
7   before, but you got it again.
8        MR. PLEBAN:  Understood.  Thank you.
9   Q.   (BY MR. CORNFELD)  Handing you what's
10  been marked as Exhibit 4 to this deposition.  Do
11  you recognize this as a proposal that Averhealth
12  made to Luzerne County for a forensic drug testing
13  program in March of 2021?
14  **A.   This says Kings County on it.**
15  Q.   Oh, did I give you the one for Kings
16  County?  Let me give you Luzerne County.
17       Handing you what's been marked as
18  Exhibit 5.  Do you recognize that as a proposal
19  made to Luzerne County for forensic drug testing
20  program dated March 23, 2021?
21  **A.   I do.**
22  Q.   And this has Bates number on the
23  first page of 18473.  And from now on, I'll try
24  just to read the last digits excluding the AH and
25  the 00.

Page 34

1   **A.   Okay.**
2   Q.   Would you look at page 7?
3   **A.   Of Luzerne?**
4   Q.   Yes.  Do you see that?
5   **A.   I do.**
6   Q.   This contains a table of cutoffs that
7   you were proposing for Luzerne County?
8   **A.   I do.**
9   Q.   And do you see that the cutoff for
10  cocaine in hair was -- for both screen and
11  confirmation was 500 pg/mg?
12  **A.   I do.**
13  Q.   So apparently it went back to 500.
14  **A.   We did not.  This is an**
15  **administrative error that they must have -- that**
16  **the person who put this together pulled the wrong**
17  **cutoff.  We've stayed at the 100.**
18  Q.   Would you look at the one for Kings
19  County and confirm that that also says 500?
20  **A.   Sure.  What page?  Page 24?**
21  Q.   Okay.
22  **A.   You tabbed it for me very nicely.**
23  Q.   Oh.
24  **A.   That's your tab?  Is that yours?  I**
25  **got your copy.**

Page 35

1   Q.   Yeah.
2   **A.   Would you like to give me a different**
3   **copy?**
4   Q.   Yeah.  Here, would you mind putting
5   this sticker on?
6        MR. PLEBAN:  Would you put it over
7   the red writing?
8        **THE WITNESS:  Over the -- yes.**
9        MR. PLEBAN:  Yes, please, thank you.
10       **THE WITNESS:  Absolutely.**
11  Q.   (BY MR. CORNFELD)  And you see that
12  proposal?
13  **A.   I do, yes.**
14  Q.   Okay.  And this is a proposal to --
15  Exhibit 4 is a proposal to Kings County dated
16  February 24, 2021.
17  **A.   I do see that, yes.**
18  Q.   All right.  And this contains the
19  same supposed administrative error that says that
20  the cutoff for hair -- for cocaine in hair is 500
21  for both screen and confirmation?
22  **A.   That is correct.**
23  Q.   Do you recall entering into a
24  contract for testing services with Samaritan
25  Recovery Community, Inc.?

Page 36

1   **A.   I don't recall off the top of my**
2   **head, but if you show me a document, I'm sure I can**
3   **confirm that that's the case.**
4   Q.   Handing you what's been marked as
5   Exhibit 6.
6   **A.   You gave me two of them.**
7   Q.   Oh, let me have one.
8        Do you see that this is a contract
9   between Averhealth and Samaritan Recovery
10  Community, Inc. dated May 1st, 2021?
11  **A.   I do.**
12  Q.   And if you would look at the page
13  Bates numbered 18755 towards the back.  Do you see
14  that you agreed in your contract with Samaritan
15  Recovery Community, Inc. in May of 2021 to do
16  cocaine testing and hair with a cutoff for both
17  screen and confirmation of 500?
18  **A.   I do see that it's listed that way,**
19  **yes.**
20  Q.   Handing you what's been marked as
21  Exhibit 7 of this deposition.  Do you see that this
22  is a contract between Averhealth and Jerry Ambrose
23  Veteran's Council dated August 1, 2021?
24  **A.   Yeah, it's an MOU, a memorandum --**
25  **these are -- I guess I should have clarified.**

Page 37

1  These are memorandum of understandings, not
2  contracts, but yes.
3      Q.   Okay.  These are agreements you
4  entered into?
5      A.   Agreements, yes.
6      Q.   Okay.  And if you would look at pages
7  19577 and 19578, do you see the table of assays and
8  cutoffs -- and actually, on 19579, do you see that
9  the cutoff for cocaine in hair in your agreement
10  with Jerry Ambrose Veteran's Council was also 500
11  pg/mg?
12     A.   Yes.
13     Q.   So you were continuing to enter into
14  contracts and make proposals with hair tested with
15  a cutoff for cocaine of 500 after you lowered
16  the -- the cutoff to 100 when you did tests on
17  people like my client, David Shnitzer.
18          MR. CEJAS:  Object to form.
19  Foundation, assumes facts not in evidence as to a
20  contract.  This is a memorandum of understanding.
21          MR. CORNFELD:  I said agreement.
22     Q.   (BY MR. CORNFELD)  Go ahead.
23     A.   I believe you did say contract.
24     Q.   Okay.  Well, in your -- in your --
25  let me -- let me rephrase the question.

Page 38

1          You -- you continued to enter into
2  agreements and make proposals to customers for
3  forensic drug testing services in which you said
4  that, and agreed, that the cutoff for cocaine in
5  hair would be 500 milligrams after you changed it
6  to only 100 for my client, correct?
7      A.   The cutoff that was listed in the
8  document did state 500, yes.
9      Q.   Okay.  And that was -- that was what
10  you agreed to do with these customers, correct?
11     A.   It was what was listed --
12     Q.   In your --
13     A.   -- and it didn't have the most
14  up-to-date cutoff.  What we were actually running
15  was different.
16     Q.   And I -- I could show you additional
17  agreements that you entered into, but you have no
18  doubt that you continued to agree and tell
19  customers that the cutoff for cocaine in hair would
20  be 500 milligrams, correct?  500 -- 500 picograms
21  per milligram?
22     A.   Our MOUs did list that as the cutoff.
23     Q.   Are you aware that the scientific
24  literature and scientific bodies agree that the
25  cutoff for cocaine in hair should be 500?

Page 39

1      A.   No.
2      Q.   Are you familiar with the Society of
3  Hair Testing?
4      A.   Yes.
5      Q.   What is it?
6      A.   It is a body that talks about the
7  testing of hair.
8      Q.   It's a scientific organization of the
9  top experts in hair testing from around the world,
10  correct?
11     A.   I don't know if it's top in the
12  world.  It is an organization that talks about hair
13  testing.
14     Q.   Are you aware of any other
15  organization that publishes standards on hair
16  testing, an organization of international experts?
17     A.   I'm not sure.  I'd need to do some
18  research on that.
19     Q.   All right.  And the Society of Hair
20  Testing -- which is abbreviated SoHT, correct?
21     A.   Uh-huh.
22     Q.   They have conference -- you need to
23  say yes rather than uh-huh.
24     A.   I apologize.  Yes.
25     Q.   Okay.  They have conferences and they

Page 40

1  publish scientific papers, correct?
2      A.   Yes.
3          You gave me two again.
4      Q.   I've handed you what's been marked as
5  Exhibit 8, which is a paper published in Forensic
6  Science International entitled Society of Hair
7  Testing Guidelines for Drug Testing in Hair.  The
8  authors are Gail A.A. Cooper, Robert Kronstrand,
9  and Pascal Kintz.
10         Do you have that?
11     A.   I do.
12     Q.   Are you familiar with this?
13     A.   This is the first time I'm actually
14  reading this document.
15     Q.   Okay.  I can tell you there was a
16  copy in the documents that Averhealth produced, but
17  it wasn't a very good copy, so --
18     A.   Okay.
19     Q.   -- I had a better copy produced.
20         And Averhealth has published a -- a
21  document that it has in its files entitled
22  Scientific References, correct?
23     A.   Yes.
24     Q.   I've handed you what's been marked as
25  Exhibit 9 to this deposition.  Do you recognize



Page 41

1  that as Averhealth's --
2      **A.   I'm still reading this document, if**
3  **that's okay.**
4      Q.   We'll get to it.  I just want to --
5      **A.   Okay.**
6      Q.   -- and I'll let you -- we'll go
7  through it, but would you take a look at Exhibit 9,
8  Ms. Delagnes?
9      **A.   Yes.**
10     Q.   Exhibit 9, which is in front of you.
11 Is that Averhealth's paper entitled Scientific
12 References?
13     **A.   Yes, it is.**
14     Q.   And do you see that on the last page
15 under the heading Analysis of Drugs and Hair, it
16 lists this document, the Society of Hair Testing,
17 Guidelines for Drug Testing in Hair?
18     **A.   On which page?**
19     Q.   On the last page.
20     **A.   Yes.**
21     Q.   All right.  Are you familiar -- go
22 back to Exhibit 8.
23          Are you familiar with any of these
24 authors?
25     **A.   I've heard of them.**

Page 42

1      Q.   Which ones have you heard of?
2      **A.   I mean, obviously, it's referenced in**
3  **here, right?**
4      Q.   Yes.
5      **A.   That's what I would know about them.**
6      Q.   Referencing here, you were pointing
7  to the Averhealth --
8      **A.   The Society of -- of Hair Testing**
9  **guidelines --**
10     Q.   In -- in --
11     **A.   -- for Drug Testing in Hair, so**
12 **C. Cooper --**
13     Q.   In --
14     **A.   -- R. Kronstrand, P. Kintz.**
15     Q.   In -- in Exhibit 9 entitled The
16 Scientific References that Averhealth compiled,
17 correct?
18     **A.   Uh-huh.**
19          MR. CEJAS:  Is that yes?
20          **THE WITNESS:  Yes.  I apologize.**
21 **Thank you.**
22          MR. CEJAS:  Everybody does it.
23          **THE WITNESS:  I will get used to yes.**
24     Q.   (BY MR. CORNFELD)  Do you know
25 anything about any of these authors other than the

Page 43

1  fact that they wrote this paper?
2      **A.   I do not.**
3      Q.   If we look at the introduction of
4  Exhibit 8, it says:  Founded in 1995, the Society
5  of Hair Testing, SoHT, has a worldwide network of
6  members involved in hair testing and has published
7  several guidance documents relating to the
8  examination of drugs and doping agents in hair.
9          Do you see that?
10     **A.   I do.  Yes.**
11     Q.   And it -- and it states:  The SoHT --
12 if you look down one paragraph.  The SoHT
13 understands the importance of setting industry
14 standards to ensure the future of hair testing and
15 its continued acceptance as evidence in court, and
16 actively encourage its members to participate in
17 the society's annual proficiency testing scheme.
18          Do you see that?
19     **A.   Yes.**
20     Q.   And it says:  These guidelines -- if
21 you look at the bottom of the first column on the
22 first page of Exhibit 8:  These guidelines for drug
23 testing and hair were reviewed and approved by the
24 Board of the Society of Hair Testing at the annual
25 board meeting held in Sevilla in January 2011.

Page 44

1          Do you see that?
2      **A.   Yes.**
3      Q.   And -- and since you included this
4  paper in your list of scientific references, you
5  would trust what they state in this paper and what
6  they -- what they approved at their meeting in
7  Sevilla in January 2011 as set forth in Exhibit 8,
8  correct?
9          MR. CEJAS:  Object to -- object to
10 form.  Vague.
11          Subject to that, go ahead.
12          **THE WITNESS:  Specifically what are**
13 **you referring to in the document?**
14     Q.   (BY MR. CORNFELD)  Anything in the
15 document.  I mean, you put --
16     **A.   It's a broad document that's**
17 **referenced.  Tell me specifically within the**
18 **document which -- what you're asking me to agree**
19 **with.**
20     Q.   You would trust what they say,
21 correct?
22          MR. CEJAS:  Same objection.
23          **THE WITNESS:  Too broad.  Can you be**
24 **more specific in your question?**
25     Q.   (BY MR. CORNFELD)  You used it as a

888-893-3767                    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                              California Firm Registration #179

LEXITAS

Page 45

1  reference.
2    **A.   Okay.**
3    Q.   Is that right?
4    **A.   Yes.  It was used as a reference,**
5  **yes.**
6    Q.   And that was so that your employees
7  would see it and know that this is a source that
8  they could go to for authoritative information,
9  correct?
10       MR. CEJAS:  Object to form.
11   **THE WITNESS:  To provide guidance and**
12  **information, yes.**
13   Q.   (BY MR. CORNFELD)  All right.  Let's
14  look at Table 1 on page 23 of Exhibit 8.  Do you
15  see Table 1 is entitled:  Recommended Cutoffs for
16  Substances and Metabolites in Hair to Identify Use?
17   **A.   I'm going to read all of 6 first**
18  **before I look at that, if that would be okay, to**
19  **read through the entire testing procedures.**
20   Q.   Sure.
21   **A.   Okay.  Thank you.  Thank you for**
22  **giving me that opportunity.**
23   Q.   All right.  So you see Table 1 is
24  entitled:  Recommended Cutoffs for Substances and
25  Metabolites in Hair to Identify Use?

Page 46

1    **A.   It does say that, yes.**
2    Q.   All right.  And this is a table
3  that's contained in Exhibit 8, the Society of Hair
4  Testing's paper that has guidelines for drug
5  testing and hair, correct?
6    **A.   It does.  It also does say in the**
7  **paragraph below that when hair analysis is utilized**
8  **in DFC cases, lower cutoffs should be employed.**
9    Q.   Do you see -- and where is that?
10   **A.   The paragraph above.**
11   Q.   What are DFC cases?
12   **A.   Department of Family and Children**
13  **Services.**
14   Q.   Do you see that under Table 1, it
15  says that the -- the recommended cutoffs for
16  substances and metabolites in hair to identify use
17  is .5 nanograms per milligram?
18   **A.   I do.**
19   Q.   And that's the equivalent of 500
20  micrograms per milligram, correct?
21   **A.   For cocaine, yes.  And then below**
22  **that, it has --**
23   Q.   Excuse me, that -- that was my
24  question.
25   **A.   And below, it talks about the**

Page 47

1  **metabolite of it, which is benzoylecgonine, which**
2  **is what we're testing for as well, and that has**
3  **.05.**
4    Q.   I see that.  That was my next
5  question.
6    **A.   Okay.**
7    Q.   And .05 nanograms per milligram is
8  the equivalent of 50 picograms per milligram,
9  correct? 50 nanograms per milligram, I should say.
10   **A.   It's .05 nanograms per milligram.**
11  **.05.**
12   Q.   Oh, I'm sorry, 50 picograms, the
13  equivalent of --
14   **A.   Picogram.**
15   Q.   Yeah.  Just so we have a clear
16  record, what they list in Table 1 of the cutoff for
17  the metabolites of cocaine, such as BZE --
18   **A.   Which is benzoylecgonine.**
19   Q.   Okay.  And they say -- and that's
20  also sometimes abbreviated BE, correct?
21   **A.   That is correct.**
22   Q.   And they say that the cutoff to
23  identify use is .05 nanograms per milligram, which
24  would be the equivalent of 50 picograms per
25  milligram, correct?

Page 48

1    **A.   That is what this chart says, yes.**
2  **There is a paragraph above, though, which I had**
3  **stated previously --**
4    Q.   You've told us about it.
5        MR. CEJAS:  Let her -- let her
6  finish, Rick.
7        MR. CORNFELD:  My question --
8        MR. CEJAS:  Rick, let her finish.
9    Q.   (BY MR. CORNFELD)  My question was
10  just that's what the table says.
11   **A.   That is what the table says.**
12   Q.   Thank you.
13   **A.   I would like to --**
14   Q.   Thank you.
15   **A.   -- state, though, that --**
16   Q.   You've already --
17   **A.   -- the paragraph above it --**
18   Q.   You've already said that.
19   **A.   -- indicates that --**
20       MR. CEJAS:  Let her finish.
21   Q.   (BY MR. CORNFELD)  Let me ask you --
22       COURT REPORTER:  Okay.  Okay, guys.
23  We have to do one at a time.
24   Q.   (BY MR. CORNFELD)  Do you believe
25  that there is a different amount that would

888-893-3767                    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                              California Firm Registration #179

July 08, 2024

LEXITAS

Page 49

1  identify use in somebody who's involved in a
2  Department of Family and Children's case --
3      A.   I don't understand your question.
4      Q.   I didn't finish it.
5      A.   Okay.
6      Q.   Is there a different amount that
7  would identify use in a Department of Family and
8  Children's case than in any other case?
9      A.   I still don't -- I apologize, I do
10  not understand what you're asking.
11     Q.   Does a lower amount in a -- in a --
12  in somebody involved in a Department of Family and
13  Children's case indicate that that person used
14  cocaine than a person involved in any other type of
15  case?
16     A.   By establishing lower cutoffs, you're
17  going to be able to potentially check a longer time
18  frame.  And so we typically see in Department of
19  Children and Family, in probation, those cutoffs
20  that are established are much lower than in the
21  workplace world.  So there is a scientific reason
22  to establish lower cutoffs for this space.
23     Q.   Does cocaine have a different affect
24  on somebody in a Department of Family and
25  Children's case than somebody, say, in an

Page 50

1  employment case?
2      A.   Cocaine's going to affect their body
3  the same way.
4      Q.   Thank you.
5           And -- and does the laboratory have
6  any idea knowing whether somebody's in -- strike
7  that.
8           Are you familiar with the Goldilocks
9  Rule?
10     A.   I am.
11     Q.   Okay.  You -- you named the
12  Goldilocks Rule, didn't you?
13     A.   Yes.
14     Q.   All right.  And that's the rule that
15  a cutoff shouldn't be too high or too low, but just
16  right, correct?
17     A.   Correct.
18     Q.   And you've been talking -- you,
19  personally, when I say you developed --
20     A.   You mean Averhealth, correct.
21     Q.   Yes.  But you, Ms. Delagnes, have
22  been talking about the Goldilocks Rule for some
23  time, correct?
24     A.   Yes.
25          MR. CEJAS:  Rick, we've been going

Page 51

1  for a little over an hour.  Whenever you're ready
2  to change topics, take a break.
3          MR. CORNFELD:  We can -- we can --
4          MR. CEJAS:  Okay.
5          MR. CORNFELD:  I'm changing it right
6  now.
7          MR. CEJAS:  I thought you were.  I
8  thought you were.
9          THE VIDEOGRAPHER:  Go off?
10         MR. PLEBAN:  I think so, yeah.
11         THE VIDEOGRAPHER:  Time is 10:16 a.m.
12  We are off the record.
13         (A short break was taken.)
14         THE VIDEOGRAPHER:  The time is 10:29.
15  We are back on the record.
16     Q.   (BY MR. CORNFELD) Ms. Delagnes, you
17  have in front of you what's been marked as
18  Exhibit 10, which is a document entitled Michigan
19  Proven Quality Averhealth, Smarter Solutions,
20  Better Outcomes.  It has a Bates number 3509 on the
21  first page.
22          Are you familiar with this?
23     A.   Yes.
24     Q.   What is this?
25     A.   This is information that we had

Page 52

1  provided to Michigan.
2      Q.   And did you do that in a
3  presentation?
4      A.   Yes.
5      Q.   Who was it given to?
6      A.   I believe it was to a specific county
7  in Michigan that we provided.  We also would have
8  given it to Amanda Doane, who was the contracting
9  officer over Michigan.
10     Q.   If you would, turn to page 3515
11  titled Getting Levels Just Right, the Goldilocks
12  Rule.
13     A.   Yes.
14     Q.   And this refers to the Goldilocks
15  Rule that Averhealth developed, correct?
16     A.   I don't know that we developed, but
17  yes, this -- this -- we used the phrase the
18  Goldilocks -- the Goldilocks Rule.
19     Q.   All right.  And this page on
20  Exhibit 10 states:  Cutoff levels help to ensure
21  that drug testing is scientifically valid and
22  forensically defensible by serving as a safeguard
23  designed to ensure the reliability of testing
24  results.
25          Correct?

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                                California Firm Registration #179

LEXITAS

Page 53

1    A.   Yes.

2    Q.   And then you've got a little diagram
3  on the left-hand side of this page that has
4  three -- are those bowls on the left of it?

5    A.   Yes, they are bowls.

6    Q.   Okay.  Labeled too much, just right,
7  and too little?

8    A.   Yes.

9    Q.   And those are labeled reaction?

10    A.   Correct.

11    Q.   What is -- what is meant by reaction?

12    A.   How much of the drug or analyte's
13  found in specimen.  So what's the reaction off the
14  analyzer.

15    Q.   All right.  And -- and you show a
16  cutoff level right in the middle of the just right
17  bowl, correct?

18    A.   Yes.

19    Q.   And you say that:  If the cutoff is
20  too high, meaning too much, it would lead to false
21  negatives, missed new-use events, and client,
22  child, and public safety are in danger.

23        Do you see that?

24    A.   Yes.

25    Q.   And if the cutoff level is just

Page 54

1  right, that's scientifically valid and forensically
2  defensible?

3    A.   Yes.

4    Q.   And if it's too low or too little,
5  that leads to inconclusive results, uncertainty
6  regarding environmental exposure; i.e., not always
7  forensically defensible.  Caseworkers and others
8  invest time in futile efforts, and clients develop
9  learned helplessness; is that right?

10    A.   Yes.

11    Q.   What is meant by "forensically
12  defensible"?  Does that mean that you can defend
13  the result in a forensic proceeding, such as a
14  legal proceeding, as indicating use by the
15  individual?

16    A.   It means that we can forensically
17  defend that we found that drug in the specimen.

18    Q.   And that it would indicate use by the
19  individual?

20    A.   What we can attest to is that we
21  found that drug in the specimen.

22    Q.   And you're not expressing a view on
23  whether it indicates use?

24    A.   I don't understand the question.

25    Q.   Are you -- are you -- when you find

Page 55

1  the drug in the specimen and it is above the cutoff
2  level that is just right, does that indicate drug
3  use by the individual?

4    A.   When we talk about giving
5  interpretation, drug result interpretation, we will
6  look at factors that the -- that the caseworker or
7  the defendant indicates as far as what's happening
8  in their environment, what the cutoff levels are,
9  what circumstances are, and we'll make
10  determinations whether or not it could possibly --
11  that it's from use or not.

12        MR. CORNFELD:  Could you read that
13  answer back, please?

14        (The preceding answer was read back.)

15        THE WITNESS:  The result itself is
16  forensically defensible.  It -- we found that drug
17  in that specimen that was received at the
18  laboratory.  That's what our test results show.

19    Q.   (BY MR. CORNFELD)  Okay.  You said as
20  factors as far as environment, circumstances.  What
21  did you mean by environment?

22    A.   There are times where our customers
23  will ask for interpretation of those results, if
24  it's possible that result could be from
25  environmental reasons.  The drug was there, we

Page 56

1  found it.  We definitively saw that we saw a drug
2  in the specimen, and then a client may come back to
3  their caseworker and indicate, hey, here's my
4  circumstances, and the caseworker will ask our
5  toxicologist for interpretations, if it could be
6  possible environmental.

7    Q.   What do you mean by environmental?
8  Not from -- not from drug use, but there was
9  cocaine in the environment in some fashion?

10    A.   Correct.

11    Q.   Or some other reason why the drug was
12  there other than drug use?

13    A.   Correct.

14    Q.   All right.  And the right-hand side
15  of the Goldilocks page in Exhibit 10, it says,
16  quote:  From a legal perspective, a specimen that
17  reduces a reaction just below the cutoff level is
18  as equally negative as a specimen that produces a
19  reaction far below the cutoff level, unquote.

20        Do you see that?

21    A.   I do.

22    Q.   And is that a true statement?

23    A.   Yes.

24    Q.   So it doesn't matter how far below
25  the cutoff level or result is, negative is



Page 57

1 negative, and it means the drug wasn't there?
2   **A.   In that specimen.**
3   Q.   Is that right?
4   **A.   Yes, in that specimen.**
5   Q.   I am handing you what's been marked
6 as Exhibits 11 and 12 to this deposition.  Exhibit
7 11 is a document with the number 6219 on the first
8 page titled Shnitzer Data Pack Accession Number,
9 and then there's a long number, collection date
10 8/23/2019.
11       And Exhibit 12 is numbered 7649 on
12 the first page entitled Shnitzer Data Pack
13 Accession Number, and then there's a long number,
14 and it's collection date 9/23/2019.
15       Do you have those?
16   **A.   I do.**
17   Q.   Are you familiar with them?
18   **A.   Yes.**
19   Q.   These are the data packs for the two
20 tests of David Shnitzer that came back positive,
21 correct?
22   **A.   Yes.**
23   Q.   Do these and the other data packs
24 that Averhealth produced on the plaintiffs' tests
25 contain all the information that's necessary for an

Page 58

1 expert to review and determine that the test
2 results are valid?
3   **A.   Yes.**
4   Q.   It is -- do these exhibits and the
5 other data packs contain all the underlying data
6 for and evidencing Plaintiff's positive tests for
7 the presence of illicit substances?
8   **A.   I don't understand your question.**
9   Q.   Let me -- let me restate it, or
10 re-ask it.
11       Has Averhealth produced, with these
12 two exhibits and the other data packs, all the
13 underlying data for and evidencing Plaintiff's
14 positive tests for the presence of illicit
15 substances?
16   **A.   Yes.**
17   Q.   And that's what's contained in
18 Exhibits 11 and 12 for David Shnitzer's tests,
19 correct?
20   **A.   Yes.**
21   Q.   Before we go into the data nexus, is
22 there any way to tell from them -- and we'll use
23 Exhibit 11 as an example -- whether historical
24 calibrations or historical QCs were used?
25   **A.   Not in this data, no.**

Page 59

1   Q.   How would we determine that, or could
2 we?
3   **A.   There's a -- in addition, what was**
4   **produced was an Excel file that I believe that**
5   **indicated whether or not historical calibration or**
6   **QC was used.**
7   Q.   All right.  In -- if we use Exhibit
8 11 as an example, the second page of this exhibit,
9 and I think all of the data packs, has the
10 full-page lab report of the test, correct?
11   **A.   Yes.**
12   Q.   And for Mr. Shnitzer, on this test,
13 it shows or states that it was positive for cocaine
14 with a level of 325.67 pg/mg, and positive for
15 benzoylecgonine at 60.852 pg/mg, correct?
16   **A.   Yes, benzoylecgonine.**
17   Q.   I --
18   **A.   I know, it's not an easy word.**
19   Q.   I try, I try.
20       And on Exhibit 12, the test from
21 September 23rd, 2019, the only positive result is
22 for cocaine, 127.74 pg/mg compared to a cutoff of
23 100 pg/mg; is that right?
24   **A.   Yes.**
25   Q.   Both of those are under 500 pg/mg,

Page 60

1 correct?
2   **A.   Yes.**
3   Q.   And so if you had used the cutoff set
4 forth in the contract with Massachusetts, these
5 tests would have been negative, correct?
6       MR. CEJAS:  I'll object to form.
7 Foundation, assumes facts not in evidence as to the
8 contract.
9   Q.   (BY MR. CORNFELD)  Go ahead.
10       MR. CEJAS:  Subject to that, go
11 ahead.
12   Q.   (BY MR. CORNFELD)  Go ahead.
13   **A.   Yes.**
14   Q.   Is it your view that these test
15 results indicate that David Shnitzer was using
16 cocaine?
17   **A.   These test results indicate that he**
18   **had cocaine in the hair specimen that we received**
19   **and tested.**
20   Q.   That wasn't my question.  Does it
21 indicate that he was using cocaine?
22   **A.   I don't have enough information to**
23   **answer that question.  What -- what the test**
24   **results tell you is that the drug was present.**
25   Q.   Under -- under the contract we looked



Page 61

1 at earlier --
2    **A.   Uh-huh.**
3    Q.   -- Averhealth was obligated to
4 provide an interpretation to Massachusetts of the
5 test results, correct?
6    **A.   We provide that service should a**
7 **caseworker ask us for information, because we'd**
8 **need additional information from -- about the**
9 **situation or the circumstance.**
10   Q.   All right.  The contract didn't say
11 that you would provide an interpretation only if
12 asked.  It said that you would provide an
13 interpretation, correct?
14   **A.   It says we provide interpretation**
15 **assistance.**
16   Q.   Right, but it doesn't say only if
17 asked?
18   **A.   I'd need to look to see exactly the**
19 **terms in the contract.**
20   Q.   Let's look at page -- at Exhibit 3
21 again.
22   **A.   Okay.**
23   Q.   And do you see -- do you have that?
24   **A.   I do.**
25   Q.   Okay.  If you would look at

Page 62

1 page 81620, Section 8, which we looked at before
2 states:  The provider shall report all test results
3 and related information via the IMS.  Specifically,
4 the provider shall, and then we skip down to
5 subparagraph D, Assist with Result Interpretation.
6    Correct?
7 **A.   Uh-huh.**
8    MR. CEJAS:  Is that a yes?
9    **THE WITNESS:  Yes, sorry.**
10   MR. CEJAS:  You're okay.
11   Q.   (BY MR. CORNFELD)  It doesn't say
12 assist with results interpretation if asked or only
13 if asked, correct?
14   **A.   Those words if asked are not in**
15 **there, no.  It says assist with interpretation.**
16   Q.   Okay.  And is there any way
17 Massachusetts would know that they need to ask you
18 every time to provide a result interpretation?
19   MR. CEJAS:  Object to form.  Calls
20 for speculation.
21   Go ahead if you know.
22   **THE WITNESS:  They ask -- they have,**
23 **through their training from us, been educated that**
24 **should there be questions about test results, that**
25 **they can reach out to toxicologists to receive**

Page 63

1 information.
2    Q.   (BY MR. CORNFELD)  That's not in the
3 contract that they have to reach out to the
4 toxicologist, correct?
5    **A.   It says assist with results**
6 **interpretation.**
7    Q.   All right.  And -- and is there any
8 communication that Averhealth made to Massachusetts
9 to explain what it means when a result for cocaine
10 in hair is 127 or 325 below the cutoff level in the
11 contract, but above the cutoff level shown in the
12 lab report?
13   **A.   No.**
14   Q.   So Massachusetts was supposed to just
15 guess about that?
16   **A.   They saw the cutoff that was listed**
17 **on the lab report when we brought the hair testing**
18 **in-house, and we provided the test results for**
19 **that.**
20   Q.   And they would just have to guess
21 about what that meant, that it was now above a
22 lower cutoff?
23   MR. CEJAS:  Object to form.
24 Argumentative.
25   Go ahead.

Page 64

1    **THE WITNESS:  I don't believe they**
2 **had to guess, no.  They knew that if -- if -- for**
3 **any of their test results, if they had a question,**
4 **to reach out.**
5    Q.   (BY MR. CORNFELD)  When the -- when
6 the Society for Hair Testing said that a cutoff
7 should -- should be lower in family cases --
8    **A.   Uh-huh.**
9    Q.   -- than the 500 that they said
10 indicate use, do you have any idea how much lower
11 that is?
12   **A.   I do not.**
13   Q.   Whether it could be instead of 500,
14 450 or 400 or 350 or anything still above what
15 Mr. Shnitzer's levels were?
16   **A.   I do not.**
17   Q.   What do you think a cutoff level to
18 indicate use in a family case should be compared to
19 a nonfamily case?
20   **A.   Setting cocaine at 100 picograms per**
21 **milligram is a reasonable cutoff level to**
22 **establish.**
23   Q.   Not to establish use, but just to
24 show that it was there in the sample, correct?
25   **A.   To show that it was positive and that**



Page 65

1 the drug was found.
2     Q.   And that's it, correct?
3     A.   Yes.
4     Q.   Did you establish a different cutoff
5 level besides 100 for nonfamily cases?
6     A.   No, our cutoff across the board is at
7 100.
8     Q.   In your test reports?
9     A.   Correct.
10    Q.   As opposed to your contracts?
11    A.   I'd have to -- you obviously showed
12 me some MOUs where it was not updated and it still
13 listed the higher cutoff.
14    Q.   All right.  And I can tell you of the
15 documents that Averhealth produced to us, and I
16 told you I searched for the phrase 100 pg/mg and
17 didn't find it.  So there were no contracts, MOUs,
18 proposals, or anything of the like that showed a
19 cutoff of cocaine in hair of 100.
20         MR. CEJAS:  Object to form.
21    Q.   (BY MR. CORNFELD)  Do you have any
22 contrary knowledge?
23    A.   I'd have to go back and review them.
24         Are we done with 11 and 12?
25    Q.   Not yet.

Page 66

1     A.   Okay.
2     Q.   I mean, I'm going to bring you out
3 another exhibit, but we'll get back to them.
4     A.   Okay.  Thank you.
5     Q.   I've handed you what's been marked as
6 Exhibit 13.  Do you recognize this as an e-mail
7 from Joel Bailey to Scott Goldberg dated
8 October 17, 2019?
9     A.   Yes.
10    Q.   And actually, it's a series of
11 e-mails, but in -- Mr. Bailey is an employee of
12 Averhealth, or was at the time, correct?
13    A.   Yes.
14    Q.   And do you recognize Scott Goldberg
15 as the individual with the State of Massachusetts
16 who oversaw David Shnitzer's case?
17    A.   Yes.
18    Q.   And his title was probation officer.
19 It's kind of an odd title because it suggests that
20 Mr. Shnitzer was involved in a criminal case, but
21 that's just how they -- what the title that
22 Massachusetts gives him, even though it wasn't a
23 criminal case.
24         And you understand that Mr. Shnitzer
25 was not involved in a criminal case over drug use,

Page 67

1 correct?
2     A.   Yes.
3     Q.   Okay.  Mr. Bailey, what was his
4 position?
5     A.   He's now the regional manager.  At
6 the time, he was either a regional manager or an
7 area manager.  Oh, it says regional manager.  His
8 title is on there, so he was regional manager.
9     Q.   In charge of Massachusetts?
10    A.   Yes.
11    Q.   Okay.  And he says:  Good morning,
12 Mr. Goldberg.  We wanted to let you know that one
13 of your clients, D. Shnitzer, e-mailed several
14 members of our management team yesterday with
15 concerns about his test results.
16         We researched his concerns and found
17 that information he provided is not accurate.  He
18 had two positive tests -- two positive hair tests
19 about a month apart.  Below are his -- are the
20 concerns he raised and your findings.
21         Do you see that?
22    A.   Yes.
23    Q.   And if we could skip down to
24 paragraph 4:  He indicated that he had a separate
25 test completed at another collection location and

Page 68

1 those results were conflicting to the Averhealth
2 test, the Averhealth results.  The cutoffs from
3 ARCpoint -- and you recognize that as the
4 laboratory Mr. Shnitzer went to have his test
5 done?
6     A.   I believe that's just a collection
7 site.  I don't believe they're a laboratory, but
8 yes.
9     Q.   Okay.  And it says:  The cutoffs from
10 ARCpoint are at 500, and the Averhealth cutoff for
11 the same drug is 100 picograms per milligram.  The
12 levels from our -- from our analysis are above our
13 cutoff and below their cutoff, which easily
14 explains the discrepancy.
15         Do you see that?
16    A.   Yes.
17    Q.   There is always a possibility to have
18 discrepancies between two collection events in any
19 event.
20         Do you see that?
21    A.   Yes.
22    Q.   Why didn't Mr. Bailey tell
23 Mr. Goldberg about all this -- all the Averhealth
24 results indicated was that it found or claimed to
25 find cocaine in Mr. Shnitzer's sample, but that



Dominique Delagnes                                                July 08, 2024

Page 69

1  more information would be needed to determine
2  whether that was indicative of drug use?
3      A.   That was not a question that was
4  being asked.
5      Q.   Well, Mr. -- Mr. Goldberg didn't ask
6  any questions.  Mr. Bailey's just giving him
7  information, correct?
8      A.   Correct.  But --
9      Q.   Providing the -- the assistance in
10 interpretation that is set forth in the contract
11 with Massachusetts, correct?
12     A.   Mr. Bailey indicated that he was
13 answering concerns that were raised by
14 Mr. Shnitzer.  And the question that Mr. Shnitzer
15 raised -- let me read this correctly -- is the fact
16 that he had a negative test result from ARCpoint
17 and a positive test result from Averhealth.
18     Q.   You know, Mr. Shnitzer also said in
19 his e-mails that he had never used cocaine,
20 correct?
21     A.   Yes.  That is correct.
22     Q.   All right.  So why didn't Mr. Bailey
23 answer that concern about whether this test result
24 indicated that Mr. Shnitzer was not correct when he
25 said he had never used cocaine?

Page 70

1      A.   Mr. Bailey is a regional manager over
2  the operations, he's not a toxicologist.
3      Q.   Well, couldn't he have consulted a
4  toxicologist at Averhealth's headquarters or at
5  Averhealth's lab?
6      A.   He could have.  But that was not the
7  question that was being raised.  The question was
8  about the -- the difference in test results.  The
9  probation officer could have asked the questions.
10     Q.   The -- the question that was --
11 Mr. Shnitzer raised was how can this show that --
12 show cocaine when I never used cocaine?  You
13 understand that was Mr. Shnitzer's concern?
14          MR. CEJAS:  Object to form.
15 Foundation, calls for speculation.
16          Go ahead.
17          THE WITNESS:  In regular, general
18 practice, our regional managers are not going to
19 answer that question.
20     Q.   (BY MR. CORNFELD)  Okay.  But they
21 could consult with a toxicologist?
22     A.   They could, yes.
23     Q.   He didn't, did he?
24     A.   No.
25     Q.   So he was not in a position to answer

Page 71

1  Mr. Shnitzer's concern, and nobody from Averhealth
2  has ever answered his concern about how this result
3  could be when he never used cocaine, correct?
4      A.   The -- anything about test results,
5  we take that -- our contract is with the State of
6  Massachusetts.  And so when it comes to test
7  results and interpretation, those would come from
8  the customer themselves asking the question.
9      Q.   You mean Massachusetts?
10     A.   I do mean Massachusetts, yes.
11     Q.   Okay.  You could have answered -- you
12 could have answered Mr. Shnitzer's concern through
13 Massachusetts, correct, as -- as you did with
14 regard to his concern about the two different
15 apparently conflicting lab results, correct?
16     A.   Had Mr. Goldberg asked the question,
17 we would have provided that information.
18     Q.   Mr. Goldberg didn't ask any question,
19 but you still provided the information about how
20 you can reconcile those two apparently different
21 lab results, correct?
22     A.   I don't understand that question, I
23 apologize, what you're asking.
24     Q.   Well, you -- you just raised the --
25 the point that, well, Mr. Goldberg didn't ask how

Page 72

1  this result can be if Mr. Shnitzer never used
2  cocaine.  But Mr. Goldberg never asked any
3  questions, and yet, Mr. Bailey answered the
4  question about how you can reconcile these two
5  apparently conflicting lab results.
6          MR. CEJAS:  Object to form.
7      Q.   (BY MR. CORNFELD)  That was one of
8  Mr. Shnitzer's concerns, correct?
9          MR. CEJAS:  Object to form.  It's
10 compound, it assumes facts not in evidence.
11     Q.   (BY MR. CORNFELD)  Go ahead.
12     A.   I -- I'm -- I don't -- I'm -- I still
13 don't understand the question that's in front of
14 me.
15     Q.   All right.  Mr. Shnitzer raised at
16 least two concerns.  One is how -- how you can
17 reconcile these two lab results, correct?
18     A.   He raised the fact that one was
19 negative and one was positive, yes.
20     Q.   Okay.  So asking.  Okay.
21     A.   He raised one was negative and one
22 was positive.
23     Q.   He also said how can this result be
24 since I never used cocaine.  You've already agreed
25 that that was one of his concerns, correct?



