---

Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE EASTERN DISTRICT OF MISSOURI
                       EASTERN DIVISION
3
4   KATARZYNA FOULGER, et al.,
5            Plaintiffs,
6   vs.                          Case No. 4:22-CV-00878
7   AVERTEST, LLC d/b/a AVERHEALTH,
8            Defendant.
9
10
11
12
13
14
15          VIDEO-RECORDED DEPOSITION OF
                 DOMINIQUE DELAGNES
16               JULY 9, 2024
17
18
19
20
21
22
23
24
25
```

Page 2

```
1               I N D E X
2               WITNESSES
3   All Witnesses:                        Page
4   Dominique Delagnes
      Examination by Mr. Cornfeld           7
5     Examination by Mr. Cejas            272
      Further Examination by Mr. Cornfeld 278
6
7               EXHIBITS
8   Exhibit 28   Memorandum                 15
9   Exhibit 29   1/4/21 Letter authored by  44
                 Michele Glinn
10
11  Exhibit 31   E-mail                     24
12  Exhibit 39   11/11/20 Letter            61
13  Exhibit 40   Memo to Supreme Court      96
14  Exhibit 45   11/19/20 Letter             9
15  Exhibit 46   12/17/20 CAP Letter        33
16  Exhibit 47   12/22/20 CAP Letter        36
17  Exhibit 48   1/29/21 CAP Letter         61
18  Exhibit 49   Teams Chat Messages        66
19  Exhibit 50   Excerpt of Transcript      76
20  Exhibit 51   2/25/21 Averhealth Letter  91
21  Exhibit 52   2/26/21 Averhealth Letter  94
22  Exhibit 53   E-mail                    103
23  Exhibit 54   Michigan Prosecutor's     104
                 Association Slide Deck
24  Exhibit 55   MDHHS Update March 2021   110
25  Exhibit 56   E-mail                    124
```

Page 3

```
1           I N D E X (continued)
2           EXHIBITS (continued)
3   Exhibit 57   Dr. Wagner's Report       150
4   Exhibit 58   E-mail                    174
5   Exhibit 59   Weekly QC Review          175
6   Exhibit 60   3/10/21 CAP Letter        189
7   Exhibit 61   3/17/21 Averhealth Letter 189
8   Exhibit 62   5/13/21 CAP Letter        194
9   Exhibit 63   Summation Report          200
10  Exhibit 64   Deficiency Response Sheet 201
11  Exhibit 65   E-mail                    219
12  Exhibit 66   6/17/21 CAP Letter        225
13  Exhibit 67   5/25/21 CAP Letter        226
14  Exhibit 68   7/29/21 CAP Letter        230
15  Exhibit 69   Slide Deck                234
16  Exhibit 70   Averhealth Response to    254
                 Vice News Article
17
    Exhibit 71   3/21/23 Annual Performance 259
18               Review
19  (Original exhibits 45 through 71 were retained by the
     reporter and copies will be provided as requested.)
20
21
22
23
24
25
```

Page 4

```
1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF MISSOURI
2                    EASTERN DIVISION
3
4   KATARZYNA FOULGER, et al.,
5            Plaintiffs,
6   vs.                          Case No. 4:22-CV-00878
7   AVERTEST, LLC d/b/a AVERHEALTH,
8            Defendant.
9
10          VIDEO-RECORDED DEPOSITION OF DOMINIQUE
11  DELAGNES, produced, sworn, and examined on July 9,
12  2024, between the hours of eight o'clock in the
13  forenoon and six o'clock in the afternoon of that
14  day, at the office of Armstrong Teasdale, 7700
15  Forsyth Boulevard, St. Louis, Missouri, before
16  Tammie A. Heet, a Registered Professional Reporter,
17  Certified Shorthand Reporter and Notary Public
18  within and for the states of Illinois and Missouri,
19  in a certain cause now pending before the United
20  States District Court for the Eastern District of
21  Missouri, Eastern Division in re: Katarzyna Foulger,
22  et al. vs. Avertest, LLC d/b/a Averhealth; on behalf
23  of the Plaintiffs.
24
25
```



Page 5

```
 1              APPEARANCES
 2
 3   For the Plaintiffs:
 4     Mr. Richard S. Cornfeld, Esq.
        GOLDENBERG HELLER ANTOGNOLI, PC
 5      2227 South State Route 157
        Edwardsville, Illinois 62025
 6      618/656-5150
        rick@ghalaw.com
 7
        AND
 8
        Mr. J.C. Pleban, Esq.
 9      PLEBAN & ASSOCIATES LAW
        2010 South Big Bend Boulevard
10      St. Louis, Missouri 63117
        314/645-6666
11      jc@plebanlaw.com
12
13   For the Defendant:
14     Mr. Nicholas P. Cejas, Esq.
        ARMSTRONG TEASDALE, LLP
15      7700 Forsyth Boulevard, Suite 1800
        St. Louis, Missouri 63105
16      314/342-8040
        ncejas@atllp.com
17
18
     Reported/Video-Recorded By:
19
        Ms. Tammie A. Heet, RPR, CSR(IL), CCR(MO)
20      Mr. David Doell, Legal Videographer
        LEXITAS LEGAL
21      711 North 11th Street
        St. Louis, Missouri 63101
22      314/644-2191
23
24
25
```

Page 6

1    IT IS HEREBY STIPULATED AND AGREED by
2   and between counsel for the Plaintiffs and counsel
3   for the Defendant that this deposition may be taken
4   in shorthand by Tammie A. Heet, RPR, CSR, CCR and
5   notary public, and afterwards transcribed into
6   printing, and signature by the witness expressly
7   reserved.
8        THE VIDEOGRAPHER:  We are now on the
9   record.  Today's date is July the 9th, 2024.  The
10  time is approximately 8:44 a.m. Central Standard
11  Time.  This begins the video-recorded deposition of
12  Dominique Delagnes in the matter of Foulger v.
13  Avertest, Case Number 4:22-CV-00878 in the United
14  States District Court for the Eastern District of
15  Missouri.
16        This deposition is being held at the
17  law offices of Armstrong Teasdale.  The reporter's
18  name is Tammie Heet.  My name is David Doell and
19  I'm the legal videographer.  We are here with
20  Lexitas.
21        Would the attorneys attending please
22  introduce yourselves and the parties you represent?
23        MR. CORNFELD:  Rick Cornfeld
24  representing the plaintiffs.
25        MR. PLEBAN:  J.C. Pleban for

Page 7

1   Plaintiffs.
2        MR. CEJAS:  Nick Cejas on behalf of
3   the defendant.
4        THE VIDEOGRAPHER:  Would the court
5   reporter please swear in the witness and we may
6   proceed.
7              * * * * *
8        DOMINIQUE DELAGNES,
9   of lawful age, produced, sworn, and examined on
10  behalf of Plaintiffs, deposes and says:
11              EXAMINATION
12  QUESTIONS BY MR. CORNFELD:
13       Q.   Would you state your name, please,
14  ma'am?
15       **A.   My name is Dominique Delagnes.**
16       Q.   And what is your business or
17  occupation?
18       **A.   What is my occupation?**
19       Q.   Yes.
20       **A.   I'm the chief operating officer at
21  Averhealth.**
22       Q.   You said chief operating officer?
23       **A.   Sorry.  I'm the chief executive
24  officer.  I was promoted several months ago and
25  still getting used to the new title.  Chief**

Page 8

1   **executive officer.**
2        Q.   You became the CEO in May, correct?
3        **A.   Correct.**
4        Q.   May of 2024?
5             And before that, you were the chief
6   operating officer?
7        **A.   That is correct.**
8        Q.   Since 2014?
9        **A.   Correct.**
10       Q.   All right.  What is your business or
11  occupation?
12       **A.   Our business --**
13       Q.   I'm sorry, what is -- what is your
14  address?
15       **A.   My -- my address for what?**
16       Q.   What is your work address?
17       **A.   For where the laboratory works or
18  where I personally work?**
19       Q.   Your -- your address.
20       **A.   I work at -- in our corporate office
21  in Richmond, Virginia.**
22       Q.   And what is the address of the
23  corporate office?
24       **A.   It's 2916 West Marshall Street,
25  Suite 100, Richmond, Virginia 23230.**



Page 9

1    Q.   All right.  I apologize in advance
2   for this question, but most lawyers ask this of
3   every witness.  How old a lady are you?
4    **A.   I am -- how old am I?  I'm 55.**
5    Q.   Okay.  You understand that you are
6   here as a witness on your own behalf?
7    **A.   Yes.**
8    Q.   Yesterday, you were testifying as a
9   corporate designee for Averhealth?
10   **A.   Correct.**
11   Q.   All right.  And that deposition was
12  concluded subject to some things that we're leaving
13  it open for, but this is your deposition of
14  yourself, of course things you know as the CEO and
15  former COO of Averhealth would be something that
16  you would be able to testify about, correct?
17   **A.   Yes.**
18   Q.   All right.  You -- you have in front
19  of you Exhibit 45, which is a letter on the
20  letterhead of Averhealth to the Investigations
21  Department of the CAP Accreditation Department of
22  the College of American Pathologists dated
23  November 18th, 2020, and signed by Michelle Glinn,
24  PhD, correct?
25   **A.   Correct.**

Page 10

1    Q.   Are you familiar with this letter?
2    **A.   Yes.**
3    Q.   This was sent -- and yesterday, we
4   went over a letter CAP sent to Averhealth on
5   November 11th, 2020.
6        Do you recall that?
7    **A.   Yes.**
8    Q.   All right.  And this -- this is a
9   letter that Dr. Glinn sent on behalf of Averhealth
10  in response to that letter, correct?
11   **A.   Correct.**
12   Q.   And I won't go back over questions
13  that we covered yesterday about what CAP is.  You
14  know, I -- that's -- you testified about that and
15  we don't need to repeat that.
16        Do you see that in the second
17  paragraph, Dr. Glinn states on Exhibit 45:  We
18  fully embrace transparency and self-report our
19  mistakes, identify the root cause, and take action
20  to prevent future occurrences.
21        Do you see that?
22   **A.   I do.**
23   Q.   And is that a true statement, that
24  Averhealth fully embraces transparency?
25   **A.   Yes.**

Page 11

1    Q.   Dr. Glinn goes on in the -- at the
2   end of the second paragraph and says:  Averhealth
3   is committed to accurate test results and helping
4   to reclaim lives, unite families, and strengthen
5   communities by helping to overcome substance use
6   disorders.
7        Do you see that?
8    **A.   Is that on the second page?**
9    Q.   No, in the -- in the second
10  paragraph.
11   **A.   Oh, end of the second paragraph.**
12  **This paragraph.  Yes, I see that.**
13   Q.   What does Averhealth do to reclaim
14  lives, unite families, or strengthen communities?
15   **A.   We provide accurate drug test**
16  **results.**
17   Q.   What do you do to help people
18  overcome substance use disorders?
19   **A.   By providing accurate test results**
20  **that gives the information back to treatment**
21  **courts, to probation departments, and to -- and**
22  **other judicial entities so they know the**
23  **appropriate action to help someone overcome their**
24  **substance use.**
25   Q.   So you don't offer people who are

Page 12

1   tested, such as my clients, any therapy or any kind
2   of treatment, correct?
3    **A.   We do not provide treatment, no.**
4    Q.   Or refer them to someone who might do
5   that?
6    **A.   We do not.**
7    Q.   Did -- all you did was test their
8   hair or their oral samples and report the results
9   you said you had, correct?
10   **A.   And there's also times, especially in**
11  **treatment court settings, that our team**
12  **participates in -- during that process, while**
13  **somebody is in a treatment court, there are**
14  **meetings with the entire care team, which includes**
15  **the treatment provider, us as Averhealth, the**
16  **judge, and the probation officer or caseworker.  So**
17  **we participate in those and provide information**
18  **about drug testing in those settings.**
19   Q.   And your participation in such
20  settings is limited to providing your drug testing
21  results and saying that those were accurate,
22  correct?
23   **A.   Correct.**
24   Q.   All right.  And then in the letter,
25  you -- if you look down at the paragraph at the



Page 13

1  bottom of the first page of Exhibit 45, carrying
2  over to the top of the second page, you spend a
3  paragraph -- or Averhealth, Dr. Riley, spends a
4  paragraph maligning -- excuse me, Dr. Glinn -- let
5  me start over.
6          In the paragraph at the bottom of the
7  first page of 45 that carries over onto the second
8  page, a pretty long paragraph, Dr. Glinn, on behalf
9  of Averhealth, spends that paragraph maligning
10 Dr. Riley, correct?
11     **A.   No.**
12     Q.   Well, she says:  The complainant
13 never fully engaged in the role.
14     **A.   Yes.  It does say that.**
15     Q.   All right.  You don't think that's
16 maligning her?
17     **A.   No.**
18     Q.   Okay.  She failed to gain a full
19 understanding of the SOPs or complete the job
20 duties assigned to her.
21         Do you see that?
22     **A.   I do.**
23     Q.   That's not maligning her?
24     **A.   That's an accurate statement.**
25     Q.   It's not maligning her?

Page 14

1      **A.   It's an accurate statement that she**
2  **didn't fulfill her responsibilities.**
3      Q.   And you say:  In fact, the
4  complainant failed -- or Dr. Glinn says on behalf
5  of Averhealth:  The complainant failed to complete
6  many duties described in the laboratory director
7  job description, such as weekly quality control
8  reviews and proficiency test result review and
9  submission.
10         Do you see that?
11     **A.   I do.**
12     Q.   And you don't consider that to be
13 maligning her?
14     **A.   It's an accurate statement that she**
15 **didn't fulfill that.**
16     Q.   This accurate statement, Dr. Riley
17 reported to you, did she not?
18     **A.   She did.**
19     Q.   Did you ever reprimand her?
20     **A.   Not in the seven weeks, no.**
21     Q.   Did you ever tell her, "You need to
22 do a better job to complete the job duties assigned
23 to you"?
24     **A.   I did not.**
25     Q.   Did you ever tell her that you

Page 15

1  believed she was failing to complete many duties
2  described in the laboratory director job
3  description?
4      **A.   I did not.**
5      Q.   Why not?
6      **A.   She had been there for only seven**
7  **weeks.  And after she did abruptly leave, I learned**
8  **that she was not on site like she had committed to**
9  **do so, I learned through information in the**
10 **database that she only spent less than 10 hours**
11 **through her entire time frame actually in our LAS**
12 **system looking at information.**
13         **And then as we responded to this**
14 **record, we learned that although -- in -- I -- let**
15 **me find the exhibit, where it was clearly that she**
16 **was supposed to do these weekly reviews, which is**
17 **outlined in here, you had provided a document that**
18 **showed a meeting between Dr. Glinn, Dr. Riley, and**
19 **myself where we outlined job duties.  It is**
20 **Exhibit Number 28.  And on that exhibit, it clearly**
21 **states that she should be doing the weekly quality**
22 **controls, and we learned in submitting this back to**
23 **CAP that it wasn't done when she was in that role.**
24     Q.   Those were -- those duties were
25 established the day before she started at

Page 16

1  Averhealth, correct?
2      **A.   I believe that they were in a onsite**
3  **meeting that we had that -- that they were duties**
4  **that were established, yes.**
5      Q.   On September 13th?
6      **A.   Yes.**
7      Q.   Of 2020?
8      **A.   Yes.**
9      Q.   Dr. Riley reported to you.  Did you
10 monitor her during that time to make sure or to see
11 whether she was fulfilling the responsibilities
12 that she was supposed to be fulfilling?
13     **A.   I did not look to see that she was**
14 **doing these, no.  I did not look to see that she**
15 **had actually completed the weekly quality reviews.**
16     Q.   Or anything else, that she was only
17 there 10 hours a week, that there were other job
18 responsibilities you say she wasn't fulfilling.
19 Did you monitor during that time to see that?
20     **A.   It was also clear in the e-mail that**
21 **she sent me that -- the one where she -- that**
22 **indicated that she came back, that I had to show,**
23 **hey, you did not release those test results like**
24 **you said that you would.  It was a**
25 **dextromethorphan.  Let me find that document.**



Page 17

1    Q.   Okay.
2    **A.   In that e-mail, it shows a lack of**
3    **understanding.  She writes:  I did not --**
4    Q.   My -- my -- that's not my question.
5    My question --
6    **A.   You're asking if I reprimanded --**
7    Q.   No, my --
8    **A.   -- in my response here, I --**
9    Q.   No, my question is:  Did you monitor?
10   That -- the letter you're talking about, the e-mail
11   you're talking about was after she resigned.
12   During her time as an employee of Averhealth and
13   working for Averhealth, did you monitor her as your
14   direct report to see whether she was fulfilling the
15   responsibility she was supposed to be fulfilling?
16   **A.   We had weekly conversations, weekly**
17   **meetings, which one of the ones that we talked**
18   **about was the day that she abruptly resigned, to go**
19   **through and for her to ask -- for her to ask me any**
20   **questions and to provide assistance.**
21   Q.   My question is --
22   **A.   Yes, I monitored her for that.**
23   Q.   And -- and never once reprimanded her
24   or even encouraged her to say "You need to be doing
25   a better job," correct?

Page 18

1    **A.   Of course I've always encouraged**
2    **people to do the best job that they can.**
3    Q.   Okay.  But you never reprimanded
4    her --
5    **A.   And I provided support to her as**
6    **she -- as she asked for it.**
7    Q.   You never --
8    **A.   You are right, I never reprimanded**
9    **her in the seven weeks.**
10   Q.   Okay.  And, in fact, we saw yesterday
11   the e-mail that your boss, Jason Herzog, the CEO of
12   the company, sent to her at the end of October --
13   **A.   Uh-huh.**
14   Q.   -- a very encouraging e-mail saying
15   he was happy that she was there --
16   **A.   Yes.**
17   Q.   -- correct?
18   **A.   Correct.**
19   Q.   Kind of the opposite of a reprimand,
20   wouldn't you say?
21   **A.   She was new to the organization and**
22   **he was welcoming her.**
23   Q.   She -- she had been there six weeks
24   during a time that you now say she wasn't
25   fulfilling her job responsibilities, but his e-mail

Page 19

1    was the -- pretty much the opposite of a reprimand,
2    wasn't it?
3    **A.   It was encouraging her as a new**
4    **employee to the organization.  I wouldn't say that**
5    **it was the opposite of a reprimand.  It was a**
6    **welcoming of a new member of the leadership team.**
7    Q.   After a two-day meeting that he had
8    with her?
9    **A.   Uh-huh.**
10   Q.   Yes?
11   **A.   Yes.**
12   Q.   And that you had with her?
13   **A.   Yes.**
14   Q.   And nobody at that meeting said,
15   "Hey, Dr. Riley, you're not fulfilling your job
16   responsibilities.  You need do to a better job."
17   Nobody told her that, did they?
18   **A.   No.**
19   Q.   Look at the -- the sentence on the
20   bottom of the first page.  Before you looked at
21   that yesterday, you told us that Dr. Riley was a
22   part-time employee, correct?
23   **A.   Correct.**
24   Q.   If you look at the bottom of the
25   first page, Dr. Glinn states:  As described in the

Page 20

1    job description, the laboratory director is a
2    full-time, on-site role.
3         Do you see that?
4    **A.   I do.**
5    Q.   That's not a true statement, is it?
6    **A.   That is not -- yes, she was hired**
7    **part-time.**
8    Q.   Did you review this before it was
9    sent?
10   **A.   I believe I did, yes.**
11   Q.   And you let her say -- you let
12   Dr. Glinn make a false statement about Dr. Riley's
13   role?
14   **A.   I did not let her make a false**
15   **statement.  I'm sure it was an oversight on my part**
16   **in here.**
17   Q.   Not an administrative error, I would
18   suspect, correct?
19   **A.   An oversight.**
20   Q.   Okay.  Dr. Glinn knew that Dr. Riley
21   was not a full-time employee, correct?
22   **A.   Correct.**
23   Q.   If you would look at page 17088, this
24   is one of a number of questions that CAP asked
25   Averhealth to answer, correct?



Dominique Delagnes                                                    July 09, 2024

Page 21

1    A.   Yes.
2    Q.   And the question is:  During the last
3  ten months -- which would mean since January of
4  '20 --
5    A.   Which number is it?
6    Q.   Number 8.
7    A.   Thank you.
8    Q.   Okay.  You see that question 8 says:
9  During the last ten months, which would be since
10 January of 2020, correct?
11   A.   Correct.
12   Q.   Has the laboratory received any
13 concerns regarding the quality from employees,
14 patients, and/or providers?  If yes, provide a
15 detailed summary of each concern, how the
16 summary -- how the concern was investigated and
17 resolved.
18       Do you see that question?
19   A.   I do.
20   Q.   And then if you go over to the last
21 paragraph of the answer, which is on page 17089, do
22 you see that you state:  On Saturday, November 1,
23 2020, the complainant via e-mail recommended for
24 continuous improvements?
25   A.   I do.

Page 22

1    Q.   The question was -- the question that
2  CAP asked was whether anybody expressed any
3  concerns, correct?
4    A.   Correct.
5    Q.   This paragraph talking about the
6  complainant, meaning Dr. Riley, doesn't mention her
7  concerns.  It just mentions that she recommended
8  improvements, correct?
9    A.   Correct.
10   Q.   Why didn't you admit that she had
11 concerns, that Dr. Riley had concerns when you
12 responded to CAP when that was their question?
13   A.   Well, it talked about QC failures,
14 morphine results in a hair batch, and proposed
15 enhancements.  So 1 and 2 do indicate that, right?
16 The concern of QC failures, and number 2, morphine
17 results in a hair batch.  And then it goes on to
18 talk about the enhancements.  So those were the two
19 concerns she raised.
20   Q.   You know that when Dr. Riley
21 expressed her concerns to you, she said that if she
22 were called as an expert witness, she could tear
23 apart the results that Averhealth was producing,
24 correct?
25   A.   She did state that, yes.

Page 23

1    Q.   Why didn't you tell CAP that?
2    A.   And in fact, she did actually
3  testify, and she was found -- in a case against us.
4    Q.   We'll talk about that case.
5    A.   Okay.  But --
6    Q.   Why didn't -- why didn't you tell --
7    A.   She was not found to be a credible
8  witness --
9    Q.   That was -- that was --
10   A.   -- so her statement said that --
11   Q.   Excuse me --
12   A.   -- but she was not found --
13   Q.   -- that was --
14   A.   -- to be a credible witness.
15   Q.   -- that was after this letter was
16 written, correct?
17   A.   Correct.
18   Q.   Okay.  Why in this letter did you --
19 didn't you admit that Dr. Riley said that the test
20 results were so bad she could tear them apart?
21   A.   Because we didn't believe that she
22 could tear them apart because we believed and have
23 faith that the test results that we did are
24 analytically sound and our results are forensically
25 defensible.

Page 24

1    Q.   The question wasn't what you believe.
2  The question that CAP asked you was:  What concerns
3  were expressed to you?
4        Correct?
5    A.   Yes, and we expressed her concerns in
6  one and two.
7    Q.   You did not tell CAP that she thought
8  the test results were so bad she could tear them
9  apart.
10   A.   We did not.
11   Q.   Okay.  In -- in point two --
12   A.   Uh-huh.
13   Q.   Sorry.  If you look -- let's go look
14 at Dr. Riley's e-mail to you.
15   A.   Okay.
16   Q.   I don't recall the exhibit number.
17   A.   I don't either.  31?
18   Q.   Looking back at Exhibit 31,
19 Dr. Riley's e-mail to you of Sunday, November 1st,
20 do you see at the bottom of the second page, she
21 has her second point regarding a method improvement
22 for hair?
23   A.   Yes.
24   Q.   And in the second sentence of that
25 paragraph, she states:  Apparently some changes



Page 25

1    were made in the method to improve THC recovery.
2        THC is -- it's basically marijuana,
3    correct?
4        **A.   Yes, it's a metabolite of marijuana.**
5        Q.   And she says:  And ever since, the
6    recovery of the other drugs has been extremely
7    poor.
8        Do you see that?
9        **A.   I do.**
10       Q.   In your -- in Averhealth's letter to
11   CAP of November 18th in answer to the question of
12   "What concerns were raised," you did not mention,
13   or Dr. Glinn on behalf of Averhealth, did not
14   mention that Dr. Riley said that:  Ever since
15   changes were made in the method to improve THC
16   recovery, the recovery of other drugs has been
17   extremely poor.  You didn't tell CAP that, did you,
18   or Averhealth didn't?
19       **A.   That is not in this letter, no.**
20       Q.   And Dr. Riley also told you that
21   these are not problems I am comfortable letting
22   continue, correct?  Strike that.
23       In the e-mail -- in your e-mail in
24   Exhibit 31 of 7:06 p.m. on November 1st, she
25   answered your question about I don't think the

Page 26

1    dilute-and-shoot is the problem.  She says:  I
2    think it's inconsistency with prep.
3        She said that, correct?
4        **A.   Those are her words in this e-mail,**
5    **yes.**
6        Q.   In answer to CAP's question about
7    what concerns people had expressed, you didn't tell
8    them that Dr. Riley believed there was
9    inconsistency with prep, did you?
10       **A.   That is not in this letter, no.**
11       Q.   Is this the kind of transparency that
12   Averhealth believes in?
13       **A.   When we provide transparency, we were**
14   **asked about issues.  She made two points on here,**
15   **and both of those were indicated in the letter.**
16       Q.   So not --
17       **A.   She gave two examples and we provided**
18   **those examples in the letter.**
19       Q.   But other things you didn't provide.
20   My question is:  Is that consistent with
21   Averhealth's view of transparency?
22       **A.   We provide transparency to our**
23   **customers.  As we find any test result that's**
24   **inaccurately reported, we go back to those**
25   **customers and we notify them of that fact.**

Page 27

1        Q.   Do you provide transparency to CAP?
2        **A.   Yes, we do.**
3        Q.   Is this letter to CAP consistent with
4    Averhealth's view of transparency?
5        **A.   Yes, it is.**
6        Q.   And did Averhealth expect that this
7    letter of November 18th to CAP would resolve the
8    complaints?
9        **A.   We answered all the questions.  We**
10   **didn't know whether it would actually resolve the**
11   **complaint or not, but we provided the information**
12   **that they requested to us.**
13       Q.   Well, Dr. Glinn, if you look at the
14   concluding sentence of her letter of November 18th,
15   Exhibit 45, she says:  We look forward to resolving
16   the matter as quickly as possible.
17       Do you see that?
18       **A.   I do.**
19       Q.   So Dr. Glinn expected that this
20   letter would resolve the complaints, correct?
21       **A.   That's --**
22       MR. CEJAS:  Well, objection.  Calls
23   for speculation as to what someone else expected.
24       Go ahead.
25       THE WITNESS:  No, we just said that

Page 28

1    we looked forward to resolving the matter.
2        Q.   (BY MR. CORNFELD)  As quickly as
3    possible?
4        **A.   Yes, those are the words.**
5        Q.   All right.  Dr. Glinn, in her letter
6    of November 18th, 2020, Exhibit 45, attached
7    various documents, correct?
8        **A.   Correct.**
9        Q.   There is attached -- she refers to,
10   in exhibit attachment A, mass spectrometry
11   confirmation procedures; attachment B, method
12   validation summaries; attachment C1, September 13
13   2020, meeting minutes.  And they go on to include
14   attachment C2, attachment D, attachment E,
15   attachment F, G, H, and I.  Approximately 10
16   attachments, correct?
17       **A.   Correct.**
18       Q.   Those were not produced to the
19   plaintiffs.  Do you know what happened to those?
20       **A.   Some of these were.  You have copies**
21   **of our confirmation procedures, you have --**
22       Q.   No, my question is:  The attachments
23   that were submitted to CAP --
24       **A.   Okay.**
25       Q.   -- were not produced to us so that we



Dominique Delagnes                                                July 09, 2024

Page 29

1  know what -- what Averhealth submitted to CAP.
2  What happened to those?  We were told that those
3  were seen not --
4      **A.   We sent the original copies along**
5  **with the letter when it was shipped to them.  We**
6  **did not retain the copies.  They were shipped to**
7  **CAP.**
8      Q.   You sent attachments to CAP without
9  retaining them in your files?
10     **A.   We did.**
11     Q.   Is -- I'm astounded.  I can't imagine
12  you would want not to keep a record of -- I mean,
13  those were thousands of pages, weren't they?  We've
14  seen references in CAP's documents that you
15  submitted thousands of pages, and CAP was going --
16  you expected CAP was going to be reviewing them,
17  correct?
18         MR. CEJAS:  Object to the form.
19  Argumentative.
20         Go ahead.
21         **THE WITNESS:  I don't remember the**
22  **exact number of pages.  We -- we submitted the**
23  **originals over to them, and we did not retain a**
24  **copy.**
25     Q.   (BY MR. CORNFELD)  And -- and you

Page 30

1  expected that CAP would be reviewing those and
2  possibly providing comments to you about them,
3  correct?
4      **A.   Possibly, yes.**
5      Q.   Wouldn't you want to keep copies of
6  what you sent so you would have a record so you
7  could understand what CAP was saying when they sent
8  you their comments?
9      **A.   We believed that if they had**
10  **questions or comments about it, that we could still**
11  **answer those.**
12     Q.   So why did you keep the cover pages,
13  attachment A mass spectrometry confirmation
14  procedures and so forth?
15     **A.   This was a -- this was a Word**
16  **document.  And along with it was each of the -- as**
17  **part of that Word document was each of the names of**
18  **the attachments.**
19     Q.   Do you know that the parties in the
20  case have obtained internal CAP documents, memos,
21  and e-mails by CAP officials commenting about
22  Averhealth submissions?
23     **A.   No, I'm not aware.**
24     Q.   You've not seen those?
25     **A.   I have not.**

Page 31

1      Q.   I'll show you one example, just to
2  make sure this doesn't refresh your recollection of
3  having seen it.
4      **A.   Thank you.**
5          MR. CEJAS:  Was this produced in this
6  case, Rick?  I just have not recognized the page
7  number.
8          MR. CORNFELD:  Yeah, this was
9  produced by us to you.  But I know that Armstrong
10  also -- I mean, we received this on a FOIA request
11  from the Michigan Department of Health and Human
12  Services and --
13         MR. CEJAS:  I'm just going to -- I'm
14  taking your word for it.  I'm going to put just a
15  standing objection on here to the extent it hasn't
16  been produced.  I can't say one way or the other.
17  I don't recognize it as I'm sitting here with this
18  particular Bates number, so I'm going to lodge my
19  objection.  You can go ahead and question the
20  witness.
21         MR. CORNFELD:  I just want to also
22  say that I know from the response to my FOIA
23  request that Armstrong also submitted a FOIA
24  request to MDHHS and received documents.  That's
25  because they produced the same -- they produced to

Page 32

1  me what they had produced to Armstrong, at least in
2  response to one FOIA request.
3          So I suspect you also received this,
4  and the Bates Number MICH, that prefix is -- if you
5  look at the lower right, that's the prefix that we
6  used for the documents that we produced from our
7  FOIA request.
8          MR. CEJAS:  I don't see it in my
9  file.  So again, I'm -- if you tell me you produced
10  it, I'm just going to -- I'm going to lodge an
11  objection to the extent this has not been produced,
12  and you know, if you can prove me wrong, that's
13  fine, but I don't see that it has been.
14         MR. CORNFELD:  I also believe this
15  was an exhibit to the Second-Amended Complaint.  In
16  fact, all of the -- all of the internal CAP
17  documents that -- that commented on the Averhealth
18  submissions were -- were attached to the
19  Second-Amended Complaint as exhibits.
20         MR. CEJAS:  Okay.  I'm going to lodge
21  my objection to the extent it hasn't been.  And if
22  it has --
23         MR. CORNFELD:  Okay.
24         MR. CEJAS:  -- that's fine.  But if
25  it hasn't been, I'm going to move to strike



Page 33

1  whatever question you have on this.  But go ahead.
2      Q.   (BY MR. CORNFELD)  Okay.
3  Ms. Delagnes, you've been handed Exhibit 46, which
4  is a memo under the letterhead College of American
5  Pathologists.  It's to Arthur M. Zebelman from Lena
6  Portillo dated December 17, 2020.
7          This is an example of the -- the
8  internal documents that we received -- the internal
9  CAP documents that we received from MDHHS.  You
10  told me you didn't think you had seen any of them.
11  Does this jog your recollection that you've seen
12  this?
13      A.   I have not seen this.  This is the
14  first time I've seen this letter.
15      Q.   Okay.  Then you can put it aside.
16      A.   Okay.
17      Q.   And I -- I won't -- I won't even show
18  you -- I mean, if you say you haven't seen any
19  them, I don't think I --
20      A.   I have not seen this one.  I don't
21  know about any, but I -- I have not specifically
22  seen this letter.
23      Q.   You don't recall seeing any of them,
24  I take it?
25      A.   I have not seen this one.

Page 34

1      Q.   Any internal -- any internal CAP
2  documents?
3      A.   I agree with you that in one of the
4  amended complaints, I think that there might be
5  some information, but not this one.  I have not
6  seen this.  There's some other quotes that I've
7  seen.
8      Q.   And I take it you did not see any of
9  the internal CAP documents over -- in the last
10  couple of weeks, few weeks, correct?
11      A.   Again, I have to recall.  I believe
12  in the Second-Amended Complaint which -- that you
13  indicated, that there was a limited e-mail that
14  I've seen, and that's it.
15      Q.   What was that e-mail?
16      A.   I don't -- I'd have to look at the
17  documents.  It's something --
18          THE WITNESS:  Nick, I'm looking at
19  you because I see all the binders there.  Can we
20  look at the Second-Amended Complaint?
21          So in the Second-Amended Complaint,
22  number 97, quote, something that Ms. Portillo
23  said --
24          MR. PLEBAN:  What page is that on?
25          THE WITNESS:  26 and 28.

Page 35

1          There's another quote from Portillo.
2      Q.   (BY MR. CORNFELD)  In what
3  paragraphs?
4      A.   It was -- can I give you the number?
5  So page 26, it starts at number 97.
6          MR. CEJAS:  Did you see any
7  underlying documents from which those quotes are
8  pulled?
9          THE WITNESS:  No, just quotes.  I've
10  not seen these documents.
11      Q.   (BY MR. CORNFELD)  Okay.  So you --
12      A.   I have not seen any documents, just
13  the quotes that are pulled out of here.
14      Q.   All right.  So -- so you haven't seen
15  any documents where you could put the quotes into
16  the context of --
17      A.   No.
18      Q.   All right.  And you didn't -- you
19  didn't see them in preparing for your 30(b)(6) for
20  your corporate designation deposition, correct?
21      A.   I did not.
22          MR. CEJAS:  And I can't find where
23  they've been produced to us, so -- so I'm
24  lodging -- again, to the extent that you-all have
25  relevant exhibits that haven't been turned over,

Page 36

1  that's going to be a problem.  We can address it
2  later.
3          MR. PLEBAN:  So did you look in the
4  old case?
5          MR. CEJAS:  Which one?
6          MR. PLEBAN:  Let's go off for a
7  second.
8          THE VIDEOGRAPHER:  Time is 9:24 a.m.
9  We are off the record.
10          (A discussion was held off the
11  record.)
12          THE VIDEOGRAPHER:  The time is 9:25.
13  We're back on the record.
14      Q.   (BY MR. CORNFELD)  You've been handed
15  what's been marked as Exhibit 47, which is a letter
16  on letterhead of the College of American
17  Pathologists dated December 22nd, 2020, to
18  Dr. Glinn from CAP signed by Lena Portillo,
19  Investigations Analyst of the CAP Accreditation
20  Programs.
21          Do you see that?
22      A.   Yes.
23      Q.   And this was CAP's response to
24  Dr. Glinn's letter of December 17th, correct?
25      A.   Yes.



Page 37

1      Q.    Actually, December 18th.
2      **A.    November 18th?**
3      Q.    I'm sorry, November 18th, yes.
4      **A.    November 18th, yes.**
5      Q.    Okay.  And Ms. Portillo asks CAP to
6   submit various items, correct?
7      **A.    Asks Averhealth to submit various?**
8      Q.    I'm sorry, Ms. Portillo asked
9   Averhealth to submit various items, correct?
10     **A.    Yes.**
11     Q.    And they explained why they wanted
12   those items, correct?
13     **A.    Yes.**
14     Q.    You start out by saying:  Additional
15   information is needed to facilitate our evaluation.
16        Do you see that, at the end of the
17   first paragraph of the letter, Exhibit 47?
18     **A.    Yes.**
19     Q.    And then she states:  Please submit
20   the following items, and the first bullet point
21   says:  Several proficiency test challenges show
22   unacceptable results or significant bias.
23        Correct?
24     **A.    That's what this says, yes.**
25     Q.    And she states that as a fact, not as

Page 38

1   an allegation that they're evaluating, correct?
2      **A.    That's what this states, yes.**
3      Q.    And so she asks for detailed
4   corrective actions for all unacceptable proficiency
5   testing results from 2019 and 2020.
6        Do you see that?
7      **A.    Yes.**
8      Q.    And also Averhealth's policy for
9   evaluation of significant bias shown in the
10   quantity result -- quantitative results of -- of
11   various items in one of the surveys, correct?
12     **A.    Yes.**
13     Q.    And she also asks for the alternative
14   PT, or proficiency testing, assessments performed
15   on hair samples, correct?
16     **A.    Yes.**
17     Q.    And then the second bullet,
18   Ms. Portillo on behalf of CAP in Exhibit 47 states:
19   The quality control policy includes unacceptable
20   practices.
21        Correct?
22     **A.    It states that, yes.**
23     Q.    And it states that as a fact, not as
24   an allegation, correct?
25     **A.    Yes, it does.**

Page 39

1      Q.    And if you go four lines down --
2   well, strike that.
3        She gives examples of what she
4   considers unacceptable practices beginning with:
5   For example.
6        Do you see that?
7      **A.    For example, the policy states?**
8      Q.    Yes.
9      **A.    I -- I -- I see that, yes.**
10     Q.    All right.  And then four lines down,
11   she says:  One of those unacceptable practices is
12   if both QC sets need to be excluded, use historical
13   QCs.
14        Do you see that?
15     **A.    Yes.**
16     Q.    And QC stands for quality control,
17   correct?
18     **A.    Yes.**
19     Q.    And that was something Averhealth was
20   doing up to that point was using historical QCs,
21   correct?
22     **A.    Very rarely, yes.**
23     Q.    And she doesn't say very rarely.  She
24   just says this is an unacceptable practice,
25   correct?

Page 40

1      **A.    That's what she says, but you asked**
2   **me did we use it.  Yes, we used historical QCs very**
3   **rarely.  I'm factually telling you it was used in a**
4   **very infrequent basis.**
5      Q.    She -- she -- at the end of that
6   paragraph, she says:  This is data manipulation to
7   accommodate poor responses and accept runs or a
8   patient sample without understanding why there are
9   discrepancies.
10        Do you see that?
11     **A.    Yes.**
12     Q.    And she states that as a factual
13   statement, correct?
14     **A.    Yes.**
15     Q.    And then in the next major bullet
16   point, Ms. Portillo states:  There are instances
17   where practice does not follow the QC policy.
18        Do you see that?
19     **A.    Yes.**
20     Q.    She says:  For example -- and this --
21   and she gives examples of where the practice does
22   not follow the quality control policy, correct?
23     **A.    Yes.**
24     Q.    And she says:  For example, the
25   policy states that the lower limit of reporting



Page 41

1  may be at or above the lowest calibrator. There
2  are instances where the laboratory did not obtain
3  results for calibrator one or two and reported
4  values less than the recovered calibrator value.
5      Do you see that?
6  **A.  Yes.**
7      Q.  And those are examples of where
8  Averhealth's practices did not follow its policies,
9  correct?
10     **A.  Yes.**
11     Q.  And another example is the statement
12  in the policy that no more than 25 percent of the
13  total number of data points per curve may be
14  excluded without a director designee review,
15  correct?
16     **A.  Yes.**
17     Q.  And show that where that's violated,
18  she says:  There are instances of three out of
19  eight calibrators not being included in the curve
20  indicating unstable calibration.
21     Correct?
22     **A.  That's what she stated, yes.**
23     Q.  And she stated that as a factual
24  statement, correct?
25     **A.  That's what she stated, yes.**

Page 42

1      Q.  If we look again at Exhibit 31
2  regarding historical QCs --
3      **A.  Exhibit 31, on which section?**
4      Q.  Exhibit 31, Dr. Riley's e-mail to
5  you.
6      **A.  Uh-huh.**
7      Q.  November 1st, 2020, her e-mail on
8  that Sunday in Exhibit 31, she gives as example
9  one, she says:  This is a general example because
10  this happens fairly frequently.
11     Correct?
12     **A.  That's what she said in her e-mail,**
13  **but that's not accurate.**
14     Q.  Well --
15     **A.  It's --**
16     Q.  -- you may disagree, but Dr. Riley
17  said --
18     **A.  She said that, but --**
19     Q.  Excuse me, let me finish my question.
20     You may disagree, and I think you
21  said you disagree, so you don't need to say it
22  again.  But Dr. Riley's view was that the use of
23  historical QCs happened fairly frequently, correct?
24     **A.  That was her opinion, yes.**
25     Q.  And she says -- she called that a

Page 43

1  manipulation using historical QCs.  She said that's
2  a manipulation, correct?
3      **A.  She said these manipulations, and she**
4  **cited three things, right?  Change in the IS -- her**
5  **full sentence says:  These manipulations, which is**
6  **change in the IS, changing the regression of the**
7  **calibration curve, and using historical QCs.**
8      Q.  All right.
9      **A.  So all of that -- if I can finish my**
10 **sentence -- she says happened fairly frequently.**
11 **As I'd indicated yesterday, changing an IS used and**
12 **change in the regression of the calibration curve**
13 **are processes that we used then, use today, and**
14 **have been verified by CAP that are acceptable**
15 **practices.**
16     Q.  Did you -- did you -- do you continue
17 to use historical QCs?
18     **A.  We do not.**
19     Q.  So that's something that doctor --
20 when you told us yesterday that the things that
21 Dr. Riley complained about are things that you're
22 still doing, that wasn't true for historical QCs?
23     **A.  I only said we were doing two of**
24 **them.  Correct.  I underlined -- and I even**
25 **underlined them on here, so I said that we continue**

Page 44

1  to use the ability to change the regression as well
2  as to change the IS that's used.
3      Q.  In this letter from CAP dated
4  December 22, 2020, CAP asked you to send yet
5  additional information, correct?
6      **A.  Yes, they did.**
7      Q.  And did you attempt to comply with
8  that?
9      **A.  We did send them additional**
10 **information.  It's Exhibit 29 from yesterday.**
11     Q.  Okay.  Thank you.
12     **A.  You're welcome.**
13     Q.  Do you have in front of you
14 Exhibit 29?
15     **A.  Yes, I do.**
16     Q.  And is that the letter that
17 Averhealth sent to CAP in response to Exhibit 47?
18     **A.  Yes, it is.**
19     Q.  And it's a letter dated January 4,
20 2021, directed to Ms. Portillo of CAP and signed by
21 Dr. Glinn, correct?
22     **A.  Yes.**
23     Q.  This is the letter we talked about
24 yesterday where Dr. Glinn said it is perplexing
25 that Sarah Riley never once raised any concerns

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Page 45

1  while working for Averhealth, correct?
2      A.   Yes.
3      Q.   Okay.  So I don't need to ask you
4  about that again.
5          Dr. Glinn goes on to say in the third
6  paragraph of the first page of Exhibit 29, the
7  letter to CAP on January 4, 2021, she vilifies
8  Dr. Riley by saying:  She disregarded the
9  principles of ethical conduct for the toxicology
10 profession by violating confidentiality, honesty,
11 and personal integrity, and by discrediting the
12 profession.
13         Do you see that?
14     A.   I do.
15     Q.   What was the principle of ethical
16 conduct that Dr. Glinn claimed on behalf of
17 Averhealth that --
18     A.   That she was going out and telling
19 everybody that our results were wrong anywhere from
20 30 to 50 percent of the time.
21     Q.   You told us yesterday that you didn't
22 blame her for that because that was her sincere
23 opinion and, in fact, she was -- she was obligated
24 to -- to do that, correct?
25     A.   It has yet to be found by CAP, by the

Page 46

1  Department of Justice, by when she testified
2  against us that --
3      Q.   Excuse me, that's not my question.
4  My question was:  You told us yesterday that she
5  was obligated to do that given that that was her
6  sincere opinion, and you didn't blame her for that.
7  Are you changing what you said yesterday?
8      A.   I don't know that I used the words I
9  didn't blame her for doing that.
10     Q.   Whatever you said --
11     A.   You asked me --
12     Q.   Whatever you said --
13     A.   -- a question, and I said that if she
14 felt that way, that -- but she still -- she drug
15 Averhealth through the mud and made claims that
16 have never been found to be actually the case.
17     Q.   Okay.
18     A.   And that's what we intended --
19     Q.   We'll get to that.
20     A.   Okay.
21     Q.   My question is:  Are you changing
22 what you said --
23     A.   No, I'm not changing what I said
24 yesterday.
25     Q.   -- about -- about whether Dr. Riley

Page 47

1  should have felt obligated to make these
2  complaints, you're not changing that testimony, are
3  you?
4      A.   I'm not changing any of my testimony.
5      Q.   You mentioned -- just a moment ago,
6  you mentioned the Department of Justice.
7      A.   Uh-huh.
8      Q.   Yes?
9      A.   Yes.
10     Q.   Averhealth settled the Department of
11 Justice investigation by agreeing to pay the United
12 States government $1.3 million, correct?
13     A.   Yes.
14     Q.   What was that -- and that was for
15 violating Averhealth's policies, correct?
16     A.   It was not having to do anything with
17 our test results, no.  It was a contractual --
18 they -- they --
19     Q.   It was not?
20     A.   No, no, we never admitted to a
21 violation.
22     Q.   I understand that.  When -- you know,
23 I settled -- I can't count the number of cases I've
24 settled in my career and neither side ever admits
25 the other side was correct.  But you settled the

Page 48

1  Department of Justice's investigation by agreeing
2  to pay $1.3 million, correct?
3      A.   We did --
4          MR. CEJAS:  Object to the form.
5  Argumentative.
6          Go ahead.
7          THE WITNESS:  We did because, as you
8  know, having attorneys is very expensive, a
9  distraction, and expensive to the organization.  So
10 we made the business decision to settle.  What --
11     Q.   (BY MR. CORNFELD)  All right.
12     A.   -- what didn't come out and what the
13 Department of Justice did not agree or look in to
14 pursue is all of the allegations that Dr. Riley
15 made in the -- in the complaint around the test
16 results being wrong 30 percent of the time, around
17 using the -- by changing the regression, and by
18 using historic QCs.  All of that, they chose not to
19 pursue because there's valid, analytical reasons to
20 do that.
21     Q.   Do you think maybe the Department of
22 Justice decided that as long as Averhealth had
23 agreed to pay so much money, they didn't need to
24 bring a bigger lawsuit, they could just accept the
25 $1.3 million as satisfaction of all of their



Page 49

1  claims?
2      A.   No.
3          MR. CEJAS:  Object to the form.
4  Calls for speculation.
5          Go ahead.
6          THE WITNESS:  No.
7      Q.   (BY MR. CORNFELD)  You don't think
8  $1.3 million was an adequate satisfaction of the
9  government's claim?
10         MR. CEJAS:  Objection.  Calls for a
11 legal conclusion.
12         THE WITNESS:  No.
13     Q.   (BY MR. CORNFELD)  Do you -- why is
14 that?  Isn't that a lot of money?
15     A.   Because -- because if the Department
16 of Justice truly believed that there was issues
17 with test results, they would have pursued it.  We
18 showed them through the investigation that the
19 testing that we're doing had sound, solid,
20 scientific backing behind it and that we produced
21 accurate test results.
22     Q.   The Department of Justice's
23 investigation was -- and their lawsuit was purely
24 to get money, correct?  It was a -- it was a
25 lawsuit for money for violation of the False Claims

Page 50

1  Act by Averhealth, correct?
2      A.   I'm not sure.
3      Q.   So if -- if -- I mean, I've settled
4  cases, and if you can get what you want for only a
5  small portion of doing the work that you need to
6  do, that's a great settlement.  Don't you think the
7  Department of Justice was satisfied that their --
8  that what they were claiming, they had received?
9          MR. CEJAS:  Object to the form.
10 Calls for speculation.
11         THE WITNESS:  They fully investigated
12 the claims that were introduced by Sarah Riley, and
13 in -- and that was all around our -- our testing
14 processes.  Through that investigation, we were
15 able to show that our testing results were accurate
16 and all of the process and procedures that we use
17 were -- were analytically sound, and so they
18 choose -- chose not to pursue that.
19     Q.   (BY MR. CORNFELD)  The -- the claim
20 was a claim of breach of contract by Averhealth
21 that it -- that it failed to live up to what it
22 agreed to do for the -- for the government in its
23 testing practices, correct?
24     A.   The original -- the original
25 complaint was around our testing -- was two parts,

Page 51

1  both on our testing processes as well as on the
2  contract.
3      Q.   Well, the testing processes were --
4  that was part of the contract that you were
5  supposed to do, use sound testing practices,
6  correct?
7      A.   We use sound testing practices.
8      Q.   But that was part of the contract
9  that you were -- under the contract, you were
10 supposed to use sound testing practices.
11     A.   Which we did.
12     Q.   I understand it's your position that
13 you did, but that was part of the contract is my
14 question, correct?  Strike that.
15         Part of the contract was you were
16 supposed to use sound testing practices?
17     A.   Correct.
18     Q.   And if the government could satisfy
19 its monetary claim for something other than that,
20 then there would be no reason to pursue the claim
21 regarding sound testing practices --
22         MR. CEJAS:  Object --
23     Q.   (BY MR. CORNFELD)  -- if it already
24 -- if it already had its monetary claim satisfied.
25         MR. CEJAS:  Object to form.  Calls

Page 52

1  for speculation.
2      Q.   (BY MR. CORNFELD)  Do you under- --
3  do you understand that?
4          MR. CEJAS:  Object to form.  Calls
5  for speculation --
6          THE WITNESS:  I don't understand
7  that.
8          MR. CEJAS:  -- calls for a legal
9  conclusion.
10         COURT REPORTER:  Hold on.
11         THE WITNESS:  Sorry.
12         MR. CEJAS:  Calls for speculation and
13 a legal conclusion.
14         THE WITNESS:  I don't understand
15 that.
16     Q.   (BY MR. CORNFELD)  What -- what did
17 Averhealth do, in your view, to -- to demonstrate
18 or attempt to demonstrate to the government that
19 its testing practices were sound?
20     A.   We provided scientific papers,
21 information, results back to the government that
22 showed that the practices that we used are
23 scientifically valid and forensically defensible,
24 and accepted by both CLIA and CAP.
25     Q.   Are you referring to Dr. Klette's

Page 53

1  report?
2       **A.   Not just Dr. Klette's report, but**
3  **other information that -- that we had sent to them.**
4       Q.   What was that other information?
5       **A.   There was a letter from Miranda**
6  **Booker --**
7       Q.   Okay.
8       **A.   -- that outlined that the practices**
9  **that we used as far as, you know, we've already**
10  **discussed, which is historic calibrations, changing**
11  **internal standards, and changing regression, that**
12  **those are all sound, valid practices accepted by**
13  **both the College of American Pathologists as well**
14  **as CLIA.**
15       Q.   Miranda -- is it Miranda Booker?
16       **A.   Uh-huh.**
17       Q.   Is that right?
18       **A.   That is correct.**
19       Q.   She's an attorney, correct?
20       **A.   She is.**
21       Q.   She's not a scientist like
22  Dr. Klette?
23       **A.   She also -- no, but she referenced**
24  **scientific papers and information and data in the**
25  **response.**

Page 54

1       Q.   All right.  Is that -- and is that
2  what you're referring to?  Because we've -- that's
3  been produced to us, but I don't think we've been
4  produced any other materials that were submitted to
5  the Department of Justice.
6       **A.   That is what I'm speaking of, yes.**
7       Q.   Okay.  If you look at page 2 of
8  Dr. Glinn's letter to CAP dated January 4, 2021,
9  Exhibit 29, do you see in the first full paragraph
10  on that page, Dr. Glinn states:  We believe that
11  upon your review of the information enclosed
12  herein, you will arrive at a finding of not
13  substantiated?
14       **A.   Yes.**
15       Q.   Correct?  That didn't happen, did it?
16       **A.   It did.**
17       Q.   They -- they arrived at a finding of
18  not substantiated in response to the information
19  that you submitted -- that Dr. Glinn submitted --
20       **A.   Not all claims are substantiated.**
21       Q.   Excuse me.  Excuse me.
22       **A.   Uh-huh.**
23       Q.   They didn't arrive at a finding of
24  not substantiated in response to the information
25  that Averhealth submitted to CAP on January 4,

Page 55

1  2021?
2       **A.   They did not find all claims**
3  **substantiated.**
4       Q.   Look at the bottom of page 2 of -- of
5  page -- of the letter Exhibit 47.  I'm sorry,
6  Exhibit 29.  Strike that.
7            Look at the bottom of page 2 of
8  Dr. Glinn's letter to CAP of January 4, 2021,
9  Exhibit 29, and she addresses PT number 3:  Submit
10  the alternative PT assessments performed on hair
11  samples.
12            Do you see that?
13       **A.   Yes.**
14       Q.   And she states that she has enclosed
15  results for hair testing proficiency results.
16  These are ordered from LGC, which is the most
17  widely used proficiency testing program for hair
18  testing.  And she states:  No results were
19  unacceptable.
20            Do you see that?
21       **A.   Yes.**
22       Q.   That was a false statement, wasn't
23  it?
24       **A.   Not that I'm aware of, no.**
25       Q.   Let's look at what she submitted, if

Page 56

1  you would look at page 21744.
2            Do you have that page?
3       **A.   Yes.**
4       Q.   And -- and do you see that this is
5  the attachment that Dr. Glinn submitted that is the
6  report of the proficiency testing by LGC?
7       **A.   Yes.**
8       Q.   And let's look at the hair
9  proficiency test results for June 2020, which
10  Dr. Glinn says found nothing unacceptable.  And do
11  you see that on page 21748?
12       **A.   Yes.**
13       Q.   And -- and do you see that it shows a
14  total of four questionable results and one
15  unsatisfactory result?
16       **A.   I see that as a summary.  I'm -- I'm**
17  **not used to looking at this, so I would need**
18  **Dr. Glinn to explain why she had indicated that on**
19  **this report.**
20       Q.   Why -- why she said that nothing was
21  found to be unacceptable when there was one
22  unsatisfactory result and four questionable
23  results?
24       **A.   I don't know how to read this table,**
25  **so I cannot answer that question.**



Page 57

1      Q.  All right.  If you would look at
2  page 21674 of Dr. Glinn's letter of January 4 to
3  CAP, she states -- I'm sorry, do you have that
4  page?
5      A.  Hold on.  I was just looking at the
6  summary because all these say a hundred percent, so
7  I'm looking at the next page.  I'm back to there,
8  although you say this summary's there, I don't know
9  if that's -- because then if you look at the
10 following page where it talks about the samples, it
11 says 100 percent satisfactory and 80 percent
12 satisfactory on benzoylecgonine.  So I'm trying to
13 figure out, but I guess we can table that for
14 Dr. Glinn and she could interpret it for you.
15     Q.  Because 80 percent satisfactory would
16 mean 20 percent unsatisfactory, correct?
17     A.  I -- I will leave it Dr. Glinn to
18 explain it to you.  Sorry, what page are you on?
19     Q.  All right.  21674.
20     A.  Okay.
21     Q.  And do you see Dr. Glinn states in
22 the first full paragraph at the top of the page:
23 Consistent with industry practices, when the above
24 three conditions hold, historical QC data is used
25 for the acceptance of the run.

Page 58

1      A.  Yes.
2      Q.  What made Averhealth believe that
3  that was consistent with industry practices?
4      A.  That's a scientific question for
5  Dr. Glinn.
6      Q.  All right.  In fact, CAP -- I mean, I
7  know I'm jumping ahead, but CAP made you stop using
8  historical QCs, didn't they?
9      A.  Yes, we stopped using historical QCs.
10     Q.  Because CAP made you stop using them,
11 correct?
12     A.  Yes.  When they were used in very
13 rare instances.
14     Q.  Well, you say they're very rare and
15 Dr. Glinn said they were fairly frequent, but
16 whether they were rare or fairly --
17     A.  I don't think she said -- where did
18 she say frequent?  Where did she say frequent?
19     Q.  We -- we've already gone over it.
20 I'm not going to go over it again, but whether it
21 was rare --
22     A.  Dr. Glinn never said they were very
23 frequent.
24     Q.  I'm sorry, I'm sorry.  Dr. Riley.
25 Dr. Riley.

Page 59

1          MR. CEJAS:  So I'm going to move to
2  strike the question.  Go ahead and restart it.
3          MR. CORNFELD:  Yeah, yeah.
4      Q.  (BY MR. CORNFELD)  I mean you say
5  rare, Dr. Riley said fairly frequent.  Whether it
6  was rare or frequent, CAP made you stop using
7  historical QCs because using historical QCs is
8  improper, correct?
9      A.  We chose to stop using historical
10 QCs.
11     Q.  Because CAP made you do it?
12     A.  They didn't make us do it.  As part
13 of the quality improvement process, we stopped
14 using historical QCs.
15     Q.  In response to CAP's complaint,
16 correct?
17     A.  Yes.
18     Q.  Kind of like settling a lawsuit, I
19 guess.
20          MR. CEJAS:  Objection.
21     Q.  (BY MR. CORNFELD)  They didn't
22 litigate it with you, but they said this is wrong,
23 and you said okay, we'll stop doing it, correct?
24          MR. CEJAS:  Object to form.
25 Argumentative.

Page 60

1          Go ahead.
2          THE WITNESS:  No.  Not correct.
3      Q.  (BY MR. CORNFELD)  They didn't say
4  this is wrong?
5      A.  We did not agree.  We -- we chose to
6  settle and -- and there was no factual basis.
7      Q.  Okay.  All right.
8      A.  What we did was proper.
9      Q.  When you said you -- you didn't
10 agree, you -- you also just said you voluntarily
11 stopped using historical QCs.  Doesn't that mean an
12 agreement?
13     A.  I didn't say we voluntarily.  Yes, we
14 stopped using historical QCs.
15     Q.  Okay.  Would you agree it would be
16 improper to use historical QCs frequently?
17     A.  That's a question for Dr. Glinn.
18          MR. CORNFELD:  How long have we been
19 going?
20          MR. PLEBAN:  An hour.
21          MR. CEJAS:  Yeah, an hour and
22 12 minutes.
23          MR. CORNFELD:  Oh, do you want to
24 take a break now?
25          MR. CEJAS:  Yes.



Page 61

1        THE VIDEOGRAPHER:  Time is 9:58 a.m.
2   We are off the record.
3        (A short break was taken.)
4        THE VIDEOGRAPHER:  The time is
5   10:16 a.m.  We are back on the record.
6     Q.   (BY MR. CORNFELD)  Ms. Delagnes, do
7   you have in front of you Exhibit 48, which is a
8   letter from the College of American Pathologists to
9   Michele Glinn dated January 29th, 2021, signed by
10  Michael B. Datto, M.D., PhD, CAP's accreditation
11  committee chair?
12    A.   Yes.
13    Q.   And do you also have in front of you
14  the letter we looked at yesterday, Exhibit 39,
15  which is the first letter that CAP sent you
16  regarding the allegations that had been made to it
17  against Averhealth by Dr. Riley?
18    A.   Yes.
19    Q.   All right.  So the Exhibit 48, that's
20  the letter where CAP told you that they had placed
21  you on probation, correct?
22    A.   Yes.
23    Q.   And that was as -- so -- and they say
24  that was as of January 27, 2021, correct?
25    A.   Yes.

Page 62

1     Q.   They sent the letter by express
2   delivery so that you would receive that the next
3   day or so, correct?
4     A.   Yes.
5     Q.   Did you get any advanced notice that
6   you were being placed on probation?
7     A.   Not that I'm aware of.
8     Q.   Okay.  So the first -- the --
9   Exhibit 48 was the first notice you had that you
10  were being placed -- Averhealth was being placed on
11  probation?
12    A.   Yes.
13    Q.   And the letter states in the second
14  paragraph:  The accreditation committee is
15  especially concerned about the implementation of
16  policies and procedures to correct the following
17  substantiated allegations.
18       Do you see that?
19    A.   Yes.
20    Q.   So they -- they found that the
21  allegations that they set forth in this letter had
22  been substantiated, correct?
23    A.   Some of them, yes.
24    Q.   Well, the ones they set forth in the
25  letter.  There are four bullet points.

Page 63

1     A.   There are four bullet points, yes.
2     Q.   And -- and those they found were
3   substantiated, correct?
4     A.   That's what the letter says, yes.
5     Q.   And -- and those where the same four
6   allegations that CAP informed you on November 11 in
7   Exhibit -- November 11, 2020, in Exhibit 39, were
8   the allegations that Dr. Riley had made, correct?
9     A.   Those are the four bullets that were
10  outlined, yes.
11    Q.   Okay.
12    A.   I've not seen the full allegations,
13  but yes, those are the four bullets outlined.
14    Q.   Okay.  So the -- so the same
15  allegations that they told you about, that CAP told
16  you about in November of 2020 are the ones they
17  found were substantiated when they placed you on
18  probation, correct?
19    A.   That's what the letter says, yes.
20    Q.   You -- and you have -- you have no
21  way of knowing whether CAP did substantiate those
22  allegations other than what CAP told you in the
23  letter of January 29, 2021, correct?
24    A.   I don't understand your question.
25  Can you rephrase it?

Page 64

1     Q.   Do you have any -- do you have any
2   knowledge about whether CAP, in fact, found
3   Dr. Riley's four allegations to be substantiated
4   other than what they said in the letter of
5   January 29, 2021?
6     A.   No.
7     Q.   Okay.  And then after the -- they
8   list the four allegations -- well, let's go through
9   those four allegations.
10    A.   Sure.
11    Q.   They were concerned regarding
12  unacceptable quality assurance of mass spectrometry
13  confirmatory testing, correct?
14    A.   Yes.
15    Q.   And they -- and there's the failure
16  to follow procedures as written?
17    A.   Yes.
18    Q.   There's concern regarding the
19  manipulation of instrument calibrations?
20    A.   Yes.
21    Q.   And there's concern regarding the
22  review of quality control results, correct?
23    A.   Yes.
24    Q.   And after each one of these items,
25  CAP set forth the checklist items of -- of what the



Page 65

1  checklist items were that they are saying that you
2  were in violation of and needed to correct; is that
3  right?
4      **A.    They cited where these came from.**
5  **Yes, these are the checklist items.**
6      Q.    Okay.  And then the letter from CAP
7  placing you on probation says:  The committee is
8  particularly concerned about the evaluation of bias
9  and root cause analysis in regard to proficiency
10  testing results, as well as the use of historical
11  QC and QC acceptance practices.
12      Do you see that?
13  **A.    Yes.**
14      Q.    And then they -- and -- and you have
15  no -- no knowledge other than what CAP stated about
16  their particular concerns other than what they told
17  you in this letter, correct?
18  **A.    Correct.**
19      Q.    Then they -- they list items they
20  want you to submit in addition to what you had
21  already submitted in regard to these various
22  concerns and findings that they made, correct?
23  **A.    Yes.**
24      Q.    And with regard to what they say
25  about their particular concern about the evaluation

Page 66

1  of bias and root cause analysis in regard to
2  proficiency testing results, isn't it the case that
3  your staff could never find the time to do that?
4      **A.    No.**
5      Q.    Handing you what's been marked as --
6  I'm sorry, I didn't write down the exhibit number.
7      **A.    49.**
8      Q.    Okay.  You've been handed what's been
9  marked as Exhibit 49, which is a document on the
10  first page of which is Bates 78821 and has the
11  title on the first page:  Short Message Report.
12      Do you see that?
13  **A.    Where it says Short Message -- yes, I**
14  **do.**
15      Q.    Okay.  And this is a report of a
16  internal chat within Averhealth, correct?
17  **A.    Yes.**
18      Q.    Done on your Microsoft Teams internal
19  system, correct?
20  **A.    Correct.**
21      Q.    This is between Christina Essington
22  and Nichole Diloretta, correct?
23  **A.    Correct.**
24      Q.    Who is Nichole Diloretta?
25  **A.    At this time, she came on as one of**

Page 67

1  the laboratory -- I don't think she was a
2  laboratory director.  I forgot exactly what her
3  title was.
4      Q.    She --
5      **A.    Michele was still -- Michele Glinn**
6  **was still the laboratory director.  She was a --**
7  **the -- the laboratory site director.**
8      Q.    Okay.  And -- and so she worked in
9  the laboratory in St. Louis?
10  **A.    Correct.**
11      Q.    And this chat is from February 16,
12  2022?
13  **A.    Yes.**
14      Q.    For -- so about a year after you were
15  placed on probation by CAP, correct?
16  **A.    Correct.**
17      Q.    And do you see at 10:05 a.m., there's
18  a message by Nichole Diloretta?
19  **A.    Yes.**
20      Q.    And she says:  Gotcha.  Ok.  Whew.  I
21  thought for a second they wanted it reported the
22  other way.  No worries.
23      Do you see that?
24  **A.    I do.**
25      Q.    And then the next sentence is what I

Page 68

1  want to call to your attention:  This is exactly
2  what we should do since we never get the time to
3  properly investigate and get a root cause and have
4  to just report what we can.
5      Do you see that?
6  **A.    I do.**
7      Q.    Is that -- is that true what
8  Ms. Diloretta said, that they never get the time to
9  properly investigate and get a root cause?
10  **A.    I know that there's other**
11  **circumstances where we do look to get a root cause,**
12  **so that's what she says in this statement, but**
13  **that's not something that occurred all the time at**
14  **the laboratory, no.**
15      Q.    It did occur at least at times, so
16  often that she said we never get a root cause -- we
17  never get time to properly investigate and get a
18  root cause and have to just report what we can,
19  correct?
20  **A.    That's what she said in here, yes.**
21      Q.    All right.  And by "root cause," what
22  that means is that if you get an unexpected result
23  or a result that isn't working out correctly, that
24  means finding out why that happened?
25  **A.    Correct.**



Dominique Delagnes                                                    July 09, 2024

Page 69

1    Q.   Correct?

2    **A.   There's plenty of other instances**
3    **where we did find root causes, including with all**
4    **of our proficiency testing after we were placed on**
5    **probation by the College of American Pathologists.**
6    **So you can go through and look at all the root**
7    **cause analysis we did on all of our proficiency**
8    **testing.**

9    Q.   All right.  And whatever it
10   was -- Ms. Diloretta, did she later become the
11   laboratory director?

12   **A.   She did not.**

13   Q.   Okay.  But is she still employed by
14   Averhealth?

15   **A.   She is not.**

16   Q.   Well, and -- and why -- why did she
17   leave?

18   **A.   She had some medical issues.**

19   Q.   All right.  It wasn't that she was
20   asked to leave because of performance --

21   **A.   No.**

22   Q.   -- problems?  She was a satisfactory
23   employee?

24   **A.   Yes, she was.**

25   Q.   All right.  And in response to what

Page 70

1    Ms. Diloretta said where she said we never get the
2    time to properly investigate and get a root cause
3    and have to just report what we can, Ms. Essington
4    says:  OK, that is what I thought and was worried
5    when she called me asking about it.  I would not
6    feel comfortable reporting something out if it is
7    clear there is an issue.

8        Do you see that?

9    **A.   I do.**

10   Q.   Okay.  And she said that in response
11   to Ms. Diloretta saying we just have to report what
12   we can because we don't get the time to properly
13   investigate?

14   **A.   That's not the full context.**

15   Q.   She says --

16   **A.   No, if you start from the top, where**
17   **Christina Essington started the communication,**
18   **right, this was when we were reporting out test**
19   **results.  We wanted to ensure in the database that**
20   **we weren't reporting out 6-MAM, we were reporting**
21   **out the other drugs within that metabolite.**

22   Q.   Okay.  Whatever -- whatever that was,
23   Ms. Essington says after -- after Ms. Diloretta
24   says we -- we don't get the time, we never get the
25   time to properly investigate and get a root cause

Page 71

1    and have to just report what we can, Ms. Essington
2    says:  I would not feel comfortable reporting
3    something out pos if there -- it is clear this is
4    an issue.

5        Correct?

6    **A.   That is what she says, yes, correct.**

7    Q.   What does -- what does POS mean?

8    **A.   Positive.**

9    Q.   Okay.  If we go back to Exhibit 48,
10   the letter from CAP placing you on probation, among
11   the items of information and explanations and so
12   forth that have -- that CAP asked Averhealth -- or
13   actually insisted that Averhealth provide, there
14   was a detailed explanation of when and how
15   historical calibration curves and/or historical
16   quality control are used; is that right?

17   **A.   Yes.**

18   Q.   And to that point, in the fourth
19   bullet, CAP says to -- that you have to submit a
20   revised QC or quality control policy that requires
21   that no results, positive or negative, are released
22   if quality control is not acceptable.  This must
23   also detail a corrective action plan for when there
24   are QC failures.

25       Do you see that?

Page 72

1    **A.   Yes.**

2    Q.   And it was in response to that that
3    you told CAP that you would no longer use
4    historical QCs, correct?

5    **A.   The submit or revise policy, they**
6    **wanted to make sure that our policy had indicated**
7    **that positives would not be released, didn't have**
8    **the words "negative."  So they wanted to make sure**
9    **that our written policy stated no positives or**
10   **negatives.**

11   Q.   But it was in response to this that
12   you changed the policy to provide that you would no
13   longer use historical QCs, correct?

14   **A.   Correct.**

15   Q.   And CAP also told you, if you look at
16   the next bullet down, they wanted you to submit --
17   or they insisted you submit an evaluation and
18   corrective actions for all external proficiency
19   testing for urine, oral fluid, and hair testing
20   that must include corrective actions for all
21   qualitative and qualitative [sic] results that are
22   less than the highest rating, or outside of a
23   standard deviation index of plus or minus 2.0 or
24   any hair test result rated as questionable or
25   unsatisfactory.

LEXITAS

Page 73

1        Correct?

2    **A.   Yes.**

3    Q.   And -- and you -- you told us that

4    you've been doing that since this point; is that

5    right?

6    **A.   Yes.**

7    Q.   And that was in response to what CAP

8    told you to do, correct?

9    **A.   Yes.**

10   Q.   And wasn't that one of Dr. Riley's

11   complaints?

12   **A.   What -- wasn't one of what?**

13   Q.   About proficiency testing.

14   **A.   I don't -- I don't believe so.**

15   Q.   Okay.  But -- but it wasn't one of

16   her -- it was one of her complaints about the use

17   of historical QCs?

18   **A.   Yes.**

19   Q.   Now, the fact that CAP placed

20   Averhealth on probation and that CAP found that

21   Dr. Riley's four allegations were substantiated,

22   that was not public at that time, was it?

23   **A.   No.**

24   Q.   And we've discussed the fact that you

25   didn't come back to the Michigan judges and

Page 74

1    Michigan state officials after you told them you

2    were confident that CAP would deem the allegations

3    as unsubstantiated and tell them that, in fact,

4    they found them substantiated, correct?

5    **A.   We did not.  Had we had improperly**

6    **reported test results, we would have gone back and**

7    **updated our test results.**

8    Q.   My -- my question was --

9    **A.   We did not.  I answered that as no,**

10   **we did not --**

11       MR. CORNFELD:  Okay.  I move --

12   **THE WITNESS:  -- and I added on to**

13   **it.**

14       MR. CORNFELD:  I move -- I move to

15   strike the rest of the answer after we did not as

16   nonresponsive to the question.

17   Q.   (BY MR. CORNFELD)  Did you tell

18   anyone outside Averhealth that CAP had placed

19   Averhealth on probation because it found

20   Dr. Riley's allegations were substantiated?

21   **A.   We did not, because we were still an**

22   **accredited laboratory.  We still held a CAP**

23   **accreditation.  When you looked at us up on the**

24   **website, it still showed that we had our CAP**

25   **accreditation.**

Page 75

1    Q.   You -- do you think -- so you didn't

2    think it would be important that anybody would know

3    that you had been placed on probation?

4    **A.   We still had our CAP accreditation.**

5    Q.   Dr. Riley didn't know that at that

6    time that CAP [sic] was on probation, did she?

7        MR. CEJAS:  Objection.  Calls for

8    speculation to what Dr. Riley knew or didn't know.

9        Subject to that, go ahead.

10       **THE WITNESS:  I don't know.**

11   Q.   (BY MR. CORNFELD)  You know -- you

12   read her testimony in the Michigan case, correct?

13   **A.   Correct.**

14   Q.   She did not mention that as a result

15   of her allegations, CAP placed Averhealth on

16   probation, did she?

17   **A.   I -- I have not read that in a while.**

18   **I don't recall.**

19   Q.   And you didn't mention that in your

20   testimony in Michigan, did you?

21   **A.   I did not.**

22       MR. PLEBAN:  That's yours.

23       (A discussion was held off the

24   record.)

25   Q.   (BY MR. CORNFELD)  Handing you --

Page 76

1    handing you what's been marked as Exhibit 50.  Do

2    you see that this is a -- the transcript of

3    testimony that you gave in a case in -- in the

4    court in Ingham County, Michigan?

5    **A.   Yes.**

6    Q.   And that's the case in which both you

7    and Dr. Riley testified?

8    **A.   Yes.**

9    Q.   And that -- that -- you gave that

10   testimony on February 5th, 2021, correct?

11   **A.   Yes.**

12   Q.   And so you knew at that time that CAP

13   had placed Averhealth on probation, didn't you?

14   **A.   Yes.**

15   Q.   This case was on a motion by a mother

16   to suppress Averhealth's test results that came

17   back positive for illegal drugs, right?

18   **A.   Yes.**

19   Q.   Because she said it was a false

20   positive, correct?

21   **A.   She -- yes, that the test results**

22   **were not accurate.**

23   Q.   If you turn to page 4, beginning --

24   **A.   4?**

25   Q.   Page 4, yes.  It's where the

LEXITAS

Dominique Delagnes                                      July 09, 2024

Page 77

1  transcript, beginning at line 7, you were asked:
2  While being the chief operating officer -- meaning
3  the chief of Averhealth -- have concerns been
4  brought to Averhealth that there have been some
5  concerns in regard to the accuracy of drug testing?
6          And your answer was:  There have.
7          Can you give the Court an idea of
8  what the concerns were and what happened?
9          Your answer:  Sure.  So we have an
10  employee that was employed for us for less than six
11  weeks, who was disgruntled, and upon her departure
12  had made claims that Averhealth had some quality
13  issues.  And since that time, you know, they've
14  been completely not substantiated.
15          Do you see that testimony?
16  **A.   I do.**
17      Q.   At this point in time, CAP had told
18  you that those claims, those allegations were
19  substantiated, correct?
20  **A.   This testimony indicates the fact**
21  **that she was -- that Dr. Riley was indicating that**
22  **our test results were wrong 30 percent of the time.**
23  **That's what I was speaking to here.  Those had not**
24  **been substantiated.**
25      Q.   You didn't --

Page 78

1  **A.   CAP did not say that our results were**
2  **wrong.**
3      Q.   You didn't mention that -- that that
4  was the -- what you were talking about.  You
5  were -- you were asked what were the concerns and
6  what happened, and you knew at that time that
7  Dr. Riley's concerns, she had sent her concerns to
8  CAP, those four bullet points we've looked at
9  several times, and CAP found they were
10  substantiated, correct?
11  **A.   There's a letter that talks about**
12  **them being substantiated.  What I'm reflecting**
13  **to --**
14      Q.   Excuse me --
15  **A.   -- here is the fact --**
16      Q.   Excuse me --
17  **A.   Yes.**
18      Q.   That's all -- that was all my
19  question.
20  **A.   Okay.**
21      Q.   Which that question was.
22  **A.   Yes.  Yes.**
23      Q.   And when you say there was a letter,
24  you're referring to the letter that CAP had just
25  sent you a week earlier telling you that those

Page 79

1  allegations of Dr. Riley's were substantiated,
2  correct?
3  **A.   Yes.**
4      Q.   And -- and your testimony was that
5  her -- her allegations were completely not
6  substantiated, correct?
7  **A.   My exact quote in here was --**
8      Q.   Your exact quote was:  Since that
9  time, you know, they've been completely not
10  substantiated.
11  **A.   Yes.**
12      Q.   Correct?
13  **A.   Yes, that is --**
14      Q.   Completely was your word in that
15  answer, correct?
16  **A.   Yes.**
17      Q.   And you -- and then you said:  And
18  we've had other independent individuals look at our
19  processes and basically not come to the same
20  conclusion that there were any quality issues with
21  the testing that is being done by Averhealth.
22          And you made that -- you made that
23  statement, didn't you?
24  **A.   Yes.**
25      Q.   Knowing that CAP was an independent

Page 80

1  body that found that Dr. Riley's four allegations
2  were substantiated, correct?
3  **A.   What I was referring to here --**
4      Q.   I'm not talking about --
5          MR. CEJAS:  Wait --
6      Q.   (BY MR. CORNFELD)  -- what you're
7  referring to, I'm talking about what you were --
8  what you knew when you said that other -- other
9  independent individuals came to the same
10  conclusion.  You knew that CAP had found that
11  Dr. Riley's allegations were substantiated at that
12  time, didn't you?
13          MR. CEJAS:  Object to form.
14  Argumentative.  And let her answer -- go ahead and
15  answer, Dominique.
16  **THE WITNESS:  What I was referring to**
17  **here was Dr. Wagner and Dr. Broussard who came on**
18  **site and did an independent investigation.**
19      Q.   (BY MR. CORNFELD)  You -- you didn't
20  mention either Dr. Wagner or Broussard in that
21  answer, did you?
22  **A.   I did not.**
23      Q.   And you didn't feel the need to tell
24  the Court that your accrediting body, the College
25  of American Pathologists, had found that



Page 81

1  Dr. Riley's four allegations were substantiated; is
2  that right?
3      A.   CAP had come -- had --
4      Q.   Excuse me, my question was:  You
5  didn't feel the need to tell the Court that CAP had
6  found that Dr. Riley's four allegations were
7  substantiated at the time you gave your
8  testimony --
9      A.   I did not --
10     Q.   -- in Michigan?
11     A.   -- mention this on the stand, no.
12     Q.   So is it your belief that when you
13  told the Court that Dr. Riley's allegations were
14  completely not substantiated, you were not telling
15  a fib to the Court?
16     A.   Dr. Riley was stating on the record
17  that our test results were wrong 30 or --
18  30 percent of the time or more, and so --
19     Q.   My question is --
20     A.   -- and so what I was responding to
21  was the fact that she was making allegations that
22  our test results were wrong 30 percent of the time.
23  CAP did not find that to be the case.  In fact, as
24  part of their investigation, they came on, and one
25  of the things they were looking at --

Page 82

1      Q.   That wasn't my --
2      A.   -- to see --
3      Q.   Excuse me --
4          MR. CEJAS:  Just a minute --
5          MR. CORNFELD:  Excuse me, that is not
6  responsive.
7          MR. CEJAS:  It is responsive --
8      Q.   (BY MR. CORNFELD)  That happened --
9  that happened in May, and we will get to that.
10  We're talking about your testimony in February when
11  you said that Dr. Riley's allegations had been
12  completely not substantiated.  Is it your testimony
13  that that -- is it your testimony today that that
14  was not false?
15          MR. CEJAS:  Object to form.
16  Argumentative.
17          Go ahead and answer the question.
18          THE WITNESS:  I don't -- that was a
19  double negative, so I'm now very confused what
20  you're asking me.
21      Q.   (BY MR. CORNFELD)  Is it -- is it --
22  are you telling us that that testimony that you
23  gave when you said that her allegations had been
24  found to be completely not substantiated, that that
25  was not a falsehood you told the Court?

Page 83

1      A.   It is not a false because they did
2  not find the fact that our test results were wrong.
3      Q.   You didn't -- you didn't refer to --
4      A.   You're right, I didn't.
5      Q.   -- you did not refer to that --
6      A.   That is correct.
7      Q.   You referred to her allegations,
8  her -- the claims she made about quality issues,
9  and CAP had found them substantiated, and you told
10  the Court that they had been completely not
11  substantiated, correct?
12      A.   Yes.
13      Q.   Take a look at page 12.  You were --
14  you were asked, referring to a memoranda that the
15  other lawyer had been using, you were asked:  Now,
16  the memorandum that the prosecutor was reading to
17  you goes on to say that in addition -- I'm quoting
18  now, and he quotes -- in addition, we have informed
19  -- been informed that allegations have been raised
20  regarding Averhealth's -- Averhealth employee
21  practices not complying with the company's
22  accreditation standard, unquote.  What do you say
23  to that?
24          And your answer was:  There has been
25  nothing that has said that we are not following our

Page 84

1  standards.  We do -- our employees do follow our
2  SOPs on a consistent basis.
3          Do you see that that was your
4  answer --
5      A.   Yes.
6      Q.   -- to that question?
7          And you didn't tell the Court when
8  you said that nothing -- nothing has said that we
9  are not following our standards and your employees
10  follow your SOPs, when you talked about the
11  standards, you're referring to your SOPs, correct?
12      A.   Yes.
13      Q.   And you did not mention that CAP had
14  found that you had failed to follow procedures as
15  written.  You didn't tell the Court that, did you?
16      A.   No.
17      Q.   Instead, you said nothing has been
18  said that our employees aren't following our
19  standards, correct?
20      A.   Yes.
21          MR. CEJAS:  Objection.
22      Q.   (BY MR. CORNFELD)  Is it your
23  testimony that that -- that your -- your testimony
24  today that what you told the Court in February of
25  2021 was not false?

Page 85

1     A.   I'm --

2     Q.   When you said nothing -- nothing has

3  been said that we are not following our standards,

4  when CAP said you weren't following your standards.

5        What -- what -- strike that.

6        MR. PLEBAN:  I think it was a double

7  negative.  Sorry.

8        MR. CORNFELD:  That's okay.  You

9  don't have to explain.

10    Q.  (BY MR. CORNFELD)  When -- when you

11  told the Court in Michigan -- after CAP had found

12  that you failed to follow your procedures as

13  written, when you told the Court there's been

14  nothing that said that we are not following our

15  standards, and our employees follow our SOPs on a

16  consistent basis, is it your testimony today that

17  you were telling the Court the truth when you did

18  not mention that CAP had found that you weren't

19  following your standards?

20    **A.   At this time, that is -- this is what**

21  **I said.**

22    Q.   You were asked whether anybody had

23  found that you were not following your standards.

24  You know that -- you knew that CAP had found that

25  you were not following your standards and you said

Page 86

1  there's been nothing that has said we are not

2  following our standards.  That's what you told the

3  Court, correct?

4    **A.   Yes.**

5    Q.   Okay.  And that wasn't true, was it?

6  It wasn't true that nothing has said that we are

7  not following our standards because CAP said you

8  weren't following your standards, correct?

9    **A.   There is documentation from CAP that**

10  **says that we did not follow our SOPs as written,**

11  **yes.**

12    Q.   So -- so -- so what -- so you're --

13  and so what you told the Court was not true?

14    **A.   Correct.**

15    Q.   And the Court took that into

16  consideration when it -- when it reached its

17  decision in the case, the Court had your testimony

18  and considered that testimony, and the Court had no

19  way of knowing what CAP had found because nobody

20  told the Court, correct?

21        MR. CEJAS:  Well, objection.  Calls

22  for speculation to what the Court knew or didn't

23  know.

24        Go ahead.

25    **THE WITNESS:  I don't know what the**

Page 87

1  Court knew and didn't know.

2    Q.   (BY MR. CORNFELD)  You -- you know --

3  you've read the Court's opinion, haven't you?

4    **A.   I have read the Court's opinion.**

5    Q.   And the Court didn't mention anything

6  about CAP finding -- putting you on probation or --

7  or finding that Dr. Riley's allegations were

8  substantiated, did it?

9    **A.   They did not state that in their**

10  **opinion, no.**

11    Q.   And so you would conclude from that

12  that the Court didn't know about.  The Court

13  reviewed all the testimony, all the evidence before

14  it, correct?

15    **A.   I believe so.**

16    Q.   Okay.

17    **A.   They also made their ruling based on**

18  **testimony that was given by Dr. Wagner, who was**

19  **also on there, who had come to our laboratory and**

20  **done an inspection to show that our test results**

21  **were accurate.**

22    Q.   We'll get to -- we'll get to

23  Dr. Wagner.

24    **A.   Okay.**

25    Q.   Do you think Dr. Wagner would take --

Page 88

1  get more weight than CAP, than your accrediting

2  body?

3    **A.   Our accrediting body didn't say our**

4  **results were wrong.**

5    Q.   Excuse me, your -- what your --

6    **A.   But our accrediting body didn't say**

7  **our results were wrong.**

8    Q.   Your accrediting body -- excuse me,

9  do you believe that Dr. Wagner carries more weight

10  than CAP?

11    **A.   I don't know how to quantify that.**

12    Q.   Do you know what happened to the --

13  to the woman who brought that case?  Did she lose a

14  child as a result of this proceeding?

15    **A.   I don't know what happened.**

16    Q.   Presumably, that is what happened

17  because she was claiming that -- that the drug test

18  was false, and this was a child custody proceeding.

19  You know that --

20    **A.   In Michigan, they --**

21    Q.   -- because --

22        MR. CEJAS:  Let me --

23    **THE WITNESS:  Okay.**

24        MR. CEJAS:  -- object to form.  It

25  assumes facts not in evidence.

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                                California Firm Registration #179

LEXITAS

Page 89

1    Q.    (BY MR. CORNFELD)  You know -- you
2  know that from the title of the case, and I don't
3  want to read the names of -- of the children, and I
4  don't know why it was produced to us with the names
5  of the children not redacted.  And it will be in
6  the record, but you -- strike that.
7    A.    In Michigan --
8    Q.    Excuse me.  This was -- this was a
9  case that was in the matter of two minor children,
10  correct?
11   A.    Correct.
12   Q.    And they were the minor children of
13  the woman who said that her -- her test was wrong
14  and she wasn't using drugs, correct?
15       MR. CEJAS:  Well, objection.  Assumes
16  facts not in evidence, calls for speculation.
17       But if you know, go ahead.
18       THE WITNESS:  I don't know.
19   Q.    (BY MR. CORNFELD)  You don't know
20  anything to the contrary.  I mean, you know that --
21  you know that a woman brought this proceeding
22  claiming that her test was inaccurate, and the
23  proceeding was in the matter of two minor children.
24  Wouldn't you conclude that those were her minor
25  children?

Page 90

1        MR. CEJAS:  Object to form.  Calls
2  for speculation.  Again, it assumes facts not in
3  evidence.
4        But go ahead, if you know.
5        THE WITNESS:  And there's nothing
6  that shows that our test results were inaccurate.
7    Q.    (BY MR. CORNFELD)  Excuse me.  That's
8  not my question.  My question is:  You would
9  conclude from the name of the case and the fact
10  that a woman brought the case, that the case
11  involved her custody over her two minor children,
12  correct?
13       MR. CEJAS:  Same objections.
14       THE WITNESS:  I don't know the case.
15   Q.    (BY MR. CORNFELD)  Do you have any
16  other idea what this case might have been, if a
17  woman brought the case claiming the test results
18  were inaccurate and it was a case that involved her
19  two minor children?
20   A.    You keep talking about our tests
21  being inaccurate --
22   Q.    Excuse me.
23   A.    -- but you don't allow me to --
24   Q.    Excuse me.
25   A.    -- respond to the fact that nothing

Page 91

1  has shown that our test results are not accurate.
2    Q.    I'm not asking you, and you said I
3  don't know how many umpteen times that you believe
4  your tests are not -- are not inaccurate, and
5  that's something that the jury will decide based on
6  all of the evidence in the case.
7        My question is about this lawsuit
8  that --
9    A.    Okay.
10   Q.    -- you testified in.  Do you have any
11  idea what this case could have been about other
12  than a woman bringing a case over the custody of
13  her two minor children?
14       MR. CEJAS:  Object to form.
15  Argumentative, again calls for speculation.
16       But go ahead, if you know.
17       THE WITNESS:  I don't know.
18   Q.    (BY MR. CORNFELD)  You've been handed
19  what's been marked as Exhibit 51, which is a letter
20  on Averhealth's letterhead to Lena Portillo of CAP
21  dated February 25, '21, from Dr. Glinn with a re
22  line:  Requested Documentation.
23       Do you see that?
24   A.    Yes.
25   Q.    And Dr. Glinn states:  In the letter

Page 92

1  of January 29, 2021, CAP has requested the
2  following documentation.
3        Correct?
4    A.    Yes.
5    Q.    And then she provides four items of
6  documentation or information.  And the first one is
7  a detailed explanation of when and how historical
8  calibration curves and/or historical quality
9  controls are used.
10       Do you see that?
11   A.    Yes.
12   Q.    And -- and in answer to that item,
13  Dr. Glinn says that Averhealth had changed its
14  procedures to stop using historical quality
15  controls and to use historical calibrators only
16  within the past 24 hours, correct?
17   A.    Yes.
18   Q.    And in item number 2, Dr. Glinn
19  states that in response to Aver -- CAP's demand,
20  Averhealth had changed its procedures on
21  chromatography, correct?
22   A.    We didn't change what we were doing,
23  we updated the written documentation about how it
24  was being done.  So the practice stayed in place,
25  we just further defined it.

Page 93

1    Q.   Regarding -- regarding
2  chromatography, correct?
3    A.   Yes.
4    Q.   And in response to number 3,
5  regarding quantitative bias as shown in the CAP
6  proficiency testing in 2019, and the correction
7  action -- corrective action plan for bias, you
8  submitted a corrective action plan, correct?
9    A.   We'd already been looking at it, but
10 they wanted us to further give a graphical
11 representation, which we provided.
12   Q.   All right.  And that was in response
13 to what they wanted, correct?
14   A.   Yes.
15   Q.   And they also wanted a revised QC
16 policy that required that no results, positive or
17 negative, would be released if QC is not
18 acceptable, and you provided that, correct?
19   A.   We updated our policy so it clearly
20 stated both positive and negative, yes.  So they
21 asked for additional --
22   Q.   Excuse me.
23   A.   -- document -- written documentation.
24        MR. CORNFELD:  How long have we been
25 going?

Page 94

1        MR. CEJAS:  We are --
2        MR. PLEBAN:  Right at about two.
3        MR. CEJAS:  Yeah, we're right about
4  two hours total.
5        MR. PLEBAN:  Are you at a breaking
6  point?
7        MR. CORNFELD:  Yeah, why don't do
8  that.
9        MR. PLEBAN:  Let's take a break.
10       THE VIDEOGRAPHER:  Time is 10:58 a.m.
11 We are off the record.
12       (A short break was taken.)
13       THE VIDEOGRAPHER:  The time is 11:18.
14 We're back on the record.
15   Q.   (BY MR. CORNFELD)  You have in front
16 of you Exhibit 52, which is a memo on the
17 letterhead of Averhealth by Jason Herzog,
18 Averhealth President and CEO, to Judge Boyd of
19 Michigan with the -- with the subject Sarah Riley,
20 February 19, 2020, testimony.
21   A.   2021 testimony?
22   Q.   2021, yes.
23   A.   Yes.
24   Q.   Are you familiar with this memo?
25   A.   I am not.  I didn't read it

Page 95

1  beforehand.  It's something that Mr. Herzog put
2  together.  I believe it's the first time that I'm
3  reading it, but I could take a look at it.
4    Q.   Well, would you -- would you read
5  that to yourself?  And then I just have a couple
6  questions about it.
7    A.   Sure.  Okay.
8    Q.   Does -- does reading this memo,
9  Exhibit 52, refresh your recollection about it?
10   A.   Again, I don't believe I saw this
11 beforehand.  Mr. Herzog didn't share every memo
12 with me before it was sent out to individuals.  I
13 honestly don't think he ever had me edit it, look
14 at it, or review it before it was sent.
15   Q.   All right.  You -- you know from
16 having just read it that Mr. Herzog is writing to
17 Judge Boyd about the testimony that Dr. Riley gave
18 in the same court in which you testified, and her
19 testimony was after yours.  It was on February
20 19th, 2021.
21   A.   Yes.
22   Q.   He doesn't mention -- strike that.
23        At this time, Averhealth was under
24 probation by CAP, correct?
25   A.   Yes.  Was on probation by CAP and

Page 96

1  still CAP accredited, yes.
2    Q.   I didn't ask about that.  I just
3  asked at this time, Averhealth was on probation
4  from CAP, correct?
5    A.   Yes.
6    Q.   He doesn't mention that to Judge
7  Boyd, does he?
8    A.   No.
9    Q.   This is after he had written Judge
10 Boyd in November and said that he was confident
11 that CAP would find that the allegations of
12 Dr. Riley were unsubstantiated, correct?
13   A.   I have not seen that either.
14   Q.   We saw that -- we saw that yesterday.
15   A.   Okay.  Which document was that that
16 he -- I apologize, I don't recall seeing that memo.
17 We've seen a lot of documents.
18   Q.   I think it's Exhibit 40.
19   A.   Yes.  Okay.  Yes, I remember the
20 accuracy of test results.  Thank you.  It is
21 Exhibit 40.
22   Q.   And -- and he -- in Exhibit 40, on
23 November 12, 2020, Mr. Herzog told Judge Boyd of
24 the Michigan Supreme Court:  We are confident that
25 CAP-FDT will deem the allegations as



Page 97

1  unsubstantiated.
2       Correct?
3    **A.   Correct.**
4       Q.   As of the -- and -- and he states:
5  Perhaps unlike others, we fully embrace
6  transparency and self-report our mistakes.
7  Correct?
8    **A.   Correct.**
9       Q.   As of when Mr. -- strike that.
10      As of when Mr. Herzog wrote his memo
11  to Judge Boyd on February 26th, 2021, Exhibit 52,
12  CAP had told Averhealth that it deemed Dr. Riley's
13  four allegations to be substantiated, correct?
14   **A.   They cited that four -- yes.**
15      Q.   Okay.  And Mr. Herzog didn't tell
16  Judge Boyd that even though he had three months
17  earlier said he would -- he was confident that they
18  would find the allegations unsubstantiated,
19  correct?
20      MR. CEJAS:  Object to form.  Calls
21  for speculation to what he told to the extent
22  you're asking about something that's beyond this
23  piece of paper, so I think it's overbroad.
24      Q.   (BY MR. CORNFELD)  Go ahead.
25   **A.   Can you repeat the last part of the**

Page 98

1  **question?**
2       MR. CORNFELD:  Could you read it
3  back, please?
4       (The following question was read
5  back: Q.   Okay.  And Mr. Herzog didn't tell
6  Judge Boyd that even though he had three months
7  earlier said he would -- he was confident that they
8  would find the allegations unsubstantiated,
9  correct?)
10      MR. CEJAS:  Same objections.
11  **THE WITNESS:  In this letter, he**
12  **did -- he did not state that, no.**
13      Q.   (BY MR. CORNFELD)  And -- and by that
14  letter, you're referring to the memo --
15   **A.   The February 26th, 2021.**
16      Q.   Exhibit 52?
17   **A.   Correct.**
18      Q.   Is that in keeping with the
19  transparency that Mr. Herzog told Judge Boyd
20  Averhealth believes it lives up to?
21   **A.   We were still -- had our CAP**
22  **certification and continued to report accurate test**
23  **results.**
24      Q.   My -- my question is:  Not telling
25  Judge Boyd when you wrote him in February of 2021

Page 99

1  that CAP had found that Dr. Riley's allegations
2  were substantiated, after having told him three
3  months earlier that he was confident they would not
4  find them substantiated, is that in keeping with
5  Averhealth's philosophy of transparency?
6    **A.   Yes.**
7       Q.   And you don't think that Judge Boyd
8  would have appreciated learning that what Dr. --
9  Mr. Herzog told him three months earlier was not
10  borne out when CAP issued its findings?
11      MR. CEJAS:  Object to form.
12  Speculation.
13  **THE WITNESS:  What was not**
14  **substantiated was the fact that our test results**
15  **were incorrect.**
16      Q.   (BY MR. CORNFELD)  Excuse me.  The
17  allegations that he was referring to in his memo of
18  November, which were the four allegations that CAP
19  had brought against Averhealth based on what
20  Dr. Riley had told it -- told CAP --
21   **A.   In addition to our result --**
22      Q.   Excuse me.  Excuse me.  Those were
23  the allegations that Judge Boyd was referring to in
24  his memo to Judge -- excuse me, that those are the
25  allegations that Mr. Herzog was referring to when

Page 100

1  he wrote Judge Boyd in November 2020, correct?
2       MR. CEJAS:  Object to form.  Calls
3  for speculation as to what someone else is
4  referring to.
5       Go ahead.
6  **THE WITNESS:  In addition to**
7  **referring to the fact that she was saying that our**
8  **results --**
9       Q.   (BY MR. CORNFELD)  No --
10   **A.   -- were wrong 30 percent of the time.**
11      Q.   My -- my -- he did not say that in
12  his -- in his memo to Judge Boyd in November.  He
13  said -- he didn't say anything about Dr. Riley
14  saying that the results were wrong 30 percent of
15  the time, did he?
16   **A.   He said that --**
17      Q.   Did he say that -- that Dr. Riley was
18  claiming that the results were wrong 30 percent of
19  the time?
20   **A.   He was stating that she had made**
21  **allegations, which she made publicly to CAP --**
22      Q.   Did he --
23   **A.   -- to the state of Michigan and to**
24  **the DOJ that our results were wrong 30 percent**
25  **of the time.  And when we are talking about --**

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                                    California Firm Registration #179

LEXITAS

Page 101

1    Q.   Did he -- did he mention that to
2  Judge Boyd in November of 2021?
3    **A.   I -- he did not use the words wrong**
4  **30 percent of the time.**
5    Q.   Or anything to that effect.  He
6  didn't even allude to 30 percent of the time, did
7  he?
8    **A.   It says made allegations regarding**
9  **test methods.**
10   Q.   Right.  And those were the four
11  allegations that CAP wrote you in November of 2020,
12  and those allegations didn't say that the test
13  results were wrong 30 percent of the time, did
14  they?
15   **A.   On that document, no.  I have not**
16  **seen the full allegation that was written from**
17  **Dr. Riley to CAP.  I don't know that she put in**
18  **there that that led to -- I don't know what was in**
19  **there.**
20   Q.   Right.  What you know is what CAP
21  told you about, and they didn't say anything about
22  30 percent of the time, did they?
23   **A.   They did not, no.**
24   Q.   They --
25   **A.   They did --**

Page 102

1    Q.   -- listed --
2    **A.   -- they did found our results as**
3  **accurate, though, through inspections with us.**
4    Q.   We'll get to that.
5    **A.   Okay.**
6    Q.   We're talking about November of 2020.
7  They hadn't done an inspection at that time, so why
8  do you keep bringing that up when we are talking
9  about what CAP told you in November of 2020?
10       MR. CEJAS:  Object to --
11   Q.   (BY MR. CORNFELD)  They didn't --
12  excuse me -- that --
13       MR. CEJAS:  Well, you're not going
14  to --
15   Q.   (BY MR. CORNFELD)  -- inspection --
16       MR. CEJAS:  -- raise your voice at
17  the witness, Rick.
18   Q.   (BY MR. CORNFELD)  -- that --
19       MR. CEJAS:  You can ask your
20  question --
21   Q.   (BY MR. CORNFELD)  -- that
22  inspection --
23       MR. CEJAS:  -- lower the voices.
24   Q.   (BY MR. CORNFELD)  That inspection
25  hadn't happened yet, had it?

Page 103

1    **A.   No.**
2    Q.   All right.  There were four
3  allegations Dr. -- excuse me, Mr. Herzog addressed
4  those in his memo to Judge Boyd in November 2020,
5  and when he had the occasion to send him another
6  memo after CAP had found those allegations
7  substantiated, he didn't -- he concealed that from
8  Judge Boyd.  He did not mention that, correct?
9        MR. CEJAS:  Object to form.
10  Argumentative to conceal, calls for speculation.
11       Go ahead.
12       **THE WITNESS:  He did not mention it,**
13  **correct.  What he did mention on here --**
14   Q.   (BY MR. CORNFELD)  Excuse me, you've
15  answered the question.  There's no question
16  pending.
17       MR. CEJAS:  That's a highlighted
18  copy.
19       MR. CORNFELD:  Oh, my gosh, I am
20  hopeless.
21   Q.   (BY MR. CORNFELD)  I'm handing you
22  what is marked as Exhibit 53, which is an e-mail
23  from Jason Herzog to Jarrad Wagner, Amanda Doane,
24  and Colin Parks dated February 26, 2021, and has a
25  Bates number on the first page of 43819.

Page 104

1        Do you have that?
2    **A.   I do.**
3    Q.   Have you seen this before?
4    **A.   I'm not sure.**
5    Q.   Would you read through it and --
6    **A.   I am.**
7    Q.   Okay.
8    **A.   I don't believe I have seen this, I**
9  **don't recall.**
10       (A discussion was held off the
11  record.)
12       **THE WITNESS:  Thank you.**
13   Q.   (BY MR. CORNFELD)  You've been handed
14  what's been marked as Exhibit 54, which appears to
15  be a slide deck to the Michigan Prosecutor's
16  Association on April 21, 2021.
17   **A.   Correct.**
18   Q.   Have you seen this before?
19   **A.   Yes.**
20   Q.   What -- what is this?
21   **A.   This was information that we provided**
22  **to the Michigan Prosecutor's Association.  It was a**
23  **slide deck about Averhealth, who we are.**
24   Q.   Okay.  And this -- this was -- was
25  this in a meeting?



Page 105

1    A.   Not -- I'm not sure.  I was going to
2  say not a meeting that I participated in, but I'm
3  not sure.  I don't recall.  I know we put this
4  together.
5    Q.   Were you part of the team that put
6  this together?  I shouldn't say "team."  Did you
7  participate in putting this together?
8    A.   I definitely reviewed it.
9    Q.   All right.  And the reason that
10  prosecutors were interested in Averhealth was that
11  they would use Averhealth's test results in their
12  cases, correct?
13   A.   Yes.
14   Q.   And so they had to have confidence
15  that you were doing the tests properly, correct?
16   A.   Yes.
17   Q.   If you turn to page 5 entitled
18  Timeline of Events.
19       Do you see that?
20   A.   Yes.
21   Q.   And this shows events from
22  November 2020, December 2020, and January 2020,
23  correct?
24   A.   Yes.  And that must be a typo, should
25  be January 2021.

Page 106

1    Q.   Okay.  And there are two events
2  listed for January 2021, correct?
3    A.   Yes.
4    Q.   The first is -- relates to the Wagner
5  Toxicology Associates' evaluation of Averhealth,
6  correct?
7    A.   Yes.
8    Q.   And the second is the statement facts
9  proved that the allegations have no basis, correct?
10   A.   Yes.
11   Q.   Are that -- is that referring to
12  Dr. Riley's allegations?
13   A.   Her allegations about our test
14  results being wrong 30 percent of the time.
15   Q.   Do you mention that she said they
16  were wrong 30 percent of the time?
17   A.   No, we do not.
18   Q.   No.  So it's just her -- you just
19  refer to allegations in general, correct?
20   A.   Correct.
21   Q.   Something you didn't mention in here
22  that happened in January 2021 is CAP putting you on
23  probation and finding that the allegations -- the
24  four allegations she made to it, that they reported
25  to you were substantiated, correct?

Page 107

1    A.   Correct.
2    Q.   Was that in keeping with Averhealth's
3  philosophy of transparency?
4    A.   We were still a CAP-accredited
5  laboratory.
6    Q.   I -- I'm -- I'm sorry, my question
7  is:  Not telling the prosecutors that CAP had been
8  put on probation and that CAP had found that
9  Dr. Riley's allegations were substantiated, was
10  that in keeping with Averhealth's philosophy of
11  transparency?
12   A.   And I --
13       MR. CEJAS:  Object to form.  Assumes
14  facts not in evidence.  It says all allegations.
15  I'm objecting to form.
16       Go ahead.
17       THE WITNESS:  Okay.  And as I
18  answered, we were still a CAP-accredited
19  laboratory.
20   Q.   (BY MR. CORNFELD)  I -- my question
21  is:  Was not telling the prosecutors so that they
22  wouldn't know because it wasn't public, that CAP
23  had put you on probation and found that the
24  allegations were substantiated, was that in keeping
25  with Averhealth's philosophy of transparency?

Page 108

1    A.   We still had accurate test results.
2    Q.   My question is:  Was that in keeping
3  with Averhealth's philosophy of transparency?
4  That's a yes-or-no question.
5    A.   Yes.
6    Q.   Thank you.  And do you believe that
7  withholding information is transparent?
8    A.   We weren't withholding information.
9    Q.   You withheld the information that CAP
10  had put you on probation and had found that
11  Dr. Riley's allegations were -- were substantiated
12  and that at this time, you were making corrections
13  to those -- to those practices that CAP was
14  investigating, correct?
15       MR. CEJAS:  Object to form --
16   Q.   (BY MR. CORNFELD)  You didn't tell --
17  you didn't tell the prosecutors any of that, did
18  you?
19       MR. CEJAS:  Object to form.
20  Argumentative and compound.
21       Go ahead.
22       THE WITNESS:  We were updating
23  procedures to outline what we -- what practices we
24  were actually doing.
25   Q.   (BY MR. CORNFELD)  That was



Page 109

1  correcting the practices, correct?
2      **A.   It was --**
3      Q.   Wasn't that --
4      **A.   -- updating our procedures to outline**
5  **and better define it.  It wasn't correcting the --**
6  **the practices.**
7      Q.   Well, we'll get to -- to all the
8  people you later told that you had corrected your
9  practices.
10     **A.   Okay.**
11     Q.   But you weren't correcting your
12  practices and you did not tell --
13     **A.   We were updating our practices.**
14     Q.   -- you didn't tell -- whether it was
15  updating your procedures or --
16     **A.   Correct.**
17     Q.   -- correcting your practices --
18     **A.   You are correct --**
19         MR. CEJAS:  Objection --
20     Q.   (BY MR. CORNFELD)  -- you didn't --
21  you didn't tell the prosecutors any of that, did
22  you?
23         MR. CEJAS:  Object to form.  It's
24  argumentative, it's asked and answered.
25         Go ahead.

Page 110

1         **THE WITNESS:  Correct.**
2      **Thank you.**
3      Q.   (BY MR. CORNFELD)  You've been handed
4  what's been marked as Exhibit 55, which is a slide
5  program -- or appears to be a slide program
6  entitled MDHHS Update March 2021.
7      Do you see that?
8      **A.   Yes.**
9      Q.   Are you familiar with this?
10     **A.   Yes.**
11     Q.   What is this?
12     **A.   This is a document that we provided**
13  **an update back to MDHHS in March of 2021.**
14     Q.   And if you -- if you would look at
15  page 5.
16     **A.   Yes.**
17     Q.   What -- I'm sorry, before I ask you
18  about this, was this done in a live presentation?
19     **A.   I don't recall.**
20     Q.   All right.  Who was it sent to?
21     **A.   I don't recall.  My guess is that it**
22  **would have gone to Amanda Doane --**
23     Q.   All right.  And --
24     **A.   -- and Colin Parks.**
25     Q.   -- and you can see by the Bates

Page 111

1  number, which has the prefix MICH, this is
2  something we actually received from the Michigan
3  Department of Health and Human Services, so it's
4  not surprising that this was in their files, is it?
5      **A.   No, because I'd indicated it probably**
6  **was sent to Amanda Doane, who works at MDHHS.**
7      Q.   And she would have distributed it to
8  the people who would be interested in Averhealth's
9  testing, correct?
10     **A.   I don't know whether to assume where**
11  **she would have sent it to.  I'm not sure.  I --**
12     Q.   But you -- you would have expected
13  her to do that when you sent it to her, correct?
14     **A.   Correct.**
15     Q.   And if you look at page 5, that has
16  the same page of timeline of events that we just
17  saw in the prosecutor's slide decks, correct?
18     **A.   Correct.**
19     Q.   And this is actually a month earlier.
20  This is March 2021, correct?
21     **A.   Correct.**
22     Q.   At a time when Averhealth was on
23  probation.  And once again, the events of January
24  2020, and it's -- I guess it's a -- it's another
25  typo, with the same typo.  It should be

Page 112

1  January 2021?
2      **A.   Yes.**
3      Q.   It lists the same two items we saw in
4  the prosecutor's slide deck and does not mention
5  anything about CAP or the CAP probation or the CAP
6  finding that Dr. Riley's four allegations were
7  substantiated, correct?
8      **A.   Correct.**
9      Q.   And it -- it states on the right:  No
10  other lab has been so thoroughly evaluated,
11  affording you trust and confidence in Averhealth
12  drug test results.
13     Do you see that?
14     **A.   Yes.**
15     Q.   Well, that -- those evaluations
16  included the one by CAP, correct?
17     **A.   Yes.**
18     Q.   Maybe the most thorough of all of the
19  evaluations --
20         MR. CEJAS:  Objection --
21         **THE WITNESS:  And they didn't find**
22  **our --**
23     Q.   (BY MR. CORNFELD)  Excuse me.
24     **A.   -- test results wrong.**
25     Q.   Excuse me.  It was maybe the most



Page 113

1  thorough of all the evaluations, correct?
2          MR. CEJAS:  Object to form.  Calls
3  for speculation, vague.
4          Go ahead.
5          THE WITNESS:  I don't -- most of the
6  inspections that we've had have been very thorough.
7      Q.   (BY MR. CORNFELD)  And -- and you
8  didn't mention the CAP investigation when you said
9  in Exhibit 55 -- in Exhibit 54, those two slide
10  decks, when you referred to the lab being
11  thoroughly evaluated, no other lab being so
12  thoroughly evaluated, you didn't mention the CAP
13  investigation, did you?
14          MR. CEJAS:  Objection.  Asked and
15  answered.
16          Go ahead again.
17          THE WITNESS:  It just says no other
18  lab has been thoroughly evaluated.
19      Q.   (BY MR. CORNFELD)  It doesn't say
20  anything about the CAP investigation?
21          MR. CEJAS:  Same objection.
22          Go ahead.
23          THE WITNESS:  I mean, that would be
24  evaluated by CAP, right?  I don't understand your
25  question.

Page 114

1      Q.   (BY MR. CORNFELD)  I mean, you
2  mentioned the Wagner investigation, you didn't --
3      A.   Yes.
4      Q.   -- you didn't mention the CAP
5  investigation, did you?
6      A.   No, we did not.
7      Q.   If you were so confident about your
8  -- well, strike that.
9          You know, a year -- about a year
10  after this, MDHHS suddenly dropped Averhealth as
11  its testing laboratory, correct?
12      A.   Correct.
13      Q.   Michigan did that, the state of
14  Michigan stopped using Averhealth, you had a
15  $29 million, five-year contract, and they suddenly
16  stopped it in the middle, correct?
17      A.   Correct.
18      Q.   At that time, they -- they had
19  learned about the CAP investigation, hadn't they?
20      A.   I don't know the time of events of
21  when they learned about it.  I believe so from the
22  Department of Justice, yes.
23      Q.   Okay.
24      A.   I didn't know that at the time.  I
25  know that now.

Page 115

1      Q.   You didn't know -- well, at the time,
2  meaning -- you mean at the time that -- that MDHHS
3  dropped Averhealth?
4      A.   When they stopped using our
5  laboratory for testing services.
6      Q.   Yes.  Is that what you're referring
7  to when you said you didn't know it at the time?
8      A.   Correct.
9      Q.   My question is:  Do you think that
10  when the state of Michigan learned that CAP had put
11  you on probation and had found Dr. Riley's
12  allegations substantiated, and that you hadn't told
13  them that, even though you claimed to be more
14  transparent than other companies, that maybe that
15  played a part when they -- they might have
16  concluded Averhealth can't be trusted, we should
17  drop them?
18          MR. CEJAS:  Object --
19      Q.   (BY MR. CORNFELD)  You think that
20  might be the reason why you got dropped?
21          MR. CEJAS:  Object to form.  Calls
22  for speculation as to the reason for their
23  decision.
24          Subject to that, go ahead, if you
25  know.

Page 116

1          THE WITNESS:  Yeah, I don't know why
2  they did.  They never told us why.
3      Q.   (BY MR. CORNFELD)  They never -- they
4  never told you why, but don't you think that
5  companies that are honest and open and above-board
6  and truly transparent do better in the business
7  area, in the marketplace than companies that have a
8  reputation for concealing adverse information?
9          MR. CEJAS:  Object to form.  Vague,
10  incomplete hypothetical, and overbroad.
11          Go ahead.
12          THE WITNESS:  That's a very broad
13  question.  I don't know how to answer that.
14      Q.   (BY MR. CORNFELD)  Well, you tell
15  people that you're transparent because you think
16  that will help you in the marketplace, correct?
17      A.   We are transparent.
18      Q.   Yet, you tell people -- the reason
19  you tell them you are transparent is to help you
20  with your customers so that they'll want to use you
21  more?
22      A.   Yes.  That's why companies talk about
23  being transparent.
24      Q.   And if they learn that you're not
25  transparent, they're liable to drop you and not do



Page 117

1  business with you anymore, correct?
2      **A.   I don't know why MDHHS stopped**
3  **testing with us.**
4          MR. CORNFELD:  Where did J.C. go?
5          MR. CEJAS:  To get food.
6      **THE WITNESS:  To get the food.**
7          MR. CORNFELD:  Then let's go off the
8  record.
9          THE VIDEOGRAPHER:  The time is 11:47.
10  We are off the record.
11          (A lunch break was taken.)
12          THE VIDEOGRAPHER:  The time is
13  12:40 p.m.  We are back on the record.
14      Q.   (BY MR. CORNFELD)  Ms. Delagnes, this
15  morning, we talked about presentations that
16  Averhealth made to the Michigan prosecutors, to the
17  MDHHS, your testimony in that court case, memos
18  that Mr. Herzog sent to judges in Michigan, and
19  e-mails in which nobody mentioned the CAP
20  probation.  I want to ask you about -- about why.
21          Why didn't you, if -- if what you
22  said today, this morning, if you believed that at
23  the time -- and you've told us repeatedly -- you've
24  insisted that the four allegations that Dr. Riley
25  brought to CAP and that CAP brought to Averhealth

Page 118

1  didn't relate to the quality of the tests -- didn't
2  relate to the accuracy, I should say, the accuracy
3  of the tests, and that you were totally confident
4  that your tests were accurate at the time, and were
5  continuing to be accurate, why didn't you tell all
6  of your customers and the judges and the
7  prosecutors and customers that CAP had put
8  Averhealth on probation in January of 2021 based on
9  four allegations of Dr. Riley that CAP said were
10  substantiated, and then list the allegations so
11  everybody knows what they are, and then say, "We
12  are cooperating with CAP in its investigation, none
13  of these allegations relate to the accuracy of our
14  tests, and we are confident about the accuracy of
15  our tests"?  Why didn't you tell customers that?
16  Wouldn't that have been truly transparent?
17      **A.   What we did --**
18      Q.   No, I -- I know what you did.  My
19  question is:  Why didn't you say something like
20  what I just outlined?  You could have said that,
21  couldn't you?
22      **A.   Yes, we could have.**
23      Q.   Why didn't you?
24      **A.   It was a business decision.**
25      Q.   Because you -- you thought it would

Page 119

1  hurt your business if customers learned about the
2  CAP probation?
3      **A.   No.**
4      Q.   Then what was the bas- -- business
5  basis of the decision?
6      **A.   It was a business decision not to do**
7  **it, and we've stood by -- as I've said repeatedly,**
8  **we've stood by the accuracy of our test results.**
9      Q.   Okay.  When I hear the term "business
10  decision" by a business person --
11      **A.   Uh-huh.**
12      Q.   -- as you were, to me what that means
13  is it would have cost us money.
14      **A.   That's your interpretation.  That's**
15  **not why we did it.**
16      Q.   Okay.  What was the business basis of
17  the decision?
18      **A.   It was a business decision.**
19      Q.   I know you said it was a business
20  decision.
21      **A.   I know.**
22      Q.   What was the business basis of the
23  decision?
24      **A.   Because we knew that our test results**
25  **were accurate and we were certified the entire**

Page 120

1  **time, we had our CAP-FDT certification, we made the**
2  **business decision not to reveal that.**
3      Q.   I understand you made a business
4  decision.
5      **A.   Okay.**
6      Q.   But you had to have a basis for that
7  decision, not just say this is our business
8  decision.  What was the basis of your business
9  decision?  What were the reasons that you made that
10  business decision?
11          MR. CEJAS:  Objection.  Asked and
12  answered.
13          Go ahead again.
14          **THE WITNESS:  Because we knew that**
15  **our test results were accurate.**
16      Q.   (BY MR. CORNFELD)  But if you weren't
17  afraid that you would lose business if you were
18  open about it, about the CAP probation and then
19  added --
20      **A.   I disagree with your statement.**
21      Q.   -- what I said if you -- my question
22  is:  If you didn't believe you would lose business,
23  why wouldn't you tell customers that?
24      **A.   Because we still maintained our**
25  **certification throughout.**



Page 121

1      Q.   You could have told them that, too.
2      A.   Okay.
3      Q.   You could have said, "We are still
4   certified.  They put us on probation; we're still
5   certified; we're still doing tests; here are the
6   allegations -- here are the four allegations; they
7   don't relate to the accuracy of the tests, and --
8   and we are confident that our tests are accurate."
9   If that was what you, in fact, believed at the
10  time, why wouldn't you tell customers that?
11     A.   I've already answered that question.
12     Q.   It was a business decision, but I --
13  I'm waiting to hear the basis of that business
14  decision --
15     MR. CEJAS:  Objection.
16     Q.   (BY MR. CORNFELD) -- other than you
17  decided to tell them something else.  But why?
18     MR. CEJAS:  Object to form.  Asked
19  and answered, argumentative.
20     Go ahead and tell him again.
21     THE WITNESS:  It was a business
22  decision.
23     Q.   (BY MR. CORNFELD) Can you not
24  provide any business reasons why you made that
25  business decision?

Page 122

1      MR. CEJAS:  Objection.  Asked and
2   answered.  It's been provided.
3      But go ahead and provide those
4   reasons again.
5      THE WITNESS:  It was a business
6   decision because we maintained our certification
7   throughout.
8      Q.   (BY MR. CORNFELD) You could have
9   told them that.
10     A.   Okay.
11     Q.   I've added to that what you could
12  have told them.  So why didn't you -- why didn't
13  you tell them and then be truly transparent and
14  they would be impressed that you were transparent?
15     MR. CEJAS:  Objection.
16     Q.   (BY MR. CORNFELD) Why -- what was
17  the business basis for not doing that?
18     MR. CEJAS:  Objection.  Asked and
19  answered three or four times now.  One last time
20  and then we're going to move on.
21     Q.   (BY MR. CORNFELD) Go -- go ahead.
22     MR. CORNFELD:  I haven't gotten an
23  answer yet.
24     Q.   (BY MR. CORNFELD) What is -- what is
25  the --

Page 123

1      MR. CEJAS:  She has answered it.
2      Q.   (BY MR. CORNFELD) -- basis of the
3   business decision?
4      MR. CEJAS:  Go ahead one last time.
5      THE WITNESS:  Because we maintained
6   our certification throughout.
7      Q.   (BY MR. CORNFELD) Did you consider
8   telling customers what I've just outlined, telling
9   customers, "Based on Dr. Riley's four allegations,
10  CAP put us on probation in January of 2021; here
11  are those allegations; none of those relate to the
12  accuracy of the tests; we are still certified; we
13  are still doing testing; and we are confident that
14  our testing is accurate"?  Did you consider telling
15  customers that?
16     A.   At the time, Jason Herzog was our
17  CEO.  I'm not trying to pass the buck.  It was a
18  business decision that started with him.
19     Q.   Did anybody join him in making that
20  business decision?  Did you?
21     A.   I did not.
22     Q.   So it was Mr. Herzog's and his alone?
23     A.   It was his decision.  He was the CEO
24  of the company.
25     Q.   And -- and so you just -- did you

Page 124

1   tell him, you know, "I think we ought to be a
2   little more transparent and tell them about the --
3   about the probation," and then add all the other
4   things I added in what you could have -- you could
5   have told customers?  Did you tell Mr. Herzog you
6   thought that that's what you should tell customers?
7      A.   I did not.
8      Q.   Did you question him in any way?
9      A.   I did not.
10     Q.   Why not?
11     A.   He was my boss.
12     Q.   Did he never -- did you never provide
13  advice to him?
14     A.   That's a very broad question.  Did
15  I -- typically, on -- on major business decisions,
16  no, I did not.
17     Thank you.
18     Q.   Handing you what's been marked as
19  Exhibit 56 to this deposition.  This is an
20  e-mail -- an e-mail thread between you and
21  Dr. Glinn dated January -- Dr. Glinn's e-mail to
22  you was dated January 9th, 2021, and your response
23  was January 13th, 2021, correct?
24     A.   Give me a minute to read it.  I
25  believe -- yes, that's the date on the e-mail.



Page 125

1    Q.   Do you recognize it?
2    **A.   I haven't looked at it since this has**
3    **been written, but if -- I'm going to take a minute**
4    **to go ahead and refresh my memory on it.**
5    Q.   Okay.
6    **A.   Thank you.  Okay.  Thank you.**
7    Q.   Do you recall this?
8    **A.   I do.**
9    Q.   All right.  On January 9th, 2021,
10   Dr. Glinn initiated this thread by e-mailing you
11   and Christina Essington and Shannon Spencer,
12   correct?
13   **A.   Yes.**
14   Q.   Her subject is:  List of accessions
15   for Dr. Wagner, correct?
16   **A.   Yes.**
17   Q.   And -- and you recall that Dr. Wagner
18   wanted to review certain tests, and that you
19   provided him a list of test results from which he
20   selected 10 tests for him to review before he
21   arrived, and another 30 for him to review on site,
22   correct?
23   **A.   Yes.**
24   Q.   And that was Dr. Wagner's selection
25   based on the test results that you provided him?

Page 126

1    **A.   We provided him an Excel sheet and he**
2    **selected tests.**
3    Q.   Okay.
4    **A.   Correct.**
5    Q.   Dr. Glinn starts saying:  Hello,
6    Ladies.  I have gone through the list of accessions
7    Dr. Jarrad Wagner would like to review while he is
8    here.
9         So you -- at this point, you had the
10   list of tests that Dr. -- you call -- she calls
11   them accessions, but they're tests and test reports
12   that Dr. Wagner was going to review, correct?
13   **A.   Yes.**
14   Q.   Okay.  Including there were 10 data
15   packs that were sent to him in advance of his
16   visit, correct?
17   **A.   Yes.**
18   Q.   All right.  And -- and that's what
19   she says a couple lines down.  She says:  The ones
20   labeled, quote, litigation, unquote, we will get
21   together and send to him before he comes.  The ones
22   labeled on site, he will look at when he gets here.
23        Do you see that?
24   **A.   Yes.**
25   Q.   And then she says:  Going through the

Page 127

1    list, I feel pretty good about this.  He may have
2    done this purposefully, but few of these have any
3    borderline results.  They are almost all
4    numerically substantial, so should not have any
5    issues with background.
6         Do you see that?
7    **A.   I do.**
8    Q.   So was she suggesting that Dr. Wagner
9    may have cherry-picked the results to find tests
10   that would be easier to substantiate --
11        MR. CEJAS:  Object to form.  Calls --
12   Q.   (BY MR. CORNFELD)  -- to be easier to
13   verify?
14        MR. CEJAS:  Calls for speculation as
15   to what someone else intended.
16        Subject to that, go ahead, if you
17   know.
18        **THE WITNESS:  I don't know.**
19   Q.   (BY MR. CORNFELD)  Did -- did -- when
20   she says that the -- that few of these have any
21   borderline results, they are almost all numerically
22   substantial so should not have any issues with
23   background, what she's saying is that those would
24   be easier to verify than other tests, correct?
25        MR. CEJAS:  Object to the form.

Page 128

1    Calls for speculation.
2         Go ahead if you know what she meant.
3    Q.   (BY MR. CORNFELD)  You understood
4    that that's what she meant, didn't you?
5    **A.   How I read this is her observation**
6    **was many of them that he picked had high drug**
7    **concentrations.**
8    Q.   And -- and they would be easier to
9    verify their accuracy than if they were more
10   borderline, correct?
11        MR. CEJAS:  Objection.  Calls for
12   speculation.
13        Go ahead if you know what she meant.
14   **THE WITNESS:  Not easier to verify,**
15   **no.**
16   Q.   (BY MR. CORNFELD)  Easier -- easier
17   to say those test results were accurate because
18   there wouldn't be an issue with background,
19   correct?
20   **A.   Not with background.  No, I disagree.**
21   Q.   Well, she says she feels pretty good
22   about this.  If you have any -- these have --
23   excuse me, few of these have any borderline
24   results.  They're almost all numerically
25   substantial, so should not have any issues with



Dominique Delagnes                                      July 09, 2024

Page 129

1  background.
2          That's what she said, didn't she?
3      **A.   It is.**
4      Q.   And didn't you -- or how did you
5  interpret this?
6      **A.   Her observation was that the list**
7  **that was sent over were test results that had high**
8  **numeric values.**
9      Q.   That's what she said, but she also
10  says that means they're going to have few issues
11  with background, and issues with background
12  would -- might result in the test being inaccurate,
13  correct?
14          MR. CEJAS:  Objection.  Calls for
15  speculation.
16          Go ahead, if you know.
17      **THE WITNESS:  No, I don't believe**
18  **that our test results that are close to the cutoff**
19  **would be wrong.  I don't agree with that.**
20      Q.   (BY MR. CORNFELD)  I understand that.
21      **A.   I don't agree with that.**
22      Q.   I understand because you're standing
23  there standing -- saying you stand behind every
24  single one of the tests Averhealth ever made.
25      **A.   Uh-huh.**

Page 130

1          MR. CEJAS:  Is that a yes?
2      **THE WITNESS:  Yes.**
3      Q.   (BY MR. CORNFELD)  Is that true?  Is
4  that true?
5      **A.   That I stand behind every test result**
6  **that we ever made?**
7      Q.   Yes.
8      **A.   I stand by the accuracy of our test**
9  **results.  I don't know that I can say every single**
10  **test result.  I stand by the accuracy of our test**
11  **results.**
12      Q.   And -- and -- but if there's the
13  issue with background, and she calls it an issue
14  with background, that makes it more difficult to
15  come up with an accurate result, doesn't it?
16      **A.   That's a question for Dr. Glinn.**
17      Q.   You're not -- you don't know the
18  answer to that?
19      **A.   That's an issue to what she meant by**
20  **this.**
21      Q.   Did you ask her at the time what do
22  you mean by this?  Are you saying that Dr. Wagner
23  might have cherry-picked the -- the tests so that
24  he'd find tests that would be easier for us to come
25  out looking good?

Page 131

1      **A.   I did not ask her that.**
2      Q.   And do you see that she changed one
3  of the results, one of the tests that Dr. Wagner
4  was going to look at?
5      **A.   I do see that she updated the**
6  **quantity, yes.**
7      Q.   She said -- she said:  There's a THC
8  result reported as 1730 that I corrected to -- to
9  200.
10          Do you see that?
11      **A.   Yes.**
12      Q.   Why would she change the results?  If
13  Dr. Wagner was coming in to see if your procedures
14  were correct and you were reporting accurate
15  results, why would she change a result before
16  Dr. Wagner even got there?
17          MR. CEJAS:  Object to form.  Calls
18  for speculation.
19          But go ahead, if you know.
20      **THE WITNESS:  I don't know.  Either**
21  **are still positive for THC.**
22      Q.   (BY MR. CORNFELD)  But Dr. Wagner's
23  not going to be seeing the result as it -- as it
24  was originally tested, is he?
25      **A.   Again, a question for Dr. Glinn.**

Page 132

1      Q.   All right.  What -- what about what
2  she says about false positives on oral fluid
3  fentanyl tests?
4      **A.   That's for the -- yes, that's --**
5      Q.   Do you see --
6      **A.   -- I do.**
7      Q.   Do you see she says:  Also, it looks
8  like our oral fluid fentanyl assay gives some false
9  positives, and maybe with THC, meaning marijuana.
10          Do you see she says that?
11      **A.   She's talking about the amino assay**
12  **test results, yes.**
13      Q.   How did -- how did she figure that
14  out?
15          MR. CEJAS:  Objection.  Calls for
16  speculation.
17          But if you know, go ahead.
18      **THE WITNESS:  So there's the ability**
19  **to look at a specimen that screens positive, and**
20  **then through the confirmation test, ends up being**
21  **negative.  And so we know that in amino assay**
22  **testing, there's absolutely interference that's out**
23  **there.  And we know for a fentanyl test, due to the**
24  **fact that there are certain medications, and it's a**
25  **low cutoff and small molecules, there is a higher**



Page 133

1 percentage of those that screen positive by amino
2 assay and confirm negative compared to other amino
3 assay tests.
4    Q.   (BY MR. CORNFELD)  This is -- this is
5 dated on January 9th, 2021.
6    A.   Uh-huh.
7    Q.   And -- and you know that it was -- it
8 was the test of January 20th, 2021, just a
9 week-and-a-half later that was the water sample
10 that Tiffani Padilla says she sent in and it got
11 reported as positive for fentanyl?
12    A.   And on that test, we did an amino
13 assay screen and an amino -- and a LC-MS/MS
14 confirmation.  What she's referring to here is just
15 the amino assay aspect of the testing.
16    Q.   If that had been a false positive on
17 the amino assay -- assay -- amino acid part of the
18 test, you wouldn't even have gone on to the
19 LC-MS/MS part, would you?
20    A.   It --
21    Q.   You would have reported it as
22 negative, correct?
23        MR. CEJAS:  Objection.  Incomplete
24 hypothetical and assumes facts not in evidence.
25        But subject to that, go ahead.

Page 134

1        THE WITNESS:  Can you restate?  I
2 don't think you said that correctly.  I don't think
3 your -- your question was how you intended it to
4 be.
5        Can you repeat his question?
6    Q.   (BY MR. CORNFELD)  I'll -- I'll --
7 I'll restate it.
8        You said -- say that what Dr. Glinn
9 is talking about on false positives relates to the
10 amino assay screen part of the test, correct?
11    A.   Correct.
12    Q.   That's the first part of the test
13 that if it's positive, it goes on for -- to the
14 LC-MS/MS, and if it's negative, it gets reported as
15 negative without doing the LC-MS/MS, correct?
16    A.   Correct.
17    Q.   So if -- if Tiffani Padilla's test
18 that she says was water had been a false positive
19 but had been reported as -- should have been
20 reported as negative by the amino assay screen,
21 that test never would have gone on to have an
22 LC-MS/MS test, it would have simply been reported
23 as negative, correct?
24        MR. CEJAS:  Objection.
25        THE WITNESS:  If there was no

Page 135

1 interaction on the analyzer and it had screened
2 negative, yes, it would have been reported as
3 negative.  But -- but in -- this is not typical to
4 Averhealth itself.  It's the reagent that's used
5 for the screening.
6        And as I indicated before, the fact
7 that for fentanyl, it has cross-reactivity with
8 certain medications in the amino assay testing, as
9 well as a very low cutoff, and it's a large
10 molecule.  It's just an industry standard.  It's
11 not an Averhealth thing.
12        If you pulled all laboratories that
13 do fentanyl testing, you will see that there's a
14 higher percentage of specimens that screen positive
15 and do not confirm.  So it has nothing to do with
16 Averhealth's testing, it's the reagent itself.
17    Q.   (BY MR. CORNFELD)  Well, she -- she
18 goes on to say -- you would think if that were the
19 case, Dr. Wagner would be familiar with it and --
20 and would treat it as lightly as you just seemed
21 to.
22        But do you see that --
23        MR. CEJAS:  Well, I'm --
24    Q.   (BY MR. CORNFELD)  -- Dr. Glinn
25 states:  Our urine fentanyl assay does the same, so

Page 136

1 not unique to Michigan.
2        And the reason she's referring to
3 Michigan is because Michigan is only oral fluids,
4 right?
5        MR. CEJAS:  Object to the beginning
6 part of that question to form, it calls for
7 speculation --
8    Q.   (BY MR. CORNFELD)  Go ahead.
9        MR. CEJAS:  -- with Dr. Wagner.
10        Go ahead.
11        THE WITNESS:  When Dr. Wagner was
12 there, he was only looking at Michigan specimens.
13 So what she's --
14    Q.   (BY MR. CORNFELD)  And -- and --
15    A.   Can I finish my --
16        MR. CEJAS:  Let --
17        MR. CORNFELD:  No.
18    Q.   (BY MR. CORNFELD)  In Michigan -- my
19 question was:  Michigan tests were only oral fluid,
20 correct?
21    A.   Not correct.
22    Q.   They were mainly oral fluid, and what
23 he was looking at was oral fluid, correct?
24    A.   In this particular instance, yes.
25    Q.   All right.  And she says:  That's



Page 137

1 something we can say we are aware of and have
2 looked into it.
3         Did anybody tell Dr. Wagner about
4 these false positives on the fentanyl test -- the
5 fentanyl --
6     **A.   Again --**
7     Q.   -- oral fluid tests?
8     **A.   I want to be careful when you're**
9 **using the word false positive.**
10    Q.   I'm using the phrase she used.
11    **A.   I understand that.**
12    Q.   I'm using --
13    **A.   And I'm trying --**
14    Q.   Okay.
15    **A.   -- to explain science to you.**
16    Q.   My question is -- you've explained
17 that.
18    **A.   Okay.**
19    Q.   My question is:  Did anybody tell
20 Dr. Wagner about that there were false positives on
21 oral fluid fentanyl tests that you were doing for
22 Michigan?
23    **A.   They were not false positives, they**
24 **were more specimens that had a -- there's a larger**
25 **percentage in fentanyl, like I'd indicated**

Page 138

1 **previously, any lab would see this, that screened**
2 **positive that do not confirm out.**
3    Q.   My --
4    **A.   I do not know if anybody told**
5 **Dr. Wagner.**
6    Q.   And -- and you object to the phrase
7 false positive.  That was not my phrase.  That's --
8 you understand that's Dr. Glinn's phrase.  She said
9 "false positives," those were her words to you at
10 the time, correct?
11    **A.   Yes.**
12    Q.   Did you respond to her and say, "What
13 are you talking about false positives?  They're not
14 false positives"?
15    **A.   I'm putting --**
16    Q.   No, my question is --
17    **A.   No.**
18    Q.   -- did you respond --
19    **A.   No, I did not.**
20    Q.   And that's because they were false
21 positives, weren't they?
22    **A.   They were screen positives.**
23    **A.   They were --**
24    **A.   A better -- a better word would have**
25 **been that they were amino assay screen positives,**

Page 139

1 and I did not correct her, but that's really --
2    Q.   Okay.
3    **A.   -- what is intended in this term is a**
4 **screen positive.**
5    Q.   You know that Dr. Wagner in his
6 report said nothing about false positives on
7 Michigan oral fluid fentanyl tests, correct?
8    **A.   We didn't report false positives**
9 **because we did an amino assay screen, we confirmed**
10 **the specimen, and then we reported out what the**
11 **results were.**
12    Q.   Whatever --
13    **A.   He -- he may have seen that more**
14 **specimens for fentanyl did not confirm than other**
15 **drugs.**
16    Q.   My -- my question to you is:
17 Whatever you think Dr. Glinn meant when she said
18 false positives, she says:  It's something we can
19 say we are aware of and have looked into.  Did --
20 did -- you don't know if anybody told Dr. Wagner.
21 You know that Dr. Wagner did not mention anything
22 about Michigan oral fluid fentanyl tests in his
23 report, correct?
24         MR. CEJAS:  Object to form.  Asked
25 and answered.

Page 140

1         THE WITNESS:  I'd have to re- -- I'd
2 have to reread his report.
3    Q.   (BY MR. CORNFELD)  I think it will
4 stand by itself.
5    **A.   Okay.**
6    Q.   When I asked you whether you were
7 standing by all of the tests that Averhealth has
8 done, you said you're not standing by all of them.
9 How many of them are you standing by?
10    **A.   I said that we report accurate test**
11 **results.**
12    Q.   I know, I know.  You also said you
13 can't say you stand by all of them.  How many do
14 you stand by?
15    **A.   Each individual report needs to be**
16 **looked at from the analytical accuracy to report**
17 **those test results.  I can't give you a number.  I**
18 **do know of instances, which I'm sure you're going**
19 **to show me, where people have made human errors to**
20 **cause the result to be looked into for us to then**
21 **update the test result.  Our procedures and our**
22 **processes that we use have us continually report**
23 **consistent, accurate results.**
24    Q.   How -- how many times have there been
25 human errors that have resulted in tests that you

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                        California Firm Registration #179

LEXITAS

Page 141

1  can't stand by?
2      A.   It's not that we can't stand by the
3  test result, that we have to update the result,
4  right?  We obviously can stand by what happened,
5  and the fact that the result's been updated.
6      Q.   Before it was reported?
7      A.   After it was reported.
8      Q.   Okay.  How many -- how often has that
9  happened?
10     A.   Rarely.
11     Q.   I -- I understand what -- rarely,
12 what does that mean?  What does -- how often has
13 that happened?
14     A.   I'd have to go back and look at -- at
15 all of our corrected reports.  I can -- I don't
16 know the number.  Less than 1 percent.  Probably
17 less than a half percent of all specimens.
18     Q.   How do you know that?
19     A.   Because from my recollection of what
20 I know, I know very few instances.  We -- we test
21 1.5 to 2 million tests per year, and -- and off the
22 top of my head, there's probably less than 50 that
23 I know that we've updated and re-resulted.  So
24 that's a very, very small number.
25     Q.   You updated them because after you

Page 142

1  sent out the report, they were called to your
2  attention by whoever received the report, correct?
3  Is that what you just said?
4      A.   Yes.
5      Q.   How about ones where nobody called it
6  to your attention and they just accepted your
7  results because they had no way of knowing any
8  different?  Do you have any idea how many of those
9  were false positives?
10     A.   No way of knowing.
11     Q.   So when you say it's rare, less than
12 1 percent, that's just ones that were called to
13 your attention by somebody, and there could have
14 been a lot more that were not called to your
15 attention by anybody?
16          MR. CEJAS:  Objection.  Incomplete
17 hypothetical, assumes facts not in evidence, calls
18 for speculation.
19          But go ahead, if you know.
20          THE WITNESS:  I don't know.
21     Q.   (BY MR. CORNFELD)  Has anybody gone
22 back to look at the test results of my clients?
23     A.   Yes.
24     Q.   Who did that?
25     A.   The -- Dr. Glinn, Christina

Page 143

1  Essington, and Matthew Mayor-Oliver [phonetic] were
2  part of putting all the data together.
3      Q.   But have they -- have they gone back
4  to look at it and said these were done accurately?
5      A.   Yes.
6      Q.   Where -- where is that?  I have not
7  seen that documented anywhere?
8      A.   It would be through the -- as they
9  pulled all the -- the litigation packets for you,
10 they re-reviewed all the data.
11     Q.   And did they write that down or was
12 that just in their heads?
13     A.   They reviewed the data through
14 pulling the information.
15     Q.   I understand.  Did they --
16     A.   There's no written report.
17     Q.   So there's no way for us to know how
18 they did that, there's no record other than them
19 saying, yeah, we looked at it and we think those
20 were done correctly?
21          MR. CEJAS:  Object to form.  Assumes
22 facts not in evidence.  There is a way, you can
23 take their depositions.
24          THE WITNESS:  You will be deposing
25 Dr. Glinn and you will be deposing Christina

Page 144

1  Essington.  So you can ask them about how they went
2  about and -- and did that.
3      Q.   (BY MR. CORNFELD)  In -- in the false
4  positives that Dr. Glinn was talking about in her
5  hello ladies -- I call it the hello ladies memo
6  because that's how she started it -- did Averhealth
7  go back to the customers and say, "Hey, these
8  results were false positives"?
9      A.   We didn't report false positives in
10 these.  Positive specimens were never reported to
11 the customer.  That's what I was trying to explain
12 to you.
13          So in this case, it would have caused
14 an amino assay to screen positive, which would have
15 driven it onto the confirmation test.  During the
16 confirmation test, we would have determined if
17 there's fentanyl in there or not in there.  We did
18 not report these test results out until the
19 confirmation was done.  So we never reported a
20 false positive in these instances, in these hello
21 lady memo.
22     Q.   On the tests that came -- that
23 somebody complained about or called to your
24 attention --
25     A.   Uh-huh.



Page 145

1    Q.   -- that you looked at and found that
2  those were inaccurate and those were false
3  positives, what did you do with that information?
4  Did you retract the report?
5    **A.   We did.**
6    Q.   Okay.  And -- and what caused the
7  false positives in those cases?
8    **A.   In the one that I'm talking about,**
9  **which I -- I know is well-documented in here, was**
10 **a -- 13 specimens that we know that there was a**
11 **tray that the individual made a mistake and**
12 **misloaded that tray.  And so we reported out that**
13 **batch of specimens.**
14 **     A caseworker in Michigan came back to**
15 **us and indicated, "Hey, can you look into this test**
16 **result?"  Based on that request by a Michigan**
17 **caseworker, we went back, we looked at that**
18 **particular specimen, and we learned that there was**
19 **an error in loading that tray.  And in doing so, we**
20 **not only updated that test result, but we reran all**
21 **the specimens and also corrected another 12**
22 **specimens that were in that batch.  We sent a**
23 **letter to each up with of the caseworkers --**
24   Q.   Hey, can I -- can I --
25     MR. CEJAS:  Let her -- let her --

Page 146

1      MR. CORNFELD:  Hey -- hey --
2      MR. CEJAS:  No, Rick -- Rick, she's
3  answering --
4      MR. CORNFELD:  Excuse me --
5      MR. CEJAS:  No, Rick --
6      MR. CORNFELD:  Excuse me --
7      MR. CEJAS:  Rick --
8      MR. CORNFELD:  Excuse me.
9      MR. CEJAS:  Rick, you have to let her
10 finish answering.
11     MR. CORNFELD:  Excuse me.
12     MR. CEJAS:  That was not a yes-or-no
13 question.
14   Q.   (BY MR. CORNFELD)  Excuse me.  I --
15 that's well-documented.  I -- I am familiar with
16 those 13 cases.
17   **A.   Okay.**
18   Q.   You don't need to go into it.
19     MR. CEJAS:  Please finish your
20 answer.
21     MR. CORNFELD:  No.  You don't --
22     MR. CEJAS:  No, are you -- you can't
23 keep stopping her.  It's one thing if it's a
24 yes-or-no question, which that was not.
25     MR. CORNFELD:  It --

Page 147

1      MR. CEJAS:  She's answering the
2  question.  She needs to have an opportunity --
3      MR. CORNFELD:  We --
4      MR. CEJAS:  -- to answer.
5      MR. CORNFELD:  It's --
6      MR. CEJAS:  I will stop this
7  deposition if you're going to keep cutting her off,
8  and we can show this to the judge.  I understand
9  you're tying her --
10     MR. CORNFELD:  I --
11     MR. CEJAS:  -- to a yes-or-no
12 question.
13     MR. CORNFELD:  Hey, let me --
14     MR. CEJAS:  -- that was not one.
15     MR. CORNFELD:  Can I respond?  Can I
16 respond --
17     MR. CEJAS:  No, she can answer --
18     MR. CORNFELD:  No, I'm --
19     MR. CEJAS:  -- and then you're going
20 to talk.
21     MR. CORNFELD:  No, I'm going to -- if
22 you're going to -- if you're going to make a long
23 speaking objection, I am going to respond to you, a
24 long, improper speaking objection.  She explained
25 the situation, I don't need her to go on for -- for

Page 148

1  minutes about it.  We are all familiar with it.
2      MR. CEJAS:  You asked an open-ended
3  question --
4      MR. CORNFELD:  We are all well
5  familiar with it --
6      MR. CEJAS:  -- she's allowed to
7  answer it.
8      MR. CORNFELD:  I -- if you want her
9  to testify at trial at length, I don't think that
10 has anything to do with this lawsuit.  But you --
11 you can -- you're, you know, welcome to try.
12   Q.   (BY MR. CORNFELD)  My question is:
13 Other than that, Doctor -- excuse me, Ms. Delagnes
14 -- and we're -- you know, we're all familiar with
15 that; it was documented; you testified about it,
16 and we've seen documents about it -- how else did
17 you discover that there were false positives?
18   **A.   It would take me some research.  We**
19 **obviously maintain a file of anytime that -- that**
20 **we look into an individual result, if there's a**
21 **question to it, and we do what's considered an**
22 **investigation.  I don't know all the top of them**
23 **off the top of my head in the 10 years that I've**
24 **been with the organization.**
25   Q.   Okay.  You said you maintain files



Dominique Delagnes                                                July 09, 2024

Page 149

1  for them?
2       A.   We have something that -- there's
3  information when we are going through an
4  inspection, any type of corrective action.  So yes,
5  we'd have to go back to the corrective action
6  aspect of it.
7       Q.   Okay.  I would request those files.
8       A.   Okay.
9       Q.   And -- and if -- if my request is for
10 the corrective action files, you understand what
11 I'm referring to?
12      A.   Yes, I do.
13           MR. CEJAS:  Please send us an a RFP
14 and we'll -- we'll respond it.
15           MR. CORNFELD:  I'm sorry?
16           MR. CEJAS:  Please send us an RFP and
17 we'll respond to it.
18           MR. CORNFELD:  I'm telling you now I
19 think that's -- you know, that's something that
20 should have been produced, but --
21           MR. CEJAS:  Send us an RFP, Rick.
22           MR. CORNFELD:  I'm making -- I'm
23 making the request now for the corrective action
24 files.
25           MR. CEJAS:  And I would appreciate an

Page 150

1  RFP, as the rules require.
2       Q.   (BY MR. CORNFELD)  And -- and what
3  caused the other false positives?
4       A.   Again, I'd have to look through the
5  files.
6       Q.   Okay.  Will the corrective action
7  files tell us what caused the --
8       A.   Yes.
9       Q.   Okay.
10           MR. CORNFELD:  I think you're going
11 to get it within minutes.
12           MR. CEJAS:  That's fine.
13      Q.   (BY MR. CORNFELD)  Do you see on --
14 strike that.
15           Handing you what's been marked as
16 Exhibit 57 to this deposition.  Do you see that
17 this is Dr. Wagner's report, it's dated
18 February 28th, 2021 --
19      A.   Yes.
20      Q.   -- and it's entitled Averhealth Lab
21 Site Visit Report prepared for the State of
22 Michigan DHHS.
23      A.   Yes.
24      Q.   You're familiar with this document,
25 correct?

Page 151

1       A.   Yes.
2       Q.   And you know that Dr. Wagner was
3  not -- does not mention anything about the CAP
4  probation or the CAP investigation in his report,
5  correct?
6       A.   Correct.
7       Q.   And that's because no one from
8  Averhealth told him about it, correct?
9           MR. CEJAS:  Objection.  Overbroad,
10 calls for speculation.
11           But if you know, go ahead.
12           THE WITNESS:  I'm not sure.
13      Q.   (BY MR. CORNFELD)  You're not sure if
14 anybody told Dr. Wagner about it?
15      A.   Correct.
16      Q.   Who would have told him?
17      A.   One of us may have when he was on
18 site.  I don't recall.
19      Q.   Were you there when he was on site?
20      A.   I was.
21      Q.   Do you recall telling him that?
22      A.   I don't recall.
23      Q.   Do you know that when he was on site,
24 he didn't even know about Dr. Riley?
25      A.   I did not know --

Page 152

1           MR. CEJAS:  Objection.  Calls for
2  speculation.
3           THE WITNESS:  I don't know that
4  that's accurate.  I don't know.
5       Q.   (BY MR. CORNFELD)  Take a look at
6  page 7 of Exhibit 57 Dr. Wagner's report.
7       A.   Uh-huh.  Yes.
8       Q.   Do you see it says:  Concerns raised
9  by the judiciary?
10      A.   Yes.
11      Q.   And he says:  Subsequent to the visit
12 in the week of February 22nd, 2021, the team was
13 made aware of allegations made by a former
14 laboratory director through communication with
15 judges and in her testimony at trial.
16           Do you see that?
17      A.   I do.
18      Q.   So nobody, when -- when he was there
19 in the laboratory, which was in January, correct?
20      A.   Yes.
21      Q.   Nobody told him about Dr. Riley and
22 what she was saying?
23           MR. CEJAS:  Objection.  Calls for
24 speculation, overbroad, and asked and answered.
25           Go ahead.



Dominique Delagnes                                    July 09, 2024

Page 153

1        THE WITNESS:  He was hired by the
2  State of Michigan to come in and do an on-site
3  test -- like an on-site inspection with a very
4  targeted, looking at our test results.  And I don't
5  know what he was told by the State of Michigan --
6        Q.   (BY MR. CORNFELD)  Well, he --
7        A.   -- about the -- the -- about his
8  visit.
9        Q.   Well, you know that he was -- he
10  was -- he was -- wasn't told until a month after
11  his visit, and that was through communications with
12  judges, correct?
13        MR. CEJAS:  Object to form.  Calls
14  for speculation, assumes facts not in evidence.
15        But go ahead, if you know.
16        THE WITNESS:  I don't know what -- he
17  was hired by the State of Michigan to come on site.
18  I do not know what Michigan had let him know before
19  he came on site.
20        Q.   (BY MR. CORNFELD)  What you know is
21  what he said is -- in his report, and that he
22  didn't learn until a month after he was in the
23  laboratory, correct?
24        MR. CEJAS:  Same objections.  Calls
25  for speculation.

Page 154

1        If you know, go ahead.
2        THE WITNESS:  That's what he wrote in
3  this report.
4        Q.   (BY MR. CORNFELD)  And you have no
5  reason to think that's untrue, do you?
6        A.   I do not.
7        Q.   Did you -- did you and your -- and
8  the other Averhealth personnel talk to Dr. Wagner
9  and explain what your procedures were when he was
10  on site?
11        A.   Yes.
12        Q.   And -- and you know that Mr. Herzog
13  sent him a -- a letter before the site visit,
14  correct?
15        A.   Is that the e-mail that you showed me
16  previously that I said I'd not seen?  No, that was
17  something else.  I do not know what he sent.
18        Q.   Okay.  Well, we'll cover that with
19  Mr. Herzog.
20        A.   Okay.
21        Q.   Just assume that -- that he -- that
22  he communicated.  But your -- your laboratory was
23  in communication with him, correct?
24        A.   To schedule this, yes.
25        Q.   And -- and while you were --

Page 155

1        A.   And to provide him a list of
2  specimens.
3        Q.   And -- and to provide him information
4  when he was on site, correct?
5        A.   As I'd indicated, he was hired by
6  MDHHS --
7        Q.   I -- I understand that.
8        A.   -- to come on site to do an
9  investigation --
10        Q.   You provided him --
11        A.   -- for us, yes.
12        Q.   -- you provided him information while
13  he was on site, didn't you?
14        A.   Yes.  Yes.
15        Q.   And nobody told him about Dr. Riley
16  and what her allegations were so that he could
17  evaluate those when he was at the laboratory?
18        MR. CEJAS:  Objection.  Asked and
19  answered.
20        Q.   (BY MR. CORNFELD)  Is that -- that's
21  correct?
22        A.   Yes.
23        Q.   And do you see that he says in the
24  next sentence:  Specifically, the former laboratory
25  director.

Page 156

1        And that's Dr. Riley, correct?
2        A.   Correct.
3        Q.   Stated that the number of quality
4  control specimens being run is insufficient and
5  does not meet the 10 percent threshold required of
6  CAP-accredited laboratories.
7        Do you see that?
8        A.   Yes.
9        Q.   Nobody -- nobody told him about the
10  four allegations he made to CAP, at least he
11  doesn't say anything about it in his report,
12  correct?
13        MR. CEJAS:  Objection.  Overbroad,
14  calls for speculation.
15        Go ahead.
16        THE WITNESS:  Correct.  He does not
17  bring it up in the report.
18        Q.   (BY MR. CORNFELD)  Dr. Wagner has --
19  besides the concerns raised by the judiciary, he
20  has a section called Areas of Concern that is on
21  page 6.
22        A.   Okay.
23        Q.   And he divides those into concerns
24  related to amino assay and related to liquid
25  chromatography, mass spectrometry, correct?



Page 157

1      A.   Yes.
2      Q.   I have a lot of questions I would
3  like to ask somebody knowledgeable about what that
4  -- Dr. Wagner says here.  Would it be the case that
5  that person should be Dr. Glinn?
6      **A.   I can talk about the MultiQuant**
7  **software and what it flags and how parameters are**
8  **set.  If you want to go into more details, you can**
9  **talk to Dr. Glinn.**
10     Q.   Because you would not be sufficiently
11 knowledgeable?
12     **A.   She's going to be able to explain it**
13 **better, yes.**
14     Q.   Is that also correct regarding what
15 he's -- and what he's talking about with regard to
16 MultiQuant that you just mentioned, that's what he
17 says in the first paragraph in the section on
18 LC-MS/MS on page 6 of his report?
19     **A.   Yes, I can speak to it a little bit.**
20 **She'll be able to speak it to it more thoroughly.**
21     Q.   All right.  I mean, I don't want to
22 deprive you of the opportunity.
23     **A.   That's okay.  You can have her**
24 **address it.  She can go into it in more detail.**
25     Q.   Okay.  And then -- and do it better

Page 158

1  than you can?
2      **A.   Just into more detail.  She's a**
3  **toxicologist and she uses it day in and day out,**
4  **MultiQuant.**
5      Q.   Yeah.  And -- and would you -- would
6  you rely on Dr. Glinn, if you had a question about
7  what Dr. Wagner meant in his section on areas of
8  concern?
9      **A.   I don't understand the question.**
10     Q.   If -- if you had a question about
11 what Dr. Wagner was saying in his section of his
12 report entitled Areas of Concern --
13     **A.   Okay.**
14     Q.   -- would you rely on Dr. Glinn for
15 that?
16     **A.   It -- it's going to depend on what**
17 **specifically it is in here.**
18     MR. PLEBAN:  Can we go off the record
19 real quick?
20     THE VIDEOGRAPHER:  Time is 1:23 p.m.
21 We are off the record.
22     (A discussion was held off the
23 record.)
24     THE VIDEOGRAPHER:  The time is 1:31.
25 We are back on the record.

Page 159

1      MR. CEJAS:  So we had a discussion
2  off the record and kind of as we were alluding to
3  before we went off, so the -- the specifics of the
4  granular aspects of the testing process as outlined
5  in Section 3 on page 6, which is Bates-stamped
6  616225, Michele is going to be the one who gets
7  into the specifics, the granular.
8      But Dominique would talk to the big
9  picture, which is the fact that this happened, and
10 then the findings, and number 5 on the conclusions
11 page would be something that she would come in and
12 talk about at trial.  So you can do with that what
13 you want.
14     MR. CORNFELD:  And would the same be
15 true for Section 4?  I mean, you -- off the record,
16 you told us that the only thing Ms. Delagnes
17 would -- might testify about at trial regarding the
18 Wagner report is what's set forth in Section 5.
19     MR. CEJAS:  Let me look at 4 real
20 quick.
21     **THE WITNESS:  And 4.  Because 4**
22 **already talked about, which I already spoke about,**
23 **which is the 13 --**
24     MR. CEJAS:  Right.
25     THE WITNESS:  -- specimens.

Page 160

1      MR. CEJAS:  So I -- I think she has
2  talked about the 13, so she's --
3      **THE WITNESS:  I've talked about the**
4  **4.**
5      MR. CORNFELD:  But other than that,
6  the only thing she will testify, or may testify
7  about at trial, talking about Ms. Delagnes, would
8  be Section 5?
9      MR. CEJAS:  Let me look at the rest
10 of this.  Well, I mean, there's also a section here
11 that says the testimony Dominique Delagnes will
12 provide to the inspection is found to be accurate.
13     **THE WITNESS:  So that's why I said 4**
14 **and 5.**
15     MR. CEJAS:  Yeah.  So I mean, I think
16 if there's something you want to ask about 4, ask
17 about 4.  But the granular parts of the testing,
18 like I said, she's not going to get into.  But if
19 there's something in 4, I think she's already
20 talked about those things, right?
21     MR. CORNFELD:  Yeah.  I mean, I --
22 and I don't want to -- you know, if somehow
23 Dr. Glinn becomes unavailable, I don't want to
24 preclude you.  I mean, that stipulation would not
25 be in effect anymore.  It's dependent on Dr. Glinn

Page 161

1  being available.
2       But in -- in terms of the basis of
3  Dr. Wagner's conclusions in -- in Section 5, as he
4  set forth -- set it forth in his report, my
5  understanding is you're saying that the witness on
6  that at trial will be Dr. Glinn?
7       MR. CEJAS:  Correct.  And maybe
8  Dr. Wagner, whomever else.
9       MR. CORNFELD:  As far as --
10      MR. CEJAS:  But it will be
11 toxicologists.
12      MR. CORNFELD:  Speaking on behalf of
13 Averhealth as the company, as far as an Averhealth
14 employee.
15      MR. CEJAS:  Correct.  Or to the
16 extent that someone like Christine or Shannon or
17 someone who was individually, but it's going to be
18 someone who does that on a day-to-day basis.
19      MR. CORNFELD:  Okay.  And you know, I
20 don't know, maybe you're going to want an expert
21 witness to talk about it.
22      MR. CEJAS:  Exactly.
23      MR. CORNFELD:  We can't preclude you
24 from that, but it's not going to be Ms. Delagnes,
25 correct?

Page 162

1       MR. CEJAS:  She's not going to get
2  into expert testimony from a toxicologist,
3  obviously, right.
4    Q.   (BY MR. CORNFELD)  Regarding
5  Section 4, what's set forth in the Wagner report in
6  Section 4, there's the reference to the 13 false
7  positives.  You've told us about that, correct?
8    A.   Yes.
9    Q.   All right.  There is a reference to
10 -- to your testimony in Michigan, and we've talked
11 about your testimony, correct?
12   A.   Yes.
13   Q.   And then he refers to an allegation
14 that a false positive was reported, as a retest of
15 the specimen was reported as negative.
16      Do you see that?
17   A.   Yes.
18   Q.   Do you know what he's referring to
19 there?
20   A.   I do not.
21   Q.   You don't know?
22   A.   No.  I take that back.  I am pretty
23 sure that is the -- I have to find the right
24 document.  That was where in the database, we had
25 specific cutoffs for Michigan based on the contract

Page 163

1  that were lower than other customers, and there was
2  a point in time where we had an issue in our
3  database, but we've since corrected it.
4    Q.   Is it -- that's after you changed the
5  cutoffs?
6       THE VIDEOGRAPHER:  I think your mic
7  pop off, sir.
8       THE WITNESS:  Ew.
9       THE VIDEOGRAPHER:  You're okay,
10 ma'am.
11      THE WITNESS:  I'm okay now?
12      MR. CEJAS:  Rick's not there.
13      MR. CORNFELD:  Oh.
14   Q.   (BY MR. CORNFELD)  Was this something
15 that happened after you clanged the cutoffs?
16   A.   I don't want to misspeak.  I have to
17 look into it further.
18   Q.   You're not familiar as you sit here?
19   A.   I'm not familiar as we sit here, no.
20   Q.   Is there any circumstance in which
21 Averhealth would consider it appropriate to
22 backdate a document?
23      MR. CEJAS:  Objection.  Overbroad.
24      Go ahead, you can answer the
25 question.

Page 164

1       THE WITNESS:  Can you be more
2  specific?
3    Q.   (BY MR. CORNFELD)  No.
4    A.   Okay.
5    Q.   I would like to know if there's any
6  circumstance in which Averhealth would consider it
7  appropriate to backdate a document.
8       MR. CEJAS:  Same objection.  It's
9  vague, overbroad.
10      THE WITNESS:  I don't know.
11   Q.   (BY MR. CORNFELD)  You can't think of
12 one?
13   A.   I didn't say I can't think of one.  I
14 mean, off the top of my head, I don't know.  I
15 don't know.
16   Q.   Are you aware of anytime when
17 Averhealth has backdated a document?
18   A.   Not that I can recall.
19   Q.   Did Averhealth hire Dr. Eugene
20 Schwilke to conduct an inspection of its lab?
21   A.   No, he was an employee of ours and he
22 did it -- as an Averhealth employee, he performed
23 on off-cycle years of a CAP inspection, you're
24 supposed to do an -- a self-inspection.  So what we
25 asked him to do was conduct Averhealth's



Page 165

1  self-inspection.
2      Q.   I -- I've seen documents referred to
3  a CAP interim inspection that Dr. Schwilke did --
4      A.   Correct.
5      Q.   -- in -- in the spring of -- or -- or
6  the first half of 2021 while you were under
7  probation.
8      A.   That was part of our -- as I
9  indicated, that was part of our -- our own -- he
10 was -- he was acting on behalf of Averhealth as an
11 employee.  So she provided extra witness testimony
12 for us on a regular basis.  And part of our
13 certification requirements on off-years when CAP
14 doesn't do their regular inspections, we are to
15 perform a self-inspection, and Dr. Schwilke
16 performed that self-inspection for us.
17     Q.   Did he perform any other
18 self-inspections besides the one in 2021?
19     A.   Not that I recall.
20     Q.   Okay.  So that -- that inspection
21 that Dr. Schwilke did in 2021, that did not have to
22 do with preparing for the -- the nonroutine
23 inspection that CAP was planning to do that year?
24     A.   It was part of our regulatory
25 requirement, as I indicated.  So one of CAP's

Page 166

1  requirements is every other year, they perform a
2  routine inspection.  On off-years of that
3  inspection, you do a self-inspection, and
4  Dr. Schwilke as -- as an employee of Averhealth
5  conducted our self-inspection for us.
6      Q.   All right.  So -- and was that an
7  inspection that would be similar to a CAP
8  inspection?
9      A.   It's a requirement within the CAP
10 certification.  So yes, they tell you to take the
11 checklist.  So every -- every off-year, so we were
12 initially inspected by CAP in 2016, we did
13 self-inspection in 2017, they do an inspection in
14 2018, we did a self-inspection in 2019, they did an
15 inspection in 2020, a routine inspection.  And in
16 2021, we were to do a self-inspection, and
17 Dr. Schwilke conducted that self-inspection for us
18 in 2021.
19     Q.   He did it in March -- on March 8th
20 and 9th of 2021?
21     A.   I don't recall.
22     Q.   We'll -- we'll take a look at it in a
23 minute.
24     A.   Okay.
25     Q.   So it would be something similar to

Page 167

1  what you were expecting CAP to do when they came in
2  to do the nonroutine inspection while you were on
3  probation, correct?
4      A.   It's an internal self-inspection.
5      Q.   I mean, but he would be doing the
6  same kind of inspection that CAP would do, was
7  planning to do during your probation; is that
8  right?
9      A.   Yes.
10     Q.   And when was Dr. Schwilke an employee
11 of Averhealth?
12     A.   I don't know the exact dates off the
13 top of my head.  I can follow up.
14     Q.   Yeah, approximately when did he --
15 did he become an employee?
16     A.   Well, all my dates run together.  I'm
17 not trying to be vague, I honestly don't recall.
18     Q.   Is he still an employee?
19     A.   He is not.
20     Q.   When did he stop being an employee?
21     A.   He took a full-time job with a
22 laboratory in Louisiana, so he didn't have the time
23 to assist with litigation anymore.  I believe it
24 was a year-and-a-half ago, but again, I don't know,
25 let me check on -- I can -- you know, we can call

Page 168

1  up with his exact dates of employment.
2      Q.   Okay.  If you could provide that
3  information --
4      A.   Uh-huh.
5      Q.   -- to Mr. Cejas and so he can provide
6  it to us.  Would you do that?
7      A.   Yes.
8      Q.   And how often did he testify for
9  Averhealth?
10     A.   On a regular basis.  I mean, he -- I
11 would say several times a month.  I have a record
12 of every testimony he's ever done for us.
13     Q.   I would request that.
14     A.   Okay.
15     Q.   And do you have his transcripts, the
16 transcripts of his testimony?
17     A.   We don't.  It's -- he was acting on
18 -- just like Dr. Glinn is, he provided testimony in
19 cases.
20     Q.   Did he ever -- did Dr. Schwilke ever
21 provide testimony in a case in which there was a
22 comparable expert on the opposing side?
23     A.   I don't know.
24     Q.   Has Averhealth ever provided expert
25 testimony in a case in which there was a comparable



Page 169

1  expert on the opposing side?
2      A.   Yes.
3      Q.   When was that?
4      A.   We get -- we are subpoenaed to
5  testify on our test results regularly.
6      Q.   I understand that.
7      A.   So I can't give you every date.  I
8  don't know.
9      Q.   All right.  Has Averhealth ever
10  testified -- or excuse me, provided expert
11  testimony in a case in which there was an expert on
12  the other side and the other side obtained anything
13  like the volume of documents we have provided [sic]
14  in this case?
15      A.   No.
16      Q.   Those cases are limited to the
17  records regarding an individual test?
18      A.   Yes.
19      Q.   And when -- when Averhealth has gone
20  up against an expert on the other side, has
21  Averhealth ever lost?
22      A.   I don't know the answer to that.
23      Q.   Okay.  And would that be in your
24  records?
25      A.   I'm not sure.  I -- I -- I honestly

Page 170

1  don't know.  I'm not trying to be evasive.
2      Q.   Okay.
3      A.   As I indicated, we get litigation
4  requests daily and we provide expert testimony on a
5  regular basis.
6      Q.   Has -- has Averhealth ever provided
7  expert testimony in a lawsuit in which -- like
8  this, that's not a -- say a domestic civil case
9  where the issue is a -- one particular laboratory
10  test, but where the issue is Averhealth's overall
11  testing practices?
12      A.   I mean, every time we testify, we
13  testify to our testing practices.
14      Q.   Right.  But what I mean is, I mean,
15  you said earlier that the -- the cases are usually
16  limited to one -- to one test.
17      A.   Not one test, one defendant.
18      Q.   Okay.  But they're limited to that
19  individual's tests, correct?
20      A.   Correct.
21      Q.   And so maybe that answered the
22  question --
23      A.   Okay.
24      Q.   -- that I was just asking, but has
25  Averhealth ever provided expert testimony in a --

Page 171

1  in a civil case that was not a domestic case over
2  something an individual -- where the Court was
3  deciding in an individual's child custody?
4      A.   Excuse me for not understanding law,
5  but I don't know the difference of what you're
6  asking.
7          MR. CEJAS:  Are you asking a case
8  where Averhealth's a defendant?  Is that what
9  you're trying to ask?
10          MR. CORNFELD:  Well, that would be
11  one thing, yeah.
12          MR. PLEBAN:  And in civil cases,
13  they're nondomestic, right?  So you have all the
14  domestic cases where you're going to have the child
15  custody issue.  I bet there's going to be a ton of
16  those.  You'll have criminal ones.  And then are
17  there -- and another civil one, right?  So
18  nondomestic civil.
19          MR. CEJAS:  What would that be other
20  than --
21          THE WITNESS:  Well, it would be a
22  nondomestic civil --
23          MR. CEJAS:  -- a case against
24  Averhealth?
25          MR. PLEBAN:  I think it would

Page 172

1  probably -- I think it would only probably be if
2  you've been sued before, probably, unless you're
3  acting as an expert in a case for another person's
4  drug testing where Schwilke's talking about --
5          MR. CEJAS:  So maybe ask it that way.
6  I think she'll understand that.
7      Q.   (BY MR. CORNFELD)  Has -- has
8  Averhealth ever provided -- has Averhealth ever
9  provided expert testimony in a case in which
10  Averhealth was the defendant?
11      A.   I don't believe so.
12      Q.   Averhealth has been sued before,
13  correct?
14      A.   Averhealth has been sued before, yes.
15      Q.   Okay.  But it never proceeded to the
16  point where you were designating expert testimony?
17      A.   Correct.
18      Q.   Has Averhealth ever gone to trial
19  when it's been sued before?
20      A.   Not since I've been with the
21  organization that I know of, no.
22      Q.   And that goes back to 2014?
23      A.   Correct.
24      Q.   Yeah, what -- what -- are you
25  familiar with the Mack case, Mack versus



Dominique Delagnes                                                    July 09, 2024

Page 173

1  Averhealth?

2       MR. CEJAS:  That's the one in

3  Philadelphia, right?

4       THE WITNESS:  Yes.

5       Q.   (BY MR. CORNFELD)  Are you familiar

6  with that?

7       A.   Yes.

8       Q.   Is that pending?

9       A.   No, it's been settled.  Or it's

10  been --

11       THE WITNESS:  Thank you.  What is the

12  right...

13       MR. CEJAS:  I can tell you.  It was

14  disposed of on summary judgment --

15       THE WITNESS:  Thank you.

16       MR. CEJAS:  -- in Averhealth's favor.

17       MR. PLEBAN:  Okay.

18       MR. CEJAS:  And upheld on appeal.

19       THE WITNESS:  Thank you, Nick.

20       Q.   (BY MR. CORNFELD)  And I -- I assume

21  for that it was -- it was disposed of --

22       MR. CEJAS:  Two different summaries,

23  a little bit.

24       Q.   (BY MR. CORNFELD)  It was disposed on

25  summary --

Page 174

1       A.   Yeah, what I said was inaccurate.

2  Thank you for the correction.

3       Q.   Okay.  And I -- and I take it from

4  what you've told us that the Mack case was disposed

5  on summary judgment on some basis other than

6  something that would have been supported by expert

7  testimony, correct?

8       MR. CEJAS:  I'll object to the extent

9  it calls for a legal conclusion.

10       But if you know, go ahead.

11       THE WITNESS:  I don't know.

12       MR. CEJAS:  You can find the order.

13       Q.   (BY MR. CORNFELD)  You -- you just

14  know -- you just know that you didn't have expert

15  testimony in that case, correct?

16       A.   Correct.

17       Q.   Okay.  Did the other side have expert

18  testimony?

19       A.   I don't know.

20       Q.   You've been handed what's been marked

21  as Exhibit 58, which is a document that has the

22  Bates number 32404 on the first page, and the first

23  page contains an e-mail from Eugene Schwilke dated

24  March 24, 2021, and that was to Dr. Glinn with

25  a copy to yourself with the subject interim

Page 175

1  inspection report.

2       Do you see that?

3       A.   Yes.

4       Q.   And then attached to that, is that --

5  is interim inspection report dated March 8, 2021,

6  and March 9, 2021?

7       A.   Yes.

8       Q.   I'm handing you what's been marked as

9  Exhibit 59, which is a document headed:  Averhealth

10  Lab Director Weekly QC Review, Dates Covered 3/7/21

11  to 3/13/21, with Bates number on the first page of

12  2651.

13       Do you have that?

14       A.   Yes.

15       Q.   Let's talk about the lab director

16  weekly QC review.

17       A.   Okay.

18       Q.   Do you see that under the notes --

19  well, strike that.

20       This was prepared by Dr. Glinn,

21  correct?

22       A.   What was prepared by Dr. Glinn?

23       Q.   The lab director weekly QC review,

24  Exhibit 59.

25       A.   Yes.

Page 176

1       Q.   Are you familiar with it?

2       A.   I've seen it, yes.

3       Q.   All right.  Are you -- under notes,

4  she refers to the interim CAP 2021 inspection by

5  Dr. Schwilke, and she lists what she says are

6  summation conference items.

7       Do you see that?

8       A.   Summation conference items?  Oh, yes,

9  I see.

10       Q.   Are you that familiar with those

11  items?

12       A.   I would not have reviewed the CAP

13  inspection.  It would be something -- I mean, I'm

14  not sure.

15       Q.   Did you -- did you receive this at or

16  near the time it was prepared?

17       A.   Did I receive this, this document

18  itself?  I don't believe so.

19       Q.   And did you -- did you receive

20  Dr. Schwilke's interim inspection that's --

21       A.   Yes.

22       Q.   -- part of 32404?

23       A.   Yes.

24       Q.   And did you review that?

25       A.   At the time, probably.  I probably

Page 177

1  looked at it.
2      Q.   When you say you looked at it, did
3  you review it and see what his findings were and
4  what his recommendations were?
5      A.   Yes.
6      Q.   All right.  If you look at Exhibit
7  59, what's listed under Summation Conference Items,
8  would I be correct that these were items that
9  Dr. Schwilke brought to Averhealth in his meeting
10  following his inspection?
11      A.   Yes.
12      Q.   Did -- and did that in person while
13  he was on site?
14      A.   I'm not sure if he did it while he
15  was on site or if he provided it after the fact.
16  Because it talks about he was on site, and then he
17  says he'll follow up with some items.
18      Q.   I'm -- I'm sorry, where -- where are
19  you looking?
20      A.   If you look at his e-mail, it says:
21  Here are the other reports.  Also attached is my
22  CV, diploma, ABFT certificate.  See my comments
23  regarding clinical consultant in the checklist.
24  Info on COLA competency.  Also, these are
25  considered draft versions, so if you have comments

Page 178

1  or suggestions, please let me know.
2      Q.   Okay.  But that e-mail was March 24?
3      A.   Yes.
4      Q.   And the lab director weekly QC
5  review, if you look at the back page that's dated
6  March 13, about a week-and-a-half earlier.
7      A.   3/7 to 3/21.
8      Q.   Well, look at the back page when
9  Dr. Glinn signed it.
10      A.   Okay.  3/13.
11      Q.   Yes.
12      A.   So she's reviewing QCs from the week
13  of 3/7 to 3/13.
14      Q.   I --
15      A.   So she reviewed them on 3/13.
16      Q.   I understand.  But that would --
17      A.   Yeah.
18      Q.   -- would that suggest that these were
19  items that Dr. Schwilke brought to her attention
20  when he was on site, or at least they were not the
21  ones that he said he was going to follow up with in
22  his e-mail later that month?
23      MR. CEJAS:  I'm going to object to
24  the extent it calls for speculation.
25      But if you know, go ahead.

Page 179

1      THE WITNESS:  I don't know.
2      Q.   (BY MR. CORNFELD)  Well, you know
3  when -- when he said in his e-mail that he was
4  going to follow up with -- with additional items,
5  he couldn't have meant what was in the lab director
6  weekly QC review that had already been prepared and
7  signed, correct?
8      MR. CEJAS:  I'm going to object to
9  the extent it calls for speculation.
10      But if you know --
11      MR. CORNFELD:  It's not speculation.
12      Q.   (BY MR. CORNFELD)  Go --
13      A.   I don't know even -- I don't
14  understand what you're asking me right now.  Like,
15  what are we looking at, what are you trying to get
16  to?  What's your question?
17      Q.   You said that he was -- he was going
18  to send the additional information in his e-mail.
19      A.   I read what his e-mail said here,
20  yes.
21      Q.   Okay.  But that was talking about
22  something other than what is in the lab director
23  weekly QC review dated March 13, 2021, correct?
24      MR. CEJAS:  Same objection.
25      But if you know, go ahead.

Page 180

1      THE WITNESS:  I don't know.
2      Q.   (BY MR. CORNFELD)  It had to be
3  because he already -- that was already in writing.
4      A.   Okay.  Where is this associated with
5  this?  That's -- that's what I'm trying to put
6  together.  Is this in this one?
7      Q.   No.
8      A.   Like what -- where is this document
9  from versus this?
10      Q.   Okay.  You're holding up --
11      A.   I'm holding up --
12      Q.   -- the lab director --
13      A.   -- number 58 --
14      Q.   Excuse me, let me -- let me -- let
15  me --
16      A.   -- and 59 --
17      Q.   -- ask my question.
18      A.   Okay.
19      Q.   You were comparing the lab director
20  weekly QC review and the formal report that
21  Dr. Schwilke prepared that's part of Exhibit 58.
22      A.   Okay.
23      Q.   And okay.  They both relate to his
24  interim CAP 2020 inspection, correct?  If you look
25  at the notes on the lab director weekly QC



Page 181

1  review --
2      A.  Okay.
3      Q.  -- it refers to his interim CAP 2021
4  inspection, correct?
5      A.  Yes.
6      Q.  And then it says:  Summation
7  conference items.
8      A.  Okay.  Yes, it does.
9      Q.  And so -- okay.  So that would mean
10  this was something that he presented, these were
11  items he presented in a conference?
12      A.  In a conference?  You mean in a
13  meeting?
14      Q.  It sounds like it.  It says
15  summation conference.
16      A.  Okay.  Summation conference, okay,
17  yes.
18      Q.  All right.  Whereas his report was
19  something he submitted later, Exhibit 58?
20      A.  Okay.
21      Q.  All right.  I didn't think that
22  should be hard.
23          MR. CEJAS:  I move to strike that
24  comment.
25          MR. CORNFELD:  That's okay.  It was

Page 182

1  just an extraneous comment.
2      Q.  (BY MR. CORNFELD)  On Exhibit 59,
3  item 2 of his summation conference items, he says:
4  Additional details needed in certain SOPs.
5      A.  Yes.
6      Q.  Do you know what those were?
7      A.  I believe it's probably outlined in
8  here, but I don't remember off the top of my head.
9      Q.  Okay.  I don't believe it is.
10      A.  Okay.
11      Q.  Okay.  So is that something we would
12  have to ask Dr. Glinn about?
13      A.  Let me see if it's in here.  I
14  believe that on page AH0032424, under the
15  Aliquoting, there's a recommendation about updating
16  the accessioning SOP.
17      Q.  You -- you think that when it says
18  additional details needed in certain SOPs and
19  that's plural --
20      A.  Okay.  So we'd need to go through
21  each of these from page -- where he had indicated
22  was the information available and acceptable, yes
23  or no, and then his comments.  So if we looked at
24  his comments, he talks about where he suggests --
25  recommends that we update SOPs.

Page 183

1          So in number 2, then if you
2  cross-reference against the pages 3 through 11,
3  you'll see where he suggested making updates to
4  SOPs.  So that's what he's referring to.
5      Q.  And number 3 when he says -- in
6  Exhibit 59 -- strike that.
7          Were you part of the conference where
8  he presented his items that are reflected in
9  Exhibit 59?
10      A.  I was not on site.  I don't recall if
11  I sat in on the conference call remotely.  I know I
12  was not on site.  I don't recall if I was part of
13  the meeting or not.
14      Q.  Do you remember -- if you were part
15  of the meeting, do you remember any -- I take it
16  you don't remember anything about it?
17      A.  I remember that it happened.  I
18  remember that it was completed.
19      Q.  But my question is:  If you don't
20  remember if you were there, I assume you don't
21  remember who said what.
22      A.  I mean, it's documented here on -- on
23  things that he indicated, right?  He clearly wrote
24  recommendations on here.
25      Q.  In -- in his formal report?

Page 184

1      A.  Yes.
2      Q.  Okay.  In his -- in -- on Exhibit 59,
3  in the lab director weekly QC report, number 3 is:
4  Additional details for root cause analysis.
5          Do you know what additional details
6  he was suggesting?
7          Can I -- can I -- can I just
8  interrupt this for a moment?
9      A.  Sure.
10          MR. CORNFELD:  And let's -- let's go
11  off the record.
12          THE VIDEOGRAPHER:  Time is 2:03 p.m.
13  We are off the record.
14          (A discussion was held off the
15  record.)
16          (A short break was taken.)
17          THE VIDEOGRAPHER:  The time is 2:17.
18  We are back on the record.
19      Q.  (BY MR. CORNFELD)  Ms. Delagnes,
20  Exhibit 58 --
21      A.  Yes.
22      Q.  -- the -- the CAP interim inspection
23  of Averhealth that Dr. Schwilke did that begins on
24  page 32406.  Before I showed it to you, when was
25  the last time you saw it?



Page 185

1     A.    I don't recall.
2     Q.    You didn't see it in preparing for
3  the 30(b)(6) deposition, did you?
4     A.    I reviewed it broadly.  It was on the
5  list.  I -- I believe that I went through it and
6  looked at what the findings were.
7     Q.    All of -- all of the findings,
8  whether positive or negative, good or bad or
9  neutral, those are all contained in the report,
10  correct?
11     A.    What I looked at was what's contained
12  in the report.
13     Q.    Do you have any knowledge beyond
14  what's contained in the report?
15     A.    No.
16     Q.    Do you have any knowledge of what
17  Averhealth did to implement any of the
18  recommendations?
19     A.    I do.  I mean, obviously one of them
20  I did myself, right.  So on here, it talks about
21  that it says formalized chain of custody policy,
22  and it was done by me on 3/13/21.
23     Q.    That -- you're referring to
24  Exhibit 59?
25     A.    Yes, I am.

Page 186

1     Q.    Item 8; is that right?
2     A.    Yes.
3     Q.    Was that an SOP?
4     A.    Yes.
5     Q.    And the chain of custody SOP?
6     A.    Yes.
7     Q.    That you did on March 13 of 2021?
8     A.    Yes.
9     Q.    So that was pretty timely because
10  that was the same day that Dr. Glinn wrote the
11  report in Exhibit 59, correct?
12     A.    Dr. Glinn or Dr. --
13     Q.    I mean Dr. -- yes, Dr. Glinn wrote
14  her lab director weekly QC review on March 13 that
15  contains the statement that you would formalize the
16  chain of custody policy.
17     A.    That's what it says, yes.
18     Q.    Did -- had you done that as of March
19  13?
20     A.    I don't recall.  I mean, that's what
21  this says.
22     Q.    Okay.  Dr. Glinn was present in the
23  summation conference that's referred to in
24  Exhibit 59, correct?
25     A.    Yes.

Page 187

1     Q.    Do you know if anyone else was?
2     A.    I don't recall.  It probably -- there
3  very well could have been other laboratory
4  employees.
5     Q.    But you don't know that, you just
6  know that Dr. Glinn was present, correct?
7     A.    Correct.
8     Q.    All right.  And the -- the report
9  that Dr. Schwilke prepared beginning on page 32406,
10  that was something that he directed to Dr. Glinn,
11  correct?
12     A.    Yes.
13     Q.    And -- and so you would expect that
14  Dr. Glinn would be knowledgeable about it --
15     A.    Yes.
16     Q.    -- correct?  More knowledgeable than
17  you as you sit here today?
18     A.    Depends upon the item, but yes.
19     Q.    I mean, she'd be knowledgeable about
20  the whole thing, maybe you have some knowledge here
21  or there --
22     A.    Yes, that is correct, yes.
23     Q.    -- but in total, on the Schwilke
24  report, would Dr. Glinn be the most knowledgeable
25  person at Averhealth about that?

Page 188

1     A.    Yes.
2     Q.    And more knowledgeable -- much more
3  knowledgeable than you, correct?
4     A.    Don't love the term "much."  I mean,
5  she would be more knowledgeable.
6          MR. CORNFELD:  All right.  But based
7  on that, I'm not going to ask any more questions,
8  but I would expect that if Ms. Delagnes, if you are
9  going to have her testify at trial, you don't have
10  to tell us until shortly before trial, obviously,
11  but we'll be exchanging witness lists, and if she's
12  going to testify about that, you will let us know
13  and we reserve the right to request a supplemental
14  deposition, which I believe the Court would give
15  us.  And I believe since you're a reasonable
16  person, Nick, that you would agree to it at that
17  time, but I'm not going to ask you to agree to it
18  to today.
19          MR. CEJAS:  We will be following the
20  federal rules, and we can --
21          MR. CORNFELD:  And reasonable
22  procedures which allow for parties to agree to
23  things like supplemental depositions.
24          MR. CEJAS:  Obviously, there are
25  rules with respect to expert disclosures.  We'll be



Page 189

1  following it and we will --
2       MR. CORNFELD:  I don't -- I don't
3  even know if it would require an expert to testify
4  about this report.  That's why I'm saying,
5  obviously if it would require an expert to testify
6  about it, then we would find out who's going to
7  testify about it when we get your expert reports.
8       MR. CEJAS:  I think you've --
9       MR. CORNFELD:  But --
10      MR. CEJAS:  Look, I mean, she had
11 some factual involvement with 8.  She's going
12 testify about those things you've heard about.  Her
13 firsthand involvement, sure, and we'll follow the
14 rules with respect to expert opinions.
15      (A discussion was held off the
16 record.)
17      **THE WITNESS:  Thank you.**
18      (A discussion was held off the
19 record.)
20      Q.  (BY MR. CORNFELD)  You have in front
21 of you Exhibit 60, which is a letter from CAP dated
22 March 10, 2021, signed by Lena Portillo to
23 Dr. Glinn with a Bates number 37207 and Exhibit 61,
24 a letter from Averhealth to CAP -- to Ms. Portillo
25 with CAP dated March 17, 2021, numbered 17105 on

Page 190

1  the first page.
2       Do you see those?
3       **A.   Yes.**
4       Q.   Are you familiar with those?
5       **A.   Not beforehand, but reading them,**
6  **yes.  I mean, I don't recall them from now, but I**
7  **just read them.**
8       Q.   Okay.  Other than -- other than just
9  reading them, do you recall them from when they
10 were sent and received?
11      **A.   I don't remember them.  It was three**
12 **years ago.**
13      Q.   Okay.  Well, we don't have to spend
14 much time on them anyway --
15      **A.   Okay.**
16      Q.   -- but on March 10, 2021, in
17 Exhibit 60, CAP asked for additional information
18 from Averhealth, correct?
19      **A.   Yes.**
20      Q.   And for example, they wanted to
21 know -- they wanted the corrective actions
22 submitted for a certain PT referred to as UDC-A,
23 correct?
24      **A.   Yes.**
25      Q.   And an investigation of the

Page 191

1  unacceptable UDC-A proficiency test survey results,
2  correct?
3       **A.   Yes.**
4       Q.   And they had a question about it, and
5  then they wanted you to submit the acknowledgment
6  form, correct?
7       **A.   Yes.**
8       Q.   And by "you," I meant Averhealth.
9  You understood that?
10      **A.   Well, you mean Dr. Glinn because now**
11 **I'm --**
12      Q.   Well -- well, they wanted Averhealth
13 to submit the signed acknowledgment form.
14      **A.   Well, it specifically has Dr. Glinn's**
15 **name on it, but yes.**
16      Q.   Okay.  And Exhibit 61 is Averhealth's
17 response to that -- that request and providing the
18 additional information that CAP said it needed,
19 correct?
20      **A.   Yes.**
21      Q.   And in Exhibit 61, Dr. Glinn refers
22 to items that -- that she submitted with the
23 letter, correct?
24      **A.   There was the letter, the response.**
25 **What do you mean the -- is there something else**

Page 192

1  that you're referring to?  There's a letter and an
2  acknowledgment form.
3       Q.   I'm sorry.  Strike that.  Strike that
4  question.
5       Are you familiar with the fact that
6  Dr. Schwilke was preparing a macro for Averhealth?
7       **A.   Yes.**
8       Q.   What was that macro?
9       **A.   For the ability to help take the QC**
10 **data and put it into a graphical representation.**
11      Q.   And Aver -- excuse me, as CAP said it
12 needed?
13      **A.   I don't recall.**
14      Q.   I mean, that was something that CAP
15 wanted, correct?
16      **A.   Are you referring to a specific**
17 **document where they requested that?**
18      Q.   I believe they did request it, but if
19 you don't recall, we can go on.
20      **A.   Okay.**
21      Q.   Are you -- are you familiar with the
22 fact that Dr. Schwilke told Averhealth that it
23 needed to -- it needed help with its QC review
24 program for LC-MS/MS?
25      MR. CEJAS:  Object to the extent --



Page 193

1    Q.   (BY MR. CORNFELD)  And that
2   Dr. Schwilke was going to help with that?
3        MR. CEJAS:  Object to form.  Assumes
4   facts not in evidence.
5        But subject to that, go ahead.
6        **THE WITNESS:  What I am familiar with**
7   **is the fact that he assisted -- he said that he**
8   **knows how to write a macro to help with putting**
9   **together large data for the QCs, yes.**
10   Q.   Okay.  That's the macro?
11   **A.   Yes.**
12   Q.   Do you recall that Dr. Schwilke told
13  Averhealth that its Levey-Jennings review needed to
14  be improved?
15   **A.   That was a recommendation that he**
16  **made on his interim inspection, yes.  I do -- I**
17  **just read that in his interim inspection.**
18   Q.   Okay.  Other than reading that in the
19  interim inspection, aside from what you just read
20  in his interim inspection report --
21   **A.   Okay.**
22   Q.   -- were you familiar with that?
23   **A.   No.**
24   Q.   All right.  So you wouldn't be
25  familiar with what he thought needed to be improved

Page 194

1   or how to improve it?
2    **A.   Again, what I know is what's written**
3   **in the interim inspection that he performed for us.**
4    Q.   Okay.  I'm asking for your
5   independent knowledge --
6    **A.   Okay.**
7    Q.   -- besides what's in that document
8   that you just read.
9    **A.   No, I'm not.**
10   Q.   Do you know what Levey-Jennings
11  charts are?
12   **A.   I do.**
13   Q.   What are they?
14   **A.   They're graphical representation of**
15  **-- I believe a quality control.  Again, let's leave**
16  **this question for Dr. Glinn.**
17   Q.   She -- all right.  She would -- this
18  would be the kind of technical --
19   **A.   Yes.**
20   Q.   -- question that we need --
21   **A.   Yes.**
22   Q.   -- to inquire of Dr. Glinn?
23   **A.   Yes.**
24   Q.   I've handed you what's been marked as
25  Exhibit 62, which is a letter from CAP to Dr. Glinn

Page 195

1   dated May 13, 2021, signed by Amy Daniels,
2   Technical Director of Accreditation Services of the
3   CAP Accreditation Program.
4        Do you have that?
5    **A.   Yes.**
6    Q.   Is this the letter where CAP informed
7   Averhealth that it was going to be doing a
8   nonroutine inspection, and what that would entail?
9    **A.   Yes.**
10   Q.   At least in very general terms?
11   **A.   Yes.**
12   Q.   All right.  And it -- it states
13  that -- and by the way, this was the day the
14  inspection occurred, correct?
15   **A.   I don't believe it was -- okay.**
16   Q.   Do you recall --
17   **A.   It was around -- it was around**
18  **May 13th, so yes, this was either a day or around**
19  **the day.  So this may have been the day that --**
20  **that the inspection occurred.**
21   Q.   I take it you don't have any
22  independent recollection of that, of whether this
23  was the very day that the inspection occurred?
24   **A.   It was around this date, yes.**
25   Q.   Okay.  But whether this was the exact

Page 196

1   date is my question.  You don't have any
2   independent recollection of that?
3    **A.   No.**
4    Q.   Okay.  And it says that:  This
5   inspection will be a condition of probation and to
6   validate compliance with accreditation requirements
7   due to complaints filed against the laboratory.
8        Do you see that?
9    **A.   Yes.**
10   Q.   And there are -- it says:  The
11  allegations of noncompliance are -- and then it
12  lists six allegations, correct?
13   **A.   Yes.**
14   Q.   The first four are the ones they told
15  you about when they first told you about the
16  allegations in November, and when they told you
17  that you were being put on probation in January,
18  correct?
19   **A.   Yes.**
20   Q.   And then number 5 is:  Concern with a
21  repeated pattern of releasing false positive
22  results.  And number 6:  Lack of compliance with
23  the CAP terms of accreditation related to adverse
24  media alleging false positive drug results.
25       Do you see that?

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                         California Firm Registration #179

LEXITAS

Page 197

1     A.   Yes.
2     Q.   Did CAP ever tell you where they got
3  those last two allegations, number 5 and 6?
4     A.   They showed me while they were on
5  site for the inspection of an article that was in a
6  legal journal, I think in St. Louis.
7     Q.   And that article was what?
8     A.   I don't recall, and it wasn't even
9  media.  It was Dr. Zebelman showed it to me, and it
10 was something that we had never seen before.  The
11 first time that I had seen it was at -- anybody at
12 Averhealth had ever seen it was the day of the
13 inspection.
14    Q.   Okay.  And -- and so -- that relates
15 to number 6?
16    A.   Correct.
17    Q.   All right.  Did you ever learn what
18 the -- where they -- the source of number 5 is,
19 concern with the repeated pattern of releasing
20 false positive results?
21    A.   No.
22    Q.   And so they never told you that was
23 from Dr. Riley; is that right?
24    A.   That's right.
25    Q.   Did they tell you that that had

Page 198

1  anything to do with Dr. Riley's testimony about
2  30 percent -- that 30 percent of the tests were --
3  in Michigan were inaccurate?
4     A.   As I said, they didn't tell me where
5  it came from.
6     Q.   Okay.  Okay.  I --
7     A.   I said I don't know where it came
8  from.
9     Q.   Well, regardless of where it came
10 from, I take it that they didn't tell you that it
11 related to that claim by Dr. Riley, correct?
12    A.   They didn't tell me where it came
13 from.
14    Q.   I mean, they might not have said --
15    A.   So how would I know?  They didn't
16 tell me where it came from.
17    Q.   Okay.  But I take it -- but where it
18 came from, meaning who told them that, who made the
19 complaint, but somebody else could have told them
20 that Dr. Riley had said that.  So I take it what
21 you're saying is CAP never told you that allegation
22 number 5 in Exhibit 62 had anything to do with
23 Dr. Riley's statement that 30 percent of the tests
24 in Michigan were inaccurate?
25    A.   That is correct.

Page 199

1     Q.   True?  Okay.
2          Could that have been an article in
3  the St. Louis Record, the one that was -- the media
4  item referred to in paragraph 6?
5     A.   I believe so.
6     Q.   Okay.  The name St. Louis Record
7  sounds familiar?
8     A.   Yes.  I think I'd said it was a
9  something published in a journal or law journal
10 that was here in St. Louis.
11    Q.   And even if it's a publication that
12 is limited to the -- to the universe of lawyers,
13 that would still be media, wouldn't it?
14    A.   The first that we learned that it was
15 even out there for us to report it to CAP was when
16 Dr. Zebelman showed it to me when he was on site.
17    Q.   Okay.  So I take it you said we
18 couldn't have reported to you, we never heard of
19 this?
20    A.   I told them that that's the first
21 time I'd seen it.
22    Q.   Okay.  But that was after you had
23 received the letter where they had that allegation,
24 correct?
25         MR. CEJAS:  Objection.  Assumes facts

Page 200

1  not in evidence.  Which letter?
2          MR. CORNFELD:  Exhibit 62.
3          THE WITNESS:  I don't understand the
4  question.
5     Q.   (BY MR. CORNFELD)  When -- when you
6  received Exhibit 62 --
7     A.   Yes.
8     Q.   -- the letter that referred to the
9  allegation number 6 about lack of compliance
10 related to adverse media, at the time he handed you
11 this letter, or somebody delivered the letter to
12 you, you were not aware of that St. Louis Record
13 publication; is that a fair statement?
14    A.   Yes.
15    Q.   You've been handed Exhibit 63, which
16 is a document titled College of American
17 Pathologists Laboratory Accreditation Program
18 Inspector Summary Report.  Correct?
19    A.   Summation report, yes.
20    Q.   Summation report.  Thank you.
21         And that has the Bates number 16940
22 on the first page.
23         Are you familiar with this document?
24    A.   Yes.
25    Q.   Did you see this in preparation for



Dominique Delagnes                                                    July 09, 2024

Page 201

1  your corporate designee deposition yesterday?
2      A.  I saw the -- in that different
3  format.  So they leave individual sheets.
4      Q.  Not stapled together?
5      A.  They're for each section.  It's the
6  same thing, it's just in individual pages.  They
7  leave an inspection report on site, so this is out
8  of CAP's computer system, but there's another
9  report that the inspectors fill out and hand to you
10 while they're on site.  It's basically the same
11 thing.  It's just in a different format.
12     Q.  I've handed you what's been marked as
13 Exhibit 64, which is a document with the heading
14 College of American Pathologists CAP Accreditation
15 Programs Deficiency Response Sheet.  Are you
16 familiar with this document?
17     A.  Yes.
18     Q.  And does this contain the handwritten
19 notes that you just referred to?
20     A.  Yes.
21     Q.  Okay.  Along with Averhealth's
22 response?
23     A.  Yes.
24     Q.  And then Exhibit 64 has the -- for
25 the record, has the Bates number 21604 on the first

Page 202

1  page.
2          So if we would look at Exhibit 63,
3  which I referred to as the -- as the typed
4  inspection notes from the interim inspection --
5  excuse me, the nonroutine inspection, when -- do
6  you see that it is dated July 28th, 2021?
7      A.  Yes.
8      Q.  But the inspection date was May 13th,
9  2021, correct?
10     A.  Yes.
11     Q.  And -- and this contains various
12 inspector comments, correct?
13     A.  Yes.
14     Q.  And if we look at the second page of
15 the document, which is called page 2 of 6, do you
16 see that these are comments related to lab general?
17     A.  Well, the first one is DRA 10440.
18 The second one and third one are lab general.  Is
19 that what you mean?  Or you mean the top, the
20 section unit?
21     Q.  It -- it says -- it says lab general.
22     A.  Okay.  Sorry.  I was reading the ID
23 numbers down the side.
24     Q.  What does lab general mean?
25     A.  I'm not sure.  Because it says

Page 203

1  section unit, lab general.
2      Q.  Okay.  And then --
3      A.  I believe that it might be on here.
4  There's various sections, so DRA, so it's referring
5  to the checklist.  So I'm making an assumption that
6  it's on the checklist of lab general.  So at the
7  top here, it says:  Avertest d/b/a section lab
8  general checklist laboratory general.  So there's
9  a -- there's different checklists, so I guess it's
10 the section of lab general, and then the individual
11 checklist.  So this would have been what CAP
12 defines as a section of lab general.
13     Q.  Okay.  And -- and there are three
14 checklist items that the inspectors address on
15 page 2, correct?
16     A.  Yes.
17     Q.  And the inspectors, by the way, they
18 were Dr. Zebelman -- and do you recall who the
19 other one was?
20     A.  Dr. Peat, I think.
21     Q.  Yeah, that's P-E-A-T?
22     A.  Mike P-E-A-T, yes.
23     Q.  Okay.  And do you see the first item
24 on page 2 has to do with the laboratory director
25 ensuring an effective quality management program

Page 204

1  for the laboratory.
2          Do you see that?
3      A.  Yes.
4      Q.  And the inspector comments on this
5  item, says trends in the quantitative results of
6  proficiency test results are ignored.  As specified
7  in the deficiency marked for GEN.20318, trend
8  analysis and response is absent for urinary [sic]
9  creatinine.  And then there are various scientific
10 notations.
11         Do you see that?
12     A.  Yes.
13     Q.  All right.  So -- so in this
14 inspection, Dr. Zebelman and Dr. -- and Peat found
15 that Averhealth was ignoring trends in the
16 quantitative results of proficiency test results,
17 something they should have been doing, correct?
18     A.  They commented that we need to do
19 more around tracking trends, yes.
20     Q.  Well, he didn't say you needed to do
21 more.  He said you were ignoring the trends, and so
22 you need to pay attention to them, correct?
23     A.  He used the words, yes, that we were
24 ignoring the trends.
25     Q.  All right.  And you --

Page 205

1    A.   Yes, trends of quantitation results
2    and proficiency tests were ignored.  Those were his
3    words.
4    Q.   Okay.  And did you tell him that you
5    would stop ignoring and you would start paying
6    attention to those?
7    A.   We had indicated that -- that we
8    would provide updated documentation of us.  So the
9    response from Dr. Glinn on that is that quality
10   control runs have always been tracked and analyzed
11   in a tabular form.  During the on-site inspection,
12   the numerical results presented in a graphical
13   form.  So they were always tracked and analyzed,
14   but it was done in a tabular form, not in a
15   graphical form.  So we had said moving forward, not
16   only would we track it in an Excel tabular form,
17   but that we'd move it to a graphical
18   representation.
19   Q.   You're -- you're referring to the
20   first page of Exhibit 64?
21   A.   Of 64, yes, I am.  Our response to
22   the deficiency DRA 10440.
23   Q.   And -- and --
24   A.   So we didn't say that it was ignored,
25   we just said that we did it in a tabular form, not

Page 206

1    a graphical representation.
2    Q.   Dr. Zebelman and Dr. Peat knew that
3    you were doing it in a tabular form, but not a
4    graphical form, correct?
5    A.   Yes.
6    Q.   All right.  And he considered that --
7    that doing it that way was essentially ignoring the
8    trends, correct?
9        MR. CEJAS:  Object to the extent it
10   calls for speculation.
11       But go ahead.
12       THE WITNESS:  He stated that in -- in
13   his inspection report, as you already indicated,
14   that trends in quantitative results of proficiency
15   test are ignored.  They wanted it to be done in a
16   different way.  They were always tracked, they just
17   were not tracked in graphical form.
18   Q.   I understand that.  And he knew that
19   you were doing that, and to -- they knew that --
20   the inspectors knew that you were doing that, and
21   what they said about what that meant was that meant
22   that the trends were being ignored, correct?
23   That's what they said?
24   A.   That's what they said, yes.
25   Q.   And in -- by the way, Exhibit 64, the

Page 207

1    portion of Exhibit 64 that consist of pages
2    entitled Deficiency Response Sheet, those are the
3    responses you sent back to CAP regarding the
4    deficiencies that the inspectors found in the
5    nonroutine inspection?
6    A.   Yes.
7    Q.   All right.  And is that Dr. Glinn's
8    handwriting on those pages in Exhibit 64?
9    A.   Yes.
10   Q.   And Dr. Glinn says:  The laboratory
11   has hired someone -- strike that.
12       With respect to the tracking of
13   trends in the PT results, Dr. Glinn says in Exhibit
14   64:  The laboratory has hired someone to assist
15   with setting this up for all drugs across all
16   specimen types.
17       Who was being hired to do that?
18   A.   You'd need to ask Dr. Glinn.  That
19   might be where she's referring to Dr. Schwilke, but
20   I'm not sure, to help us.
21   Q.   I mean, Dr. Schwilke, you said, was
22   an employee, so he was already hired.
23   A.   You're right.  I don't know.  You
24   need to ask Dr. Glinn.  I don't recall who she was
25   hiring.

Page 208

1    Q.   Okay.  All right.  And then it says:
2    This will be completed in the next 30 days, and
3    then moving forward, updated continuously and
4    reviewed weekly.
5        Do you see that?
6    A.   Yes.
7    Q.   And it also says:  The IT support
8    team is working on a project to integrate QC data
9    into our LIMS for tracking purposes.  It is hoped
10   that this program will be in process by the last
11   quarter of 2021.
12       Do you see that on the first page of
13   Exhibit 64?
14   A.   Yes.
15   Q.   The first quarter of 2021 would mean
16   that that program would be in process between
17   August 1st and December 31st of December 2021,
18   correct?
19   A.   Yes.
20   Q.   I -- I don't see a date on the
21   deficiency response sheet or on the first page.  Do
22   you know when this was done?
23   A.   I'd have to look.  I don't know off
24   the top of my head.  I don't see a date either.
25   Q.   Okay.  Perhaps we can find out from



Page 209

1  Dr. Glinn.
2        Do you see -- going back to
3  Exhibit 63, on the -- on page 2, continuing with
4  the items that they list under Lab General, the
5  second item, which is that the QM program must
6  include processes for recording create --
7  corrective and preventative actions taken for
8  errors and incidents and so forth.
9        The inspector's comments were after
10  some scientific notation.  It says:  Further, the
11  Levey-Jennings plots or other graphical numerical
12  methods are not used to detect trends in day-to-day
13  QC.  Thus, trends may not be detected.  There is no
14  analysis of trends in the quantitative results of
15  PT surveys.
16        And then he uses as an example
17  something related to the PTs, survey called UDC-A.
18        Do you see that?
19  **A.   Yes.**
20  Q.   And then he says:  This is a
21  systematic issue in the QM and QC program.
22        Correct?
23  **A.   Yes.**
24  Q.   And in Exhibit 64, did Dr. Glinn
25  respond to that?

Page 210

1  **A.   Yes.  She said:  As mentioned in**
2  **DRA.10440 --**
3  Q.   Excuse me.  Are you referring to a
4  page with a Bates number 21065?
5  **A.   Yes, I am.**
6  Q.   Okay.  And --
7  **A.   So you can tell the corresponding**
8  **numbers.  So at the top, it says requirement number**
9  **GEN.20318.  So this is the response to that.**
10  Q.   Okay.  And -- and --
11  **A.   The evaluation of PT results will**
12  **include examination of the CAP performance,**
13  **analytics dashboard, and the appropriate action**
14  **taken if results are unsatisfactory.**
15  Q.   Okay.  So this is another deficiency
16  that the inspectors found that Dr. Glinn told CAP
17  that Averhealth's going to take care of, correct?
18  **A.   Yes.**
19  Q.   And then the last item on the second
20  page of Exhibit 63 is -- refers to the requirement
21  that the laboratory have a written policy that
22  addresses compliance with the CAP terms of
23  accreditation.
24        Do you see that?
25  **A.   I do.**

Page 211

1  Q.   And the inspector's note is that the
2  CAP terms of accreditation are listed in the
3  laboratory's official notification of
4  accreditation.  The written policy must include,
5  and then he lists what it must include.
6        Correct?
7  **A.   Yes.**
8  Q.   And in -- in response to that --
9  **A.   We had everything listed in our SOP**
10  **except who would be the --**
11  Q.   Excuse me, there's no question
12  pending.
13        In response to that, in Exhibit 64,
14  Dr. Glinn states on page 21606 that:  This was
15  corrected on site, and the policy was amended to
16  specify the lab director and chief operating
17  officer.
18        Correct?
19  **A.   To whom would notify.  So we had this**
20  **entire thing listed except for what was not listed**
21  **in this.  So in our original SOP, it outlined all**
22  **of the CAP accreditation standards except for it**
23  **did not indicate, if there was adverse media, who**
24  **would be the one to notify CAP.  So we updated that**
25  **to specify that it would either be the lab director**

Page 212

1  or the chief operating officer to do so.
2  Q.   Okay.  And that was something that
3  you did while the inspectors were on site at the
4  lab?
5  **A.   Correct, we updated the SOP then.**
6  Q.   And -- and by your -- I don't want to
7  read anything into it that's not appropriate, but
8  by your tone of voice, I take it you considered
9  that this is not as serious a finding as the other
10  two that we talked about.
11  **A.   I don't know why you're reading that**
12  **into my voice.  I'm just explaining what had**
13  **happened because in the previous statement, you**
14  **said there wasn't a question pending.  So I was**
15  **just explaining this particular one.**
16  Q.   You considered that this wasn't as
17  serious as the other two violations on this page?
18  **A.   We take anything where they want us**
19  **to make adjustments to our processes or -- as**
20  **procedures.  I don't think that one is more serious**
21  **than the other.**
22  Q.   Okay.  And on page 3 of the -- of
23  Exhibit 63, that's just a continuation of what
24  the -- the policy we've been talking about must
25  include, correct?



Page 213

1    A.   Correct.
2    Q.   Regarding either of the other two
3   findings that the inspectors made on the second
4   page of Exhibit 63, the one where they said that
5   you were ignoring quantitative results and
6   proficiency test results, and the one that you
7   weren't using -- you weren't doing the
8   Levey-Jennings analysis, did you go back
9   and review your past tests with regard to the --
10   the PT trends or the Levey-Jennings analysis?
11   **A.   When you say past tests, what do you**
12   **mean by that?**
13   Q.   Before May 13th, before the date of
14   this inspection.
15   **A.   Are you talking about our PT results?**
16   Q.   Yeah, to go back and do a -- do a
17   trend analysis that he said you weren't doing and
18   to --
19   **A.   You'd have to ask Dr. Glinn that.**
20   Q.   -- and to do the Levey -- and to do
21   the Levey-Jennings analysis.
22   **A.   You'd have to ask Dr. Glinn.  I do**
23   **know that -- that they stated that.  What we had**
24   **done to track trends before that is every six**
25   **months, we did what is considered an instrument**

Page 214

1   **comparison.  So by the instrument comparison, you**
2   **would take all of your quality control results**
3   **across all the instruments, you plot it on a graph,**
4   **and it shows you the trends.**
5   **So we did have trend information,**
6   **they just wanted us to -- to change what we were**
7   **doing, but we did track trends.**
8   Q.   But -- but not adequately according
9   to their findings, correct?
10   **A.   That's what they indicated, yes.**
11   **Oh, sorry.**
12   Q.   If we look at page 4 of the report of
13   the May 13th, 2021, nonroutine CAP analysis in
14   Exhibit 63 --
15   **A.   Which page?**
16   Q.   Page 4.
17   **A.   Page 4, thank you.**
18   Q.   Page 4 of 6.  This relates to a
19   requirement to adhere to the certificate marked
20   terms of use/agreement for the CAP certification
21   mark and design, if the laboratory is or will use
22   the CAP certification mark.
23   Do you see that?
24   **A.   I do.**
25   Q.   And -- and the inspector commented

Page 215

1   that that wasn't done adequately because it didn't
2   specify who was responsible.  This is the one where
3   it said -- they said you didn't indicate who was
4   responsible to report adverse media attention, and
5   that -- that he noted was corrected on site,
6   correct?
7    **A.   Yes.**
8    Q.   On exhibit -- excuse me.  On page 5
9   of Exhibit -- of Exhibit 63, this relates to the
10   section unit called Confirmation.
11   **A.   Yes.**
12   Q.   And the first item says:  The results
13   of controls are that -- this is the requirement
14   that the results of controls are reviewed for
15   acceptability before reporting results.
16   Correct?
17   **A.   Yes.**
18   Q.   And his comment was that the lab's
19   SOP on LC-MS/MS, quality control section two
20   describes quantitation methods and shifts in
21   retention times, variations in IS, meaning internal
22   standards, where calibrator recovery or to select a
23   better fitting regression model.
24   To begin with, this section is
25   confusing.  However, the impression left is that it

Page 216

1   allows the lab flexibility in approving a batch of
2   specimens for reporting.  Furthermore, there is
3   disagreement and/or complete -- incomplete match
4   with the training manual.  For example, the use of
5   different calibration curves.
6   Do you see that?
7    **A.   Yes.**
8    Q.   So that -- that was their finding of
9   a deficiency when they inspected you on May 13,
10   2021?
11   **A.   They wanted us to update our SOPs to**
12   **be more clear, yes.**
13   Q.   Okay.  And in response --
14   **A.   Do you want me to read it?**
15   Q.   I'm just -- I'm finding the page.
16   **A.   It's 21607.**
17   Q.   Yes.  Okay.  In the -- in Dr. Glinn's
18   deficiency response sheet, she says:  The LC-MS/MS
19   quality control SOP has been updated to be more
20   specific regarding the certification process for
21   reporting LC-MS/MS test results.  In addition,
22   training document has been incorporated into the
23   LC-MS/MS quality control SOP.  See attached
24   LC-MS/MS quality control SOP.
25   That's what -- that's what she told



Page 217

1  CAP in -- in response to this finding, correct?
2      A.   Yes.
3      Q.   And that -- that she was updating the
4  -- the standard operating procedure to comply with
5  the -- with CAP's requirement, correct?
6      A.   To be more clear, yes.
7      Q.   Yeah, to comply with -- or to correct
8  the deficiency that inspectors found, correct?
9      A.   To -- to be more clear, yes.
10     Q.   Okay.  But that was to correct what
11  they found was a deficiency, correct?
12     A.   Yes.
13     Q.   Okay.  And that -- that revised SOP
14  is attached to Exhibit 64 beginning with 21629,
15  correct?
16     A.   Sorry, I'm just looking at one thing.
17     Q.   First, could you answer my question?
18     A.   I didn't hear your question because I
19  wanted -- they differentiate between recommendation
20  and deficiency, and I just want to confirm that
21  that was actually listed as a deficiency.  That's
22  what I was looking for.
23          Can you repeat your question, please?
24     Q.   It was a deficiency, correct?
25     A.   I was still trying to figure it out

Page 218

1  and you asked me to answer your question, so I
2  haven't had a chance to do either.
3      Q.   Okay.  Let's -- the -- the revised
4  LC-MS/MS quality control standard operating
5  procedure was attached to the deficiency --
6      A.   Yes.
7      Q.   -- response sheets beginning on
8  21629, correct?
9      A.   Yes.
10     Q.   And that has a -- a handwritten date.
11  I know the copy's not very good, but it has a
12  handwritten date of May 24, 2021, correct?
13     A.   Yes.
14     Q.   I believe there's also a typed
15  version that was produced, but this will do for
16  now.
17          So -- so was this -- what they said
18  about the LC-MS/MS quality control SOP, was this a
19  deficiency?
20     A.   It was.
21     Q.   Okay.  And so were the others that
22  they talked about, correct?
23     A.   Yes.
24     Q.   All right.  And then the last page of
25  Exhibit 63, which relates to -- strike that.

Page 219

1          The last page of Exhibit 63, which
2  are the laboratory inspection-type notes relates to
3  screening, and they found no deficiencies there,
4  correct?
5      A.   What page?
6      Q.   The last page.
7      A.   Correct.
8      Q.   Handing you what's been marked as
9  Exhibit 65.
10     A.   Are we done with these?
11     Q.   Yes.
12          You've been handed Exhibit 65, which
13  is an e-mail exchange between you and Lena Portillo
14  of CAP dated May 20th, 2021, correct?
15     A.   Yes.
16     Q.   This was one week after the
17  nonroutine inspection we've been talking about,
18  correct?
19     A.   Yes.
20     Q.   And in your e-mail that initiates --
21  by the way, for the record, the Bates number, first
22  page of this is 19194.
23          In the e-mail that initiates this
24  exchange, you wrote on May 20th, 2021, at
25  9:44 a.m.:  Good morning, Lena.  We wanted to

Page 220

1  follow up regarding our special inspection that
2  took place by Dr. Zebelman and Dr. Peat on May 13,
3  2021.  Based on the outbrief -- and let me stop
4  there.
5          What did you mean by "outbrief"?
6      A.   At the end of the inspection when
7  they produce these documents, that's called an
8  outbrief.  So the inspectors, along with whomever
9  from the laboratory team want to participate, they
10  go through the -- their findings.
11     Q.   And you say:  It was shared by both
12  Dr. Zebelman and Dr. Peat that they did not find
13  any evidence if the allegations of noncompliance
14  were true or any evidence that we are reporting
15  false positive test results.
16          Do you see that?
17     A.   I do.
18     Q.   And in response, Ms. Portillo states
19  that same afternoon:  Good morning, Dominique.
20  Thank you for your e-mail.  The next steps, and she
21  says what the next steps for the laboratory -- was
22  for the laboratory responses to be received and
23  reviewed for compliance, followed by commissioner
24  review, and then the laboratory would be presented
25  for whether or not probation would be removed.



Page 221

1      Correct?
2    **A.   Yes.**
3      Q.    And -- and to establish its
4    accreditation status, correct?
5    **A.   Yes.**
6      Q.    And then she says:  To be clear, the
7    allegations initially investigated in a -- in
8    complaint reference 10219.
9          And that's the complaint that arose
10   from Dr. Riley's complaint to CAP, correct?
11   **A.   Yes.**
12     Q.    And she says:  Those allegations were
13   all substantiated.  The purpose of the probation
14   and documentation submissions were to monitor
15   progress with compliance.
16        Correct?
17   **A.   Yes.**
18     Q.    And she said:  The purpose of the
19   inspection was to verify implementation of
20   corrective actions and continued compliance.
21        She said that, correct?
22   **A.   Yes.**
23     Q.    So in response to your statement that
24   you thought that the finding was that the
25   allegations of noncompliance were not true, what

Page 222

1    she's saying is the allegations were all
2    substantiated, and the purpose of the inspection
3    was to make sure you were implementing corrective
4    actions and were continuing with compliance,
5    correct?
6    **A.   What she didn't address was the one**
7    **that was number 5 on the reason --**
8      Q.    Excuse me --
9    **A.   -- for their inspection --**
10     Q.    Excuse me --
11   **A.   -- that concerned with --**
12     Q.    Excuse me --
13   **A.   -- repeating a pattern of --**
14     Q.    -- my --
15   **A.   -- releasing false positive results.**
16     Q.    My -- my --
17   **A.   She'll --**
18     Q.    -- we'll -- we'll get to that --
19   **A.   You put her --**
20     Q.    My question -- my question was --
21   strike that.
22        MR. CORNFELD:  Would you reread the
23   question?
24        COURT REPORTER:  I can't because she
25   talked all over you.

Page 223

1        MR. CORNFELD:  All over my question?
2        COURT REPORTER:  All over it.
3        MR. CORNFELD:  All right.  Would you
4    read the question and answer before that?
5          (The preceding question and answer
6    was read back.)
7      Q.    (BY MR. CORNFELD)  So in response to
8    what -- what you said -- and we'll get to what you
9    said about false positives, but in response to your
10   statement that you understood that the inspectors
11   found that the allegations of noncompliance were
12   not true, she said essentially no, the allegations
13   were all substantiated, and the purpose of the
14   probation and documentation submissions were to
15   monitor progress with compliance.  And the purpose
16   of the inspection was to verify that you were
17   implementing corrections, and that you were
18   continuing to be in compliance, correct?
19        MR. CEJAS:  Object to the form of the
20   question.  It assumes facts not in evidence, calls
21   for speculation as to someone else's intent.
22        Subject to that, go ahead.
23   **THE WITNESS:  In my sentence, it was**
24   **a compound sentence that I wrote.**
25     Q.    (BY MR. CORNFELD)  Okay.

Page 224

1    **A.   Okay?  So --**
2      Q.    I want to address the first part of
3    what you wrote.  All right?  What you wrote --
4    **A.   As long as I have an opportunity to**
5    **address --**
6      Q.    We're going to --
7    **A.   -- the second part of what I wrote.**
8      Q.    Absolutely.  I'm dying to ask you
9    about it.  Okay?  But the -- you -- what you said
10   to Dr. -- excuse me, to Ms. Portillo of CAP when
11   you wrote her a week after the inspection was that
12   you thought that the inspectors didn't find any
13   evidence that the allegations of noncompliance were
14   true.
15        And what she wrote back was to the
16   contrary, the allegations were all substantiated.
17   The purpose of the probation and document
18   submissions were to monitor progress with
19   compliance and the inspection was to verify that
20   you were implementing corrections and continuing
21   with compliance.
22        Correct?
23   **A.   Yes.**
24     Q.    Okay.  And you also said that you
25   understood that they did not find evidence that you



Page 225

1  were reporting false positive test results, and she
2  did not respond to that at all, did she?
3      A.  She did not.
4      Q.  She didn't say whether that what you
5  said was correct or incorrect?
6      A.  When they came -- that is correct.
7      Q.  Okay.  Thank you.  According to the
8  CAP letter of May 13th, and according to what we
9  read that Dr. Glinn submitted, you were required to
10 submit responses to the deficiencies within 30 days
11 after the submission -- after the inspection.
12     Was that what we were looking at in
13 terms of the deficiency response sheets?
14     A.  Yes.
15     Q.  So that -- that would have been
16 submitted by -- at least by June 12th, if you
17 complied with that 30-day requirement, correct?
18     A.  Yes.
19     Q.  So we can put a date on it.
20     You've been handed what's been marked
21 Exhibit 66, which is a letter on the letterhead of
22 the College of American Pathologists dated June 17,
23 2021, to Dr. Glinn from Lena Portillo.
24     Do you have that?
25     A.  Yes.

Page 226

1      Q.  And in this letter, Ms. Portillo asks
2  for additional information, correct?
3      A.  Yes.
4      Q.  And she indicates that the
5  investigation is not completed, correct?  Or at
6  least this indicates --
7      A.  It doesn't state --
8      Q.  I'm sorry.
9      A.  -- she did not state --
10     Q.  No, I'm sorry --
11     A.  -- that the investigation was still
12 ongoing.
13     Q.  I'm sorry.  That was the conclusion
14 we can draw, the investigation is not completed,
15 correct?
16     A.  We provided our response and she
17 asked for supplemental information, yes.
18     Q.  Handing you what's been marked as
19 Exhibit 67.  Do you see that this is a letter on
20 the letterhead of College of American Pathologists
21 by Dr. Earle S. Collum, M.D., who's the Complaints
22 and Investigations Committee Chair of the CAP
23 Accreditation Programs, and it's directed to
24 Dr. Glinn dated May 25th, 2021?
25     A.  Yes.

Page 227

1      Q.  And for the record, the Bates number
2  is 48954.  Are you familiar with this letter?
3      A.  Yes.
4      Q.  And do you see that it states:  The
5  College of American Pathologists, or CAP,
6  accreditation program has reviewed the inspector
7  findings concerning the complaints -- complaint
8  that we received.
9      Do you see that?
10     A.  Yes.
11     Q.  And it says:  The allegations were
12 reviewed and determined to be not applicable to the
13 testing performed under the CAP-FDT program.
14     Do you see that?
15     A.  Yes.
16     Q.  Is it your view that -- or what do
17 you understand that this letter means?
18     A.  At our laboratory, we have two SOPs.
19 So we have specimens that fall under the CLIA SOP
20 and specimens that fall under the CAP SOP.  So
21 they're saying that this followed the CLIA SOP, so
22 it was not applicable to their program.
23     Q.  Can I see your exhibit?
24     A.  Yes.
25     Q.  I don't see a reference to CLIA.

Page 228

1      A.  You asked me what it meant, and I was
2  explaining what it meant, and I'm explaining to you
3  why it says determined not applicable to the
4  testing performed under CAP-FDT.
5      So the fact that they said that, I
6  was trying to explain to you we have two SOPs.
7  Right?  We was specimens that fall -- a CLIA SOP
8  and specimens that follow a CAP SOP.  So when --
9  the reason why they sent this to us is we showed
10 them that the particular complaint that they were
11 investigating here did not follow the specimens
12 that are tested under the CAP-FDT program.
13     Q.  Okay.  That's -- that -- I've seen
14 documents related to that, and I didn't think they
15 were particularly pertinent.  That was a different
16 complaint you received, correct?  Not -- not the
17 complaint that arose out of Dr. Riley, correct?
18     A.  Correct, it's a different reference
19 number.
20     Q.  Okay.  Okay.  So Exhibit 67, the
21 letter from -- the letter dated May 25th, 2021,
22 from CAP to Averhealth has nothing to do with
23 Dr. Riley's complaints, correct?
24     A.  Correct.
25     Q.  So if anybody were to suggest that



Dominique Delagnes                                                July 09, 2024

Page 229

1  this letter meant that CAP had exonerated
2  Averhealth of the -- of Dr. Riley's complaints,
3  that would just be not true, correct?
4         MR. CEJAS:  Object to the form.
5  Specific as to exonerate.
6     Q.   (BY MR. CORNFELD)  Go ahead.
7     A.   Ask the question again.
8     Q.   If anyone were to suggest that
9  Exhibit 67 means that CAP exonerated Averhealth of
10  Dr. Riley's allegations, that would not be correct?
11        MR. CEJAS:  Same --
12     Q.   (BY MR. CORNFELD)  Isn't that --
13  isn't that right?
14     A.   This reference number is different
15  than -- than her allegations, correct.
16        MR. CORNFELD:  How long we been
17  going?
18        MR. CEJAS:  I lost track of it.
19        MR. CORNFELD:  Why don't we take a
20  break, and I think then we can be in the
21  homestretch.
22        THE VIDEOGRAPHER:  The time is
23  3:24 p.m.  We are off the record.
24        (A short break was taken.)
25        THE VIDEOGRAPHER:  The time is

Page 230

1  3:44 p.m.  We are back on the record.
2     Q.   (BY MR. CORNFELD)  Ms. Delagnes, you
3  have in front of you Exhibit 68, which is a letter
4  from the College of American Pathologists dated
5  July 29, 2021, to Dr. Glinn signed by Michael B.
6  Datto, M.D., PhD, CAP's accreditation committee
7  chair.
8         Do you see that?
9     A.   Yes.
10     Q.   You familiar with this letter?
11     A.   Yes.
12     Q.   This is the letter where CAP told you
13  that they were lifting the probation, correct?
14     A.   Yes.
15     Q.   And they said the reason was that
16  Averhealth had made what they called significant
17  progress in correcting deficiencies identified
18  during their investigation of the complaint,
19  correct?
20     A.   Yes.
21     Q.   And that was -- and this relates to
22  the complaint based on Dr. Riley's allegations,
23  correct?
24     A.   Yes.
25     Q.   And they -- they also state that the

Page 231

1  investigation found that the laboratory was out of
2  compliance with the CAP standards for laboratory
3  accreditation with respect to four allegations,
4  correct?
5     A.   Yes.
6     Q.   And they list those allegations, and
7  that they're -- they're the same ones we've been
8  looking at that Dr. Riley made to CAP going back to
9  October, correct?
10     A.   November, but yes, correct.
11     Q.   I thought she submitted it -- oh,
12  you're right, November, November 2020?
13     A.   Yes.
14     Q.   They don't say anything about what
15  was listed as allegation number 5 in the May 13
16  letter, Exhibit 62, concerned with the repeated
17  pattern of releasing false positive results,
18  correct?
19     A.   Correct.
20     Q.   They don't say whether they found
21  that that was substantiated or found that it was
22  not substantiated, correct?
23     A.   Correct.  But through the entire
24  process, they never told us we had incorrect test
25  results, they never had us update any test results.

Page 232

1  Obviously, as you've indicated, they did an
2  incredibly thorough investigation.  Through that,
3  if they believed that we reported incorrect test
4  results, they would have asked us to reanalyze them
5  and re-report them or update procedures.  They
6  never came and said, hey, your results are wrong.
7  They asked us to make some changes to our
8  processes.
9     Q.   Okay.  I -- I have not seen any
10  communication from CAP to Averhealth addressing a
11  complaint regarding false positives other than what
12  is set forth in the letter of May 13.  Are you
13  aware of any letter like that?
14     A.   Not a letter, but through their
15  investigation --
16     Q.   Or no, any communication from CAP to
17  you where they specifically address an allegation
18  of false positives, other than the May 13, 2021 --
19     A.   No.
20     Q.   -- letter.  Are you aware of such a
21  communication?
22     A.   No.
23     Q.   Okay.  When did you first acknowledge
24  to customers -- by "you," I mean Averhealth -- that
25  CAP had put Averhealth on probation?



Page 233

1     A.   I don't know off the top of my head.
2  I'd have to look back through documentation.
3     Q.   Was that after there was an article
4  about it in -- on the vice.com website?
5     A.   Yes.
6     Q.   And that was in February of 2023?
7     A.   If that's what you have record of.
8  Again, I'd have to look.  I don't know the date off
9  the top of my head.
10    Q.   All right.  I'm not going to show you
11 the letter, the article, and we're not going to go
12 through it, but will you accept my representation
13 that that was February 2023?
14    A.   Yes.
15    Q.   So that was actually two years after
16 CAP put you -- put Averhealth on probation, and
17 Averhealth only acknowledged that fact publicly
18 when it was already public through a media
19 publication, correct?
20    A.   Yes.
21    Q.   Was that being transparent, in
22 Averhealth's view?
23    A.   We'd already covered why -- that we
24 made a business decision not to tell customers.
25    Q.   Okay.  After the -- after the Vice

Page 234

1  article was published in February of 2023,
2  Averhealth did make an effort to reach out to its
3  customers to provide its explanation and its
4  version of what happened, correct?
5     A.   We proactively notified some; and
6  others, as they were asked about it, we let them
7  know why.
8     Q.   Okay.  You let them know what
9  happened and what those events were, correct?
10    A.   Yes.
11    Q.   And why CAP lifted the probation,
12 correct?
13    A.   Not why they lifted it.  What --
14 there was nothing in there about why they lifted
15 it.  I don't understand the question.
16    Q.   Let's -- let's take a look at one of
17 those.
18    A.   Okay.  Thank you.
19    Q.   You have in front of you Exhibit 69,
20 which appears to be a slide deck entitled:
21 Averhealth CAP-FDT Accreditation Complaint,
22 Temporary Probation, and Corrective Actions.
23        Do you have that?
24    A.   Yes.
25    Q.   Can you -- are you familiar with

Page 235

1  this?
2     A.   Yes.
3     Q.   What is this?
4     A.   This is a document that we put
5  together that outlined the process.
6     Q.   All right.  And it's the subtitle
7  that says:  Complaint, temporary probation, and
8  corrective actions, correct?
9     A.   Yes.
10    Q.   And if we would look at the summary
11 page, which is the second page, page 2, do you see
12 there's a paragraph that starts on July 28, 2021?
13    A.   Yes.
14    Q.   And it states:  On July 28, 2021, the
15 CAP accreditation committee removed the probation
16 and indicated that the CAP inspector confirmed
17 significant Averhealth progress in correcting
18 deficiencies, correct?
19    A.   Yes.
20    Q.   So what you were telling customers
21 with this slide deck was that the reason why the
22 probation was lifted was that Averhealth had made
23 significant progress to correct deficiencies,
24 correct?
25    A.   Yes.

Page 236

1     Q.   One thing -- one thing you didn't say
2  in this document to customers was what you have
3  told us, which is that in your view, CAP rejected
4  any allegation that Averhealth had false positives.
5  You didn't say anything about false positives in
6  this document, Exhibit 69, that you sent to
7  customers, did you?
8     A.   What we did say, if you look on
9  page 4, there are several bullets.  Our certifying
10 scientists have always had valid quality control
11 specimens prior to releasing test results is the
12 first bullet --
13    Q.   Excuse me --
14    A.   -- and the last bullet is --
15    Q.   -- that is -- that is --
16    A.   -- Averhealth never releases positive
17 test results without the valid positive controls
18 bracketing the patient specimens.
19    Q.   Okay.  That's your statement to
20 customers that you believe your tests are valid.
21 What you didn't tell customers was that CAP had
22 found that you didn't have false positives, you
23 didn't say that in this slide deck that you sent to
24 customers about the CAP probation, did you?
25    A.   I did not.  It did not.





Page 237

1    Q.   Averhealth did not; is that right?

2    A.   **This document did not, yes.**

3    Q.   All right.  Isn't that something you
4    would want them to know if, in fact, that were the
5    case, that CAP had investigated a complaint that
6    you had false positives and found that you didn't
7    have false positives?  Would -- if that were really
8    true, wouldn't you want customers to know that?

9    A.   **What we outlined --**

10   Q.   Excuse me.  If that were really true,
11   wouldn't you want customers to know that?

12   A.   **In this --**

13   Q.   Excuse me.  Let me rephrase it and
14   maybe --

15   A.   **Sure.**

16   Q.   -- you'll be able to answer it.

17        Is there any reason you wouldn't want
18   customers to know that CAP had found that you
19   didn't have false positives, if that were really
20   true?

21   A.   **It's written in a different way.**

22   Q.   You --

23   A.   **So it shows points that we used valid
24   scientific results, right?  So instead --**

25   Q.   I'm talking about --

Page 238

1    A.   **-- of making that specific
2    response --**

3    Q.   -- I'm talking about CAP's finding.

4    A.   **Okay.**

5    Q.   I'm talking not about your view
6    that -- that you think your -- your results -- your
7    procedures are fine.  I'm talking about what CAP
8    found.  If, in fact, CAP found, as you're telling
9    us here, that you didn't have false positives,
10   despite investigating whether you had false
11   positives, isn't that -- is there any reason why
12   you wouldn't want customers to know that?

13   A.   **We, in this document --**

14   Q.   Is there any reason why -- this is a
15   yes-or-no question.  Is there any reason why you
16   wouldn't want customers to say that?

17   A.   **We did it in a way to go through them
18   in this.**

19   Q.   No, I'm talking about CAP's findings,
20   not --

21   A.   **Okay.**

22   Q.   -- not your personal view bragging
23   about your own procedures.  I'm talking about the
24   independent CAP investigation.  Is there any reason
25   you would not want customers to know that CAP found

Page 239

1    that you didn't have false positives after
2    investigating that complaint, if that were really
3    the fact?

4        MR. CEJAS:  Object to the form.

5    Q.   (BY MR. CORNFELD)  Can you think of a
6    reason why you wouldn't want customers to know
7    that?

8        MR. CEJAS:  Object to the form.
9    Argumentative and compound.

10       Subject to that, go ahead.

11   Q.   (BY MR. CORNFELD)  It's a yes-or-no
12   question.

13       MR. CEJAS:  Same objections.

14       Go ahead.

15   Q.   (BY MR. CORNFELD)  And if -- and if
16   the question is that there is a reason, then you
17   can tell me what's the reason, but is there any
18   reason why you wouldn't want customers to know
19   that, yes --

20   A.   **Yes --**

21   Q.   -- or no?

22   A.   **-- we'd want customers to know that.**

23   Q.   You would want customers to know
24   that?

25   A.   **Yes.**

Page 240

1    Q.   But you didn't tell them that, did
2    you?

3    A.   **We did --**

4    Q.   No, you did not --

5    A.   **-- and that's what I was trying to
6    explain to you.**

7    Q.   -- you told them what you -- that you
8    thought your -- your procedures were correct.  As
9    you just told me, you did not say that CAP found
10   that you didn't have false positives.

11   A.   **Those words are not in this --**

12       MR. CEJAS:  Hold on.

13       **THE WITNESS:  -- document.**

14       MR. CEJAS:  Object to the form.
15   Argumentative.

16   Q.   (BY MR. CORNFELD)  Not just those
17   words, that sentiment, that idea, anything about
18   it, correct?

19       MR. CEJAS:  Object to the form.
20   Argumentative.

21       Subject to that, go ahead.

22   Q.   (BY MR. CORNFELD)  Is that correct?

23   A.   **No, it's not correct.**

24   Q.   No, I'm saying --

25   A.   **No, it is not correct because through**

Page 241

1   here --
2       Q.   It's not just the words about CAP.
3       A.   Okay.
4       Q.   It's not the -- nowhere would
5   somebody reading that -- excuse me, strike that.
6            It's not just those words.  You
7   didn't mention that you -- that CAP even
8   investigated whether you had false positives, did
9   you?
10      A.   Through any investigation, as part of
11  CAP's investigation process --
12      Q.   I'm sorry, I'm talking about --
13      A.   -- and the responsibility as a
14  regulatory body --
15      Q.   I'm talking about what you --
16      A.   -- they have to determine whether or
17  not we have positive test results.
18      Q.   I'm talking about what you told
19  customers.  Customers don't know what CAP does
20  unless you tell them, and you said you would want
21  them to know that, and you did not tell them that,
22  correct?
23      A.   We did not use those words, correct.
24      Q.   Not just those words --
25      A.   We didn't make that --

Page 242

1       Q.   -- any other -- are there any words
2   that would tell customers that CAP investigated the
3   complaint about false positives and found that it
4   was not true, you didn't use --
5       A.   I don't agree with that.
6       Q.   -- those exact words or any words?
7       A.   I don't agree with that.
8       Q.   Point me to the words.
9       A.   Okay.
10      Q.   Show me the words.
11      A.   It was --
12      Q.   Show them to me.  Point me --
13           MR. CEJAS:  You're asking.  Let her
14  -- let her answer.
15      Q.   (BY MR. CORNFELD)  I'm -- I'm --
16  don't read it.  Point me to the words.
17           MR. CEJAS:  Well, she's --
18      Q.   (BY MR. CORNFELD)  What page --
19           MR. CEJAS:  This is --
20      Q.   (BY MR. CORNFELD)  -- what page --
21  excuse me, what page are you looking at?
22      A.   I was looking at all the points.
23      Q.   Okay.  Point me to the words that you
24  believe tell a customers that CAP investigated
25  whether you have false positives and that it found

Page 243

1   that you did not have false positives?
2           MR. CEJAS:  Object to the form.
3   Argumentative.  We're arguing with the witness now.
4           Please go ahead and answer the
5   question.
6           THE WITNESS:  Those words, we did not
7   use.
8       Q.   (BY MR. CORNFELD)  Look at the last
9   bullet on the summary page of Exhibit 69.  Do you
10  see that it says:  Since removal of the probation
11  in April and July 2022, CAP and CLIA --
12      A.   I'm on the wrong page.  Sorry.  I was
13  reading the last page.
14      Q.   The summary page.
15           MR. CEJAS:  Which -- which Bates
16  number?  Because I'm lost, too, actually.
17           THE WITNESS:  Yeah.
18           MR. CORNFELD:  It's the -- it's the
19  second page of the exhibit, it's headed Summary.
20           MR. CEJAS:  Okay.
21      Q.   (BY MR. CORNFELD)  Do you see --
22      A.   Thank you.
23      Q.   -- do you see that the last item
24  under -- on the summary page says:  Since removal
25  of the probation in April and July 2022, CAP and

Page 244

1   CLIA conducted regular inspections and found zero
2   deficiencies?
3       A.   CLIA found -- CLIA found zero
4   deficiencies in our inspection.
5       Q.   You said CAP and CLIA found zero --
6   conducted regular inspections and found zero
7   deficiencies.  That's what you said, correct?
8       A.   This is probably not worded the best.
9   CLIA did not find any deficiencies in their --
10      Q.   Because -- because CAP did find
11  deficiencies, and if somebody read that to say CAP
12  and CLIA conducted regular inspections and found
13  zero deficiencies, if somebody would read that as
14  it states, that you're saying CAP conducted a
15  regular inspection and found zero deficiencies,
16  that was a lie, wasn't it?
17      A.   The sentence is not written the best.
18  CLIA conducted a regular inspection and found zero
19  deficiencies.
20      Q.   You have two verbs in this sentence.
21  This says:  In April and July of 2022, CAP and
22  CLIA -- that's subject of the sentence, right?  CAP
23  and CLIA, correct?
24      A.   As I said, it's not a well-written
25  sentence --



Page 245

1    Q.   Excuse me.  CAP and CLIA is the
2  subject of the sentence, is it?
3    **A.   CAP and CLIA conducted regular**
4  **inspections --**
5    Q.   Excuse me --
6    **A.   Yes, yes.**
7    Q.   -- my question is:  CAP and CLIA is
8  the subject of the sentence.
9    **A.   Yes.**
10   Q.   Okay.  And there are two verbs that
11 go with CAP and CLIA.  One is "conducted" and one
12 is "found," correct?
13   **A.   Yes.**
14   Q.   And CAP did conduct a regular
15 inspection.  That was the one you referred to in
16 April of -- of 2022, correct?
17   **A.   Yes.**
18   Q.   And it is false that CAP found zero
19 deficiencies, wasn't it?
20   **A.   CAP found deficiencies, yes.**
21   Q.   How much care do you put into what
22 you tell customers?  You know -- you're a literate
23 person.  Did you review this when it -- before it
24 went out?
25   **A.   I don't think that I did.  I hate to**

Page 246

1  **say this, but I'm pretty sure Jason Herzog wrote**
2  **this.  I -- I don't believe that I did review it.**
3    Q.   So if this is -- if the jury were to
4  find that this was just an out-and-out lie when you
5  told customers that CAP had zero deficiencies, it
6  would be Jason Herzog who was the one who told that
7  lie?
8        MR. CEJAS:  Object to the form.
9  Argumentative, assumes facts not in evidence.
10       Go ahead, if you know.
11       Calls for speculation, too.
12       **THE WITNESS:  Yeah, I don't know.**
13   Q.   (BY MR. CORNFELD)  You -- but you
14 believe that Mr. Herzog made that statement and the
15 jury can conclude whether that was a lie or not,
16 correct?
17       MR. CEJAS:  Object to the form.
18 Again, it calls for a legal conclusion, calls for
19 speculation --
20   Q.   (BY MR. CORNFELD)  Go ahead.
21       MR. CEJAS:  -- what a jury's going to
22 do or not.
23   Q.   (BY MR. CORNFELD)  Go ahead.
24   **A.   I don't know.**
25   Q.   Do you know whether Mr. Herzog wrote

Page 247

1  it or is that just your recollection?
2    **A.   I don't know for sure.  I'd have to**
3  **go back and look.**
4    Q.   If it weren't Mr. Herzog, who --
5  what -- would Mr. Herzog have approved this going
6  out?
7    **A.   I don't know.  Yes.**
8    Q.   He would have, but you didn't see it?
9    **A.   I don't -- I don't recall.**
10   Q.   You may have seen it?
11   **A.   I may have seen it.**
12   Q.   And let it go out saying that CAP
13 conducted a regular inspection in April 2022 and
14 found zero deficiencies; is that right?
15   **A.   As I said, I don't recall whether I**
16 **saw this beforehand or not.**
17   Q.   Have you been counting up all of the
18 false statements that we've gone over in the last
19 two days that Averhealth has made to customers, to
20 judges, to others?
21       MR. CEJAS:  Object to the form.
22 Overbroad.
23   Q.   (BY MR. CORNFELD)  I mean, are you
24 shocked by the number of false statements
25 Averhealth has made?

Page 248

1    **A.   We've not made false statements.**
2    Q.   This is a false statement.
3    **A.   It was a poorly written sentence.**
4    Q.   It was a false statement.  It said
5  that -- it says -- it may have been -- you may
6  consider it poorly written, and I would agree that
7  that false positive is poorly written, but it says
8  that CAP conducted a regular inspection and found
9  zero deficiencies.  And that simply wasn't true.
10       So my -- my question is:  Are you
11 shocked by the number of times we've gone over
12 statements that Averhealth has made -- and we're
13 not going to go over them again, it's all in the
14 record -- but as we've gone over them, are you
15 really -- as the CEO of this company, are you just
16 simply shocked by the number of times this has
17 happened?
18       MR. CEJAS:  Object to the form.
19 Argumentative, assumes facts not in evidence, lacks
20 foundation.
21       Go ahead.
22       **THE WITNESS:  I don't believe there's**
23 **a significant amount of false statements that**
24 **Averhealth has made.**
25   Q.   (BY MR. CORNFELD)  I'm sure as CEO,



Page 249

1  you've got to say that.
2         MR. CEJAS:  Objection.  Move to
3  strike.
4     Q.    (BY MR. CORNFELD)  That -- that
5  would -- if you agreed that Averhealth's been lying
6  to the public for years about its testing
7  practices --
8         MR. CORNFELD:  Rick --
9     Q.    (BY MR. CORNFELD)  -- and you, as
10  CEO --
11        MR. CEJAS:  -- this is
12  inappropriate --
13        MR. CORNFELD:  Excuse me.
14        MR. CEJAS:  Rick, Rick, this is not
15  appropriate.  This is commentary right now --
16        MR. CORNFELD:  It's a question.  It's
17  a question.
18        MR. CEJAS:  There was not a question,
19  so rephrase the question, please.
20     Q.    (BY MR. CORNFELD)  As the CEO, would
21  that be a firing offense if you were to sit here
22  after hearing the number of false statements and
23  say that you were surprised at the number of times
24  Averhealth has lied to the public?
25     **A.   I don't agree that there's been a**

Page 250

1  **numerous number of times that Averhealth has agreed**
2  **[sic] to the public.**
3     Q.    No.  I -- I know as the president of
4  the company, that's something that you're going to
5  say.  My question is:  If you -- if you were to say
6  that you were surprised, would that be a firing
7  offense?
8         MR. CEJAS:  Object to the form.
9  That's highly argumentative.
10     Q.    (BY MR. CORNFELD)  Go ahead.
11        MR. CEJAS:  Go ahead.
12        **THE WITNESS:  Is what a fireable**
13  **offense?**
14     Q.    (BY MR. CORNFELD)  If you admitted
15  that Averhealth had made many --
16     **A.   I don't know.  I -- I -- I don't**
17  **control my employment.**
18     Q.    Just so I have the question clear.
19     **A.   Uh-huh.**
20     Q.    If you said that you were just
21  shocked by the number of times Averhealth has made
22  false statements to the public, to customers, to
23  judges, to -- to agencies, would that be a firing
24  offense?
25        MR. CEJAS:  Object to the form.

Page 251

1  Assumes facts not in evidence, incomplete
2  hypothetical, and argumentative.
3         Subject to that, go ahead.
4     Q.    (BY MR. CORNFELD)  Go ahead.
5     **A.   As I've stated previously, we -- we**
6  **weren't making tremendous amount of false**
7  **statements --**
8     Q.    That's not my question.
9     **A.   I understand that that's --**
10     Q.    I think you answered my question
11  before you heard the full question.  I just want it
12  on the record is:  You answered that you don't know
13  what would be a fireable offense because you don't
14  control your employment.
15         When you understand that I was asking
16  you if you were to state under oath that you were
17  shocked at the number of false statements
18  Averhealth has made to the public, to judges, to
19  regulators, to customers, would that be a firing
20  offense?  And you said I don't know because I don't
21  control my employment; is that right?
22        MR. CEJAS:  Object to the form.
23     Q.    (BY MR. CORNFELD)  Go ahead.
24        MR. CEJAS:  Assumes facts not in
25  evidence, misstates her prior testimony.

Page 252

1     Q.    (BY MR. CORNFELD)  Go ahead.
2         MR. CEJAS:  Compound question, lacks
3  foundation, argumentative.
4     Q.    (BY MR. CORNFELD)  Go ahead.
5         MR. CEJAS:  Go ahead.
6     **THE WITNESS:  What I said was I don't**
7  **control my employment.**
8     Q.    (BY MR. CORNFELD)  Who at Averhealth
9  would have the authority to discipline you?
10     **A.   It would not be Averhealth.**
11     Q.    Who would have the authority to
12  discipline you if they thought you did something
13  wrong?  Who would have the authority to fire you if
14  they thought you committed a firing offense?
15     **A.   It would be somebody from Five Arrows**
16  **Capital Partners.**
17     Q.    The -- the investment firm that owns
18  Averhealth?
19     **A.   Correct.**
20     Q.    Have the statements that we've seen
21  in this deposition been called to the attention of
22  Five Arrows?
23        MR. CEJAS:  I'm going to object to
24  the form of the question.
25     Q.    (BY MR. CORNFELD)  Go ahead.



Page 253

1      MR. CEJAS:  Go ahead.
2      THE WITNESS:  Have which statements?
3   Q.   (BY MR. CORNFELD)  Any of them.  Any
4   of the ones that -- where we talked about whether
5   those were true statements made to the public, made
6   to customers, made to judges, made to regulators?
7      MR. CEJAS:  Same objection.
8   Overbroad, assumes facts not in evidence.
9      Go ahead, if you understand it.
10     THE WITNESS:  Has Five Arrows seen
11  documentation, have seen correspondence with our
12  customers?  Is that what you're asking?
13  Q.   (BY MR. CORNFELD)  Yes.
14  A.   Yes.
15  Q.   And has anybody discussed with them
16  whether those statements were true or false?
17  A.   I don't know.
18     THE VIDEOGRAPHER:  Mr. Cornfeld,
19  your...
20  Q.   (BY MR. CORNFELD)  Has anybody at
21  Averhealth ever been disciplined for making a false
22  statement to a customer, to a judge, to a -- to the
23  public, to regulators?
24  A.   Not that I'm aware.
25     THE WITNESS:  Before we look at your

Page 254

1   next document, can I get ice?  Is that okay?
2      MR. CORNFELD:  Sure.
3      MR. PLEBAN:  Give it to me, I'll do
4   it.  I don't have a mic on.
5      THE WITNESS:  Thanks.
6   Q.   (BY MR. CORNFELD)  Handing you what's
7   been marked as Exhibit 70 to this deposition, do
8   you see that this is a document entitled:
9   Averhealth Customer Communication Response to Vice
10  News Article that bears the Bates 4115?  Do you
11  have that?
12  A.   Yes.
13  Q.   Are you familiar with this document?
14  A.   Yes.
15  Q.   What is this?
16  A.   This is an internal document that we
17  provided to our employees and -- when there was
18  questions from customers about the Vice news
19  article.
20  Q.   To provide talking points for them?
21  A.   Yes.
22  Q.   And if you look at the second bullet,
23  it states:  From time to time following inspections
24  or data audits, regulators identify deficiencies
25  intended to foster continuous improvement.

Page 255

1      And then there's a sentence that's
2   crossed out, and it says:  The quantity and type of
3   deficiencies identified in association with
4   Averhealth Laboratory are consistent with industry
5   standards.
6      Do you see that?
7   A.   Yes.
8   Q.   And then it says:  Per Dominique.
9      Can you explain that?
10  A.   I believe, if I recollect this
11  correctly, that I struck out that statement.
12  Q.   And why did you do that?
13  A.   I don't recall.
14  Q.   Do you see that four -- two bullets
15  down, it says:  Averhealth maintains its
16  accreditation today, and since the brief
17  probationary period -- and let's stop there.
18     That probationary period was six
19  months, correct?
20  A.   Yes.
21  Q.   Why did you want to tell customers
22  that it was a brief probationary period rather than
23  tell them the true length of it of six months so
24  that they could decide for themselves whether six
25  months was brief or not?

Page 256

1   A.   Based on the complete time frame that
2   we had our accreditation, it was brief compared to
3   the full accreditation period.
4   Q.   That wasn't my question.
5   A.   Okay.  It was, you asked why we used
6   the word "brief."
7   Q.   Wouldn't you want customers -- in the
8   interest of transparency, wouldn't you want to tell
9   customers that the probationary period was six
10  months and let customers decide whether that was
11  brief or not?
12  A.   We chose to use the word "brief."
13  Q.   I know, that's my question.  But
14  wouldn't customers have the right to know exactly
15  how long it was so they can decide whether that was
16  brief?
17  A.   It was our choice to use the word
18  "brief."
19  Q.   I understand that.
20  A.   I know you understand that.
21  That's --
22  Q.   But shouldn't -- but shouldn't
23  customers have the right to make the decision
24  themselves whether it was brief?
25     MR. CEJAS:  Object to the form.  It's

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                        California Firm Registration #179



Page 257

1  argumentative.
2        THE WITNESS:  If the customer had
3  asked us a time frame, we would have shared that
4  with them.  In this letter, we chose the word
5  "brief."
6     Q.   (BY MR. CORNFELD)  Okay.  And -- and
7  then you go on in this sentence to say that:
8  Averhealth has successfully completed several
9  inspections by both CAP and CLIA with zero
10  deficiencies.
11        Do you see that?
12     A.   I do.
13     Q.   Is that another poorly written
14  sentence that says that -- falsely, that CAP found
15  zero deficiencies in April of 2022?
16     A.   I believe it's the same sentence.
17     Q.   It's not the same sentence.
18     A.   Okay.
19     Q.   I mean, we can look at it, if you
20  want, but --
21     A.   You're right, it is not.
22     Q.   All right.  This even more clearly
23  states that CAP found zero deficiencies, doesn't
24  it?
25     A.   It does.

Page 258

1     Q.   And that's false, isn't it?
2     A.   Can we look at the inspection report
3  from this time frame from CAP?
4     Q.   I'll tell you what we can look at.
5     A.   From 2022?
6     Q.   Look at what Dr. Glinn told you about
7  it.
8        THE WITNESS:  Nick, can we find the
9  actual inspection report?
10        MR. CEJAS:  We can.
11     Q.   (BY MR. CORNFELD)  I can show you
12  that, too, but first let me show you what Dr. Glinn
13  told you about it.
14     A.   I just would like to look at the
15  inspection report from 2022.
16        MR. CEJAS:  Here's the 2021 one.
17  Well, I'll find 2022.
18     Q.   (BY MR. CORNFELD)  Does Dr. Glinn
19  give you annual management reviews?
20     A.   Yes.
21     Q.   What are the annual management
22  reviews?
23     A.   It's part of the requirement for her
24  to provide information to me as far as what's
25  happened in the laboratory in the previous year.

Page 259

1     Q.   Hand -- you've been handed what's
2  been marked as Exhibit 71.  Is this the annual
3  management review that she sent you in March 21,
4  2023?
5     A.   Yes.
6     Q.   And for the record, it bears the
7  Bates number on the first page of 87183.
8        Three paragraphs down, do you see
9  that she states:  The CAP inspection was conducted
10  on April 11th, 2022?
11     A.   Yes.
12     Q.   And -- and then she says:  All
13  deficiencies were satisfactorily remediated.
14        Correct?
15     A.   Yes.
16     Q.   And then she says what the
17  remediation measures included, and she's got five
18  bullet points of remediation measures to remedy all
19  of the deficiencies, correct?
20     A.   Yes.
21     Q.   So this confirms your understanding
22  that there were deficiencies in CAP's inspection
23  review in April of '22, doesn't it?
24        MR. CEJAS:  Object to form.  Assumes
25  facts not in evidence.  We haven't seen the actual

Page 260

1  report.
2     Q.   (BY MR. CORNFELD)  Go ahead.
3     A.   Can I see the report?  I'd like to
4  see the actual --
5     Q.   First -- first, do you think
6  Dr. Glinn was making this up when --
7     A.   I don't.
8     Q.   -- when she said -- when she referred
9  to deficiencies?  You'll accept that there were
10  deficiencies, won't you?
11        MR. CEJAS:  Same objection.
12        THE WITNESS:  I would like to see the
13  report.
14     Q.   (BY MR. CORNFELD)  Excuse me.  This
15  is the document.  I am asking you about what
16  Dr. Glinn told you, and you don't -- you have no
17  reason to believe that she was lying to you when
18  she referred to all deficiencies and said you had
19  to undergo six different measures in order to
20  remediate them.  She wasn't telling you a fib when
21  she said that, was she?
22        MR. CEJAS:  Object to the form.
23  Assumes facts not in evidence.  She answered your
24  question, said --
25     Q.   (BY MR. CORNFELD)  Go ahead.



Page 261

1          MR. CEJAS:  -- she didn't look at it.
2     Q.   (BY MR. CORNFELD)  Go ahead.
3     A.   May I please --
4     Q.   No.  You can look at this exhibit,
5  which I am asking you about.
6     A.   Okay.  What's your question?
7     Q.   Dr. Glinn referred to all
8  deficiencies as we talked.  Do you think she was
9  making that up?
10    A.   No.
11    Q.   She was telling the truth to you,
12 wasn't she?
13    A.   Yes.
14    Q.   There were deficiencies, you knew
15 that before you ever even saw this annual
16 management review.
17         MR. CEJAS:  Object to the form.
18 Assumes facts not in evidence.
19         Go ahead, if you know.
20    Q.   (BY MR. CORNFELD)  You knew that,
21 didn't you?
22    A.   Yes.
23    Q.   Okay.  I don't think it's necessary
24 to look at the report.  I will tell you this, it
25 isn't necessary.  I'm sure you can go back and look

Page 262

1  at it, and if you find that there are no
2  deficiencies in the -- in that report, you can tell
3  Mr. Cejas and he can take whatever judicial action
4  he thinks is appropriate to sanction me in front of
5  the Court.
6          On the other hand, if you find that
7  there were, in fact, several pages of deficiencies
8  in that report, that will confirm what you already
9  understood before I ever showed you the annual
10 management review, that there were deficiencies,
11 correct?
12         MR. CEJAS:  I'll object to the form.
13 It's argumentative.  You just made a decision not
14 to show her.  That's fine, that's your decision --
15         MR. CORNFELD:  No, I can --
16         MR. CEJAS:  -- but you can't use that
17 as a sword and a shield.  It's one or the other.
18         MR. CORNFELD:  Oh, no, no, I can ask
19 her this hypothetical.
20         MR. CEJAS:  No, it's argumentative.
21    Q.   (BY MR. CORNFELD)  If you -- if you
22 find when you look at the actual report that there
23 were several pages of deficiencies, that would
24 confirm your understanding before we even got into
25 this topic that there were deficiencies that CAP

Page 263

1  found in April of 2022 --
2          MR. CEJAS:  Object --
3     Q.   (BY MR. CORNFELD)  -- correct?
4          MR. CEJAS:  Object to the form.
5  Argumentative, assumes facts not in evidence, it's
6  vague.
7          If you can answer it, go ahead.
8          THE WITNESS:  I don't understand the
9  question.
10    Q.   (BY MR. CORNFELD)  I -- I'm asking
11 you to assume that when you go look at that CAP
12 report, that you'll find that it has several pages
13 of deficiencies.
14    A.   Okay.  You're asking me to assume
15 that.
16    Q.   And that would confirm what you
17 understood before we even got into that topic this
18 afternoon, that CAP found deficiencies in
19 Averhealth in its April 2022 inspection, correct?
20    A.   If -- if there's deficiencies, then I
21 will find them, yes.
22         MR. CEJAS:  April 11, 2022.
23         THE WITNESS:  Uh-huh.
24    Q.   (BY MR. CORNFELD)  Did you ever tell
25 any customer that -- and by "you," I mean did

Page 264

1  Averhealth ever tell any customer in any of its
2  communications regarding the -- the CAP probation
3  and the reasons for lifting the probation, that
4  Averhealth was inspected for whether there were
5  false positives and CAP found that there were no
6  false positives?
7     A.   You asked me that earlier in that one
8  document.
9     Q.   About the one document.  I'm asking
10 you, because I haven't seen it.  I'm asking you
11 did --
12    A.   I don't believe so, no.
13    Q.   All right.  I just have a few
14 follow-up things from the last couple of days.
15         When -- you told us that you thought
16 it was in 2018 that Averhealth brought its testing
17 in-house, I think it was hair testing, and that's
18 when you changed the -- the cutoff.
19    A.   I said I didn't know.  I made a -- I
20 made a -- I said I would follow up with an exact
21 date.
22    Q.   Okay.  My question --
23    A.   I don't remember the date.
24    Q.   Okay.  My question isn't -- doesn't
25 have anything to do with the date.



Page 265

1    A.   Okay.
2    Q.   Why did Averhealth bring its testing
3  in-house?
4         Before that, what testing did
5  Averhealth bring in-house?
6    A.   Hair -- our hair testing.
7    Q.   Why did you do that?
8    A.   So we could provide test results
9  under one umbrella and have the ability to -- it's
10  easier for processing.
11    Q.   You said yesterday, and I think it
12  was at the beginning of the deposition, that you
13  had employees who had been retrained, suggesting
14  that they might have been doing things wrong.  Who
15  -- who are those employees that were retrained
16  because they needed to be instructed on how to do
17  things properly?
18    A.   I'd have to go back and look at
19  records.  I can't list off -- them -- I don't know
20  them off the top of my head.
21    Q.   Do you know any of them?
22    A.   I -- not off the top of my head.
23    Q.   What are the -- what are those
24  records called, so we can search for them?
25    A.   They -- it would be -- it could be a

Page 266

1  document that says Employee Performance.
2    Q.   Would they have any other name?
3    A.   I can follow up with the names of
4  them.
5    Q.   Okay.  You --
6    A.   I can follow up with the names of
7  what the document would be.
8    Q.   Okay.
9    A.   Is that what you're asking?
10    Q.   Yeah.  I mean, you don't --
11    A.   Okay.
12    Q.   -- have to tell us the specific ones,
13  if you tell us what that documents are called --
14    A.   Sure.
15    Q.   -- so we can search for them, if
16  you can tell Mr. Cejas --
17    A.   Absolutely.
18    Q.   -- so he can tell us.
19    A.   I can do that.
20    Q.   All right.
21    A.   Typically -- I believe it's called
22  Employee Corrective Action.  There's a -- there's a
23  name at the top of the form.
24    Q.   All right.  You've said several times
25  over the past few days that you believe

Page 267

1  Averhealth's tests are accurate.  Tell me all the
2  reasons why you believe that.
3    A.   I believe that our test results are
4  accurate because we have test processes in place
5  that are scientifically valid and forensically
6  defensible, and that through the testing processes,
7  that our employees follow the SOPs appropriately.
8    Q.   By the "testing processes," you're
9  referring to the SOPs?
10    A.   Yes.
11    Q.   Which SOPs?
12    A.   All of the SOPs.
13    Q.   All right.  Does that complete your
14  answer on the reasons why you believe the tests are
15  accurate?
16         THE WITNESS:  Can you read back my
17  answer?
18         (The preceding answer was read back.)
19         THE WITNESS:  There's -- there's a
20  lot more to that.  Right?  We know that through
21  each step, that we handle specimens appropriately.
22  Our employees at the laboratory handle one sample
23  at a time.  We have quality control specimens and
24  quality control procedures that allow us to be able
25  to ensure that the specimens are accurate.

Page 268

1    Q.   (BY MR. CORNFELD)  Anything else?
2    A.   We follow appropriate chain of
3  custody guidelines throughout the entire testing
4  process.
5         There's many others.  I mean, it's
6  hard for me to sit here -- I mean, those are the
7  broad major categories.
8    Q.   All right.  Those are the ones that
9  come to mind right now?
10    A.   Yes.
11    Q.   All right.  And all of those -- I
12  think every one of those, you mentioned would be
13  tied to following the SOPs; is that right?
14    A.   Sure.  I mean, chain of custody, I
15  guess it -- yes.  I mean, it's also the ability to
16  track samples to chain of custodies a little bit,
17  of maybe not only following SOPs, but the ability
18  to track specimens.
19    Q.   And -- and -- and if an employee
20  doesn't do all of the things that you mentioned,
21  then that would jeopardize whether the tests are
22  accurate, correct?
23    A.   Depends upon what happens.
24    Q.   It could jeopardize whether the tests
25  are accurate, correct?





Page 269

1   A.   It's not always going to, but there
2   are certain things that an employee did that could,
3   yes.
4   Q.   Who at Five Arrows is in charge of
5   Averhealth?
6   A.   Who at Five Arrows is in charge of
7   Averhealth?
8   Q.   Yes.
9   A.   Who's the -- the -- I guess the --
10  the partner, Ari -- I'm going to spell his last
11  name incorrectly.
12  Q.   Do the best you can.
13  A.   It's Benacerraf.  B-E-N -- do I have
14  my phone in here?  I don't.
15  MR. CEJAS:  Just do the best you can.
16  THE WITNESS:  B-E-N-N-E-C-E-R-I-F
17  [sic], I believe.
18  Q.   (BY MR. CORNFELD)  First name?
19  A.   Ari, A-R-I.
20  Q.   And where is he?
21  A.   In New York City.
22  Q.   Is he an employee of Five -- oh, he's
23  a partner of Five Arrows?
24  A.   Uh-huh.
25  Q.   I guess Five Arrows is a partnership?

Page 270

1   Yes?
2   A.   I believe so.
3   Q.   All right.  If -- can you look him
4   up, and if you have the spelling wrong, would you
5   tell --
6   A.   Absolutely.
7   Q.   -- Mr. Cejas?
8   A.   Yes.
9   Q.   Okay.  Yesterday, we -- we talked
10  about the fact that there were -- about Mrs.
11  Foulger, that there were two reports.
12  A.   Uh-huh.
13  Q.   Yes?
14  A.   Yes.
15  Q.   Okay.
16  A.   I apologize, yes.
17  Q.   You were going to check to see why
18  they -- why that was.  Did you do that?
19  A.   I did.  So originally, it was
20  released prematurely, so the specimen never should
21  have reported.  It was pulled back.  And so then
22  the test results were updated.  So when it was
23  originally released, the certifying scientist
24  released the result, realized that we didn't have
25  valid QCs with all of them, pulled the result back,

Page 271

1   completed the testing with the appropriate QCs, and
2   re-reported the test results.
3   Q.   Was it -- was the specimen tested
4   again or was it just --
5   A.   The specimen was tested a second
6   time, yes.
7   Q.   The same specimen?
8   A.   Yes.
9   Q.   So it wasn't destroyed when it was
10  tested the first time?
11  A.   So we maintain for a -- a period of
12  time the actual, like, aliquot in the aliquot vile.
13  So that can get pulled and reinjected when it's
14  liquefied.
15  Q.   When you say a short time, that's not
16  the -- the two years that's set forth in the
17  contract or in the report?
18  A.   The one year that's set forth in
19  contract?  No, it's -- no, it's the individual
20  specimen, it's -- that at some point in time is
21  going to completely evaporate, right, so it doesn't
22  have a life cycle forever.
23  Q.   Okay.  And how were -- how was it
24  re-QC'd?
25  A.   It went back into a new batch.

Page 272

1   Q.   So -- and that would have new QCs?
2   A.   Correct.
3   Q.   Is a historical QC used?
4   A.   I don't believe so, no.
5   Q.   It's -- okay.
6         Have you spoken to any of the
7   plaintiffs in this case?
8   A.   No.
9   Q.   Do you know anybody who has?
10  A.   Besides what you had already set
11  forth?
12  Q.   Yeah, right.
13  A.   No.
14  MR. CORNFELD:  Okay.  Thank you so
15  much.  That's all the questions I have today.
16  MR. CEJAS:  I have a few questions.
17  THE WITNESS:  Yes.
18  EXAMINATION
19  QUESTIONS BY MR. CEJAS:
20  Q.   I'll start by handing you what was
21  previously marked Exhibit 48.  In fact, I think
22  you've got it, if you can find Exhibit 48.
23  A.   Sure.
24  Q.   As well as Exhibit 50, please.
25  A.   They're all out of order.

Dominique Delagnes

July 09, 2024

Page 273

1        MR. CORNFELD:  What are these?

2        MR. CEJAS:  48 is the January 29,

3  '21, letter from CAP to Dr. Glinn.  And then

4  Exhibit 50 is the transcript from Michigan.

5        MR. CORNFELD:  You said 49 and 50?

6        **THE WITNESS:  48.**

7        MR. CEJAS:  48.

8        MR. CORNFELD:  48?  That was the

9  January?

10        MR. CEJAS:  29, January 29.

11      Q.   (BY MR. CEJAS)  All right.

12  Ms. Delagnes, do you have Exhibits 48 and 50 in

13  front of you?

14      **A.   I do.**

15      Q.   All right.  And you were asked a

16  number of questions for quite a long time about the

17  four complaints that were found and substantiated,

18  which are set forth in 48, including that second

19  line item, failure to follow procedures as written.

20  Do you remember that testimony?

21      **A.   I do.**

22      Q.   All right.  And then you were shown

23  Exhibit 50, which was your sworn testimony in the

24  state of Michigan on February 5th, 2021.

25        And specifically, you were asked

Page 274

1  several questions about testimony on page 12.  If

2  you could please flip to page 12 for me.

3      **A.   Yes.**

4      Q.   And you were asked about one

5  particular sentence, or question one particular

6  sentence, but can you tell me -- look at the

7  context of -- of what's here on page 12.  What was

8  the point you were attempting to make in your

9  testimony on page 12?

10      **A.   That our employees do follow our**

11  **standard operating procedures on a consistent**

12  **basis.**

13      Q.   And is that, in fact, found on -- on

14  lines 15 through 16?

15      **A.   Yes.**

16      Q.   Okay.  There was a sentence right

17  before it that you were asked about.  Could you

18  tell us what you meant by that particular sentence

19  from lines 14 through 15?

20      **A.   It was not well stated, where I said**

21  **that, and really what I intended to state, which**

22  **I -- which was stated much better in the second**

23  **sentence, is that our employees do follow our**

24  **standing operating procedures on a consistent**

25  **basis.**

Page 275

1      Q.   And even with what CAP found to be

2  substantiated, is your testimony -- do you still

3  stand behind your testimony here on page 12 of your

4  transcript of -- of Exhibit 50?

5      **A.   Yes.**

6      Q.   All right.  You were also asked there

7  at the end, and I apologize, this is electronic,

8  but I do have the April 2022 lab report, which for

9  the record --

10        MR. CORNFELD:  You mean the

11  inspection?

12        MR. CEJAS:  Inspection report.

13  Sorry.

14        For the record, it's AH0019489.

15        MR. CORNFELD:  Can you hang on just a

16  moment?  Go ahead.

17      Q.   (BY MR. CEJAS)  All right.  Have you

18  had a chance to review that document now that it's

19  sitting in front of you?

20      **A.   Yes.**

21      Q.   And you were asking earlier to see

22  this, now you've had a chance to read it, correct?

23      **A.   Yes.**

24      Q.   All right.  And you'll see as you

25  flip through it, the first several pages list no

Page 276

1  deficiencies.  Is that accurate?

2      **A.   Yes.**

3      Q.   Okay.  And then if we get to 19493,

4  there are some things written there in terms of

5  deficiencies.  Is that accurate?

6      **A.   They're recommendations.**

7      Q.   Okay.  And what were those

8  recommendations that were made?

9      **A.   The one -- 19493?**

10      Q.   Correct.

11      **A.   Okay.**

12      Q.   And just generally, what -- what

13  essentially is CAP saying here?

14      **A.   Talking about adding a sentence to a**

15  **chemical hygiene plan, add requirements to notify**

16  **CAP of the laboratory subject to investigation.  So**

17  **it's about adding verbiage into our SOPs.**

18      Q.   All right.

19        MR. CORNFELD:  I'm sorry, what did

20  you say?

21        THE WITNESS:  Adding verbiage into

22  **our standing operating procedures.**

23      Q.   (BY MR. CEJAS)  And if we scroll to

24  the next page, can you tell us what's listed there?

25      **A.   Reagent lot acceptance criteria is**



Page 277

1  not included in the SOP, and that was corrected on
2  site. So that's adding verbiage into our SOP.
3      Q. Okay. Please keep going.
4      A. Oral fluid and hair testing listed on
5  activity menu, testing currently is not performed
6  in accordance with -- so the -- the hair testing
7  was taken off of the activity menu and oral fluid I
8  believe was missing some drugs that we tested. So
9  we needed to update our activity menu on CAP's
10  website.
11      Q. Okay. Can you keep going down for me
12  onto the next page?
13      A. Written procedure for chain of
14  custody did not mention temporary storage location
15  for aliquots.
16      Q. All right. So is that another thing
17  in terms of documentation that would be updated?
18      A. Yes. And then control acceptance
19  rejection criteria is not clearly described in the
20  SOP.
21      Q. Okay.
22      A. And then record storage is not
23  segregated from the main facility, access not
24  secured beyond overall security of the facility.
25          So actually, our records storage was

Page 278

1  secured. We didn't provide accurate information to
2  the inspector, like somebody didn't show them, we
3  keep our records storage locked and it says frozen
4  storage of primary specimen bottle not secured
5  beyond the overall security.
6      Q. And are those all the deficiencies
7  from the April 11, 2022, inspection?
8      A. Yes.
9      Q. Are any of those deficiencies from
10  April 11, 2022, related to the accuracy of
11  interpretation of any drug tests?
12      A. No.
13      Q. All right. You can set that aside.
14      A. Okay.
15      Q. You were also asked several questions
16  about standing behind reports issued by Averhealth.
17  Do you remember that testimony from earlier?
18      A. Yes.
19      Q. And I think you mentioned at some
20  point you would need to review each one
21  individually. Is that an accurate summary of what
22  you said earlier?
23      A. That I specifically need to review
24  each one?
25      Q. Well, when you were asked about

Page 279

1  standing behind, you said --
2      A. Yes.
3      Q. -- I think you said generally --
4      A. Yes, I stand behind test results.
5          MR. CORNFELD: Object. Leading.
6      Q. (BY MR. CEJAS) So let me rephrase
7  that. You recall testimony earlier about standing
8  behind test results. Is that accurate?
9      A. Yes.
10      Q. Okay. And is it your understanding
11  in this case that there are eight individuals who
12  have filed a claim against Averhealth?
13          MR. CORNFELD: Object. Leading.
14      Q. (BY MR. CEJAS) To your
15  understanding, how many individuals have a filed a
16  lawsuit in this case against Averhealth?
17      A. Eight.
18      Q. And have the tests conducted on those
19  eight individuals been reviewed after this lawsuit
20  was filed?
21      A. Yes.
22      Q. Okay. And was there a determination
23  made as to whether the reports on those tests for
24  those eight individuals were accurate?
25          MR. CORNFELD: Object. Leading.

Page 280

1          THE WITNESS: Yes.
2      Q. (BY MR. CEJAS) What was the --
3  strike that.
4          What was the determination made with
5  respect to the accuracy of the tests performed on
6  the eight plaintiffs in this case?
7      A. All of the test results have been
8  reviewed and have been found to be accurate.
9      Q. Does Averhealth stand behind the
10  accuracy and reliability of those tests?
11      A. Yes.
12          MR. CEJAS: Those are all the
13  questions I have. Thank you.
14          FURTHER EXAMINATION
15  QUESTIONS BY MR. CORNFELD:
16      Q. Yeah, I think I went over the review
17  that you say was made of the plaintiffs' tests
18  after the lawsuit was filed. And I asked you who
19  did that review, and I don't remember exactly what
20  you told me, but you gave me some names of people,
21  correct?
22      A. Yes.
23      Q. And I asked you what documents there
24  were. What documents are there that reflect that
25  review? I think you said they just did the review,



Page 281

1  they didn't write it down, correct?
2      A.   You asked if there was a document
3  that stated that they looked at them, yes.
4      Q.   There is a document that says that?
5      A.   No, you asked me if there was.
6      Q.   And you told me that there wasn't?
7      A.   Correct.
8      Q.   They're just in their heads, they
9  looked at it and said, oh, yeah these are correct.
10     A.   No, we've had conversations about --
11  as they've compiled them together, as they reviewed
12  them on the accuracy of those test results.  So
13  they've each been looked at and have been put
14  together.  And the person who pulled the
15  documentation reviewed the data.  And as they
16  dropped it into the files for us to combine it all
17  had indicated that, you know, had moved them in
18  there and had indicated that they're accurate.
19     Q.   Is there any reason why you didn't
20  have them write down what they did and the basis of
21  their conclusion so we could review it and we could
22  have an expert witness review it and see whether
23  that expert agrees that they did an adequate
24  review?
25     A.   By providing the documentation, that

Page 282

1  gives you what your experts need --
2      Q.   No, that's not my question.  Yes, our
3  experts can review the documentation you provided.
4      A.   Uh-huh.
5      Q.   I'm talking about the review that you
6  say your personnel did of these tests when they
7  concluded that the tests were done correctly.  Is
8  there any reason why you didn't have them write
9  those -- the basis of that review down, what they
10  reviewed, and why they came to their conclusions?
11     A.   Can you rephrase the question?
12     Q.   When -- when your personnel reviewed
13  the test results -- I think there were 114 of the
14  plaintiffs in this case -- and concluded, as you
15  have stated, that those tests were done properly,
16  is there any reason why you didn't have them write
17  down what they reviewed and the basis of their
18  conclusion?
19     A.   The effort was to compile all the
20  data to put the litigation packages together.
21     Q.   Well, that you -- that you did, but
22  you're now saying they did something more.  They
23  reviewed the data and came to the conclusion that
24  the tests were properly done.  My question is:  Why
25  didn't you have them write that down?

Page 283

1      A.   It's not something that I requested.
2      Q.   I understand.  Why not?
3      A.   Okay.  I did not --
4      Q.   Is there any reason?
5      A.   -- think to do it.
6      Q.   You didn't think that maybe we'd want
7  to see what the -- what the basis was so we could
8  see whether they did an adequate review, and came
9  to the proper conclusions, and knew why -- what the
10  basis was?
11     A.   By providing --
12          MR. CEJAS:  Object to the form.
13  Argumentative and asked and answered.
14          But go ahead.
15          THE WITNESS:  By providing the
16  litigation packages to you, it gave you the
17  information that you need to accurately review the
18  accuracy of the test results.
19     Q.   (BY MR. CORNFELD)  I'm not talking
20  about reviewing the accuracy of the test results.
21  We're going to do that.
22     A.   Okay.
23     Q.   I shouldn't say -- it's in the
24  future.  That's going to be presented.  My question
25  is:  Reviewing your people, what your people did,

Page 284

1  to see whether they did an adequate review and came
2  to the proper conclusions, why -- why didn't you
3  have them write that down so we could look at it
4  and see what that was?
5          MR. CEJAS:  Object to the form.
6  Argumentative, asked and answered.
7          Go ahead.
8          THE WITNESS:  I didn't think to do
9  it.  I believe that the -- that the litigation
10  packages themselves spoke to the accuracy of the
11  test results because that gave you all the data
12  that you needed.
13     Q.   (BY MR. CORNFELD)  Did anybody
14  exchange e-mails about it?
15     A.   I don't -- I don't believe so.  I'd
16  have to look.
17     Q.   Or any --
18     A.   We can look and -- we'll look and see
19  if there are any e-mails and we'll produce them if
20  we have them.
21     Q.   Or -- or chats?
22     A.   Yeah, we will look and we will
23  produce any that -- that there are.
24     Q.   Okay.  We're going to need them
25  pretty quickly because those should be produced

888-893-3767                    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                              California Firm Registration #179

LEXITAS

Page 285

1   already, if they exist.
2   **A.   Okay.**
3       Q.   And our -- our expert deadline is
4   coming up pretty quickly, so I would ask that
5   you -- if you have them, you produce them right
6   away.
7            That's all the questions I have.
8            MR. CEJAS:  All right.  We will read
9   and sign.
10           THE VIDEOGRAPHER:  The time is 4:46.
11   We are off the record.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 286

1                NOTARIAL CERTIFICATE
2
3        I, Tammie A. Heet, Registered Professional
4   Reporter, certified Shorthand Reporter for the
5   State of Illinois, and Certified Court Reporter for
6   the state of Missouri and a duly commissioned
7   Notary Public within and for the States of Missouri
8   and Illinois, do hereby certify that the witness
9   whose testimony appears in the foregoing deposition
10  was duly sworn by me; that the testimony of said
11  witness was taken by me to the best of my ability
12  and thereafter reduced to typewriting under my
13  direction; that I am neither counsel for, related
14  to, nor employed by any of the parties to the
15  action in which this deposition was taken, and
16  further that I am not a relative or employee of any
17  attorney or counsel employed by the parties
18  thereto, nor financially or otherwise interested in
19  the outcome of the action.
20
21
22   _____
          Tammie A. Heet, RPR, CSR, CCR
23
24
25

Page 287

1                   Lexitas Legal
                 711 North 11th Street
2            St. Louis, Missouri 63101
                 Phone 314/644-2191
3
4
5   July 22, 2024
6   Mr. Nicholas P. Cejas
    ARMSTRONG TEASDALE, LLP
7   7700 Forsyth Boulevard, Suite 1800
    St. Louis, Missouri 63105
8
9   IN RE:  Katarzyna Foulger, et al. v. Avertest, LLC
    d/b/a Averhealth
10
11  Dear Mr. Cejas:
12  Please find enclosed your copy of the deposition of
    Dominique Delagnes taken on July 9, 2024, in the
13  above-referenced case.  Also enclosed is the
    original signature page and errata sheets.
14
    Please have the witness read your copy of the
15  transcript, indicate any changes and/or corrections
    desired on the errata sheets, and sign the
16  signature page before a notary public.
17  Please return the errata sheets and notarized
    signature page to Lexitas Legal, ATTN: Production
18  Department, 711 N. 11th Street, St. Louis, Missouri
    63101 within 30 days of receipt of this letter.
19
    Sincerely,
20
21  Tammie A. Heet, RPR, CSR, CCR
22  Enclosures
23  cc:  Mr. Richard Cornfeld
              Lexitas Legal Production
24
25

Page 288

1   STATE OF _____  )
                                )
2   CITY OF _____    )
3
4        I, DOMINIQUE DELAGNES, do hereby certify:
5        That I have read the foregoing deposition;
6        That I have made such changes in form and/or
7   substance to the within deposition as might be
8   necessary to render the same true and correct;
9        That having made such changes thereon, I
10  hereby subscribe my name to the deposition.
11       I declare under penalty of perjury that the
12  foregoing is true and correct.
13
14  Executed this _____ day of _____,
15  20_____, at _____.
16
17
18           _____
19               DOMINIQUE DELAGNES
20  My Commission Expires:  _____
21  Notary Public:  _____
22
23
24
25



```
 1              DOMINIQUE DELAGNES
               NAME OF DEPONENT
 2
           DEPOSITION CORRECTION SHEET
 3
         IN RE:  Katarzyna Foulger, et al. v. Avertest, LLC
 4       d/b/a Averhealth
 5       Reported by:  TAH
 6       Upon reading the deposition and before subscribing
         thereto, the deponent indicated the following
 7       changes should be made:
 8       Page    Line    Should Read:
            Reason assigned for change:
 9
10       Page    Line    Should Read:
            Reason assigned for change:
11
12       Page    Line    Should Read:
            Reason assigned for change:
13
14       Page    Line    Should Read:
            Reason assigned for change:
15
16       Page    Line    Should Read:
            Reason assigned for change:
17
18       Page    Line    Should Read:
            Reason assigned for change:
19
20       Page    Line    Should Read:
            Reason assigned for change:
21
22       Page    Line    Should Read:
            Reason assigned for change:
23
24                    _____
25               SIGNATURE OF DEPONENT
```



## Exhibits

**168740 Delagnes, Dominique 07.09.24 EX 45**  2:13 9:19 10:17 13:1 27:15 28:6

**168740 Delagnes, Dominique 07.09.24 EX 46**  2:14 33:3

**168740 Delagnes, Dominique 07.09.24 EX 47**  2:15 36:15 37:17 38:18 44:17 55:5

**168740 Delagnes, Dominique 07.09.24 EX 48**  2:16 61:7,19 62:9 71:9 272:21,22

**168740 Delagnes, Dominique 07.09.24 EX 49**  2:17 66:9

**168740 Delagnes, Dominique 07.09.24 EX 50**  2:18 76:1 272:24 273:4,23 275:4

**168740 Delagnes, Dominique 07.09.24 EX 51**  2:19 91:19

**168740 Delagnes, Dominique 07.09.24 EX 52**  2:20 94:16 95:9 97:11 98:16

**168740 Delagnes, Dominique 07.09.24 EX 53**  2:21 103:22

**168740 Delagnes, Dominique 07.09.24 EX 54**  2:22 104:14 113:9

**168740 Delagnes, Dominique 07.09.24 EX 55**  2:24 110:4 113:9

**168740 Delagnes, Dominique 07.09.24 EX 56**  2:25 124:19

**168740 Delagnes, Dominique 07.09.24 EX 57**  3:3 150:16 152:6

**168740 Delagnes, Dominique 07.09.24 EX 58**  3:4 174:21 180:21 181:19 184:20

**168740 Delagnes, Dominique 07.09.24 EX 59**  3:5 175:9,24 177:6,7 182:2 183:6,9 184:2 185:24 186:11,24

**168740 Delagnes, Dominique 07.09.24 EX 60**  3:6 189:21 190:17

**168740 Delagnes, Dominique 07.09.24 EX 61**  3:7 189:23 191:16,21

**168740 Delagnes, Dominique 07.09.24 EX 62**  3:8 194:25 198:22 200:2,6 231:16

**168740 Delagnes, Dominique 07.09.24 EX 63**  3:9 200:15 202:2 209:3 210:20 212:23 213:4 214:14 215:9 218:25 219:1

**168740 Delagnes, Dominique 07.09.24 EX 64**  3:10 201:13,24 205:20 206:25 207:1,8, 13,14 208:13 209:24 211:13 217:14

**168740 Delagnes, Dominique 07.09.24 EX 65**  3:11 219:9,12

**168740 Delagnes, Dominique 07.09.24 EX 66**  3:12 225:21

**168740 Delagnes, Dominique 07.09.24 EX 67**  3:13 226:19 228:20 229:9

**168740 Delagnes, Dominique 07.09.24 EX 68**  3:14 230:3

**168740 Delagnes, Dominique 07.09.24 EX 69**  3:15 234:19 236:6 243:9

**168740 Delagnes, Dominique 07.09.24 EX 70**  3:16 254:7

**168740 Delagnes, Dominique 07.09.24 EX 71**  3:17 259:2

---

### $

**$1.3**  47:12 48:2,25 49:8

**$29**  114:15

---

### 1

**1**  21:22 22:15 141:16 142:12

**1.5**  141:21

**10**  15:10 16:17 28:15 125:20 126:14 148:23 156:5 189:22 190:16

**100**  8:25 57:11

**10219**  221:8

**10440**  202:17 205:22

**10:05**  67:17

**10:16**  61:5

**10:58**  94:10

**11**  63:6,7 183:2 263:22 278:7,10

**114**  282:13

**11:18**  94:13

**11:47**  117:9

**11th**  10:5 259:10

**12**  60:22 83:13 96:23 145:21 274:1,2,7,9 275:3

**12:40**  117:13

**12th**  225:16

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


**13** 28:12 145:10 146:16 159:23 160:2 162:6 178:6 179:23 186:7,14, 19 195:1 216:9 220:2 231:15 232:12,18

**13th** 16:5 124:23 195:18 202:8 213:13 214:13 225:8

**14** 274:19

**15** 274:14,19

**16** 67:11 274:14

**16940** 200:21

**17** 33:6 189:25 225:22

**17088** 20:23

**17089** 21:21

**17105** 189:25

**1730** 131:8

**17th** 36:24

**18th** 9:23 25:11 27:7,14 28:6 37:1, 2,3,4

**19** 94:20

**19194** 219:22

**19493** 276:3,9

**19th** 95:20

**1:23** 158:20

**1:31** 158:24

**1st** 24:19 25:24 42:7 208:17

---

**2**

**2** 22:15,16 54:7 55:4,7 92:18 141:21 182:3

**183:1** 202:15 203:15,24 209:3 235:11

**2.0** 72:23

**20** 21:4 57:16

**200** 131:9

**2014** 8:8 172:22

**2016** 166:12

**2017** 166:13

**2018** 166:14 264:16

**2019** 38:5 93:6 166:14

**2020** 9:23 10:5 16:7 21:10,23 28:6,13 33:6 36:17 38:5 42:7 44:4 56:9 63:7,16 94:20 96:23 100:1 101:11 102:6,9 103:4 105:22 111:24 166:15 180:24 231:12

**2021** 44:20 45:7 54:8 55:1,8 61:9, 24 63:23 64:5 76:10 84:25 92:1 94:21,22 95:20 97:11 98:15,25 101:2 103:24 104:16 105:25 106:2,22 110:6,13 111:20 112:1 118:8 123:10 124:22,23 125:9 133:5,8 150:18 152:12 165:6,18, 21 166:16,18,20 174:24 175:5,6 176:4 179:23 181:3 186:7 189:22,25 190:16 195:1 202:6,9

**208:11,15,17** 214:13 216:10 218:12 219:14,24 220:3 225:23 226:24 228:21 230:5 232:18 235:12,14 258:16 273:24

**2022** 67:12 243:11,25 244:21 245:16 247:13 257:15 258:5,15, 17 259:10 263:1, 19,22 275:8 278:7,10

**2023** 233:6,13 234:1 259:4

**2024** 6:9 8:4

**20th** 133:8 219:14, 24

**21** 91:21 104:16 259:3 273:3

**21065** 210:4

**21604** 201:25

**21606** 211:14

**21607** 216:16

**21629** 217:14 218:8

**21674** 57:2,19

**21744** 56:1

**21748** 56:11

**22** 44:4 259:23

**22nd** 36:17 152:12

**23230** 8:25

**24** 92:16 174:24 178:2 218:12

**25** 41:12 91:21

**25th** 226:24 228:21

**26** 34:25 35:5 103:24

**2651** 175:12

**26th** 97:11 98:15

**27** 61:24

**28** 15:20 34:25 235:12,14

**28th** 150:18 202:6

**29** 44:10,14 45:6 54:9 55:6,9 63:23 64:5 92:1 230:5 273:2,10

**2916** 8:24

**29th** 61:9

**2:03** 184:12

**2:17** 184:17

---

**3**

**3** 55:9 93:4 159:5 183:2,5 184:3 212:22

**3/13** 178:10,13,15

**3/13/21** 175:11 185:22

**3/21** 178:7

**3/7** 178:7,13

**3/7/21** 175:10

**30** 45:20 48:16 77:22 81:17,18,22 100:10,14,18,24 101:4,6,13,22 106:14,16 125:21 198:2,23 208:2 225:10

**30(b)(6)** 35:19 185:3

**30-day** 225:17

**31** 24:17,18 25:24



42:1,3,4,8

**31st** 208:17

**32404** 174:22
176:22

**32406** 184:24
187:9

**37207** 189:23

**39** 61:14 63:7

**3:24** 229:23

**3:44** 230:1

---

**4**

**4** 44:19 45:7 54:8,
25 55:8 57:2
76:23,24,25
159:15,19,21
160:4,13,16,17,19
162:5,6 214:12,
16,17,18 236:9

**40** 96:18,21,22

**4115** 254:10

**43819** 103:25

**45** 9:19 10:17
13:1,7 27:15 28:6

**46** 33:3

**47** 36:15 37:17
38:18 44:17 55:5

**48** 61:7,19 62:9
71:9 272:21,22
273:2,6,7,8,12,18

**48954** 227:2

**49** 66:7,9 273:5

**4:22-CV-00878**
6:13

**4:46** 285:10

---

**5**

**5** 105:17 110:15
111:15 159:10,18
160:8,14 161:3
196:20 197:3,18
198:22 215:8
222:7 231:15

**50** 45:20 76:1
141:22 272:24
273:4,5,12,23
275:4

**51** 91:19

**52** 94:16 95:9
97:11 98:16

**53** 103:22

**54** 104:14 113:9

**55** 9:4 110:4 113:9

**56** 124:19

**57** 150:16 152:6

**58** 174:21 180:13,
21 181:19 184:20

**59** 175:9,24 177:7
180:16 182:2
183:6,9 184:2
185:24 186:11,24

**5th** 76:10 273:24

---

**6**

**6** 156:21 157:18
159:5 196:22
197:3,15 199:4
200:9 202:15
214:18

**6-MAM** 70:20

**60** 189:21 190:17

**61** 189:23 191:16,
21

**616225** 159:6

**62** 194:25 198:22
200:2,6 231:16

**63** 200:15 202:2
209:3 210:20
212:23 213:4
214:14 215:9
218:25 219:1

**64** 201:13,24
205:20,21 206:25
207:1,8,14 208:13
209:24 211:13
217:14

**65** 219:9,12

**66** 225:21

**67** 226:19 228:20
229:9

**68** 230:3

**69** 234:19 236:6
243:9

---

**7**

**7** 77:1 152:6

**70** 254:7

**71** 259:2

**78821** 66:10

**7:06** 25:24

---

**8**

**8** 21:6,8 175:5
186:1 189:11

**80** 57:11,15

**87183** 259:7

**8:44** 6:10

**8th** 166:19

---

**9**

**9** 175:6

**97** 34:22 35:5

**9:24** 36:8

**9:25** 36:12

**9:44** 219:25

**9:58** 61:1

**9th** 6:9 124:22
125:9 133:5
166:20

---

**A**

**A-R-I** 269:19

**a.m.** 6:10 36:8
61:1,5 67:17
94:10 219:25

**ABFT** 177:22

**ability** 44:1 132:18
192:9 265:9
268:15,17

**above-board**
116:5

**abruptly** 15:7
17:18

**absent** 204:8

**absolutely** 132:22
224:8 266:17
270:6

**accept** 40:7 48:24
233:12 260:9

**acceptability**
215:15

**acceptable** 43:14
71:22 93:18
182:22

**acceptance** 57:25
65:11 276:25



Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 77 of 111
PageID #: 3785
Domingus Delagnes          July 09, 2024  Index: accepted..ahead

277:18

**accepted** 52:24
53:12 142:6

**access** 277:23

**accessioning**
182:16

**accessions**
125:14 126:6,11

**accommodate**
40:7

**accordance** 277:6

**accreditation** 9:21
36:19 61:10 62:14
74:23,25 75:4
83:22 195:2,3
196:6,23 200:17
201:14 210:23
211:2,4,22 221:4
226:23 227:6
230:6 231:3
234:21 235:15
255:16 256:2,3

**accredited** 74:22
96:1

**accrediting** 80:24
88:1,3,6,8

**accuracy** 77:5
96:20 118:2,13,14
119:8 121:7
123:12 128:9
130:8,10 140:16
278:10 280:5,10
281:12 283:18,20
284:10

**accurate** 11:3,15,
19 12:21 13:24
14:1,14,16 42:13
49:21 50:15 76:22
87:21 91:1 98:22
102:3 108:1
118:4,5 119:25
120:15 121:8
123:14 128:17

130:15 131:14
140:10,23 152:4
160:12 267:1,4,
15,25 268:22,25
276:1,5 278:1,21
279:8,24 280:8
281:18

**accurately** 143:4
283:17

**acid** 133:17

**acknowledge**
232:23

**acknowledged**
233:17

**acknowledgment**
191:5,13 192:2

**Act** 50:1

**acting** 165:10
168:17 172:3

**action** 10:19 11:23
71:23 93:7,8
149:4,5,10,23
150:6 210:13
262:3 266:22

**actions** 38:4
72:18,20 190:21
209:7 221:20
222:4 234:22
235:8

**activity** 277:5,7,9

**actual** 258:9
259:25 260:4
262:22 271:12

**add** 124:3 276:15

**added** 74:12
120:19 122:11
124:4

**adding** 276:14,17,
21 277:2

**addition** 65:20
83:17,18 99:21

100:6 216:21

**additional** 37:14
44:5,9 93:21
179:4,18 182:4,18
184:4,5 190:17
191:18 226:2

**address** 8:14,15,
16,19,22 36:1
157:24 203:14
222:6 224:2,5
232:17

**addressed** 103:3

**addresses** 55:9
210:22

**addressing**
232:10

**adequate** 49:8
281:23 283:8
284:1

**adequately** 214:8
215:1

**adhere** 214:19

**adjustments**
212:19

**administrative**
20:17

**admit** 22:10 23:19

**admits** 47:24

**admitted** 47:20
250:14

**advance** 9:1
126:15

**advanced** 62:5

**adverse** 116:8
196:23 200:10
211:23 215:4

**advice** 124:13

**affording** 112:11

**afraid** 120:17

**afternoon** 220:19
263:18

**age** 7:9

**agencies** 250:23

**agree** 34:3 48:13
60:5,10,15
129:19,21 188:16,
17,22 242:5,7
248:6 249:25

**agreed** 6:1 48:23
50:22 249:5 250:1

**agreeing** 47:11
48:1

**agreement** 60:12

**agrees** 281:23

**AH0019489**
275:14

**AH0032424**
182:14

**ahead** 27:24 29:20
31:19 33:1 48:6
49:5 58:7 59:2
60:1 75:9 80:14
82:17 86:24 89:17
90:4 91:16 97:24
100:5 103:11
107:16 108:21
109:25 113:4,16,
22 115:24 116:11
120:13 121:20
122:3,21 123:4
125:4 127:16
128:2,13 129:16
131:19 132:17
133:25 136:8,10
142:19 151:11
152:25 153:15
154:1 156:15
163:24 174:10
178:25 179:25
193:5 206:11
223:22 229:6
239:10,14 240:21

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


243:4 246:10,20, 23 248:21 250:10, 11 251:3,4,23 252:1,4,5,25 253:1,9 260:2,25 261:2,19 263:7 275:16 283:14 284:7

**aliquot** 271:12

**Aliquoting** 182:15

**aliquots** 277:15

**allegation** 38:1,24 101:16 162:13 198:21 199:23 200:9 231:15 232:17 236:4

**allegations** 48:14 61:16 62:17,21 63:6,8,12,15,22 64:3,8,9 73:21 74:2,20 75:15 77:18 79:1,5 80:1, 11 81:1,6,13,21 82:11,23 83:7,19 87:7 96:11,25 97:13,18 98:8 99:1,17,18,23,25 100:21 101:8,11, 12 103:3,6 106:9, 12,13,19,23,24 107:9,14,24 108:11 112:6 115:12 117:24 118:9,10,13 121:6 123:9,11 152:13 155:16 156:10 196:11,12,16 197:3 220:13 221:7,12,25 222:1 223:11,12 224:13, 16 227:11 229:10, 15 230:22 231:3,6

**alleging** 196:24

**allowed** 148:6

**allude** 101:6

**alluding** 159:2

**alternative** 38:13 55:10

**Amanda** 103:23 110:22 111:6

**amended** 34:4 211:15

**American** 9:22 33:4 36:16 53:13 61:8 69:5 80:25 200:16 201:14 225:22 226:20 227:5 230:4

**amino** 132:11,21 133:1,2,12,13,15, 17 134:10,20 135:8 138:25 139:9 144:14 156:24

**amount** 248:23 251:6

**Amy** 195:1

**analysis** 65:9 66:1 69:7 184:4 204:8 209:14 213:8,10, 17,21 214:13

**Analyst** 36:19

**analytical** 48:19 140:16

**analytically** 23:24 50:17

**analytics** 210:13

**analyzed** 205:10, 13

**analyzer** 135:1

**and/or** 21:14 71:15 92:8 216:3

**annual** 258:19,21 259:2 261:15

262:9

**answering** 146:3, 10 147:1

**anymore** 117:1 160:25 167:23

**anytime** 148:19 164:16

**apologize** 9:1 96:16 270:16 275:7

**Apparently** 24:25

**appeal** 173:18

**appears** 104:14 110:5 234:20

**applicable** 227:12, 22 228:3

**appreciated** 99:8

**appropriately** 267:7,21

**approved** 247:5

**approving** 216:1

**approximately** 6:10 28:15 167:14

**April** 104:16 243:11,25 244:21 245:16 247:13 257:15 259:10,23 263:1,19,22 275:8 278:7,10

**area** 116:7

**areas** 156:20 158:7,12

**arguing** 243:3

**argumentative** 29:19 48:5 59:25 80:14 82:16 91:15 103:10 108:20 109:24 121:19 239:9 240:15,20 243:3 246:9

248:19 250:9 251:2 252:3 257:1 262:13,20 263:5 283:13 284:6

**Ari** 269:10,19

**Armstrong** 6:17 31:9,23 32:1

**arose** 221:9 228:17

**arrive** 54:12,23

**arrived** 54:17 125:21

**Arrows** 252:15,22 253:10 269:4,6, 23,25

**Arthur** 33:5

**article** 197:5,7 199:2 233:3,11 234:1 254:10,19

**asks** 37:5,7 38:3, 13 226:1

**aspect** 133:15 149:6

**aspects** 159:4

**assay** 132:8,11,21 133:2,3,13,15,17 134:10,20 135:8, 25 138:25 139:9 144:14 156:24

**assessments** 38:14 55:10

**assigned** 13:20 14:22

**assist** 167:23 207:14

**assistance** 17:20

**assisted** 193:7

**Associates'** 106:5

**association**

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Case: 4:22-cv-00878-SHL   Doc. #: 106-29   Filed: 08/08/24   Page: 79 of 111
PageID #: 11437
Dominguez/Delagnes                                    July 09, 2024 Index: assume..basis

104:16,22 255:3

**assume** 111:10
154:21 173:20
183:20 263:11,14

**assumes** 88:25
89:15 90:2 107:13
133:24 142:17
143:21 153:14
193:3 199:25
223:20 246:9
248:19 251:1,24
253:8 259:24
260:23 261:18
263:5

**assumption** 203:5

**assurance** 64:12

**astounded** 29:11

**attached** 28:6,9
32:18 175:4
177:21 216:23
217:14 218:5

**attachment** 28:10,
11,12,14,15 30:13
56:5

**attachments**
28:16,22 29:8
30:18

**attempt** 44:7
52:18

**attempting** 274:8

**attending** 6:21

**attention** 68:1
142:2,6,13,15
144:24 178:19
204:22 205:6
215:4 252:21

**attorney** 53:19

**attorneys** 6:21
48:8

**audits** 254:24

**August** 208:17

**authority** 252:9,
11,13

**Aver** 92:19 192:11

**Averhealth** 7:21
9:9,15,20 10:4,9,
24 11:2,13 12:15
13:3,9 14:5 16:1
17:12,13 20:25
22:23 25:13,18
26:12 27:6 29:1
30:22 32:17 37:7,
9 39:19 44:17
45:1,17 46:15
47:10 48:22 50:1,
20 52:17 54:25
58:2 61:17 62:10
66:16 69:14
71:12,13 73:20
74:18,19 75:15
76:13 77:3,4,12
79:21 83:20
92:13,20 94:17,18
95:23 96:3 97:12
98:20 99:19
104:23 105:10
106:5 111:22
112:11 114:10,14
115:3,16 117:16,
25 118:8 129:24
135:4,11 140:7
144:6 150:20
151:8 154:8
161:13 163:21
164:6,17,19,22
165:10 166:4
167:11 168:9,24
169:9,19,21
170:6,25 171:24
172:8,10,12,14,18
173:1 175:9 177:9
184:23 185:17
187:25 189:24
190:18 191:8,12
192:6,22 193:13
195:7 197:12

204:15 228:22
229:2,9 230:16
232:10,24,25
233:16,17 234:2,
21 235:17,22
236:4,16 237:1
247:19,25 248:12,
24 249:24 250:1,
15,21 251:18
252:8,10,18
253:21 254:9
255:4,15 257:8
263:19 264:1,4,16
265:2,5 269:5,7
278:16 279:12,16
280:9

**Averhealth's**
25:10 26:21 27:4
38:8 41:8 47:15
76:16 83:20 91:20
99:5 105:11
107:2,10,25 108:3
111:8 135:16
164:25 170:10
171:8 173:16
191:16 201:21
210:17 233:22
249:5 267:1

**Avertest** 6:13
203:7

**aware** 30:23 55:24
62:7 137:1 139:19
152:13 164:16
200:12 232:13,20
253:24

---

**B**

**B-E-N** 269:13

**B-E-N-N-E-C-E-R-I-F** 269:16

**back** 10:12 11:20
15:22 16:22 24:18
26:24 36:13 52:21
57:7 61:5 71:9

73:25 74:6 76:17
94:14 98:3,5
110:13 117:13
141:14 142:22
143:3 144:7
145:14,17 149:5
158:25 162:22
172:22 178:5,8
184:18 207:3
209:2 213:8,16
223:6 224:15
230:1 231:8 233:2
247:3 261:25
265:18 267:16,18
270:21,25 271:25

**backdate** 163:22
164:7

**backdated** 164:17

**background**
127:5,23 128:18,
20 129:1,11
130:13,14

**backing** 49:20

**bad** 23:20 24:8
185:8

**bas-** 119:4

**based** 87:17 91:5
99:19 118:8 123:9
125:25 145:16
162:25 188:6
220:3 230:22
256:1

**basically** 25:2
79:19 201:10

**basis** 40:4 60:6
84:2 85:16 106:9
119:5,16,22
120:6,8 121:13
122:17 123:2
161:2,18 165:12
168:10 170:5
174:5 274:12,25
281:20 282:9,17



283:7,10

**batch** 22:14,17 145:13,22 216:1 271:25

**Bates** 31:18 32:4 66:10 103:25 110:25 174:22 175:11 189:23 200:21 201:25 210:4 219:21 227:1 243:15 254:10 259:7

**Bates-stamped** 159:5

**bears** 254:10 259:6

**begin** 215:24

**beginning** 39:4 76:23 77:1 136:5 187:9 217:14 218:7 265:12

**begins** 6:11 184:23

**behalf** 7:2,10 9:6 10:9 13:8 14:4 25:13 38:18 45:16 161:12 165:10

**belief** 81:12

**believed** 15:1 23:22 26:8 30:9 49:16 117:22 121:9 232:3

**believes** 26:12 98:20

**Benacerraf** 269:13

**benzoylecgonine** 57:12

**bet** 171:15

**bias** 37:22 38:9 65:8 66:1 93:5,7

**big** 159:8

**bigger** 48:24

**binders** 34:19

**bit** 157:19 173:23 268:16

**blame** 45:22 46:6, 9

**body** 80:1,24 88:2, 3,6,8 241:14

**Booker** 53:6,15

**borderline** 127:3, 21 128:10,23

**borne** 99:10

**boss** 18:11 124:11

**bottle** 278:4

**bottom** 13:1,6 19:20,24 24:20 55:4,7

**Boyd** 94:18 95:17 96:7,10,23 97:11, 16 98:6,19,25 99:7,23 100:1,12 101:2 103:4,8

**bracketing** 236:18

**bragging** 238:22

**breach** 50:20

**break** 60:24 61:3 94:9,12 117:11 184:16 229:20,24

**breaking** 94:5

**bring** 48:24 156:17 265:2,5

**bringing** 91:12 102:8

**broad** 116:12 124:14 268:7

**broadly** 185:4

**brought** 77:4

88:13 89:21 90:10,17 99:19 117:25 177:9 178:19 264:16

**Broussard** 80:17, 20

**buck** 123:17

**bullet** 37:20 38:17 40:15 62:25 63:1 71:19 72:16 78:8 236:12,14 243:9 254:22 259:18

**bullets** 63:9,13 236:9 255:14

**business** 7:16 8:10,12 48:10 116:6 117:1 118:24 119:1,4,6, 9,10,16,18,19,22 120:2,3,7,8,10,17, 22 121:12,13,21, 24,25 122:5,17 123:3,18,20 124:15 233:24

---

## C

**C1** 28:12

**C2** 28:14

**calibration** 41:20 43:7,12 71:15 92:8 216:5

**calibrations** 53:10 64:19

**calibrator** 41:1,3,4 215:22

**calibrators** 41:19 92:15

**call** 68:1 126:10 144:5 167:25 183:11

**called** 22:22 42:25 70:5 142:1,5,12, 14 144:23 156:20 202:15 209:17 215:10 220:7 230:16 252:21 265:24 266:13,21

**calls** 27:22 49:4, 10 50:10 51:25 52:4,8,12 75:7 86:21 89:16 90:1 91:15 97:20 100:2 103:10 113:2 115:21 126:10 127:11,14 128:1, 11 129:14 130:13 131:17 132:15 136:6 142:17 151:10 152:1,23 153:13,24 156:14 174:9 178:24 179:9 206:10 223:20 246:11,18

**CAP** 9:21 10:4,13 15:23 20:24 22:2, 12 23:1 24:2,7 25:11,17 27:1,3,7 28:23 29:1,7,8,15, 16 30:1,7,20,21 32:16 33:9 34:1,9 36:18,19 37:5 38:18 43:14 44:3, 4,17,20 45:7,25 52:24 54:8,25 55:8 57:3 58:6,7, 10 59:6,11 61:15, 20 63:6,15,21,22 64:2,25 65:6,15 67:15 71:10,12,19 72:3,15 73:7,19, 20 74:2,18,22,24 75:4,6,15 76:12 77:17 78:1,8,9,24 79:25 80:10 81:3, 5,23 83:9 84:13 85:4,11,18,24

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 81 of 111
PageID #: 10996
Dominique Delagnes       July 09, 2024 Index: Cap's..certification

86:7,9,19 87:6
88:1,10 91:20
92:1 93:5 95:24,
25 96:1,4,11
97:12 98:21 99:1,
10,18,20 100:21
101:11,17,20
102:9 103:6
106:22 107:7,8,22
108:9,13 112:5,16
113:8,12,20,24
114:4,19 115:10
117:19,25 118:7,
9,12 119:2 120:18
123:10 151:3,4
156:10 164:23
165:3,13,23
166:7,9,12 167:1,
6 176:4,12 180:24
181:3 184:22
189:21,24,25
190:17 191:18
192:11,14 194:25
195:3,6 196:23
197:2 198:21
199:15 201:14
203:11 207:3
210:12,16,22
211:2,22,24
214:13,20,22
217:1 219:14
221:10 224:10
225:8 226:22
227:5,20 228:8,22
229:1,9 230:12
231:2,8 232:10,
16,25 233:16
234:11 235:15,16
236:3,21,24
237:5,18 238:7,8,
24,25 240:9
241:2,7,19 242:2,
24 243:11,25
244:5,10,11,14,
21,22 245:1,3,7,
11,14,18,20 246:5
247:12 248:8

257:9,14,23 258:3
259:9 262:25
263:11,18 264:2,5
273:3 275:1
276:13,16

**CAP's** 26:6 29:14
36:23 59:15 61:10
92:19 165:25
201:8 217:5 230:6
238:3,19 241:11
259:22 277:9

**CAP-
ACCREDITED**
107:4,18 156:6

**CAP-FDT** 96:25
120:1 227:13
228:4,12 234:21

**Capital** 252:16

**care** 12:14 210:17
245:21

**career** 47:24

**careful** 137:8

**carries** 13:7 88:9

**carrying** 13:1

**case** 6:13 23:3,4
30:20 31:6 36:4
46:16 66:2 75:12
76:3,6,15 81:23
86:17 88:13 89:2,
9 90:9,10,14,16,
17,18 91:6,11,12
117:17 135:19
144:13 157:4
168:21,25 169:11,
14 170:8 171:1,7,
23 172:3,9,25
174:4,15 237:5
272:7 279:11,16
280:6 282:14

**cases** 47:23 50:4
105:12 145:7
146:16 168:19
169:16 170:15

171:12,14

**caseworker** 12:16
145:14,17

**caseworkers**
145:23

**categories** 268:7

**caused** 144:13
145:6 150:3,7

**CCR** 6:4

**Cejas** 7:2 27:22
29:18 31:5,13
32:8,20,24 35:6,
22 36:5 48:4 49:3,
10 50:9 51:22,25
52:4,8,12 59:1,20,
24 60:21,25 75:7
80:5,13 82:4,7,15
84:21 86:21
88:22,24 89:15
90:1,13 91:14
94:1,3 97:20
98:10 99:11 100:2
102:10,13,16,19,
23 103:9,17
107:13 108:15,19
109:19,23 112:20
113:2,14,21
115:18,21 116:9
117:5 120:11
121:15,18 122:1,
15,18 123:1,4
127:11,14,25
128:11 129:14
130:1 131:17
132:15 133:23
134:24 135:23
136:5,9,16 139:24
142:16 143:21
145:25 146:2,5,7,
9,12,19,22 147:1,
4,6,11,14,17,19
148:2,6 149:13,
16,21,25 150:12
151:9 152:1,23
153:13,24 155:18

156:13 159:1,19,
24 160:1,9,15
161:7,10,15,22
162:1 163:12,23
164:8 168:5
171:7,19,23 172:5
173:2,13,16,18,22
174:8,12 178:23
179:8,24 181:23
188:19,24 189:8,
10 192:25 193:3
199:25 206:9
223:19 229:4,11,
18 239:4,8,13
240:12,14,19
242:13,17,19
243:2,15,20
246:8,17,21
247:21 248:18
249:2,11,14,18
250:8,11,25
251:22,24 252:2,
5,23 253:1,7
256:25 258:10,16
259:24 260:11,22
261:1,17 262:3,
12,16,20 263:2,4,
22 266:16 269:15
270:7 272:16,19
273:2,7,10,11
275:12,17 276:23
279:6,14 280:2,12
283:12 284:5
285:8

**Central** 6:10

**CEO** 8:2 9:14
18:11 94:18
123:17,23 248:15,
25 249:10,20

**certificate** 177:22
214:19

**certification** 98:22
120:1,25 122:6
123:6 165:13
166:10 214:20,22
216:20



**certified** 119:25 121:4,5 123:12

**certifying** 236:9 270:23

**chain** 185:21 186:5,16 268:2, 14,16 277:13

**chair** 61:11 226:22 230:7

**challenges** 37:21

**chance** 218:2 275:18,22

**change** 43:4,6,12 44:1,2 92:22 131:12,15 214:6

**changed** 72:12 92:13,20 131:2 163:4 264:18

**changing** 43:6,11 46:7,21,23 47:2,4 48:17 53:10,11

**charge** 269:4,6

**charts** 194:11

**chat** 66:16 67:11

**chats** 284:21

**check** 167:25 270:17

**checklist** 64:25 65:1,5 166:11 177:23 203:5,6,8, 11,14

**checklists** 203:9

**chemical** 276:15

**cherry-picked** 127:9 130:23

**chief** 7:20,22,23, 25 8:5 77:2,3 211:16 212:1

**child** 88:14,18

**children** 89:3,5,9, 12,23,25 90:11,19 91:13

**choice** 256:17

**choose** 50:18

**chose** 48:18 50:18 59:9 60:5 256:12 257:4

**Christina** 66:21 70:17 125:11 142:25 143:25

**Christine** 161:16

**chromatography** 92:21 93:2 156:25

**circumstance** 163:20 164:6

**circumstances** 68:11

**cited** 43:4 65:4 97:14

**City** 269:21

**civil** 170:8 171:1, 12,17,18,22

**claim** 49:9 50:19, 20 51:19,20,24 198:11 279:12

**claimed** 45:16 115:13

**claiming** 50:8 88:17 89:22 90:17 100:18

**claims** 46:15 49:1, 25 50:12 54:20 55:2 77:12,18 83:8

**clanged** 163:15

**clear** 16:20 70:7 71:3 216:12 217:6,9 221:6

250:18

**CLIA** 52:24 53:14 227:19,21,25 228:7 243:11 244:1,3,5,9,12,18, 22,23 245:1,3,7, 11 257:9

**clients** 12:1 142:22

**clinical** 177:23

**close** 129:18

**COLA** 177:24

**Colin** 103:24 110:24

**College** 9:22 33:4 36:16 53:13 61:8 69:5 80:24 200:16 201:14 225:22 226:20 227:5 230:4

**Collum** 226:21

**combine** 281:16

**comfortable** 25:21 70:6 71:2

**comment** 181:24 182:1 215:18

**commentary** 249:15

**commented** 32:17 204:18 214:25

**commenting** 30:21

**comments** 30:2,8, 10 177:22,25 182:23,24 202:12, 16 204:4 209:9

**commissioner** 220:23

**committed** 11:3 15:8 252:14

**committee** 61:11 62:14 65:7 226:22 230:6 235:15

**communicated** 154:22

**communication** 70:17 152:14 154:23 232:10,16, 21 254:9

**communications** 153:11 264:2

**communities** 11:5,14

**companies** 115:14 116:5,7,22

**company** 18:12 123:24 161:13 248:15 250:4

**company's** 83:21

**comparable** 168:22,25

**compared** 133:2 256:2

**comparing** 180:19

**comparison** 214:1

**competency** 177:24

**compile** 282:19

**compiled** 281:11

**complainant** 13:12 14:4,5 21:23 22:6

**complained** 43:21 144:23

**complaint** 27:11 32:15,19 34:12, 20,21 48:15 50:25 59:15 198:19 221:8,9,10 227:7 228:10,16,17

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                California Firm Registration #179



Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 83 of 111
Dominique Delagnes        July 09, 2024
PageID #: 1594                          Index: complaints..copies

230:18,22 232:11
234:21 235:7
237:5 239:2 242:3

**complaints** 27:8,
20 34:4 47:2
73:11,16 196:7
226:21 227:7
228:23 229:2
273:17

**complete** 13:19
14:5,22 15:1
216:3 256:1
267:13

**completed** 16:15
183:18 208:2
226:5,14 257:8
271:1

**completely** 77:14
79:5,9,14 81:14
82:12,24 83:10
271:21

**compliance** 196:6,
22 200:9 210:22
220:23 221:15,20
222:4 223:15,18
224:19,21 231:2

**complied** 225:17

**comply** 44:7
217:4,7

**complying** 83:21

**compound** 108:20
223:24 239:9
252:2

**computer** 201:8

**conceal** 103:10

**concealed** 103:7

**concealing** 116:8

**concentrations**
128:7

**concern** 21:15,16
22:16 64:18,21

65:25 156:20
158:8,12 196:20
197:19

**concerned** 62:15
64:11 65:8 222:11
231:16

**concerns** 21:13
22:3,7,11,19,21
24:2,5 25:12 26:7
44:25 65:16,22
77:3,5,8 78:5,7
152:8 156:19,23

**conclude** 87:11
89:24 90:9 246:15

**concluded** 9:12
115:16 282:7,14

**concluding** 27:14

**conclusion** 49:11
52:9,13 79:20
80:10 174:9
226:13 246:18
281:21 282:18,23

**conclusions**
159:10 161:3
282:10 283:9
284:2

**condition** 196:5

**conditions** 57:24

**conduct** 45:9,16
164:20,25 245:14

**conducted** 166:5,
17 244:1,6,12,14,
18 245:3,11
247:13 248:8
259:9 279:18

**conference** 176:6,
8 177:7 181:7,11,
12,15,16 182:3
183:7,11 186:23

**confidence**
105:14 112:11

**confident** 74:2
96:10,24 97:17
98:7 99:3 114:7
118:3,14 121:8
123:13

**confidentiality**
45:10

**confirm** 133:2
135:15 138:2
139:14 217:20
262:8,24 263:16

**confirmation**
28:11,21 30:13
132:20 133:14
144:15,16,19
215:10

**confirmatory**
64:13

**confirmed** 139:9
235:16

**confirms** 259:21

**confused** 82:19

**confusing** 215:25

**consideration**
86:16

**considered** 86:18
148:21 177:25
206:6 212:8,16
213:25

**considers** 39:4

**consist** 207:1

**consistent** 26:20
27:3 57:23 58:3
84:2 85:16 140:23
255:4 274:11,24

**consultant** 177:23

**contained** 185:9,
11,14

**context** 35:16
70:14 274:7

**continually**
140:22

**continuation**
212:23

**continue** 25:22
43:16,25

**continued** 98:22
221:20

**continuing** 118:5
209:3 222:4
223:18 224:20

**continuous** 21:24
254:25

**continuously**
208:3

**contract** 50:20
51:2,4,8,9,13,15
114:15 162:25
271:17,19

**contractual** 47:17

**contrary** 89:20
224:16

**control** 14:7 38:19
39:16 40:22 64:22
71:16,20,22 156:4
194:15 205:10
214:2 215:19
216:19,23,24
218:4,18 236:10
250:17 251:14,21
252:7 267:23,24
277:18

**controls** 15:22
92:9,15 215:13,14
236:17

**conversations**
17:16 281:10

**COO** 9:15

**cooperating**
118:12

**copies** 28:20 29:4,



Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 84 of 111
Page Dominguez Delagnes
July 09, 2024    Index: copy..correct

6 30:5

**copy** 29:24 103:18 174:25

**copy's** 218:11

**Cornfeld** 6:23 7:12 28:2 29:25 31:8, 21 32:14,23 33:2 35:2,11 36:14 48:11 49:7,13 50:19 51:23 52:2, 16 59:3,4,21 60:3, 18,23 61:6 74:11, 14,17 75:11,25 80:6,19 82:5,8,21 84:22 85:8,10 87:2 89:1,19 90:7, 15 91:18 93:24 94:7,15 97:24 98:2,13 99:16 100:9 102:11,15, 18,21,24 103:14, 19,21 104:13 107:20 108:16,25 109:20 110:3 112:23 113:7,19 114:1 115:19 116:3,14 117:4,7, 14 120:16 121:16, 23 122:8,16,21, 22,24 123:2,7 127:12,19 128:3, 16 129:20 130:3 131:22 133:4 134:6 135:17,24 136:8,14,17,18 140:3 142:21 144:3 146:1,4,6,8, 11,14,21,25 147:3,5,10,13,15, 18,21 148:4,8,12 149:15,18,22 150:2,10,13 151:13 152:5 153:6,20 154:4 155:20 156:18 159:14 160:5,21

161:9,12,19,23 162:4 163:13,14 164:3,11 171:10 172:7 173:5,20,24 174:13 179:2,11, 12 180:2 181:25 182:2 184:10,19 188:6,21 189:2,9, 20 193:1 200:2,5 222:22 223:1,3,7, 25 229:6,12,16,19 230:2 239:5,11,15 240:16,22 242:15, 18,20 243:8,18,21 246:13,20,23 247:23 248:25 249:4,8,9,13,16, 20 250:10,14 251:4,23 252:1,4, 8,25 253:3,13,18, 20 254:2,6 257:6 258:11,18 260:2, 14,25 261:2,20 262:15,18,21 263:3,10,24 268:1 269:18 272:14 273:1,5,8 275:10, 15 276:19 279:5, 13,25 280:15 283:19 284:13

**corporate** 8:20,23 9:9 35:20 201:1

**correct** 8:2,3,7,9 9:10,16,24,25 10:10,11 12:2,9, 22,23 13:10 16:1 17:25 18:17,18 19:22,23 20:18, 21,22,25 21:10,11 22:3,4,8,9,24 23:16,17 24:4 25:3,22 26:3 27:20 28:7,8,16, 17 29:17 30:3 34:10 35:20 36:24 37:6,9,12,23 38:1,

11,15,21,24 39:17,21,25 40:13,22 41:9,15, 21,24 42:11,23 43:2,24 44:5,21 45:1,24 47:12,15, 25 48:2 49:24 50:1,23 51:6,14, 17 53:18,19 54:15 57:16 58:11 59:8, 16,23 60:2 61:21, 24 62:3,16,22 63:3,8,18,23 64:13,22 65:2,17, 18,22 66:16,19, 20,22,23 67:10, 15,16 68:19,25 69:1 71:5,6 72:4, 13,14 73:1,8 74:4 75:12,13 76:10,20 77:19 78:10 79:2, 6,12,15 80:2 83:6, 11 84:11,19 86:3, 8,14,20 87:14 89:10,11,14 90:12 92:3,16,21 93:2,8, 13,18 95:24 96:4, 12 97:2,3,7,8,13, 19 98:9,17 100:1 103:8,13 104:17 105:12,15,23 106:2,6,9,19,20, 25 107:1 108:14 109:1,16,18 110:1 111:9,13,14,17, 18,20,21 112:7,8, 16 113:1 114:11, 12,16,17 115:8 116:16 117:1 124:23 125:12,15, 22 126:4,12,16 127:24 128:10,19 129:13 131:14 133:22 134:10,11, 15,16,23 136:20, 21,23 138:10 139:1,7,23 142:2

150:25 151:5,6,8, 15 152:19 153:12, 23 154:14,23 155:4,21 156:1,2, 12,16,25 157:14 161:7,15,25 162:7,11 165:4 167:3 170:19,20 172:13,17,23 174:7,15,16 175:21 177:8 179:7,23 180:24 181:4 185:10 186:11,24 187:6, 7,11,16,22 188:3 190:18,23 191:2, 6,19,23 192:15 195:14 196:12,18 197:16 198:11,25 199:24 200:18 202:9,12 203:15 204:17,22 206:4, 8,22 208:18 209:22 210:17 211:6,18 212:5,25 213:1 214:9 215:6,16 217:1,5, 7,8,10,11,15,24 218:8,12,22 219:4,7,14,18 221:1,4,10,16,21 222:5 223:18 224:22 225:5,6,17 226:2,5,15 228:16,17,18,23, 24 229:3,10,15 230:13,19,23 231:4,9,10,18,19, 22,23 233:19 234:4,9,12 235:8, 18,23,24 240:8, 18,22,23,25 241:22,23 244:7, 23 245:12,16 246:16 252:19 255:19 259:14,19 262:11 263:3,19



268:22,25 272:2
275:22 276:10
280:21 281:1,7,9

**corrected** 109:8
131:8 141:15
145:21 163:3
211:15 215:5
277:1

**correcting** 109:1,
5,11,17 230:17
235:17

**correction** 93:6
174:2

**corrections**
108:12 223:17
224:20

**corrective** 38:4
71:23 72:18,20
93:7,8 149:4,5,10,
23 150:6 190:21
209:7 221:20
222:3 234:22
235:8 266:22

**correctly** 68:23
134:2 143:20
213:8 255:11
282:7

**correspondence**
253:11

**cost** 119:13

**counsel** 6:2

**count** 47:23

**counting** 247:17

**County** 76:4

**couple** 34:10 95:5
126:19 264:14

**court** 6:14 7:4
12:11,13 52:10
76:4 77:7 80:24
81:5,13,15 82:25
83:10 84:7,15,24

85:11,13,17 86:3,
13,15,17,18,20,22
87:1,5,12 95:18
96:24 117:17
171:2 188:14
222:24 223:2
262:5

**Court's** 87:3,4

**courts** 11:21

**cover** 30:12
154:18

**covered** 10:13
175:10 233:23

**create** 209:6

**creatinine** 204:9

**credible** 23:7,14

**criminal** 171:16

**criteria** 276:25
277:19

**cross-reactivity**
135:7

**cross-reference**
183:2

**crossed** 255:2

**CSR** 6:4

**curve** 41:13,19
43:7,12

**curves** 71:15 92:8
216:5

**custodies** 268:16

**custody** 88:18
90:11 91:12
171:3,15 185:21
186:5,16 268:3,14
277:14

**customer** 144:11
253:22 254:9
257:2 263:25
264:1

**customers** 26:23,
25 116:20 118:6,
7,15 119:1 120:23
121:10 123:8,9,15
124:5,6 144:7
163:1 232:24
233:24 234:3
235:20 236:2,7,
20,21,24 237:8,
11,18 238:12,16,
25 239:6,18,22,23
241:19 242:2,24
245:22 246:5
247:19 250:22
251:19 253:6,12
254:18 255:21
256:7,9,10,14,23

**cutoff** 129:18
132:25 135:9
264:18

**cutoffs** 162:25
163:5,15

**cutting** 147:7

**CV** 177:22

**cycle** 271:22

---

**D**

**d/b/a** 203:7

**daily** 170:4

**Daniels** 195:1

**dashboard** 210:13

**data** 40:6 41:13
53:24 57:24
126:14 143:2,10,
13 192:10 193:9
208:8 254:24
281:15 282:20,23
284:11

**database** 15:10
70:19 162:24
163:3

**date** 6:9 124:25
169:7 195:24
196:1 202:8
208:20,24 213:13
218:10,12 225:19
233:8 264:21,23,
25

**dated** 9:22 33:6
36:17 44:3,19
54:8 61:9 91:21
103:24 124:21,22
133:5 150:17
174:23 175:5
178:5 179:23
189:21,25 195:1
202:6 219:14
225:22 226:24
228:21 230:4

**dates** 167:12,16
168:1 175:10

**Datto** 61:10 230:6

**David** 6:18

**day** 15:25 17:18
62:3 158:3 186:10
195:13,18,19,23
197:12

**day-to-day** 161:18
209:12

**days** 208:2 225:10
247:19 264:14
266:25

**deadline** 285:3

**December** 33:6
36:17,24 37:1
44:4 105:22
208:17

**decide** 91:5
255:24 256:10,15

**decided** 48:22
121:17

**deciding** 171:3

**decision** 48:10 86:17 115:23 118:24 119:5,6, 10,17,18,20,23 120:2,4,7,8,9,10 121:12,14,22,25 122:6 123:3,18, 20,23 233:24 256:23 262:13,14

**decisions** 124:15

**deck** 104:15,23 112:4 234:20 235:21 236:23

**decks** 111:17 113:10

**deem** 74:2 96:25

**deemed** 97:12

**defendant** 6:3 7:3 170:17 171:8 172:10

**defensible** 23:25 52:23 267:6

**deficiencies** 207:4 219:3 225:10 230:17 235:18,23 244:2,4,7,9,11,13, 15,19 245:19,20 246:5 247:14 248:9 254:24 255:3 257:10,15, 23 259:13,19,22 260:9,10,18 261:8,14 262:2,7, 10,23,25 263:13, 18,20 276:1,5 278:6,9

**deficiency** 201:15 204:7 205:22 207:2 208:21 210:15 216:9,18 217:8,11,20,21,24 218:5,19 225:13

**define** 109:5

**defined** 92:25

**defines** 203:12

**Delagnes** 6:12 7:8,15 33:3 61:6 117:14 148:13 159:16 160:7,11 161:24 184:19 188:8 230:2 273:12

**delivered** 200:11

**delivery** 62:2

**demand** 92:19

**demonstrate** 52:17,18

**Department** 9:21 31:11 46:1 47:6, 10 48:1,13,21 49:15,22 50:7 54:5 111:3 114:22

**departments** 11:21

**departure** 77:11

**depend** 158:16

**dependent** 160:25

**Depends** 187:18 268:23

**deposes** 7:10

**deposing** 143:24, 25

**deposition** 6:3,11, 16 9:11,13 35:20 124:19 147:7 150:16 185:3 188:14 201:1 252:21 254:7 265:12

**depositions** 143:23 188:23

**deprive** 157:22

**describes** 215:20

**description** 14:7 15:3 20:1

**design** 214:21

**designating** 172:16

**designation** 35:20

**designee** 9:9 41:14 201:1

**destroyed** 271:9

**detail** 71:23 157:24 158:2

**detailed** 21:15 38:3 71:14 92:7

**details** 157:8 182:4,18 184:4,5

**detect** 209:12

**detected** 209:13

**determination** 279:22 280:4

**determine** 241:16

**determined** 144:16 227:12 228:3

**deviation** 72:23

**dextromethorphan** 16:25

**DHHS** 150:22

**difference** 171:5

**differentiate** 217:19

**difficult** 130:14

**Diloretta** 66:22,24 67:18 68:8 69:10 70:1,11,23

**dilute-and-shoot** 26:1

**diploma** 177:22

**direct** 17:14

**directed** 44:20 187:10 226:23

**director** 14:6 15:2 20:1 41:14 67:2,6, 7 69:11 152:14 155:25 175:10,15, 23 178:4 179:5,22 180:12,19,25 184:3 186:14 195:2 203:24 211:16,25

**disagree** 42:16,20, 21 120:20 128:20

**disagreement** 216:3

**discipline** 252:9, 12

**disciplined** 253:21

**disclosures** 188:25

**discover** 148:17

**discrediting** 45:11

**discrepancies** 40:9

**discussed** 53:10 73:24 253:15

**discussion** 36:10 75:23 104:10 158:22 159:1 184:14 189:15,18

**disgruntled** 77:11

**disorders** 11:6,18

**disposed** 173:14, 21,24 174:4

**disregarded** 45:8

**distraction** 48:9

**distributed** 111:7

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**District** 6:14

**divides** 156:23

**Doane** 103:23
110:22 111:6

**doctor** 43:19
148:13

**document** 15:17
16:25 30:16,17
66:9 93:23 96:15
101:15 110:12
150:24 162:24
163:22 164:7,17
174:21 175:9
176:17 180:8
192:17 194:7
200:16,23 201:13,
16 202:15 216:22
224:17 235:4
236:2,6 237:2
238:13 240:13
254:1,8,13,16
260:15 264:8,9
266:1,7 275:18
281:2,4

**documentation**
86:9 91:22 92:2,6,
23 93:23 205:8
221:14 223:14
233:2 253:11
277:17 281:15,25
282:3

**documented**
143:7 148:15
183:22

**documents** 28:7
29:14 30:20 31:24
32:6,17 33:8,9
34:2,9,17 35:7,10,
12,15 96:17
148:16 165:2
169:13 220:7
228:14 266:13
280:23,24

**Doell** 6:18

**DOJ** 100:24

**domestic** 170:8
171:1,14

**Dominique** 6:12
7:8,15 80:15
159:8 160:11
220:19 255:8

**double** 82:19 85:6

**DRA** 202:17 203:4
205:22

**DRA.10440** 210:2

**draft** 177:25

**draw** 226:14

**driven** 144:15

**drop** 115:17
116:25

**dropped** 114:10
115:3,20 281:16

**drug** 11:15 12:18,
20 46:14 77:5
88:17 112:12
128:6 172:4
196:24 278:11

**drugs** 25:6,16
70:21 76:17 89:14
139:15 207:15
277:8

**due** 132:23 196:7

**duties** 13:20 14:6,
22 15:1,19,24
16:3

**dying** 224:8

---

## E

**e-mail** 16:20 17:2,
10 18:11,14,25
21:23 24:14,19
25:23 26:4 34:13,

15 42:4,7,12
103:22 124:20,21,
25 154:15 174:23
177:20 178:2,22
179:3,18,19
219:13,20,23
220:20

**e-mailing** 125:10

**e-mails** 30:21
117:19 284:14,19

**Earle** 226:21

**earlier** 78:25 97:17
98:7 99:3,9
111:19 170:15
178:6 264:7
275:21 278:17,22
279:7

**easier** 127:10,12,
24 128:8,14,16
130:24 265:10

**Eastern** 6:14

**edit** 95:13

**effect** 101:5
160:25

**effective** 203:25

**effort** 234:2
282:19

**electronic** 275:7

**else's** 223:21

**embrace** 10:18
97:5

**embraces** 10:24

**employed** 69:13
77:10

**employee** 17:12
19:4,22 20:21
69:23 77:10 83:20
161:14 164:21,22
165:11 166:4
167:10,15,18,20
207:22 266:1,22

268:19 269:2,22

**employees** 21:13
84:1,9,18 85:15
187:4 254:17
265:13,15 267:7,
22 274:10,23

**employment**
168:1 250:17
251:14,21 252:7

**enclosed** 54:11
55:14

**encouraged** 17:24
18:1

**encouraging**
18:14 19:3

**end** 11:2,11 18:12
37:16 40:5 220:6
275:7

**ends** 132:20

**engaged** 13:13

**enhancements**
22:15,18

**ensure** 70:19
267:25

**ensuring** 203:25

**entail** 195:8

**entire** 12:14 15:11
119:25 211:20
231:23 268:3

**entities** 11:22

**entitled** 105:17
110:6 150:20
158:12 207:2
234:20 254:8

**error** 20:17 145:19

**errors** 140:19,25
209:8

**essentially** 206:7
223:12 276:13

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**Essington** 66:21 70:3,17,23 71:1 125:11 143:1 144:1

**establish** 221:3

**established** 15:25 16:4

**ethical** 45:9,15

**Eugene** 164:19 174:23

**evaluate** 155:17

**evaluated** 112:10 113:11,12,18,24

**evaluating** 38:1

**evaluation** 37:15 38:9 65:8,25 72:17 106:5 210:11

**evaluations** 112:15,19 113:1

**evaporate** 271:21

**evasive** 170:1

**events** 105:18,21 106:1 111:16,23 114:20 234:9

**evidence** 87:13 88:25 89:16 90:3 91:6 107:14 133:24 142:17 143:22 153:14 193:4 200:1 220:13,14 223:20 224:13,25 246:9 248:19 251:1,25 253:8 259:25 260:23 261:18 263:5

**Ew** 163:8

**exact** 29:22 79:7,8 167:12 168:1 195:25 242:6

264:20

**examination** 7:11 210:12 272:18 280:14

**examined** 7:9

**examples** 26:17, 18 39:3 40:21 41:7

**Excel** 126:1 205:16

**exchange** 219:13, 24 284:14

**exchanging** 188:11

**excluded** 39:12 41:14

**excuse** 13:4 23:11 42:19 46:3 54:21 78:14,16 81:4 82:3,5 88:5,8 89:8 90:7,22,24 93:22 99:16,22,24 102:12 103:3,14 112:23,25 128:23 146:4,6,8,11,14 148:13 169:10 171:4 180:14 192:11 202:5 210:3 211:11 215:8 222:8,10,12 224:10 236:13 237:10,13 241:5 242:21 245:1,5 249:13 260:14

**executive** 7:23 8:1

**exhibit** 9:19 10:17 13:1 15:15,20 24:16,18 25:24 27:15 28:6,10 32:15 33:3 36:15 37:17 38:18 42:1, 3,4,8 44:10,14,17 45:6 54:9 55:5,6,9

61:7,14,19 62:9 63:7 66:6,9 71:9 76:1 91:19 94:16 95:9 96:18,21,22 97:11 98:16 103:22 104:14 110:4 113:9 124:19 150:16 152:6 174:21 175:9,24 177:6 180:21 181:19 182:2 183:6,9 184:2,20 185:24 186:11,24 189:21, 23 190:17 191:16, 21 194:25 198:22 200:2,6,15 201:13,24 202:2 205:20 206:25 207:1,8,13 208:13 209:3,24 210:20 211:13 212:23 213:4 214:14 215:8,9 217:14 218:25 219:1,9,12 225:21 226:19 227:23 228:20 229:9 230:3 231:16 234:19 236:6 243:9,19 254:7 259:2 261:4 272:21,22,24 273:4,23 275:4

**exhibits** 32:19 35:25 273:12

**exist** 285:1

**exonerate** 229:5

**exonerated** 229:1, 9

**expect** 27:6 187:13 188:8

**expected** 27:19,23 29:16 30:1 111:12

**expecting** 167:1

**expensive** 48:8,9

**expert** 22:22 161:20 162:2 168:22,24 169:1, 10,11,20 170:4,7, 25 172:3,9,16 174:6,14,17 188:25 189:3,5,7, 14 281:22,23 285:3

**experts** 282:1,3

**explain** 56:18 57:18 85:9 137:15 144:11 154:9 157:12 228:6 240:6 255:9

**explained** 37:11 137:16 147:24

**explaining** 212:12, 15 228:2

**explanation** 71:14 92:7 234:3

**explanations** 71:11

**express** 62:1

**expressed** 22:2,21 24:3,5 26:7

**expressly** 6:6

**extent** 31:15 32:11,21 35:24 97:21 161:16 174:8 178:24 179:9 192:25 206:9

**external** 72:18

**extra** 165:11

**extraneous** 182:1

**extremely** 25:6,17

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 89 of 111
PageID #: 1447
Dominique Delagnes                                July 09, 2024    Index: facilitate..follow

# F

facilitate 37:15

facility 277:23,24

fact 14:3 18:10 23:2 26:25 32:16 37:25 38:23 45:23 58:6 64:2 73:19, 24 74:3 77:20 78:15 81:21,23 83:2 90:9,25 99:14 100:7 121:9 132:24 135:6 141:5 159:9 177:15 192:5,22 193:7 228:5 233:17 237:4 238:8 239:3 262:7 270:10 272:21 274:13

facts 88:25 89:16 90:2 106:8 107:14 133:24 142:17 143:22 153:14 193:4 199:25 223:20 246:9 248:19 251:1,24 253:8 259:25 260:23 261:18 263:5

factual 40:12 41:23 60:6 189:11

factually 40:3

failed 13:18 14:4,5 50:21 84:14 85:12

failing 15:1

failure 64:15 273:19

failures 22:13,16 71:24

fair 200:13

fairly 42:10,23 43:10 58:15,16 59:5

faith 23:23

fall 227:19,20 228:7

false 20:12,14 49:25 55:22 76:19 82:14 83:1 84:25 88:18 132:2,8 133:16 134:9,18 137:4,9,20,23 138:7,9,13,14,20 139:6,8,18 142:9 144:3,8,9,20 145:2,7 148:17 150:3 162:6,14 196:21,24 197:20 220:15 222:15 223:9 225:1 231:17 232:11,18 236:4,5,22 237:6, 7,19 238:9,10 239:1 240:10 241:8 242:3,25 243:1 245:18 247:18,24 248:1, 2,4,7,23 249:22 250:22 251:6,17 253:16,21 258:1 264:5,6

falsehood 82:25

falsely 257:14

familiar 10:1 94:24 110:9 135:19 146:15 148:1,5,14 150:24 163:18,19 172:25 173:5 176:1,10 190:4 192:5,21 193:6, 22,25 199:7 200:23 201:16 227:2 230:10 234:25 254:13

families 11:4,14

favor 173:16

February 67:11 76:10 82:10 84:24 91:21 94:20 95:19 97:11 98:15,25 103:24 150:18 152:12 233:6,13 234:1 273:24

federal 188:20

feel 70:6 71:2 80:23 81:5 127:1

feels 128:21

felt 46:14 47:1

fentanyl 132:3,8, 23 133:11 135:7, 13,25 137:4,5,21, 25 139:7,14,22 144:17

fib 81:15 260:20

figure 57:13 132:13 217:25

file 32:9 148:19

filed 196:7 279:12, 15,20 280:18

files 29:9 111:4 148:25 149:7,10, 24 150:5,7 281:16

fill 201:9

find 15:15 16:25 26:23 35:22 55:2 66:3 69:3 81:23 83:2 96:11 97:18 98:8 99:4 112:21 127:9 130:24 162:23 174:12 189:6 208:25 220:12 224:12,25 244:9,10 246:4 258:8,17 262:1,6, 22 263:12,21

272:22

finding 54:12,17, 23 68:24 87:6,7 106:23 112:6 212:9 216:8,15 217:1 221:24 238:3

findings 65:22 99:10 159:10 177:3 185:6,7 213:3 214:9 220:10 227:7 238:19

fine 32:13,24 150:12 238:7 262:14

finish 42:19 43:9 136:15 146:10,19

fire 252:13

fireable 250:12 251:13

firing 249:21 250:6,23 251:19 252:14

firm 252:17

firsthand 189:13

fitting 215:23

five-year 114:15

flags 157:7

flexibility 216:1

flip 274:2 275:25

fluid 72:19 132:2,8 136:19,22,23 137:7,21 139:7,22 277:4,7

fluids 136:3

FOIA 31:10,22,23 32:2,7

follow 40:17,22 41:8 64:16 84:1,



Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 90 of 111
PageID #: 1848
Dominique Delagnes    July 09, 2024    Index: follow-up..government

10,14 85:12,15
86:10 167:13
177:17 178:21
179:4 189:13
220:1 228:8,11
264:20 266:3,6
267:7 268:2
273:19 274:10,23

**follow-up** 264:14

**food** 117:5,6

**forensically** 23:24
52:23 267:5

**forever** 271:22

**forgot** 67:2

**form** 29:18 48:4
49:3 50:9 51:25
52:4 59:24 80:13
82:15 88:24 90:1
91:14 97:20 99:11
100:2 103:9
107:13,15 108:15,
19 109:23 113:2
115:21 116:9
121:18 127:11,25
131:17 136:6
139:24 143:21
153:13 191:6,13
192:2 193:3
205:11,13,14,15,
16,25 206:3,4,17
223:19 229:4
239:4,8 240:14,19
243:2 246:8,17
247:21 248:18
250:8,25 251:22
252:24 256:25
259:24 260:22
261:17 262:12
263:4 266:23
283:12 284:5

**formal** 180:20
183:25

**formalize** 186:15

**formalized** 185:21

**format** 201:3,11

**forward** 27:15
28:1 205:15 208:3

**foster** 254:25

**Foulger** 6:12
270:11

**found** 23:3,7,12
45:25 46:16
56:10,21 62:20
63:2,17 64:2
73:20 74:4,19
78:9 80:1,10,25
81:6 82:24 83:9
84:14 85:11,18,
23,24 86:19 99:1
102:2 103:6
107:8,23 108:10
115:11 145:1
160:12 204:14
207:4 210:16
217:8,11 219:3
223:11 231:1,20,
21 236:22 237:6,
18 238:8,25 240:9
242:3,25 244:1,3,
5,6,12,15,18
245:12,18,20
247:14 248:8
257:14,23 263:1,
18 264:5 273:17
274:13 275:1
280:8

**foundation** 248:20
252:3

**fourth** 71:18

**frame** 15:11 256:1
257:3 258:3

**frequent** 58:15,18,
23 59:5,6

**frequently** 42:10,
23 43:10 60:16

**front** 9:18 44:13
61:7,13 94:15
189:20 230:3
234:19 262:4
273:13 275:19

**frozen** 278:3

**fulfill** 14:2,15

**fulfilling** 16:11,12,
18 17:14,15 18:25
19:15

**full** 13:18 43:5
54:9 57:22 63:12
70:14 101:16
251:11 256:3

**full-time** 20:2,21
167:21

**fully** 10:18,24
13:13 50:11 97:5

**future** 10:20
283:24

## G

**gain** 13:18

**gave** 26:17 76:3,9
81:7 82:23 95:17
280:20 283:16
284:11

**GEN.20318** 204:7

**GEN.20318.** 210:9

**general** 42:9
106:19 195:10
202:16,18,21,24
203:1,6,8,10,12
209:4

**generally** 276:12
279:3

**give** 35:4 77:7
93:10 124:24
140:17 169:7
188:14 254:3
258:19

**Glinn** 9:23 10:9,17
11:1 13:4,8 14:4
15:18 19:25
20:12,20 25:13
27:13,19 28:5
36:18 44:21,24
45:5,16 54:10,19
56:5,10,18 57:14,
17,21 58:5,15,22
60:17 61:9 67:5
91:21,25 92:13,18
124:21 125:10
126:5 130:16
131:25 134:8
135:24 139:17
142:25 143:25
144:4 157:5,9
158:6,14 160:23,
25 161:6 168:18
174:24 175:20,22
178:9 182:12
186:10,12,13,22
187:6,10,14,24
189:23 191:10,21
194:16,22,25
205:9 207:10,13,
18,24 209:1,24
210:16 211:14
213:19,22 225:9,
23 226:24 230:5
258:6,12,18
260:6,16 261:7
273:3

**Glinn's** 36:24 54:8
55:8 57:2 124:21
138:8 191:14
207:7 216:17

**good** 127:1 128:21
130:25 185:8
218:11 219:25
220:19

**gosh** 103:19

**Gotcha** 67:20

**government** 47:12
50:22 51:18

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 91 of 111
PageID #: 1649
Dominique Delaghe, 2024
Index: government's..implementation

52:18,21

**government's** 49:9

**granular** 159:4,7 160:17

**graph** 214:3

**graphical** 93:10 192:10 194:14 205:12,15,17 206:1,4,17 209:11

**great** 50:6

**guess** 57:13 59:19 110:21 111:24 203:9 268:15 269:9,25

**guidelines** 268:3

---

**H**

**hair** 12:8 22:14,17 24:22 38:15 55:10,15,17 56:8 72:19,24 264:17 265:6 277:4,6

**half** 141:17 165:6

**hand** 201:9 259:1 262:6

**handed** 33:3 36:14 66:8 91:18 104:13 110:3 174:20 194:24 200:10,15 201:12 219:12 225:20 259:1

**handing** 66:5 75:25 76:1 103:21 124:18 150:15 175:8 219:8 226:18 254:6 272:20

**handle** 267:21,22

**handwriting** 207:8

**handwritten** 201:18 218:10,12

**hang** 275:15

**happen** 54:15

**happened** 28:19 29:2 42:23 43:10 68:24 77:8 78:6 82:8,9 88:12,15, 16 102:25 106:22 141:4,9,13 159:9 163:15 183:17 212:13 234:4,9 248:17 258:25

**happy** 18:15

**hard** 181:22 268:6

**hate** 245:25

**he'll** 177:17

**head** 141:22 148:23 164:14 167:13 182:8 208:24 233:1,9 265:20,22

**headed** 175:9 243:19

**heading** 201:13

**heads** 143:12 281:8

**Health** 31:11 111:3

**hear** 119:9 121:13 217:18

**heard** 189:12 199:18 251:11

**hearing** 249:22

**Heet** 6:4,18

**held** 6:16 36:10 74:22 75:23 104:10 158:22 184:14 189:15,18

**helping** 11:3,5

**Herzog** 18:11 94:17 95:1,11,16 96:23 97:10,15 98:5,19 99:9,25 103:3,23 117:18 123:16 124:5 154:12,19 246:1, 6,14,25 247:4,5

**Herzog's** 123:22

**hey** 16:23 19:15 144:7 145:15,24 146:1 147:13 232:6

**high** 128:6 129:7

**higher** 132:25 135:14

**highest** 72:22

**highlighted** 103:17

**highly** 250:9

**hire** 164:19

**hired** 20:6 153:1, 17 155:5 207:11, 14,17,22

**hiring** 207:25

**historic** 48:18 53:10

**historical** 39:12, 20 40:2 42:2,23 43:1,7,17,22 57:24 58:8,9 59:7, 9,14 60:11,14,16 65:10 71:15 72:4, 13 73:17 92:7,8, 14,15 272:3

**hold** 52:10 57:5,24 240:12

**holding** 180:10,11

**homestretch** 229:21

**honest** 116:5

**honestly** 95:13 167:17 169:25

**honesty** 45:10

**hoped** 208:9

**hopeless** 103:20

**hour** 60:20,21

**hours** 15:10 16:17 92:16 94:4

**human** 31:11 111:3 140:19,25

**hundred** 57:6

**hurt** 119:1

**hygiene** 276:15

**hypothetical** 116:10 133:24 142:17 251:2 262:19

---

**I**

**ice** 254:1

**ID** 202:22

**idea** 77:7 90:16 91:11 142:8 240:17

**identified** 230:17 255:3

**identify** 10:19 254:24

**ignoring** 204:15, 21,24 205:5 206:7 213:5

**illegal** 76:17

**imagine** 29:11

**implement** 185:17

**implementation** 62:15 221:19

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


**implementing** 222:3 223:17 224:20

**important** 75:2

**impressed** 122:14

**impression** 215:25

**improper** 59:8 60:16 147:24

**improperly** 74:5

**improve** 25:1,15 194:1

**improved** 193:14, 25

**improvement** 24:21 59:13 254:25

**improvements** 21:24 22:8

**in-house** 264:17 265:3,5

**inaccurate** 89:22 90:6,18,21 91:4 129:12 145:2 174:1 198:3,24

**inaccurately** 26:24

**inappropriate** 249:12

**incidents** 209:8

**include** 28:13 72:20 209:6 210:12 211:4,5 212:25

**included** 41:19 112:16 259:17 277:1

**includes** 12:14 38:19

**including** 69:3 126:14 273:18

**incomplete** 116:10 133:23 142:16 216:3 251:1

**inconsistency** 26:2,9

**incorporated** 216:22

**incorrect** 99:15 225:5 231:24 232:3

**incorrectly** 269:11

**incredibly** 232:2

**independent** 79:18,25 80:9,18 194:5 195:22 196:2 238:24

**index** 72:23

**indicating** 41:20 77:21

**individual** 140:15 145:11 148:20 169:17 171:2 201:3,6 203:10 271:19

**individual's** 170:19 171:3

**individually** 161:17 278:21

**individuals** 79:18 80:9 95:12 279:11,15,19,24

**industry** 57:23 58:3 135:10 255:4

**Info** 177:24

**information** 11:20 12:17 15:9,12 27:11 34:5 37:15 44:5,10 52:21

53:3,4,24 54:11, 18,24 71:11 92:6 104:21 108:7,8,9 116:8 143:14 145:3 149:3 155:3,12 168:3 179:18 182:22 190:17 191:18 214:5 226:2,17 258:24 278:1 283:17

**informed** 63:6 83:18,19 195:6

**infrequent** 40:4

**Ingham** 76:4

**initially** 166:12 221:7

**initiated** 125:10

**initiates** 219:20,23

**inquire** 194:22

**insisted** 71:13 72:17 117:24

**inspected** 166:12 216:9 264:4

**inspection** 87:20 102:7,15,22,24 149:4 153:3 160:12 164:20,23 165:3,20,23 166:2,3,7,8,13,15 167:2,6 175:1,5 176:4,13,20 177:10 180:24 181:4 184:22 193:16,17,19,20 194:3 195:8,14, 20,23 196:5 197:5,13 201:7 202:4,5,8 204:14 205:11 206:13 207:5 213:14 219:17 220:1,6 221:19 222:2,9

223:16 224:11,19 225:11 244:4,15, 18 245:15 247:13 248:8 258:2,9,15 259:9,22 263:19 275:11,12 278:7

**inspection-type** 219:2

**inspections** 102:3 113:6 165:14 244:1,6,12 245:4 254:23 257:9

**inspector** 200:18 202:12 204:4 214:25 227:6 235:16 278:2

**inspector's** 209:9 211:1

**inspectors** 201:9 203:14,17 206:20 207:4 210:16 212:3 213:3 217:8 220:8 223:10 224:12

**instance** 136:24

**instances** 40:16 41:2,18 58:13 69:2 140:18 141:20 144:20

**instructed** 265:16

**instrument** 64:19 213:25 214:1

**instruments** 214:3

**insufficient** 156:4

**integrate** 208:8

**integrity** 45:11

**intended** 46:18 127:15 134:3 139:3 254:25 274:21

**intent** 223:21



Case: 4:22-cv-00878-SHL   Doc. #: 106-29   Filed: 08/08/24   Page: 93 of 111
PageID #: 1091
Dominique Delagnes   July 09, 2024   Index: interaction..knowledgeable

**interaction** 135:1

**interest** 256:8

**interested** 105:10
111:8

**interference**
132:22

**interim** 165:3
174:25 175:5
176:4,20 180:24
181:3 184:22
193:16,17,19,20
194:3 202:4

**internal** 30:20
32:16 33:8 34:1,9
53:11 66:16,18
167:4 215:21
254:16

**interpret** 57:14
129:5

**interpretation**
119:14 278:11

**interrupt** 184:8

**introduce** 6:22

**introduced** 50:12

**investigate** 68:3,9,
17 70:2,13,25

**investigated**
21:16 50:11 221:7
237:5 241:8
242:2,24

**investigating**
108:14 228:11
238:10 239:2

**investigation**
47:11 48:1 49:18,
23 50:14 80:18
81:24 113:8,13,20
114:2,5,19 118:12
148:22 151:4
155:9 190:25
226:5,11,14

230:18 231:1
232:2,15 238:24
241:10,11 276:16

**Investigations**
9:20 36:19 226:22

**investment**
252:17

**involved** 90:11,18

**involvement**
189:11,13

**issue** 70:7 71:4
128:18 130:13,19
163:2 170:9,10
171:15 209:21

**issued** 99:10
278:16

**issues** 26:14
49:16 69:18 77:13
79:20 83:8 127:5,
22 128:25 129:10,
11

**item** 92:12,18
182:3 186:1
187:18 199:4
203:23 204:5
209:5 210:19
215:12 243:23
273:19

**items** 37:6,9,12,20
38:11 64:24,25
65:1,5,19 71:11
92:5 112:3 176:6,
8,11 177:7,8,17
178:19 179:4
181:7,11 182:3
183:8 191:22
203:14 209:4

---

**J**

**J.C.** 6:25 117:4

**January** 21:3,10
44:19 45:7 54:8,

25 55:8 57:2 61:9,
24 63:23 64:5
92:1 105:22,25
106:2,22 111:23
112:1 118:8
123:10 124:21,22,
23 125:9 133:5,8
152:19 196:17
273:2,9,10

**Jarrad** 103:23
126:7

**Jason** 18:11 94:17
103:23 123:16
246:1,6

**jeopardize** 268:21,
24

**job** 13:19 14:7,22
15:2,19 16:17
17:25 18:2,25
19:15,16 20:1
167:21

**jog** 33:11

**join** 123:19

**journal** 197:6
199:9

**judge** 12:16 94:18
95:17 96:6,9,23
97:11,16 98:6,19,
25 99:7,23,24
100:1,12 101:2
103:4,8 147:8
253:22

**judges** 73:25
117:18 118:6
152:15 153:12
247:20 250:23
251:18 253:6

**judgment** 173:14
174:5

**judicial** 11:22
262:3

**judiciary** 152:9

156:19

**July** 6:9 202:6
230:5 235:12,14
243:11,25 244:21

**jumping** 58:7

**June** 56:9 225:16,
22

**jury** 91:5 246:3,15

**jury's** 246:21

**Justice** 46:1 47:6,
11 48:13,22 49:16
50:7 54:5 114:22

**Justice's** 48:1
49:22

---

**K**

**keeping** 98:18
99:4 107:2,10,24
108:2

**kind** 12:1 18:19
26:11 59:18 159:2
167:6 194:18

**Klette** 53:22

**Klette's** 52:25
53:2

**knew** 20:20 75:8
76:12 78:6 80:8,
10 85:24 86:22
87:1 119:24
120:14 206:2,18,
19,20 261:14,20
283:9

**knowing** 63:21
79:25 86:19
142:7,10

**knowledge** 64:2
65:15 185:13,16
187:20 194:5

**knowledgeable**
157:3,11 187:14,

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


Case: 4:22-cv-00878-SHL   Doc. #: 106-29   Filed: 08/08/24   Page: 94 of 111
PageID #: 3812
Dominique Delagnes                                    July 09, 2024 Index: lab..lives

16,19,24 188:2,3,
5

## L

**lab** 112:10 113:10,
11,18 138:1
150:20 164:20
175:10,15,23
178:4 179:5,22
180:12,19,25
184:3 186:14
202:16,18,21,24
203:1,6,7,10,12
209:4 211:16,25
212:4 216:1 275:8

**lab's** 215:18

**labeled** 126:20,22

**laboratories**
135:12 156:6

**laboratory** 8:17
14:6 15:2 20:1
21:12 41:2 67:1,2,
6,7,9 68:14 69:11
74:22 87:19
107:5,19 114:11
115:5 152:14,19
153:23 154:22
155:17,24 167:22
170:9 187:3 196:7
200:17 203:8,24
204:1 207:10,14
210:21 214:21
219:2 220:9,21,
22,24 227:18
231:1,2 255:4
258:25 267:22
276:16

**laboratory's** 211:3

**lack** 17:2 196:22
200:9

**lacks** 248:19
252:2

**ladies** 126:6 144:5

**lady** 9:3 144:21

**large** 135:9 193:9

**larger** 137:24

**LAS** 15:11

**law** 6:17 171:4
199:9

**lawful** 7:9

**lawsuit** 48:24
49:23,25 59:18
91:7 148:10 170:7
279:16,19 280:18

**lawyer** 83:15

**lawyers** 9:2
199:12

**LC-MS/MS** 133:13,
19 134:14,15,22
157:18 192:24
215:19 216:18,21,
23,24 218:4,18

**leadership** 19:6

**Leading** 279:5,13,
25

**learn** 116:24
153:22 197:17

**learned** 15:7,9,14,
22 114:19,21
115:10 119:1
145:18 199:14

**learning** 99:8

**leave** 15:7 57:17
69:17,20 194:15
201:3,7

**leaving** 9:12

**led** 101:18

**left** 215:25

**legal** 6:19 49:11
52:8,13 174:9
197:6 246:18

**Lena** 33:5 36:18
91:20 189:22
219:13,25 225:23

**length** 148:9
255:23

**letter** 9:19 10:1,4,
9,10 12:24 17:10
23:15,18 25:10,19
26:10,15,18 27:3,
7,14,20 28:5 29:5
33:14,22 36:15,24
37:17 44:3,16,19,
23 45:7 53:5 54:8
55:5,8 57:2 61:8,
14,15,20 62:1,13,
21,25 63:4,19,23
64:4 65:6,17
71:10 78:11,23,24
91:19,25 98:11,14
145:23 154:13
189:21,24 191:23,
24 192:1 194:25
195:6 199:23
200:1,8,11 225:8,
21 226:1,19
227:2,17 228:21
229:1 230:3,10,12
231:16 232:12,13,
14,20 233:11
257:4 273:3

**letterhead** 9:20
33:4 36:16 91:20
94:17 225:21
226:20

**letting** 25:21

**Levey** 213:20

**Levey-jennings**
193:13 194:10
209:11 213:8,10,
21

**Lexitas** 6:20

**LGC** 55:16 56:6

**liable** 116:25

**lie** 244:16 246:4,7,
15

**lied** 249:24

**life** 271:22

**lifted** 234:11,13,14
235:22

**lifting** 230:13
264:3

**lightly** 135:20

**limit** 40:25

**limited** 12:20
34:13 169:16
170:16,18 199:12

**LIMS** 208:9

**lines** 39:1,10
126:19 274:14,19

**liquefied** 271:14

**liquid** 156:24

**list** 64:8 65:19
118:10 125:14,19
126:6,10 127:1
129:6 155:1 185:5
209:4 231:6
265:19 275:25

**listed** 102:1 106:2
177:7 211:2,9,20
217:21 231:15
276:24 277:4

**lists** 112:3 176:5
188:11 196:12
211:5

**literate** 245:22

**litigate** 59:22

**litigation** 126:20
143:9 167:23
170:3 282:20
283:16 284:9

**live** 50:21 110:18

**lives** 11:4,14

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



98:20

**loading** 145:19

**location** 277:14

**locked** 278:3

**lodge** 31:18 32:10, 20

**lodging** 35:24

**long** 13:8 48:22 60:18 93:24 147:22,24 224:4 229:16 256:15 273:16

**longer** 72:3,13

**looked** 19:20 28:1 61:14 74:23 78:8 125:2 137:2 139:19 140:16,20 143:19 145:1,17 177:1,2 182:23 185:6,11 281:3,9, 13

**lose** 88:13 120:17, 22

**lost** 169:21 229:18 243:16

**lot** 49:14 96:17 142:14 157:2 267:20 276:25

**Louis** 67:9 197:6 199:3,6,10 200:12

**Louisiana** 167:22

**love** 188:4

**low** 132:25 135:9

**lower** 32:5 40:25 102:23 163:1

**lowest** 41:1

**lunch** 117:11

**lying** 249:5 260:17

## M

**M.D.** 61:10 226:21 230:6

**Mack** 172:25 174:4

**macro** 192:6,8 193:8,10

**made** 25:1,15 26:14 46:15 48:10,15 58:2,7, 10 59:6,11 61:16 63:8 65:22 77:12 79:22 83:8 87:17 100:20,21 101:8 106:24 117:16 120:1,3,9 121:24 129:24 130:6 140:19 145:11 152:13 156:10 193:16 198:18 213:3 230:16 231:8 233:24 235:22 246:14 247:19,25 248:1, 12,24 250:15,21 251:18 253:5,6 262:13 264:19,20 276:8 279:23 280:4,17

**main** 277:23

**maintain** 148:19, 25 271:11

**maintained** 120:24 122:6 123:5

**maintains** 255:15

**major** 40:15 124:15 268:7

**make** 16:10 20:12, 14 31:2 47:1 59:12 72:6,8 147:22 212:19

222:3 232:7 234:2 241:25 256:23 274:8

**makes** 130:14

**making** 81:21 108:12 123:19 149:22,23 183:3 203:5 238:1 251:6 253:21 260:6 261:9

**maligning** 13:4,9, 16,23,25 14:13

**management** 203:25 258:19,21 259:3 261:16 262:10

**manipulation** 40:6 43:1,2 64:19

**manipulations** 43:3,5

**manual** 216:4

**March** 110:6,13 111:20 166:19 174:24 175:5,6 178:2,6 179:23 186:7,14,18 189:22,25 190:16 259:3

**marijuana** 25:2,4 132:9

**mark** 214:21,22

**marked** 36:15 66:5,9 76:1 91:19 103:22 104:14 110:4 124:18 150:15 174:20 175:8 194:24 201:12 204:7 214:19 219:8 225:20 226:18 254:7 259:2 272:21

**marketplace** 116:7,16

**Marshall** 8:24

**mass** 28:10 30:13 64:12 156:25

**match** 216:3

**materials** 54:4

**matter** 6:12 27:16 28:1 89:9,23

**Matthew** 143:1

**Mayor-oliver** 143:1

**MDHHS** 31:24 33:9 110:6,13 111:6 114:10 115:2 117:2,17 155:6

**meaning** 22:6 77:2 115:2 132:9 198:18 215:21

**means** 68:22,24 119:12 129:10 227:17 229:9

**meant** 128:2,4,13 130:19 139:17 158:7 179:5 191:8 206:21 228:1,2 229:1 274:18

**measures** 259:17, 18 260:19

**media** 196:24 197:9 199:3,13 200:10 211:23 215:4 233:18

**medical** 69:18

**medications** 132:24 135:8

**meet** 156:5

**meeting** 15:18 16:3 19:7,14

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


28:13 104:25
105:2 177:9
181:13 183:13,15

**meetings** 12:14
17:17

**member** 19:6

**memo** 33:4 94:16,
24 95:8,11 96:16
97:10 98:14
99:17,24 100:12
103:4,6 144:5,21

**memoranda** 83:14

**memorandum**
83:16

**memory** 125:4

**memos** 30:20
117:17

**mention** 22:6
25:12,14 75:14,19
78:3 80:20 81:11
84:13 85:18 87:5
95:22 96:6 101:1
103:8,12,13
106:15,21 112:4
113:8,12 114:4
139:21 151:3
241:7 277:14

**mentioned** 47:5,6
114:2 117:19
157:16 210:1
268:12,20 278:19

**mentions** 22:7

**menu** 277:5,7,9

**message** 66:11,13
67:18

**metabolite** 25:4
70:21

**method** 24:21
25:1,15 28:11

**methods** 101:9
209:12 215:20

**mic** 163:6 254:4

**MICH** 32:4 111:1

**Michael** 61:10
230:5

**Michele** 61:9 67:5
159:6

**Michelle** 9:23

**Michigan** 31:11
73:25 74:1 75:12,
20 76:4 81:10
85:11 88:20 89:7
94:19 96:24
100:23 104:15,22
111:2 114:13,14
115:10 117:16,18
136:1,3,12,18,19
137:22 139:7,22
145:14,16 150:22
153:2,5,17,18
162:10,25 198:3,
24 273:4,24

**Microsoft** 66:18

**middle** 114:16

**Mike** 203:22

**million** 47:12 48:2,
25 49:8 114:15
141:21

**mind** 268:9

**minor** 89:9,12,23,
24 90:11,19 91:13

**minus** 72:23

**minute** 82:4
124:24 125:3
166:23

**minutes** 28:13
60:22 148:1
150:11

**Miranda** 53:5,15

**misloaded** 145:12

**missing** 277:8

**Missouri** 6:15

**misspeak** 163:16

**misstates** 251:25

**mistake** 145:11

**mistakes** 10:19
97:6

**model** 215:23

**molecule** 135:10

**molecules** 132:25

**moment** 47:5
184:8 275:16

**monetary** 51:19,
24

**money** 48:23
49:14,24,25
119:13

**monitor** 16:10,19
17:9,13 221:14
223:15 224:18

**monitored** 17:22

**month** 111:19
153:10,22 168:11
178:22

**months** 7:24 21:3,
9 97:16 98:6 99:3,
9 213:25 255:19,
23,25 256:10

**morning** 117:15,
22 219:25 220:19

**morphine** 22:14,
16

**mother** 76:15

**motion** 76:15

**move** 32:25 59:1
74:11,14 122:20
181:23 205:17
249:2

**moved** 281:17

**moving** 205:15
208:3

**mud** 46:15

**Multiquant** 157:6,
16 158:4

**N**

**names** 30:17 89:3,
4 266:3,6 280:20

**needed** 37:15 65:2
182:4,18 191:18
192:12,23 193:13,
25 204:20 265:16
277:9 284:12

**negative** 71:21
72:8 82:19 85:7
93:17,20 132:21
133:2,22 134:14,
15,20,23 135:2,3
162:15 185:8

**negatives** 72:10

**neutral** 185:9

**news** 254:10,18

**Nichole** 66:22,24
67:18

**Nick** 7:2 34:18
173:19 188:16
258:8

**noncompliance**
196:11 220:13
221:25 223:11
224:13

**nondomestic**
171:13,18,22

**nonresponsive**
74:16

**nonroutine** 165:22
167:2 195:8 202:5
207:5 214:13
219:17



Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 97 of 111
PageID #: 1095
Dominique Delagnes                                                July 09, 2024    Index: notary..order

**notary** 6:5

**notation** 209:10

**notations** 204:10

**note** 211:1

**noted** 215:5

**notes** 175:18
176:3 180:25
201:19 202:4
219:2

**notice** 62:5,9

**notification** 211:3

**notified** 234:5

**notify** 26:25
211:19,24 276:15

**November** 9:23
10:5 21:22 24:19
25:11,24 27:7,14
28:6 37:2,3,4 42:7
63:6,7,16 96:10,
23 99:18 100:1,12
101:2,11 102:6,9
103:4 105:22
196:16 231:10,12

**number** 6:13
15:20 20:24 21:5,
6 22:16 24:16
29:22 31:7,18
32:4 34:22 35:4,5
41:13 47:23 55:9
66:6 92:18 93:4
103:25 111:1
140:17 141:16,24
156:3 159:10
174:22 175:11
180:13 183:1,5
184:3 189:23
196:20,22 197:3,
15,18 198:22
200:9,21 201:25
210:4,8 219:21
222:7 227:1
228:19 229:14
231:15 243:16

247:24 248:11,16
249:22,23 250:1,
21 251:17 259:7
273:16

**numbered** 189:25

**numbers** 202:23
210:8

**numeric** 129:8

**numerical** 205:12
209:11

**numerically**
127:4,21 128:24

**numerous** 250:1

## O

**oath** 251:16

**object** 29:18 48:4
49:3 50:9 51:22,
25 52:4 59:24
80:13 82:15 88:24
90:1 91:14 97:20
99:11 100:2
102:10 103:9
107:13 108:15,19
109:23 113:2
115:18,21 116:9
121:18 127:11,25
131:17 136:5
138:6 139:24
143:21 153:13
174:8 178:23
179:8 192:25
193:3 206:9
223:19 229:4
239:4,8 240:14,19
243:2 246:8,17
247:21 248:18
250:8,25 251:22
252:23 256:25
259:24 260:22
261:17 262:12
263:2,4 279:5,13,
25 283:12 284:5

**objecting** 107:15

**objection** 27:22
31:15,19 32:11,21
49:10 59:20 75:7
84:21 86:21 89:15
109:19 112:20
113:14,21 120:11
121:15 122:1,15,
18 128:11 129:14
132:15 133:23
134:24 142:16
147:23,24 151:9
152:1,23 155:18
156:13 163:23
164:8 179:24
199:25 249:2
253:7 260:11

**objections** 90:13
98:10 153:24
239:13

**obligated** 45:23
46:5 47:1

**observation** 128:5
129:6

**obtain** 41:2

**obtained** 30:20
169:12

**occasion** 103:5

**occupation** 7:17,
18 8:11

**occur** 68:15

**occurred** 68:13
195:14,20,23

**occurrences**
10:20

**October** 18:12
231:9

**off-cycle** 164:23

**off-year** 166:11

**off-years** 165:13
166:2

**objecting** 107:15

**offense** 249:21
250:7,13,24
251:13,20 252:14

**offer** 11:25

**office** 8:20,23

**officer** 7:20,22,24
8:1,6 12:16 77:2
211:17 212:1

**offices** 6:17

**official** 211:3

**officials** 30:21
74:1

**on-site** 20:2 153:2,
3 205:11

**ongoing** 226:12

**onsite** 16:2

**open** 9:13 116:5
120:18

**open-ended** 148:2

**operating** 7:20,22
8:6 77:2 211:16
212:1 217:4 218:4
274:11,24 276:22

**opinion** 42:24
45:23 46:6 87:3,4,
10

**opinions** 189:14

**opportunity** 147:2
157:22 224:4

**opposing** 168:22
169:1

**opposite** 18:19
19:1,5

**oral** 12:8 72:19
132:2,8 136:3,19,
22,23 137:7,21
139:7,22 277:4,7

**order** 174:12
260:19 272:25



**ordered** 55:16

**organization** 18:21 19:4 48:9 148:24 172:21

**original** 29:4 50:24 211:21

**originally** 131:24 270:19,23

**originals** 29:23

**out-and-out** 246:4

**outbrief** 220:3,5,8

**outline** 108:23 109:4

**outlined** 15:17,19 53:8 63:10,13 118:20 123:8 159:4 182:7 211:21 235:5 237:9

**overbroad** 97:23 116:10 151:9 152:24 156:13 163:23 164:9 247:22 253:8

**overcome** 11:5, 18,23

**oversight** 20:15, 19

**owns** 252:17

**P**

**P-E-A-T** 203:21,22

**p.m.** 25:24 117:13 158:20 184:12 229:23 230:1

**packages** 282:20 283:16 284:10

**packets** 143:9

**packs** 126:15

**Padilla** 133:10

**Padilla's** 134:17

**pages** 29:13,15,22 30:12 183:2 201:6 207:1,8 262:7,23 263:12 275:25

**paper** 97:23

**papers** 52:20 53:24

**paragraph** 10:17 11:2,10,11,12 12:25 13:3,4,6,8,9 21:21 22:5 24:25 37:17 40:6 45:6 54:9 57:22 62:14 157:17 199:4 235:12

**paragraphs** 35:3 259:8

**parameters** 157:7

**Parks** 103:24 110:24

**part** 20:15 30:17 51:4,8,13,15 59:12 81:24 97:25 105:5 115:15 133:17,19 134:10, 12 136:6 143:2 165:8,9,12,24 176:22 180:21 183:7,12,14 224:2,7 241:10 258:23

**part-time** 19:22 20:7

**participate** 12:17 105:7 220:9

**participated** 105:2

**participates** 12:12

**participation** 12:19

**parties** 6:22 30:19 188:22

**partner** 269:10,23

**Partners** 252:16

**partnership** 269:25

**parts** 50:25 160:17

**pass** 123:17

**past** 92:16 213:9, 11 266:25

**Pathologists** 9:22 33:5 36:17 53:13 61:8 69:5 80:25 200:17 201:14 225:22 226:20 227:5 230:4

**patient** 40:8 236:18

**patients** 21:14

**pattern** 196:21 197:19 222:13 231:17

**pay** 47:11 48:2,23 204:22

**paying** 205:5

**Peat** 203:20 204:14 206:2 220:2,12

**pending** 103:16 173:8 211:12 212:14

**people** 11:17,25 18:2 26:7 109:8 111:8 116:15,18 140:19 280:20 283:25

**percent** 41:12 45:20 48:16 57:6, 11,15,16 77:22 81:18,22 100:10, 14,18,24 101:4,6,

13,22 106:14,16 141:16,17 142:12 156:5 198:2,23

**percentage** 133:1 135:14 137:25

**perform** 165:15,17 166:1

**performance** 69:20 210:12 266:1

**performed** 38:14 55:10 164:22 165:16 194:3 227:13 228:4 277:5 280:5

**period** 255:17,18, 22 256:3,9 271:11

**perplexing** 44:24

**person** 119:10 157:5 177:12 187:25 188:16 245:23 281:14

**person's** 172:3

**personal** 45:11 238:22

**personally** 8:18

**personnel** 154:8 282:6,12

**pertinent** 228:15

**Phd** 9:24 61:10 230:6

**Philadelphia** 173:3

**philosophy** 99:5 107:3,10,25 108:3

**phone** 269:14

**phonetic** 143:1

**phrase** 137:10 138:6,7,8

888-893-3767    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com    California Firm Registration #179



Case: 4:22-cv-00878-SHL   Doc. #: 106-29   Filed: 08/08/24   Page: 99 of 111
PageID #: 1759
Dominique/Delagnes                        July 09, 2024   Index: picked..probation

**picked** 128:6

**picture** 159:9

**piece** 97:23

**place** 92:24 220:2 267:4

**placing** 65:7 71:10

**plaintiffs** 6:2,24 7:1,10 28:19 272:7 280:6 282:14

**plaintiffs'** 280:17

**plan** 71:23 93:7,8 276:15

**planning** 165:23 167:7

**played** 115:15

**Pleban** 6:25 34:24 36:3,6 60:20 75:22 85:6 94:2,5, 9 158:18 171:12, 25 173:17 254:3

**plenty** 69:2

**plot** 214:3

**plots** 209:11

**plural** 182:19

**point** 24:11,21 37:20 39:20 40:16 71:18 73:4 77:17 94:6 126:9 163:2 172:16 242:8,12, 16,23 271:20 274:8 278:20

**points** 26:14 41:13 62:25 63:1 78:8 237:23 242:22 254:20 259:18

**policies** 41:8 47:15 62:16

**policy** 38:8,19 39:7 40:17,22,25

**41**:12 71:20 72:5, 6,9,12 93:16,19 185:21 186:16 210:21 211:4,15 212:24

**poor** 25:7,17 40:7

**poorly** 248:3,6,7 257:13

**pop** 163:7

**Portillo** 33:6 34:22 35:1 36:18 37:5,8 38:18 40:16 44:20 91:20 189:22,24 219:13 220:18 224:10 225:23 226:1

**portion** 50:5 207:1

**pos** 71:3,7

**position** 51:12

**positive** 71:8,21 76:17,20 93:16,20 131:21 132:19 133:1,11,16 134:13,18 135:14 137:9 138:2,7 139:4 144:10,14, 20 162:14 185:8 196:21,24 197:20 220:15 222:15 225:1 231:17 236:16,17 241:17 248:7

**positives** 72:7,9 132:2,9 134:9 137:4,20,23 138:9,13,14,21, 22,25 139:6,8,18 142:9 144:4,8,9 145:3,7 148:17 150:3 162:7 223:9 232:11,18 236:4, 5,22 237:6,7,19 238:9,11 239:1

**240**:10 241:8 242:3,25 243:1 264:5,6

**possibly** 30:2,4

**practice** 39:24 40:17,21 92:24

**practices** 38:20 39:4,11 41:8 43:15 50:23 51:5, 7,10,16,21 52:19, 22 53:8,12 57:23 58:3 65:11 83:21 108:13,23 109:1, 6,9,12,13,17 170:11,13 249:7

**preceding** 223:5 267:18

**preclude** 160:24 161:23

**prefix** 32:4,5 111:1

**prematurely** 270:20

**prep** 26:2,9

**preparation** 200:25

**prepared** 150:21 175:20,22 176:16 179:6 180:21 187:9

**preparing** 35:19 165:22 185:2 192:6

**present** 186:22 187:6

**presentation** 110:18

**presentations** 117:15

**presented** 181:10, 11 183:8 205:12 220:24 283:24

**president** 94:18 250:3

**pretty** 13:8 19:1 127:1 128:21 162:22 186:9 246:1 284:25 285:4

**prevent** 10:20

**preventative** 209:7

**previous** 212:13 258:25

**previously** 138:1 154:16 251:5 272:21

**primary** 278:4

**principle** 45:15

**principles** 45:9

**printing** 6:6

**prior** 236:11 251:25

**proactively** 234:5

**probation** 11:21 12:16 61:21 62:6, 11 63:18 65:7 67:15 69:5 71:10 73:20 74:19 75:3, 6,16 76:13 87:6 95:24,25 96:3 106:23 107:8,23 108:10 111:23 112:5 115:11 117:20 118:8 119:2 120:18 121:4 123:10 124:3 151:4 165:7 167:3,7 196:5,17 220:25 221:13 223:14 224:17 230:13 232:25 233:16 234:11,22 235:7,15,22

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


236:24 243:10,25
264:2,3

**probationary**
255:17,18,22
256:9

**problem** 26:1 36:1

**problems** 25:21
69:22

**procedure** 217:4
218:5 277:13

**procedures** 28:11,
21 30:14 50:16
62:16 64:16 84:14
85:12 92:14,20
108:23 109:4,15
131:13 140:21
154:9 188:22
212:20 232:5
238:7,23 240:8
267:24 273:19
274:11,24 276:22

**proceed** 7:6

**proceeded** 172:15

**proceeding** 88:14,
18 89:21,23

**process** 12:12
50:16 59:13 159:4
208:10,16 216:20
231:24 235:5
241:11 268:4

**processes** 43:13
50:14 51:1,3
79:19 140:22
209:6 212:19
232:8 267:4,6,8

**processing**
265:10

**produce** 220:7
284:19,23 285:5

**produced** 7:9
28:18,25 31:5,9,
16,25 32:1,6,9,11

35:23 49:20 54:3,
4 89:4 149:20
218:15 284:25

**producing** 22:23

**profession** 45:10,
12

**proficiency** 14:8
37:21 38:4,14
55:15,17 56:6,9
65:9 66:2 69:4,7
72:18 73:13 93:6
191:1 204:6,16
205:2 206:14
213:6

**program** 55:17
110:5 192:24
195:3 200:17
203:25 208:10,16
209:5,21 227:6,
13,22 228:12

**Programs** 36:20
201:15 226:23

**progress** 221:15
223:15 224:18
230:17 235:17,23

**project** 208:8

**promoted** 7:24

**proper** 60:8 283:9
284:2

**properly** 68:3,9,17
70:2,12,25 105:15
265:17 282:15,24

**proposed** 22:14

**prosecutor** 83:16

**prosecutor's**
104:15,22 111:17
112:4

**prosecutors**
105:10 107:7,21
108:17 109:21
117:16 118:7

**prove** 32:12

**proved** 106:9

**provide** 11:15
12:3,17 17:20
21:14 26:13,19,22
27:1 71:13 72:12
121:24 122:3
124:12 155:1,3
160:12 168:2,5,21
170:4 205:8 234:3
254:20 258:24
265:8 278:1

**provided** 15:17
18:5 26:17 27:11
52:20 93:11,18
104:21 110:12
122:2 125:19,25
126:1 155:10,12
165:11 168:18,24
169:10,13 170:6,
25 172:8,9 177:15
226:16 254:17
282:3

**provider** 12:15

**providers** 21:14

**providing** 11:19
12:20 30:2 191:17
281:25 283:11,15

**PT** 38:14 55:9,10
190:22 207:13
209:15 210:11
213:10,15

**PTS** 209:17

**public** 6:5 73:22
107:22 233:18
249:6,24 250:2,22
251:18 253:5,23

**publication**
199:11 200:13
233:19

**publicly** 100:21
233:17

**published** 199:9
234:1

**pulled** 35:8,13
135:12 143:9
270:21,25 271:13
281:14

**pulling** 143:14

**purely** 49:23

**purpose** 221:13,
18 222:2 223:13,
15 224:17

**purposefully**
127:2

**purposes** 208:9

**pursue** 48:14,19
50:18 51:20

**pursued** 49:17

**put** 31:14 33:15
35:15 95:1 101:17
105:3,5 107:8,23
108:10 115:10
118:7 121:4
123:10 180:5
192:10 196:17
222:19 225:19
232:25 233:16
235:4 245:21
281:13 282:20

**putting** 87:6 105:7
106:22 138:15
143:2 193:8

---

## Q

**QC** 22:13,16
39:12,16 40:17
57:24 65:11
71:20,24 93:15,17
175:10,16,23
178:4 179:6,23
180:20,25 184:3
186:14 192:9,23
208:8 209:13,21



272:3

**QCS** 39:13,20 40:2
42:2,23 43:1,7,17,
22 48:18 58:8,9
59:7,10,14 60:11,
14,16 72:4,13
73:17 178:12
193:9 270:25
271:1 272:1

**QM** 209:5,21

**qualitative** 72:21

**quality** 14:7 15:21
16:15 21:13 38:19
39:16 40:22 59:13
64:12,22 71:16,
20,22 77:12 79:20
83:8 92:8,14
118:1 156:3
194:15 203:25
205:9 214:2
215:19 216:19,23,
24 218:4,18
236:10 267:23,24

**quantify** 88:11

**quantitation** 205:1
215:20

**quantitative** 38:10
93:5 204:5,16
206:14 209:14
213:5

**quantity** 38:10
131:6 255:2

**quarter** 208:11,15

**question** 9:2 17:4,
5,9,21 21:2,8,18
22:1,12 24:1,2
25:11,25 26:6,20
28:22 31:19 33:1
42:19 46:3,4,13,
21 51:14 56:25
58:4 59:2 60:17
63:24 74:8,16
78:19,21 81:4,19

82:17 84:6 90:8
91:7 98:1,4,24
102:20 103:15
107:6,20 108:2,4
113:25 115:9
116:13 118:19
120:21 121:11
124:8,14 130:16
131:25 134:3,5
136:6,19 137:16,
19 138:16 139:16
146:13,24 147:2,
12 148:3,12,21
158:6,9,10 163:25
170:22 179:16
180:17 183:19
191:4 192:4
194:16,20 196:1
200:4 211:11
212:14 217:17,18,
23 218:1 222:20,
23 223:1,4,5,20
229:7 234:15
238:15 239:12,16
243:5 245:7
248:10 249:16,17,
18,19 250:5,18
251:8,10,11
252:2,24 256:4,13
260:24 261:6
263:9 264:22,24
274:5 282:2,11,24
283:24

**questionable**
56:14,22 72:24

**questions** 7:12
10:12 17:20 20:24
27:9 30:10 95:6
157:2 188:7
254:18 272:15,16,
19 273:16 274:1
278:15 280:13,15
285:7

**quick** 158:19
159:20

**quickly** 27:16 28:2
284:25 285:4

**quote** 34:22 35:1
79:7,8 126:20

**quotes** 34:6 35:7,
9,13,15 83:18

**quoting** 83:17

---

## R

**raise** 102:16

**raised** 22:19 25:12
44:25 83:19 152:8
156:19

**rare** 58:13,14,16,
21 59:5,6 142:11

**rarely** 39:22,23
40:3 141:10,11

**rated** 72:24

**rating** 72:22

**re-** 140:1

**re-qc'd** 271:24

**re-report** 232:5

**re-reported** 271:2

**re-resulted** 141:23

**re-reviewed**
143:10

**reach** 234:2

**reached** 86:16

**read** 56:24 75:12,
17 87:3,4 89:3
94:25 95:4,16
98:2,4 104:5
124:24 128:5
179:19 190:7
193:17,19 194:8
212:7 216:14
223:4,6 225:9
242:16 244:11,13
267:16,18 275:22

**quickly** 27:16 28:2
285:8

**reading** 83:16
95:3,8 190:5,9
193:18 202:22
212:11 241:5
243:13

**reagent** 135:4,16
276:25

**real** 158:19 159:19

**realized** 270:24

**reanalyze** 232:4

**reason** 51:20
105:9 115:20,22
116:18 136:2
154:5 222:7 228:9
230:15 235:21
237:17 238:11,14,
15,24 239:6,16,
17,18 260:17
281:19 282:8,16
283:4

**reasonable**
188:15,21

**reasons** 48:19
120:9 121:24
122:4 264:3
267:2,14

**recall** 10:6 24:16
33:23 34:11 75:18
96:16 104:9 105:3
110:19,21 125:7,
17 151:18,21,22
164:18 165:19
166:21 167:17
183:10,12 185:1
186:20 187:2
190:6,9 192:13,19
193:12 195:16
197:8 203:18
207:24 247:9,15
255:13 279:7

**receive** 62:2
176:15,17,19

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**received** 21:12
31:10,24 32:3
33:8,9 50:8 111:2
142:2 190:10
199:23 200:6
220:22 227:8
228:16

**reclaim** 11:4,13

**recognize** 31:17
125:1

**recognized** 31:6

**recollect** 255:10

**recollection** 31:2
33:11 95:9 141:19
195:22 196:2
247:1

**recommendation**
182:15 193:15
217:19

**recommendations**
177:4 183:24
185:18 276:6,8

**recommended**
21:23 22:7

**recommends**
182:25

**record** 6:9 15:14
29:12 30:6 36:9,
11,13 61:2,5
75:24 81:16 89:6
94:11,14 104:11
117:8,10,13
143:18 158:18,21,
23,25 159:2,15
168:11 184:11,13,
15,18 189:16,19
199:3,6 200:12
201:25 219:21
227:1 229:23
230:1 233:7
248:14 251:12
259:6 275:9,14
277:22 285:11

**recording** 209:6

**records** 169:17,24
265:19,24 277:25
278:3

**recovered** 41:4

**recovery** 25:1,6,
16 215:22

**redacted** 89:5

**refer** 12:4 83:3,5
106:19

**reference** 162:6,9
221:8 227:25
228:18 229:14

**referenced** 53:23

**references** 29:14

**referred** 83:7
113:10 165:2
186:23 190:22
199:4 200:8
201:19 202:3
245:15 260:8,18
261:7

**referring** 52:25
54:2 78:24 80:3,7,
16 83:14 84:11
98:14 99:17,23,25
100:4,7 106:11
115:6 133:14
136:2 149:11
162:18 183:4
185:23 192:1,16
203:4 205:19
207:19 210:3
267:9

**refers** 28:9 162:13
176:4 181:3
191:21 210:20

**reflect** 280:24

**reflected** 183:8

**reflecting** 78:12

**refresh** 31:2 95:9

**recording** 209:6

125:4

**regard** 65:9,21,24
66:1 77:5 157:15
213:9

**regression** 43:6,
12 44:1 48:17
53:11 215:23

**regular** 165:12,14
168:10 170:5
244:1,6,12,15,18
245:3,14 247:13
248:8

**regularly** 169:5

**regulators** 251:19
253:6,23 254:24

**regulatory** 165:24
241:14

**reinjected** 271:13

**rejected** 236:3

**rejection** 277:19

**relate** 118:1,2,13
121:7 123:11
180:23

**related** 156:24
196:23 198:11
200:10 202:16
209:17 228:14
278:10

**relates** 106:4
134:9 197:14
214:18 215:9
218:25 219:2
230:21

**release** 16:23

**released** 71:21
72:7 93:17
270:20,23,24

**releases** 236:16

**releasing** 196:21
197:19 222:15
231:17 236:11

**relevant** 35:25

**reliability** 280:10

**rely** 158:6,14

**remediate** 260:20

**remediated**
259:13

**remediation**
259:17,18

**remedy** 259:18

**remember** 29:21
96:19 182:8
183:14,15,16,17,
18,20,21 190:11
264:23 273:20
278:17 280:19

**remotely** 183:11

**removal** 243:10,24

**removed** 220:25
235:15

**repeat** 10:15 97:25
134:5 217:23

**repeated** 196:21
197:19 231:16

**repeatedly** 117:23
119:7

**repeating** 222:13

**rephrase** 63:25
237:13 249:19
279:6 282:11

**report** 12:8 17:14
53:1,2 56:6,19
66:11,15 68:4,18
70:3,11 71:1
98:22 139:6,8,23
140:2,10,15,16,22
142:1,2 143:16
144:9,18 145:4
150:17,21 151:4
152:6 153:21
154:3 156:11,17
157:18 158:12



Case: 4:22-cv-00878-SHL   Doc. #: 106-29   Filed: 08/08/24   Page: 103 of 111
PageID #: 4691
Dominique Delagnes                July 09, 2024   Index: reported..results

159:18 161:4
162:5 175:1,5
180:20 181:18
183:25 184:3
185:9,12,14
186:11 187:8,24
189:4 193:20
199:15 200:18,19,
20 201:7,9 206:13
214:12 215:4
258:2,9,15 260:1,
3,13 261:24
262:2,8,22 263:12
271:17 275:8,12

**reported** 14:17
16:9 26:24 41:3
67:21 74:6 106:24
131:8 133:11,21
134:14,19,20,22
135:2 139:10
141:6,7 144:10,19
145:12 162:14,15
199:18 232:3
270:21

**reporter** 7:5 52:10
222:24 223:2

**reporter's** 6:17

**reporting** 40:25
70:6,18,20 71:2
131:14 215:15
216:2,21 220:14
225:1

**reports** 126:11
141:15 177:21
189:7 270:11
278:16 279:23

**represent** 6:22

**representation**
93:11 192:10
194:14 205:18
206:1 233:12

**representing** 6:24

**reprimand** 14:19

18:19 19:1,5

**reprimanded** 17:6,
23 18:3,8

**reputation** 116:8

**request** 31:10,23,
24 32:2,7 145:16
149:7,9,23 168:13
188:13 191:17
192:18

**requested** 27:12
91:22 92:1 192:17
283:1

**requests** 170:4

**require** 150:1
189:3,5

**required** 93:16
156:5 225:9

**requirement**
165:25 166:9
210:8,20 214:19
215:13 217:5
225:17 258:23

**requirements**
165:13 166:1
196:6 276:15

**requires** 71:20

**reran** 145:20

**reread** 140:2
222:22

**research** 148:18

**reserve** 188:13

**reserved** 6:7

**resigned** 17:11,18

**resolve** 27:7,10,20

**resolved** 21:17

**resolving** 27:15
28:1

**respect** 188:25
189:14 207:12

231:3 280:5

**respond** 90:25
138:12,18 147:15,
16,23 149:14,17
209:25 225:2

**responded** 15:13
22:12

**responding** 81:20

**response** 10:10
17:8 31:22 32:2
36:23 44:17 53:25
54:18,24 59:15
69:25 70:10 72:2,
11 73:7 92:19
93:4,12 124:22
191:17,24 201:15,
22 204:8 205:9,21
207:2 208:21
210:9 211:8,13
216:13,18 217:1
218:7 220:18
221:23 223:7,9
225:13 226:16
238:2 254:9

**responses** 40:7
207:3 220:22
225:10

**responsibilities**
14:2 16:11,18
18:25 19:16

**responsibility**
17:15 241:13

**responsible**
215:2,4

**responsive** 82:6,7

**rest** 74:15 160:9

**restart** 59:2

**restate** 134:1,7

**result** 14:8 26:23
38:10 56:15,22
68:22,23 72:24
75:14 88:14 99:21

129:12 130:5,10,
15 131:8,15,23
140:20,21 141:3
145:16,20 148:20
270:24,25

**result's** 141:5

**resulted** 140:25

**results** 11:3,16,19
12:8,21 16:23
22:14,17,23
23:20,23,24 24:8
37:22 38:5,10
41:3 45:19 47:17
48:16 49:17,21
50:15 52:21
55:15,18 56:9,14,
23 64:22 65:10
66:2 70:19 71:21
72:21 74:6,7
76:16,21 77:22
78:1 81:17,22
83:2 87:20 88:4,7
90:6,17 91:1
93:16 96:20 98:23
99:14 100:8,14,
18,24 101:13
102:2 105:11
106:14 108:1
112:12,24 119:8,
24 120:15 125:19,
25 127:3,9,21
128:17,24 129:7,
18 130:9,11
131:3,12,15
132:12 139:11
140:11,17,23
142:7,22 144:8,18
153:4 169:5 191:1
196:22,24 197:20
204:5,6,16 205:1,
12 206:14 207:13
209:14 210:11,14
213:5,6,15 214:2
215:12,14,15
216:21 220:15
222:15 225:1



Case: 4:22-cv-00878-SHL   Doc. #: 106-29   Filed: 08/08/24   Page: 104 of 111
PageID #: 1962
Dominique Delagnes
July 09, 2024 Index: retain..section

231:17,25 232:4,6
236:11,17 237:24
238:6 241:17
265:8 267:3
270:22 271:2
279:4,8 280:7
281:12 282:13
283:18,20 284:11

**retain** 29:6,23

**retaining** 29:9

**retention** 215:21

**retest** 162:14

**retract** 145:4

**retrained** 265:13,
15

**reveal** 120:2

**review** 14:8 20:8
41:14 54:11 64:22
95:14 125:18,20,
21 126:7,12
175:10,16,23
176:24 177:3
178:5 179:6,23
180:20 181:1
186:14 192:23
193:13 213:9
220:24 245:23
246:2 259:3,23
261:16 262:10
275:18 278:20,23
280:16,19,25
281:21,22,24
282:3,5,9 283:8,
17 284:1

**reviewed** 87:13
105:8 143:13
176:12 178:15
185:4 208:4
215:14 220:23
227:6,12 279:19
280:8 281:11,15
282:10,12,17,23

**reviewing** 29:16

30:1 178:12
283:20,25

**reviews** 14:8
15:16 16:15
258:19,22

**revise** 72:5

**revised** 71:20
93:15 217:13
218:3

**RFP** 149:13,16,21
150:1

**Richmond** 8:21,25

**Rick** 6:23 31:6
102:17 146:2,5,7,
9 149:21 249:8,14

**Rick's** 163:12

**Riley** 13:3,10
14:16 15:18 16:9
19:15,21 20:20
22:6,11,20 23:19
25:14,20 26:8
42:16 43:21 44:25
45:8 46:25 48:14
50:12 58:24,25
59:5 61:17 63:8
75:5,8 76:7 77:21
81:16 94:19 95:17
96:12 99:20
100:13,17 101:17
117:24 118:9
151:24 152:21
155:15 156:1
197:23 198:11,20
228:17 231:8

**Riley's** 20:12
24:14,19 42:4,22
64:3 73:10,21
74:20 78:7 79:1
80:1,11 81:1,6,13
82:11 87:7 97:12
99:1 106:12 107:9
108:11 112:6
115:11 123:9

198:1,23 221:10
228:23 229:2,10
230:22

**role** 13:13 15:23
20:2,13

**root** 10:19 65:9
66:1 68:3,9,11,16,
18,21 69:3,6 70:2,
25 184:4

**routine** 166:2,15

**RPR** 6:4

**rules** 150:1
188:20,25 189:14

**ruling** 87:17

**run** 57:25 156:4
167:16

**runs** 40:7 205:10

**S**

**sample** 40:8 133:9
267:22

**samples** 12:8
38:15 55:11 57:10
268:16

**sanction** 262:4

**Sarah** 44:25 50:12
94:19

**sat** 183:11

**satisfaction** 48:25
49:8

**satisfactorily**
259:13

**satisfactory**
57:11,12,15 69:22

**satisfied** 50:7
51:24

**satisfy** 51:18

**Saturday** 21:22

**schedule** 154:24

**Schwilke** 164:20
165:3,15,21
166:4,17 167:10
168:20 174:23
176:5 177:9
178:19 180:21
184:23 187:9,23
192:6,22 193:2,12
207:19,21

**Schwilke's** 172:4
176:20

**science** 137:15

**scientific** 49:20
52:20 53:24 58:4
204:9 209:10
237:24

**scientifically**
52:23 267:5

**scientist** 53:21
270:23

**scientists** 236:10

**screen** 133:1,13
134:10,20 135:14
138:22,25 139:4,9
144:14

**screened** 135:1
138:1

**screening** 135:5
219:3

**screens** 132:19

**scroll** 276:23

**search** 265:24
266:15

**Second-amended**
32:15,19 34:12,
20,21

**section** 42:3
156:20 157:17
158:7,11 159:5,
15,18 160:8,10

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 105 of 111
PageID #: 2123
Dominique Delagnes                                            July 09, 2024    Index: sections..sound

161:3 162:5,6
201:5 202:20
203:1,7,10,12
215:10,19,24

**sections**  203:4

**secured**  277:24
278:1,4

**security**  277:24
278:5

**segregated**
277:23

**select**  215:22

**selected**  125:20
126:2

**selection**  125:24

**self-inspection**
164:24 165:1,15,
16 166:3,5,13,14,
16,17 167:4

**self-inspections**
165:18

**self-report**  10:18
97:6

**send**  44:4,9 103:5
126:21 149:13,16,
21 179:18

**sentence**  19:19
24:24 27:14 43:5,
10 67:25 155:24
223:23,24 244:17,
20,22,25 245:2,8
248:3 255:1
257:7,14,16,17
274:5,6,16,18,23
276:14

**sentiment**  240:17

**September**  16:5
28:12

**services**  31:12
111:3 115:5 195:2

**set**  62:21,24 64:25
157:8 159:18
161:4 162:5
232:12 271:16,18
272:10 273:18
278:13

**sets**  39:12

**setting**  207:15

**settings**  12:11,18,
20

**settle**  48:10 60:6

**settled**  47:10,23,
24,25 50:3 173:9

**settlement**  50:6

**settling**  59:18

**Shannon**  125:11
161:16

**share**  95:11

**shared**  220:11
257:3

**she'd**  187:19

**she'll**  157:20
172:6 222:17

**sheet**  126:1
201:15 207:2
208:21 216:18

**sheets**  201:3
218:7 225:13

**shield**  262:17

**shifts**  215:20

**shipped**  29:5,6

**shocked**  247:24
248:11,16 250:21
251:17

**short**  61:3 66:11,
13 94:12 184:16
229:24 271:15

**shorthand**  6:4

**shortly**  188:10

**show**  16:22 31:1
33:17 37:21 41:17
50:15 87:20
140:19 147:8
233:10 242:10,12
258:11,12 262:14
278:2

**showed**  15:18
49:18 52:22 74:24
154:15 184:24
197:4,9 199:16
228:9 262:9

**shown**  38:9 91:1
93:5 273:22

**shows**  17:2 56:13
90:6 105:21 214:4
237:23

**sic**  72:21 75:6
169:13 204:8
250:2 269:17

**side**  47:24,25
168:22 169:1,12,
20 174:17 202:23

**sign**  285:9

**signature**  6:6

**signed**  9:23 36:18
44:20 61:9 178:9
179:7 189:22
191:13 195:1
230:5

**significant**  37:22
38:9 230:16
235:17,23 248:23

**similar**  166:7,25

**simply**  134:22
248:9,16

**sincere**  45:22 46:6

**single**  129:24
130:9

**sir**  163:7

**sit**  163:18,19
187:17 249:21
268:6

**site**  15:8 67:7
80:18 125:21
126:22 150:21
151:18,19,23
153:17,19 154:10,
13 155:4,8,13
177:13,15,16
178:20 183:10,12
197:5 199:16
201:7,10 211:15
212:3 215:5 277:2

**sitting**  31:17
275:19

**situation**  147:25

**slide**  104:15,23
110:4,5 111:17
112:4 113:9
234:20 235:21
236:23

**small**  50:5 132:25
141:24

**software**  157:7

**solid**  49:19

**SOP**  182:16 186:3,
5 211:9,21 212:5
215:19 216:19,23,
24 217:13 218:18
227:19,20,21
228:7,8 277:1,2,
20

**SOPS**  13:19 84:2,
10,11 85:15 86:10
182:4,18,25 183:4
216:11 227:18
228:6 267:7,9,11,
12 268:13,17
276:17

**sound**  23:24 49:19
50:17 51:5,7,10,
16,21 52:19 53:12

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Case: 4:22-cv-00878-SHL   Doc. #: 106-29   Filed: 08/08/24   Page: 106 of 111
PageID #: 2091
Dominique Delagnes
July 09, 2024 Index: sounds..strike

**sounds** 181:14
199:7

**source** 197:18

**speak** 157:19,20

**speaking** 54:6
77:23 147:23,24
161:12

**special** 220:1

**specific** 162:25
164:2 192:16
216:20 229:5
238:1 266:12

**specifically** 33:21
155:24 158:17
191:14 232:17
273:25 278:23

**specifics** 159:3,7

**specimen** 132:19
139:10 145:18
162:15 207:16
270:20 271:3,5,7,
20 278:4

**specimens** 135:14
136:12 137:24
139:14 141:17
144:10 145:10,13,
21,22 155:2 156:4
159:25 216:2
227:19,20 228:7,
8,11 236:11,18
267:21,23,25
268:18

**spectrometry**
28:10 30:13 64:12
156:25

**speculation** 27:23
49:4 50:10 52:1,5,
12 75:8 86:22
89:16 90:2 91:15
97:21 99:12 100:3
103:10 113:3
115:22 127:14
128:1,12 129:15

**131:18** 132:16
136:7 142:18
151:10 152:2,24
153:14,25 156:14
178:24 179:9,11
206:10 223:21
246:11,19

**spell** 269:10

**spelling** 270:4

**Spencer** 125:11

**spend** 13:2 190:13

**spends** 13:3,9

**spent** 15:10

**spoke** 159:22
284:10

**spoken** 272:6

**spring** 165:5

**St** 67:9 197:6
199:3,6,10 200:12

**staff** 66:3

**stand** 81:11
129:23 130:5,8,10
140:4,13,14
141:1,2,4 275:3
279:4 280:9

**standard** 6:10
72:23 83:22
135:10 217:4
218:4 274:11

**standards** 53:11
84:1,9,11,19 85:3,
4,15,19,23,25
86:2,7,8 211:22
215:22 231:2
255:5

**standing** 31:15
129:22,23 140:7,
8,9 274:24 276:22
278:16 279:1,7

**stands** 39:16

**stapled** 201:4

**start** 13:5 37:14
70:16 205:5
272:20

**started** 15:25
70:17 123:18
144:6

**starts** 35:5 126:5
235:12

**state** 7:13 21:22
22:25 74:1 87:9
98:12 100:23
114:13 115:10
150:21 153:2,5,17
226:7,9 230:25
251:16 273:24
274:21

**stated** 41:22,23,25
65:15 72:9 93:20
156:3 206:12
213:23 251:5
274:20,22 281:3
282:15

**statement** 10:23
13:24 14:1,14,16
20:5,12,15 23:10
40:13 41:11,24
55:22 68:12 79:23
106:8 120:20
186:15 198:23
200:13 212:13
221:23 223:10
236:19 246:14
248:2,4 253:22
255:11

**statements**
247:18,24 248:1,
12,23 249:22
250:22 251:7,17
252:20 253:2,5,16

**states** 6:14 10:17
15:21 19:25 24:25
37:19,25 38:2,18,
22,23 39:7 40:12,

16,25 47:12 54:10
55:14,18 57:3,21
62:13 91:25 92:19
97:4 112:9 135:25
195:12 211:14
220:18 227:4
235:14 244:14
254:23 257:23
259:9

**stating** 81:16
100:20

**status** 221:4

**stayed** 92:24

**step** 267:21

**steps** 220:20,21

**STIPULATED** 6:1

**stipulation** 160:24

**stood** 119:7,8

**stop** 58:7,10 59:6,
9,23 92:14 147:6
167:20 205:5
220:3 255:17

**stopped** 58:9
59:13 60:11,14
114:14,16 115:4
117:2

**stopping** 146:23

**storage** 277:14,
22,25 278:3,4

**Street** 8:24

**strengthen** 11:4,
14

**strike** 25:22 32:25
39:2 51:14 55:6
59:2 74:15 85:5
89:6 95:22 97:9
114:8 150:14
175:19 181:23
183:6 192:3
207:11 218:25
222:21 241:5

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Case: 4:22-cv-00878-SHL   Doc. #: 106-29   Filed: 08/08/24   Page: 107 of 111
PageID #: 2205
Dominique Delagnes                                    July 09, 2024 Index: struck..telling

249:3 280:3

**struck** 255:11

**subject** 9:12 75:9
94:19 115:24
125:14 127:16
133:25 174:25
193:5 223:22
239:10 240:21
244:22 245:2,8
251:3 276:16

**submission** 14:9
225:11

**submissions**
30:22 32:18
221:14 223:14
224:18

**submit** 37:6,7,9,19
55:9 65:20 71:19
72:5,16,17 191:5,
13 225:10

**submitted** 28:23
29:1,15,22 31:23
54:4,19,25 55:25
56:5 65:21 93:8
181:19 190:22
191:22 225:9,16
231:11

**submitting** 15:22

**subpoenaed**
169:4

**Subsequent**
152:11

**substance** 11:5,
18,24

**substantial** 127:4,
22 128:25

**substantiate**
63:21 127:10

**substantiated**
54:13,18,20,24
55:3 62:17,22
63:3,17 64:3

73:21 74:4,20
77:14,19,24
78:10,12 79:1,6,
10 80:2,11 81:1,7,
14 82:12,24 83:9,
11 87:8 97:13
99:2,4,14 103:7
106:25 107:9,24
108:11 112:7
115:12 118:10
221:13 222:2
223:13 224:16
231:21,22 273:17
275:2

**subtitle** 235:6

**successfully**
257:8

**suddenly** 114:10,
15

**sued** 172:2,12,14,
19

**sufficiently**
157:10

**suggest** 178:18
228:25 229:8

**suggested** 183:3

**suggesting** 127:8
184:6 265:13

**suggestions**
178:1

**suggests** 182:24

**Suite** 8:25

**summaries** 28:12
173:22

**summary** 21:15,
16 56:16 57:6
173:14,25 174:5
200:18 235:10
243:9,14,19,24
278:21

**summary's** 57:8

**summation** 176:6,
8 177:7 181:6,15,
16 182:3 186:23
200:19,20

**Sunday** 24:19
42:8

**supplemental**
188:13,23 226:17

**support** 18:5
208:7

**supported** 174:6

**supposed** 15:16
16:12 17:15 51:5,
10,16 164:24

**suppress** 76:16

**Supreme** 96:24

**surprised** 249:23
250:6

**surprising** 111:4

**survey** 191:1
209:17

**surveys** 38:11
209:15

**suspect** 20:18
32:3

**swear** 7:5

**sword** 262:17

**sworn** 7:9 273:23

**system** 15:12
66:19 201:8

**systematic** 209:21

---

**T**

**table** 56:24 57:13

**tabular** 205:11,14,
16,25 206:3

**taking** 31:14

**talk** 22:18 23:4
116:22 147:20
154:8 157:6,9
159:8,12 161:21
175:15

**talked** 17:17 22:13
44:23 84:10
117:15 159:22
160:2,3,20 162:10
212:10 218:22
222:25 253:4
261:8 270:9

**talking** 17:10,11
22:5 78:4 80:4,7
82:10 90:20
100:25 102:6,8
132:11 134:9
138:13 144:4
145:8 157:15
160:7 172:4
179:21 212:24
213:15 219:17
237:25 238:3,5,7,
19,23 241:12,15,
18 254:20 276:14
282:5 283:19

**talks** 57:10 78:11
177:16 182:24
185:20

**Tammie** 6:4,18

**targeted** 153:4

**team** 12:11,14
19:6 105:5,6
152:12 208:8
220:9

**Teams** 66:18

**tear** 22:22 23:20,
22 24:8

**Teasdale** 6:17

**technical** 194:18
195:2

**telling** 40:3 45:18
78:25 81:14 82:22



Case: 4:22-cv-00878-SHL    Doc. #: 106-29    Filed: 08/08/24    Page: 108 of 111
Page ID #: 19806
Dominique Delagnes    July 09, 2024 Index: temporary..time

85:17 98:24
107:7,21 123:8,14
149:18 151:21
235:20 238:8
260:20 261:11

**temporary** 234:22
235:7 277:14

**ten** 21:3,9

**term** 119:9 139:3
188:4

**terms** 161:2
195:10 196:23
210:22 211:2
214:20 225:13
276:4 277:17

**test** 11:3,15,19
12:7 14:8 16:23
23:19,23 24:8
26:23 37:21 47:17
48:15 49:17,21
56:9 70:18 72:24
74:6,7 76:16,21
77:22 81:17,22
83:2 87:20 88:17
89:13,22 90:6,17
91:1 96:20 98:22
99:14 101:9,12
105:11 106:13
108:1 112:12,24
119:8,24 120:15
125:19,25 126:11
128:17 129:7,12,
18 130:5,8,10
132:12,20,23
133:8,12,18
134:10,12,17,21,
22 137:4 140:10,
17,21 141:3,20
142:22 144:15,16,
18 145:15,20
153:3,4 169:5,17
170:10,16,17
191:1 204:6,16
206:15 213:6
216:21 220:15

225:1 231:24,25
232:3 236:11,17
241:17 265:8
267:3,4 270:22
271:2 279:4,8
280:7 281:12
282:13 283:18,20
284:11

**tested** 12:1 131:24
228:12 271:3,5,10
277:8

**testified** 10:14
46:1 76:7 91:10
95:18 148:15
169:10

**testify** 9:16 23:3
148:9 159:17
160:6 168:8 169:5
170:12,13 188:9,
12 189:3,5,7,12

**testifying** 9:8

**testimony** 47:2,4
75:12,20 76:3,10
77:15,20 79:4
81:8 82:10,12,13,
22 84:23 85:16
86:17,18 87:13,18
94:20,21 95:17,19
117:17 152:15
160:11 162:2,10,
11 165:11 168:12,
16,18,21,25
169:11 170:4,7,25
172:9,16 174:7,
15,18 198:1
251:25 273:20,23
274:1,9 275:2,3
278:17 279:7

**testing** 12:18,20
38:5,14 49:19
50:13,15,23,25
51:1,3,5,7,10,16,
21 52:19 55:15,
17,18 56:6 64:13
65:10 66:2 69:4,8

72:19 73:13 77:5
79:21 93:6 111:9
114:11 115:5
117:3 123:13,14
132:22 133:15
135:8,13,16 159:4
160:17 170:11,13
172:4 227:13
228:4 249:6
264:16,17 265:2,
4,6 267:6,8 268:3
271:1 277:4,5,6

**tests** 90:20 91:4
105:15 118:1,3,4,
14,15 121:5,7,8
123:12 125:18,20
126:2,10,11
127:9,24 129:24
130:23,24 131:3
132:3 133:3
136:19 137:7,21
139:7,22 140:7,25
141:21 144:22
170:19 198:2,23
205:2 213:9,11
236:20 267:1,14
268:21,24 278:11
279:18,23 280:5,
10,17 282:6,7,15,
24

**THC** 25:1,2,15
131:7,21 132:9

**therapy** 12:1

**thing** 135:11
146:23 159:16
160:6 171:11
187:20 201:6,11
211:20 217:16
236:1 277:16

**things** 9:12,14
26:19 43:4,20,21
81:25 124:4
160:20 183:23
188:23 189:12
264:14 265:14,17

268:20 269:2
276:4

**thinks** 262:4

**thought** 24:7
67:21 70:4 118:25
124:6 193:25
221:24 224:12
231:11 240:8
252:12,14 264:15

**thousands** 29:13,
15

**thread** 124:20
125:10

**threshold** 156:5

**tied** 268:13

**Tiffani** 133:10
134:17

**time** 6:10,11 15:11
16:10,19 17:12
18:24 33:14 36:8,
12 45:20 48:16
61:1,4 66:3,25
68:2,8,13,17 70:2,
12,24,25 73:22
75:6 76:12 77:13,
17,22 78:6 79:9
80:12 81:7,18,22
85:20 94:10,13
95:2,23 96:3
100:10,15,19,25
101:4,6,13,22
102:7 106:14,16
108:12 111:22
114:18,20,24
115:1,2,7 117:9,
12,23 118:4 120:1
121:10 122:19
123:4,16 130:21
138:10 158:20,24
163:2 167:22
170:12 176:16,25
184:12,17,25
188:17 190:14
197:11 199:21



Case: 4:22-cv-00878-SHL   Doc. #: 106-29   Filed: 08/08/24   Page: 109 of 111
PageID #: 1997
Dominique Delagnes                                    July 09, 2024
Index: timeline..under-

200:10 229:22,25
254:23 256:1
257:3 258:3
267:23 271:6,10,
12,15,20 273:16
285:10

**timeline** 105:18
111:16

**timely** 186:9

**times** 12:10 68:15
78:9 91:3 122:19
140:24 168:11
215:21 248:11,16
249:23 250:1,21
266:24

**title** 7:25 66:11
67:3 89:2

**titled** 200:16

**today** 43:13 82:13
84:24 85:16
117:22 187:17
188:18 255:16
272:15

**Today's** 6:9

**told** 19:17,21
25:20 29:2 33:10
43:20 45:21 46:4
61:20 63:15,22
65:16 72:3,15
73:3,8 74:1 77:17
81:13 82:25 83:9
84:24 85:11,13
86:2,13,20 96:23
97:12,21 98:19
99:2,9,20 101:21
102:9 109:8
115:12 116:2,4
117:23 121:1
122:9,12 124:5
138:4 139:20
151:8,14,16
152:21 153:5,10
155:15 156:9
159:16 162:7

174:4 192:22
193:12 196:14,15,
16 197:22 198:18,
19,21 199:20
210:16 216:25
230:12 231:24
236:3 240:7,9
241:18 246:5,6
258:6,13 260:16
264:15 280:20
281:6

**ton** 171:15

**tone** 212:8

**top** 13:2 57:22
70:16 141:22
148:22,23 164:14
167:13 182:8
202:19 203:7
208:24 210:8
233:1,9 265:20,22
266:23

**topic** 262:25
263:17

**total** 41:13 56:14
94:4 187:23

**totally** 118:3

**toxicologist** 158:3
162:2

**toxicologists**
161:11

**toxicology** 45:9
106:5

**track** 205:16
213:24 214:7
229:18 268:16,18

**tracked** 205:10,13
206:16,17

**tracking** 204:19
207:12 208:9

**training** 216:4,22

**transcribed** 6:5

**transcript** 76:2
77:1 273:4 275:4

**transcripts**
168:15,16

**transparency**
10:18,24 26:11,
13,21,22 27:1,4
97:6 98:19 99:5
107:3,11,25 108:3
256:8

**transparent** 108:7
115:14 116:6,15,
17,19,23,25
118:16 122:13,14
124:2 233:21

**tray** 145:11,12,19

**treat** 135:20

**treatment** 11:20
12:2,3,11,13,15

**tremendous** 251:6

**trend** 204:7
213:17 214:5

**trends** 204:5,15,
19,21,24 205:1
206:8,14,22
207:13 209:12,13,
14 213:10,24
214:4,7

**trial** 148:9 152:15
159:12,17 160:7
161:6 172:18
188:9,10

**true** 10:23 20:5
43:22 68:7 86:5,6,
13 130:3,4 159:15
199:1 220:14
221:25 223:12
224:14 229:3
237:8,10,20 242:4
248:9 253:5,16
255:23

**trust** 112:11

**trusted** 115:16

**truth** 85:17 261:11

**turn** 76:23 105:17

**turned** 35:25

**two-day** 19:7

**tying** 147:9

**type** 149:4 255:2

**typed** 202:3
218:14

**types** 207:16

**typical** 135:3

**typically** 124:15
266:21

**typo** 105:24
111:25

**U**

**UDC-A** 190:22
191:1 209:17

**Uh-huh** 18:13 19:9
24:12 42:6 47:7
53:16 54:22
119:11 129:25
133:6 144:25
152:7 168:4
250:19 263:23
269:24 270:12
282:4

**umbrella** 265:9

**umpteen** 91:3

**unacceptable**
37:22 38:4,19
39:4,11,24 55:19
56:10,21 64:12
191:1

**unavailable**
160:23

**under-** 52:2



**undergo** 260:19

**underlined** 43:24, 25

**underlying** 35:7

**understand** 9:5 30:7 47:22 51:12 52:3,6,14 63:24 113:24 120:3 129:20,22 137:11 138:8 141:11 143:15 147:8 149:10 155:7 158:9 169:6 172:6 178:16 179:14 200:3 206:18 227:17 234:15 251:9,15 253:9 256:19,20 263:8 283:2

**understanding** 13:19 17:3 40:8 161:5 171:4 259:21 262:24 279:10,15

**understood** 128:3 191:9 223:10 224:25 262:9 263:17

**unexpected** 68:22

**unique** 136:1

**unit** 202:20 203:1 215:10

**unite** 11:4,14

**United** 6:13 47:11

**universe** 199:12

**unlike** 97:5

**unquote** 83:22 126:20

**unsatisfactory** 56:15,22 57:16 72:25 210:14

**unstable** 41:20

**unsubstantiated** 74:3 96:12 97:1, 18 98:8

**untrue** 154:5

**update** 110:6,13 140:21 141:3 182:25 216:11 231:25 232:5 277:9

**updated** 74:7 92:23 93:19 131:5 141:5,23,25 145:20 205:8 208:3 211:24 212:5 216:19 270:22 277:17

**updates** 183:3

**updating** 108:22 109:4,13,15 182:15 217:3

**upheld** 173:18

**urinary** 204:8

**urine** 72:19 135:25

**use/agreement** 214:20

___

**V**

**vague** 113:3 116:9 164:9 167:17 263:6

**valid** 48:19 52:23 53:12 236:10,17, 20 237:23 267:5 270:25

**validate** 196:6

**validation** 28:12

**values** 41:4 129:8

**variations** 215:21

**verbiage** 276:17, 21 277:2

**verbs** 244:20 245:10

**verified** 43:14

**verify** 127:13,24 128:9,14 221:19 223:16 224:19

**version** 218:15 234:4

**versions** 177:25

**versus** 172:25 180:9

**Vice** 233:25 254:9, 18

**vice.com** 233:4

**video-recorded** 6:11

**view** 26:21 27:4 42:22 52:17 227:16 233:22 236:3 238:5,22

**vile** 271:12

**vilifies** 45:7

**violated** 41:17

**violating** 45:10 47:15

**violation** 47:21 49:25 65:2

**violations** 212:17

**Virginia** 8:21,25

**visit** 126:16 150:21 152:11 153:8,11 154:13

**voice** 102:16 212:8,12

**voices** 102:23

**volume** 169:13

**voluntarily** 60:10, 13

___

**W**

**Wagner** 80:17,20 87:18,23,25 88:9 103:23 106:4 114:2 125:15,17 126:7,12 127:8 130:22 131:3,13, 16 135:19 136:9, 11 137:3,20 138:5 139:5,20,21 151:2,14 154:8 156:18 157:4 158:7,11 159:18 161:8 162:5

**Wagner's** 125:24 131:22 150:17 152:6 161:3

**Wait** 80:5

**waiting** 121:13

**wanted** 37:11 67:21 70:19 72:6, 8,16 93:10,13,15 125:18 190:20,21 191:5,12 192:15 206:15 214:6 216:11 217:19 219:25

**water** 133:9 134:18

**website** 74:24 233:4 277:10

**week** 16:17 78:25 152:12 178:12 219:16 224:11

**week-and-a-half** 133:9 178:6

**weekly** 14:7 15:16, 21 16:15 17:16 175:10,16,23

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


178:4 179:6,23
180:20,25 184:3
186:14 208:4

**weeks** 14:20 15:7
18:9,23 34:10
77:11

**weight** 88:1,9

**welcoming** 18:22
19:6

**well-documented**
145:9 146:15

**well-written**
244:24

**West** 8:24

**Whew** 67:20

**whomever** 161:8
220:8

**widely** 55:17

**withheld** 108:9

**withholding**
108:7,8

**woman** 88:13
89:13,21 90:10,17
91:12

**word** 30:15,17
31:14 79:14 137:9
138:24 256:6,12,
17 257:4

**worded** 244:8

**words** 26:4 28:4
46:8 72:8 101:3
138:9 204:23
205:3 240:11,17
241:2,6,23,24
242:1,6,8,10,16,
23 243:6

**work** 8:16,18,20
50:5

**worked** 67:8

**working** 17:13
45:1 68:23 208:8

**works** 8:17 111:6

**worried** 70:4

**worries** 67:22

**write** 66:6 143:11
193:8 281:1,20
282:8,16,25 284:3

**writes** 17:3

**writing** 95:16
180:3

**written** 23:16
64:16 72:9 84:15
85:13 86:10 92:23
93:23 96:9 101:16
125:3 143:16
194:2 210:21
211:4 237:21
244:17 248:3,6,7
257:13 273:19
276:4 277:13

**wrong** 32:12 45:19
48:16 59:22 60:4
77:22 78:2 81:17,
22 83:2 88:4,7
89:13 100:10,14,
18,24 101:3,13
106:14,16 112:24
129:19 232:6
243:12 252:13
265:14 270:4

**wrote** 97:10 98:25
100:1 101:11
154:2 183:23
186:10,13 219:24
223:24 224:3,7,
11,15 246:1,25

---

**Y**

**year** 67:14 114:9
141:21 165:23
166:1 258:25

271:18

**year-and-a-half**
167:24

**years** 148:23
164:23 190:12
233:15 249:6
271:16

**yes-or-no** 108:4
146:12,24 147:11
238:15 239:11

**yesterday** 9:8
10:3,13 18:10
19:21 43:11,20
44:10,24 45:21
46:4,7,24 61:14
96:14 201:1
265:11 270:9

**York** 269:21

**you-all** 35:24

---

**Z**

**Zebelman** 33:5
197:9 199:16
203:18 204:14
206:2 220:2,12

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

