IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KATARZYNA FOULGER, *et al.*, | |
| Plaintiffs, | 4:22-cv-00878-SHL |
| vs. | |
| AVERTEST, LLC, d/b/a AVERHEALTH, | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SANCTIONS** |
| Defendant. | |

Plaintiffs accuse Defendant Avertest, LLC, d/b/a Averhealth ("Averhealth") of negligently processing their drug tests, resulting in them receiving false positives and suffering devastating real-life consequences. Plaintiffs seek sanctions against Averhealth for losing a hair sample and destroying other discoverable documents, including chain of custody information and lab analyses. (ECF 106.) Averhealth concedes it lost the hair sample and that some documents to be destroyed in accordance with its document retention policies but argues this did not occur in bad faith and did not prejudice Plaintiffs anyway. The Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Sanctions. Sanctions of some sort will be imposed for Averhealth's loss of Plaintiff Katarzyna Foulger's hair sample but not for the loss or destruction of other documents and information.

**I.     BACKGROUND.**

*A.  Plaintiffs' Lawsuit Against Averhealth.*

The eight Plaintiffs are residents of three states: Arizona (Katarzyna Foulger), Massachusetts (David Shnitzer and Nicole White), and Michigan (Tiffani Padilla, Stephen Padilla, Randi Hekkema, Joseph Hekkema, and Alexandra Hodor). (ECF 23, ¶¶ 16–23.) All eight were required to submit to drug testing performed by Averhealth in connection with child custody proceedings in their home states. (Id., ¶¶ 1, 278, 313, 325, 351, 377, 398.) Plaintiffs allege that, due to Averhealth's negligence, the drug tests sometimes came back positive even though Plaintiffs had not used drugs at or near the time of the tests. (E.g., id., ¶¶ 285, 315, 333–35, 363, 369, 380–81, 400–01.)

Plaintiffs provided samples for the drug tests in their respective home states of Arizona, Massachusetts, and Michigan. (E.g., id., ¶¶ 281, 314, 340, 362, 398.) They allege that they suffered injuries as a result of the positive drug tests, including, e.g., loss of custody of their children, emotional distress, and lost employment opportunities. (E.g., id., ¶¶ 349–50, 363–64, 375–76, 396–97, 408–411.) All eight Plaintiffs bring claims for common law negligence under the laws of their respective home states. (Id., ¶¶ 412–18, 477–83, 500–541.) In addition, Plaintiffs who reside in Massachusetts and Arizona bring claims under those states' consumer protection statutes. (Id., ¶¶ 419–69, 484–499, 542–557.) Finally, the Arizona resident, Foulger, also brings a breach of contract claim. (Id., ¶¶ 470–76.) All eight Plaintiffs allege that the events giving rise to their claims occurred in their home states and Missouri, where Averhealth's laboratory is located and the samples were processed. (Id., ¶¶ 27–28.)

The Second Amended Complaint alleges various problems with Averhealth's testing services, including, *inter alia*, failure to follow accepted testing protocols (id., ¶ 71), use of inadequate quality control practices (id., ¶ 75), use of improper calibration curves (id., ¶ 82), and manipulation of data (id., ¶ 85). These allegations are based largely on information from Dr. Sarah Riley, who worked for Averhealth in 2020 until resigning due to concerns about Averhealth's practices. (Id., ¶¶ 72–74.) According to Dr. Riley, "as many as 30 percent of the laboratory results that Averhealth did for the State of Michigan were false." (Id., ¶ 87.) The Second Amended Complaint goes into extensive detail regarding an investigation in the State of Michigan arising out of Dr. Riley's allegations. (Id., ¶¶ 121–277.)