Page 73

1    A.   Yes.

2    Q.   All right.  He raised those directly

3 with Averhealth, correct?

4    A.   Yes.

5    Q.   Mr. Goldberg never raised either

6 concern with Averhealth, did he?

7    A.   We provided Mr. Shnitzer's --

8    Q.   Excuse me.

9    A.   -- concerns --

10   MR. CEJAS:  Let -- let her answer --

11   MR. CORNFELD:  My question is --

12   MR. CEJAS:  Let her answer.

13   Q.   (BY MR. CORNFELD)  My question is:

14 Mr. Goldberg never raised either of those concerns

15 with Averhealth, correct?

16   A.   Mr. Shnitzer raised concerns with us.

17 We do not talk directly with clients.  We provided

18 his concerns, Mr. Shnitzer's concerns, to

19 Mr. Goldberg, and provided additional information

20 to him on why the test results would be between 100

21 and 500, why you can have a negative and a

22 positive.

23   Q.   All right.  But you didn't -- but you

24 said nothing about how his result can be as

25 Averhealth reported it when he said he never used

Page 74

1 cocaine, correct?

2    A.   Correct.

3    Q.   That was part of the assistance set

4 forth in your contract with Massachusetts that you

5 did not provide, correct?

6    A.   No, that is not correct.

7    Q.   You didn't -- you did not provide

8 assistance on answering Mr. Shnitzer's concern

9 about how he could have had this result when he

10 never used cocaine, correct?

11   A.   Mr. Goldberg never asked the

12 question.

13   Q.   Mr. Shnitzer asked the question.

14   A.   Mr. Goldberg never asked the

15 question.

16   Q.   Excuse me.  Mr. Shnitzer asked that

17 question, correct?

18   A.   Yes.  We've established that, but

19 Mr. Goldberg --

20   Q.   Okay.

21   A.   Our -- our contract is that we answer

22 questions from probation officers, not directly

23 from clients.  Had Mr. Goldberg asked the question,

24 we would have answered it.

25   Q.   Yet -- how did Mr. Bailey decide that

Page 75

1 he would answer Mr. Shnitzer's question to

2 Mr. Goldberg regarding how to reconcile the two lab

3 results and say nothing about how his result could

4 have come out the way it did when he never used

5 cocaine?

6    MR. CEJAS:  Object to form.  Assumes

7 facts not in evidence.

8    THE WITNESS:  I -- I can't speak on

9 behalf of Mr. Bailey.

10   Q.   (BY MR. CORNFELD)  And you know that

11 the court in Massachusetts branded Mr. Shnitzer as

12 a drug user based on your test?

13   MR. CEJAS:  Objection.  Assumes facts

14 not in evidence, foundation.

15   THE WITNESS:  I do not know what

16 Massachusetts did with the test result.

17   Q.   (BY MR. CORNFELD)  Do you know that

18 he got a reputation in the community as being an

19 illegal drug user based on your tests and your

20 tests alone?

21   MR. CEJAS:  Objection.  Assumes facts

22 not in evidence, foundation.

23   Subject to that.

24   THE WITNESS:  I do not know what

25 happened in the community in Massachusetts.

Page 76

1    Q.   (BY MR. CORNFELD)  If -- if you knew

2 that, and I'll ask you to assume that, do you feel

3 any responsibility for that, for not having told

4 them what the test result really means?

5    A.   We provide the test results and

6 provide interpretation when asked.

7    Q.   When asked by -- not when asked by

8 Mr. Shnitzer, even through the -- through the

9 Massachusetts official, Mr. Goldberg, correct?

10   A.   Can you rephrase that?  I don't

11 understand the question.

12   Q.   Well, I think you've answered it.

13   A.   Okay.

14   Q.   And you know Mr. Shnitzer lost

15 unsupervised contact with his children based only

16 on your test results?

17   MR. CEJAS:  Object to form.  Assumes

18 facts not in evidence and lacks foundation.

19   Subject to that, go ahead.

20   THE WITNESS:  I'm not aware of what

21 caused him to lose supervised visitation with his

22 children.

23   Q.   (BY MR. CORNFELD)  You read the

24 Complaint, correct?

25   A.   Yes.



Page 77

1    Q.   And it was in the Complaint, correct?
2    **A.   I have not seen the facts to know**
3  **that that's the only reason why.**
4    Q.   Okay.  Well, I'd like you to assume
5  that.  Do you feel any responsibility for that,
6  without providing assistance to Massachusetts to
7  explain what your test really means and doesn't
8  mean?
9          MR. CEJAS:  Object to form.
10  Foundation, assumes facts not in evidence.
11         **THE WITNESS:  We provide test results**
12  **to our customers.  We provide interpretation when**
13  **asked.  And they're the ones that look at the**
14  **information and make determinations on it.**
15         Q.   (BY MR. CORNFELD) Do you feel any
16  responsibility for the fact that Mr. Bailey did not
17  answer to Mr. Goldberg about Mr. Shnitzer's
18  concern, that his test results showed up positive
19  when he said he never used cocaine?
20         MR. CEJAS:  Object to form.
21         Q.   (BY MR. CORNFELD) Do you feel any
22  responsibility that the -- that as a result of
23  that, and because of your test results,
24  Mr. Shnitzer lost unsupervised contact with his two
25  little daughters?

Page 78

1          MR. CEJAS:  Object to form.  Assumes
2  facts not in evidence, lacks foundation, the
3  question's compound, and it's asked and answered at
4  this point.
5          MR. CORNFELD:  You know what, you can
6  just say objection to form.  I'll stipulate that
7  your objection to form will cover any objection you
8  later come up with.
9          MR. CEJAS:  I'm going to follow the
10  federal rules that's required to give bare bones --
11         MR. CORNFELD:  Not if I stip- -- not
12  if I stipulate -- I could stipulate that you don't
13  even need to make a objection and all objections
14  are preserved.
15         MR. CEJAS:  Well, I'll --
16         MR. CORNFELD:  But I will allow you
17  to say objection to form.
18         Q.   (BY MR. CORNFELD) Go ahead.
19         MR. CEJAS:  I'm not going to
20  stipulate to that.
21         Q.   (BY MR. CORNFELD) Go ahead.
22         MR. CORNFELD:  You don't have to --
23  excuse me.  You don't have to stipulate.  I made a
24  one-way stipulation.  Your objection to form will
25  cover any possible objection to form, you're just

Page 79

1  wasting time by rattling off everything you can
2  possibly think of, and -- and if we don't finish by
3  the deadline, that will be the reason.
4          Q.   (BY MR. CORNFELD) Go ahead.
5          **A.   We provide our test results back to**
6  **our customers, they have many other information in**
7  **addition to our test results and make**
8  **determinations on how they choose to proceed.**
9          Q.   Can you read back the question that
10  was pending?
11         MR. CEJAS:  It was a yes or no.
12         MR. CORNFELD:  Yeah.
13         (A discussion was held off the
14  record.)
15         (The preceding question was read
16  back.)
17         MR. CEJAS:  Same objections to the
18  form.
19         **THE WITNESS:  The test results showed**
20  **that there was cocaine in there.  Whether or not he**
21  **used cocaine -- just because he said that, we often**
22  **see many individuals indicate that they've never**
23  **used a drug and they actually have.**
24         Q.   (BY MR. CORNFELD) And you could have
25  explained that, or you could have explained that --

Page 80

1  what the test result means, that it just means that
2  cocaine was in there and that was it.
3          But my question was:  Do you feel any
4  responsibility for the fact that based on your
5  test -- and I'm asking you to assume this -- based
6  on your test and your tests alone, Mr. Shnitzer
7  lost unsupervised contact with his two little
8  daughters?
9          MR. CEJAS:  Same objections.
10         **THE WITNESS:  Again, I don't know**
11  **that that's the case why my test result and my test**
12  **result alone are why he lost supervision.**
13         Q.   (BY MR. CORNFELD) I'm asking you to
14  assume that that was the case.  We'll prove it.
15  I'm asking you to assume it.  Do you feel any
16  responsibility for that?
17         MR. CEJAS:  Same objections.
18         **THE WITNESS:  No.**
19         Q.   (BY MR. CORNFELD) Okay.  Let's look
20  at Exhibit 12, the Shnitzer data pack for the test
21  that was collected on September 23, 2019.
22  Actually, let's look at -- let's look at page --
23  Exhibit 11.
24         **A.   Okay.**
25         Q.   Which is the test from August of 2019



Page 81

1 on Mr. Shnitzer. And if you would look at page --
2 it may be cut off on the -- by the staple, but it
3 is 6226, and it's titled Cocaine Cal Curve.
4        What does this page show?
5     A.   It shows the points on the
6 calibration curve.
7     Q.   The calibration curve for cocaine?
8     A.   Correct.
9     Q.   And are those the -- the -- are you
10 referring to the two slightly curved lines in the
11 middle of that table, the middle of that chart?
12    A.   When you say slightly curved lines,
13 these lines here in the middle? That what you're
14 talking about?
15    Q.   Yeah, the lines in the -- in the
16 middle that are under the heading Calibration for
17 Cocaine.
18        Is that right?
19    A.   Yes.
20    Q.   All right. Why are there two curves?
21    A.   There's transition one and transition
22 two.
23    Q.   Can you explain what that means?
24    A.   You're going to -- I'm not a
25 toxicologist, so you're going to start to get over

Page 82

1 my expertise to interpret test results, and really,
2 for the best thing to walk through this
3 interpretation would be a toxicologist.
4     Q.   You're referring to Dr. Glinn --
5     A.   Yes.
6     Q.   -- for example?
7        All right. But you're the person
8 that Averhealth put up to talk about the data
9 packs, so that's why I'm asking you.
10    A.   Okay.
11    Q.   What -- what do you understand the
12 reason is why there are two curves?
13    A.   There's two transitions. So in any
14 drug test, there's transition one and transition
15 two.
16    Q.   Okay. And what is -- what is meant
17 by transition one and transition two?
18    A.   It's starting to get outside of my
19 expertise. I'm not comfortable answering the
20 question. I know you put me up as the expert. I'm
21 not a toxicologist, so when it comes to specific
22 results interpretation...
23    Q.   All right. I -- I didn't put you up.
24    A.   Okay.
25    Q.   We asked Averhealth to designate a

Page 83

1 witness who could testify about these topics.
2     A.   Understood.
3     Q.   And you got nominated. I don't know
4 why. It wasn't our decision, so that's why I'm
5 asking you. Okay?
6        Let me -- let me ask you: There's a
7 table above the -- those calibration curves --
8     A.   Uh-huh.
9     Q.   -- that has headings like index,
10 sample name, sample type, and so forth.
11        Do you see that?
12    A.   Uh-huh.
13    Q.   Yes?
14    A.   Yes. Sorry, yes.
15    Q.   Are you familiar with what those
16 items are?
17    A.   Yes. The sample name's going to be
18 the accession number for the individual specimen.
19    Q.   Okay. What -- what is meant by
20 index?
21    A.   I'm not sure.
22    Q.   All right. What is meant by sample
23 type? It says unknown for all of that, for going
24 down the column.
25    A.   Unknowns typically are the actual

Page 84

1 patient's specimen. So that's why there's the
2 accession numbers. So the accession number is the
3 individual one saying that it's an unknown. So you
4 have your calibrators, your controls, and then your
5 unknowns.
6     Q.   Okay. And then there's a column ACQ
7 method name, and that says hair something?
8     A.   Uh-huh.
9     Q.   What's the something, hair -- can you
10 read it?
11    A.   I think it's .dam.
12    Q.   I'm sorry?
13    A.   I believe it's .dram, D -- dam,
14 hair.dam.
15    Q.   What -- what does -- what is meant by
16 that?
17    A.   It's the acquisition method name. So
18 it's the name of the method that's used to test the
19 specimens. So we have very many different methods
20 that we use. So for example, for -- we have our
21 hair test method that we inject the specimen and it
22 goes through and it looks for -- it's a validated
23 method for hair. So each method has its own name.
24    Q.   All right. Then there's -- the next
25 column is the component name, and there's cocaine

Page 85

1  one and cocaine two.
2      Do you see that?
3  **A.   Yes.**
4  Q.   What is meant by cocaine one and
5  cocaine two?
6  **A.   That's your transition one and your**
7  **transition two.**
8  Q.   All right.  The next column is I-S
9  name, and it says benzoylecgonine?
10 **A.   Benzoylecgonine, yes.**
11 Q.   All right.  What is meant by I-S
12 name?
13 **A.   The internal standard.**
14 Q.   The internal standard that was used
15 in the test?
16 **A.   Correct.**
17 Q.   The next column calculated --
18 **A.   Concentration.**
19 Q.   -- concentration?
20 **A.   Uh-huh.**
21 Q.   And that's the concentration of what?
22 **A.   The quantitative value of the amount**
23 **of that particular drug that was found in the**
24 **specimen.**
25 Q.   All right.  I note that there's one

Page 86

1  row that's highlighted in this table on cocaine cal
2  curve page.  What -- why is there one row that's
3  highlighted?
4  **A.   I believe it's just a matter of when**
5  **pulling up the data that it's -- that it's**
6  **highlighted.  That's your transition one.  So**
7  **transition is highlighted versus transition two.**
8  Q.   Well, there are several cocaine ones,
9  and only one of them is highlighted.
10 **A.   Well, they're different accession**
11 **numbers.  So if you look at here -- so if you look**
12 **at the one that indexes 1338, that accession number**
13 **has two.  So 1338 and 1339 is the same accession**
14 **number, so it's that same 08571391-225.  Okay?  So**
15 **that is -- that's this -- that is a specimen that**
16 **we test for, the first transition and the second**
17 **transition.**
18 **Then the -- the next two numbers down**
19 **are, again, a different accession number, so a**
20 **different specimen.  So we're showing the two**
21 **preceding specimens prior to Mr. Shnitzer's**
22 **specimen.  So you can see both of those, you see**
23 **both transition one and transition two.**
24 **And then you get to Shnitzer's, and**
25 **so the -- on the actual analyzer, right, and index**

Page 87

1  **being the -- the -- the sequence number of which --**
2  **that -- that it sits, then you can see, so each of**
3  **these specimens are the same specimen that's**
4  **injected, and when it's tested, you look for**
5  **transition one and transition two.**
6  Q.   All right.  Under sample name, those
7  are the accession numbers?
8  **A.   Yes, they are.**
9  Q.   There's none -- none of those match
10 the accession number of this test.
11 **A.   They do.  08508406.**
12 Q.   But --
13 **A.   This one that's highlighted matches.**
14 **So we highlighted what was his transition one of**
15 **his specimen.**
16 Q.   But on the cover page, the accession
17 number of the test ends in 017.
18 **A.   So this is the root number, so when**
19 **you look at our specimen numbers, this number**
20 **matches --**
21 Q.   You mean all the numbers before the
22 dash?
23 **A.   Correct.**
24 Q.   What are the three digits after the
25 dash mean?

Page 88

1  **A.   After the dash, once they get to the**
2  **laboratory, we have specimens that are -- it gets**
3  **assigned a dash to -- as, like, the primary test**
4  **number, and then when it goes onto the analyzer, it**
5  **gets the number that's specific to that batch.  So**
6  **this one that ends in 215, is the confirmation**
7  **accession number that was assigned along with that**
8  **specimen.**
9  Q.   Okay.  But -- but on the --
10 **A.   You just have to look at the root.**
11 Q.   On the -- on the cover page, the
12 numbers after the dash are 017.  What --
13 **A.   Yeah, that's just its primary number,**
14 **right, so when it gets to the specimen, it goes**
15 **into a batch to create a batch of specimens.  And**
16 **at that point in time, it gets -- it gets assigned**
17 **as 017.**
18 **And then it goes into a -- it's**
19 **prepped into a confirmation batch, and when it's**
20 **prepped into that confirmation batch, it gets a**
21 **confirmation batch specific number.  And so that's**
22 **the one that's dash 215.  So really, the specimen**
23 **itself is what's -- precedes the -- the dash.**
24 Q.   All right.  So if we looked under
25 the -- in the calculated concentration column, it



Page 89

1  looks like, although it's not perhaps as legible as
2  it could be, but the highlighted number looks like
3  it matches what is in the --
4      **A.   The 325.67.**
5      Q.   -- the positive result that you --
6      **A.   It's in transition one.**
7      Q.   Okay.
8      **A.   Correct.**
9      Q.   What does the column headed Actual
10  Concentration mean?  It says NA in every cell under
11  that.
12      **A.   I'm not sure what those three are:**
13  **The actual concentration, the accuracy, or the**
14  **concentration ratio.**
15      Q.   When they all say NA, does that mean
16  not applicable?
17      **A.   Correct.**
18      Q.   And then the next column area, what
19  is -- what does that mean?
20      **A.   The area of the peak.**
21      Q.   In the -- in the -- in the
22  chromatogram that's on the bottom?
23      **A.   Mr. Shnitzer's, uh-huh.**
24      Q.   Yes?
25      **A.   Yes.**

Page 90

1      Q.   So the -- your two curves on the
2  bottom, one highlighted and one not highlighted.
3      **A.   That's your transition one and your**
4  **transition two.**
5      Q.   And those curves are the
6  chromatograms of his sample?
7      **A.   Yes.**
8      Q.   And area is the area under the curve?
9      **A.   The area is the area -- the whole**
10  **area of the peak.**
11      Q.   Okay.  The -- the part of the curve
12  that's under the peak?
13      **A.   To make sure I understand what you're**
14  **saying, it would be the area of this, yes.**
15      Q.   Okay.  From where it goes from the
16  baseline up to the peak and then down to the
17  baseline?
18      **A.   Yes.**
19      Q.   And that curve is -- the shape of
20  that curve can be called Gaussian, correct?
21      **A.   Can be called, pardon?**
22      Q.   Gaussian, G-A-U-S-S-I-A-N.
23      **A.   I'm not sure.**
24      Q.   Have you ever heard of the term
25  Gaussian referred to a chromatogram?

Page 91

1      **A.   Again, I'm not a toxicologist, so**
2  **you're starting to get outside of my expertise.**
3      Q.   Have you ever heard the term Gaussian
4  referred to a chromatogram?
5      **A.   Yes.**
6      Q.   What do you understand that is?
7      **A.   I've heard the term, what I**
8  **understand it to be.  I don't have the expertise to**
9  **talk about it.**
10      Q.   All right.  Then there's a column
11  for -- go back up to the table, the top of the
12  cocaine cal curve page, and Mr. Shnitzer's data
13  pack from August of 2019, there's a column called
14  area ratio.  What is that?
15      **A.   I don't know.**
16      Q.   There's a column called -- well, the
17  next column -- I'm not sure I can read it.  Can you
18  read that?
19          MR. PLEBAN:  Baseline.  Baseline.
20          THE WITNESS:  I don't think the
21  height.  Is that the one you're talking about?
22      Q.   (BY MR. CORNFELD)  Delta/height?
23          MR. PLEBAN:  Baseline.
24      Q.   (BY MR. CORNFELD)  And then there's a
25  word above that.

Page 92

1      **A.   Baseline delta to height.**
2      Q.   Okay.  What is -- what is shown in
3  that column?
4      **A.   It's the difference between, I**
5  **believe, the -- the baseline and the height.**
6      Q.   Okay.  And the next column, what does
7  that say?
8      **A.   It says used.**
9      Q.   Used?
10      **A.   Uh-huh.**
11      Q.   What is meant in that column, shown
12  in that column?
13      **A.   I'm not sure.**
14      Q.   The next column is headed Ion Ratio?
15      **A.   Yes.**
16      Q.   What is shown in that column?
17      **A.   It's -- it shows, I think, the amount**
18  **of the ion ratio.**
19      Q.   What is the ion ratio?
20      **A.   I'm not comfortable answering these**
21  **questions.**
22      Q.   There's a column headed Expected Ion
23  Ratio.
24      **A.   Uh-huh.**
25      Q.   What is shown in that column?



Dominique Delagnes                                           July 08, 2024

Page 93

1    A.   I think it shows 1.0000.

2    Q.   But what -- what -- what does that

3  represent?

4    A.   Similarly, not comfortable answering

5  the questions.

6        MR. CORNFELD:  Counsel, I think we're

7  going to need another 30(b)(6) witness.

8        MR. CEJAS:  On the specifics?

9        MR. CORNFELD:  On these -- yeah, on

10  the things that Ms. Delagnes is unable to answer.

11       MR. CEJAS:  On the interpretation of

12  the data?

13       MR. CORNFELD:  Yeah, yeah.

14       MR. PLEBAN:  You marked on one of

15  those exhibits, maybe on the front of that, with

16  that little dash.

17       THE WITNESS:  Oh, I just was trying

18  to visualize the fact that this actual specimen

19  itself is the first eight numbers, and then there's

20  a dash, and those are kind of secondary subnumbers

21  that tie back to this.

22       MR. PLEBAN:  We just need to note,

23  like, put on the record where you marked so we

24  don't think it's the original.

25       THE WITNESS:  I boxed --

Page 94

1        MR. CEJAS:  So that the record --

2        MR. CORNFELD:  Wait --

3        THE WITNESS:  -- the first nine.

4    Q.   (BY MR. CORNFELD)  Before you say

5  that, the record you are holding up is Exhibit 11,

6  correct?

7    A.   Yes, it is.

8    Q.   Okay.  And you made some markings on

9  the cover page of Exhibit 11.  You underlined a

10  portion of the accession number, correct?

11       I boxed the root accession number.

12   Q.   Okay.  And those -- that's your --

13   A.   And that's what we call it, we call

14  it a root accession number.  So I boxed the root

15  accession number to show for his sample, it is

16  always going to be those first eight numbers.  And

17  then there's a dash, and there's three digits after

18  that depending upon the various stages within

19  testing procedures, those -- those last three

20  numbers may change.  That's what I was indicating.

21       Thank you.

22   Q.   Ms. Delagnes, I've handed you what's

23  been marked as Exhibit 14, which is a document

24  numbered 7836 on the first page titled:  Foulger

25  data pack accession number, and then there's a long

Page 95

1  number, collection date December 13, 2021.

2        Do you see that?

3    A.   Yes.

4    Q.   And this is the data pack for the

5  tests -- the test that was positive for Katarzyna

6  Foulger for her sample that was collected on

7  December 13, 2021, correct?

8    A.   Yes.

9    Q.   And do you understand this was the

10  only test that Averhealth reported that was

11  positive -- or the only sample that Averhealth

12  reported that was positive?

13   A.   Yes.

14   Q.   If we could look at the page titled

15  Full Page Lab Report --

16   A.   Yes.

17   Q.   -- which is the second page on the

18  sample.  And do you see that it shows that -- or

19  states that this was positive for cocaine in a hair

20  sample?

21   A.   Yes.

22   Q.   And the cutoff is 100 pg/mg, correct?

23   A.   Yes.

24   Q.   There's no level reported.  Do you

25  see that?

Page 96

1    A.   Yes.

2    Q.   It says NA under level?

3    A.   Yes.

4    Q.   Why is that?

5    A.   This particular customer probably

6  does not have levels turned on.  So when the full

7  page report is pulled out of the database, it

8  doesn't reflect the levels.

9    Q.   The customer turns on something in

10  your system?

11   A.   Yes.  They have an opportunity to

12  either have levels reported or not.

13   Q.   So as far as we can tell from this

14  report, her -- her result could have been under 500

15  for cocaine, correct?

16   A.   What I can tell from this report is

17  it would have been above 100.

18   Q.   But you have no idea how far or how

19  little?

20   A.   Not on this -- not on this lab

21  report, no.

22   Q.   Is that data available anywhere?

23   A.   Yes, it would be on the

24  chromatograph.

25   Q.   Are you referring to the page headed



Dominique Delagnes                                              July 08, 2024

Page 97

1  Drug Cal Curve that is page numbered 7842?

2      A.   Give me a minute.  This one's
3  Dr. Glinn needs to look at.

4      Q.   I'm sorry?  What -- what --

5      A.   I said this one Dr. Glinn will need
6  to look at with all the charts in here to show
7  where the actual value of the concentration is.

8      Q.   Would that -- and do you see that
9  Ms. Foulger's benzoylecgonine was negative?

10     A.   Yes.

11     Q.   Do you have an understanding as to
12  whether a positive cocaine in hair with a negative
13  benzoylecgonine would indicate the absence of drug
14  use?

15     A.   That's a question for a toxicologist.

16     Q.   If we go through Ms. Foulger's lab
17  report --

18     A.   Uh-huh.

19     Q.   -- there's a section that is -- that
20  starts on page 1 of 68 or Bates number 7843, and a
21  table that begins on 7844.

22         Do you see that?

23     A.   I do.

24     Q.   And there's a column entitled Percent
25  Accuracy.

Page 98

1      A.   Yes.

2      Q.   Are you familiar with what's shown in
3  the column?

4      A.   I am.  I mean, I can read the
5  numbers, yes.

6      Q.   Are you familiar with what they
7  represent?

8      A.   A toxicologist needs to get into
9  details about these numbers.

10     Q.   Would that be true for the rest of
11  the tables in the Foulger data pack and the other
12  data packs?

13     A.   Yes.

14         MR. CEJAS:  I would say whenever
15  you're ready to change topics, it would probably be
16  a good time for a break, so it's up to you,
17  whenever you're ready.

18         MR. CORNFELD:  I was thinking the
19  same thing.

20         THE VIDEOGRAPHER:  The time is 11:35.
21  We are off the record.

22         (A short break was taken.)

23         THE VIDEOGRAPHER:  The time is 11:51.
24  We are back on the record.

25     Q.   (BY MR. CORNFELD)  Ms. Delagnes, did

Page 99

1  anyone from Massachusetts tell you that they wanted
2  cutoffs that were the lowest possible level that
3  Averhealth could detect?

4      A.   It's a vague question.  I'd -- I'd
5  have to look into that further.

6      Q.   But you're not aware of it as you sit
7  here?

8      A.   I'm not aware of it as I sit here,
9  no.

10     Q.   All right.  I'll -- we'll leave the
11  record open and you can -- if there's a document or
12  a memo or something, I'd ask that you provide it to
13  your counsel and they can provide it to us, and we
14  can decide whether we need to ask you about it.

15     A.   Okay.

16         THE WITNESS:  Do I need to take a
17  note for follow-ups?

18     Q.   (BY MR. CORNFELD)  And are there
19  documents that --

20     A.   Sorry, I can't wear my reading
21  glasses and look at you.

22     Q.   Are -- you need -- you need bifocals.

23     A.   Yeah.

24     Q.   Are there -- are there documents
25  regarding Averhealth's procedures for changing

Page 100

1  cutoffs?

2      A.   Not that I'm aware of.

3      Q.   I think I asked you this, but are
4  there documents regarding Averhealth's change in
5  the cutoff for cocaine in hair from 500 to 100?

6      A.   You asked if we provided
7  communication out to our customers about the cutoff
8  change, and I -- I -- I indicated I don't believe
9  so.  So those are two follow-ups that I have.

10  Document used for lowest cutoff and did we document
11  or send out a change in cutoffs.

12     Q.   Are there -- are there internal
13  documents within Averhealth on the change in the
14  cutoff for hair for cocaine in hair from 500 to
15  100?

16     A.   We would have changed -- in our
17  database, we would have made changes, right, to
18  bring that test in-house and to set the cutoffs,
19  and there is an SOP of what our hair testing is and
20  there would be documentation on what we determined
21  would be the cutoffs of that.

22     Q.   All right.  I've -- as I said, I've
23  not seen documentation regarding the change in
24  cutoff because I --

25     A.   Okay.



Page 101

1    Q.   -- searched for 100 pg/mg.

2    A.   Uh-huh.

3    Q.   So I would ask that if there is such

4 documentation, you provide that to your counsel so

5 they can provide it to us and we can decide whether

6 we need to ask about that.

7    A.   Okay.

8         MR. CORNFELD:  Tammie, would you mark

9 that portion of the transcript where I made those

10 requests?

11   Q.   (BY MR. CORNFELD)  You have in front

12 of you Exhibit 15, which bears the number 2239 on

13 the first page and is titled Judicial Branch of

14 Arizona in Maricopa County, Contract Drug and

15 Alcohol Testing, Urinalysis Services 190161-RFP.

16        Do you see that?

17   A.   Yes.

18   Q.   Is this the contract that governed

19 the test on -- on Katza [as pronounced] Foulger

20 that we've been looking at?

21   A.   Yes.

22   Q.   If you would look at page 5, the page

23 with the Bates number 2265.  Do you see that

24 there's a section of this contract titled --

25   A.   5?  I have 2243, 5-5.

Page 102

1    Q.   Maybe you don't have the same Bates

2 number document.

3    A.   Sorry, this has page number 5, but

4 it's -- is there another 5 maybe in the -- I'll

5 just look for the Bates number.

6    Q.   Yeah.

7    A.   What's the Bates number?  22?

8    Q.   2265.

9    A.   Okay.  Thank you.

10   Q.   Did I staple two copies together?

11   A.   Oh, there's two.  It must be two

12 different sections of the document.  Okay.  I'm on

13 the right one now.

14   Q.   If you look at the page with the

15 Bates number 2261.

16   A.   2261?  Okay.

17   Q.   Do you see that this is Exhibit B,

18 Scope of Work?

19   A.   Okay.

20   Q.   And they start the page numbering

21 over again with page 1, so page 5 following that,

22 within Exhibit B, the page with the Bates number

23 2265 has Section 6, Laboratory Requirements.

24   A.   Uh-huh.

25   Q.   Yes?

Page 103

1    A.   Yes.

2    Q.   And it states:  Drug testing

3 laboratory shall, and if you skip down to

4 subparagraph J, it says:  Provide the Court with

5 drug testing data as requested and any explanation

6 of test results and laboratory policy and

7 procedure.

8         Do you see that?

9    A.   Yes.

10   Q.   Did you provide any explanation of

11 Ms. Foulger's test results to Maricopa County?

12   A.   I'm not aware that they asked of any,

13 so no, we did not.

14   Q.   Well, it doesn't say provide -- oh,

15 it says as requested, and you provide drug testing

16 data as requested and any explanation of test

17 results.

18        And that doesn't say as requested for

19 the explanation, correct?

20        MR. CEJAS:  Object to form.  Object

21 to form.

22        THE WITNESS:  The words of "as

23 requested" are not in there, no.

24        It is standard practice, though, we

25 don't with -- every test result, not just

Page 104

1 Averhealth, but any laboratory, as they report test

2 results, they respond to questions about those

3 results.

4    Q.   (BY MR. CORNFELD)  Did you provide

5 any explanation to Maricopa County regarding what

6 it means to have a positive cocaine in hair but a

7 negative benzoylecgonine?

8    A.   No.

9    Q.   And do you have any idea whether

10 Maricopa County would -- or strike that.

11        Do you have any reason to think that

12 Maricopa County, without any explanation from

13 Averhealth, would have any idea what it means to

14 have a positive cocaine and negative

15 benzoylecgonine in hair?

16        MR. CEJAS:  Object to form.

17 Speculation.

18        THE WITNESS:  The agency requesting

19 this testing has been doing it for a long time and

20 is very well versed.  So I -- I can't -- I can't

21 respond to that one way or another.  I don't know

22 what Maricopa was thinking.

23   Q.   (BY MR. CORNFELD)  You're the CEO of

24 Averhealth, and at the time of this test, you were

25 the COO, and you just told us you don't know what



Page 105

1  it means to have a positive cocaine in hair with a
2  negative benzoylecgonine.  So do you have any idea
3  whether you would expect Maricopa County to know
4  that?
5  **A.   I would expect that they know when to**
6  **ask questions about test results.  It is typical**
7  **for our customers, when clients raise concerns**
8  **about the test results, that then the customer**
9  **comes to us to ask for interpretation.**
10  Q.   Do you know if -- what Ms. Foulger
11  told Maricopa County about her test results?
12  **A.   I do not.**
13  Q.   All right.  And if you look at --
14  under Laboratory Requirements, paragraph H, it
15  says:  Maintain all positive test specimens for a
16  minimum of one year.
17      Correct?
18  **A.   Yes.**
19  Q.   And that was a requirement you had
20  under the contract with Maricopa County, correct?
21  **A.   Yes.**
22  Q.   What's the reason for that
23  requirement?
24  **A.   Typically, the reason is if the**
25  **Court -- sorry, not the Court -- well, I'm using**

Page 106

1  **the Court as in the customer.  So our customer**
2  **often asks us to maintain them in case they want to**
3  **come back and ask for any additional testing.**
4  Q.   Or have another lab test the sample?
5  **A.   Or that.**
6  Q.   Or if the -- if the person being
7  tested wants to have another lab test the sample?
8  **A.   If the person being tested wants**
9  **another lab to test it, then they need to go**
10  **through -- our contract is with Maricopa County, so**
11  **we need Maricopa County's permission to send, and**
12  **they need to make the request, not the client**
13  **themselves, to have the specimen retested in**
14  **another laboratory.**
15  Q.   And if we would look at the -- the
16  test result in --
17  **A.   Which number is that?**
18  Q.   Exhibit 14.
19  **A.   Thank you.**
20  Q.   Do you see -- do you have that there?
21  **A.   I do.**
22  Q.   Okay.  If you look at item 3 under
23  Notes, do you see it says:  Nonnegative samples
24  will be sealed in the original container, properly
25  marked for identification, and locked in storage

Page 107

1  for 365 days from date of collection --
2  **A.   Yes.**
3  Q.   -- correct?
4      And so that applied to this test,
5  which was a test of hair, correct?
6  **A.   Yes.**
7  Q.   So you had that obligation not just
8  in the contract, but in the report you sent to
9  Ms. Foulger, correct?
10  **A.   Yes.**
11  Q.   Do you see on the test report for
12  Ms. Foulger, there's a Certification Statement?
13  **A.   Yes.**
14  Q.   And the last sentence of this
15  Certification Statement -- or excuse me, not the
16  last sentence, but there is a sentence that says:
17  I acknowledge at submission of false information
18  may subject me to prosecution for the criminal
19  offense of perjury?
20  **A.   I see that statement, yes.**
21  Q.   And that statement was signed by the
22  certification technician Krista Ferando?
23  **A.   Yes.**
24  Q.   Who is Ms. Ferando?
25  **A.   She's one of our certifying**

Page 108

1  **scientists.**
2  Q.   So she was certifying, subject to the
3  potential prosecution for the criminal offense of
4  perjury, that nonnegative samples will be sealed in
5  the original container, properly marked for
6  identification, and locked in storage for 365 days
7  from date of collection, correct?
8  **A.   She's certifying that she reviewed**
9  **the data, released the test results.**
10  Q.   Well, she's certifying that -- that
11  submission of false information may subject me to
12  prosecution for a criminal offense, correct?
13  **A.   Yes, that statement is in there.**
14  Q.   Not just data, but false information,
15  and part of the information that she was certifying
16  was that nonnegative samples will be sealed in the
17  original container, properly marked for
18  identification, and locked in storage for 365 days
19  from date of collection, correct?
20      MR. CEJAS:  Object to the form.
21  Assumes facts not in evidence.
22      **THE WITNESS:  Yes.**
23      MR. CEJAS:  Is this 16?
24      MR. CORNFELD:  Yeah, 16.
25  Q.   (BY MR. CORNFELD)  I've handed you



Dominique Delagnes                                                          July 08, 2024

Page 109

1  what's been marked as Exhibit 16, which is a
2  one-page document with the Bates number 38388.  And
3  it's an e-mail exchange between Lee Bostic and
4  Michael Giraldor.
5      Do you see that?
6  **A.  Yes.**
7  Q.  Dated January 12th, 2022?
8  **A.  Yes.**
9  Q.  And you see the date of Ms. Foulger's
10 test report was January 5th, 2022, correct?
11 **A.  Yes.**
12 Q.  So this is within a week afterwards?
13 **A.  Yes.**
14 Q.  If we start at the bottom for the
15 first e-mail, it's by Michael Giraldor, who has an
16 e-mail address from Averhealth.com.  Who is
17 Mr. Giraldo -- Giraldor?
18 **A.  He's a customer service**
19 **representative.**
20 Q.  In Arizona?
21 **A.  He actually resides, or resided --**
22 **he's no longer employed with us -- part of our**
23 **customer service team.  I believe he may have**
24 **actually lived in Virginia.**
25 Q.  Okay -- well, okay.  And he's writing

Page 110

1  to Lee Bostic.  Who is Lee Bostic?
2  **A.  He was the area manager at the time.**
3  Q.  The area manager for Arizona?
4  **A.  Yes, that is correct.**
5  Q.  And the subject is Katarzyna Foulger,
6  and his e-mail states, in full:  The lady is
7  calling asking if she can have the hair follicle
8  back because she wants it tested in another lab.
9  Can we help her with that?  And then it has her
10 name, Katarzyna Foulger and her phone number.
11     Do you see that?
12 **A.  Yes.**
13 Q.  And Mr. Bostic -- and that was
14 dated -- excuse me, that was dated January 12th,
15 2022, at 8:20 a.m., correct?
16 **A.  2020 -- yes.  January 12th, yes,**
17 **8:20 a.m.**
18 Q.  All right.  And Mr. Bostic wrote back
19 at 10:23 a.m. and says:  The answer to that is no.
20 Our hair follicle screens are one and done.  The
21 hair is destroyed during the testing process.
22     Do you see that?
23 **A.  I do.**
24 Q.  Is that a true statement?
25 **A.  When the sample is received, we need**

Page 111

1  **50 grams of the sample to go through the testing**
2  **process.  Part of testing for hair is you need to**
3  **take that hair, you need to pulverize it, you need**
4  **to liquefy it, and you need to -- to**
5  **reconstitute -- so basically, you -- you pulverize**
6  **the hair, you put in, you know, other chemicals**
7  **into the hair to be able to test for it, so you --**
8  **you make it into a solution that then is prepped**
9  **and run on the instrument, and -- once it's**
10 **reported.**
11     **So, depending upon how much hair was**
12 **collected, it is -- it is a factual statement that**
13 **through that testing process, all of that hair is**
14 **used to be prepped and run on the analyzer.**
15     **If all 50 grams were not used, then**
16 **there may still continue to be hair.  But what's**
17 **actually used to test for hair samples is**
18 **completely used, run on the instrument, and so**
19 **there's no specimen left.**
20 Q.  So it's true that the hair was
21 destroyed, or hair was destroyed?
22 **A.  Her hair was used in the testing**
23 **process.**
24 Q.  It says -- he said the hair is
25 destroyed during the testing process.