Averhealth moved to dismiss the Second Amended Complaint on various grounds. (ECF 26.) The Court denied Averhealth's motion in July 2023. (ECF 60.) Since then, both parties have filed motions to compel relating to documents and mental health examinations. (ECF 63; ECF 66; ECF 68; ECF 72; ECF 75.) The Court granted in part and denied in part those requests in two separate Orders and, in one instance, granted Plaintiffs' motion for attorney's fees upon finding Averhealth's discovery position to be unjustified. (ECF 73; ECF 88.) Plaintiffs filed the instant motion for sanctions in August 2024, seeking default judgment or an adverse-inference instruction for what they allege was the intentional destruction of evidence. (ECF 106.)

B. *Averhealth's Handling of Evidence.*

Plaintiffs allege Averhealth destroyed three categories of information: (i) excess hair from Plaintiff Foulger's sole positive drug test on December 13, 2021; (ii) records of chain of custody

of several of Plaintiffs' test specimens; and (iii) the final analyses of several of Plaintiffs' drugs tests. (ECF 106.) During a hearing on Plaintiffs' motion, the parties provided additional information about the state of production. (ECF 118.) The parties' allegations, with the updated context from the hearing, are discussed below.

        1.   Plaintiff Foulger's hair sample.

In December 2021, the Superior Court of Maricopa County, Arizona, ordered Foulger to undergo drug testing by Averhealth in connection with her divorce proceeding. (ECF 23, ¶ 278.) Foulger provided a hair sample at Averhealth's Phoenix location on December 13, 2021. (Id., ¶¶ 279–80.) In January 2022, Averhealth informed Foulger her hair sample tested positive for cocaine, which Foulger denied ever using. (Id., ¶¶ 285, 288; see also ECF 106-25 ("Pl. Ex. X").) Foulger's test results stated that "[n]on-negative samples will be . . . stor[ed] for 365 days from the date of collection." (Pl. Ex. X, p. 2.) Additionally, Averhealth's contract with Maricopa County required it to maintain all positive test specimens for one year. (ECF 106-3 ("Pl. Ex. B"), p. 27.)

Foulger contacted Averhealth in January 2022 to obtain her hair sample and have it re-tested elsewhere, but she was informed by an Averhealth representative that the sample was destroyed. (ECF 106-26 ("Pl. Ex. Y").) At the time, one Averhealth employee explained to another that positive urine samples are retained, but "hair follicle screens are one and done" since "the hair is destroyed during the testing process." (Id.) As it turns out, however, the situation is more nuanced: only the root end of hair samples are tested because the hair shaft closest to the root represents the most recent point in time and therefore is the most reliable indicator of recent drug use. (ECF 112-2 ("Def. Ex. B"), ¶¶ 14–15.) But Averhealth retains any portion of the hair that remains after Averhealth pulverizes and liquifies the root end. (Id., ¶ 13; ECF 112-6 ("Def. Ex. F").)

Despite informing Foulger the hair sample was destroyed, Averhealth located the excess hair on July 11, 2023, and photographed it. (ECF 112, p. 11; ECF 112-11 ("Def. Ex. K").) Averhealth produced the photograph, but not the sample, to Plaintiffs on November 10, 2023. (ECF 112, p. 11.) Averhealth's counsel explained that to keep Foulger's sample safe, Averhealth employees put it in a secure location, one that was "so safe they forgot where it was." (Tr. 31–32.) The sample was Foulger's sole positive test with Averhealth, and it has not been located. (Tr. 32.) Averhealth denies that its spoilation prejudiced Foulger, however, because the non-root excess

3

only would have shown whether Foulger used drugs in the months or years prior to her positive drug test, which they argue is not probative of whether the original root test was accurate. (Tr. 33.)

      2.   Data Packs.

When Averhealth tests a specimen, it creates a one- or two-page laboratory report reflecting the test results. (Def. Ex. B, ¶ 3.) When requested, Averhealth also can prepare a "data pack" for a specimen that contains, *inter alia*, test results, chain-of-custody information, instrument data, and sometimes quality control logs and chromatographs. (Id., ¶¶ 8, 11; see, e.g., Pl. Ex. X.) This information is typically requested if a test will be used as evidence in court or someone challenges the test's accuracy or validity. (Def. Ex. B, ¶ 4.) Data packs are not automatically created for every tested specimen, nor would it be feasible to do so given the large number of tests Averhealth performs every year. (Id., ¶¶ 4, 9–10; Tr. 18.)