Page 112

1  **A.  It's used up to be tested.**
2  Q.  All right.  And then Mr. Giraldor
3  says:  The test came back positive, and she was
4  told that the lab kept it if the test comes
5  positive.
6      Do you see that?  He responded that
7  same day at 8:27 a.m.
8  **A.  Yes, I do see that.**
9  Q.  And we know that she was told that
10 because it was on her test report, correct?
11 **A.  Yes.**
12     **If there's no hair left, right, so we**
13 **only received 50 grams of specimen, it's not**
14 **physically possible for --**
15 Q.  My question was --
16 **A.  I understand that, but I'm trying to**
17 **explain the testing process.**
18 Q.  You've already explained that.
19 **A.  Okay.**
20 Q.  My question is simply:  We know she
21 was told that the lab kept it if the test comes
22 positive because it was on her lab report, correct?
23 **A.  We would have retained any sample**
24 **that was left --**
25 Q.  She was --



Page 113

1    **A.    -- if there was any left.**
2    Q.    My question was:  She was told in the
3    lab report what she said to Mr. Giraldor she was
4    told, which was that the lab kept it if the test
5    comes back positive, correct?
6    **A.    If there's any specimen left, yes.**
7    Q.    She -- it did not say if there's any
8    specimen left --
9    **A.    Okay.**
10    Q.    -- did it?  You're just making that
11    up.
12    **A.    I'm not making that up --**
13    Q.    All she --
14    MR. CEJAS:  Wait, wait, wait --
15    Q.    (BY MR. CORNFELD)  You're making that
16    up --
17    **A.    I'm not making that up --**
18    Q.    -- as part of something --
19    COURT REPORTER:  Okay.  Okay.  One at
20    a time, guys.
21    MR. CEJAS:  You have to --
22    Q.    (BY MR. CORNFELD)  My question had to
23    do with what she was told.  You have no knowledge
24    that she was told it would be -- it would be kept
25    if there was enough to keep it.  All you know is

Page 114

1    what it said on the lab report, which was that the
2    test would be kept if it was positive, and what was
3    in the agreement in the contract with Maricopa
4    County in which you promised to keep it for a year,
5    correct?
6    MR. CEJAS:  Object to form.  It's
7    argumentative and it's compound.
8    Q.    (BY MR. CORNFELD)  Correct?
9    **A.    Yes.**
10    Q.    All right.  And then it says:  She --
11    she needs to -- retesting -- this is Mr. Giraldor.
12    **A.    Uh-huh.**
13    Q.    She needs to retesting and is very
14    upset about it.
15    Do you see that?
16    **A.    Yes.**
17    Q.    Can you blame her for being very
18    upset when she was told it would be kept for a year
19    and now she's -- she's told that it wasn't kept at
20    all?
21    **A.    Can you restate that question for me,**
22    **please?**
23    Q.    Can you -- can you blame -- first of
24    all, can you blame her for being very upset that
25    the test came back positive when she never used

Page 115

1    cocaine?
2    **A.    I don't --**
3    MR. CEJAS:  Object to form.
4    Foundation.
5    **THE WITNESS:  -- know whether she's**
6    **used cocaine or not.**
7    **I can understand her being upset for**
8    **having a positive cocaine result.**
9    Q.    (BY MR. CORNFELD)  And being even
10    more upset if it came back positive when she never
11    used cocaine.
12    MR. CEJAS:  Object to form.  Assumes
13    facts not in evidence.
14    Q.    (BY MR. CORNFELD)  I'm asking you to
15    assume she never used cocaine.  That's going to be
16    her testimony.
17    **A.    That can be her testimony.  I --**
18    **okay.**
19    Q.    And can you blame her for being very
20    upset about getting a positive test result back?
21    **A.    Nobody likes to get a positive test**
22    **result back and is upset about it.**
23    Q.    And that's especially true for
24    someone who's never used cocaine, correct?
25    MR. CEJAS:  Object to form.  Assumes

Page 116

1    facts not in evidence.
2    **THE WITNESS:  Again, I don't know**
3    **whether or not she's used cocaine.**
4    Q.    (BY MR. CORNFELD)  I'm asking you to
5    assume she never used cocaine.  No -- and my
6    question is:  They are even more upset -- people
7    are even more upset if they get a positive result
8    and they never used cocaine, correct?
9    **A.    You can't speculate they're more**
10    **upset.  People are upset for positive test results.**
11    Q.    Okay.  And then Mr. Giraldor says:
12    She is asking if you could contact her through her
13    phone number, and he provides the phone number.
14    Correct?
15    **A.    Yes.**
16    Q.    And Mr. Bostic responds again that
17    same morning -- or that same afternoon and says:
18    The lab keeps urine if it's positive, not hair.
19    Do you see he says that?
20    **A.    I do see that, yes.**
21    Q.    And he doesn't say not hair unless
22    there's some left over.  He just makes the blanket
23    statement, as he did before, when he said it's one
24    and done, saying the laboratory doesn't keep hair.
25    Correct?

LEXITAS

Page 117

1    A.   Yes.

2    Q.   And he says:  Yes, I'll reach out.

3         Do you see that?

4    A.   Yes.

5    Q.   I'd like you to assume that he never

6  called her.  Nobody ever called her.  Can you blame

7  her for being even more upset?

8         MR. CEJAS:  Objection.  Foundation --

9    Q.   (BY MR. CORNFELD)  Or do you have any

10  idea -- strike that.

11        Do you have any idea why he didn't

12  call her?

13        MR. CEJAS:  Objection, foundation.

14  Assumes facts not in evidence.

15        THE WITNESS:  I don't know that he

16  called her or didn't call her.

17   Q.   (BY MR. CORNFELD)  Wouldn't the

18  responsible thing have been to -- to call her and

19  explain?

20   A.   I don't know that he didn't call

21  her --

22   Q.   I'm asking you to assume that she

23  didn't -- that he didn't call her because she's

24  going to testify that he never called her, nobody

25  ever called her.

Page 118

1    A.   Okay.

2         MR. CEJAS:  Object to form.  Assumes

3  facts not in evidence.

4    Q.   (BY MR. CORNFELD)  Wouldn't the

5  responsible thing have been to call her?

6    A.   In here, if he said he would call

7  her, yes.

8    Q.   And -- and wouldn't Ms. Ferando have

9  known at the time of her report whether there was

10  enough hair left over to keep it for a year?

11   A.   She doesn't know, she doesn't have

12  the original container in front of her.

13   Q.   She could find out, when she's

14  certifying subject to a criminal offense, that

15  there was -- that the lab would keep the sample for

16  365 days, locked in storage, she could find out

17  before she certifies that, couldn't she?

18        MR. CEJAS:  Object to the form.

19        THE WITNESS:  Based on our processes

20  and procedures, she -- she doesn't have the

21  specimen in front of her.

22   Q.   (BY MR. CORNFELD)  No, but she could

23  find out, couldn't see?

24   A.   Is it possible to find out?  Yes.  Is

25  it probable in our processes?  No.

Page 119

1    Q.   So instead, she just makes the false

2  statement that nonnegative samples will be sealed

3  in the original container, properly marked for

4  identification, and locked in storage for 365 days

5  from date of collection, correct?

6         MR. CEJAS:  Object to the form.

7  Foundation.

8         THE WITNESS:  That statement is on

9  here, yes.

10   Q.   (BY MR. CORNFELD)  And that's a --

11  that statement is false --

12        MR. CEJAS:  Object to the form --

13   Q.   (BY MR. CORNFELD)  -- correct?

14        MR. CEJAS:  Object to the form.

15  Assumes facts not in evidence, foundation.

16        THE WITNESS:  It appears to be.

17   Q.   (BY MR. CORNFELD)  Not just appears

18  to be.  You think now she should be prosecuted for

19  perjury?

20        MR. CEJAS:  Objection.  Calls for --

21   Q.   (BY MR. CORNFELD)  By following

22  your -- I mean, this is a standard form that you

23  send out, correct?

24   A.   Yes.

25        MR. CEJAS:  Let me -- I'm object to

Page 120

1  the predicate of that question, not the second

2  part, as calling for a legal conclusion.

3    Q.   (BY MR. CORNFELD)  I'm sorry, did you

4  answer that yes?

5    A.   Yes.

6    Q.   And so the statement about storage,

7  that's just part of your form, isn't it?  That goes

8  in every report, doesn't it?

9    A.   I don't believe it goes into every

10  report, no.

11   Q.   It's -- it -- it found its way into

12  this report because it's part of a form, correct?

13   A.   It is part of this certification

14  statement, yes.

15   Q.   All right.  I mean, she didn't sit

16  there at the keyboard and type that out.  It just

17  was built into the form that has her name at the

18  bottom, correct?

19   A.   Yes.

20   Q.   Do you think she should be the one

21  who is potentially prosecuted for perjury for that

22  or should it be Averhealth itself for putting into

23  its form a false statement?

24        MR. CEJAS:  Object to the form.

25  Assumes facts not in evidence, calls for a legal



Page 121

1  conclusion, it's argumentative.

2  **THE WITNESS:  No, she should not be**

3  **prosecuted.**

4  Q.   (BY MR. CORNFELD)  It should be

5  whoever put that into the form when it -- when it

6  wasn't true, correct?

7  MR. CEJAS:  Same objection.  Calls

8  for a legal conclusion.

9  Q.   (BY MR. CORNFELD)  Yes?

10  **A.   Can you repeat the question, please?**

11  Q.   It should be whoever was responsible

12  for putting that statement -- that false statement

13  into the form --

14  **A.   It's not a false statement.  There --**

15  **there are times that there is plenty of the sample**

16  **there for it to be retested.  It's not a false**

17  **statement.**

18  Q.   It's a false statement as applied to

19  hair when Mr. --

20  **A.   Not always.**

21  Q.   -- when Mr. Bostic said they're just

22  not kept.

23  **A.   This was a general statement.  That's**

24  **not the case.  We do keep it.  We keep the original**

25  **container with the initials, the seals, and**

Page 122

1  **everything.  And if there's hair in there, it would**

2  **have the opportunity to be sent out to be retested.**

3  **The original container is -- is retained.**

4  Q.   Okay.  I -- you're not -- you're not

5  retracting your testimony that this statement 3

6  under storage about nonnegative samples being

7  sealed in the original container, properly marked

8  and -- for identification, and locked in storage

9  for 365 days from date of collection, you're not

10  retracting your statement that that was a false

11  statement, are you?

12  **A.   The original packaging container --**

13  Q.   No, my question is --

14  MR. CEJAS:  Let -- let her --

15  Q.   (BY MR. CORNFELD)  -- are you

16  retracting your statement that you made about three

17  minutes ago that that was a false statement?

18  MR. CEJAS:  Objection.

19  Argumentative.

20  Go ahead and answer.

21  **THE WITNESS:  So there's a difference**

22  **between the liquid specimen that's tested on the**

23  **analyzer that we talked about, that -- what**

24  **Mr. Bostic is referring to in this e-mail, that is**

25  **the actual liquid form of the hair that's tested**

Page 123

1  **versus the actual packaging.**

2  **The packaging itself, even for Mr. --**

3  **Ms. Foulger's hair, that original packaging with**

4  **the specimen identifier, the actual package that**

5  **the hair would come in, that is actually retained.**

6  **The question is, is there any hair left to be**

7  **retested or not.**

8  **So it is not -- it is -- they're --**

9  **they're separate and apart two different things.**

10  **So we had the -- we had the original packaging**

11  **container and identifier on it.**

12  Q.   (BY MR. CORNFELD)  The statement in

13  the report --

14  **A.   Uh-huh.**

15  Q.   -- doesn't say only the packaging is

16  retained for 365 days.  It says nonnegative samples

17  will be sealed.  Correct?

18  **A.   If we --**

19  Q.   Is that what it says?

20  **A.   If we've used up the specimen --**

21  Q.   Excuse me.  Is that what it says?

22  **A.   If we've used up the specimen,**

23  **there's nothing to retain --**

24  Q.   Did you --

25  **A.   -- the packaging itself remains.**

Page 124

1  Q.   Does it say nonnegative samples will

2  be sealed in the original container and not just

3  the original container will be kept?

4  **A.   It says nonnegative samples.**

5  Q.   All right.  And that was false,

6  wasn't it?

7  MR. CEJAS:  Objection.  Asked and

8  answered.

9  Q.   (BY MR. CORNFELD)  Yeah, I think --

10  you're not retracting your statement that that was

11  false, are you?

12  MR. CEJAS:  Objection.

13  **THE WITNESS:  I am --**

14  Q.   (BY MR. CORNFELD)  Are you?  Are you

15  retracting any of the testimony you gave?

16  MR. CEJAS:  Objection --

17  **THE WITNESS:  I am not retracting.**

18  Q.   (BY MR. CORNFELD)  Okay.

19  **A.   I'm clarifying --**

20  Q.   Then that's --

21  **A.   I'm clarifying the difference between**

22  **the sample that gets tested on the analyzer versus**

23  **the original container that the specimen was**

24  **delivered in,**

25  Q.   We understand what your practices



Page 125

1  are. My question had to do with what you told
2  customers. Did -- do you think you -- you should
3  go back to Arizona and clarify what's in that
4  contract and say that you are not keeping hair
5  samples for a year?
6     **A.   If there's enough sample, we are**
7  **keeping hairs -- hair for a year.**
8     Q.   Do you think you should go back to
9  Arizona and say we need to modify this contract and
10  we've been violating the requirement that says that
11  the laboratory shall maintain negative test
12  specimens -- excuse me, maintain all positive test
13  specimens for a minimum of one year?
14     MR. CEJAS: Object to the form.
15     **THE WITNESS: No. Because if there's**
16  **sample left, we retain it for a year, and we retain**
17  **the original packaging.**
18     Q.   (BY MR. CORNFELD) Do you think you
19  should go back to Arizona and say that this -- we
20  did not mean to agree that we would maintain all
21  positive test specimens for a year?
22     MR. CEJAS: Object to the form.
23     **THE WITNESS: Can you rephrase your**
24  **question?**
25     Q.   (BY MR. CORNFELD) Do you see that

Page 126

1  the agreement says maintain all positive test
2  specimens for a minimum of one year?
3     **A.   I do.**
4     Q.   And that wasn't true, was it?
5     MR. CEJAS: Object to the form.
6  Asked and answered.
7     **THE WITNESS: My attorney indicated**
8  **asked and answered.**
9     Q.   (BY MR. CORNFELD) Go ahead and
10  answer. You can answer.
11     MR. CEJAS: You can answer it one
12  more time and then we'll move on. But go ahead.
13     **THE WITNESS: Okay. As I've**
14  **indicated, for hair tests, you have to take out**
15  **50 grams --**
16     Q.   (BY MR. CORNFELD) No.
17     **A.   -- to test that, and that's not**
18  **capable to be maintained. But any other hair and**
19  **the original packaging and all of it, and the**
20  **identifiers is maintained for one year.**
21     Q.   Does it say maintain all positive
22  test spec -- I'm sorry, read that. Maintaining all
23  positive test specimens, that is not true.
24  Ms. Foulger's positive test specimen was not
25  maintained for a minimum of a year.

Page 127

1     **A.   Because it was all --**
2     MR. CEJAS: Object to the form.
3     **THE WITNESS: -- all used during this**
4  **sample process.**
5     Q.   (BY MR. CORNFELD) Whatever reason,
6  it wasn't maintained for a year, was it?
7     **A.   The original packaging was retained**
8  **with the label on it.**
9     Q.   The specimen wasn't retained as -- as
10  the contract requires. Do you believe that you
11  have -- that you should go back to Arizona and tell
12  them we shouldn't have said maintain all positive
13  test specimens, we should say maintain all positive
14  test specimens if there's any left over?
15     MR. CEJAS: Object to the form. It's
16  argumentative, asked and answered multiple times
17  now. One last time and we're moving on.
18     **THE WITNESS: I've made it clear on**
19  **what we retain and what's written down.**
20     Q.   (BY MR. CORNFELD) I understand that.
21     **A.   Yes.**
22     Q.   Do you believe -- do you think you
23  should go back to Arizona and say we shouldn't have
24  agreed to that because that's not what --
25     **A.   No, I don't.**

Page 128

1     Q.   -- we're doing, we need to modify?
2     **A.   No, I don't. No.**
3     Q.   And -- and could you have collected
4  more hair so that you would have enough left over?
5     **A.   Our procedures says to collect**
6  **50 grams. It is one of those that it's a balance**
7  **between not wanting to take out a huge chunk of**
8  **somebody's hair, that people can find invasive**
9  **versus having enough to be able to test the**
10  **specimen. So we've chosen to have enough to be**
11  **able to test it, but not so much that we have**
12  **invasively, that we leave a huge hole in their**
13  **hair --**
14     Q.   And not --
15     **A.   -- in their head, to test.**
16     Q.   -- and not so -- you wouldn't put a
17  big hole in the head if you took a little more.
18  There wouldn't be a hole in the head.
19     **A.   You're talking about this size,**
20  **right? And so to have -- to have -- this size.**
21  **Okay? Thank you. An eraser -- a little bit larger**
22  **than an eraser size. Yes, unfortunately, many**
23  **people find it very invasive, so we collect enough**
24  **to be able to test the samples and not to be**
25  **invasive.**



1    Q.    And not so that you could comply with
2    the provision in your contract and the statement in
3    your test report that you maintain all test
4    specimens for a minimum of a year, correct?
5    A.    No.  I -- I've already asked and
6    answered that.
7    Q.    And -- and you don't -- you don't
8    collect enough so that you can comply with that
9    provision in the contract, correct?
10    A.    There are times that we do.
11    Q.    But you -- not all specimens,
12    correct?
13    A.    Correct.
14    Q.    Handing you what's been marked as
15    Exhibit 17 to this deposition.  It's a one-page
16    exhibit bearing the Bates number FOU00036, and it
17    is headed Aversys Account, Arizona, Maricopa
18    County.  And it's a test report.
19    A.    Uh-huh.
20    Q.    Do you have that?
21    A.    Yes.
22    Q.    And do you see that that is another
23    test report on Ms. Foulger's sample from December
24    of 2021?
25    A.    Which date in December 2021?  If we

1    can clarify.  December 13, 2021, collected, yes.
2    Q.    And do you see that it bears the same
3    accession number as on Exhibit 14, the data pack
4    from Ms. Foulger's test?
5    A.    What's the -- is that 14?  Thank you.
6    Q.    Yes.
7    A.    You said 14.  I...
8    Q.    Yeah.
9    A.    Yes, I do.
10    Q.    But it's a different test report,
11    correct?
12    A.    It was reported a different time,
13    yes.
14    Q.    And it has different results,
15    correct?
16    A.    Yes.
17    Q.    This one's also positive for cocaine
18    and also supposedly positive for 6-MAM, correct?
19    A.    Yes.
20    Q.    I want you to assume that Ms. Foulger
21    received Exhibit 17.
22    A.    Okay.
23    Q.    With the -- with the report date --
24    and you see that it has the report date December 2,
25    2022?

1    A.    Uh-huh.
2    Q.    Yes?
3    A.    Yes.
4    Q.    And the report date of the lab report
5    that's in her data pack is dated January 5th, 2022.
6    A.    Yes.
7    Q.    All right.  Okay.  I want you to
8    assume that she received both of these.  First, she
9    received Exhibit 17, and then she received a copy
10    of the report that's in her data pack.
11    A.    Okay.
12    Q.    The January 5th report.  Do you have
13    any idea why she got two inconsistent reports?
14    A.    The one that was reported on the 5th
15    was updated.
16    Q.    Do you have any idea why?
17    A.    I do not.  I'd need to look into
18    that.
19    Q.    All right.  If you -- if you do that,
20    can you do that before we finish tomorrow?
21    A.    I believe so.  I will try.
22    Q.    Okay.
23    A.    Can I write on this or I'm not
24    supposed to write on exhibits?
25    Q.    Yeah, I --

1        MR. CEJAS:  I made a note.  We're
2    okay.
3        THE WITNESS:  Okay.  Sorry about
4    that.
5        MR. PLEBAN:  Do you want a copy?
6        THE WITNESS:  That's okay.
7        MR. PLEBAN:  Here, just take this
8    one.
9        THE WITNESS:  Do you want me to
10    update the sticker so there's no comment on here?
11        MR. CEJAS:  No, no, that's fine.  Did
12    you draw on there?
13        THE WITNESS:  All I wrote was -- I
14    started to say why -- I wrote on the back.
15        MR. CORNFELD:  You wrote on the back?
16        MR. PLEBAN:  It's fine.
17        MR. CORNFELD:  You wrote on the back?
18    It's okay.
19        MR. PLEBAN:  We have it on the record
20    now, so we're good.
21        THE WITNESS:  Okay.
22        MR. PLEBAN:  You can keep that one
23    for you if you want it.
24        THE VIDEOGRAPHER:  Ms. Delagnes, you
25    lost your mic.  It's over there.



Page 133

1    THE WITNESS:  Oh, sorry.  Thank you.
2    THE VIDEOGRAPHER:  It's swirling.
3    MR. CORNFELD:  Let's go off the
4  record.  This would be a good time for lunch.
5    THE VIDEOGRAPHER:  Time is 12:29 p.m.
6  We are off the record.
7    (A lunch break was taken.)
8    THE VIDEOGRAPHER:  The time is
9  1:29 p.m.  We are back on the record.
10    Q.    (BY MR. CORNFELD)  I just -- I'd like
11  to return just -- for a moment to the -- to the two
12  test reports on Katza Foulger's test.  You said
13  that there was a second test because it was
14  updated.  What did you mean by that?
15    A.    That's what I was looking into, that
16  I said I would follow up.
17    Q.    Oh.
18    A.    You're hoping that I would have an
19  answer by tomorrow.  So obviously it shows that it
20  was originally reported on the 2nd, right?  So that
21  time frame, and it's what you showed me in
22  Exhibit 17 shows it was reported on 1/2, and then
23  it was re-reported on 1/5, if I have -- what was
24  the other document number?
25    MR. PLEBAN:  14?

Page 134

1    Q.    (BY MR. CORNFELD)  Yeah.
2    A.    14?  Yeah.  So it was reported,
3  pulled back, and re-reported.  So I'm trying to
4  figure out why.
5    Q.    Okay.  And --
6    A.    That's what I'm looking into.
7    Q.    Okay.  And how it was re-reported, do
8  you --
9    A.    How it was re-reported?  So the first
10  one that you showed me has both cocaine and 6-MAM,
11  right?  Those were the drugs on there.
12    Q.    I'm sorry, I didn't mean the results,
13  but what they did to re-report it?
14    A.    They would release it back through
15  whoever -- however the test results are set up in
16  the database.  So I don't know if it was sent
17  through, if it was just pulled on our database
18  itself, or if it was set up on direct results
19  distribution, so it would have been e-mailed out.
20  I don't know, I'd have to go back and look at her
21  profile.
22    Q.    Okay.  I -- I don't remember -- I
23  mean, she received -- Mrs. Foulger received both
24  test reports, and I don't recall if it was e-mail
25  or regular mail.

Page 135

1    A.    It would not be regular mail.  We
2  don't send out anything through U.S. mail.
3    Q.    Oh, okay.
4    A.    So it could have been either pulled
5  in our database or for -- especially in Maricopa,
6  for the family departments specifically, a lot of
7  them are set up on direct results distribution,
8  meaning we -- that the results were e-mailed out.
9    Q.    Okay.  And as far as what reanalysis
10  they did or whether they --
11    A.    That's what I'm looking into.
12    Q.    Or whether they --
13    A.    That's what I said I would try and
14  get back to you by tomorrow.
15    Q.    Okay.  Okay.
16    All right.  When -- when Averhealth
17  enters into an agreement with a customer --
18    A.    Uh-huh.
19    Q.    -- you expect the customer to live
20  up to that agreement, right?
21    A.    What do you mean we "expect the
22  customer to live up to that agreement"?
23    Q.    That they're going to abide by the
24  provisions of the agreement, do what they said they
25  would do.

Page 136

1    A.    Yes.
2    Q.    Okay.  And -- and of course the
3  customer would expect Averhealth to do the same,
4  correct?
5    A.    Yes.
6    Q.    All right.  And -- and you have no
7  question about that, that the customer would expect
8  Averhealth to live up to its agreement?
9    A.    Yes.
10    Q.    And is it your view that Averhealth
11  does live up to its agreements?
12    A.    Yes.
13    Q.    Despite what we talked about this
14  morning?
15    A.    Yes.
16    Q.    All right.  When -- when you do tests
17  for a court or a family agency or someone like that
18  and somebody comes in for the first time, and the
19  result is positive, you know that very often that
20  means they're going to have to come back for more
21  tests?
22    A.    Don't -- I don't know that for sure.
23    Q.    You --
24    A.    I don't set their testing, how often
25  they test.  That's all established by the customer.



Page 137

1    Q.   Sure, sure.  But you -- you
2  understand that that will happen, correct?
3    **A.   It doesn't always happen.  Again,**
4  **it's the -- it's up to our customer to set the**
5  **frequency of how they're tested.**
6    Q.   Okay.  I -- I didn't ask whether it
7  always happens, but you understand it does happen?
8    **A.   Sure.**
9    Q.   Okay.
10   **A.   Yes, I guess, not sure.**
11   Q.   Yes.  Okay.  Yes.  And for example,
12  it happened with both Mr. Shnitzer and
13  Mrs. Foulger, they went in for tests the first
14  time, and compared to a cutoff of 100 rather than
15  500, their tests were positive and they ended up
16  having to go back for tests every week for months,
17  even more than a year.
18   **A.   I don't believe that's why they had**
19  **to test that frequently.  I believe that they would**
20  **have tested that frequently regardless of what that**
21  **first test result was.**
22   Q.   You understand they initially had
23  hair tests, and then they had urine tests?
24   **A.   I believe, actually, in some of them,**
25  **they were done simultaneously.  So there was both a**

Page 138

1  **hair and a urine collected at the same time.**
2    Q.   Not -- not for Mr. Foulger -- excuse
3  me, Mr. Shnitzer, and I don't believe for
4  Mrs. Foulger, they ended up having to do urine
5  tests later.
6    **A.   I believe in -- in Kat -- sorry,**
7  **what -- her --**
8    Q.   Mrs. Foulger?
9    **A.   Yeah.  In her testing, she did both**
10  **simultaneously.**
11   Q.   Okay.  If she were to testify that
12  that's what the Court said, you got a positive
13  test, now you've got to keep coming back for more,
14  that would mean that because she had a positive
15  test, she had to keep doing tests for --
16   **A.   If we look at her test history**
17  **though --**
18   Q.   -- for months.
19   **A.   Can we pull up her test history?  I**
20  **am almost positive she had urine tests done**
21  **simultaneously to her hair test, and her frequently**
22  **was set to that.**
23   Q.   We -- we have not received what
24  you're referring to as her test history.  All we
25  received were the positive tests you did.

Page 139

1    **A.   That's not true --**
2    Q.   It -- it is.
3    **A.   -- we provided test results for**
4  **everything, because there was questions about**
5  **no-shows.**
6    Q.   You -- you provided -- no, you
7  provided the test reports.  We didn't -- if there's
8  a document called test history --
9    **A.   There is not a document.**
10   Q.   Okay.
11   **A.   There's not a document, but it would**
12  **show that the same day -- she actually had no-shows**
13  **even before she started doing urine, but she was**
14  **doing urine and hair simultaneously.**
15   Q.   She had one hair test, and then if
16  she were to testify that the Court said because of
17  that, you've got to go back weeks -- for weeks and
18  weeks, months, that would mean that because she had
19  a positive test, she ended up having to do a lot
20  more tests.
21        MR. CEJAS:  Object to form.  Assumes
22  facts not in evidence.
23        Subject to that, go ahead.
24        THE WITNESS:  Okay.  If I recall what
25  I read in your Complaint, it was that she didn't

Page 140

1  **show up for tests, which is why the courts ordered**
2  **her for more testing.**
3    Q.   (BY MR. CORNFELD)  That was after she
4  had the positive hair test and she was ordered to
5  do more tests.  And Mr. Shnitzer only had urine
6  tests after he had the two positive hair tests.
7        In any event, you know that when
8  you -- when you reduced his -- the cutoff for
9  cocaine in his hair from 500 to 100 resulting in
10  those positive -- those tests being positive rather
11  than negative, if they -- if the cutoff had been
12  500, Averhealth was able to do dozens more tests on
13  him?
14   **A.   I don't know that --**
15        MR. CEJAS:  Objection --
16        THE WITNESS:  -- to be the case.
17   Q.   (BY MR. CORNFELD)  Well, you know
18  that they did do dozens more tests on him, correct?
19   **A.   I don't know that is because of his**
20  **positive hair test.**
21   Q.   Okay.  If he were to testify that
22  that's what the Court did, then that would be
23  because of his positive hair tests, that he had to
24  do the urine test.  And you told us that there are
25  cases where you get a -- you get an initial



Page 141

1  positive test, and that means you've got to keep
2  going back for more and more tests.
3     A.  It's --
4        MR. CEJAS:  Objection --
5     Q.  (BY MR. CORNFELD)  And Averhealth --
6  and Averhealth is -- then gets to do more tests --
7        MR. CEJAS:  Object to to --
8     Q.  (BY MR. CORNFELD)  -- correct?
9        MR. CEJAS:  Object to form.  Assumes
10  facts not in evidence, it's compound.
11        THE WITNESS:  As I've indicated,
12  Averhealth does not set the testing, the standards,
13  the frequency that are done.  Correct.
14     Q.  (BY MR. CORNFELD)  But you know that
15  that happens.  You told me you know that that
16  happens.
17     A.  Yes.
18     Q.  Okay.  And when that happens, if a
19  test -- initial test is positive because the cutoff
20  was lowered, that means Averhealth will get a lot
21  more revenue from doing a lot more tests, correct?
22        MR. CEJAS:  Object to the form.
23  Assumes facts not in evidence.
24        THE WITNESS:  Can I look at -- can I
25  go back to Mr. Foulger's [sic] result and look at

Page 142

1  something?
2        MR. CEJAS:  Go ahead.
3     Q.  (BY MR. CORNFELD)  Well, what -- what
4  is it you would like to look at?
5     A.  I'd like to look at -- I believe he
6  was positive for both cocaine and benzoylecgonine,
7  and the benzoylecgonine was at the cutoffs that
8  SoFT [sic] required as established cutoffs.  I just
9  would like to look at --
10     Q.  I will tell you that is correct on
11  the first test.
12     A.  Okay.
13     Q.  Not the second test.
14     A.  Okay.  So on his first test, we
15  followed what you had presented in evidence as
16  appropriate cutoff level for benzoylecgonine, and
17  he was above that cutoff.  So it doesn't matter
18  what -- if -- if you're making the statement that
19  we picked the 100 versus the 500.  We -- correct?
20     Q.  If -- if an expert were to testify
21  that as long as the cocaine is below 500, it
22  indicates that there's no use, you're not qualified
23  to disagree with that, are you?
24     A.  You can't just look at cocaine
25  itself, you have to look at combination of cocaine

Page 143

1  and benzoylecgonine.
2     Q.  True.  But if an expert were to say
3  looking at the combination, as long as the cocaine
4  is under 500, it doesn't indicate use, would you
5  disagree with that?
6     A.  No, I don't know that -- I don't -- I
7  don't agree with that.  Sorry, I disagree with
8  that.
9     Q.  Tell me what literature supports
10  that.
11     A.  There are people that use cocaine
12  that test below a hundred.
13     Q.  Tell me what literature supports the
14  proposition that a cocaine test, regardless of
15  benzoylecgonine, a cocaine result under 500
16  indicates cocaine use.
17     A.  It's just a known fact that people
18  who use cocaine and you test the specimen, that it
19  -- that that positive test result, if they use
20  cocaine, right, depending upon when they used the
21  cocaine and when the sample was collected,
22  there's -- their samples are going to be below 500.
23     Q.  Tell me what studies show that.
24     A.  It's analytically just possible.
25  Right, so --

Page 144

1     Q.  That didn't -- can you cite me a
2  study --
3     A.  Can I explain what I'm trying to say
4  regardless of a study?  I use cocaine today, right?
5  I use it multiple times.  I'm going to be positive
6  for cocaine.  Over time, that amount is going to
7  continue to degrade.  It will test positive between
8  500 and 100 for a portion of that time, if you took
9  my hair every single day.  I used cocaine and it's
10  going to be below 500.
11     Q.  Tell me what studies or what
12  literature support that.
13     A.  The -- if you look at anything -- if
14  you look at the half-life of drugs and how they
15  eliminate out of your body.
16     Q.  What --
17     A.  They eliminate over time.
18     Q.  What -- what studies show that over
19  time, cocaine use can result in a cocaine level in
20  hair under 500?
21     A.  I would have to look those up.  But
22  I'll find some for you.
23     Q.  Okay.  All right.  I'd like to turn
24  to the topic of chain of custody.
25     A.  Okay.



Dominique Delagnes                                                    July 08, 2024

Page 145

1    Q.   What is chain of custody?
2    A.   Chain of custody is the record to
3    show how -- who touched a sample throughout the
4    entire process.
5    Q.   The entire process beginning with
6    collection?
7    A.   Uh-huh.
8    Q.   Yes?
9    A.   Yes.  I'm sorry.
10   Q.   Through -- through the test report?
11   A.   Correct, yes.
12   Q.   And even beyond the test report?
13   A.   There are times that, yes, there's
14   documentation about when the sample was destroyed.
15   Q.   Okay.  I take it there can be, but
16   not necessarily.
17   A.   Negatives are not recorded after the
18   fact of when it was destroyed.
19   Q.   Okay.  Are positives?
20   A.   Yes.
21   Q.   And is there a chain-of-custody
22   document?
23   A.   There is.  We use an electronic chain
24   of custody, so there are -- within our database, it
25   shows that chain of custody.

Page 146

1    Q.   Okay.  And is that the
2    chain-of-custody document?
3    A.   Yes.
4    Q.   All right.  And would it be a true
5    statement that the chain-of-custody document is
6    used to keep track of a specimen throughout the
7    drug-testing process.  It tracks the specimen from
8    the moment the donor provides the specimen to the
9    collector until the result is reported back to the
10   client.  Averhealth captures and tracks its chain
11   of custody documentation electronically.
12   A.   Yes.
13   Q.   Okay.  I was reading that from
14   Dr. Klette --
15   A.   Klette.
16   Q.   Klette's report?
17   A.   Klette, yes.
18   Q.   K-L-E-T-T-E?
19   A.   Yes.  Dr. Klette.
20   Q.   I was able to guess right on
21   Delagnes, but not that.
22        All right.  And -- and this is a
23   statement I got from Averhealth website:  Chain of
24   custody is preserved from sample collection and
25   shipping through laboratory analysis and results

Page 147

1    reporting, ensuring legal defensibility that a
2    valid sample is collected, appropriately tested,
3    and accurately reported.  In other words, you
4    always know the status of the specimen.
5        Do you recognize that?
6    A.   Yes.
7    Q.   And that's a true statement?
8    A.   Yes.
9    Q.   So if the chain of custody from
10   collection to the reporting of test results is not
11   preserved, the corollary would be that you can't
12   defend the test result in court, correct?
13   A.   That's a very vague statement.  Can
14   you be more specific?  Do you have a specific cite
15   sample you -- or a specific instance you're trying
16   to...
17   Q.   Well, I'm just taking it from the
18   statement you had on your website saying that chain
19   of custody being preserved from sample collection
20   and shipping through laboratory, and analysis and
21   results reporting ensures legal defensibility that
22   a valid sample is collected, appropriately tested,
23   and accurately reported.
24        That was from your web page.
25   A.   Okay.

Page 148

1    Q.   So the -- so the corollary would be
2    that if you don't do that, then you haven't ensured
3    legal defensibility, you can't defend the results
4    in court, correct?
5    A.   Without specifics, that's an overly
6    broad statement I would like to understand.
7    Q.   In what instance, if you didn't have
8    a chain of custody, a contemporaneous chain of
9    custody from collection to test reporting, could
10   you still defend the test results in court?
11   A.   Again, very broad.  Can you give me a
12   specific question?
13   Q.   I'm asking you what -- you're
14   suggesting there are examples where you --
15   A.   I'm not suggesting there are
16   examples.  I'm saying that's an overly broad
17   statement, so...
18   Q.   So my question now is:  In what
19   instances could you be able to defend the test
20   result in court without a contemporaneous
21   chain-of-custody document as we've described?
22   A.   And what do you mean by
23   contemporaneous?
24   Q.   With the results -- you know, putting
25   down at the time things happen.  That's how a chain

Dominique Delagnes                                                    July 08, 2024

Page 149

1  of custody works, right?
2      A.   Yes.
3      Q.   Okay.
4      Okay.
5      Q.   So what -- what kind of circumstances
6  could there be where you could defend the result in
7  court without a contemporaneous chain-of-custody
8  document from collections to test report?
9      A.   I don't know how to answer that.
10     Q.   Can you think of anything?
11     A.   No.
12     Q.   Have you ever defended a test result
13  without a contemporaneous chain of custody from
14  collection to test reporting?
15     A.   Not that I'm aware.
16         MR. PLEBAN:  That's your copy.
17  That's what I'm here for.
18         MR. CORNFELD:  Thanks.
19         MR. PLEBAN:  Big stuff.
20         THE WITNESS:  You don't want to give
21  me the tabbed one?
22     Q.   (BY MR. CORNFELD)  We'll go through
23  it anyway.  It's just to help me.  And you can see
24  I really need it.
25     A.   Thank you.

Page 150

1      Q.   I've handed you what's been marked as
2  Exhibit 18, which has the number -- the Bates
3  number 10155 on the first page and is titled:  T
4  Padilla data pack, with an accession number and
5  collection date 1/13/2021.
6          Can you confirm that this is the data
7  pack for Tiffani Padilla's test for a sample
8  collected on January 13, 2021?
9      A.   Yes.
10     Q.   Do you recognize Tiffani Padilla as
11  the plaintiff who stated that she sent a water
12  sample for testing at Averhealth and the result was
13  reported positive for fentanyl?
14     A.   Yes.  I am aware that she alleged
15  that.
16     Q.   Have you seen her video?
17     A.   Yes.
18     Q.   Do you have an explanation for how
19  that could have happened?
20     A.   I have no idea what was in the water
21  bottle.
22     Q.   Did you -- did you notice that her
23  video was nonstop from the time she was in her
24  vehicle before the test until the time she left --
25  until the time she left the sample location and

Page 151

1  went back into the -- to the vehicle?
2      A.   We'd have to watch the video again.
3  I don't believe that it was contemporaneous, but
4  also again, I don't know what was in the water
5  bottle.
6      Q.   Okay.  Did you -- did you notice that
7  when she opened up the water bottle, you could hear
8  a click, demonstrating that it was a brand new
9  water bottle?
10     A.   That doesn't mean that there couldn't
11  have been something injected into it.
12     Q.   You think she injected something
13  into -- into the water bottle?
14     A.   I don't know what was in the water
15  bottle.
16     Q.   Have you -- have you investigated,
17  assuming that it was pure water, how it could have
18  been that Averhealth reported the result as
19  fentanyl?
20         MR. CEJAS:  Object to the form.
21  Assumes facts not in evidence.
22         Go ahead.
23         THE WITNESS:  No.
24     Q.   (BY MR. CORNFELD)  Weren't you
25  curious?