In response to Plaintiffs' discovery requests, Averhealth created and produced data packs for 118 specimens from Plaintiffs. (Tr. 18; ECF 115-1 ("Pl. Ex. HH"), ¶ 2.) However, seven of those data packs were missing the original analyses from the lab technicians who performed the testing at the time the samples were obtained and submitted to the laboratory. (Tr. 18, 20; ECF 106-27 ("Pl. Ex. Z"), p. 1.) Averhealth was later able to locate and produce two of those analyses, and thus only five remain unproduced. (Tr. 20; ECF 112, p. 8.) According to Averhealth, those five analyses are missing because some of the company's lab technicians saved their analyses to their local hard drives instead of uploading them to Averhealth's SharePoint system. (ECF 112-1 ("Def. Ex. A"), ¶¶ 26–27.)

Four of the five missing analyses are attributable to a single former Averhealth employee named Anthony Hall, who worked for the company from November 19, 2019, to July 1, 2021. (Def. Ex. A, ¶¶ 25, 27.) When Hall received and analyzed the four samples at issue—which belonged to Plaintiffs Joseph Hekkema, Randi Hekkema, Stephen Padilla, and Tiffani Padilla, respectively—he saved his analyses to his local hard drive but did not upload them to Averhealth's system. (Id., ¶ 27.) At the end of his employment in July 2021, Averhealth followed then-existing company policy by erasing Hall's hard drive in its entirety, including the analyses of the four samples. (Id., ¶ 29.) Thus, although Averhealth admits the information was destroyed sooner than it should have been under the two-year document retention policy, the destruction was accidental and not related to this lawsuit. Averhealth apparently has been unable to reproduce Hall's analyses in its entirety, although it has recreated the chromatographs "to reflect what they believe the remote

4

certifier may have done during the review process." (Pl. Ex. Z, p. 1.) Averhealth was able to recreate the chromatographs because only Hall's final analyses were wiped, not the raw data. (Tr. 22.)

Something similar happened with a fifth data pack that was collected in December 2019. (Tr. 24.) A second-level certifying technician did not save her batch analysis to Averhealth's system, and it was apparently not retained beyond the normal two-year documentation retention window. (Tr. 24.) However, the destruction of the document occurred well before this litigation commenced.

3. Chain of Custody Information.

When it collects each specimen, Averhealth creates chain of custody information showing, among other things the following: who collected the sample; when the sample was shipped to the laboratory; and who received it at the laboratory. However, in nineteen instances, the first date shown in the chain of custody materials produced by Averhealth during discovery did not match the collection date of the specimen, as summarized in this table from Plaintiffs' Brief:

| Exhibit | Plaintiff | Collection Date | First Date in Chain of Custody |
|---|---|---|---|
| E | Hodor | 11/22/2019 | 12/3/2019 |
| F | Hodor | 11/24/2019 | 12/3/2019 |
| G | Hodor | 12/18/2019 | 12/21/2019 |
| H | S. Padilla[4] | 12/19/2019 | 12/24/2019 |
| I | Hodor | 1/24/2020 | 1/30/2020 |
| J | Hodor | 2/13/2020 | 2/17/2020 |
| K | Hodor | 2/26/2020 | 2/27/2020 |
| L | Helmcke (R. Hekkema) | 7/21/2020 | 7/28/2020 |
| M | J. Hekkema | 7/21/2020 | 7/28/2020 |
| N | J. Hekkema | 8/10/2020 | 8/12/2020 |
| O | Helmcke (R. Hekkema) | 8/10/2020 | 8/12/2020 |
| P | Helmcke (R. Hekkema) | 8/14/2020 | 8/19/2020 |
| Q | T. Padilla[5] | 7/27/2021 | 7/29/2021 |
| R | S. Padilla | 8/31/2021 | 9/8/2021 |
| S | T. Padilla | 10/20/2021 | 10/27/2021 |
| T | S. Padilla | 10/28/2021 | 11/5/2021 |
| U | S. Padilla | 11/8/2021 | 11/10/2021 |
| V | T. Padilla | 11/8/2021 | 11/10/2021 |
| W | T. Padilla | 11/26/2021 | 11/30/2021 |

(ECF 106-1, p. 9; see also ECF 106-6–ECF 106-24 ("Pl. Exs. E–W").) It follows that some portion of the chain of custody information must have been lost or destroyed.