Page 152

1      A.   No.
2      Q.   You don't give the slightest credence
3  to the fact that this was pure water that she sent
4  in?
5      A.   I do not.
6      Q.   You think she made it up and she's
7  just lying?
8      A.   I believe that the specimen that was
9  received at the laboratory -- and one thing that we
10  cannot see on the video is the actual accession
11  number of that sample that came in.  Right?  You
12  watch that video, at no point in time does it show
13  that on that label, that that accession number, it
14  was 13167535.  Not once in the video did she show
15  that.
16     Q.   You -- you read off the accession
17  number for the sample of January 13th, 2021,
18  correct?
19     A.   Yes.  13167535.
20     Q.   That -- you know that's not the
21  accession number of the water sample that was
22  reported back as fentanyl?
23     A.   Okay.  That's the one that you gave
24  me in this.
25     Q.   I know.  I said this was not the one.



Page 153

1    A.   Okay.  I thought that you said that
2  it was.
3    Q.   Do you have any idea where -- whether
4  Tiffani Padilla even knew what an accession number
5  was so that she would know that to prove to your
6  satisfaction that it was the same sample that was
7  reported with fentanyl, that she should somehow
8  video that accession number?
9    A.   I think that she would know that
10 there's a number on the label, and that's pretty
11 critical to tying specimens together.
12   Q.   You know that she did the video on
13 January 20th and the date shows up on the video?
14   A.   Okay.
15   Q.   Which is the -- which is the -- the
16 collection date of the sample that was reported
17 back as fentanyl?
18   A.   Okay.
19   Q.   So doesn't that not provide any
20 credence to you to -- so that you'll say, oh, no,
21 Mrs. Padilla is not lying about this, the fact that
22 she hasn't seen her children in years and was
23 really upset about it, so did this test to prove
24 that she was not taking drugs?
25        MR. CEJAS:  Object to the form.

Page 154

1    Q.   (BY MR. CORNFELD)  Would it give you
2  the slightest credence?
3        MR. CEJAS:  Object to the form.
4        THE WITNESS:  We received a specimen
5  from this collection site.  We did an amino assay
6  screen, we did an LC-MS confirmation.  We found
7  fentanyl in both the screen and the confirmation
8  and reported the test result back to Michigan.
9    Q.   (BY MR. CORNFELD)  I understand.
10 That wasn't my question.
11   A.   Okay.  I don't understand your
12 question.
13   Q.   My question is:  You're not giving
14 her the slightest credence.  You're saying she's
15 making this up, she's going to commit a fraud on
16 the Court by saying she submitted water when it
17 wasn't water, even though she videotaped the sample
18 from the moment -- or videotaped the event from the
19 moment she left the car until after she left the
20 sample site -- sample selection site?
21        MR. CEJAS:  Object to the form.
22   Q.   (BY MR. CORNFELD)  Without -- without
23 stopping, and that you can hear the click on the
24 bottle when she opened it up?
25        MR. CEJAS:  Object to the form.

Page 155

1  Assumes facts not in evidence.
2        Go ahead.
3        THE WITNESS:  All I can do -- attest
4  to is the sample that was received at our
5  laboratory, that went through proper chain of
6  custody processes, that caused us to test the
7  specimen and report it back.
8    Q.   (BY MR. CORNFELD)  So are you saying
9  that she's -- she's committing a fraud on the Court
10 when she filed a complaint that -- that said it was
11 pure water?
12   A.   I'm not saying she's committing
13 fraud.  I'm telling you what -- what happened.  We
14 received a sample with an accession number that we
15 screened, confirmed, and reported back to the
16 Court.
17   Q.   Has Averhealth ever reported a false
18 positive?
19   A.   Yes.
20   Q.   And so you're just assuming that this
21 was not a false positive, and that somehow she
22 doesn't submit pure water; is that right?
23   A.   I'm saying that we received a
24 specimen.  I've -- I've answered this multiple
25 times.  We received a specimen, through putting the

Page 156

1  data packs together, right, obviously through
2  the -- pulling the information in the data packs
3  that we've pulled all the information and reviewed
4  it.  We show the specimen with an accession number
5  that we reported positive as fentanyl was received,
6  went through our amino assay screening, went
7  through our LC-MS confirmation, found fentanyl in
8  both of those, and reported the result back to the
9  customer.
10   Q.   Wasn't my question.  Are -- you are
11 assuming that there was no mistake and it was not a
12 false positive?
13   A.   I'm assuming --
14   Q.   Is that right?
15   A.   -- that there was no mistake at the
16 laboratory of testing the specimen, yes.
17   Q.   Okay.  Let's look at the chain of
18 custody in Exhibit 18.
19   A.   Okay.  Exhibit 18.  So this is not
20 the water bottle specimen?
21   Q.   No.
22   A.   Okay.
23   Q.   So the chain of custody starts on
24 page 10157, and I just want to ask about a few
25 items on it.  This is the chain of custody, it



Page 157

1  starts on 10157 and goes through 10162.  That's the
2  chain-of-custody document.
3       A.   Okay.
4       Q.   Yes?
5       A.   Yes.
6       Q.   Okay.  And the first page is
7  actually -- it starts, it looks like, before she
8  came in to give her specimen, correct?
9       A.   That is correct.
10      Q.    What -- what is shown on the first
11  page?
12      A.   That is shown that at one o'clock in
13  the morning, Ms. Padilla was selected to have a
14  collection event.  So this is the order being
15  created in the sample -- in the -- in the database.
16      Q.   All right.  And if we look at --
17  and -- strike that.
18           The -- the second column for each
19  item on the first page of the chain-of-custody
20  document, it says:  System.
21           What does that mean?
22      A.   That's the system creating the random
23  order within the database.
24      Q.   All right.  And then on the second
25  page of the chain-of-custody document, the second

Page 158

1  line, January 13, 2021, at 17:57 or 5:57 p.m., it
2  says Floyd W.
3           Who is Floyd W.?
4       A.   That would have been a collector at
5  Services of Esperenza (Services of Hope).
6       Q.   Okay.  And you're looking for -- to
7  find Services of Hope, you were looking at the test
8  report that says that's where the collection
9  occurred, correct?
10      A.   Yes, that's correct.
11      Q.   Okay.  And that was -- that's a -- a
12  third-party collector that was -- Floyd W. was not
13  an employee of Averhealth?
14      A.   Correct.
15      Q.   And that's how Michigan worked at the
16  time, right?  Collections were done by third
17  parties such as this organization?
18      A.   Either by third parties, by case
19  managers themselves, or we also had some employees
20  that did work -- that did some collections for us.
21      Q.   Okay.  But whoever it was, they would
22  input the event into the computer system to record
23  what was happening for the chain of custody?
24      A.   They would -- well, the event was
25  created in the system, and then when the individual

Page 159

1  came into the collection site, then they would
2  check this client in.  So that's what that is
3  showing you here is Floyd W. changed it from the
4  order being created to actually checking in that
5  event.
6       Q.   Okay.  And -- but the point of my
7  question is:  These third-party collectors, they
8  had access to Averhealth's computer system and
9  input whatever was occurring into that computer
10  system, and then it got recorded in the
11  chain-of-custody document, correct?
12      A.   Correct.
13      Q.   All right.  And so the next item, the
14  third item on the second page of the
15  chain-of-custody document, Exhibit 18, January 13,
16  2021, at 17:58 by Floyd W., that shows status
17  updated from scheduled to collected; is that right?
18      A.   Yes.
19      Q.   And so that is a record of when
20  Mrs. Padilla actually turned her sample in and it
21  was collected at the site, correct?
22      A.   That's the time that she showed up at
23  the collection site and they created that event
24  with -- actually had the accession number be
25  printed on a label.

Page 160

1       Q.   Okay.  Is that -- is that the -- when
2  it says collected, which makes me think that that
3  means that the sample was collected.
4       A.   Within this time frame, it's being
5  collected, yes.
6       Q.   Okay.  So this is a record when he
7  gets the sample from her, he -- he types in or
8  presses a button or something, and it says status
9  updated from scheduled to collected, correct?
10      A.   Yes.
11      Q.   All right.  And then two lines down,
12  January 13th, 2021, at 19:08, Floyd W. enters Panel
13  added to Shipment - Finalize.
14           Do you see that?
15      A.   I do, yes.
16      Q.   What does that mean?
17      A.   That means that that particular
18  specimen was added into a shipment, that shipment
19  was changed to be finalized.  So all the specimens
20  that were collected that day at Services of
21  Esperanza were finalized in a shipment.
22      Q.   Okay.  And then the next item, which
23  is that same day, 19:09, or 7:09 p.m., the status
24  is updated from collected to shipped.  Does that
25  mean that that is when the specimen was shipped to



Page 161

1  St. Louis?

2  **A.   Correct.**

3  Q.   All right.  And if we go down about

4  three lines, we have -- we're two days later,

5  January 15, 2021, at 8:38 a.m., and now the person

6  who's entering it is T. Roberts.

7  Do you see that?

8  **A.   Yep.**

9  Q.   Who is T. Roberts?

10  **A.   She is a sessioner who received the**

11  **package and scanned that package in and changed it**

12  **from shipped to delivered at the laboratory.**

13  Q.   Okay.  And that -- and that's why

14  the -- this item in the chain-of-custody document

15  says status updated from shipped to delivered?

16  **A.   That is correct.  Yes.**

17  Q.   All right.  And T. Roberts, is that

18  Toshla Roberts?

19  **A.   Yes, it is.**

20  Q.   And she's an employee at the

21  laboratory in St. Louis?

22  **A.   Yes.**

23  Q.   Has she ever been employed in

24  Michigan?

25  **A.   No.  Not that I'm aware of, I should**

Page 162

1  say.

2  Q.   Okay.  Okay.  And then at the bottom

3  of the second page of the chain-of-custody document

4  -- before I get to that.

5  **A.   Yes.**

6  Q.   How are items shipped from Michigan

7  to the laboratory in St. Louis?

8  **A.   We were at FedEx and we moved to UPS,**

9  **and I don't remember the exact time frame.  When we**

10  **started, specimens were shipped via the courier,**

11  **FedEx, and at some point in time, we changed from**

12  **FedEx to UPS.**

13  Q.   And what kind of shipment was it?

14  Was it overnight?

15  **A.   Yes.**

16  Q.   So if it -- if it was shipped on

17  Tuesday, it should arrive in St. Louis on

18  Wednesday?

19  **A.   It is possible that it missed -- that**

20  **the person at the collection site basically closed**

21  **and had that package ready for be -- for pickup,**

22  **but it missed the pickup window, so it didn't ship**

23  **the next day.**

24  Q.   Okay.

25  **A.   That's why you'd have the time frame**

Page 163

1  **between the 13th and the 15th.**

2  Q.   Why it was two days?

3  **A.   Yes.**

4  Q.   Okay.  Was that true both for when

5  you were using FedEx and when you were using UPS?

6  **A.   Yes, there was daily -- there was**

7  **daily pickups --**

8  Q.   Okay.

9  **A.   -- so they showed up at a specific**

10  **time frame.**

11  Q.   So it should be -- it should arrive

12  in St. Louis a day or perhaps two days after --

13  after it was shipped; is that right?

14  **A.   Or on a weekend, it would be longer**

15  **than that.**

16  Q.   Okay.  So it could be maybe three

17  days --

18  MR. JENKINS:  Whoa, whoa, whoa, whoa,

19  whoa, whoa, whoa, whoa.

20  **THE WITNESS:  Are you okay?**

21  MR. CORNFELD:  Let's go off the

22  record.

23  THE VIDEOGRAPHER:  Time is 2:02.  We

24  are off the record.

25  (A discussion was held off the

Page 164

1  record.)

2  THE VIDEOGRAPHER:  The time is

3  2:03 p.m.  We are back on the record.

4  Q.   (BY MR. CORNFELD)  Okay.  Go ahead.

5  **A.   I answered the question.  I said it**

6  **could be more than three days if it was collected**

7  **on a Friday.**

8  Q.   Saturday, Sunday -- strike that.

9  Did you have deliveries over the

10  weekend on Saturday or Sunday?

11  **A.   We did not.**

12  Q.   So it could be Saturday,

13  Sunday, Monday, so three days?

14  **A.   A sample that's collected on Friday**

15  **that missed the shipment would get picked up on**

16  **Monday and delivered on Tuesday.**

17  Q.   Okay.  So four days, could be four

18  days?

19  **A.   Typically.**

20  Q.   Okay.  If you look at the last item

21  on the second page of the chain-of-custody document

22  in Exhibit 18, do you see that this item says

23  status updated from Delivered to Box?

24  **A.   Yes.**

25  Q.   What does that mean?

Page 165

1     A.   That it was placed in position B5 in
2  the actual box.
3     Q.   What is position B5?
4     A.   In this batch, right, all of our --
5  all of our -- all of our -- once the samples are
6  received and going through the accessioning
7  process, they're going to go inside a batch so you
8  know what place within the trier -- in the case
9  of -- these are oral fluid samples, correct?  So
10 you have a box, so it's showing you that it was in
11 slot B5.  So if you think about it, it goes -- if
12 you had a box with slots in it, it goes A, B, C, D,
13 E, F, and one, two, three, four, five.  So this
14 particular sample was placed in a box in slot B5.
15    Q.   Okay.  And what is -- and B5 is?
16    A.   It's just a holding place in a box so
17 we know where that sample was put inside that box.
18    Q.   But that's the second-to-last item on
19 the second page of the chain-of-custody document,
20 correct?  Where it says batch position updated to
21 B5?
22    A.   Yes.
23    Q.   All right.  What does it mean to be
24 in a box?
25    A.   So you have your original oral fluid

Page 166

1  container, right?  And then you also have your
2  batches.  So we -- the -- within a batch, you're
3  going to have a portion of that sample.
4        So throughout the entire testing
5  process, we keep the original container, and then
6  we're going to pour off portions what are called
7  aliquots for -- that is what then gets tested on
8  the analyzer.
9        So when you talk about a batch versus
10 a box, the box is the -- is the actual original
11 container, and then batches are going to be when
12 we've poured off a portion of that and put it into
13 testing.
14    Q.   So does each specimen have its own
15 box?
16    A.   No.  Within a given box, there's
17 multiple specimens.
18    Q.   Oh.  All from -- all from the same
19 batch or all to -- that will become part of the
20 same batch?
21    A.   Yes.
22    Q.   And a batch is simply a -- a
23 collection of specimens that are tested together,
24 correct?
25    A.   Correct.

Page 167

1     Q.   If you could go to the page that --
2  you may not be able to read it on the bottom, but
3  it's number 10161 [sic].  At the top of the page,
4  it says:  Overall result updated from quote mark to
5  POS.
6        Do you have that page?
7     A.   Yes.
8     Q.   The third item down, this is by
9  kkelly@averhealth.  I assume that's an --
10    A.   Okay.
11    Q.   -- Averhealth technician?
12    A.   Then I'm -- I apologize.  You said
13 10161?
14    Q.   6-0, I'm sorry.
15    A.   6-0.  Thank you.  I was looking at
16 6-1.
17    Q.   If you -- kkelly, is she a
18 technician, or was she a technician at Averhealth?
19    A.   I believe so.
20    Q.   Okay.  And the -- the third item on
21 that page, it says:  IsReportedFromLab updated to
22 True.
23        Do you see that?
24    A.   Yes.
25    Q.   What does that mean?

Page 168

1     A.   That means the data is coming back.
2  So this is the initial amino assay test, so data is
3  coming back off of the analyzer through the DI.  So
4  the DI is the -- the pipeline, I guess, that takes
5  results of off our screening analyzers and pushes
6  it into our database.
7     Q.   What does "true" mean, looking at the
8  third item on this page?
9     A.   That -- yes, it was that that event
10 happened.
11    Q.   That -- that that what happened?
12    A.   That the data's coming through.  So
13 you look here on -- on -- it says so:
14 IsReportedFromLab updated from to true.  So it's
15 saying yes, true.  That they've pushed a button.
16    Q.   And -- and what's true?
17    A.   That they've pushed the button for
18 that action.
19    Q.   For which action?
20    A.   Well, in this case, kkelly said:
21 Overall result updated to positive.  This is a
22 screening result.
23    Q.   All right.  I've seen, not on this
24 data pack, but I've seen chain of custody documents
25 where it says false.  What -- what would false




Page 169

1   mean?
2        A.   I'd have to look at it to -- to know.
3        Q.   All right.  What -- what does DI
4   stand for?
5        A.   It is the program Data Innovations
6   that transfers the results from the screening
7   analyzer back into our LIS Aversys.
8        Q.   You -- did you say translates?
9        A.   Transfers.
10       Q.   Transfers?  Okay.
11       A.   So you have to get results from the
12   analyzer -- sorry, it's really hard for me.  You
13   have to get the results from the analyzer back into
14   the database.  So the data's being transferred
15   through a program called Data Innovations, or DI.
16       Q.   Okay.  And what does LIS stand for?
17       A.   Laboratory Information System.
18       Q.   That's Aversys?
19       A.   Yes.
20       Q.   If you look further down the page,
21   there's an entry that says:  PickingListBoxPosition
22   updated to H4.
23            Do you see that?
24       I do.
25       Q.   What does "picking list" mean?

Page 170

1        A.   Because the specimen was positive,
2   we're going to pull out the positives and separate
3   them from the negatives.  So it gets on a picking
4   list for us to go back to that specimen and pull it
5   from the initial batch and put it into now what's
6   called a positive batch -- a positive box, sorry.
7        Q.   Is that -- I've also seen the term
8   "pick list."
9        A.   Uh-huh.
10       Q.   Is that just another term for picking
11   list?
12       A.   Yes.
13       Q.   And does that refer to a list of
14   specimens that have tested positive on the amino
15   assay?  In other words, the first screening part of
16   the test and are then going to go through the
17   confirmation process?
18       A.   Either to be rescreened, yes, or to
19   go through a confirmation process.
20       Q.   Why would they be rescreened?
21       A.   We have many contracts where they
22   don't want us to do confirmation testing up front.
23   They want us to do an amino assay screen, and if
24   positive, rescreen it and report those test
25   results.  And only do confirmations when the

Page 171

1   probation officer asked for the test.
2        Q.   Okay.  That's not Michigan, though,
3   right?
4        A.   That's not Michigan, no, but you
5   asked generally what this meant --
6        Q.   Yeah, I understand.  I understand.
7        A.   -- so I'm answering the question as
8   you asked.
9        Q.   Right.  I understand.  So in -- in
10   Michigan, the picking list would be a list of
11   specimens that have tested positive on the first
12   amino assay screen and are then going to go further
13   into a confirmation test, correct?
14       A.   In this data pack, yes.
15       Q.   Okay.  And -- and that's the process
16   for Michigan, correct?
17       A.   It -- it -- it was not always the
18   process for Michigan.
19       Q.   After the change in November of 2020?
20       A.   Yes.
21       Q.   So in what we've been looking at,
22   Exhibit 18, the -- the chain-of-custody document --
23       A.   Uh-huh.
24       Q.   -- does this show how it -- how it is
25   supposed to work, or is this how it is supposed to

Page 172

1   work?
2        A.   Can you be more specific in your
3   question?
4        Q.   We've looked and seen that there are
5   contemporaneous records for when the person -- in
6   this case, Mrs. Padilla -- entered the collection
7   site and when the collection occurred, when the
8   shipment occurred, when it was received in
9   St. Louis.  We haven't looked at everything, but
10   also when the test was done, when it was reported
11   back as positive, and so forth.
12       A.   Uh-huh.
13       Q.   And -- and so that's how it's
14   supposed to work; is that right?
15       A.   That's a very broad question.  I
16   still don't quite understand what you're trying to
17   ask me.  I mean, I'm not trying to be difficult, I
18   don't understand the question.
19       Q.   I mean the chain of custody is
20   supposed to show all of these things --
21       A.   Yes.
22       Q.   -- on a contemporaneous basis?
23       A.   Yes.
24       Q.   And that's what you -- what you
25   create in order to have defensible test results in

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Dominique Delagnes                                                        July 08, 2024

Page 173

1  a court of law --
2     A.   Yes.
3     Q.   -- correct?
4     A.   Thank you.
5     Q.   I've handed you what's been marked as
6  Exhibit 19, which is a document with the number
7  4769 on the first page entitled:  S Padilla data
8  pack with an accession number and the collection
9  date 10/28/21.
10        Do you see that?
11    A.   Yes.
12    Q.   And S. Padilla is Stephen Padilla,
13 who was Tiffani Padilla's husband.  And if we look
14 at the second page at the lab report, do you see
15 that this -- this test was scheduled on 10/28/2021,
16 and the collection date is the same as it shows on
17 the first page of the data pack?
18    A.   Yes.
19    Q.   And the -- it was collected at
20 Catholic Charities of West Michigan?
21    A.   Yes.
22    Q.   If you would look at the
23 chain-of-custody document, which is page 4772, do
24 you see that the first item on the chain-of-custody
25 document is November 5th, 2021?

Page 174

1     A.   Yes.
2     Q.   It says:  Panel Created:  Walk-In.
3     A.   Yes.
4     Q.   And that was entered by Toshla
5  Roberts?
6     A.   Yes.
7     Q.   And that was actually a week after
8  the collection actually occurred, wasn't it?
9     A.   Yes.
10    Q.   And there's no record of anything
11 that occurred in connection with the collection of
12 this shipment in Michigan, correct?
13    A.   That is correct.
14    Q.   Toshla Roberts was an employee at the
15 laboratory in St. Louis, and therefore couldn't
16 have created a contemporaneous record of the
17 walk-in, correct?
18    A.   This would be one that wasn't started
19 as an electronic chain and must have come with a
20 piece of paper.
21    Q.   Whether it came in as a piece of
22 paper or not --
23    A.   Uh-huh.
24    Q.   -- Toshla Roberts wrote that walk-in
25 occurred on November 5th, and it did not, correct?

Page 175

1     A.   She checked it into the system on
2  November 5th because the sample -- the sample
3  arrived at the laboratory on November 5th.
4     Q.   Where -- where are the pieces of
5  paper that you say must have recorded that part of
6  the chain of custody that occurred in Michigan?
7     A.   We don't store those electronically,
8  so by the time we pulled this record, we would not
9  have had that paper documentation anymore.
10    Q.   What happened to it?
11    A.   We have a retention of two years, so
12 it would have been discarded after that time frame.
13    Q.   So the -- the test was done on
14 November 9th, 2021, so that would have been
15 November 9th 2023?
16    A.   Yes.
17    Q.   It was thrown away then?
18    A.   Yes, that would have been our storage
19 time frame for it, two years.
20    Q.   You know this lawsuit was pending in
21 November of 2023?
22    A.   Okay.
23    Q.   Do you know that?
24    A.   Yes.
25    Q.   So why did you throw away documents

Page 176

1  related to a test that was at issue in this lawsuit
2  while the lawsuit was pending?
3     A.   It was not done on purpose.
4     Q.   You threw something away by accident?
5  I mean, didn't you purposefully throw it away?
6     A.   It would have been with records that,
7  you know, due to our retention time frame, that we
8  would have discarded.
9     Q.   You know before then, we requested
10 all documents related to this test, correct?
11    A.   Yes.
12    Q.   And rather than produce them to us so
13 that we could review it and check to see if the
14 chain of custody creates a legal defensible record,
15 you threw it away?
16    A.   Yes.
17    Q.   And then said that we have everything
18 that an expert needs to determine whether the test
19 is valid; is that right?
20    A.   Yes.
21    Q.   And you know that's not true, is it?
22 Because an expert would need to review the chain of
23 custody to determine that the test was valid,
24 correct?
25    A.   We have the information from the time

1  the specimen was received at the laboratory.

2     Q.   My question is --

3     A.   I -- I understand your question.

4  What we have is from the time that the specimen was

5  received at the laboratory.

6     Q.   I know that.

7     A.   Okay.

8     Q.   An expert would need to review the

9  chain of custody beginning when the person walked

10  into the collection site in Michigan in order to

11  determine that the test was valid, correct?

12     A.   What we can show --

13     Q.   Excuse me.

14     A.   Yes, I know, I've heard your

15  question.

16     Q.   Wouldn't an expert need to review

17  that, just like you reviewed it at the time, or you

18  say you reviewed it at the time?

19     A.   Well, we --

20          MR. CEJAS:  Objection.  Again, it

21  calls for speculation as to what an expert would

22  require.

23          But subject to that, go ahead.

24          THE WITNESS:  Sure.  So what we have

25  is what we documented from the time that the

1  specimen was received at the laboratory within our

2  database.

3     Q.   (BY MR. CORNFELD)  Doesn't an expert

4  need to review the entire chain of custody from the

5  time that the person entered the facility in

6  Michigan to when the test was -- the sample was

7  collected and what happened with the sample at the

8  collection site and when it was shipped?

9          MR. CEJAS:  Same objection.

10          Go ahead.

11          THE WITNESS:  What we've documented

12  is from the time of --

13     Q.   (BY MR. CORNFELD)  I understand what

14  you've documented.

15     A.   No, I don't think that -- no, I don't

16  think an expert has to have all that information.

17     Q.   You had that information when you

18  reviewed and approved the test, right?

19     A.   And we would have documented if

20  any --

21     Q.   Excuse me --

22     A.   Yes.

23     Q.   -- you had --

24     A.   Yes.  Yes, we did.

25     Q.   You had it when --

1     A.   Yes, we did.  And we would have

2  documented anything that was unusual with the

3  specimen and not tested it had we seen that the

4  chain of custody was broken.

5     Q.   Well, you could have said that about

6  everything in the test and said, well, we

7  documented that everything was on the up-and-up,

8  we're only giving you the results, we're not giving

9  you the test data.

10          You know that an expert needs to

11  review all the test data, just like you did, in

12  order to verify whether the test was done properly,

13  correct?

14          MR. CEJAS:  Objection.  Asked and

15  answered.

16          Go ahead again.

17          THE WITNESS:  Yeah, our standard

18  operating procedures would be that when the

19  specimen was received and checked in by Toshla

20  Roberts, if the seal was not intact or anything

21  that made sure that we could not defend these test

22  results, we would have rejected that sample and

23  reported it as rejected for whatever reason, and

24  not continued with the testing.

25     Q.   (BY MR. CORNFELD)  And so any other

1  expert just has to take your word for it and can't

2  see the same data you saw.  Is that your testimony?

3     A.   We can testify to --

4     Q.   Excuse me.  Is that --

5     A.   -- based on our standard operating --

6     Q.   -- your testimony that -- that any

7  other expert must simply take your word for it,

8  just like they maybe could have taken your word for

9  the fact that this is the result you got without

10  reviewing the underlying data?

11          MR. CEJAS:  Object to the form.

12  Argumentative.

13          Go ahead.

14          THE WITNESS:  What I can say is that

15  we have standard operating procedures that if the

16  sample didn't come intact, we would have rejected

17  it and not tested it.

18     Q.   (BY MR. CORNFELD)  We'll get to that.

19     A.   Okay.

20     Q.   We'll get to the fact that you didn't

21  take photographs of the samples as your -- as your

22  sample litigation package shows.  I'm talking about

23  what happened in Michigan.

24     A.   Understood.

25     Q.   Okay.



Page 181

1      MS. KINSEY:  Rick, can I just ask a
2   clarifying question?  Is this -- which succession
3   is this?  Because he had two tests that same day.
4      MR. CORNFELD:  This is 16636898011.
5      MS. KINSEY:  Okay.
6      MR. CORNFELD:  It's 4769.
7      Q.   (BY MR. CORNFELD)  And don't you
8   think the jury ought to be entitled to review the
9   chain of custody documents?
10     **A.   We don't have it, and what I can --**
11  **what I can talk to is what our standard operating**
12  **procedures are, that we ensure that before we test**
13  **any specimen, that we -- that the sample's intact**
14  **and it moves on to testing.**
15     Q.   My -- my question is:  Don't you
16  think the jury should be entitled to review what
17  you reviewed, and say yes, you did it, or no, you
18  didn't?
19     MR. CEJAS:  Object to the form.
20     **THE WITNESS:  We can attest to our**
21  **standard operating procedures, which is we don't --**
22     Q.   (BY MR. CORNFELD)  My question is:
23  Shouldn't the jury --
24     **A.   I understand that.  I've heard your**
25  **question.**

Page 182

1      Q.   Shouldn't the jury -- shouldn't -- I
2   know you've heard it, you haven't answered it.
3   Shouldn't the jury be entitled to look at those
4   same documents?
5      MR. CEJAS:  Object to the form.
6   Asked and answered.  And --
7      MR. CORNFELD:  It's not been
8   answered.
9      Q.   (BY MR. CORNFELD)  Go ahead.
10     **A.   We can provide what our standard**
11  **operating procedures are to ensure that we would**
12  **not test a specimen that was not received intact.**
13     Q.   I -- my question is --
14     **A.   Okay.**
15     Q.   -- shouldn't -- are you going to tell
16  the jury, sorry, you don't get to look at it
17  because we destroyed the record?
18     MR. CEJAS:  Same objection.
19  Argumentative.
20     Go ahead.
21     **THE WITNESS:  We don't have it.  Yes,**
22  **I would tell the jury we no longer have it.**
23     Q.   (BY MR. CORNFELD)  And shouldn't the
24  jury be entitled to -- to look at it?
25     MR. CEJAS:  Objection.  Asked and

Page 183

1   answered.
2      Q.   (BY MR. CORNFELD)  And the jury
3   weighs the credibility of everybody.  If you
4   testify at trial, the jury will decide whether you
5   are an honest person who is telling the truth or
6   whether you are not an honest person who is not
7   telling the truth.  They'll do that with our
8   witnesses also.  They'll do that with the Padillas.
9      Shouldn't the jury get to look at the
10  evidence to help them decide that question?
11     MR. CEJAS:  Same objections.
12     **THE WITNESS:  What we could talk to**
13  **is what we have, which is what I've indicated,**
14  **which we don't have the chain of custody anymore.**
15  **But what we do have is standard operating**
16  **procedures that we wouldn't have moved on with**
17  **testing without it.**
18     Q.   (BY MR. CORNFELD)  What -- what --
19  what you don't have are the complete
20  chain-of-custody records to ensure legal
21  defensibility that a valid sample was collected
22  appropriately, tested, and accurately reported as
23  you said in your -- on your website, correct?
24     **A.   I disagree to the fact that we can**
25  **talk about -- and Toshla Roberts can testify that**

Page 184

1   **she followed standard and would not have put a**
2   **specimen in testing that had a broken chain of**
3   **custody.**
4      Q.   That's not the only issue about chain
5   of custody, whether it was collected properly.  I
6   mean, it -- otherwise, you wouldn't maintain any
7   records of what happened in Michigan, you'd just
8   say oh, we got a -- we got a specimen, and there
9   was -- there was no broken seal, but you keep
10  records of what happened in Michigan for a reason.
11  And that's because it is part of the chain of
12  custody that, as you say on your website, ensures
13  legal defensibility that a valid sample is
14  collected, appropriately tested, and accurately
15  reported, correct?
16     **A.   And that's what Toshla can testify to**
17  **is she was the one who received it and checked it**
18  **into the database.**
19     Q.   What you don't have is the chain of
20  custody that on your -- as you say on your website
21  ensures legal defensibility that a valid sample was
22  collected, appropriately tested, and accurately
23  reported, correct?
24     **A.   No.  We do.  Because we have her**
25  **following our standard operating procedures and**



Page 185

1  only putting in a specimen into testing that has
2  not been tampered with, has a tamper seal onto it,
3  and that the -- the information is -- is okay to
4  test.
5      Q.   You -- your website doesn't say that
6  the fact that we -- we received a sample and put it
7  on for testing ensures legal defensibility that a
8  valid sample is collected, appropriately tested,
9  and accurately reported.  You state:  Chain of
10  custody is preserved from sample collection and
11  shipping through laboratory analysis and
12  resulting -- results reporting, ensuring legal
13  defensibility that a valid sample is collected,
14  appropriately tested, and accurately reported.
15         That's what you say, correct?
16     A.   Yes.
17     Q.   And you don't have that for
18  Mr. Padilla's test?  I'm showing --
19     A.   I disagree --
20     Q.   -- so you don't have --
21     A.   -- because if you read --
22     Q.   -- a chain --
23     A.   -- the beginning of that --
24     Q.   Wait.
25     A.   If -- I disagree.  Because if you

Page 186

1  read, based on our SOPs, we -- we had a sample that
2  was appropriately collected, received at the
3  laboratory, the laboratory technician ensured that
4  we had a specimen that was testable based on our
5  standard operating procedures, she'll put it into
6  testing.
7      Q.   You don't -- for -- for the test in
8  Exhibit 19, you don't have a chain of custody
9  preserved from sample collection and shipping
10  through laboratory analysis and results reporting,
11  correct?
12         MR. CEJAS:  Objection, asked and
13  answered.
14         Go ahead again.
15         THE WITNESS:  I disagree.
16     Q.   (BY MR. CORNFELD)  You don't have
17  that chain of custody.  The chain-of-custody
18  document doesn't show anything from Michigan, does
19  it?
20     A.   It shows that Toshla Roberts received
21  the specimen, ensured that it was a valid specimen,
22  and put it into testing.
23     Q.   Do you have a chain-of-custody
24  document that shows sample collection and shipping?
25     A.   We have that Toshla Roberts checked

Page 187

1  it in and --
2      Q.   Excuse me, do you have a
3  chain-of-custody document?
4      A.   We don't have the external chain of
5  custody, no.
6      Q.   And that's the chain of custody
7  preserved from sample collection and shipping,
8  correct?
9      A.   I've answered this already.
10     Q.   That's what you mean -- that's what
11  you mean by external chain of custody, correct?
12     A.   Correct.  We don't have the external
13  chain of custody anymore.
14     Q.   Okay.  How are the documents
15  destroyed that are part of the external chain of
16  custody, if it comes in on paper?
17     A.   They're shredded.
18     Q.   Who does that?
19     A.   Our team on site or we use an
20  external company who will come in and pick -- like,
21  a document destruction company who will come in and
22  pick them up and destroy them.
23     Q.   How often do they do that?
24     A.   I'm not sure.  I'd have to clarify,
25  but I can find out.  I don't want to give

Page 188

1  inaccurate information.
2      Q.   What's your best estimate?
3      A.   I honestly don't know because it's
4  not something that I'm responsible for.  I believe
5  it's monthly, but I will confirm.
6      Q.   Why didn't Ms. Roberts record the
7  collection date in -- in the chain-of-custody
8  document in Exhibit 19?
9      A.   The way that the computer system
10  works, that -- it's the time that she checked in.
11  So she created that event, and then checking that
12  into the database, it creates the collection page.
13  Part of entering that into the system records the
14  collection date.  So that's how that date ends up
15  on the report.
16     Q.   You're saying she transcribed it from
17  the paper record --
18     A.   Yes.
19     Q.   -- that's now destroyed?
20     A.   Yes.
21     Q.   Handing you what's been marked as
22  Exhibit 20, which is a document on which the first
23  page is numbered 6745.  This has the title:
24  S Padilla data pack, with an accession number, and
25  the collection date 8/31/21.



Page 189

1    Do you have that?
2    A.   Yes.
3    Q.   So this is another test by -- on
4  Mr. -- on Mr. Padilla's specimen.  This time when
5  it was collected on August 31, '21.  And if we look
6  at the second page, the full-page lab report, do
7  you see that the collection location was Catholic
8  Charities West Michigan in Muskegon?
9    A.   Yes.
10   Q.   And it shows a collection date of
11 8/31/21, and it was collected by S.W.
12   Do you see that?
13   A.   Yes.
14   Q.   So S.W. would have been an employee
15 of Catholic Charities of Western Michigan in
16 Muskegon, Michigan?
17   A.   Yes.
18   Q.   If you go to the chain-of-custody
19 document, which is number 6748, do you see that the
20 first item is September 8, 2021?
21   A.   Yes.
22   Q.   Which is over a week after the sample
23 that was collected on 8/31?
24   A.   Yes.
25   Q.   And the person who's listed is

Page 190

1  M. Grim.  Who is that?
2    A.   That is one of our accessioners at
3  the laboratory, Marlo Grim.
4    Q.   All right.  So he's also an employee
5  in St. Louis?
6    A.   Yes.
7    Q.   So he had -- he made these entries in
8  St. Louis, correct?
9    A.   Yes.
10   Q.   And we have nothing in the
11 chain-of-custody document from what happened with
12 this specimen in Michigan, correct?
13   A.   Correct.
14   Q.   And if we look at the second page of
15 the chain-of-custody document, this is page 6749.
16 You see this is September 8, 2021.  And again, it's
17 by M. Grim?
18   A.   Uh-huh.
19   Q.   Do you see that?
20   A.   Yes.
21   Q.   And this time, it says:  Status
22 updated from PreScheduled to Collected.
23   Do you see that?
24   A.   Yes.
25   Q.   That did not happen on September 8th,

Page 191

1  2021, did it?
2    A.   It -- within the database, he's able
3  to find the prescheduled event that linked it to
4  the date of 8/31/2021.
5    Q.   But this says -- on the
6  chain-of-custody document, it says it happened on
7  September 8, 2021.  And it didn't happen on that
8  date, correct?
9    A.   This says that that's the date that
10 he found that prescheduled event.
11   Q.   So again, this is not a
12 contemporaneous record of the collection, is it?
13   A.   This was entered on 9/8 for a
14 collection event that occurred on 8/31, yes.
15   Q.   And it was -- it was entered by
16 Mr. Grim, who had nothing do with the collection,
17 correct?
18   A.   Yes.
19   Q.   And the date September 8th, 2021,
20 couldn't have been the date of collection because
21 that was also the date that the test was done in
22 St. Louis, and it couldn't have possibly been
23 collected on the same day it's tested in St. Louis,
24 correct?
25   A.   On the full page lab report, it shows

Page 192

1  that the collection date was 8/31/2021.
2    Q.   I'm talking about the -- what's shown
3  on the chain-of-custody document.
4    A.   That's showing when it got entered
5  into the computer system, but the event that was
6  picked, which shows the correct collection date, is
7  8/31/2021.
8    Q.   And -- and is it your testimony that
9  the chain of custody in Michigan was recorded on
10 paper and sent to St. Louis?
11   A.   Yes.
12   Q.   For a test on August 31, 2021,
13 meaning it was destroyed on -- the paper
14 chain-of-custody record would have been destroyed
15 on August 31, 2023?
16   A.   Yes.
17   Q.   Again, after we had requested this?
18   A.   Yes.
19   Q.   Have you -- have you seen the paper
20 chain of custody for either of the tests we've
21 talked about?
22   A.   I personally have not, no.
23   Q.   Do you know if anybody has after the
24 test was reported?
25   A.   After the test was reported, I don't

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexislegal.com                        California Firm Registration #179

LEXITAS

Page 193

1  know.
2      Q.   I'd like you to assume that we found
3  18 data packs on Plaintiffs' tests in which the
4  earliest date in the chain of custody, in the
5  chain-of-custody document was after the collection
6  date on the lab report.
7      A.   Okay.
8      Q.   And that in none of those cases was
9  there any entry in the chain-of-custody document by
10 the person who did the collecting according to the
11 lab report.
12     A.   Okay.
13     Q.   And that no entry in the
14 chain-of-custody document corresponds to the
15 collection date in the lab report.
16     A.   Okay.
17     Q.   And that's out of 114 data packs.
18     A.   Okay.
19     Q.   Actually, they're all from Michigan
20 because they're all third-party collectors.  Is it
21 your testimony that all of those would have been
22 paper chains of custody from Michigan that
23 Averhealth destroyed?
24     A.   Yes.
25     Q.   And so out of 114 data packs

Page 194

1  altogether, and that includes the ones outside
2  Michigan, from Massachusetts and Arizona, that
3  comes to 16 percent of the tests on these
4  plaintiffs where Averhealth destroyed the
5  contemporaneous chain-of-custody records showing
6  what happened to the samples from the time the
7  plaintiff showed up to give his or her sample to
8  when it was shipped to the lab, correct?
9      A.   I don't know about that -- I disagree
10 with that statement from the fact that I'd already
11 indicated that we, in our standard operating
12 procedures, when the specimen is received in the
13 laboratory and our team is checking in those
14 samples, they're going to check and ensure that the
15 sample is testable and that chain of custody has
16 not been destroyed, and they start that record
17 at -- at -- from that point in time.
18     Q.   My question --
19     A.   I -- I do agree that we don't have
20 the external chain of custodies anymore.  Yes, I'm
21 not disputing that.
22     Q.   That was all --
23     A.   We don't have that.
24     Q.   -- my question was.
25     A.   Okay.