The first twelve of these nineteen tests occurred more than two years before Plaintiffs filed their lawsuit, which is important because at all relevant times Averhealth had a two-year document retention policy. (Tr. 25; Def. Ex. A, ¶ 8.) Meaning: the destruction of the chain-of-custody information happened before Averhealth knew there were claims against the company relating to the tests. Of the remaining seven tests, Averhealth was able to locate and produce chain of custody information for one of them. (Tr. 25; ECF 112, p. 9.) Accordingly, only six tests remain at issue, all relating to Plaintiffs Tiffani or Stephen Padilla. (Id.) Those six tests occurred less than two years before Plaintiffs filed suit,[1] and thus the destruction of the chain of custody information must have occurred before the expiration of the two-year period under Averhealth's document retention policy. (ECF 106-1, p. 9.)

Averhealth typically maintains chain of custody information electronically. (Def. Ex. A, ¶ 9.) However, it works with private partners and case workers who are sometimes responsible for collecting specimens. (Id., ¶ 11.) Some of these private partners and case workers do not maintain chain of custody information electronically, but rather use paper records that are sent to Averhealth's laboratory along with each specimen. (Id., ¶¶ 10–11, 14–15.) It appears that all nineteen specimens in Plaintiffs' table—including the six for Tiffani or Stephen Padilla that were destroyed in a manner inconsistent with Averhealth's document retention policy—were collected by a case worker or private partner, although the record is not totally clear on this. (Id., ¶¶ 11–13; Pl. Exs. R–W.) In any event, Averhealth makes no attempt to explain why the document retention policy was not followed with respect to the six samples for Tiffani and Stephen Padilla. Averhealth does, however, assert that the loss of the chain of custody information is not prejudicial because the company's lab technicians are forbidden from testing specimens that arrive in the laboratory without proper chain of custody information. (Def. Ex. A, ¶ 24; ECF 112-5 ("Def. Ex. E").) In other words, according to Averhealth, the chain of custody information must have existed at some point and adequately described the date and location of collection of the sample.

---

[1] Plaintiff Foulger filed her original Complaint on August 22, 2022. (ECF 1.) An Amended Complaint was filed on January 25, 2023, and included claims from the Padillas and others. (ECF 16.)

**II.    LEGAL STANDARDS.**

District courts have the authority to impose sanctions for discovery misconduct pursuant to Fed. R. Civ. P. 37 and as part of their inherent power. *See Anderson v. BNSF Rwy. Co.*, 681 F. Supp. 3d 899, 908 (S.D. Iowa 2023). Potential sanctions may include "entry of default judgment, an adverse inference jury instruction, exclusion of evidence, and the imposition of the prejudiced party's attorneys' fees or other monetary sanction." *Id.* at 910. "A spoliation-of-evidence sanction requires a finding of intentional destruction indicating a desire to suppress the truth." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007). "Intent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir. 2004).

**III.   LEGAL ANALYSIS.**

> A. *The Court Is Likely to Impose Sanctions for Averhealth's Loss of Plaintiff Foulger's Hair Sample, but the Record Is Not Developed Enough Yet to Determine Which Sanction.*

As it relates to the loss of Plaintiff Foulger's hair sample, the facts are egregious. Her one and only positive drug test arose out of Averhealth's analysis of that sample, which was partly (but not completely) destroyed during the testing process. Accordingly, Averhealth must have known the remaining portion of the sample would be a highly relevant piece of evidence; indeed, one reasonably might view it as the single most important piece of evidence in Foulger's case. Yet Averhealth lost it after the case was filed. For this reason alone, a sanction of some sort is likely appropriate. *See, e.g.*, *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993) ("We do not hesitate in determining that the findings in this case—a retained witness and counsel destroyed evidence that they knew or should have known was relevant to [pending] litigation—are sufficient for imposing sanctions.").