Page 195

1      Q.   My question was only --
2      A.   Yes, we do not have the external
3  chain of custody.
4      Q.   For 16 percent of the tests in this
5  case, correct?
6      A.   Yes.
7      Q.   No contemporaneous chain-of-custody
8  record --
9      A.   It's not contemporaneous --
10     Q.   Excuse me.  No --
11     A.   We don't have the external
12 chain-of-custody form.
13     Q.   Which are the external -- which are
14 the contemporaneous -- contemporaneous records of
15 what happened to the samples in Michigan, correct?
16     A.   No.  Because we've started the
17 contemporaneous chain of custody when the sample's
18 received at the laboratory.
19     Q.   My -- my question is:  You don't have
20 the original chain-of-custody record that provides
21 a contemporaneous record of what happened to the
22 samples in Michigan, correct?
23     A.   We have --
24     Q.   Is that right?
25     A.   I've already said we don't have the

Page 196

1  external -- I've -- I've already said we don't have
2  the external.
3      Q.   Okay.  And that's the -- that was
4  what was written down at the time the events
5  occurred, correct?
6      A.   Yes.
7          MR. CORNFELD:  How long have we been
8  going?
9          MR. CEJAS:  Probably about -- it's
10 over an hour for sure.  So if now is a good time to
11 take a break.
12         MR. CORNFELD:  Yeah, yeah.
13         THE VIDEOGRAPHER:  Time is 2:42 p.m.
14 We are off the record.
15         (A short break was taken.)
16         THE VIDEOGRAPHER:  The time is 3:03.
17 We are back on the record.
18     Q.   (BY MR. CORNFELD)  I want to go back
19 to what you said about what Mrs. Padilla might have
20 done to that water bottle.  You said she might have
21 injected fentanyl into the bottle, and I wanted to
22 talk to you about how that could possibly be done.
23     A.   I don't know.  I don't know how.  I
24 know that a sample was collected, as I had
25 indicated, was shipped, received at the laboratory,



Dominique Delagnes                                                    July 08, 2024

Page 197

1  we tested it both by an amino assay and an LC-MS
2  and found fentanyl.
3     Q.   Okay.  My -- my question is --
4     A.   The specimen that we received.  I
5  don't know about the water bottle, I have no idea
6  what happened with the water bottle, but the
7  specimen that arrived at our laboratory, that's
8  what we found.
9     Q.   I know that's what you're saying.
10    A.   Yes.
11    Q.   I want to go into how you could
12 possibly inject fentanyl into a water bottle and
13 result in a -- in a positive test at Averhealth.
14          So first, you'd have to find a needle
15 that could inject something into a water bottle, a
16 needle that would be capable of going through the
17 plastic of the water bottle.
18          Do you have any idea how you would
19 find out what kind of a needle that would be?
20    A.   I don't know.
21    Q.   And then you'd have to figure out how
22 much fentanyl to inject into the water bottle so
23 that you would -- assuming you were dishonest
24 enough to do that -- so that you were going to end
25 up with a result that was over the cutoff, but not

Page 198

1  so much that it would be an implausible result,
2  like enough fentanyl to kill a rhinoceros.  You'd
3  have to figure out how much fentanyl to inject,
4  correct?
5     A.   Sure.
6     Q.   Okay.  How would you -- how would you
7  go about trying to figure that out?
8     A.   I -- I don't know.
9     Q.   And -- and you're the -- you're the
10 head of Averhealth.
11    A.   Okay.
12    Q.   How do you think Mrs. Padilla, who
13 doesn't have even a college education, much less is
14 a scientist, how do you think she would figure that
15 out?
16    A.   I don't know.
17    Q.   And is fentanyl lighter or heavier
18 than water?
19    A.   I don't know.
20    Q.   I mean --
21    A.   And I don't know if it can be put
22 into a solution and dissolved.  I mean, I -- I -- I
23 don't know even why we're talking about the water
24 bottle, right?  At this point in time, what I've
25 already indicated, the sample that was received at

Page 199

1  the laboratory screened positive and confirmed
2  positive for fentanyl.
3     Q.   All right.  But I -- we're talking
4  about it because you raised the possibility that
5  she might have injected --
6     A.   I think you raised the possibility.
7     Q.   No, I asked you how it -- what --
8     A.   I think you said --
9     Q.   -- is a possible explanation.
10    A.   -- is it, well, then, did she put
11 fentanyl into the water bottle.
12    Q.   You -- you -- you --
13    A.   You asked.
14    Q.   The record will show.
15    A.   Okay.
16    Q.   The record will show.  My
17 recollection is -- because I hadn't even thought
18 about injecting fentanyl into the water bottle.
19 You raised the -- that as a possibility, and so I'm
20 just trying to figure out how that could possibly
21 be done.
22    A.   I'm pretty sure you made the
23 statement, well, was there fentanyl in the water
24 bottle?  And then you asked, well, did you hear
25 that it clicked?  And I said I don't know how

Page 200

1  fentanyl might have gotten in the water bottle.
2     Q.   And then --
3     A.   That's how I recollect --
4     Q.   Okay.  And then --
5     A.   -- the conversation occurred.
6     Q.   And I mean, we have a transcript.
7     A.   Okay.
8     Q.   You raised the possibility of an
9  injection, and so that's why I'm asking you the
10 question.  If fentanyl was heavier than water, is
11 there any way she could have gotten fentanyl on
12 that swab that was shorter -- much shorter than
13 that water bottle?
14    A.   I believe fentanyl could probably be
15 dissolved into water.
16    Q.   You -- but you just told us you
17 didn't know that.
18    A.   Okay.  So then why are you asking the
19 questions if I --
20    Q.   My question was --
21    A.   -- I don't know.
22    Q.   -- if you think it's heavier.  Okay.
23          You can't Google how to inject
24 fentanyl into a water bottle so that you'll rig a
25 fentanyl test or a drug test and find a plausible



Dominique Delagnes                                                    July 08, 2024

Page 201

1  amount of fentanyl in the --

2      A.   Fentanyl, like other drugs, can be

3  heated, liquefied, and injected into the vein.

4      Q.   Right.  But there was no vein in that

5  water bottle, was there?

6      A.   But it can be turned into liquid is

7  my point.

8      Q.   Okay.

9          THE WITNESS:  Do you know that the

10  camera's not up in the back?  I don't know that it

11  matters --

12         MR. CEJAS:  He logged off.

13         THE WITNESS:  Gotcha.  So we don't

14  have to look at me again, which is fine.

15     Q.   (BY MR. CORNFELD)  To save time, I'm

16  not going to show you the next series of -- of data

17  packs.  But if I showed you the Tiffani Padilla

18  data pack from June 11, 2020, that took seven days

19  from the date of collection to when it was

20  received, according to the chain of custody.  It

21  was collected June 11th and it was received in the

22  lab June 18th.

23         Do you have any explanation for how

24  that could happen?

25     A.   It could have not been shipped

Page 202

1  immediately upon collection.

2      Q.   Because they missed the last delivery

3  time, correct?  That's what you've told us before.

4      A.   That is a possibility, yes.

5      Q.   Okay.  And -- but that wouldn't take

6  a week.  You said that --

7      A.   Not every location potentially ships

8  every single day.  One of the things that we've

9  learned, we often saw in Michigan, that samples

10  weren't necessarily shipped every single day.

11         (A discussion was held off the

12  record.)

13         THE WITNESS:  You gave me two

14  highlighted.

15         MR. CORNFELD:  Okay.  Let me have

16  them back.

17         THE WITNESS:  They're not tabbed,

18  though.

19         MR. CORNFELD:  Right.  This will be

20  easy to find.

21         (A discussion was held off the

22  record.)

23         THE WITNESS:  Thank you.

24     Q.   (BY MR. CORNFELD)  T. Padilla is

25  which one?

Page 203

1      A.   T. Padilla is 21 and S. Padilla is

2  22.

3          MR. PLEBAN:  T. Padilla is 21, you

4  said?

5          THE WITNESS:  Yes.

6      Q.   (BY MR. CORNFELD)  I've handed you

7  what have been marked as Exhibits 21 and 22.  21

8  has the number 11369 on the front page.  It's

9  titled:  T Padilla data pack with an accession

10  number, and the collection day 12/3/21.

11         And Exhibit 22 is titled:  S. Padilla

12  data pack with an accession number, and collection

13  date 12/3/21.

14         Do you have those?

15     A.   Yes.

16     Q.   All right.  I'd like you to look at

17  the full-page lab report.

18     A.   On both?

19     Q.   Okay.  And do you see that both of

20  those specimens were collected at the Services of

21  Esperanza (Services of Hope) and collected on

22  December 23rd, 2021.

23     A.   Yes.

24     Q.   And -- and the way it works, you've

25  got a collection -- in the lab report, a collection

Page 204

1  date, a date received, a date reported, that's when

2  the test result was reported; is that right?

3      A.   Uh-huh.

4      Q.   Correct?

5      A.   Yes.

6      Q.   And obviously, the date received,

7  that's the date it was received in the laboratory,

8  correct?

9      A.   Yes.

10     Q.   So that obviously has to be before

11  the date reported, correct?

12     A.   Yes.

13     Q.   And do you see that in both of these

14  instances, it says that the date received is

15  December 9th, 2021, and the date reported was two

16  days earlier?

17     A.   Yes.

18     Q.   December 7th, 2021?

19     A.   Yes.

20     Q.   That's false, isn't it?

21     A.   Seems to be some sort of

22  administrative error, yes.  That is not accurate.

23     Q.   All right.  It can't have been --

24     A.   Correct.

25     Q.   -- reported before it was received,



Page 205

1  correct?

2  **A.   Yes.**

3  Q.   Shouldn't that be --

4  MR. PLEBAN:  She just wrote on that.

5  MR. CORNFELD:  What?

6  MR. PLEBAN:  I think she wrote on

7  that again.

8  Q.   (BY MR. CORNFELD)  Did you write on

9  that exhibit?

10  **A.   I'm sorry, I boxed the date.  I boxed**

11  **the date received.**

12  Q.   Okay.  In which exhibit?

13  **A.   On both.  I boxed the date --**

14  Q.   Okay.

15  **A.   -- received on both of them.**

16  Q.   Okay.

17  **A.   Apologize.**

18  Q.   Just so the record will reflect how

19  that got there.

20  This should be something pretty

21  simple to get right, shouldn't it?

22  **A.   I'm trying to figure out how it**

23  **reflects that, so give me a minute.  There must**

24  **have been a transcription error on the date**

25  **received because it clearly --**

Page 206

1  Q.   Okay.  But my --

2  **A.   A transcription error on the date**

3  **received because clearly, on the chain of custody,**

4  **it shows received on the 7th.**

5  Q.   Was this somebody who personally put

6  the date in or does it -- does it happen

7  automatically?  Does it get transferred from one

8  place to the other?

9  **A.   I don't know how that was there.  I'd**

10  **need to do some research on it.**

11  Q.   All right.  But this should be

12  something pretty simple to get correct, shouldn't

13  it?

14  **A.   There are times where if it's a human**

15  **error, that there might be a transcription where**

16  **somebody enters a date in incorrectly.  It's not a**

17  **common occurrence, but it could happen.**

18  Q.   Okay.

19  **A.   But let me investigate this.**

20  Q.   Okay.  And we talked about other

21  things that ought to be pretty simple, like having

22  the correct cutoff levels in your proposals and

23  your contracts, that shouldn't be difficult to get

24  right, assuming that you got that wrong there,

25  correct?

Page 207

1  **A.   Human error happens.**

2  Q.   Okay.  So my question is:  If your

3  lab can't even get the easy stuff right, can you

4  see why somebody might be skeptical about whether

5  you get the hard stuff correct, meaning doing these

6  very complicated laboratory tests?

7  **A.   There -- anything that is an**

8  **administrative error is a rare occurrence.**

9  Q.   My question is:  Can you see that --

10  I mean, we've been here less than a day and --

11  **A.   All humans make mistakes, right?  All**

12  **of us have certain things where we make an error.**

13  Q.   Okay.

14  **A.   And it's an isolated event that these**

15  **errors occur.**

16  Q.   Can you see why somebody might think

17  if you make isolated errors on something that's

18  easy --

19  **A.   No, I don't understand that.**

20  Q.   -- it might be -- it might be -- that

21  it might be -- they might be -- skeptical about --

22  **A.   No, I don't.**

23  Q.   -- whether you --

24  COURT REPORTER:  Can you --

25  Q.   (BY MR. CORNFELD)  Let me finish my

Page 208

1  question.

2  COURT REPORTER:  Please.

3  Q.   (BY MR. CORNFELD)  Can you see why

4  somebody might be skeptical about whether if you

5  can't get the easy stuff right, that you're having

6  trouble, that you would have trouble getting the

7  hard stuff, meaning doing these complicated

8  laboratory tests, correct?

9  **A.   No.**

10  Q.   I have some questions I'd like to ask

11  about chromatographs of quality controls and

12  calibrators.

13  **A.   Okay.**

14  Q.   Are you the person to ask?

15  **A.   I might be able to answer some of it**

16  **and some of it might be Dr. Glinn.  Until I know**

17  **the question, I don't know that.  Are you**

18  **comfortable with if you ask me something and I want**

19  **to defer it, that that's what we do?**

20  Q.   I -- I would be comfortable deferring

21  the whole thing.  I was going to start by asking

22  what is integration.  What does that mean?

23  **A.   Okay.**

24  Q.   What does integration mean?

25  **A.   Can you give a little more context?**

888-893-3767                    Lexitas operates in all 50 states and is licensed where required    Nevada Registration #116F.
www.lexitaslegal.com                                                            California Firm Registration #179

LEXITAS

Dominique Delagnes                                                   July 08, 2024

Page 209

1   You're picking one word.
2        Q.   I know.  I've seen that word a lot in
3   Averhealth's documents.  That's why I'm asking you.
4        A.   Okay.  But normally, we don't just
5   say the word "integration."
6        Q.   Well, I know --
7        A.   It's -- it's part of a broader
8   sentence.
9        Q.   It would be in a sentence, but --
10       A.   Yes.
11       Q.   -- it would refer to the laboratory
12  tests.
13       A.   Okay.  Can you point me to one of
14  them where it says integration?
15       Q.   I don't actually have it because it
16  wasn't -- there was no modifier, like high
17  integration, low integration, whatever.  It was
18  just integration in terms of the laboratory tests.
19  If you can't answer it, that's fine.  I'll defer it
20  to Dr. Glinn.
21       A.   I'm not saying I can't.  I can --
22       Q.   Okay.
23       A.   -- if you give me the full sentence
24  where we used the term "integration."  There's
25  nowhere does it just say the word "integration."

Page 210

1        Q.   Tell me anything you know about the
2   word, what the word "integration" means.
3        A.   I need more context.
4        Q.   Anything you know.  Without context.
5   You can tell me what you understand it to be
6   without being prompted by a context.
7        A.   No, I can't.
8        Q.   Think of a context in which you would
9   know what the word "integration" means.
10       A.   Can you ask me a question with a
11  specific reason where you're talking about
12  "integration"?
13       Q.   If I told you that integration was
14  the determination of the height and the area of a
15  peak in a chromatogram, would that ring a bell?
16       A.   The integration?  That doesn't make
17  sense.
18       Q.   Okay.  I'll read you a sentence
19  from -- from the LC-MS/MS quality control --
20            THE VIDEOGRAPHER:  I'm so sorry, sir.
21            THE WITNESS:  Your mic's --
22            MR. CORNFELD:  Oh, shoot.
23       Q.   (BY MR. CORNFELD)  Let me read you a
24  sentence from Averhealth's LC-MS/MS quality control
25  SOP from January 2021.

Page 211

1        A.   Okay.
2        Q.   Acceptable peak integration is from
3   trough to trough at the baseline, including
4   fronting or tailing as appropriate.
5        A.   Okay.
6        Q.   What does integration mean?
7        A.   Integration is looking at the peak of
8   that chromatograph, right, and ensuring that if
9   there is a peak, that from point to point, as that
10  indicated, is signaled or identified appropriately.
11       Q.   What -- what does the sentence
12  integration of fronting or trailing -- excuse me.
13  What does integration mean in the sentence from
14  that same SOP, integration of fronting or tailing
15  peaks shall be consistent with calibrator or
16  control integration?
17       A.   That in that chromatograph, if there
18  was tailing, if you're going to truncate that peak,
19  right, or chop it off to get rid of the tailing,
20  that what you do on this -- on the patient sample
21  is going to be the same of what you do on the
22  calibrators or the controls.
23       Q.   Okay.  What is -- what is calibrator
24  or control integration as used in that sentence?
25       A.   Can you read the sentence again?

Page 212

1        Q.   Integration of fronting or tailing
2   peaks shall be consistent with calibrator or
3   control integration.
4        A.   So in all of our batches in testing,
5   right, when there's the calibrators and the
6   controls within that batch, if you're going to do
7   any kind of trunking or of -- sorry.  If you're
8   going to get rid of any tailing or fronting of it,
9   that you're consistent with the patient samples as
10  well as the controls or the calibrators.
11       Q.   So -- so integration there would be
12  the same for the calibrators or controls as the
13  patient samples, meaning looking at the peak on the
14  chromatograph?
15       A.   Yes.
16       Q.   So you would have to have a
17  chromatogram of the calibrated or -- and control in
18  order to do that, correct?
19       A.   Help me with the context of where
20  you're going with this.  Like, yes, so when you're
21  looking at a batch, you're going to ensure that
22  you're going to have consistency in your controls
23  and your patient samples and your calibrators.
24       Q.   Okay.  So -- so you would look -- in
25  order to interpret the test result, you would look

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                              California Firm Registration #179



Page 213

1  at the chromatograms of the patient sample and of
2  the calibrators and of the control, correct?
3      A.   You would have valid calibrators --
4          THE WITNESS:  I lost mine.  Sorry.
5          You would have a valid -- a valid
6  calibration curve, and then you'd have controls and
7  patient samples, yes.
8      Q.   (BY MR. CORNFELD)  So you'd have the
9  chromatograms of those, correct?
10     A.   Yes.
11     Q.   And you would -- you'd have to look
12  at those in order to interpret the test result; is
13  that right?
14     A.   You have to have valid calibration,
15  yes.
16     Q.   And that means looking at the
17  chromatograms of the calibrators and controls as
18  well as at -- of the patient sample, correct?
19     A.   Yes.
20     Q.   You probably have handy Exhibit 21,
21  the T. Padilla data pack.
22     A.   Yes.  If we're going to go down
23  asking me to look at calibrators and controls,
24  that's going to have to be deferred to Dr. Glinn.
25     Q.   My -- my question was whether you

Page 214

1  could point to the chromatographs of calibrators or
2  controls in the data pack.
3      A.   If I remember correctly -- Colleen,
4  correct me if I'm wrong -- so originally, we gave
5  you the chart, which gave you the values --
6      Q.   My --
7      A.   -- off of it.  Okay?
8      Q.   My question is:  Can you point me to
9  calibrators or to -- to chromatographs of
10  calibrators or controls in the Tiffani Padilla data
11  pack?
12     A.   I believe that was a supplemental
13  request that we provided to you.
14     Q.   I --
15     A.   We originally give it to you in data
16  format.
17     Q.   Okay.  You did not give us the
18  chromatographs or controls.  Those are not
19  contained in the data packs, correct?
20     A.   We gave you the table that had the
21  results --
22     Q.   My question --
23     A.   Yes, you are correct.  To answer your
24  question, yes.
25     Q.   Is it the case that Averhealth did

Page 215

1  not have chromatograms or chromatographs of
2  calibrators and quality controls on any test
3  reported as positive on any plaintiff at or near
4  the time it conducted and reported the results of
5  those tests?
6      A.   Can you please repeat that question?
7      Q.   I was reading from a request for
8  admissions that we've served on Averhealth and that
9  Averhealth admitted -- and that request for
10  admission which Averhealth admitted was:
11  Averhealth did not possess chromatograms or
12  chromatographs of calibrators and quality controls
13  on any test reported as positive on any plaintiff
14  at or near the time it conducted and reported the
15  results of those tests.
16         That was the first part of the
17  statement.  Is that true?
18     A.   No.
19     Q.   That's not true?
20     A.   That we did not have?  You said that
21  we did not have?
22     Q.   That Averhealth did not possess
23  chromatograms or chromatographs of calibrators and
24  quality controls on any test reported as positive
25  on any plaintiff at or near the time it conducted

Page 216

1  and reported the results of those tests.
2      A.   Where is that from?
3      Q.   That is from a request for admission
4  that we asked Averhealth --
5      A.   Okay.  Can -- can you reference the
6  document?
7      Q.   You know, I thought I had it with me.
8  We can get it tomorrow.
9          MR. PLEBAN:  I'll pull it up here.
10  Let's just go off.
11         THE VIDEOGRAPHER:  The time is 3 --
12  2 -- 3:29 p.m.  We are off the record.
13         (A discussion was held off the
14  record.)
15         THE VIDEOGRAPHER:  Time is 3:29.  We
16  are back on the record.
17         MR. CORNFELD:  Oh, I had it in a
18  different folder.
19         THE VIDEOGRAPHER:  I think the mic
20  might have been a casualty again.
21         THE WITNESS:  Every document
22  containing data that it had on any --
23         MR. CEJAS:  Just a second.
24         MR. PLEBAN:  Yeah, it is.
25     Q.   (BY MR. CORNFELD)  Ms. Delagnes, I've



Page 217

1  handed you what's been marked as Exhibit 23 --
2      **A.   Okay.**
3      Q.   -- which is a document on the caption
4  of this lawsuit titled Defendant Avertest, LLC,
5  d/b/a Averhealth's Answers to Plaintiff's Second
6  Set of Request for Admissions.
7          Do you have that?
8      **A.   Yes.**
9          THE VIDEOGRAPHER:  Can I have you
10  clip your mic on?
11         MR. CORNFELD:  Oh.
12         THE VIDEOGRAPHER:  No, you're good.
13     Q.   (BY MR. CORNFELD)  And do you see
14  that this contains Averhealth's Answers to Requests
15  for Admissions that Plaintiff asked Averhealth to
16  admit?
17     **A.   Yes.**
18     Q.   And Averhealth could admit it, if it
19  was true; or deny it if it was not true?
20     **A.   Yes.**
21     Q.   And if you would look at number 3 on
22  page 2.
23     **A.   Okay.**
24     Q.   It says -- as I was reading:
25  Averhealth did not possess chromatograms or

Page 218

1  chromatographs of calibrators and controls on any
2  test reported as positive on any plaintiff at or
3  near the time it conducted and reported the results
4  of those tests.  And let me stop there.
5          Is that part of the statement true?
6      **A.   This is -- this is something**
7  **Dr. Glinn -- she knows this data so much better.**
8  **So -- I didn't mean to get this far, but I want to**
9  **table this question because she'd look at -- and**
10  **our team's looking at -- is used to looking at**
11  **data.**
12     Q.   I'm sorry, what was the last part of
13  what you said?
14     **A.   I said -- I said because they are the**
15  **ones who look at the data prior to reporting it, so**
16  **I want to leave this question to Dr. Glinn.**
17     Q.   All right.  Would the -- would the
18  same be true for the second part of the statement,
19  that Averhealth admitted that it did not possess
20  such chromatograms or chromatographs until it
21  created them in response to Plaintiffs' requests --
22     **A.   Yes.**
23     Q.   -- during this litigation?
24     **A.   Yes.**
25         MR. CEJAS:  Did you mark that as an

Page 219

1  exhibit?
2          MR. CORNFELD:  I'm sorry?
3          MR. CEJAS:  Did we just mark that as
4  an exhibit?
5      **THE WITNESS:  Yeah, 23.**
6          MR. CORNFELD:  Yeah.
7      Q.   (BY MR. CORNFELD)  What is a
8  litigation package?
9      **A.   It's data that's put together that we**
10  **provide to our customers if they need it for**
11  **litigation package support.**
12     Q.   And did you provide a sample
13  litigation to Dr. Klette?
14     **A.   We did.**
15     Q.   And that was in response to his
16  request for the litigation package or the package
17  of data that you would provide to courts on the
18  tests that you conducted, correct?
19     **A.   It was in response to he wanted to**
20  **know what we would put together for him to do an**
21  **audit for us.**
22     Q.   He specifically requested a document
23  package for a specimen that is sent to court for
24  trial prior to September 14, 2020, and after
25  November 3rd, 2020, correct?

Page 220

1      **A.   I didn't actually see his request.**
2  **I've never seen the request of what he -- like,**
3  **what -- what he requested, if he was that specific.**
4          **Thank you.**
5      Q.   I've handed you what's been marked as
6  Exhibit 24, which is a document, the first page of
7  which has the Bates number 35319.  And on the first
8  page, this has an e-mail from Jason Herzog to you
9  and Dr. Glinn dated August 11, 2022.
10         Correct?
11     **A.   Yes.**
12     Q.   And he says Kevin -- meaning
13  Dr. Klette; is that right?
14     **A.   Yes.**
15     Q.   Would like to come on site for three
16  days next week to review 150 samples.  And he goes
17  on.
18         And Dr. Klette was coming on so that
19  he could evaluate Averhealth's testing procedures
20  and write a report to be submitted to investigators
21  in Michigan, correct?
22     **A.   Not to Michigan.  I believe it was to**
23  **the Department of Justice.**
24     Q.   You're correct.  But what I meant was
25  to the U.S. attorney in Michigan.



Page 221

1   A.   Okay.  Yes, that is correct.
2   Q.   All right.  And then he attaches in
3   this e-mail he's sent to you the information that
4   Dr. Klette was requesting, correct?
5   A.   Yes.
6   Q.   And if you would look at the
7   second-to-last page, which is numbered 35323, do
8   you see there's a heading:  Laboratory information
9   required prior to the inspection audit?
10  A.   Yes.
11  Q.   And by "inspection audit," he means
12  his inspection of Averhealth's practices that he
13  was coming to the laboratory to do, correct?
14  A.   Yes.
15  Q.   And the first item is document
16  package for a specimen that is sent to court for
17  trial prior to September 14, 2020, and after
18  November 3rd, 2020.
19       Do you see that?
20  A.   Yes.
21  Q.   So that is what Dr. -- Dr. Klette was
22  requesting, and in response to which the sample
23  litigation package was sent, correct?
24  A.   Yes.
25  Q.   All right.  And I -- you know, I'm

Page 222

1   puzzled over these dates, why he would want it
2   before September 14, 2020, and after November 3rd,
3   2020.  Those are -- those are the dates when
4   Dr. Riley was employed by Averhealth, correct?
5   A.   Yes.
6   Q.   I wonder if that was his
7   transcription error, and he really meant after
8   September 24, 2020, and before November 3rd, 2020,
9   so he would have it for the time that Dr. Riley was
10  employed.
11       MR. CEJAS:  Objection to the extent
12  it calls for speculation.
13       But if you know, go ahead.
14  Q.   (BY MR. CORNFELD)  Go ahead.  Go
15  ahead.
16  A.   I don't know.
17  Q.   But in any event, in response, what
18  was sent was a document entitled sample litigation
19  package, correct?
20  A.   Yes.
21       Thank you.
22  Q.   Handing you what's been marked as
23  Exhibit 25.  Is this the sample litigation package
24  we're talking about?
25  A.   Yes, it is.

Page 223

1   Q.   All right.  So this is an example of
2   what Averhealth was sending to courts during the
3   time period that Dr. Klette requested?
4   A.   This is not.  This is an outdated
5   document.  As you can see, this was back in 2015.
6   So the person who sent it, the owner on this
7   document shows Courtney Clements, who was at the
8   time in charge of proposal writing, and so I don't
9   know why this is what she pulled.
10       Jason didn't ask neither Michele,
11  Dr. Glinn, or myself, for example, what was said
12  from court.  And if you look at this document, all
13  of this was printed in 2015.  This is not what we
14  were producing during this time frame.  So this is
15  not an accurate litigation package of what we sent
16  to our customers today or what we were sending to
17  our customers in 2020.
18  Q.   All right.  When did you stop using
19  the sample litigation package, the documents based
20  on Exhibit 20 -- 25?
21  A.   I don't know the exact date.
22  Q.   Approximately.
23  A.   I would say probably in 2016 or '17.
24  Q.   So is this another administrative
25  error that somebody at Averhealth did?

Page 224

1   A.   Yes.
2   Q.   And something that would have been
3   easy to get right, correct?
4   A.   Should have been.
5   Q.   And she could have just sent
6   something from an actual case and blacked out the
7   identity of the individual, correct?
8   A.   She could have.
9   Q.   In fact, that's what was done for
10  Dr. Wagner, wasn't it?
11  A.   I believe so.
12  Q.   We'll get to that.
13  A.   Okay.
14  Q.   Unless that will get deferred for
15  Dr. Glinn also.
16       Let's look at the first page after
17  the cover page.
18  A.   Okay.
19  Q.   The cover page says:  Averhealth
20  sample litigation package.
21       Correct?
22  A.   Yes.  And at the time of 2020, we
23  didn't even go by Avertest.  We'd updated our name
24  to Averhealth.  So this is an outdated document.
25  Q.   Okay.  It has on the second page,



Page 225

1   page numbered 38144, a letter to whom it may

2   concern stating the information included in this

3   litigation package has been reviewed and contains

4   accurate and true copies of relevant data

5   concerning the specimen in question.

6          Correct?

7      **A.   Yes.**

8      Q.   And it's signed Michele A. Glinn,

9   PhD, laboratory director.

10         Correct?

11         MR. CEJAS:  Let me object.  Assumes

12  facts not in evidence.  I don't think that's

13  signed.

14         Subject to that, go ahead.

15     Q.   (BY MR. CORNFELD)  It has a signature

16  line for her?

17     **A.   It has a signature line, yes.**

18     Q.   Thank you.

19         MR. CORNFELD:  I'm not going to say

20  feel free to correct my questions, but I appreciate

21  that one.

22     Q.   (BY MR. CORNFELD)  There's no letter

23  like this in the data packs that you produced on

24  the plaintiffs' tests, is there?

25     **A.   No.**

Page 226

1      Q.   There's a table of contents.  That's

2   on page 38145, correct?

3      **A.   Yes.**

4      Q.   To make it easy for whoever's

5   reviewing to do the review, know what to find and

6   where to find it, correct?

7      **A.   There is a table of contents, yes.**

8      Q.   And that assists the reader in

9   knowing what to find and where to find it, correct?

10     **A.   Yes.**

11     Q.   There was no table of contents in the

12  data packs you provided us, was there?

13     **A.   No.**

14     Q.   There was a data -- excuse me.  There

15  was a table of contents in the data packs you

16  provided to Dr. Wagner, wasn't there?

17     **A.   I'd have to look at one.  I don't**

18  **remember what was provided to him.**

19     Q.   Okay.  Well, we may have a chance to

20  look at it, unless that will be for Dr. Glinn.  I'm

21  not sure.

22         The sample litigation package,

23  Exhibit 25, has a section entitled:  Chain of

24  custody.

25     **A.   Yes.**

Page 227

1      Q.   And that shows the titles and the

2   names and whether they were employed of everyone

3   who was involved in the chain of custody, correct?

4      **A.   Yes.**

5      Q.   There was nothing like that in the

6   data package that you provided the plaintiffs, was

7   there?

8      **A.   No.**

9      Q.   If we would look at the second page

10  of the chain of custody, page 38147, or page 4 of

11  the document, it shows specimen with tamper tape,

12  and then there's a photograph, correct?

13     **A.   Yes.**

14     Q.   And that provides a verification that

15  the sample arrived with the seals intact, correct?

16     **A.   Yes.**

17     Q.   There was no -- there were no photos

18  in the data packs of my client's tests, were there?

19     **A.   We didn't have the specimens any**

20  **longer.**

21     Q.   You had the -- you had the specimens

22  when they arrived, correct?

23     **A.   Yes, but these pictures were not**

24  **taken at the time the specimen was arrived.  These**

25  **were taken at the time litigation package was put**

Page 228

1   **together.  We've never taken specimens of -- we've**

2   **never taken pictures of specimens as they've been**

3   **received.**

4      Q.   Why not?

5      **A.   Because we receive over 8,000 samples**

6   **a day.  It's overly burdensome.  No laboratory**

7   **takes pictures of samples as they receive them.**

8      Q.   How do you know that?

9      **A.   Okay.  I will -- let me rephrase**

10  **that.**

11         **Of the laboratories that I've been at**

12  **of similar size and similar type of work that we do**

13  **here, including other CAP- and CLIA-certified**

14  **laboratories where we do mutual inspections and**

15  **where I've personally worked, there was no picture**

16  **that was taken at the time of receipt of the**

17  **specimens.  It is not typical.**

18     Q.   Was it at the time in 2015 or 2016?

19     **A.   No.  This was taken after the fact**

20  **when the litigation package was requested.**

21     Q.   What happens to the specimen -- to

22  the specimen packages?

23     **A.   I don't understand the question.**

24     Q.   How is it that you had the specimen

25  packages to take the photographs in the sample

Page 229

1  litigation package?

2      A.   Because the sample litigation was --
3  was requested within the first year.  Right?  So
4  typically, our customers, when they ask for
5  litigation package, it's going to be within that
6  year that we have the specimen.  We retain those
7  specimens.

8          In this example, when we put this
9  together, we would go back to the -- where that
10 sample was frozen because, you know, we may -- back
11 in 2015, we were probably doing less than ten
12 litigation packages a year.  So when it was
13 requested, we would go back to where this sample
14 was sitting in frozen storage and take a picture of
15 it.

16     Q.   How long are the samples kept?  You
17 said a year?

18     A.   One year.

19     Q.   One year?

20     A.   Yes.

21     Q.   And we filed our requests on -- in
22 early 2023, so anything that was within a year, you
23 could have taken a photograph, correct?  At the
24 time we filed our request for -- for you to produce
25 all the records you had on the tests.

Page 230

1      A.   Correct.

2      Q.   And you didn't produce any, did you?

3      A.   No.

4      Q.   And -- and --

5      A.   Because that's not what we provide in
6  our litigation packages today.  Like I said, this
7  was a package back from 2015.  In litigation
8  packages that we provide to our customers today, we
9  don't provide a picture of the specimen.

10     Q.   You know that David Shnitzer
11 complained about his result within days of when he
12 got the results back?

13     A.   Okay.

14     Q.   You know that, don't you?

15     A.   Yes.  I do.

16     Q.   And he complained about how it was
17 collected, didn't he?

18     A.   Yes.

19     Q.   You didn't save the photographs, or
20 you didn't take photographs, of his samples that
21 were still pretty fresh, correct?

22     A.   There was not a request from the
23 courts for a litigation package.  There was not a
24 request from Massachusetts for a litigation
25 package.

Page 231

1      Q.   There was a -- there was a complaint
2  by Mr. Shnitzer.  Couldn't you have taken a
3  photograph then and said see here, everything
4  was -- was on the up-and-up?

5      A.   As I'd indicated previously, any --
6  our contract is with the state.  So in this case,
7  the state of Massachusetts.  So anything having to
8  do with testing the specimens needed to be a
9  request that came from Massachusetts.

10     Q.   Have you ever -- strike that.

11         And so you didn't think it would --
12 it would at all help responding to Mr. Shnitzer's
13 request to show him a photograph of the -- of the
14 package?

15     A.   We don't provide information back to
16 the client giving the -- or to the patient
17 themselves.  Any requests for information we
18 provide back to Massachusetts.

19     Q.   You didn't --

20     A.   So had Massachusetts asked us for
21 pictures of the specimens, we would have provided
22 those to them.

23     Q.   And -- and why don't you provide
24 records to a patient who complains?  Somebody did
25 respond to Katza Foulger when -- when she made her

Page 232

1  complaint and asked for the sample back.

2      A.   Because our contract is with the
3  state or the county entity.  So with Maricopa
4  County or with Massachusetts.

5      Q.   But why did you respond to
6  Mrs. Foulger and you didn't respond to
7  Mr. Shnitzer?  Do you think it's responsible to get
8  a complaint from him and you have the evidence that
9  you say could refute the complaint and you didn't
10 provide it to him?

11     A.   We provided the -- we did an
12 investigation and provided a written documentation
13 back to Massachusetts.

14     Q.   My question is:  Do you think it's
15 responsible not to provide that to Mr. Shnitzer
16 himself and not to provide him a photograph that
17 could refute his complaint?

18     A.   He didn't ask for a photograph, and
19 our contract is not with him, it's with
20 Massachusetts.

21     Q.   He didn't -- all he did was make his
22 complaint.  My question is:  Do you think it's
23 responsible not to have photographed his -- his
24 specimens?

25     A.   I think what we did around his



Page 233

1  testing is responsible.
2      Q.   All right.  Have you ever had a
3  delivery service deliver something to your house?
4      A.   Yes.
5      Q.   And take a picture to show that it
6  arrived and where it is?
7      A.   Yes.
8      Q.   They do it, so why don't you do it?
9      A.   Again, it's to the number of
10  specimens that are received in our laboratory on a
11  daily basis.
12      Q.   How many deliveries do you think Uber
13  makes a day or DoorDash or UPS?
14      A.   They're a much larger organization
15  with many more people.
16      Q.   Because they have many more
17  deliveries.  They have one person per delivery, and
18  they -- and they find it -- the ability to take a
19  photograph and send it to the customer.
20      A.   It's not common practice in the
21  industry to take pictures of a sample that was
22  received at the laboratory.
23      Q.   Is the reason why you only respond to
24  the state or the court and not to the individual --
25  except of course there was Mrs. Foulger's instance

Page 234

1  -- is that those are the people who are paying you?
2      A.   No, it's who -- it's who our contract
3  is with.
4      Q.   Have you had -- do -- do any of your
5  contracts forbid you from communicating with the
6  actual person who's being tested?
7      A.   I don't believe that there's language
8  in there to -- to forbid it.
9      Q.   Okay.
10      A.   But our contract, right, you're going
11  to have communication with who you have a contract
12  with, not with a third-party person.
13      Q.   Except in Mrs. Foulger's case.
14  Right?
15      A.   Right.
16      Q.   And I -- I think there were also
17  direct communications with the Padillas, weren't
18  there?
19      A.   I'm not sure.
20      Q.   Okay.  If you look at page 5 of
21  Exhibit 25, do you see that Section 2, Screening
22  Data?
23      A.   Yes.
24      Q.   And that's a section that provides
25  data on instrument calibration and controls with

Page 235

1  weekly calibrations?
2      A.   Yes.
3      Q.   That was not part of the data packs
4  that you provided the plaintiffs with, was it?
5      A.   It was part of the supplemental.
6      Q.   No, my question is:  The data packs
7  that you provided to the plaintiffs, that was not
8  part of it, was it?
9      A.   The data packs we provided to which
10  plaintiffs?
11      Q.   Any of the plaintiffs.  You didn't
12  have data on instrument calibration and controls
13  with weekly calibrations.  I mean, take a look at
14  starting with 38150, all of that data that's headed
15  calibrations.
16      A.   So I understand it, we provide -- we
17  produced data and then we produced supplemental
18  data packs.
19      Q.   You did not produce a supplemental
20  data pack.  You might have produced data that we
21  requested, but the data packs that you provided,
22  which are the only data packs we received on any of
23  the plaintiffs, they do not have information as in
24  this section from the sample litigation package
25  entitled Weekly Calibrations, correct?