Averhealth's "explanation" for losing the hair sample is far from satisfying. Averhealth reports that employees put the sample in a location that was "so safe they forgot where it was." (Tr. 31–32.) This explanation is dubious on its face, but, even if one accepts it, it fails to explain why the employees did not simply turn the evidence over to counsel in the first place, as they should have done. Or, at minimum, the employees should have informed someone in writing where they were going to store the evidence, thus eliminating any risk that the hiding place would be "forgotten." In these circumstances, the Court is inclined to conclude that Averhealth acted in bad

faith in failing to retain the sample. *S. D. Wheat Growers Ass'n v. Chief Indus., Inc.*, 337 F. Supp. 3d 891, 914 (D. S.D. 2018) (finding bad faith despite party's argument that evidence was inadvertently lost or destroyed).

To make matters worse, this is not the first time Averhealth engaged in improper conduct relating to the hair sample. In January 2022, when Foulger reached out to Averhealth to obtain the sample to have it tested a second time, Averhealth employees falsely told her it had been destroyed. As it turns out, the sample had *not* been destroyed or lost. It is unclear from the existing record why Averhealth gave Foulger inaccurate information in January 2022, but the fact that this is the second instance of misconduct by Averhealth relating to the hair sample is nonetheless relevant to whether Averhealth acted in bad faith.

All the same, the Court does not have enough information to definitively conclude that Averhealth acted in bad faith. Eighth Circuit precedent contemplates that the Court will consider circumstantial evidence, witness testimony, witness motives, and other similar information in determining whether bad faith is present. *See, e.g.*, *Morris*, 373 F.3d at 902–03. The consideration of such a full range of information is particularly important when the Court is considering serious sanctions like an adverse inference instruction, which is appropriate only if the Court finds "intentional destruction indicating a desire to suppress the truth." *Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875, 879 (8th Cir. 2015). Here, there are too many gaps in the record to allow the Court to determine whether intentional destruction occurred.

For example, although Averhealth's Chief Executive Officer submitted an Affidavit to help explain the loss of Foulger's hair sample, the Affidavit merely states that "Averhealth laboratory staff located the remaining portion of [Foulger's] hair specimen," photographed it, and "placed the specimen in a safe place with the intent to preserve the specimen" before being unable to locate it "despite several exhaustive searches." (Def. Ex. A, ¶¶ 32–36.) The names of the "staff" are not provided, nor is there any indication as to how they located the sample in the first place, why they did not immediately turn it over to counsel once it was located, how it is possible that they later lost it, and what, exactly, they have done to try to find it since then. Without this information—and notwithstanding the fact that *indicia* of bad faith are unmistakably present—the Court cannot conclude once and for all that Averhealth intentionally destroyed evidence out of a desire to suppress the truth.

8

The Court will proceed as follows. At the Final Pretrial Conference, both sides should be prepared to present evidence and testimony on the issue of Foulger's lost hair sample. This evidence must include, at minimum, the identities of—and, preferably, testimony from—the laboratory staff who located the hair sample and later misplaced it, as well as all relevant communications regarding the hair sample. If any such communications have not yet been produced in discovery, Averhealth must produce them within **fourteen days** of this Order. If Averhealth asserts that any such communications are privileged, it must provide a privilege log **by the same deadline** identifying the date, sender(s), recipient(s), and general subject matter of each withheld communication.

The Court will not need the parties to present evidence at the Final Pretrial Conference regarding prejudice because the record is already sufficient on that issue to allow the Court to conclude that prejudice exists. Foulger's case revolves around her allegation that Averhealth returned a false positive test on her hair sample. By losing the remaining portion of that sample, Averhealth has undeniably prejudiced her by preventing her from testing it again and potentially yielding a different conclusion. This is a paradigmatic example of prejudice. *See Anderson*, 681 F. Supp. 3d at 914 (finding prejudice based on removal of evidence critical to plaintiff's ability to prove his case).