Page 236

1      A.   Correct.
2      Q.   And then there's also a section
3  entitled Donor Data.  That's at page 13,
4  Bates 38156.
5          Do you see that?
6      A.   Yes.
7      Q.   Do you see that on --
8      A.   I said yes.  I'm sorry if you didn't
9  hear me.
10      Q.   I didn't.
11      A.   I apologize.  I think I said it
12  softly, yes.
13      Q.   Okay.  All right.  There's no donor
14  data section in the data packs as there is in the
15  sample litigation package, correct?
16      A.   Yes.
17      Q.   That is correct?
18      A.   Yes, that is correct.
19      Q.   And then the next page is Instrument
20  Maintenance.
21          Do you see that?
22      A.   Yes.
23      Q.   That's not in the data packs, is it?
24      A.   No.
25      Q.   And then Section 3 is entitled --



Page 237

1  that's on page 15.  That's entitled Section 3,
2  LC-MS/MS Confirmation Data THC.
3       Correct?
4       **A.   We don't use this form anymore.  This**
5  **is outdated.**
6       Q.   What -- and --
7       **A.   The batch prep sheet that you're**
8  **referring to.**
9       Q.   I'm referring to Section 3.
10      **A.   Okay.  LC-MS Confirmation Data THC.**
11 **That's just a header.**
12      Q.   Oh.  And then the next page, batch
13 prep sheet?
14      **A.   We don't -- this is not in our**
15 **procedures today.  We don't use a batch prep sheet.**
16      Q.   Do you have any record of the batch
17 prep?
18      **A.   In the database, it's going to be in**
19 **the chain of custody section.**
20      Q.   For example, on the batch prep sheet
21 on page 16 of Exhibit 25, the first task is:
22 Poured confirmation samples into microfuge tubes.
23      Do you see that?
24      **A.   I do.**
25      Q.   And that's not in the data packs, is

Page 238

1  it?  That's not in the chain of custody?
2       **A.   We don't use this form anymore.**
3       Q.   But you don't have any information
4  about pouring the confirmation samples into the
5  centrifuge tubes.  Do you?
6       **A.   No.**
7       Q.   If you would look at the -- page 17,
8  Section B, Calibrations and Controls.
9       Do you see that?
10      **A.   Yes.**
11      Q.   And are those -- are those -- on the
12 first two pages, they contain a -- a -- a
13 calibration, that's the -- the two lines, slanted
14 lines?
15      **A.   Yes.**
16      Q.   All right.  And then the rest of
17 those, there are chromatograms?
18      **A.   Yes.**
19      Q.   And those are -- are those
20 chromatograms of the calibrators and controls?
21      **A.   Yes.**
22      Q.   And that was not part of the data
23 packs?
24      **A.   We provided it in a tabular format,**
25 **not in the actual peak format.**

Page 239

1       Q.   Page 23 is Section C, Confirmation
2  Results Summary.
3       **A.   Okay.  That's a header, yes.**
4       Q.   And then the data is on page 24?
5       **A.   Yes.**
6       Q.   Is there anything like that in the
7  data packs?
8       **A.   Yes.**
9       Q.   And where -- if you take one of the
10 data packs --
11      **A.   Yes.**
12      Q.   -- and tell me where that is.
13      **A.   Exhibit 22, page 110, where it starts**
14 **to show the chromatographs.**
15      Q.   Page 38168 contains a Section D,
16 Sequence Table, and it contains a sequence table,
17 correct?
18      **A.   Yes.**
19      Q.   Why do you do this?
20      **A.   To be able to show the information**
21 **about the controls, and then the sequence of the**
22 **specimens.**
23      Q.   The sequence of the specimens in the
24 batch?
25      **A.   Yes.**

Page 240

1       Q.   So not just the patients or the
2  individual specimen, the sample you're testing, but
3  the other specimens that are in the batch?
4       **A.   Some of them.  I don't know that this**
5  **is all.  If you can see, our batches typically were**
6  **larger than that.**
7       Q.   Okay.
8       **A.   So it shows that the -- it shows the**
9  **sequence of the specimen --**
10      **THE WITNESS:  Whoops, I'm sorry.  Did**
11 **I pull myself out?**
12      THE VIDEOGRAPHER:  No, you're still
13 good.
14      **THE WITNESS:  No?  Okay.**
15      **It shows the -- the -- the list**
16 **around the other specimens that are tested.  So**
17 **this is not a full sequence of the batch.**
18      Q.   (BY MR. CORNFELD)  It has -- it has
19 25 specimens, correct?
20      **A.   It does.**
21      Q.   All right.  And there was no sequence
22 table in the data packs that we were provided, was
23 there?
24      **A.   There's a partial sequence table on**
25 **these as well that you can see.**



Page 241

1    Q.   Does have anywhere near 25 items?

2    A.   Correct.  There is --

3    Q.   How many --

4    A.   -- it is a partial sequence table.

5    Q.   It had about three items, correct?

6    A.   It showed the samples before and

7    after so you could look to see if there's potential

8    carryover.

9    Q.   The purpose of the sequence table is

10   to show potential carryover, correct?

11   A.   Yes.

12   Q.   And -- and you need more than

13   three --

14   A.   You don't --

15   Q.   -- items --

16   A.   -- need more than three because

17   typically if you're going to show that the sample

18   before it was huge, you just need to see the

19   sample -- one or two sample -- preceding samples

20   and not more than that.

21   Q.   What -- what is carryover?

22   A.   Carryover is where the -- the

23   specimen before it, the concentration is so high

24   that is there the risk that some -- that that

25   potential sample didn't completely clear out before

Page 242

1    the next sample's injected.

2    Q.   So that the positive result wasn't

3    from that sample but from a prior sample?

4    A.   Correct.

5        MR. CORNFELD:  All right.  Why don't

6    we take a break.

7        THE VIDEOGRAPHER:  Time is 4:02 p.m.

8    We are off the record.

9        (A short break was taken.)

10       THE VIDEOGRAPHER:  The time is

11   4:30 p.m.  We are back on the record.

12   Q.   (BY MR. CORNFELD)  I'd like to ask

13   about Dr. Riley.

14   A.   Okay.

15   Q.   You -- she was hired on August 28,

16   2020, correct?

17   A.   Yes.

18   Q.   Handing you Exhibit 26.  Is this the

19   letter you sent to her on August 28, 2020 -- or not

20   sent to Dr. Riley, but sent to the Department of

21   Pathology at Saint Louis U telling them that

22   Dr. Riley would be joining Averhealth in your

23   St. Louis laboratory in the role of laboratory

24   director?

25   A.   Yes.

Page 243

1    Q.   And Dr. Riley would not be considered

2    an employee of Averhealth?

3    A.   Correct.

4    Q.   Why is that?

5    A.   My understanding is based on her

6    employment with Saint Louis University, this was

7    her choice, that she wanted us to pay Saint Louis

8    University, that she could turn around and use that

9    money to hire somebody to work alongside of her

10   there.

11   Q.   Alongside of her?

12   A.   At SLU.

13   Q.   Okay.

14   A.   She wanted to use it as a stipend.

15   Q.   I'm sorry?

16   A.   She wanted to use it as a stipend for

17   employment for a fellow at Saint Louis University

18   and didn't want to be employed directly.

19   Q.   And she would still be employed at

20   Saint Louis University?

21   A.   Yes.

22   Q.   In her role as professor?

23   A.   Yes.

24   Q.   Why did you feel the need to hire a

25   new laboratory director in 2020?

Page 244

1    A.   Because Dr. Glinn had moved to

2    Michigan and we wanted a laboratory director that

3    could be on site more frequently.

4    Q.   Dr. Glinn was still going to be

5    employed at Averhealth?

6    A.   Yes.

7    Q.   What was her title going to be?

8    A.   She continued to assume the role of

9    -- she was moving into a scientist.  I don't

10   remember what her actual title was.  She was moving

11   into a role as a toxicologist.

12   Q.   Did -- was part of the reason why you

13   wanted a new laboratory director that you wanted

14   somebody to improve your procedures?

15   A.   No.

16   Q.   Had nothing to do with it?

17   A.   Correct.

18   Q.   Did the fact that you had failed a

19   lot of proficiency tests in the previous year have

20   anything to do with it?

21       MR. CEJAS:  Object to the form.

22   Assumes facts not in evidence.

23       Go ahead.

24       THE WITNESS:  Can you show me the

25   fact we'd failed a lot?  We actually didn't fail a



Dominique Delagnes                                    July 08, 2024

Page 245

1  lot of proficiency tests.
2     Q.   (BY MR. CORNFELD)  But you had a lot
3  of unacceptable results?
4        MR. CEJAS:  Same objection.  Assumes
5  facts not in evidence.
6        THE WITNESS:  Our overall percentages
7  were not failed.  We still were good on our
8  proficiency tests, the overall score.
9        Thank you.
10     Q.   (BY MR. CORNFELD)  I've handed you
11  what's been -- I handed you what's been marked as
12  Exhibit 27, which is a document Bates number on the
13  first page of 21685 titled CAP PT Exception
14  Investigation Checklist.
15        Do you see that?
16     A.   I do.
17     Q.   PT stands for proficiency test?
18     A.   Yes.
19     Q.   What is a proficiency test?
20     A.   CAP sends us the spiked samples
21  that -- of certain drugs of unknown concentration,
22  and through that process, we test those alongside
23  of other specimens and we report out the test
24  results.
25     Q.   And -- and for any unacceptable

Page 246

1  results, you have to submit a PT Exception
2  Investigation Checklist, correct?
3     A.   Correct.
4     Q.   And this one is from tests that were
5  done in September 2019?  This one meaning
6  Exhibit 27?
7     A.   Correct.
8     Q.   And there were five unacceptable
9  results, correct?
10     A.   We found the accurate result, so in
11  this case, if you look at these, we found all the
12  drugs that were spiked in there.  So we found the
13  PCP, the one that's labeled unacceptable result 1;
14  in UDC result 2, we found the EDDP, which is the
15  metabolite of methadone.  In result 3, UDC 28, we
16  found the 6-MAM.  In unacceptable result 4, we
17  found THC.  And in UDC 23, unacceptable result 5,
18  we found the pH result.
19        The -- the question was the results
20  range and whether it was reported within the range
21  of us compared to other laboratories.
22     Q.   Are you disputing the fact that these
23  were considered -- these five results were
24  considered unacceptable?
25     A.   I'm not.

Page 247

1     Q.   Okay.
2     A.   I'm -- I'm explaining the fact that
3  we found the drug that was present.
4     Q.   And -- and still had an --
5     A.   What they wanted us to look into is
6  why our results were not in the range that was
7  reported.
8     Q.   And -- and CAP considered them
9  unacceptable, correct?
10     A.   For the range, yes.
11     Q.   And part of the exception
12  investigation checklist is to analyze why these
13  were unacceptable, correct?
14     A.   Yes.
15     Q.   And for that, in the conclusion
16  summary, all that's stated is all were acceptable
17  upon repeat, correct?
18     A.   Correct, yes.
19     Q.   You didn't actually figure out why
20  they were unacceptable?
21     A.   It shows that it was acceptable upon
22  repeat, yes.
23     Q.   Now, my clients who had positive
24  results that they say are not accurate, you didn't
25  repeat those.  They didn't have the benefit of

Page 248

1  having somebody say these were unacceptable so that
2  you could repeat them and find that they were
3  normal, did they?
4     A.   The results were accurate.  They --
5  they -- we found the positive drug that was spiked
6  in there.  What CAP wants us to look at is why the
7  quantitative value is not within the range that
8  they had specified.
9     Q.   My -- my question was:  My clients
10  didn't have the benefit of having somebody say that
11  the results were unacceptable and have you repeat
12  the tests, correct?
13     A.   They could have asked to have the
14  test repeated.
15     Q.   They -- well, some of them complained
16  about it to you that you didn't repeat the tests.
17     A.   The customer -- they could have gone
18  to their -- whoever was contracted for them and
19  asked us to repeat the samples.  And in Michigan,
20  we had requests for repeats on a regular basis that
21  we conducted.
22     Q.   Well, Mrs. Foulger, she wanted to
23  have her test repeated, and you said, sorry, we get
24  -- we destroyed all of your hair that we had,
25  correct?



Page 249

1    A.   Correct.
2    Q.   When -- when somebody from Michigan
3   requested you repeat a test --
4    A.   Uh-huh.
5    Q.   -- were there times when they came
6   back after having been tested the first time
7   positive, they came back negative?
8    A.   There were very few instances, less
9   than 1 percent where the drug was still present but
10   was below the cutoff due to sample degradation
11   between the timing between when the original test
12   was done and when the secondary test was done.
13        Besides the one isolated event, that
14   I'm sure we'll -- that we will talk about, which
15   was a tray that the samples were put in the
16   incorrect place, so there were 13 results that one
17   client asked us to take a look into.  And through
18   the investigation, we realized that not only that
19   one sample had been incorrectly reported because it
20   was all on a tray, that we proactively then
21   corrected all the results and notified all the
22   caseworkers of that instance of those 13 specimens.
23    Q.   That wasn't an administrative error,
24   was it?
25    A.   It was a -- no, I didn't say that it

Page 250

1   was an administrative error.
2    Q.   I know you didn't, that's why I'm
3   asking.
4    A.   Okay.
5    Q.   It wasn't an administrative error,
6   was it?
7    A.   It was a human error that somebody
8   loaded the tray incorrectly.
9    Q.   So I went through the PT tests for
10   the year before Dr. Riley started.
11    A.   Yes.
12    Q.   And looking at the PT Exception
13   Investigation Checklist, and I found in the test of
14   September 22, 2020, there was one unacceptable
15   result; in October, there was one unacceptable
16   result; there also was in December.
17        And there was a second test in -- on
18   December 30th of 2019 where the creatinine tests
19   for all specimens were unacceptable.  There was one
20   unacceptable in January; five again in February;
21   three in March; two in April; one in May; four in
22   July; and one in 9.  And that was all of them.
23        Does that sound familiar?
24        MR. CEJAS:  Let me just object.
25   Objection.  Assumes facts not in evidence and

Page 251

1   foundation.
2        But subject to that, go ahead.
3        THE WITNESS:  I would want to see all
4   of our reports to be able to verify that.  So if we
5   want to pull out all of our -- our scoring, then we
6   can go through and I can ensure that all that's
7   factually correct.
8    Q.   (BY MR. CORNFELD)  Okay.  I'd like
9   you to assume it.  There will be experts on both
10   sides who will be looking at this.
11    A.   Okay.
12    Q.   But I'd like you to assume that was
13   the case.  And you're saying that had nothing to do
14   with hiring Dr. Riley?
15    A.   Correct.
16    Q.   Do you know that CAP discussed with
17   you the unacceptable PT results when you were on
18   probation?
19    A.   They discussed with me unacceptable
20   results?  Can you --
21    Q.   Discussed with Averhealth.
22    A.   Can you talk to me about what --
23    Q.   We will have an opportunity --
24    A.   Okay.  Okay.
25    Q.   Are you -- unless that gets -- also

Page 252

1   gets deferred to D. Riley.
2    A.   You mean Dr. Glinn.
3    Q.   I'm sorry, to Dr. Glinn.  But do you
4   recall that, that that happened?
5    A.   Yes.
6    Q.   Okay.
7    A.   I just want to be clear.
8   Unacceptable means around the quantitation of it,
9   not that we actually found the correct result or
10   not.  So there's no argument on these that we
11   didn't find the drug present.  It's about the
12   numerical number.
13        MR. CORNFELD:  Move to strike as
14   nonresponsive to any question.
15    Q.   (BY MR. CORNFELD)  Was
16   Dr. Riley going to be -- excuse me -- was -- yes,
17   was Dr. Riley going to be full-time?
18    A.   No.
19    Q.   She was not full-time, was she?
20    A.   She was not.
21    Q.   What were her hours?
22    A.   She was supposed to work 20 hours per
23   week.  So she would split her time.
24    Q.   By the way, when those PT results
25   were unacceptable --



Page 253

1   A.   Uh-huh.

2   Q.   -- that wasn't an administrative

3   error, was it?

4   A.   No.  But it wasn't an error at all.

5   The results were accurately reported.  The question

6   was about the quantitation.  So it's not an error.

7   They were not reported in error.  The drug was

8   found.

9   Q.   Aren't the levels of my client's

10  test, what we're talking about, whether they were

11  above or below the cutoff?

12  A.   To determine a specimen to be

13  positive or negative, yes, there is a established

14  cutoff.

15  Q.   And -- and there are levels that are

16  either above or below the cutoff?

17  A.   Correct.

18  Q.   And for -- how was Dr. Riley trained

19  at Averhealth?

20  A.   A combination of spending time with

21  Dr. Glinn, as well as spending time with other

22  laboratory staff on site to learn our processes and

23  procedures.  So it would have been some, you know,

24  training -- I believe Dr. Glinn and Dr. Riley spent

25  about a week together, and then obviously when she

Page 254

1   was on site, it would have been with the team that

2   was there.  So Christina Essington, Shannon

3   Spencer, and others throughout her time frame.

4        She was not on site at the 20 hours

5   as agreed upon, but actually spent considerably

6   less time on site to fully understand our processes

7   and procedures.  She committed to be on site for

8   20 hours a week and actually was on site less than

9   10 hours a week.

10  Q.   Did she -- did she clock in and clock

11  out?

12  A.   She did not.

13  Q.   Was any record kept of what hours she

14  was on site?

15  A.   There was not.

16  Q.   Then how do you know that she was not

17  on site for more than 10 hours?

18  A.   She had an office across the hall

19  from Shannon Spencer, who was a full-time employee

20  that was there for, you know, 10 to 12 hours a day.

21  And typically, when Dr. Riley was there, she would

22  have checked in with Shannon and checked out.

23  So based on feedback that I received

24  from employees that were on site, they saw

25  Dr. Riley less than 10 hours a week.

Page 255

1   Q.   Was she ever chastised or reprimanded

2   or was that ever brought to her attention while she

3   was working for Averhealth?

4   A.   It was not.

5   Q.   Dr. Riley began with Averhealth on

6   September 14, 2020, correct?

7   A.   I'd have to check a document to know

8   exactly what date she started.

9   Q.   We'll see a document to that effect.

10  Just assume for now that it was --

11  A.   Okay.

12  Q.   -- it was September 14, 2020.

13       (A discussion was held off the

14  record.)

15       MR. CEJAS:  Thank you.

16  Q.   (BY MR. CORNFELD)  Handing you what's

17  been marked as Exhibit 28 --

18  A.   Okay.

19  Q.   -- which is a one-page document with

20  the Bates number 15724.

21       Do you see that this is a memorandum

22  on Averhealth letterhead dated and timed from

23  September 13, 2020, from 12 noon to 1:00 p.m. about

24  a meeting with you and Dr. Glinn and Dr. Riley?

25  A.   Yes.

Page 256

1   Q.   Did Dr. Riley report to you?

2   A.   Yes.

3   Q.   And so this was actually -- would

4   have been the day before she started, correct?

5   A.   I need to look at a calendar if I --

6   don't -- if we had a meeting from 12:00 to 1:00,

7   what day of the week is this?  I would have assumed

8   she would have started.

9       THE WITNESS:  Can I look at my phone

10  to look at a calendar?

11      MR. CEJAS:  Sure.

12      THE WITNESS:  So I know what day of

13  the week it is?

14  Q.   (BY MR. CORNFELD)  I can ask Siri.

15      MR. CEJAS:  I'll have an answer for

16  you in just a second.

17      MR. PLEBAN:  Which is it, 9/13?

18      THE WITNESS:  9/13/2020.

19      MR. PLEBAN:  2020 is a Sunday.

20  9/13/2020.

21      MR. CEJAS:  Agreed.

22      THE WITNESS:  Okay.

23  Q.   (BY MR. CORNFELD)  And this -- this

24  was a division of responsibilities that was

25  established during this meeting between Dr. Riley

Page 257

1  and Dr. Glinn?
2      A.   And myself, the three of us I believe
3  were in the meeting together.
4      Q.   Right.  What I meant was it was a
5  division of responsibilities between the two of
6  them?
7      A.   Correct.
8      Q.   And -- and what their
9  responsibilities are for each of them is set forth
10 under their names, correct?
11     A.   Correct.
12     Q.   And everybody agreed on that division
13 of responsibility?
14     A.   Yes.
15     Q.   And you know that Dr. Riley grew
16 dissatisfied with what was going on in the
17 laboratory, correct?
18     A.   Can you be more specific in your
19 question?
20     Q.   Well, she raised concerns with you
21 about the laboratory's practices and procedures,
22 correct?
23     A.   She sent me an e-mail wanting to make
24 some changes in processes, yes.
25     Q.   Well, there was more than that.  She

Page 258

1  had concerns about the practices, not just that she
2  wanted to make changes, correct?
3      A.   Yes.
4      Q.   She called them significant concerns,
5  correct?
6      A.   Those were the words she used, yes.
7      Q.   Do you know that Averhealth told CAP
8  that Dr. Riley never once raised any concerns while
9  working for Averhealth?
10     A.   I'm -- I'd need to see the verbiage
11 that was put in there.
12     Q.   Well, we will get --
13     A.   We'll get there?
14     Q.   We will get there.  Well, here.
15         MR. CEJAS:  That's your highlighted
16 copy.
17         MR. CORNFELD:  Whoops.
18         THE WITNESS:  Looks like two are
19 highlighted.
20         MR. CORNFELD:  Yeah, there are.  You
21 can have the other one.
22         THE WITNESS:  Thank you.
23     Q.   (BY MR. CORNFELD)  I've handed you
24 what's been marked as Exhibit 29, a multipage
25 document bearing the number on the first page of

Page 259

1  21671.  This is on the letterhead of Averhealth,
2  and it's a letter dated January 4, 2021, to Lena
3  Portillo of the investigations department of CAP's
4  accreditation department.  And it is signed by
5  Dr. Glinn, if you look on page 21676.
6          Do you have that?
7      A.   I do.
8      Q.   CAP stands for the College of
9  American Pathologists, correct?
10     A.   Yes.
11     Q.   And it's the body that provides
12 Averhealth with its accreditation as a forensic
13 laboratory, correct?
14     A.   Yes.
15     Q.   And we'll get to this letter in more
16 detail, but if you would look at the third
17 paragraph, the paragraph that starts:  We have
18 tremendous.  Four lines down, she says:  It is
19 perplexing that Sarah Riley never once raised any
20 concerns while working for Averhealth.
21         Do you see that?
22     A.   Yes.
23     Q.   That was not a true statement, was
24 it?
25     A.   She sent one e-mail with quality

Page 260

1  changes that she wanted to make that she sent to
2  me.
3      Q.   It was not a true statement that she
4  never once raised any concerns while she was
5  working for Averhealth, was it?
6      A.   Correct.
7      Q.   Why did Dr. Riley lie about that?
8  Excuse me, why did -- strike that.
9          Why did Dr. Glinn lie about that?
10     A.   I don't know.
11         MR. CEJAS:  Objection.  For the
12 record, my objection was assumes facts not in
13 evidence.
14     Q.   (BY MR. CORNFELD)  It's not -- it's
15 not -- it's not -- I assume it's not Averhealth's
16 policy that its employees should tell untruths to
17 anyone, much less its accrediting body, correct?
18     A.   Correct.
19     Q.   When did you first learn that she
20 said that to CAP?
21     A.   When did I first learn?
22     Q.   Yes.
23     A.   That this was written in this letter?
24     Q.   Yes.
25     A.   In my recollection, I most likely



Page 261

1  reviewed it before it went over to CAP.
2     Q.   Did you -- did you review it with the
3  statement that Dr. Riley never once raised any
4  concerns while working for Averhealth?
5     A.   I did.
6     Q.   And you let that go out, too?
7     A.   I did.
8     Q.   Even though you know it's not true?
9     A.   She had sent me one e-mail wanting to
10  make concern -- wanting to make changes to our
11  processes, and I responded with her that she, yes,
12  absolutely, what you've outlined as far as the
13  changes that you want to make, go ahead and go
14  forward with those.
15     Q.   No, I'm not talking about wanting to
16  make changes.  I'm talking about her -- her raising
17  concerns, what she called significant concerns,
18  with -- with you, with Averhealth.  Why did you let
19  this letter go out with this statement that it's
20  perplexing that Sarah Riley never once raised any
21  concerns while working for Averhealth?
22     A.   I was confident in the testing
23  processes that were outlined in our SOPs, and in
24  the test results that we put out.
25     Q.   That's a different issue.  I know

Page 262

1  that you told CAP that you thought that the testing
2  processes were proper, and CAP made its own
3  judgment on that.
4         My question is:  Why did you let the
5  letter go out with the false statement that
6  Dr. Riley never once raised any concerns while
7  working for Averhealth?
8     A.   I don't recall.
9     Q.   And then the letter goes on to say:
10  Just one work day prior to abruptly resigning,
11  Sarah Riley shared how much she looked forward to
12  working with the team.
13         Do you see that?
14     A.   I do.
15     Q.   Okay.  Let's look at what I've handed
16  you, what's been marked as Exhibit 30, which is a
17  document with the Bates number on the first page of
18  36600.
19         Do you see that this is an exchange
20  of e-mails between Dr. Riley and Jason Herzog on
21  October 30th, 2020?
22     A.   I do.
23     Q.   Is this the e-mail that Dr. Glinn was
24  referring to when she said she shared how much she
25  looked forward to working with the team?

Page 263

1     A.   I believe so.
2     Q.   All right.  And Mr. Herzog was the
3  CEO of Averhealth at the time, correct?
4     A.   That is correct, yes.
5     Q.   He was your boss, correct?
6     A.   Yes, he was.
7     Q.   So you were Dr. Riley's boss,
8  Mr. Herzog was your boss?
9     A.   Correct.
10     Q.   Correct?  Okay.  And this was -- this
11  exchange was initiated by Mr. Herzog on Friday,
12  October 30th.
13         And by the way, the letter to CAP
14  said it was one business day.  She actually -- not
15  that it matters that much, but it was actually two
16  business days, correct, since she resigned on
17  Tuesday?
18     A.   Correct.
19     Q.   All right.  Is that a -- was that
20  just an administrative error to say it was one day
21  rather than two?
22     A.   I never saw this exchange beforehand,
23  so...
24     Q.   You don't know how that error was
25  made?

Page 264

1     A.   I do not.
2     Q.   All right.  Mr. Herzog says to
3  Dr. Riley:  Sarah, it was a pleasure meeting you
4  yesterday.  Very much looking forward to learning
5  from you and learning with you.  Thanks for joining
6  the Averhealth team.
7         Do you see that?
8     A.   I do.
9     Q.   That was a very nice e-mail from him
10  to Dr. Riley, wasn't it?
11     A.   We'd have a two-day, onsite meeting in
12  Richmond, and had an opportunity for all of us to
13  get together.  And she spent two days side-by-side
14  with my boss Mr. Herzog, our CFO, and others with
15  the leadership team.
16     Q.   Okay.  My question --
17     A.   And not once there did she raise
18  concerns about our testing.
19     Q.   My question was:  This is a very nice
20  e-mail --
21     A.   It is.
22     Q.   -- from Mr. Herzog to Dr. Riley?
23     A.   It is.
24     Q.   She probably felt very good when she
25  got that, don't you think?



Page 265

1    MR. CEJAS:  I'm going to object to
2    the extent that calls for speculation.
3        But go ahead, if you know.
4        THE WITNESS:  I don't know how she
5    felt.
6    Q.    (BY MR. CORNFELD)  And then he -- and
7    then he makes kind of a funny line because
8    Halloween's coming up.  He says:  Hope that you
9    have a spooky safe Halloween with your littles.
10       I assume he means her children?
11   A.    I assume so.
12   Q.    Okay.  And then he says:  Many
13   thanks, Jason.
14       Do you see that?
15   A.    Yes.
16   Q.    And during that meeting that you had
17   for two days, did anybody complain about
18   Dr. Riley's performance?
19   A.    They did not.
20   Q.    Mention that, hey, you're not
21   spending enough time at the lab, or you need to
22   pick up the time you spent at the lab?
23   A.    They did not, but nobody would have
24   known how much -- of that team, nobody would have
25   known how much time she was spending at the

Page 266

1    laboratory, being that the leadership team does not
2    preside in St. Louis or at the laboratory.
3    Q.    Weren't you at the meeting?
4    A.    I was.
5    Q.    Didn't you know?
6    A.    I did not know.
7    Q.    Okay.  Dr. Riley responds by saying:
8    Thank you for including me.  I am enjoying CYL.
9        What does CYL stand for?
10   A.    It was a leadership training that we
11   did.  It -- Catch Your Limit is what it stands for.
12   Q.    That was an Averhealth term?
13   A.    No, it's an actual company.
14   Q.    Oh.
15   A.    So we hired a third-party company
16   called Catch Your Limit that did leadership
17   training for us.
18   Q.    Okay.  So she -- she said she's
19   enjoying CYL and learning a lot.  I've also really
20   enjoyed getting to know the team.  I'm looking
21   forward to working with everyone.  Have a good
22   weekend.  Sarah.
23       Do you see that?
24   A.    Yes.
25   Q.    And is that what Dr. Glinn was

Page 267

1    referring to in the letter to CAP?
2    A.    Yes.
3    Q.    Can you see why in response to
4    Mr. Herzog's very nice welcoming note that she
5    wouldn't want to go over her boss's head and unload
6    all of her complaints to him?
7    A.    I can't speculate what she was
8    thinking.  I don't know why she wouldn't.  If she
9    had serious analytical concerns, you would think
10   she would voice them to the CEO of the
11   organization.
12   Q.    You think she might have thought it
13   wasn't her place to go over your head, that she
14   should voice them to you first?
15   A.    I can't speculate exactly what she
16   was thinking.  But again, I'll go back to if she
17   thought that they were serious concerns, you would
18   think that she would have raised them not only to
19   myself, but to the CEO of the company.
20   Q.    Well, you said the CFO and other
21   people were there.  That wouldn't be their role.
22   She was there to learn, and she came -- and then
23   she came back and it was the next day that she
24   shared her significant concerns with you, correct?
25   A.    It was.  It was the two days.  I

Page 268

1    believe it was -- if -- if this --
2    Q.    It was on a Sunday.
3    A.    It was on a Sunday, and I don't
4    believe it was the 30th.  I think it was several
5    days later.  I don't know what day the 30th was.
6    Q.    I've handed you what's been marked as
7    Exhibit 31, which is a document that has the
8    number 85224 on its first page and is an e-mail --
9    A.    You gave me your highlighted one
10   again.
11   Q.    Oh.
12       MR. PLEBAN:  Start putting your
13   initials on these.
14       MR. CORNFELD:  Yeah, right.
15   Q.    (BY MR. CORNFELD)  Handing you what's
16   been marked as Exhibit 31, which is a -- which
17   bears the number 85224 on the first page and is an
18   e-mail exchange between you and Dr. Riley, along
19   with an e-mail from you at the top.
20       Is this the e-mail in which Dr. Riley
21   made her complaints?
22   A.    This is where she expressed some
23   concerns, yes.
24   Q.    Okay.  And the e-mail that started
25   this exchange was dated Sunday, November 1st --



Page 269

1    A.   Correct.
2    Q.   -- 2020 at 12:42 p.m., correct?
3    A.   Yes.
4    Q.   And her subject is:  Analytical
5  concerns and immediate future plans.
6       Correct?
7    A.   Yes.
8    Q.   And when you read this, did you
9  conclude that she had been thinking about these
10  things for a long time?
11    A.   I didn't think about that -- I didn't
12  give it any thought.  I read the e-mail for
13  context.
14    Q.   Okay.  You can count up the
15  paragraphs, but this is a very long e-mail
16  containing 15 paragraphs, correct?
17    A.   It is.  It's an action plan.  I mean,
18  part of it is an action plan.  There's five
19  paragraphs of an action plan.
20    Q.   Well, whatever, the e-mail is
21  15 paragraphs long.  It showed that she had devoted
22  quite a lot of thought to this, correct?
23       MR. CEJAS:  Let me object.  It calls
24  for speculation of what she did or didn't do.
25       Go ahead.

Page 270

1       THE WITNESS:  She cited some specific
2  things on here and provided an action plan.
3    Q.   (BY MR. CORNFELD)  My question is
4  it's clear from this that she devoted quite a lot
5  of thought to it, didn't she?
6       MR. CEJAS:  Same objection.
7       THE WITNESS:  Yeah, I can't speculate
8  how much thought she put into this.  It was -- she
9  provided some feedback and gave an action plan of
10  what she wanted to do over the coming weeks.
11    Q.   (BY MR. CORNFELD)  And she starts out
12  by saying:  Hi, Dominique.  Having observed the
13  analytical processes for a few weeks, I have some
14  significant concerns.
15       That's what she said, correct?
16    A.   Yes.
17    Q.   So that's what she starts out is
18  talking about her concerns, what she said were
19  significant, correct?
20    A.   Yes.
21    Q.   And she says:  I want to lay them out
22  here in an e-mail because I don't want to forget
23  anything during a phone call.
24       And it would have had to have been a
25  phone call because she was in St. Louis and you

Page 271

1  were in Richmond, correct?
2    A.   Yes.
3    Q.   Okay.  And then you see she goes on
4  and says:  All of the issues have to do with the MS
5  confirmation side of the lab.
6       Do you see that, at the end of her
7  first full paragraph?
8    A.   Yes, I do.
9    Q.   What is meant by the MS confirmation
10  side of the lab?
11    A.   The mass spectrometry.
12    Q.   That's -- that's the second part of
13  the test, for example, that you do in Michigan, the
14  first part being amino assay, and the second would
15  be the confirmation part, and the MS confirmation
16  refers to that?
17    A.   It refers to the confirmation side of
18  the laboratory, the -- the LC-MS/MS testing side of
19  the lab, yes.
20    Q.   Okay.  She says:  The most
21  significant issue is how frequently QCs fail and
22  how data is manipulated to get the QCs in, where
23  exceptions are made in order to release results.
24       Do you see that?
25    A.   I see that.

Page 272

1    Q.   And she said that's not even the only
2  significant issue, but that's the most significant
3  issue, correct?
4    A.   That's what she said, yes.
5    Q.   And when you saw this, did you
6  conclude that that was very significant?
7    A.   No, because many of the things that
8  she outlines are practices that we still use today,
9  and they're scientifically valid and appropriate
10  practices.
11    Q.   Well, she -- she provides two
12  examples.
13    A.   She does.
14    Q.   And the first one, she says -- and by
15  the way, these are practices that she complained
16  about to CAP and CAP investigated, correct?
17    A.   Yes.
18    Q.   And -- and we'll look at what CAP
19  concluded, but her first example, she says -- it's
20  a general example because this happens fairly
21  frequently.
22       Do you see that?
23    A.   I do.
24    Q.   And she gives three examples of this
25  example.  They are changing the IS -- and that



Page 273

1  stands for internal standard, correct?
2      **A.   Yes.**
3      Q.   Changing the regression of the
4  calibration curve, and using historical QCs,
5  correct?
6      **A.   That's what these words say, yes.**
7      Q.   That's what she told you, what her
8  most significant concerns out of the first
9  example --
10     **A.   That was her -- yes, that is what she**
11 **said, yes.**
12     Q.   Okay.  And then she says that Jen --
13 who is Jen?
14     **A.   Jen Andre, one of the certifying**
15 **scientists.**
16     Q.   Okay.  And she says:  Jen tells
17 Christina.
18         Who is Christina?
19     **A.   Christina Essington.**
20     Q.   Okay.  So she says:  In one Teams
21 message -- that's referring to your communication
22 system through Microsoft?
23     **A.   Yes.**
24     Q.   In one Teams message, Jen tells
25 Christina to, quote, work her magic, unquote, to

Page 274

1  get QCs in.  This is a problem.  As a
2  well-validated, well-cared-for assay should be
3  robust and reproducible and no magic should be
4  necessary.  The QCs are supposed to be the canaries
5  in the mine for the assay, indicators of whether or
6  not the prep and analysis processes are working as
7  validated.
8         Do you see that?
9      **A.   I do.**
10     Q.   And by -- assay, she's referring to a
11 laboratory test.  Is that right?
12     **A.   By assay, she's referring to -- sure,**
13 **the laboratory test, yes.**
14     Q.   And before you read that, did you
15 know that Christina was being asked to work --
16 quote, work her magic, unquote, to get QCs in?
17     **A.   I don't believe Christina was working**
18 **any magic.  I think that was a term, a colloquial**
19 **term that was used in a chat.**
20     Q.   Okay.  To get QCs in, what it means
21 is QC stands for quality control, correct?
22     **A.   Correct.**
23     Q.   And you get -- you get the result of
24 the quality control and that's supposed to help you
25 decide whether the test of the unknown sample,

Page 275

1  meaning the patient sample, was done accurately,
2  correct?
3      **A.   Correct.**
4      Q.   And it can be in, meaning it came out
5  the way it's supposed to be; or it can be out,
6  meaning it didn't come out the way it's supposed to
7  be, and therefore, there was likely a problem with
8  the patient sample test, correct?
9      **A.   That there was a likely problem with**
10 **the patient sample test?**
11     Q.   The test of the patient sample.
12 There was a problem -- likely a problem with the
13 test, if the QC does not come in.
14     **A.   You need QC -- acceptable QCs to**
15 **report a result.**
16     Q.   Right.  Well, maybe that's a simpler
17 way of what I thought I was saying, but...
18         And QC -- for the QC to be referred
19 to as being in, that would mean an acceptable QC
20 result, correct?
21     **A.   Yes.  That's the word I just used.**
22     Q.   Okay.  Okay.  And Dr. Riley says:  A
23 well-validated, well-cared for assay should be
24 robust and reproducible and no magic should be
25 necessary.