The Court is unpersuaded by Averhealth's attempts to minimize the significance of the lost hair sample. Averhealth argues that testing the non-root portion of Foulger's hair sample might not have resulted in a reliable indication of whether the root portion tested positive for cocaine. Averhealth supports this argument with an Affidavit from one of the company's toxicologists, Dr. Michele Glinn, who states that the "end of a long strand of hair may represent a time frame several months or years prior to the part of the hair shaft closest to the root" and that analyzing different sections of the strand "could yield different results due to the different time frames the growth represents." (Def. Ex. B, ¶ 15.) Parsing the language of Dr. Glinn's Affidavit reveals several problems.

First, Averhealth points to nothing in the record indicating how long Foulger's hair strand was, and thus it is unclear whether Dr. Glinn's statement about "long strand[s] of hair" is even relevant. Second, even if Foulger's strand was "long," Averhealth points to nothing in the record indicating that any further testing of that strand would have to occur at the extreme opposite end from the root—as opposed to, say, testing the part of the remaining strand that is closest to the

root. By Dr. Glinn's own logic, it appears that testing the part closest to the root would result in a more reliable comparison to the test Foulger contends was a false positive. <u>Third</u>, and similarly, Dr. Glinn's language is equivocal about the impact of testing a different portion of the strand. At most, she states that testing another portion of the strand "could" yield different results than testing the root. The converse also is apparently true: testing the other portions could yield the *same* result as testing the root. Meaning: if Foulger had the non-root portion tested and it came back negative, she could argue the root must have been negative as well and Averhealth bungled the testing process. By failing to preserve the remaining portion of the strand, Averhealth denied her this opportunity, thus causing Foulger considerable prejudice in her attempt to prove her case. *See Rattray v. Woodbury Cnty.*, 761 F. Supp. 2d 836, 847 (N.D. Iowa 2010) (finding prejudice where defendant destroyed the only recorded evidence of the incident in question).

<u>Fourth</u>, and relatedly, the fact that testing the non-root portion of the strand "could" yield different results than testing the root does not mean the non-root test results are irrelevant. Foulger's position is that she did not use drugs at any time near when Averhealth said her sample tested positive. If the non-root portion of her strand came back negative, it would indicate she was not using drugs in the weeks, months, or years prior to her positive test result; in turn, this would cast at least some doubt on the reliability of Averhealth's conclusion that she was using drugs at the exact time the root portion of her hair was tested. Again, however, Averhealth has denied her this opportunity and therefore caused substantial prejudice. *See id.* It follows that the Court does not need evidence on prejudice at the Final Pretrial Conference.

In terms of potential sanctions, all options are on the table. The Court is, however, leaning toward an adverse inference instruction if bad faith is established and a lesser sanction if it is not. Either way, the Court also likely will award attorney's fees to Foulger for the fees associated with the hearing and the portion of the Motion for Sanctions dedicated to the lost hair sample. And, of course, regardless of the sanction imposed, Foulger will have the opportunity to present evidence at trial regarding the lost hair sample and may argue any reasonable inferences flowing therefrom.

B.  The Court Will Not Impose Sanctions for the Lost Chain of Custody Information.

As it relates to the lost chain of custody information, it appears to be undisputed that there were originally nineteen specimens provided by Plaintiffs for which Averhealth was unable during discovery to produce complete chain of custody information. Averhealth was, however, able to produce *some* chain of custody information for those nineteen specimens, starting with the date of

10

their arrival at Averhealth's testing facility. The missing portion revolved around the original collection of those specimens, including the date and location of the collection and identity of the collector. Averhealth never fully explains the loss of this information, but it does imply that all nineteen specimens were originally collected by private partners or case workers who maintain chain of custody information through paper records instead of electronically.