Page 276

1         What was Ms. Essington doing to bring
2  a QC that was out, to bring it in?
3         MR. CEJAS:  Objection.  Assumes facts
4  not in evidence.
5         Subject to that, go ahead.
6      **THE WITNESS:  So she was using**
7  **scientifically appropriate ways to process data.**
8  **So here, she talks about these manipulation include**
9  **change in the IS.  We still, in our SOPs -- and CAP**
10 **has looked at them thoroughly -- are changing the**
11 **IS.**
12         **It talks about changing the**
13 **regression of the calibration curve.  In our SOPs**
14 **today -- and CAP obviously, as you know, has done a**
15 **tremendous amount looking into our practices.  We**
16 **are able to change the regression of calibration.**
17 **So things that she's pointing out here are**
18 **practices that we still do in the laboratory today.**
19         **They're not working -- they're not**
20 **working any kind of magic, and they're**
21 **scientifically valid practices that are used not**
22 **only by Averhealth, but by others as well, and are**
23 **allowable by CAP and CLIA.**
24         MR. PLEBAN:  I think she just marked
25 some paper.



Dominique Delagnes                                                    July 08, 2024

Page 277

1    Did you mark again?
2    **THE WITNESS:  Yes.**
3    MR. PLEBAN:  We'll need to do --
4    Q.   (BY MR. CORNFELD)  Did you mark up
5    the exhibit?
6    **A.   I underlined two things.**
7    Q.   The underlining on?
8    **A.   I underlined the IS used and the**
9    **changing of regression calibration curve.  Kind of**
10   **the two points I just made.**
11   MR. PLEBAN:  It's just for this
12   written record --
13   **THE WITNESS:  Okay.  I apologize.**
14   MR. PLEBAN:  -- because you're going
15   to have a highlight on an original, and then we
16   sort of have an explanation for it.
17   **THE WITNESS:  You should take my pens**
18   **away from me.**
19   Q.   (BY MR. CORNFELD)  Dr. Riley goes on
20   to talk about Exhibit [sic] 2, which she says is a
21   specific example of an incident where exceptions
22   were made to reduce a result.
23   Do you see that?
24   **A.   To release a result, yes.**
25   Q.   Yeah, to release a result.

Page 278

1    And she -- and she describes that
2    example.  And then she says in the next paragraph:
3    I'm not going to beat around the bush.  If I was
4    called in as an expert witness, and given the data
5    from these runs, I would be able to tear them to
6    pieces.
7    Do you see that?
8    **A.   Yes.  But can we go back to example 2**
9    **that she gave and give some context to that?**
10   Q.   No, I'm asking you about this.
11   **A.   Okay.  Those are the words she used.**
12   Q.   Did that cause you concern when your
13   laboratory director said that the results you were
14   getting, the testing you were doing was so bad that
15   if she was called as an expert witness, and given
16   the data from these tests, she would be able to
17   tear them to pieces?
18   **A.   I had confidence in the practices**
19   **that we set upon us.  We'd been through many CAP**
20   **and CLIA inspections, and Dr. Glinn's been in the**
21   **industry forever.  So I looked at that -- this that**
22   **Dr. Riley came in with a different set of eyes and**
23   **wanted to make some changes to potentially make**
24   **things better, but no, I did not think that we**
25   **could be torn apart.**

Page 279

1    Q.   And then Dr. Riley says:  I know
2    there was a lot of pressure to get results out, and
3    I believe that has an impact in the quality.  I
4    don't think people feel like there is a lot of time
5    to troubleshoot, and so Band-Aids and workarounds
6    are being used instead.
7    Do you see that?
8    **A.   She made -- yes, I do.**
9    Q.   Do you see that?
10   **A.   And she may have thought it was a lot**
11   **of pressure.  She came from a much smaller**
12   **laboratory that was doing less than 100 samples a**
13   **day to our laboratory that was doing 8,000 samples**
14   **a day.  So she may have felt that pressure.**
15   Q.   So she felt that there was pressure
16   that whereas in her laboratory at Saint Louis
17   University, she was able to take the time and do
18   the work the way it should be done, and that it
19   could not be -- occur at Averhealth.  That's what
20   she's telling you, correct?
21   **A.   No.**
22   MR. CEJAS:  Object to form.
23   **THE WITNESS:  I don't believe that --**
24   **she's saying she felt pressure.**
25   Q.   (BY MR. CORNFELD)  Right.  She feels

Page 280

1    pressure and that keeping the test results --
2    excuse me.  Keeping the test practices from being
3    done the way they should be.  That's what she
4    believed, correct?
5    MR. CEJAS:  Object to form.  Calls
6    for speculation.
7    Go ahead.
8    **THE WITNESS:  Yeah, I don't know what**
9    **she was thinking.**
10   Q.   (BY MR. CORNFELD)  That's what she
11   was saying, correct?
12   **A.   I don't know if that's exactly what**
13   **she was saying, how you took her words and said**
14   **that that's what her thought process was.**
15   Q.   Well, she's saying she was getting
16   pressure and they can't get the tests done right.
17   That's what she's telling you, correct?
18   MR. CEJAS:  Object to form.
19   Misstates the record.
20   Q.   (BY MR. CORNFELD)  Isn't that --
21   isn't that what she's saying?
22   **A.   She said:  I know that there's a lot**
23   **of pressure to get results out, and I believe this**
24   **has an impact on quality.  That was her viewpoint**
25   **of it.**



Page 281

1   Q.   Yeah, and she sincerely believed
2  that, didn't she?
3       A.   I don't know what she believes or
4  doesn't believe.
5       Q.   You don't have any reason to think
6  that she's making this up.  You don't have any
7  reason to think --
8       A.   Practices that she's outlined here
9  are practices that we still do today.  I believe
10  that she did not have a thorough understanding and
11  look at enough data, based on our volume and our
12  amount, to appropriately be able to determine our
13  practices and whether it was hurting the quality of
14  test results that were going out.
15      Q.   My -- my -- my question was whether
16  she sincerely believed what she was telling you.
17  You have no reason to think that she didn't
18  sincerely believe that, do you?
19      A.   It's the words she used.
20      Q.   So you have no reason to think --
21      A.   Yes, I have no -- I have no reason to
22  believe that.
23           I want to go back to example 2,
24  though, because you didn't give me an opportunity.
25  You read it and you did not give me an opportunity

Page 282

1  to comment on it.
2       Q.   Okay.  Tell me what you want to say
3  about it.
4       A.   Okay.  Sure.  So she talks about
5  specifically in the hair batch, and that basically
6  the quantitative values of the morphine was an
7  educated guess.
8           In this specific example, the level
9  of morphine was reported above the upper limit of
10  linearity.  So on -- on any of our validations, we
11  go through that process, and if it's above that
12  number, we report it as greater than.  So greater
13  than 1,600.
14           So the number in this case really
15  doesn't matter.  She didn't deny that there wasn't
16  morphine in there.  She said that there was.  Just
17  that the number was an educated guess.  But we
18  didn't release a number.  We reported it as greater
19  than the highest calibrator.
20      Q.   All right.  Then Dr. Riley presented
21  a plan that she believed could help correct these
22  issues that she saw, correct?
23      A.   She did, yes.
24      Q.   All right.  And you responded to her
25  within just a couple of hours that same Sunday,

Page 283

1  right?
2       A.   Yes.
3       Q.   And you never said you disagreed with
4  anything she told you, did you?
5       A.   I did not.
6       Q.   She -- you said:  Thank you very much
7  for all of the information below.  This is in your
8  e-mail to her on Sunday afternoon, November 1st at
9  3:44.
10          Correct?
11      A.   Correct.
12      Q.   And then you asked her a question,
13  wanting to tap into her expertise.  You said:  We
14  currently conduct a dilute-and-shoot method.  Does
15  that have any factor in the inconsistent QC issues?
16          Do you see that?
17      A.   Yes.
18      Q.   What is a dilute-and-shoot method?
19      A.   Dilute-and-shoot method is the way
20  that we do the sample cleanup before it goes on to
21  the LC-MS/MS instrument.
22      Q.   And then you said to Dr. Riley:  I
23  appreciate the action plan and what you outlined
24  will be very beneficial, correct?
25      A.   Yes.

Page 284

1       Q.   And our action plan was an action
2  plan to try to correct the problems she saw.  Isn't
3  that right?
4       A.   The action plan was to make some
5  quality improvement, also some projects that we had
6  going on, yes.
7       Q.   Okay.  But it was to correct the
8  problems that she saw, wasn't it?
9       A.   It was also just some general
10  projects that we had going on in the company.
11      Q.   And it was also an action plan to
12  correct the problems she saw, wasn't it?
13      A.   It was an action plan that she
14  thought would give us better quality test results.
15      Q.   To correct the problems she saw,
16  correct?
17      A.   That she believed that were problems,
18  yes, to give us better quality assurance.
19      Q.   All right.  Then you said:  I agree
20  there is pressure to get results out.
21          You said that, right?
22      A.   Yes.
23      Q.   And in the next line, you said:  We
24  need to balance how we get the work out right now
25  and take up the time of the team to resolve the



Dominique Delagnes                                                July 08, 2024

Page 285

1  issues, correct.
2        Do you see that?
3     A.   I'm trying to find that paragraph,
4  so...
5     Q.   It's three lines down in the
6  paragraph that begins:  I agree that there is
7  pressure to get results out.
8     A.   I see that part. I did not --
9     Q.   I'm sorry, the next line, you said:
10  We need to balance how we get the work out right
11  now and take up the time of the team to resolve the
12  issues.
13     A.   Yes.
14     Q.   And do you see how Dr. Riley would
15  interpret that to mean we can't fully correct the
16  accuracy concern right now?
17        MR. CEJAS:  Object to the form.
18  Speculation as to what she understood.
19        THE WITNESS:  I don't know how she
20  would think that because I had confidence in our
21  test results getting reported. I looked at this as
22  she was looking for some additional improvement,
23  which we're always looking to improve.
24     Q.   (BY MR. CORNFELD)  Well, she -- she
25  didn't say just additional improvement as we talked

Page 286

1  about. She had significant concerns that were so
2  bad that she said she could tear the results apart
3  if she were called as an expert witness on it.
4        So my question is:  When you said we
5  need to balance how we get the work out right now
6  and take up the time with the team to resolve the
7  issues, can't you see that that was interpreted to
8  mean that you couldn't fully correct the accuracy
9  concern right now?
10     A.   I was not concerned that we were
11  incorrectly reporting test results.
12     Q.   You didn't say that in your e-mail,
13  did you?
14     A.   I didn't say what?
15     Q.   That you weren't concerned that you
16  were inaccurately reporting test results.
17     A.   No, that's not written in my e-mail.
18     Q.   And as we already -- you already
19  admitted, you didn't take any issue with what she
20  said were her concerns when you responded to her
21  e-mail, did you?
22     A.   As I indicated, though, some of these
23  things that she outlined that were --
24     Q.   Excuse me --
25     A.   -- her concerns and issues --

Page 287

1     Q.   -- that's not --
2     A.   -- are practices that we use today.
3     Q.   That's not my question.
4     A.   Okay.
5     Q.   My question was:  In your response to
6  Dr. Riley, when she told you about her significant
7  concerns that were so bad that if she were an
8  expert witness called against you, she could tear
9  the results apart, you didn't disagree with
10  anything she said, did you?  You had the
11  opportunity to, but you didn't disagree with
12  anything she said, did you?
13     A.   I didn't put it in writing, no.
14     Q.   You didn't say, "I am fully confident
15  in our results," did you?
16     A.   I did not put that in writing, no.
17     Q.   Did you call her up and tell her
18  that?
19     A.   We did have a conversation before she
20  left --
21     Q.   And my --
22     A.   -- and resigned -- I'm trying -- you
23  asked me a question, I'm trying to remember the
24  conversation that we had over the phone.
25     Q.   We will get to that.

Page 288

1     A.   Okay.  But you asked a question, I
2  was answering.
3     Q.   Did you call -- when you -- when you
4  got her e-mail --
5     A.   Yes.  I did not call her on Sunday,
6  no.
7     Q.   And say what -- "What in the world
8  are you talking about?  Everything we do is
9  accurate.  I don't know what in the world you're
10  talking about."  You didn't do anything like that,
11  did you?
12     A.   I did not.
13     Q.   And then Dr. Riley wrote back to you
14  that evening, Sunday evening, and if you look at
15  that e-mail, she said she would take your concern
16  about turnaround time into account, correct?
17     A.   She said:  I totally agree with the
18  need to balance, and I don't plan on impacting
19  turnaround time with -- with resolutions right now.
20     Q.   And that's TAT, turnaround time?
21     A.   Yes.
22     Q.   And she says:  The plan I outlined
23  was by priority.
24        Do you see that?
25     A.   Yes.



Page 289

1    Q.   And -- and she discusses what she
2  thinks the priority should be, and then she says --
3  she answers your question about dilute and shoot.
4  She says:  I don't think the dilute and shoot is
5  the problem.  I think it's inconsistency with prep.
6        What does -- what does she mean?  Do
7  you see that?
8    A.   I do.
9    Q.   What does she mean by "prep"?
10   A.   The -- during the sample prep
11  process, what the technicians were doing to prep
12  the specimens.
13   Q.   And specimens have to be prepped
14  before they're -- they're tested, correct?
15   A.   Yes.
16   Q.   And she thought that that was
17  resulting in inaccurate test results, correct?
18   A.   Not inaccurate test results, no.
19   Q.   Well --
20   A.   She's talking -- no.  She never says
21  it made the results wrong.  She was talking about
22  that as far as the QCs and the acceptance of those.
23   Q.   Well, the QCs, that means you can't
24  be reporting out results, and she said that she
25  complained about what she perceived Ms. Essington

Page 290

1  doing in working her magic that resulted in
2  reporting out results that shouldn't have been
3  reported out, correct?
4        MR. CEJAS:  Object to the form.
5  Calls for speculation.
6        THE WITNESS:  And again, what she's
7  citing is concerns are practiced -- are
8  scientifically valid practices that we use today.
9  So that's her opinion in looking at very small
10  amounts of data within the organization.
11       Thank you.
12   Q.   (BY MR. CORNFELD)  I've handed you
13  what's been marked as Exhibit 32, which is a
14  document bearing the number 85232 on the first
15  page.  And this is an e-mail exchange between --
16  it's an e-mail exchange between Dr. Riley and
17  others.  Dr. Riley's most recent e-mail is from
18  November 3rd, 2020, and the e-mails go back to
19  October 23rd, 2020.
20       Do you see that?
21   A.   Yes.
22   Q.   Have you seen these e-mails before?
23   A.   Yes.  I'm copied on them.
24   Q.   Okay.  Do you recall if there was an
25  issue regarding a large number of tests that the

Page 291

1  state of Michigan wanted to be retested?
2    A.   There was not a large -- there was
3  not an issue, but they were requesting retests as
4  we had talked about previously.  And so this is
5  where there's a batch of retests.
6    Q.   And -- and the -- on retests, the
7  results were inconsistent with the first time,
8  correct?
9    A.   That is not correct.
10   Q.   The results were different from the
11  first time, correct?
12   A.   I'd have to read through this.  I
13  don't see where the results are different.  It
14  actually says here at one point that the retests --
15  the results from previous testing are pretty
16  consistent for cocaine, BE, and THC.  It says BEG
17  -- which would again be benzoylecgonine.
18   Q.   Yeah, I won't take the time to go
19  through all this.  I'll look at it tonight and we
20  can talk about that.
21   A.   Okay.  Okay.
22   Q.   But let's look at Dr. Riley's e-mail
23  on November 3rd, the one on the first page.  She
24  says:  I do not want to report the things that are
25  positive now.  These, quote, new, unquote,

Page 292

1  positives are probably due to the differing lowest
2  calibrator mentioned in an earlier e-mail or
3  evaporation, but these issues are hard to explain,
4  and I think it would add to the confusion.  I would
5  need to see the chromatography and calibrators from
6  the original run before I would be comfortable
7  reporting the new positives.
8        Do you see that?
9    A.   I do.
10   Q.   And so there were new positives.  And
11  doesn't that look to you like these were results
12  that were different?
13   A.   There's analytical variance that
14  especially if a drug is right around the cutoff,
15  that when it's run from batch to batch, if it's
16  right below the cutoff in one run, it may now be
17  right above the cutoff.  So yes, it's entirely
18  possible.
19   Q.   That there could be different
20  results --
21   A.   Yes.
22   Q.   -- in a test and a retest.  And
23  that's what she's addressing, correct?
24   A.   Yes.
25   Q.   And can -- can you sense Dr. Riley's



Page 293

1  frustration from this e-mail?
2      A.    No.  I don't, actually.
3      Q.    You don't think this shows any
4  frustration?
5      A.    I don't.
6      Q.    What --
7      A.    I think it's her learning our
8  processes and how things work.
9      Q.    And that she's being frustrated by
10  those processes.
11      A.    I don't read frustration in here.
12          Thank you.
13      Q.    I've handed you what's been marked as
14  Exhibit 33, which bears the Bates number 16111.  Do
15  you see this is an e-mail from you personally to
16  Dr. Riley on November 3rd, 2020, at 11:44 p.m.?
17      A.    No, this is not -- that's not what I
18  read.
19      Q.    Wait.  What did I get wrong?
20      A.    There's not an e-mail.
21      Q.    Oh, this is not an e-mail when it
22  says from Dominique Delagnes to Sarah Riley?
23      A.    It's not an e-mail, no.
24      Q.    What is it?  What is it?
25      A.    It's a reoccurring meeting event.

Page 294

1      Q.    Okay.  And this was a meeting that
2  was scheduled for November 3rd at three o'clock for
3  approximately half an hour?
4      A.    For 40 minutes, correct.
5      Q.    All right.  40 minutes.
6          And what was -- what was the purpose
7  of that meeting on November 3rd?
8      A.    She and I had already had had
9  scheduled reoccurring meetings to catch up once a
10  week.  And one of the things that she wanted to do,
11  obviously, is she had sent that e-mail on Sunday,
12  and one of the items was to go through her action
13  plan of what she had written out about what she
14  wanted to do.
15      Q.    Did you discuss the concerns she had
16  addressed to you?
17      A.    We went through the action plan.
18      Q.    Did you discuss the concerns that she
19  had sent to you?
20      A.    I can't -- I honestly cannot recall
21  everything that we discussed.  That was four years
22  ago.
23      Q.    Tell me everything you can recall
24  about the meeting you had with Dr. Riley --
25      A.    I don't --

Page 295

1      Q.    -- on November 3rd.
2      A.    I recall us going through the e-mail
3  that she sent and walking through the action plan.
4      Q.    So --
5      A.    That's the most that I recall.  I
6  don't remember in detail what was discussed.
7      Q.    Do you recall whether you told her
8  about the amount of time she would have to rectify
9  the situation --
10      A.    I do not.
11      Q.    -- that she -- you -- do you
12  recall --
13      A.    I don't recall.
14      Q.    Do you recall telling her that there
15  was no time right now to do that?
16      A.    No, I don't.
17      Q.    Do you recall whether you'd said that
18  at all or not?
19      A.    No, I don't.
20      Q.    Other than reviewing the e-mail she
21  sent you, do you recall anything else that happened
22  at that meeting?
23      A.    I don't.
24      Q.    Dr. Riley submitted her resignation
25  that night, correct?

Page 296

1      A.    She never actually sent it to us.  It
2  was not received until Thursday.
3      Q.    How was it received on Thursday?
4      A.    Because I had learned that she had
5  called up to one of the judges in the state of
6  Michigan, so I reached out to her to understand
7  what was going on.  I was in complete surprise.
8          I believe it was in her draft e-mail,
9  and based on my conversation of me reaching out to
10  her to ask her, you know, what was her conversation
11  with the judge, what she said, what was going
12  on, actually two days later, we had received it
13  from her SLU e-mail.
14          So I believe it sat in her draft
15  e-mail.  I never received her resignation on that
16  day.  Actually, then later learned that she'd sent
17  a text message to Shannon Spencer that she had
18  resigned, but I didn't learn about it until
19  Thursday.
20      Q.    All right.  I --
21      A.    And she never returned any of my
22  phone calls about it.
23      Q.    Do you know whether she thought she
24  sent it or not?  I mean, I can't tell you --
25      A.    I have no idea.



Page 297

1   Q.   I mean, I -- I can't tell you how
2   many times I find an e-mail in my outbox that I
3   thought I sent and I didn't, and I'm sure I'm not
4   the only person that happens to.
5   **A.   Well, I didn't receive it.**
6   Q.   Okay.
7   **A.   I did not receive it from her.**
8   Q.   Well, let's -- before we look at
9   that, let's look at the letter you sent to her in
10  response.
11  **A.   Thank you.**
12  Q.   I've handed you Exhibit 34, Bates
13  number 15703 addressed to Sarah Riley dated
14  November 6th, 2020, and a place for your signature,
15  Dominique Delagnes, correct?
16  **A.   Yes.**
17  Q.   Do you see that?
18       And is this the letter that you sent
19  to Dr. Riley on November 6th?
20  **A.   Yes.**
21  Q.   And you start out:  Dear, Sarah.  As
22  you know, you resigned on Tuesday evening via
23  e-mail, which was received by Jason and me on
24  November 5th, 2020.
25       So the day before you sent this

Page 298

1   letter, correct?
2   **A.   Correct.**
3   Q.   And in the next sentence, you say:
4   While we are disappointed our relationship has
5   ended, we understand your decision.
6       Do you see that?
7   **A.   I do.**
8   Q.   So you did understand her decision
9   and why she made it?
10  **A.   I understand that people choose to**
11  **resign from -- from positions.**
12  Q.   And you understand why, because she
13  told you --
14  **A.   No, I didn't understand why.  She**
15  **didn't tell me why.**
16  Q.   You go on to say you recognize that
17  these are extraordinarily difficult times.
18       What did you mean by that?
19  **A.   That this might not have been the**
20  **position for her, and that it was something that**
21  **she didn't want to do.  But I did not in any way**
22  **believe that we were incorrectly reporting test**
23  **results.  The scale of our laboratory versus**
24  **laboratories that she had worked in previously was**
25  **quite different.**

Page 299

1   Q.   I've handed you what's been marked as
2   Exhibit 35, which bears the Bates number 415.
3       Do you recognize this as an e-mail
4   that Dr. Riley wrote to you and Mr. Herzog
5   submitting her resignation?
6   **A.   Yes.**
7   Q.   And that was dated November 3rd,
8   2020, at 7:14 p.m.?
9   **A.   Yes, but it was received on**
10  **November 5th at 12:57.**
11  Q.   Right.  Right.  Well, you already
12  told us that.
13       And do you see that she thanks you
14  for the offer of lab director and says the business
15  has some good people, but she doesn't think she's a
16  good fit.  Correct?
17  **A.   Yes.**
18  Q.   And in the third paragraph, she says:
19  The lab has deep seated quality issues that will
20  require a significant effort to remedy.  It has
21  been explained to me several times that there is no
22  time to rectify these issues and I think the
23  business growth is outpacing the laboratory's
24  ability to produce quality, meaningful data.  I am
25  not comfortable being the director of the lab until

Page 300

1   the right opportunity comes to work on the
2   analytical problems.
3       Did I read that correctly?
4   **A.   Those were her words, yes.**
5   Q.   And you have no reason to think she
6   -- this was not her sincere belief, do you?
7   **A.   That was her words.  That was her**
8   **belief.**
9   Q.   Then -- all right.  And then she
10  says:  The pace at which the lab is driven and the
11  level of micromanaging is also concerning.
12       She says that, correct?
13  **A.   Yes.**
14  Q.   And she was telling the truth as she
15  saw it, wasn't she?
16  **A.   That was her opinion of what she saw.**
17  Q.   All right.  And by the level of
18  micromanaging, was she referring to the fact that
19  you were not allowing her to take the time that
20  would be needed to rectify the problems?
21  **A.   I don't believe that that's the case.**
22  Q.   You don't believe you weren't giving
23  her the time, but do you think that's what she
24  meant?
25  **A.   I don't know what she meant.**



Dominique Delagnes                                                    July 08, 2024

Page 301

1      Q.    That that was -- that that's what
2  she -- you don't know what she meant by the level
3  of micromanaging?
4      A.    No, I do not.
5      Q.    Also, in your -- in your letter the
6  day after you received her resignation e-mail --
7      A.    Which document is that, just so I can
8  find it quickly?
9      Q.    Yeah, Exhibit 34.
10     A.    Thank you.
11     Q.    You -- in the third paragraph, you
12 say four lines down, we would like to discuss your
13 concerns directly.  Please contact me as soon as
14 possible to discuss your concerns.
15          Do you see that?
16     A.    I do.
17     Q.    Hadn't you already talked about her
18 concerns with her?
19     A.    She had sent the one e-mail with an
20 action plan of what she wanted to do from a quality
21 control.  But again, as I had stated previously, I
22 had confidence that our test results that we put
23 out were scientifically valid procedures and
24 accurate.
25          So I was surprised that she would

Page 302

1  leave, not make a -- not call me, talk to me about
2  it, and just in our conversation that we had had,
3  right, the day that she resigned where we talked
4  40 minutes, not once did she tell me she was too
5  uncomfortable to work at the laboratory and wanted
6  to resign.
7      Q.    Well, she didn't make that decision
8  until after she reflected on your conversation,
9  correct?
10     A.    I don't know.
11     I mean, she -- she wrote her
12 resignation letter several hours later, correct?
13     A.    Yes.
14     Q.    It's not like she walked out of that
15 meeting with you and immediately said I'm quitting.
16          MR. CEJAS:  Well, I'll object --
17     Q.    (BY MR. CORNFELD)  Did she?
18          MR. CEJAS:  -- it calls for
19 speculation.
20     Q.    (BY MR. CORNFELD)  Did she?
21          MR. CEJAS:  Calls for speculation.
22          Go ahead, if you know.
23          THE WITNESS:  The e-mail was drafted
24 at 7:14 p.m.
25     Q.    (BY MR. CORNFELD)  And your meeting

Page 303

1  was at three o'clock?
2      A.    Yes.
3      Q.    All right.  Don't you think she would
4  have wanted to take time to reflect on it and make
5  sure that was what she really wanted to do and how
6  to explain it?
7      A.    I would have --
8          MR. CEJAS:  Same objection.
9          THE WITNESS:  I would have thought in
10 our conversation where we spoke for 40 minutes, she
11 would have indicated to the fact that she wasn't
12 comfortable with our practices.
13     Q.    (BY MR. CORNFELD)  Well, you told me
14 you don't remember what she said during that
15 meeting.  Is that right?
16     A.    If she had told me that she wanted to
17 resign or had serious concerns, it would have
18 resonated, but yes, I cannot tell you exactly what
19 the conversations were in that meeting.
20     Q.    Other than you went over her -- her
21 e-mail --
22     A.    Action plan.
23     Q.    -- her e-mail that it was not just --
24 you keep referring to it as an action plan.  The
25 title -- the subject was:  Analytical concerns.

Page 304

1          And the first portion of the e-mail,
2  all but five paragraphs, meaning eight
3  paragraphs -- or nine paragraphs were on her
4  significant concerns that were so bad that if she
5  were an expert witness, she could tear apart your
6  procedures.
7      A.    And they're --
8      Q.    Correct?
9      A.    -- practices and procedures that we
10 have in place today.
11     Q.    Excuse me.  That is what she --
12 that's what her e-mail was --
13     A.    That is --
14     Q.    -- it was not just an action plan,
15 which is all you want to refer to it as.  It was
16 her description of the significant quality concerns
17 she saw at Averhealth --
18          MR. CEJAS:  Object --
19     Q.    (BY MR. CORNFELD)  -- correct?
20          MR. CEJAS:  Object to the form.
21 Argumentative.
22          THE WITNESS:  She outlines some
23 things that are still in place today.
24     Q.    (BY MR. CORNFELD)  Excuse me --
25     A.    So in my opinion, they were not

Page 305

1  serious concerns.
2    Q.   You -- you may not think they were
3  serious concerns, but she thought they were serious
4  concerns.
5    A.   Okay.
6    Q.   Didn't she?
7    A.   Yes, she did.
8    Q.   So serious that she -- and we'll talk
9  about this in a moment or maybe tomorrow.  She went
10  to CAP with those concerns, correct?
11    A.   She did.
12    Q.   All right.  And in your letter to
13  Dr. Riley on November 6th, your letter in response
14  to her e-mail to you, or resignation, rather --
15    A.   Yes.
16    Q.   -- you said you understood her
17  decision, you asked her to contact you to talk
18  about her concerns.  But one thing you didn't say
19  was, "You are wrong and we have total confidence in
20  our procedures," correct?
21    A.   Correct.
22    Q.   You didn't disagree with anything she
23  brought to you?
24    A.   I didn't say -- it's not written in
25  this.  I disagree with you, but it is not in

Page 306

1  writing in this letter.
2    Q.   You never sent her a letter that
3  disagreed with her.  You never sent her an e-mail
4  or a letter, and you can't recall if you ever said
5  verbally that you disagreed with her, correct?
6    A.   Correct.
7    Q.   If -- if somebody believed that
8  what -- that Dr. Riley's concerns were valid and
9  were substantiated, and you were -- have those same
10  procedures in place today, then wouldn't that
11  person have to conclude that your procedures today
12  are faulty?
13    A.   That is too broad of a question.  Can
14  you be more specific.
15    Q.   Well, if Dr. Riley raised concerns,
16  you said that her concerns pertained to practices
17  that you still have in place today.
18    A.   Yes.
19    Q.   If somebody agreed with Dr. Riley's
20  concerns and then found out that you have those
21  same practices in place today, and that was
22  somebody knowledgeable in the field of forensic
23  toxicology, wouldn't that person have to conclude,
24  if they agreed that Dr. Riley raised concerns that
25  your practices were faulty, that they're still

Page 307

1  faulty today?
2    A.   No.
3        MR. CEJAS:  Object to form.
4    Q.   (BY MR. CORNFELD)  How -- how are
5  they different from the practices that were faulty
6  in 2020 if they're the same practices today?
7        MR. CEJAS:  Object to form.  Assumes
8  facts not in evidence.
9        Go ahead.
10        THE WITNESS:  I'm stating that the
11  two things that she outlined specific, that she
12  said were serious practices or concerns, are
13  practices that we have today.
14        The examples she cited, there's --
15  she gave very specific examples, and those are
16  allowable practices that we have in our procedures
17  today, that have been reviewed by CAP, by CLIA, by
18  Dr. Klette, by Dr. Wagner, by everybody else.
19        (A discussion was held off the
20  record.)
21    Q.   (BY MR. CORNFELD)  Did you make any
22  of the changes that Dr. Riley suggested in her
23  action plan?
24    A.   What's that exhibit again?  Is that
25  29?  No, it's not 29.

Page 308

1        MR. PLEBAN:  31.
2        THE WITNESS:  31.  Thank you.  Number
3  one, we never implemented the screening cutoffs at
4  the lower levels.  We did work with the state of
5  Michigan, they raised their cutoff levels.  So we
6  introduced amino assay screening at that time.
7        I believe there were some method
8  improvements made with the hair tests.
9        Number three, she wanted to look for
10  a summary of QCs.  I know we've -- you know, we
11  continuously do training with data reviewers.  She
12  talks about developing a training presentation, so
13  if -- we didn't have that, but obviously they have
14  continuous education and training on data
15  reviewing.
16        And then Christina asked for some
17  additional training, that Sarah talks about, she
18  found Sciex courses that could be used as
19  continuing education.
20    Q.   (BY MR. CORNFELD)  Handing you what's
21  been marked as Exhibit 36, which bears the Bates
22  number 413.  This is an e-mail exchange between you
23  and Dr. Riley, along with Christina Essington on
24  November 3rd and November 4th.
25        Do you see that?



Page 309

1    A.   Yes.

2    Q.   And the most recent e-mail was sent

3  -- she sent it to you on November 4th, 2020, at

4  12:57 in the morning, correct?

5    A.   Pardon?  I'm sorry?

6    Q.   Dr. Riley --

7    A.   Can you repeat what you said?

8    Q.   Dr. Riley sent you the e-mail at the

9  top of the page, which is the most recent in this

10  thread --

11    A.   Okay.

12    Q.   -- on November 4th, 2020, at 12:57.

13    A.   Yes.

14    Q.   That's 12:57 a.m., correct?

15    A.   Yes.

16    Q.   And so that was the same night she

17  wrote her resignation, correct?

18    A.   Tuesday, November 3rd was from me.

19    Q.   She sent that e-mail about

20  seven o'clock in the evening on November 3rd, and

21  this is after midnight that same night, correct?

22    A.   Yes, I'm trying to reconcile the time

23  frame.  Yes.

24    Q.   All right.  And this --

25    A.   So she sent an e-mail after she

Page 310

1  resigned?

2    Q.   Do you recall this e-mail?

3    A.   I didn't recall it until looking at

4  it now.

5    Q.   And do you recall it now?

6    A.   Yes.

7    Q.   All right.  And this had to do with

8  an issue in one of her batches, correct?  Actually,

9  two of her batches.

10    A.   Issue, no.  The results weren't

11  actually released, so it was when she went to

12  upload the results in Aversys and released them,

13  they still sat in pending.

14    Q.   Well, the reason I use the word

15  "issue," in your e-mail initiating this

16  thread, you said:  Good evening, Sarah.  Two of the

17  batches you did yesterday seem to have an issue.

18    Correct?

19    A.   That's the word I used, yes.

20    Q.   All right.  And what she says in her

21  e-mail after midnight was:  I came into the lab and

22  fixed the dextromethorphan.

23    A.   Methorphan.

24    Q.   Methorphan issue.  Those should be

25  released now.  I went back Superman -- Superman was

Page 311

1  one of your testing machines?

2    A.   It is.

3    Q.   Okay.  And she went back to it to

4  check the THC.  THC is -- is a drug that you're

5  testing for?

6    A.   Correct.

7    Q.   To check the THC pending from that

8  batch.  And she gives the batch number.  And none

9  of the accession numbers that are sitting in the

10  queue are in the batch on MultiQuant.

11    Correct?

12    A.   Yes.

13    Q.   MultiQuant is your software program?

14    A.   It's the Sciex software program

15  that's tied to the LC-MS instruments, yes.

16    Q.   Okay.  And was this after she had

17  written her resignation letter, and she still

18  thought she ought to go in the lab to fix an issue,

19  correct?

20    A.   I don't know what time she came back

21  to the lab, I just know what time it was sent to

22  me.

23    Q.   After midnight.  Correct?

24    A.   The e-mail was sent after midnight.

25  I don't know what time she was physically at the

Page 312

1  lab, though.

2    Q.   Well, once she -- once she resigned,

3  she could have said forget it, it's your problem,

4  you deal with it, right?

5    A.   Could have.

6    Q.   And she didn't.  Whether she drove to

7  the lab at midnight or just sent her e-mail to you

8  at midnight, did you ever thank her for that, for

9  doing that after she resigned?

10    MR. CEJAS:  Object to the form.

11  Assumes facts not in evidence.

12    THE WITNESS:  I don't believe so.

13    Q.   (BY MR. CORNFELD)  Instead, in the

14  months ahead, you smeared her to CAP, correct?

15    MR. CEJAS:  Objection.  Assumes facts

16  not in evidence, argumentative.

17    Q.   (BY MR. CORNFELD)  Correct?

18    A.   No.

19    Q.   What's not correct?

20    A.   That we did not smear her to CAP.

21    Q.   Well, we'll look at the --

22    A.   Okay.

23    Q.   -- names you called her to CAP.

24    A.   Thank you.

25    Q.   I've handed you what's been marked as



Page 313

1 Exhibit 37, which is a Microsoft Teams chat between
2 two Averhealth employees that was produced by
3 Averhealth to us.
4         Are you familiar with this document?
5   **A.  Yes.**
6   Q.   All right.  Is this the -- the
7 message that you said Dr. Riley sent to Shannon
8 Spencer that you saw subsequently?
9   **A.   I never actually saw the text**
10  **message, but yes.**
11  Q.   I'm sorry?
12  **A.   I've never seen the actual text**
13  **message that went from Dr. Riley to Shannon**
14  **Spencer.**
15  Q.   Okay.  Ms. Spencer copied that text
16 message in her e-mail, or excuse me, in her chat
17 with Ellen Tomko, correct?
18  **A.  Yes.**
19  Q.   Ellen Tomko being another Averhealth
20 employee?
21  **A.  Yes.**
22  Q.   When did you see this document?
23  **A.   In the last several weeks.**
24  Q.   In preparation for the deposition?
25  **A.  Yes.**

Page 314

1   Q.   The e-mail that -- that Ms. Spencer
2 copied from Dr. Riley says:  Hi, Shannon.  I wanted
3 to let you know that I just resigned.  I'm too
4 uncomfortable with the quality issues and with
5 Dominique's response to me bringing them up.  We've
6 had a few conversations about it, and I just don't
7 think I'm a good fit.  I think you are awesome and
8 I'm really sorry it turned out like this.  Please
9 stay in touch.
10        Do you see that?
11  **A.   I do.**
12  Q.   Have you talked to Ms. Spencer about
13 this?
14  **A.   I have not had a conversation since**
15  **looking at this through discovery with Ms. Spencer**
16  **about it, no.**
17  Q.   Or an e-mail exchange or a chat?
18  **A.  No.**
19  Q.   You haven't communicated with her?
20  **A.   (Witness indicated.)**
21  Q.   What do you think Dr. Riley meant by
22 the quality issues and with Dominique's response to
23 me bringing them up?
24        MR. CEJAS:  Objection.  Calls for
25 speculation.

Page 315

1         But if you know, go ahead.
2   **THE WITNESS:  I don't know.**
3   Q.   (BY MR. CORNFELD)  You have no idea?
4   **A.   I don't.**
5   Q.   And you don't remember what response
6 you had in that meeting that you held with her?
7   **A.   I don't.**
8   Q.   Or any of the other conversations she
9 refers to when she says we've had a few
10 conversations about it?
11  **A.   No, I don't.**
12  Q.   Do you know if Ms. Spencer responded
13 to Dr. Riley?
14  **A.   I don't know.**
15  Q.   All right.  You know that the day
16 after Dr. Riley resigned from Averhealth, she filed
17 a former -- a formal complaint against Averhealth
18 with the College of American Pathologists, or CAP?
19  **A.   I know there was a complaint filed.**
20  **I didn't know the exact date.**
21  Q.   Well, you know it was shortly after
22 she resigned, correct?
23  **A.   I believe so.**
24        MR. CEJAS:  Just as reminder, Rick,
25 we've got about 30 minutes, I think, roughly on the

Page 316

1 seven hours.
2         MR. CORNFELD:  30 minutes left?
3         MR. CEJAS:  Roughly.  It's about
4 six o'clock now.
5         MR. PLEBAN:  You're saying 6:30 is
6 our cutoff, or 7:00?
7         MR. CEJAS:  I think it's right around
8 6:30.
9         MR. PLEBAN:  Thank you.
10  Q.   (BY MR. CORNFELD)  I've handed you --
11 no, I haven't.  I'm handing you what's marked
12 Exhibit 38, which bears the Bates number on the
13 first page 56436, and is an e-mail from Amanda
14 Doane of the Michigan Department of Health and
15 Human Services to you, among others.
16        Correct?
17  **A.  Yes.**
18  Q.   And that's dated November 5th,
19 correct?
20  **A.   I mean, the original e-mail, yes.**
21  Q.   And she's calling a Microsoft Teams
22 meeting, correct?
23  **A.  Yes.**
24  Q.   And she attaches as part of the
25 thread an e-mail, if you look at page 56438, an



Page 317

1  e-mail from Terence Ackert, dated Wednesday
2  November 4th, 2020, to a number of people.
3      Correct?
4      **A.   Yes.**
5      Q.   And do you understand that Terence
6  Ackert was a judge in Michigan?
7      **A.   Yes.**
8      Q.   All right.  And he says:  Greetings.
9  I received a telephone call today from Dr. Sarah
10  Riley, the former director of labs at Averhealth.
11      Do you see that?
12      **A.   Yes.**
13      Q.   And that telephone call today would
14  have been November -- Wednesday, November 4th,
15  meaning the day after she -- she wrote out her
16  resignation, correct?
17      **A.   Yes.**
18      Q.   And then in the next paragraph, Judge
19  Ackert says:  Dr. Riley informed me that last
20  night, she terminated her position as lab director
21  of Averhealth because of her serious concerns that
22  Averhealth has failed to follow standard testing
23  procedures and is not compliant with the standards
24  developed by the College of American Pathologists.
25      Do you see that?

Page 318

1      **A.   Yes.**
2      Q.   And then at the end of that
3  paragraph, he says:  Dr. Riley advised me that she
4  had -- has filed a formal complaint against
5  Averhealth with the College of American
6  Pathologists, correct?
7      **A.   Yes.**
8      Q.   And you were copied on this -- not on
9  this e-mail, but you were sent a copy in the e-mail
10  from Ms. Doane --
11      **A.   Yes.**
12      Q.   -- correct?  So you knew at the time
13  that the day after Dr. Riley resigned, she
14  submitted that formal complaint with CAP?
15      **A.   Yes.**
16      Q.   And considering that Dr. Riley
17  sincerely believed that Averhealth had deep seated
18  quality problems that it was not addressing, don't
19  you agree that you would have been obligated to
20  bring those to the attention of CAP?
21      **A.   Yes.**
22      Q.   So you don't have any complaint with
23  her about going to CAP about this, do you?
24      **A.   If she had concerns, she needs to**
25  **raise them.  It doesn't mean I agree with her**

Page 319

1  **concerns.**
2      Q.   Right.  I understand that.
3      **A.   I don't believe we were following**
4  **them.**
5      Q.   I'm sorry?
6      **A.   I don't believe that -- that what she**
7  **said we were doing caused our test results to be**
8  **reported inaccurately.**
9      Q.   All right.  But I understand that
10  you're saying you disagree with Dr. Riley, with her
11  expert opinion as a toxicologist, which you are
12  not.  But considering that she had those concerns,
13  you have no quarrel with her bringing them to the
14  attention of CAP, do you?
15      MR. CEJAS:  Object to the form.
16  Argumentative.
17      Go ahead.
18      **THE WITNESS:  She needs to do what**
19  **she believes.**
20      Q.   (BY MR. CORNFELD)  All right.
21  Otherwise, she'd be guilty of a cover-up, right?
22      MR. CEJAS:  Object to the form to the
23  extent you're implying there's something criminal.
24      MR. CORNFELD:  I'm not implying that
25  it's criminal.  That's not for me to decide.

Page 320

1      Q.   (BY MR. CORNFELD)  But --
2      **A.   There is no cover-up.**
3      Q.   -- a cover up -- no, she would be
4  guilty of a cover-up if she didn't bring those
5  concerns to CAP, wouldn't she?
6      MR. CEJAS:  Same objection.
7      Go ahead.
8      **THE WITNESS:  I -- there was nothing**
9  **to cover-up.**
10      Q.   (BY MR. CORNFELD)  But --
11      **A.   We had been --**
12      Q.   -- don't you think she would believe
13  she'd be guilty of a cover-up?  She had serious
14  concerns about problems with Averhealth's quality
15  that were not being addressed, and she kept those
16  to herself and didn't bring them to the attention
17  of the courts in Michigan or to the College of
18  American Pathologists, that she'd be guilty of a
19  cover-up?
20      MR. CEJAS:  Object to the form.
21  Calls for speculation as to what some other witness
22  believed.
23      **THE WITNESS:  I don't know what she**
24  **would -- what she would have believed.**
25      Q.   (BY MR. CORNFELD)  You don't know



Page 321

1  that she would think, oh, I can't cover this up,
2  I've got to do something?
3          MR. CEJAS:  Same objection.
4          **THE WITNESS:  No, I don't know what**
5  **she would believe.**
6      Q.   (BY MR. CORNFELD)  I've handed you
7  what's been marked as Exhibit 39, which bears the
8  Bates number on the first page 17080 and is a
9  letter on the letterhead of College of American
10  Pathologists dated November 11, 2020, to Michele
11  Glinn, PhD at Averhealth, and is signed by Earle
12  S. Collum, M.D., Complaints and Investigations
13  Committee Chair of the CAP accreditation program.
14          Do you have that?
15      **A.   Yes.**
16      Q.   All right.  And Collum is spelled
17  C-O-L-L-U-M.
18          This -- this is the letter in which
19  CAP informed Averhealth of Dr. Riley's complaints,
20  correct?
21      **A.   Yes.**
22      Q.   And it relates to complaint number,
23  if you look at the upper right-hand corner, 10219,
24  correct?
25      **A.   Yes.**

Page 322

1      Q.   And Dr. Collum states that:  The
2  College of American Pathologists, or CAP,
3  accreditation program has received a complaint
4  containing the following allegations.
5          Correct?
6      **A.   Yes.**
7      Q.   And then he lists four allegations
8  concern with regard to mass spectrometry
9  confirmatory testing.  That's number one.
10          Number two, failure to follow
11  procedures as written.
12          Number three, concerns regarding
13  instrument calibrations.
14          And four, concerns regarding the
15  review of quality control results.
16          Correct?
17      **A.   Yes.**
18      Q.   These were serious allegations,
19  weren't they?
20      **A.   They were allegations.**
21      Q.   They were serious allegations,
22  weren't they?
23      **A.   They were allegations.**
24      Q.   Did you consider them serious or
25  frivolous?

Page 323

1      **A.   They were allegations about our**
2  **processes.**
3      Q.   Were they serious?
4      **A.   They were allegations.  I mean, who's**
5  **to determine whether they're serious or not.**
6      Q.   I'm asking what Averhealth thought
7  when it saw this.  Didn't it think oh, my gosh,
8  this is really serious?
9      **A.   They were concerning.**
10      Q.   And serious with -- they were
11  serious, they were concerning because they were
12  concerns, but they were serious, weren't they?
13          MR. CEJAS:  Objection.  Asked and
14  answered.
15      Q.   (BY MR. CORNFELD)  Didn't Averhealth
16  consider this was serious?
17      **A.   We had confidence in our test results**
18  **to receive this.  We knew that we needed to go**
19  **through and show that our processes that we used**
20  **provided us to have scientifically valid results.**
21      Q.   That's not my question.  My question
22  is --
23      **A.   Okay.**
24      Q.   -- when you saw this, didn't you
25  think, my gosh, this is really serious?

Page 324

1          MR. CEJAS:  Objection.  Asked and
2  answered.
3          Go ahead one last time.
4          **THE WITNESS:  We knew that we needed**
5  **to show that our processes were valid.**
6      Q.   (BY MR. CORNFELD)  You didn't
7  consider this frivolous or something you could blow
8  off.  This was really -- and you spent a lot of
9  time --
10      **A.   Anything --**
11      Q.   -- and a lot of work --
12      **A.   -- from the regulatory bodies is**
13  **something that we know that we can't just blow off.**
14  **Right.**
15      Q.   And it's serious, isn't it, when a
16  regulatory body comes and says they've gotten the
17  following -- these following allegations, including
18  failure to follow your procedures, concerns with
19  your mass spectrometry confirmatory testing, your
20  instrument calibrations, your review of quality
21  control results, you won't admit that those are
22  serious?
23          MR. CEJAS:  Objection.  Asked and
24  answered.  It's argumentative at this point.
25          Go ahead.



Page 325

1      THE WITNESS:  As I've indicated
2  before, we had confidence in our test results we
3  put out.  Yes, these allegations were there and we
4  needed to show the American -- the College of
5  American Pathologists that we had practices that
6  resulted in accurate test results.
7      Q.   (BY MR. CORNFELD)  I don't understand
8  why you won't admit that these are serious.  Would
9  you look at the camera, tell the jury that you are
10  not agreeing that these are serious allegations?
11      MR. CEJAS:  Object to the form.  It's
12  argumentative.  She's asked and answered it five
13  different times.
14      Q.   (BY MR. CORNFELD)  Go ahead.  Tell
15  them -- tell the jury whether you considered these
16  serious allegations.
17      MR. CEJAS:  Same objections.
18      Q.   (BY MR. CORNFELD)  And also the
19  Court.
20      MR. CEJAS:  Same objections.  Asked
21  and answered, argumentative.
22      THE WITNESS:  Anytime CAP has written
23  to us about somebody who has raised a concern, we
24  take it very seriously and we look into it.
25      Q.   (BY MR. CORNFELD)  You take it very

Page 326

1  seriously because these were serious allegations,
2  correct?
3      MR. CEJAS:  Objection.  Asked and
4  answered, argumentative.  She just answered the
5  question again.
6      Q.   (BY MR. CORNFELD)  Go ahead.
7      MR. PLEBAN:  No, it wasn't.
8      MR. CEJAS:  Go ahead.
9      THE WITNESS:  Okay.  Do you want me
10  to state again what I've already stated?
11      Q.   (BY MR. CORNFELD)  I want you to tell
12  the jury whether or not you considered this
13  serious, not whether you took it seriously --
14      A.   Anytime we receive anything from a
15  governing body, we take it very seriously.
16      Q.   I'm not asking whether you take it
17  seriously.
18      A.   Okay.
19      Q.   Of course you take it seriously when
20  they ask you to send them all this information they
21  asked you in this letter.  I'm asking whether you
22  considered these to be serious allegations.
23      MR. CEJAS:  Objection.  Asked and
24  answered now many times.  It's argumentative.  One
25  last time and then we're moving on.

Page 327

1      Go ahead.
2      THE WITNESS:  We looked into these,
3  we responded, and we showed that we had solid
4  procedures that had us accurately report test
5  results.
6      Q.   (BY MR. CORNFELD)  Okay.  Is that
7  your answer to the Court and jury about whether you
8  considered these allegations serious?
9      A.   I indicated anything that we received
10  from the College of American Pathologists we take
11  seriously.
12      Q.   I didn't ask that.
13      A.   Okay.  Well, you did because you said
14  that it came from the College of American
15  Pathologists --
16      Q.   When they sent you -- when they sent
17  you the -- the proficiency test materials, you take
18  that -- anything they send you, you take serious.
19  I'm asking about the allegations, whether you
20  considered them serious allegations.
21      A.   Serious as any other time that we
22  receive written correspondence from the College of
23  American Pathologists.
24      Q.   When they said that you failed to
25  follow procedures as written, is that a serious

Page 328

1  allegation?
2      A.   It's concerning, yes.
3      Q.   All right.  And then he -- Dr. Collum
4  elaborates on one of those -- one of those
5  allegations.
6      A.   Okay.
7      Q.   In his bullet point, he says:  A
8  concern was raised in regard to mass spectrometry
9  testing.  The concerns pertain specifically to how
10  quality controls, internal standards defined cutoff
11  and calibration data are interpreted prior to the
12  release of patient results.  There are also
13  concerns that practice does not follow laboratory
14  procedures.
15      Was it serious that he had those
16  concerns?
17      MR. CEJAS:  Objection.  Calls for
18  speculation to whether these are his concerns or
19  someone else's, assumes facts not in evidence.
20      Go ahead, subject to that.
21      THE WITNESS:  He was reporting of
22  concerns that were raised by Dr. Riley to the
23  College of American Pathologists.
24      Q.   (BY MR. CORNFELD)  All right.  And
25  then, he wants to investigate those concerns, so he



Page 329

1 asked you to provide a long list of information,
2 didn't he?
3      **A.   Yes.**
4      Q.   And they dealt with specific CAP
5 requirements?
6      **A.   Yes.**
7      Q.   Some of them dealt with tests on
8 specific dates and even a specific test by
9 accession number, correct?
10     **A.   Yes.**
11     Q.   Do you know why he selected those?
12     **A.   I do not know why he selected those.**
13          MR. CEJAS:  My numbers are off.
14          MR. CORNFELD:  Yeah, I didn't give
15 them to you in order.
16          MR. CEJAS:  You skipped some.
17          MR. CORNFELD:  Well, I didn't.  I
18 just got them out of order.  I'll read off what
19 they are.  This is 44.
20          MR. CEJAS:  Is there no 41?
21          MR. PLEBAN:  No, not yet.
22          MR. CORNFELD:  I'm sorry, 41, I
23 misread it.
24          MR. PLEBAN:  This one is 41?
25          MR. CORNFELD:  Yeah.

Page 330

1          MR. PLEBAN:  There you go.  Good?
2          MR. CEJAS:  I'm good.  Thank you.
3     Q.   (BY MR. CORNFELD)  This is 44.
4     **A.   44.  Mrs. Delagnes, I just marked and**
5 **handed you five exhibits.  Exhibit 40 is a memo on**
6 **Averhealth's letterhead from Mr. Herzog to Thomas**
7 **Boyd, the state court administrator of Michigan**
8 **Supreme Court.**
9          **Exhibit 41 is an e-mail from**
10 **Mr. Herzog to Colin Parks and Amanda Doane dated**
11 **November 13, 2020.**
12          **Exhibit 42 is a memo on Averhealth**
13 **letterhead by Mr. Herzog to Colin Parks, manager of**
14 **Michigan's Child's Protective Service program**
15 **office dated November 12th, 2022.**
16          **Exhibit 43 is a memo from Mr. Herzog**
17 **to Judge Ackert on Averhealth stationary dated**
18 **November 12th, 2020.**
19          **And Exhibit 44 is an e-mail from**
20 **Austin Cady to Shelly Hunter dated December 3rd,**
21 **2020.**
22          **Do you have those?**
23     **A.   I do.**
24     Q.   All right.  So Averhealth took no
25 time in sending these e-mails and messages to

Page 331

1 judges and officials of the Michigan Department of
2 Health and Human Services to present its story
3 about the -- the complaint that was made to CAP,
4 correct?
5      **A.   There were questions in Michigan,**
6 **based on the phone call that Dr. Riley had had with**
7 **Judge Ackert, and so they were asking us -- I think**
8 **in one of the messages, it indicated that we needed**
9 **to get on a phone call, and so yes, we wanted to**
10 **make sure that we could respond to questions around**
11 **test results.**
12     Q.   All right.  If we look at Exhibit 43,
13 Mr. Herzog's memo to Judge Ackert.
14     **A.   Yes.**
15     Q.   He starts out by saying:  The
16 allegation raised by Sarah Riley -- who he calls
17 Riley -- are very concerning.
18          Correct?
19     **A.   Yes.**
20     Q.   By the way, is there a reason why
21 Averhealth never refers to Dr. Riley as Dr. Riley?
22     **A.   This is --**
23     Q.   It's always Sarah Riley, never
24 Dr. Riley.
25     **A.   This is from Jason, so I'm not sure**

Page 332

1 **why he indicated that in this memo.**
2     Q.   I'm not talking about just this memo.
3     **A.   Okay.**
4     Q.   I have never seen any document in
5 which Averhealth ever referred to Dr. Riley by her
6 title Dr. Riley.
7     **A.   I don't know.**
8     Q.   You don't know why that is?
9     **A.   Correct.**
10     Q.   She is -- she is a PhD, she is
11 entitled to the title doctor, correct?
12     **A.   She is a PhD.**
13     Q.   As a father of a PhD, I think that's
14 very important that they always be given that
15 title.  And maybe that's just me and not
16 Mr. Herzog.
17          MR. CEJAS:  Object to the form.  Not
18 a question.
19     Q.   (BY MR. CORNFELD)  All right.  He --
20 in -- at the end of the second paragraph of
21 Exhibit 43, Mr. Herzog tells Judge Ackert:  The
22 false allegations -- and he's referring to
23 Dr. Riley's allegations as false; is that right?
24     **A.   Yes.**
25     Q.   And he says that the false



Page 333

1 allegations reported to CAP, FDT -- and FDT refers
2 to the Forensic Drug Testing arm of CAP, correct?
3    **A.   It does.**
4       Q.   All right.  And that's the specific
5 arm of CAP that regulates Averhealth, correct?
6    **A.   I'm sorry, can you say that again?  I**
7 **was reading and I didn't fully hear your question.**
8 **I apologize.**
9       Q.   CAP FDT, meaning College of American
10 Pathologists Forensic Drug Testing, that's the
11 specific part of CAP that regulates Averhealth,
12 correct?
13   **A.   Yes.**
14      Q.   All right.  And he says:  The false
15 allegations were reported to CAP FDT, and he means
16 by Dr. Riley, correct?
17   **A.   Yes.**
18      Q.   And he says:  And we are confident
19 that CAP FDT will deem the allegations as
20 unsubstantiated, correct?
21   **A.   Yes.**
22      Q.   And that's what he told Judge Ackert?
23   **A.   Yes.**
24      Q.   Correct?
25          And then in the next paragraph, he

Page 334

1 says:  For unknown reasons, Riley appears to have
2 become disgruntled.
3          Do you see that?
4    **A.   I do.**
5       Q.   That wasn't true, that there were
6 unknown reasons.  You knew why Dr. Riley was
7 unhappy.  She told you.
8    **A.   She had raised some analytical**
9 **concerns that we had indicated that she could put**
10 **in an action plan.**
11      Q.   I understand, but these were not
12 unknown reasons why she became disgruntled.  They
13 were very well known by Averhealth because
14 Dr. Riley told you, didn't she?
15   **A.   She raised some -- in-process**
16 **improvements she wanted to make, yes.**
17      Q.   So why did Mr. Herzog tell Judge
18 Ackert in Michigan that they were unknown reasons?
19   **A.   I don't know.**
20      Q.   That wasn't true, was it?
21   **A.   You -- I mean, tell me you're going**
22 **to ask Mr. Herzog.**
23      Q.   I'll ask him why he said that.  I'm
24 asking you, it wasn't true that they were unknown,
25 was it?

Page 335

1    **A.   The fact that she was indicating that**
2 **our results were wrong 20 to 30 percent of the time**
3 **was not a factual statement and not accurate --**
4       Q.   I understand -- I understand you --
5 you disagree with -- with her beliefs.  But they
6 weren't unknown, she had her reasons, didn't she?
7 And so that Mr. Herzog told Judge Ackert was false,
8 wasn't it?
9          MR. CEJAS:  Objection.  Asked and
10 answered.
11          Go ahead.
12          **THE WITNESS:  I'm rereading how the**
13 **sentence is written.  Just bear with me for a**
14 **minute.**
15      Q.   (BY MR. CORNFELD)  The sentence
16 states:  For unknown reasons, Riley appears to have
17 become disgruntled.
18          He didn't say she has her reasons,
19 but we think she's wrong.  He said that she didn't
20 have reasons.  For unknown reasons, she appears to
21 have become disgruntled.
22   **A.   Can I reread it without -- sorry, I**
23 **apologize.  Can I just read it myself?**
24      **But it says:  For unknown reasons,**
25 **Riley appears to have become disgruntled.**

Page 336

1       Q.   Right.  And that wasn't true, because
2 you told her --
3    **A.   The question was why she became**
4 **disgruntled, right?**
5       Q.   She became disgruntled because she
6 thought that the practices were so bad that if she
7 were an expert witness against Averhealth, she
8 could tear them to pieces.  That's not unknown, is
9 it?
10          MR. CEJAS:  Object to form.  Calls
11 for speculation.
12          Go ahead.
13          **THE WITNESS:  We believed in the**
14 **practice that we had, so we didn't understand why**
15 **she became disgruntled.**
16      Q.   (BY MR. CORNFELD)  That's not --
17 that's not -- she told you why she became
18 disgruntled.
19   **A.   Okay.**
20      Q.   Didn't she?
21   **A.   Yes.**
22      Q.   All right.  So it wasn't unknown, was
23 it?  You might have disagreed, you might have
24 thought she was all wrong, but she had her reasons
25 and Mr. Herzog told something that was false when



Dominique Delagnes                                                July 08, 2024

Page 337

1  he said the reasons were unknown.  Correct?
2        MR. CEJAS:  Objection.  Asked and
3  answered.
4        Go ahead.
5        THE WITNESS:  The root unknown of why
6  she thought that we had such quality issues when we
7  were confident in what we reported, that's --
8  that's what we're trying to state here.
9        Q.   (BY MR. CORNFELD) That's not what he
10  said, did he?  He didn't say --
11        A.   That is not what he said.  That was
12  the intention of what was written in here.
13        Q.   He could have easily said she came to
14  us with her concerns and we don't believe they are
15  real concerns.
16        A.   Okay.
17        Q.   That's not what he said, is it?  He
18  said for unknown reasons, and he knew that reasons.
19        MR. CEJAS:  Objection.
20  Argumentative.  Also calls for speculation as to
21  what he knew or didn't know.
22        Q.   (BY MR. CORNFELD) Go ahead.
23        A.   As I've indicated previously, we --
24  we didn't understand why she had become so
25  disgruntled when we were confident in our test

Page 338

1  results, so to that, that was unknown to us.
2        Q.   She told you what the reasons were,
3  didn't she?
4        A.   She -- she -- she wrote down reasons
5  in an e-mail.
6        Q.   All right.
7        MR. CEJAS:  And we are at seven
8  hours, Rick, so I'm not stopping you right now, but
9  we need to wrap up in, like, the next five minutes.
10        MR. CORNFELD:  Okay.  Let me -- let
11  me just finish these.
12        MR. CEJAS:  How much longer?  That's
13  fine, you can ask a couple questions.  How much
14  longer do you think?
15        MR. CORNFELD:  Five, ten minutes
16  maybe.
17        MR. CEJAS:  Five minutes is fine.
18        Q.   (BY MR. CORNFELD) Let's take a look
19  at -- strike that.
20        If you look on Exhibit 43, do you see
21  that he refers to his table -- he refers to
22  Dr. Riley's e-mail to you in the first -- the first
23  line?  He says: Riley e-mailed Dominique Delagnes
24  -- who he calls -- he calls you Delagnes --
25  regarding four continuous improvement ideas and her

Page 339

1  plan to implement.
2        A.   Yes.
3        Q.   Do you see that?  Why didn't he
4  mention her significant concerns and that she said
5  your practices were so bad that she could tear them
6  to pieces?  She did more than just write about four
7  continuous improvement ideas and a plan to
8  implement.  Why didn't he tell her -- tell him
9  that?
10        A.   That was her opinion, and we had
11  confidence in the practices that we had in place.
12        Q.   I understand that, but why -- when
13  he's summarizing what happened, why didn't he tell
14  Judge Ackert anything more than she had some
15  continuous improvement ideas, and why he thought --
16  she thought they needed improvement, and that's
17  because your practices were so terrible?
18        A.   We didn't believe that they were so
19  terrible.
20        Q.   Why didn't he tell --
21        A.   We had --
22        Q.   If he told Dr. -- Judge Ackert about
23  Dr. Riley's e-mail, why didn't he tell him the
24  complete story about it?  Why did he pick and
25  choose what he preferred to say?

Page 340

1        A.   I don't know.
2        Q.   All right.  Take a look at the e-mail
3  from Exhibit 41, the e-mail from Mr. Herzog to
4  Colin Parks.  And by the way, the -- the memo that
5  Mr. Herzog sent to Averhealth, that was an official
6  statement on behalf of the company, correct?
7        MR. PLEBAN:  To Michigan?
8        THE WITNESS:  The e-mail that he sent
9  to Averhealth?
10        Q.   (BY MR. CORNFELD) No, the memo.  The
11  memo that Dr. -- that Mr. Herzog sent to Judge
12  Ackert, Exhibit 43.
13        A.   Uh-huh.
14        Q.   He wasn't just expressing his own
15  view.  That was an official statement on behalf of
16  Averhealth, wasn't it?
17        A.   It was.
18        Q.   If you look at Exhibit 41,
19  Mr. Herzog's e-mail to Colin Parks and Amanda
20  Doane, they're employees of the Michigan Department
21  of Health and Human Services, which was your
22  customer in Michigan?
23        A.   Correct.
24        Q.   And he refers to a meeting that was
25  going to take place that day?

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Page 341

1    A.   Correct.

2    Q.   That was a meeting to explain

3  Averhealth's position regarding Dr. Riley's

4  complaint; is that right?

5    A.   Not Dr. Riley's complaint, because we

6  didn't know what the specific complaint was, but to

7  address the -- what we had learned, whatever

8  attachment that you'd indicated of what was sent to

9  Dr. Ackert -- Judge -- sorry, Judge Ackert.

10    Q.   Did you know about -- had you

11  received the letter from CAP at that point?

12    A.   So this was the 13th, the letter from

13  CAP was 11th.

14        MR. PLEBAN:  39.

15        THE WITNESS:  What number was it?

16  31?

17        MR. PLEBAN:  9.

18        THE WITNESS:  39.

19    Q.   (BY MR. CORNFELD)  Which was

20  November 11th.

21    A.   Which was the 11th.

22    Q.   Sent by express mail.

23    A.   Uh-huh.

24    Q.   So you would have had that at that

25  point, correct?

Page 342

1    A.   I'm not sure if we had it in our

2  hands yet, but I can certainly confirm that, if it

3  wasn't sent by express mail.

4    Q.   You would have received that on the

5  12th, then, right?

6    A.   I'm not sure if we had.

7    Q.   Okay.

8    A.   This was to address the conversation

9  and the e-mail that Amanda Doane had sent.

10    Q.   All right.  And Mr. Herzog says at

11  the second-to-last bullet:  They are also confident

12  -- this is a talking point.  So I assume he's

13  referring to Averhealth, when he says:  They are

14  also confident that CAP FDT will find these

15  allegations to be unsubstantiated.

16        Is that right?

17    A.   Yes.

18    Q.   Are these talking points that he

19  expects Mr. Parks and Ms. Doane to -- to express?

20    A.   I don't understand the question.

21    Q.   Who is going to provide these talking

22  points at the meeting?

23    A.   Who's going to talk on the meeting?

24    Q.   Yes.

25    A.   I -- I don't recall who did the

Page 343

1  talking on the meeting.

2    Q.   All right.  Take a look at Exhibits

3  40 and 42.

4    A.   Okay.

5    Q.   And by the way, who was at the

6  meeting?  Was it judges or officials with MDHHS, or

7  who?

8    A.   I don't remember.

9    Q.   And it wasn't a private meeting, so

10  anything that Averhealth said at the meeting would

11  be public, correct?

12    A.   It was not an internal meeting, if

13  that's your question.

14    Q.   Okay.  Then if you look at Exhibits

15  40 and 42.  Exhibit 40, an official memo on behalf

16  of Averhealth sent by Mr. Herzog to Judge Boyd, who

17  was the state court administrator of the Michigan

18  Supreme Court, and to Colin Parks, Exhibit 42, to

19  Colin Parks, manager of the Child Protective

20  Service of Michigan, both dated November 12th,

21  2020, correct?

22    A.   Correct.

23    Q.   And they -- they look pretty similar,

24  but I just want to call your attention to a couple

25  of statements.  At the end of the paragraph that

Page 344

1  starts November 2020, Mr. Herzog again says:  We

2  are confident that CAP FDT will deem the

3  allegations as unsubstantiated.

4        Did you see that?

5    A.   I do.

6    Q.   And you said Averhealth is

7  considering legal options.

8        Do you see that?

9    A.   I do.

10    Q.   All right.  And what did Averhealth

11  mean by that?  What legal options?

12    A.   I honestly am not sure.

13    Q.   Were you considering suing Dr. Riley?

14    A.   I don't -- I'm not sure.

15    Q.   You didn't sue Dr. Riley, did you?

16    A.   No.

17    Q.   And in the last paragraph of each of

18  these Averhealth memos, the one to Judge Boyd of

19  the Michigan Supreme Court and one to the manager

20  of the Child Protective Service in Michigan, he

21  says:  Perhaps unlike others, we fully embrace

22  transparency.

23        Do you see that?

24    A.   I do.

25    Q.   And we self-report our mistakes.



Page 345

1     Do you see that?
2     A.   I do.
3     Q.   Do you consider that Averhealth fully
4 embraces transparency?
5     A.   I do.
6          MR. CEJAS:  Even your own watch is
7 cutting me off.  I don't have to say anything.
8     Q.   (BY MR. CORNFELD)  And look at
9 Exhibit 44, that's --
10         MR. PLEBAN:  Did you get an answer?
11    Q.   (BY MR. CORNFELD)  -- from Austin
12 Cady to --
13         MR. PLEBAN:  Did you get an answer to
14 your last question?
15         MR. CORNFELD:  I think I did.
16         THE WITNESS:  I did.  I said I do.
17         MR. PLEBAN:  Okay.  I'm sorry.
18         THE WITNESS:  No problem.
19    Q.   (BY MR. CORNFELD)  From Austin Cady
20 of Averhealth to Shelly Hunter.  And Shelly Hunter
21 is a representative of an Averhealth client,
22 correct?  She's -- she's with St. Vincent Catholic
23 Charities in Lansing, Michigan, if you look at the
24 second page.
25    A.   Okay.  I was going to say...

Page 346

1     Q.   And -- and he also says, as
2 Mr. Herzog said:  The false allegations reported to
3 CAP FDT, and we are confident that CAP FDT will
4 deem the allegations as unsubstantiated.
5          Correct?
6     A.   Correct.
7     Q.   Did it turn out that confidence that
8 CAP would deem the allegations unsubstantiated, did
9 it turn out that that confidence was well-founded?
10    A.   CAP threw it -- had come and looked
11 at several things.  There were parts of their
12 checklist that they wanted us to change.  There
13 were some of the allegations that were not
14 substantiated, and there are others that were.
15    Q.   Did they find that Dr. Riley's
16 allegations were substantiated?
17    A.   Not all of them.  Not all.
18    Q.   Some of them?
19    A.   Yes.
20    Q.   Some of the serious concerns that
21 she -- and we'll look at that.
22    A.   Okay.
23    Q.   So what -- what Mr. Herzog told all
24 of these judges and officials in Michigan that you
25 were confident that Averhealth [sic] would deem the

Page 347

1 allegations unsubstantiated turned out not to be
2 true?
3     A.   When CAP came through and inspected
4 us, there were some things that they did find that
5 were substantiated.
6     Q.   Did you go back to these people and
7 say, you know what, we were wrong?
8     A.   We did not.
9     Q.   Is that the kind of the transparency
10 that Averhealth believes in?
11    A.   It's with -- what goes on between us
12 and our regulatory body is something that, I mean,
13 we still had confidence.  One of the things that
14 they looked at --
15         MR. CEJAS:  Go ahead.
16         THE WITNESS:  -- when they came on
17 was the four -- the -- of the six things that they
18 looked at when they came on site, one of them was
19 that we consistently reported incorrect or false
20 positive test results, and that was not
21 substantiated.
22    Q.   (BY MR. CORNFELD)  That --
23    A.   So we were confident in the test
24 results that we continued to report.
25    Q.   That was not one of Dr. Riley's

Page 348

1 allegations, was it?
2     A.   She said our results were wrong 20 to
3 30 percent of the time.
4     Q.   That -- that was not the -- well,
5 we'll go through -- we'll go through that.
6          My question is:  When CAP found that
7 her allegations were substantiated, and you did not
8 go back to these people, don't you think they must
9 have thought, oh, CAP must have found that
10 Dr. Riley was all wrong?
11         MR. CEJAS:  Object to the form.
12 Foundation, assumes, facts not in evidence.
13         Go ahead.
14         THE WITNESS:  The one big thing that
15 she said out there was that our results were wrong
16 20 to 30 percent of the time.
17    Q.   (BY MR. CORNFELD)  I'm not talking
18 about one big thing.
19    A.   And that is a huge thing.
20    Q.   I'm not talking about --
21    A.   That is our test results and the
22 accuracy of those test results.
23    Q.   I'm not talking about that.
24    A.   And our -- CAP did not find that our
25 test results were wrong.



Page 349

1    Q.    My -- my question is:  Don't you
2   think that the judges and the officials in
3   Michigan, after Dr. Herzog said that you were
4   confident they'd find the allegations
5   unsubstantiated, they must have thought, yeah, that
6   must have happened since CAP -- since Averhealth,
7   which believes in transparency, didn't come and
8   tell us that?
9        MR. CEJAS:  Objection.  Calls for
10   speculation.
11       **THE WITNESS:  And I don't understand**
12   **the question.  That was -- what are you -- can you**
13   **rephrase your question?  I don't understand it.**
14    Q.    (BY MR. CORNFELD)  When the -- when
15   the judges and the officials with Michigan's Child
16   Protection Agency were told by Averhealth that you
17   were confident that CAP would find the allegations
18   unsubstantiated and they never came back to them
19   and said, hey, they did find that Dr. Riley's
20   allegations were substantiated, don't you think
21   that they would have concluded, oh, I guess they
22   found that Dr. Riley was wrong?
23       MR. CEJAS:  Object to the form.
24   Calls for speculation.  Assumes facts not in
25   evidence.

Page 350

1        Go ahead.
2        **THE WITNESS:  Based on CAP's**
3   **checklist, they came in, they investigated us, as**
4   **you indicated earlier very thoroughly, and there**
5   **were some updates that they wanted us to make to**
6   **our SOPs to further define things, based on what**
7   **she had raised.**
8    Q.    (BY MR. CORNFELD)  My question has to
9   do with the judges and the officials in Michigan
10   who you told you were confident that CAP would find
11   all the allegations unsubstantiated.  When they
12   didn't hear anything more about that from you,
13   don't you think they would have concluded that, oh.
14   CAP -- Averhealth must be right, CAP must have
15   found they were all unsubstantiated, or CAP, which
16   believes -- or Averhealth, which believes in
17   transparency, would have come and told us that?
18       MR. CEJAS:  Objection.  Calls for
19   speculation.
20       **THE WITNESS:  I don't know what the**
21   **judges would have thought.**
22       MR. CORNFELD:  All right.  We can
23   break for the day.
24       MR. CEJAS:  Well, we're done with the
25   corporate representative deposition and we'll come

Page 351

1   back tomorrow and do individual.
2        MR. CORNFELD:  Well, subject to the
3   issues regarding the -- that she was not able to
4   answer.  But yes, yes.  And subject to the fact
5   that we just got almost a thousand pages of
6   documents on Friday that we may need to ask about.
7        MR. PLEBAN:  We're good on the video.
8        MR. CEJAS:  We're good on the video.
9        THE VIDEOGRAPHER:  Time is 6:43, and
10   we're off the record.
11       MR. CEJAS:  And just for the record,
12   the written record, my position is you have seven
13   hours under the rule for the corporate rep.  The
14   seven hours is over and finished with.  However,
15   you do have the ability to, you know, depose both
16   Dominique and Michele in their individual
17   capacities, and we can revisit that later if we
18   need to.
19       MR. CORNFELD:  All right.
20       MR. PLEBAN:  And it could be that --
21   I think we're good.
22
23
24
25

Page 352

1                  NOTARIAL CERTIFICATE

2

3        I, Tammie A. Heet, Registered Professional
4   Reporter, certified Shorthand Reporter for the
5   State of Illinois, and Certified Court Reporter for
6   the state of Missouri and a duly commissioned
7   Notary Public within and for the States of Missouri
8   and Illinois, do hereby certify that the witness
9   whose testimony appears in the foregoing deposition
10   was duly sworn by me; that the testimony of said
11   witness was taken by me to the best of my ability
12   and thereafter reduced to typewriting under my
13   direction; that I am neither counsel for, related
14   to, nor employed by any of the parties to the
15   action in which this deposition was taken, and
16   further that I am not a relative or employee of any
17   attorney or counsel employed by the parties
18   thereto, nor financially or otherwise interested in
19   the outcome of the action.

20

21

22



     Tammie A. Heet, RPR, CSR, CCR

23

24

25



Dominique Delagnes                                                    July 08, 2024

Page 353

```
 1              Lexitas Legal
             711 North 11th Street
 2          St. Louis, Missouri 63101
              Phone 314/644-2191
 3

 4

 5   July 15, 2024
 6   Mr. Nicholas P. Cejas
     ARMSTRONG TEASDALE, LLP
 7   7700 Forsyth Boulevard, Suite 1800
     St. Louis, Missouri 63105
 8
 9   IN RE:  Katarzyna Foulger, et al. v. Avertest, LLC
     d/b/a Averhealth
10
11   Dear Mr. Cejas:
12   Please find attached your copy of the video-recorded
     deposition of Dominique Delagnes taken on July 8,
13   2024, in the above-referenced case.  Also enclosed
     is the original signature page and errata sheets.
14
     Please have the witness read your copy of the
15   transcript, indicate any changes and/or corrections
     desired on the errata sheets, and sign the
16   signature page before a notary public.
17   Please return the errata sheets and notarized
     signature page to Lexitas Legal, ATTN: Production
18   Department, 711 N. 11th Street, St. Louis, Missouri
     63101 within 30 days of receipt of this letter.
19
     Sincerely,
20
21   Tammie A. Heet, RPR, CSR, CCR
22   Enclosures
23   cc:  Mr. Richard Cornfeld
          Lexitas Legal Production
24
25
```

Page 355

```
 1                              DOMINIQUE DELAGNES
                                NAME OF DEPONENT
 2

 3                         DEPOSITION CORRECTION SHEET

     IN RE:  Katarzyna Foulger, et al. v. Avertest, LLC
 4   d/b/a Averhealth
 5   Reported by:  TAH
 6   Upon reading the deposition and before subscribing
     thereto, the deponent indicated the following
 7   changes should be made:
 8   Page    Line    Should Read:
      Reason assigned for change:
 9
10   Page    Line    Should Read:
      Reason assigned for change:
11
12   Page    Line    Should Read:
      Reason assigned for change:
13
14   Page    Line    Should Read:
      Reason assigned for change:
15
16   Page    Line    Should Read:
      Reason assigned for change:
17
18   Page    Line    Should Read:
      Reason assigned for change:
19
20   Page    Line    Should Read:
      Reason assigned for change:
21
22   Page    Line    Should Read:
      Reason assigned for change:
23
24   _____
25       SIGNATURE OF DEPONENT
```

Page 354

```
 1   STATE OF _____  )
                               )
 2   CITY OF _____   )

 3

 4        I, DOMINIQUE DELAGNES, do hereby certify:
 5        That I have read the foregoing deposition;
 6        That I have made such changes in form and/or
 7   substance to the within deposition as might be
 8   necessary to render the same true and correct;
 9        That having made such changes thereon, I
10   hereby subscribe my name to the deposition.
11        I declare under penalty of perjury that the
12   foregoing is true and correct.

13

14   Executed this _____ day of _____,
15   20_____, at _____.

16

17

18              _____
                  DOMINIQUE DELAGNES
19
20   My Commission Expires:  _____
21   Notary Public:  _____
22

23

24

25
```