The timing of the collection of the specimens is important. Of the nineteen with missing chain of custody information, twelve were collected more than two years prior to this lawsuit. Thus, the chain of custody information for those twelve specimens was presumably destroyed pursuant to Averhealth's two-year document retention policy and not for any reason related to hiding evidence. As Plaintiffs have not established any basis for the Court to conclude otherwise, there is no basis to impose sanctions as to the loss of chain of custody information for those twelve specimens.

Of the remaining seven specimens, Averhealth located chain of custody information for one of them after Plaintiffs' Motion for Sanctions was filed, thus reducing the number at issue to six. With respect to those six, the parties' briefs are essentially ships passing in the night. Plaintiffs focus on the importance of chain of custody records in the abstract and emphasize that the documents must have been destroyed after this lawsuit was filed. Averhealth, by contrast, asserts that its lab technicians would not have been permitted to test a specimen in the first place if it was not accompanied by adequate chain of custody information; thus, according to Averhealth, there is no prejudice to Plaintiffs from the loss of chain of custody information.

The Court concludes that sanctions are not appropriate for the loss of the chain of custody information. Although neither side says so explicitly, the Court infers that Averhealth was able to produce partial chain of custody information for all 118 specimens provided by Plaintiffs during the timeframe at issue in the case and full chain of custody information for ninety-nine of these specimens. It therefore does not appear that Averhealth engaged in any widespread effort to hide evidence, but rather simply failed to do a good enough job of keeping track of paper copies of chain of custody information in some circumstances. Moreover, unlike Foulger's hair sample, Plaintiffs have not given the Court any reason to believe the lost chain of custody information is crucial to their ability to prove their cases. In fact, if anything, the absence of that information may *help* their cases by: (a) making it harder for Averhealth to defend the validity of those tests; and (b) giving Plaintiffs an opportunity to argue that Averhealth is sloppy with the collection and/or

retention of information relating to test samples. Plaintiffs therefore have not made a sufficient showing of bad faith or prejudice to warrant sanctions. *See Koons v. Aventis Pharms., Inc.*, 367 F.3d 768, 780 (8th Cir. 2004) (affirming denial of sanctions where lost documents would not have helped parties' position).

> C. *The Court Will Not Impose Any Sanctions for the Five Data Packs With Missing Information.*

The record is also insufficient to justify sanctions with respect to the five data packs for which Averhealth was unable to produce complete information. The loss of that information occurred well before this lawsuit was filed and for reasons that appear to be unrelated to any desire on Averhealth's part to suppress unfavorable information. At most, the company simply did not have adequate policies and procedures in place to make sure: (a) potentially relevant information was not being stored on the local hard drives of Averhealth employees; and/or (b) those hard drives were not erased until all relevant information was recovered and preserved. Given that Averhealth apparently was able to produce complete data packs for 113 of the 118 specimens at issue, there is no basis for awarding sanctions based on the missing five. *See White v. United States*, 959 F.3d 328, 332–33 (8th Cir. 2020) (affirming refusal to impose sanctions where there was no evidence of bad faith and defendant deleted information pursuant to its standard procedures); *see also Merfeld v. Dometic Corp.*, 306 F. Supp. 3d 1070, 1085 (N.D. Iowa 2018) (declining to impose sanctions where evidence was destroyed due to miscommunication), *aff'd*, 940 F.3d 1017 (8th Cir. 2019). Plaintiffs may, of course, present evidence to the jury at trial about the missing information from the five data packs and argue reasonable inferences flowing therefrom.

## IV. CONCLUSION.

Plaintiffs' Motion for Sanctions (ECF 106) is GRANTED IN PART and DENIED IN PART. Sanctions likely will be imposed against Averhealth and in favor of Foulger with respect to the lost hair sample, pending presentation of evidence at the Final Pretrial Conference. Sanctions will not be imposed with respect to the missing chain of custody information and incomplete data packs.

**IT IS SO ORDERED.**

Dated: January 17, 2025.

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE